SUBMITTED *EX PARTE* AND UNDER SEAL

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| KEITH D. NELSON, | : | |
| Petitioner, | : | |
| vs. | : | 4:04-cv-8005(JFG) |
| UNITED STATES OF AMERICA, | : | |
| Respondent. | : | |

PETITIONER KEITH NELSON'S SEALED *EX PARTE* MOTION FOR
EXPERT AND INVESTIGATIVE ASSISTANCE

COMES NOW Petitioner Keith D. Nelson, by his undersigned counsel, and moves this Court for an order approving the appointment of two individuals – Michael Gelbort, Ph.D. and Jill Miller, MSSW – to provide expert and investigative assistance in this case.[1] The grounds for the motion are set forth in the following numbered paragraphs. Permission is also sought to maintain this motion as an *ex parte* filing and under seal.

[1]Dr. Gelbort is a clinical psychologist with a speciality in neuropsychology. Ms. Miller is a highly respected and sought after mitigation specialist with extensive experience in capital litigation in general and federal capital cases in particular. Their respective curricula vitae are filed herewith as attachments to this motion.

1. This is a motion for the appointment of two individuals to provide expert and investigative assistance in connection with this post-conviction challenge to Petitioner's sentence of death. The motion is brought pursuant to 21 U.S.C. § 848(q)(10)(B), and the guarantees of the Fifth, Sixth and Eighth Amendments to the United States Constitution. The motion discusses defense strategy, reveals privileged attorney-client conversations, discloses otherwise privileged conversations with Petitioner's trial counsel as well as an expert appointed to assist at the trial phase and, as such, contains privileged material and attorney work-product. Chapter VI of the Guidelines for Administration of the Criminal Justice Act ("CJA Guidelines") governs representation in federal capital cases, including habeas corpus cases challenging a sentence of death. Those Guidelines state that requests of this nature, as well as overall budget proposals, should be considered *ex parte* and under seal. *See* Guideline at § 6.02F, stating, "Courts are encouraged to require appointed counsel to submit (*ex parte*) a proposed initial litigation budget . . ." In May 1998, a sub-committee of the Committee on Defender Services of the Judicial Conference of the United States, chaired by Hon. James R. Spencer, U.S.D.J., released a report and recommendations on the cost and quality of defense representation in federal death penalty cases. *See*, FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (hereinafter cited as "Spencer Committee Report").[2] In discussing case

[2]The recommendations made in the Spencer Committee Report were adopted by the Judicial Conference of the United States on September 15, 1998. A copy of the Spencer Committee Report is available through the federal judiciary's web-site: www.uscourts.gov.

budgeting, the Spencer Committee Report recommended that such budgets "be submitted ex parte and maintained permanently under seal," observing that, "A case budget requires counsel to spell out the overall litigation plan for the case. Consequently, it is an extremely sensitive document and contains privileged information." Spencer Committee Report at p. 56. The same may be said of this application. Permission is therefore sought, pursuant to 21 U.S.C. § 848(q)(9), to submit this application *ex parte* and under seal of the Court.

2. In November 2001, Keith D. Nelson ("Petitioner") was sentenced to death in this Court. On direct appeal, the sentence of death was affirmed. *United States v. Nelson*, 347 F.3d 701 (8th Cir. 2003). On November 8, 2004, the United States Supreme Court denied Petitioner's *certiorari* petition. *Nelson v. United States*, 125 S.Ct. 486 (2004). On December 14, 2004, this Court, Hon. Fernando J. Gaitain, Jr., U.S.D.J., appointed Gary E. Brotherton, Esquire and David A. Ruhnke, Esquire, to represent Petitioner on a petition for *habeas corpus* to be brought pursuant to 28 U.S.C. § 2255. That petition must be filed on or before November 8, 2005.

3. By this application, undersigned counsel move for the appointment of two experts to assist counsel in investigating and assessing one aspect of the 2255 petition. In particular, it is likely that Petitioner's present counsel will file a petition that alleges, as one ground for relief, ineffective assistance of counsel in the investigation and preparation of Petitioner's penalty-phase case.[3]

---

[3] Since Petitioner entered a guilty plea, the only issue presented to the jury was penalty.

4. Petitioner's present counsel are engaged in an ongoing investigation and review of the entire circumstances of this case. That review shows that the mitigation investigation of the case was woefully incomplete at the time the case went to trial. Petitioner's review also shows that his trial counsel, despite having obtained authorization from the Court to have Petitioner examined by mental-health professionals, including a neuropsychologist, did not do so and, in fact, Petitioner was not evaluated by a mental health professional until October 2001, shortly before his trial was to begin.[4] Despite presenting with a history of head injuries and other difficulties, Petitioner was never evaluated for organic brain damage or other cognitive dysfunction. Petitioner was prepared to cooperate in that evaluation. Finally, the investigation conducted by Petitioner's present counsel also reveals that the decision by Petitioner to refuse to meet with the Government's chosen mental-health processionals came at the suggestion of trial counsel in an ill-conceived effort to create trial error and an appellate issue. This latter assertion has been confirmed by both Petitioner and trial counsel.

5. A review of the history of this case shows that Susan Hunt, Esquire, was the only attorney who represented Petitioner in the case from its beginnings. Immediately following Petitioner's arrest on October 17, 1999, he was represented by a "volunteer" retained attorney, Daniel L. Franco, who has since been disbarred. Thereafter, the Court

---

[4]The evaluation and testimony of Mark Cunningham, Ph.D., was limited to historical "risk factors" and whether Petitioner would present a danger if confined for ;life.

appointed the Federal Public Defender (effective October 21, 1999), Ms. Hunt (effective November 2, 1999), and William E. Shull, Esquire (effective November 2, 1999). Thereafter, the following occurred with regard to Petitioner's representation by counsel:

- Larry C. Pace, Esquire, of the Federal Public Defender, remained in the case for approximately 10 months. On July 28, 2000, Petitioner filed a motion to withdraw Mr. Pace as counsel. The motion was granted on August 21, 2000, although the actual order was apparently not entered until March 2, 2001.

- On September 6, 2000, Petitioner filed a notice with the Court that Mr. Franco had been discharged as attorney of record. An order withdrawing Mr. Franco was actually entered on March 2, 2001.

- With regard to Mr. Shull, an order was entered on November 14, 2000 denying Petitioner's request to withdraw Mr. Shull as counsel. (There does not appear to be a docket entry for the motion itself.) Thereafter, on February 20, 2001, an order was entered granting Mr. Shull's oral motion to withdraw as Petitioner's counsel.

- On the same date as Mr. Shull's withdrawal, February 20, 2001, Patrick Berrigan, Esquire was appointed as counsel to Petitioner.

Mr. Berrigan and Ms. Hunt ultimately served as Petitioners trial counsel. Petitioner's trial commenced approximately just nine months after Mr. Berrigan's entry into the case.

6. One side-effect of the numerous changes of counsel was that no coordinated penalty-phase investigation was begun until early in 2001, when Tena Francis was appointed by the Court to serve as Petitioner's mitigation specialist. Based upon conversations with Ms. Francis and with trial counsel, it appears that her work on the case was coordinated primarily through Ms. Hunt, although Ms. Francis does have notes of conversations with Mr. Berrigan. It appears further that both Ms. Francis and Ms. Hunt believed it was important

to have Petitioner evaluated by a neuropsychologist or similarly-qualified professional in order to assess Petitioner for organic brain damage and/or other cognitive dysfunction. Despite the fact that an application for funding such an examination was made and granted by this Court, that examination never took place. It is the view of Petitioner's present counsel that the decision not to have a neuropsychological examination conducted cannot be justified as a reasonable strategy decision. While it may have been reasonable not to offer such evidence, depending on the results of the evaluation, that decision could not be made in a vacuum, *i.e.*, without having the examination results. It is for this reason that Petitioner now seeks the appointment of Michael Gelbort, Ph.D., to conduct a neuropsychological examination of Petitioner.

7. Dr. Gelbort is based in Chicago, in relatively close proximity to Petitioner's present place of confinement, Terre Haute, Indiana, and is prepared to undertake a neuropsychological evaluation of Petitioner promptly upon approval of this application. A neuropsychological examination consists of a review of pertinent history and records, an in-person evaluation, and the administration of a battery of standardized tests. The testing and evaluation process typically takes 8 to 10 hours to complete. Dr. Gelbort's hourly rate is $250 and he estimates that reviewing relevant records, conducting the examination, scoring the results, and preparing a report, will take him approximately 30 hours. Thus, authorization is sought for up to $7,500 for testing and a report, plus reasonable travel expenses. Dr. Gelbort will have to administer the testing at the federal death row, housed within the United

States Penitentiary at Terre Haute. Dr. Gelbort will be required to stay overnight in the Terre Haute area. If the appointment is approved by the Court, travel and lodging will be arranged, via National Travel Service, at government rates. Without this testing, the decision of trial counsel to forgo a neuropsychological examination for which funding had been authorized cannot be assessed for its impact on the second prong of the issue of effective assistance of counsel, *i.e.*, whether, assuming significant findings, the results of the examination would have made a difference to one or more jurors.[5]

8. Regarding the mitigation investigation, Ms. Francis was only in the case for nine months before the case came to trial. Both Ms. Francis and Ms. Hunt, in interviews, have confirmed that the investigation was incomplete at the time the trial began. For her part, Ms. Francis has informed Petitioner's present counsel that she had not come close to completing the investigation. In August of 2001 – approximately three months before the trial commenced – Ms. Francis prepared an affidavit for Petitioner's trial counsel outlining the tasks she felt that she needed to accomplish in order complete her work and estimating that she would need approximately 220 hours to do what was necessary to complete the investigation. Ms. Francis felt strongly that trial counsel should seek an adjournment of the trial date. At approximately the same time, Mr. Berrigan underwent heart surgery. Petitioner

---

[5] In the federal system, a jury that is non-unanimous for death spares a defendant's life. *Jones v. United States*, 527 U.S. 1 (1999). In *Wiggins v. Smith*, 123 S.Ct. 2527 (2003), the Court explained that, under such a system, the prejudice prong of *Strickland* is satisfied where "there is a reasonable probability that at least one juror would have struck a different balance." *Id*. at 2543.

agreed that an adjournment should be requested. After a discussion among all counsel, however, no such motion was made. It is Ms. Francis' recollection that she was asked to do very little work on the case thereafter. It is Petitioner's view that the decision not to seek an adjournment in the face of an incomplete mitigation case was not tactically reasonable.

9. Among the major areas left undone were the gathering of a family history of Petitioner's paternal family. There were numerous interviews and follow-up interviews that never took place. Ms. Francis spent very little time with Petitioners and believes that more time was required. Also left undone was an assessment as to whether Petitioner, as a result of his mother's alcohol abuse, had been born with Fetal Alcohol Syndrome ("FAS"). No effort was made to gather family photographs which may have shown the physical symptoms of FAS. Ms. Francis is unclear as to whether she acquired the records surrounding Petitioner's birth and social service files that would have demonstrated that the hospital where Petitioner was born, and retained for some time after his birth, did not want to release him to his mother since she had failed to visit Petitioner ion the hospital and was seen as unfit to be a parent. Ms. Francis does not believe she spent an adequate amount of time interviewing Petitioner, having seen him only once over the curse of two days. She believes she should have spent time investigating the circumstances of the juvenile facilities in Texas where Petitioner was confined as well as the facilities in Texas where Petitioner was incarcerated as a young adult. In short, the mitigation investigation conducted in this case fell far short of what is required. The responsibility to see that an adequate investigation is

conducted is, in the final analysis, counsel's. The failure to conduct an adequate mitigation investigation can amount to ineffective assistance of counsel. In order to establish that proposition, however, it is necessary for Petitioner's counsel to present results of a complete investigation in order to demonstrate what could have been presented had the investigation been completed. Otherwise, Petitioner would be unable to satisfy the "prejudice" prong of his Sixth Amendment claim.

10. This application seeks the appointment of Jill Miller, MSSW, to conduct and complete the mitigation investigation that was left half-completed by Ms. Francis and, by virtue of their responsibility for the overall presentation of the case, Petitioner's trial counsel. Ms. Miller is an extraordinarily talented mitigation specialist. Petitioner seeks up to 200 hours of time at an hourly rate of $110 per hour.[6] Ms. Miller, upon appointment, will conduct in depth interviews with Petitioner and with members of his family, on both the maternal and paternal sides. She will attempt to locate critical life history records that were not acquired by trial counsel in their incomplete investigation. She will also seek to

[6]This figure is not out of line for top level mitigation specialists. Ms. Miller has been authorized by United States District Court Judges to bill at this rate in numerous federal death penalty cases. She is also regularly been paid this rate by various Federal Public Defender offices which do not have to seek court approval for expert and investigative services in capital cases but pay experts out of their own budgets. Undersigned counsel David A. Ruhnke recently had the gratifying experience of working with Ms. Miller in a New Jersey capital case, on post-conviction, where the trial judge, in vacating the sentence of death, quoted at length from Ms. Miller's report, praised her work, and described her as, "An exceptionally gifted mitigation expert." *State v. Robert W. Morton*, Burlington County Ind.No. 93-09-0492-I (N.J. Superior Court 6/28/2005), Hon. Cornelius P. Sullivan, J.S.C., opinion vacating death penalty.

document and determine the presence or not of FAS. She will investigate the paternal side of Petitioner's family and will complete and supplement the investigation of other aspects of Petitioner life. In short, Ms. Miller will undertake and complete the mitigation investigation that should have been done in this case before Petitioner's life was placed in the balance before a jury.

______11. The task of defending a capital case, and preparing a case in mitigation, is unfamiliar to most courts and most attorneys, no matter how experienced in the area of criminal law. In 1983 Professor Gary Goodpaster published an article entitled, "The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases," 58 N.Y.U.L.REV. 299 (1983). In the article, Professor Goodpaster discussed the role of the advocate in a death-penalty case in the following terms:

> As an advocate, . . . defense counsel has the related but distinct function of attempting to persuade the jury to exercise mercy. Defense counsel therefore has both the opportunity and the duty to present potentially beneficial mitigating evidence and to attempt to convince the sentencer that, notwithstanding the defendant's guilt, he or she is a person who should not die. Once the defendant has been found guilty of a capital crime, a life sentence is counsel's only remaining advocacy goal. As an advocate for life, counsel must attempt to demonstrate that mitigating factors outweigh aggravating factors and must present the sentencer with the most persuasive possible case for mercy.

58 N.Y.U.L.REV. at 318. In his article, the author also outlined the steps an attorney handling a capital case should follow, including the absolute duty of trial counsel "to investigate the client's life history, and emotional and psychological make-up, as well as the

substantive case and defenses" noting further that, "The importance of this investigation, and the thoroughness and care with which it is conducted, cannot be overemphasized." *Id.* at 324. In describing the nature of such an investigation, Professor Goodpaster emphasized both its difficulty and time-consuming nature:

> Such investigations present more obstacles than those conducted in furtherance of an ordinary criminal defense, primarily because of the difficulty in locating relevant witnesses. Over the years, the witnesses who are acquainted with the defendant are likely to have become geographically dispersed and more difficult to trace than guilt-phase witnesses. Indeed, constructing a mitigating case on the basis of the life-history investigation is perhaps best viewed as a successive winnowing process: the attorney's investigator tracks down all mitigating leads; the attorney next interviews the most promising contacts and then chooses to call some of them at the penalty phase of the trial in accordance with a coherently developed strategy.

*Id.*

12. In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court established the now familiar two-prong test for evaluating claims that defense attorneys in criminal cases did not provide the effective assistance of counsel guaranteed by the Sixth Amendment to the United States Constitution. First, counsel's performance must fall "below an objective standard of reasonableness," *Strickland*, 466 U.S. at 680, and second, there must be a "reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different." *Id.* at 693-94. The first prong of *Strickland* is met where, in light of all the circumstances of the case, counsel's "acts or omissions were outside the range of professionally competent assistance." *Id.* at 690. *See*

*also, Burger v. Kemp*, 483 U.S. 776, 795 (1987); *United States v. Kauffman*, 109 F.3d 186, 190 (3d Cir. 1997). The second prong of *Strickland* is met where, but for counsel's unprofessional performance, there is a reasonable probability that the "result" of the proceeding would have been different.[7] *Kauffman*, 109 F.3d at 190 (quoting *United States v. Nino,* 878 F.2d 702, 711 (3d Cir. 1989).

13. There is, of course, no specific set of rules for judging reasonable performance. *Strickland*, 466 U.S. at 688-89. Instead, "[i]n any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances," *Strickland*, 466 U.S. at 688, although "[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides."[8] *Strickland*, 466 U.S. at 688.

14. It is the heart of this application that Petitioner's trial counsel could not have made a reasonable tactical judgment not to offer the results of a neuropsychological

---

[7]As noted earlier, in the context of a capital case where a non-unanimous jury spares a defendant's life, which is the situation in the federal system, the prejudice prong of *Strickland* requires proof only of "a reasonable probability that at least one juror would have struck a different balance." *Wiggins v. Smith,* 123 S.Ct. at 2543.

[8]In *Wiggins*, and more recently in *Rompilla*, the Court specifically cited the American Bar Association's 1989 "Standards for the Appointment and Performance of Counsel in Death Penalty Cases" as providing a guide to "'determining what is reasonable.'" *Wiggins*, 123 S.Ct. at 2537, quoting *Strickland*, 466 U.S. at 688. In interpreting *Wiggins*, at least one court has concluded that the 2003 revision of those guidelines should control since the 2003 Guidelines "simply explain in greater detail the 1989 Guidelines," especially in the area of "the obligations of counsel to investigate mitigating evidence." *Hamblin v. Mitchell*, 354 F.3d 482 (6th Cir. 2003).

evaluation without having conducted such an evaluation. Similarly, in the absence of a competed investigation, Petitioner's trial counsel could not have made reasonable tactical judgments about the scope and nature of the case in mitigation that would be presented. Of particular import here, courts have found counsel's performance unreasonable in cases challenging a failure to present evidence favorable to a defendant, where counsel failed to make "reasonable investigations or to make a reasonable decision that makes particular investigation unnecessary," *Strickland*, 466 U.S. at 691; *see also, Rompilla v. Beard*, 125 S.Ct. 2456 (2005); *Williams v. Taylor*, 529 U.S. 362, 396 (2000); *Mayfield v. Woodford*, 270 F.3d 915 (9th Cir. 2001) (en banc); *Coleman v. Mitchell*, 268 F.3d 417 (6th Cir. 2001); *Ainsworth v. Woodford*, 268 F.3d 868 (9th Cir. 2001); *Jermyn v. Horn*, 266 F.3d 257, 312 (3d Cir. 2001); *Carter v. Bell*, 218 F.3d 581, 596 (6th Cir. 2000); *Smith v. Stewart*, 189 F.3d 1004, 1008 (9th Cir. 1999) (9th Cir. 1999); *Berryman v. Morton*, 100 F.3d 1089, 1101 (3d Cir. 1996); *Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995); *Workman v. Tate*, 957 F.2d 1339, 1345 (6th Cir. 1992); *Kenley v. Armontrout,* 937 F.2d 1298, 1309 (8th Cir. 1991).

15. The American Bar Association's guidelines for counsel in death penalty cases have come to play an increasingly important role in assessing the performance of counsel in a capital case. The 2003 guidelines set forth the following about investigation and preparation:

GUIDELINE 10.7 – INVESTIGATION

A. Counsel at every stage have an obligation to conduct through and independent investigations relating to the issues of both guilt and penalty.

GUIDELINE 10.10.1– TRIAL PREPARATION OVERALL

A. As the investigations mandated by Guideline 10.7 produce information, trial counsel should formulate a defense theory. Counsel should seek a theory that will be effective in connection with both guilt and Penalty, and should seek to minimize any inconsistencies.

In disusing the scope of the investigation to be undertaken pursuant to Guideline 10.7, the ABA Commentary states the following:

> Because the sentencer in a capital case must consider in mitigation, "anything in the life of the defendant which might militate against the appropriateness of the death penalty for the defendant," "Penalty Phase preparation requires extensive and generally unparalleled investigation into personal and family history." In the case of the client, this begins with the moment of conception. Counsel needs to explore:
>
> (1) Medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage);
>
> (2) Family and social history (including physical, sexual or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment and peer influence); other traumatic events such as exposure to criminal violence, the loss fo a loved one or a natural disaster, experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (*e.g.*, failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities);
>
> (3) Educational history (including achievement, performance, behavior and activities), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof and activities;

(4) Military service, (including length and type of service, conduct, special training, combat exposure, health and mental health services);

(5) Employment and training history (including skills and performance, and barriers to employability);

(6) Prior juvenile and adult correctional experience (including conduct while under supervision, in institutions of education or training, and regarding clinical services).

ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (Rev. Ed. 2003).

16. The importance of the ABA Guidelines is illustrated by *Wiggins* where the Court specifically cited the ABA's 1989 Standards as the benchmark for "'determining what is reasonable'" to expect of counsel in a capital case. *Wiggins*, 123 S.Ct. at 2537, quoting *Strickland*, 466 U.S. at 688. *Wiggins* thus stands squarely for the proposition that the "prevailing professional norms" by which the performance of counsel in a capital case is measured are those set forth in the ABA Guidelines. *Wiggins* also stated the following with regard to defense counsel's obligations to preparing and, more importantly, *investigate*, a case in mitigation:

> Investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) . . . . Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources.

*Wiggins*, 123 S.Ct. at 2537 (emphasis in original).[9] More recently, in *Rompilla v. Beard*, 125 S.Ct. 2456 (2005), the Court found that the Petitioner had not received effective assistance of counsel at the penalty-phase of his Pennsylvania capital case, reversing the United States Court of Appeals for the Third Circuit. In the course of the opinion, the Supreme Court re-emphasized the importance of defense counsel conducting a full penalty-phase investigation. In describing the case before it, the majority observed that, "This case, like some others recently, looks to norms of adequate investigation in preparing for the sentencing phase of a capital trial . . . ." The Court also, once again, emphasized and reiterated the importance of the American Bar Association's Guidelines on criminal cases in general and capital cases in particular in resolving a claim of ineffective assistance of counsel. *See* discussion, *id*., at nn.6, 7.

17. Petitioner's counsel understand fully that they are seeking significant resources by this application. However, as the United States Supreme Court has made very clear, the failure of counsel in a capital case to conduct an adequate investigation can be the essence of ineffective assistance. *Rompilla v. Beard*, *supra*; *Wiggins v. Smith*, *supra*; *Williams v. Taylor*, *supra*. By this application, Petitioner, through his counsel, seeks access to the

---

[9]The Summer 2003 edition of the Hofstra Law Review contains a complete rendition of the 2003 ABA Guidelines, together with the official commentary and accompanying scholarly articles regarding the Guidelines themselves and issues concerning the defense of death penalty cases. *See*, "The Guiding Hand of Counsel: ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases," 31 HOFSTRA L.REV. 903-1211 (2003).

resources necessary to show that his sentence of death should be set aside.

WHEREFORE, Petitioner's counsel request that this Court appoint Dr. Gelbort and Ms. Miller for the purposes outlined above.

Respectfully submitted,

RUHNKE & BARRETT
47 Park Street
Montclair, New Jersey 07042
(973)744-1000
(973)746-1490
davidruhnke@ruhnkeandbarrett.com
Co-counsel to Petitioner

By: /s/ David A. Ruhnke
DAVID A. RUHNKE
Co-counsel to Petitioner

Dated: Columbia, Missouri
Montclair, New Jersey
July 10, 2005