SUBMITTED *EX PARTE* AND UNDER SEAL

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| KEITH D. NELSON, | : | |
| Petitioner, | : | |
| vs. | : | 4:04-cv-8005(JFG) |
| UNITED STATES OF AMERICA, | : | |
| Respondent. | : | |

PETITIONER KEITH NELSON'S SEALED *EX PARTE* MOTION FOR
EXPERT AND INVESTIGATIVE ASSISTANCE

COMES NOW Petitioner Keith D. Nelson, by his undersigned counsel, and moves this Court for an order approving additional time for a previously-approved expert, Jill Miller, MSSW. The grounds for the motion are set forth in the following numbered paragraphs.[1] Permission is also sought to maintain this motion *ex parte* and under seal.

[1]Counsel will dispense with the procedural history of this case.

1. This motion is brought pursuant to 21 U.S.C. § 848(q)(10)(B), and the guarantees of the Fifth, Sixth and Eighth Amendments to the United States Constitution. The motion discusses defense strategy, reveals privileged conversations, and contains protected attorney work-product. Permission is therefore sought, pursuant to 21 U.S.C. § 848(q)(9), to submit this application *ex parte* and under seal of the Court. This Court has granted previous orders permitting applications of this nature to be filed and maintained under seal.

2. On July 10, 2005, counsel to Petitioner filed a sealed and *ex parte* motion seeking, *inter alia*, the appointment of Jill Miller, MSSW to provide expert and investigative assistance in connection with this post-conviction challenge to Petitioner's sentence of death. Ms. Miller is a highly experienced and respected mitigation specialist.[2] The application sought prior approval of up to 200 hours, plus reasonable expenses, at an hourly rate of $110. On August 30, 2005, this Court granted the application in part, authorizing compensation for Ms. Miller up to $7,500, plus reasonable travel expenses. At the hourly rate of $110, this translated into just over 68 hours. In granting the application in part, this Court noted that

---

[2]In that same application, Petitioner's counsel sought the appointment of a neuropsychologist. That application was granted. The neuropsychologist in question, Michael M. Gelbort, Ph.D., has since examined Petitioner and has reported significant findings, namely that Petitioner "shows indications of frontal lobe disturbance/dysfunction," a circumstance that affects "[Petitioner's] everyday thinking and reasoning capacities," and that the test results show that Petitioner does not "conform with what is seen in individuals with normal functioning brains," and that his overall testing performance "is consistent with and indicative of brain dysfunction." As the Court knows from prior filings, even though Petitioner's counsel had funds authorized to conduct a neuropsychological examination, none was ever conducted.

if additional hours proved necessary, a supplemental application would have to be filed which, if approved by this Court, would have to undergo further review by the Chief Judge of the Eighth Circuit or his designee. *See* 21 U.S.C. § 848(q)(9)(B). This application seeks approval of an additional 250 hours. The request for these additional hours is prompted by the reality that the mitigation investigation conducted in this case was inadequate in almost every respect.

3. Petitioner's present counsel are engaged in an ongoing investigation and review of the entire circumstances of this case. It is counsel's intention to file a motion brought pursuant to 28 U.S.C. § 2255 no later than Monday, November 7, 2005. One aspect of that motion will allege ineffective assistance of counsel in the preparation and presentation of a case in mitigation on behalf of Petitioner. In fact, as both of Petitioner's trial have conceded, the mitigation investigation of this case was woefully incomplete at the time the case went to trial.

4. The record of this case reflects numerous changes in counsel. Susan Hunt, Esquire, was the only attorney who represented Petitioner in the case from its beginnings. Immediately following Petitioner's arrest on October 17, 1999, he was represented by a "volunteer" retained attorney, Daniel L. Franco, who has since been disbarred. Thereafter, the Court appointed the Federal Public Defender (effective October 21, 1999), Ms. Hunt (effective November 2, 1999), and William E. Shull, Esquire (effective November 2, 1999). Thereafter, the following occurred with regard to Petitioner's representation by counsel:

- Larry C. Pace, Esquire, of the Federal Public Defender, remained in the case for approximately 10 months. On July 28, 2000, Petitioner filed a motion to withdraw Mr. Pace as counsel. The motion was granted on August 21, 2000, although the actual order was apparently not entered until March 2, 2001.

- On September 6, 2000, Petitioner filed a notice with the Court that Mr. Franco had been discharged as attorney of record. An order withdrawing Mr. Franco was actually entered on March 2, 2001.

- With regard to Mr. Shull, an order was entered on November 14, 2000 denying Petitioner's request to withdraw Mr. Shull as counsel. (There does not appear to be a docket entry for the motion itself.) Thereafter, on February 20, 2001, an order was entered granting Mr. Shull's oral motion to withdraw as Petitioner's counsel.

- On the same date as Mr. Shull's withdrawal, February 20, 2001, Patrick Berrigan, Esquire was appointed as counsel to Petitioner.

Mr. Berrigan and Ms. Hunt ultimately served as Petitioners trial counsel. Petitioner's trial commenced approximately just nine months after Mr. Berrigan's entry into the case. As will be demonstrated during an evidentiary hearing in this matter, one side-effect of the numerous changes of counsel was that no effort at pursuing a coordinated penalty-phase investigation was begun until late 2000 and early 2001, when Tena Francis was appointed by the Court to serve as Petitioner's mitigation specialist. Ms. Francis has informed Petitioner's present counsel that, when the case came to trial, she had not come close to completing the investigation. In August of 2001 – approximately three months before the trial commenced – Ms. Francis prepared an affidavit for Petitioner's trial counsel outlining the tasks she felt that she needed to accomplish in order to complete her work, estimating at the time that she would need approximately 220 hours to complete the investigation. Ms. Francis felt strongly

that trial counsel should seek an adjournment of the trial date. At approximately the same time, Mr. Berrigan underwent heart surgery. Petitioner himself agreed that an adjournment should be requested and specifically asked his counsel to request an adjournment. After a discussion among all counsel, however, no such motion was made. It is Ms. Francis' recollection that she was asked to do very little work on the case thereafter. It is Petitioner's view that the decision not to seek an adjournment in the face of an incomplete mitigation case was not tactically reasonable.

5. Ms. Miller has reviewed numerous relevant documents, conferred with Petitioner's current counsel, and met with Petitioner at USP/Terre Haute for a five-hour interview. Petitioner's present counsel have little doubt that they will be able to convince this Court, at an evidentiary hearing, that Petitioner's counsel failed to represent him adequately in the preparation and representation of the mitigation case. In order to fulfill their burden of establishing prejudicial ineffective assistance, however, it is vital that the mitigation case is, for the first time, thoroughly investigated so that it may be effectively presented during the hearing which, realistically speaking, must be conducted before this Court.

6. Ms. Miller has prepared a confidential memorandum to counsel outlining the inadequacies of the initial mitigation investigation, summarizing her work to date, and outlining in specific terms what needs to be accomplished in order for this Court to have a complete picture of an adequately investigated and prepared mitigation case. To date, Ms.

Miler has reviewed the following materials:

- Decision of the Eighth Circuit in U.S. vs. Keith Nelson
- Transcripts of pre-trial proceedings
- Transcript of the plea hearing
- Penalty phase transcript, including verdict
- Verdict form
- File of Tena Francis, including: witness interview memos; social history draft; chronology; correspondence; memos to counsel; billing records; copies of photo pages from school yearbooks; and research materials on neurological impairment, schizophrenia, attachment disorder, fetal alcohol syndrome and juvenile institutionalization
- Memos and investigative reports of Dan Grothaus, Grothaus investigation
- Investigative memos and witness interview summaries by Ron Ninemire of the Office of the Federal Public Defender
- Letter by Ron Ninemire dated 09/14/2000 to Susan Hunt, Esquire, detailing things needed to be done in investigation
- Some interview memos authored by Susan Hunt
- Correspondence from Susan Hunt to Tena Francis, including fax covers
- Juvenile Records – Three volumes containing juvenile court, juvenile detention and Texas Youth Commission records (may not be complete - need to check for medical/mental health records, which may be separate), overall records may not be complete
- Birth records, Providence and Children's Mercy Hospitals
- Medical records, John Peter Smith Hospital, 1988

- School records from White Settlement, which may be incomplete
- Report of Dr. Roger Burns, Ph.D., 1988, in juvenile records
- Southwest Missouri Mental Health Center records, 1995 - believe these were furnished by government
- Johnny Nelson's records - police, court and mental health
- Report of Dr. Daniel Foster, Psy.D., 2001

7. In addition to undertaking a review of relevant records, Ms. Miller has met with Petitioner's present counsel on three occasions and interviewed Keith Nelson for approximately five hours on October 11th. During that interview, Petitioner revealed to Ms. Miller instances in which he had been sexually victimized and exposed to sexual victimization of others. (Ms. Francis only met with Petitioner one time, an interview she describes in her own as a superficial "meet and greet" rather than a substantive session.) Ms. Miller believes, based on her training and experience, that it is likely there is additional information regarding sexual victimization and exposure to sexually deviant/inappropriate behavior that will be revealed in subsequent interviews. Ms. Miller has also consulted with Danalynn Recer of the Gulf Region Advocacy Center in Texas regarding child protective services and welfare records, and information on problems within facilities of the Texas Youth Commission. The Center has access to records relating to conditions at the facilities operated by the Texas Youth Commission that coincide with the period that Petitioner was incarcerated at those facilities.

8. During the time Petitioner was represented by the Office of the Federal Public

Defender, the investigation was conducted principally by Ron Ninemire, an investigator with that office. On September 14, 2000, at the time the Federal Public Defender was relieved as counsel, Mr. Ninemire wrote a memo to trial counsel, Susan Hunt, Esquire, outlining records and documents that needed to be located and obtained. He also identified a number of persons who needed to be interviewed. Based on Ms. Miler's review to date, it appears that some of the investigative efforts ongoing at the time were misdirected, with investigators looking in the wrong places. Among the records specified in Mr. Ninemire's September 2000 memorandum that had not been obtained were the following:

- "Background check" on family in Visalia, California (Ms. Miller believes this should include Hanford, California)
- Protection orders or other "government" contact with Nelson family in Visalia, California (should include police incident reports, welfare records re: Kenneth Morse and Nancy Nelson for Hanford, as well)
- Police and Social Service records re: arrest of Kenneth Nelson in Visalia or Sacramento (most likely Hanford)
- Battered women's shelter in Visalia (again, probably Hanford)
- Juvenile probation agents and juvenile police officer in White Settlement
- School records from Amsterdam, Missouri
- Any Missouri Division of Family Services records re: Nancy, Keith or the other children (Ms. Miler believes this should be Kansas, where the family lived during Petitioner's first five years, though there may be something in Missouri for the period of time that Petitioner was hospitalized at Mercy following his birth)
- "Juvenile facility" at Booneville (Ms. Miller believes Petitioner was in an adult correctional facility there which would be in Mo. DOC records, there is a need

to be sure he had no juvenile arrests/confinements after his move to Missouri in 1991)

- Pre-school records in "Sacramento" (Again, most likely Hanford)

- Division of Family Services in Texas, any complaints (this would be the CPS records when family was in White Settlement - some efforts were made to obtain these, but Ms. Francis turned the effort over to Ms. Hunt, who apparently did not follow through)

9. In addition to the "red flag" raised by Mr. Ninemire's departing letter, Ms. Francis also tried to keep trial counsel apprised of the shortcomings of the mitigation investigation. In a memorandum dated June 13, 2001, Ms. Francis identified the following records that still needed to be obtained. At this point, the trial was scheduled to begin in approximately 120 days.

- Texas Child Protective Services (a form needed to be signed by Nancy and a copy of her driver's license obtained - this information was sent to Susan Hunt twice.)

- Records from women's shelter in California and police department records from California re: Kenneth Nelson

- Paul Nelson's mental health records

- All educational, medical and mental health records for Petitioner's brothers

- Criminal history information for E.J. Hendricks and Mr. Mackey (Mackey described by others as a pedophile)

10. In a memorandum to defense counsel, Ms. Miller also reports the following with regard to the June 13, 2001 memorandum:

> Ms. Frances noted that Keith's juvenile and adult incarceration experiences would have been significant and needed to be

> investigated, including conditions at the facilities. She indicated in her 6-13-01 memo that this was something she was going to do, but she personally did no work on the case after that date, and nothing was done to look into this. My conversation with Danalynn Recer indicates that this is an important area of investigation, particularly for Gainesville in the TYC. Tena further indicated that more information was needed about the paternal family, particularly re: Kenneth Morse and possible mental health problems. Again, no indication of what efforts were made to do this. My review of the file indicates virtually nothing was done following this until late August, when a number of interviews were conducted by Lisa Murphy, but mostly of maternal family and school personnel in White Settlement. Tena's billing records reflect no work from 5-18-01 to 8-28-01, though memos indicate that some work was done in late May and early June. There is no billing after September 6, 2001, so apparently counsel did not involve mitigation staff after that date.

In that same memorandum, Ms. Miller notes that there are other records that may be relevant and obtainable. These include the following:

- Medical and mental health records for Nancy Nelson's extended family
- Records or information on mental illness in paternal family
- Information re: Kenneth Morse's alcohol and drug abuse
- Information on Kenneth Morse as a police informant
- Social Services records for family in Missouri (should include Kansas)
- Women's shelter records in or near Rancho Cordova and Visalia, CA
- Section 8 Housing records in White Settlement
- Mental Health/Mental Retardation in Tarrant County (1988 - Keith and Nancy referred there by juvenile authorities)

- University Psychology, Fort Worth - Nancy and Keith seen there in 1988

- Nancy Nelson's school records

- Nancy Nelson's employment records

- Information on the suicide of Nancy's boyfriend

- Pre-natal and birth records for all of Nancy's children

- Kansas and Missouri Juvenile Probation records for Keith (1988-89)

- Mark Frey, Social Worker, KS. Dept of Soc. & Rehab. Services

- Information on the death of Kenneth Morse's father - may have died in a motor vehicle accident in which Kenneth was the driver and was DUI
- Social Services records at Mercy Hospital following Keith's birth

- Hospital records for Nancy Nelson when admitted under the name of Karen Morse (Kenneth's sister) in 1975

- Police report in Kansas when Nancy went to station to get away from Kenneth (1979)

- Welfare records in Hanford, California

- Nancy's medical records in White Settlement

- Special education records in White Settlement and Amsterdam, Mo.( It is significant that the school records obtained from White Settlement had at least two memos indicating that the records were not complete, and that special education records were kept separate; transfer credits from Miami HS indicated that Keith was in resource classes; the fact that counsel knew that Keith was in special education is significant; that this was an indicator of brain dysfunction; and that there were records they didn't have, which would have, by law, included testing and assessment.)

- GED verification

- Records re: Keith in counseling with Cindy Phillips, Family and Individual

Counseling (1990)

- John Peter Smith Hospital, all inpatient, ER and outpatient clinic records re: Keith (apparently received routine health care there)

- Records of Dr. Pretz, Kansas City, Mo; he delivered all Nelson children

- Nancy Nelson's criminal history, including probation records

- Everything that can be found on Kenneth Morse's criminal history, including indecent liberties charges, arrests not prosecuted (especially if not prosecuted because he was working as an informant). If possible, the court-ordered mental examinations from a recent case in Missouri.

12. In terms of what Ms. Miller needs to accomplish in the immediate short run, she has advised counsel as follows:

> Initially, my continued work should focus on the most important records and documents that were not obtained, e.g. child protective services and social services records in Kansas, Texas, and possibly California; special education records from all schools; social services records from Mercy Hospital in KC, Mo. Investigation of conditions and abuses in TYC, including the facility at Gainseville is another important area; as is conditions in the prison (s) in Missouri in which Keith was held. Kenneth Morse needs to be interviewed. More information is needed about him, including his cognitive and mental functioning, and alcohol and drug use. More information is needed from and about Nancy, including alcohol use during pregnancy, prenatal care, and neglect of the children. An accurate and complete chronology needs to be prepared. Keith's history of sexual victimization and exposure to sexually perverse or inappropriate conduct by others needs to be further explored. I will need to meet with him again. Documentation and corroboration of mental illness on both sides of the family may be helpful.

10. The mitigation investigation conducted in this case fell far short of what is required. The responsibility to see that an adequate investigation is conducted was, in the

final analysis, trial counsel's. It is now well-settled that the failure to conduct an adequate mitigation investigation can amount to ineffective assistance of counsel. In order to establish that proposition, however, it is now incumbent on Petitioner's counsel to present the results of a complete investigation. Otherwise, as stated, Petitioner will be unable to satisfy the "prejudice" prong of his Sixth Amendment claim.

13. This application seeks further hours for Jill Miller, MSSW, to conduct and complete the mitigation investigation that was left half- (or less) completed by Petitioner's trial counsel. Petitioner seeks up to 250 hours of additional time at an hourly rate of $110 per hour.[3] Ms. Miller, upon appointment, will continue to conduct in depth interviews with Petitioner and with members of his family, on both the maternal and paternal sides. She will attempt to locate critical life history records that were not acquired by trial counsel in their incomplete investigation. She will also seek to document and determine the presence or not of Fetal Alcohol Syndrome. She will investigate the paternal side of Petitioner's family and will complete and supplement the investigation of other aspects of Petitioner life. In short,

---

[3]This figure is not out of line for top level mitigation specialists. Ms. Miller has been authorized by United States District Court Judges to bill at this rate in numerous federal death penalty cases. She is also regularly been paid this rate by various Federal Public Defender offices which do not have to seek court approval for expert and investigative services in capital cases but pay experts out of their own budgets. Undersigned counsel David A. Ruhnke recently had the gratifying experience of working with Ms. Miller in a New Jersey capital case, on post-conviction, where the trial judge, in vacating the sentence of death, quoted at length from Ms. Miller's report, praised her work, and described her as, "An exceptionally gifted mitigation expert." *State v. Robert W. Morton*, Burlington County Ind.No. 93-09-0492-I (N.J. Superior Court 6/28/2005), Hon. Cornelius P. Sullivan, J.S.C., opinion vacating death penalty.

Ms. Miller will undertake and complete the mitigation investigation that should have been done in this case before Petitioner's life was placed in the balance before a jury.

14. In 1983 Professor Gary Goodpaster published an article entitled, "The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases," 58 N.Y.U.L.REV. 299 (1983). In the article, Professor Goodpaster discussed the role of the advocate in a death-penalty case in the following terms:

> As an advocate, . . . defense counsel has the related but distinct function of attempting to persuade the jury to exercise mercy. Defense counsel therefore has both the opportunity and the duty to present potentially beneficial mitigating evidence and to attempt to convince the sentencer that, notwithstanding the defendant's guilt, he or she is a person who should not die. Once the defendant has been found guilty of a capital crime, a life sentence is counsel's only remaining advocacy goal. As an advocate for life, counsel must attempt to demonstrate that mitigating factors outweigh aggravating factors and must present the sentencer with the most persuasive possible case for mercy.

58 N.Y.U.L.REV. at 318. In his article, the author also outlined the steps an attorney handling a capital case should follow, including the absolute duty of trial counsel "to investigate the client's life history, and emotional and psychological make-up, as well as the substantive case and defenses" noting further that, "The importance of this investigation, and the thoroughness and care with which it is conducted, cannot be overemphasized." *Id.* at 324. In describing the nature of such an investigation, Professor Goodpaster emphasized both its difficulty and time-consuming nature:

> Such investigations present more obstacles than those conducted in furtherance of an ordinary criminal defense,

> primarily because of the difficulty in locating relevant witnesses. Over the years, the witnesses who are acquainted with the defendant are likely to have become geographically dispersed and more difficult to trace than guilt-phase witnesses. Indeed, constructing a mitigating case on the basis of the life-history investigation is perhaps best viewed as a successive winnowing process: the attorney's investigator tracks down all mitigating leads; the attorney next interviews the most promising contacts and then chooses to call some of them at the penalty phase of the trial in accordance with a coherently developed strategy.

*Id.*

15. In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court established the now familiar two-prong test for evaluating claims that defense attorneys in criminal cases did not provide the effective assistance of counsel guaranteed by the Sixth Amendment to the United States Constitution. First, counsel's performance must fall "below an objective standard of reasonableness," *Strickland*, 466 U.S. at 680, and second, there must be a "reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different." *Id.* at 693-94. The first prong of *Strickland* is met where, in light of all the circumstances of the case, counsel's "acts or omissions were outside the range of professionally competent assistance." *Id.* at 690. *See also, Burger v. Kemp*, 483 U.S. 776, 795 (1987); *United States v. Kauffman*, 109 F.3d 186, 190 (3d Cir. 1997). The second prong of *Strickland* is met where, but for counsel's unprofessional performance, there is a reasonable probability that the "result" of the proceeding would have been different.[4]

---

[4]In the context of a capital case where a non-unanimous jury spares a defendant's life, which is the situation in the federal system, the prejudice prong of *Strickland* requires proof

*Kauffman*, 109 F.3d at 190 (quoting *United States v. Nino,* 878 F.2d 702, 711 (3d Cir. 1989).

16. There is, of course, no specific set of rules for judging reasonable performance. *Strickland*, 466 U.S. at 688-89. Instead, "[i]n any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances," *Strickland*, 466 U.S. at 688, although "[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides."[5] *Strickland*, 466 U.S. at 688.

17. It is the heart of this application that Petitioner's trial counsel, in the absence of a competed mitigation investigation, could not have made reasonable tactical judgments about the scope and nature of the case in mitigation that would be presented. Of particular import here, is that numerous courts have found counsel's performance unreasonable in cases challenging a failure to present evidence favorable to a defendant, where counsel failed to make "reasonable investigations or to make a reasonable decision that makes particular investigation unnecessary." *Strickland*, 466 U.S. at 691; *see also, Rompilla v. Beard*, 125

---

only of "a reasonable probability that at least one juror would have struck a different balance." *Wiggins v. Smith,* 123 S.Ct. at 2543.

[5]In *Wiggins*, and more recently in *Rompilla*, the Court specifically cited the American Bar Association's 1989 "Standards for the Appointment and Performance of Counsel in Death Penalty Cases" as providing a guide to "'determining what is reasonable.'" *Wiggins*, 123 S.Ct. at 2537, quoting *Strickland*, 466 U.S. at 688. In interpreting *Wiggins*, at least one court has concluded that the 2003 revision of those guidelines should control since the 2003 Guidelines "simply explain in greater detail the 1989 Guidelines," especially in the area of "the obligations of counsel to investigate mitigating evidence." *Hamblin v. Mitchell*, 354 F.3d 482 (6th Cir. 2003).

S.Ct. 2456 (2005); *Williams v. Taylor*, 529 U.S. 362, 396 (2000); *Mayfield v. Woodford*, 270 F.3d 915 (9th Cir. 2001) (en banc); *Coleman v. Mitchell*, 268 F.3d 417 (6th Cir. 2001); *Ainsworth v. Woodford*, 268 F.3d 868 (9th Cir. 2001); *Jermyn v. Horn*, 266 F.3d 257, 312 (3d Cir. 2001); *Carter v. Bell*, 218 F.3d 581, 596 (6th Cir. 2000); *Smith v. Stewart*, 189 F.3d 1004, 1008 (9th Cir. 1999) (9th Cir. 1999); *Berryman v. Morton*, 100 F.3d 1089, 1101 (3d Cir. 1996); *Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995); *Workman v. Tate*, 957 F.2d 1339, 1345 (6th Cir. 1992); *Kenley v. Armontrout,* 937 F.2d 1298, 1309 (8th Cir. 1991).

18. The American Bar Association's guidelines for counsel in death penalty cases have come to play an increasingly important role in assessing the performance of counsel in a capital case. The 2003 guidelines set forth the following about investigation and preparation:

> GUIDELINE 10.7 – INVESTIGATION
>
> A. Counsel at every stage have an obligation to conduct through and independent investigations relating to the issues of both guilt and penalty.
>
> GUIDELINE 10.10.1– TRIAL PREPARATION OVERALL
>
> A. As the investigations mandated by Guideline 10.7 produce information, trial counsel should formulate a defense theory. Counsel should seek a theory that will be effective in connection with both guilt and Penalty, and should seek to minimize any inconsistencies.

In disusing the scope of the investigation to be undertaken pursuant to Guideline 10.7, the ABA Commentary states the following:

> Because the sentencer in a capital case must consider in mitigation, "anything in the life of the defendant which might

militate against the appropriateness of the death penalty for the defendant," "Penalty Phase preparation requires extensive and generally unparalleled investigation into personal and family history." In the case of the client, this begins with the moment of conception. Counsel needs to explore:

(1) Medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage);

(2) Family and social history (including physical, sexual or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment and peer influence); other traumatic events such as exposure to criminal violence, the loss fo a loved one or a natural disaster, experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (*e.g.*, failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities);

(3) Educational history (including achievement, performance, behavior and activities), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof and activities;

(4) Military service, (including length and type of service, conduct, special training, combat exposure, health and mental health services);

(5) Employment and training history (including skills and performance, and barriers to employability);

(6) Prior juvenile and adult correctional experience (including conduct while under supervision, in institutions of education or training, and regarding clinical services).

ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (Rev. Ed. 2003).

19. The importance of the ABA Guidelines is illustrated by *Wiggins* where the Court specifically cited the ABA's 1989 Standards as the benchmark for "'determining what is reasonable'" to expect of counsel in a capital case. *Wiggins*, 123 S.Ct. at 2537, quoting *Strickland*, 466 U.S. at 688. *Wiggins* thus stands squarely for the proposition that the "prevailing professional norms" by which the performance of counsel in a capital case is measured are those set forth in the ABA Guidelines. *Wiggins* also stated the following with regard to defense counsel's obligations to prepare and, more importantly, *investigate*, a case in mitigation:

> Investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) . . . . Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources.

*Wiggins*, 123 S.Ct. at 2537 (emphasis in original).[6] More recently, in *Rompilla v. Beard*, 125 S.Ct. 2456 (2005), the Court found that the Petitioner had not received effective assistance of counsel at the penalty-phase of his Pennsylvania capital case, reversing the United States

[6]The Summer 2003 edition of the Hofstra Law Review contains a complete rendition of the 2003 ABA Guidelines, together with the official commentary and accompanying scholarly articles regarding the Guidelines themselves and issues concerning the defense of death penalty cases. *See*, "The Guiding Hand of Counsel: ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases," 31 HOFSTRA L.REV. 903-1211 (2003).

Court of Appeals for the Third Circuit. In the course of the opinion, the Supreme Court re-emphasized the importance of defense counsel conducting a full penalty-phase investigation. In describing the case before it, the majority observed that, "This case, like some others recently, looks to norms of adequate investigation in preparing for the sentencing phase of a capital trial . . . ." The Court also emphasized and reiterated the importance of the American Bar Association's Guidelines on criminal cases in general and capital cases in particular in resolving a claim of ineffective assistance of counsel. *See* discussion, *id*., at nn.6, 7.

20. Petitioner's counsel understand fully that they are seeking additional significant resources by this application. However, as the United States Supreme Court has made very clear, the failure of counsel in a capital case to conduct an adequate investigation can be the essence of ineffective assistance. *Rompilla v. Beard*, *supra*; *Wiggins v. Smith*, *supra*; *Williams v. Taylor*, *supra*. By this application, Petitioner, through his counsel, seeks access to the resources necessary to show that his sentence of death should be set aside.

WHEREFORE, Petitioner's counsel request that this Court approve this application for subsequent review by the Chief Judge, or his designee, in the Eighth Circuit.

Respectfully submitted,

/s/ Gary E. Brotherton
1390 Boone Industrial Drive, Suite 120
Columbia, MO 65202-3381
(573)875-1571
(573)875-1572 (fax)
gebrotherton@legalwritesllc.com
Co-counsel to Keith Nelson

/s/ David A. Ruhnke
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
(973)744-1000
(973)746-1490
davidruhnke@ruhnkeandbarrett.com
Co-counsel to Keith Nelson

Dated: Columbia, Missouri
Montclair, New Jersey
October 30, 2005