SUBMITTED *EX PARTE* AND UNDER SEAL

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| KEITH D. NELSON, | : | |
| Petitioner, | : | |
| vs. | : | 4:04-cv-8005(JFG) |
| UNITED STATES OF AMERICA, | : | |
| Respondent. | : | |

# PETITIONER KEITH NELSON'S SEALED *EX PARTE* MOTION FOR EXPERT AND INVESTIGATIVE ASSISTANCE

COMES NOW Petitioner Keith D. Nelson, by his undersigned counsel, and moves this Court for an order appointing Xavier Amador, Ph.D. to provide expert assistance in this post-conviction challenge to Petitioner's conviction and sentence of death. Dr. Amador is a highly qualified, experienced, and respected clinical psychologist. Petitioner seeks approval of 50 hours of services, at an hourly rate of $250, and reasonable expenses. A copy of Dr. Amador's c.v. is filed as an attachment to this motion. The grounds for the motion are

set forth in the following numbered paragraphs.[1] Permission is also sought to maintain this motion *ex parte* and under seal.

1. This motion is brought pursuant to 21 U.S.C. § 848(q)(10)(B), and the guarantees of the Fifth, Sixth and Eighth Amendments to the United States Constitution. The motion discusses defense strategy, reveals privileged conversations, and contains protected attorney work-product. Permission is therefore sought, pursuant to 21 U.S.C. § 848(q)(9), to submit this application *ex parte* and under seal of the Court. This Court has granted previous orders permitting applications of this nature to be filed and maintained under seal.

2. This Court previously approved the appointment of Michael M. Gelbort, Ph.D., a qualified neuropsychologist, to examine Petitioner. That examination took place on October 5, 2005. As a result of his examination, Dr. Gelbort found evidence of frontal lobe disturbance/dysfunction in Petitioner's brain and that Petitioner's test scores did not conform with what is seen in individuals with normal functioning brains. Dr. Gelbort has recommended to Petitioner's counsel that Petitioner be seen and evaluated by a clinical psychologist, especially one experienced in diagnosing schizophrenia.

3. Several days after Dr. Gelbort's evaluation, Petitioner was interviewed in depth for five hours by Jill Miller, MSSW, a mitigation specialist whose services have been approved by this Court. Ms. Miller is trained in the detection of symptoms of mental illness but is not qualified to diagnose mental illness. Ms. Miller also believes strongly that

[1]Counsel will dispense with the procedural history of this case.

Petitioner should be evaluated by a qualified clinical psychologist and endorses Dr. Gelbort's suggestion that the clinical psychologist be someone with a speciality in schizophrenia.

4. Schizophrenia, and its various manifestations, is of particular interest in Petitioner's case. Schizophrenia has a strong hereditary component. Petitioner's four brother s were all fathered by the same man. Two of Petitioner's brothers – Johnny and Paul – have been diagnosed with schizophrenia. Johnny, who is eight months older than Petitioner, has been diagnosed as a paranoid schizophrenic, is presently serving a life sentence in Texas for murder, and had been found incompetent to stand trial for a long period of time. Petitioner's brother Paul, who is 17 months younger than Petitioner, is currently on medication and being treated for schizophrenia. He reportedly experiences visual and auditory hallucinations. There is moreover, schizophrenia found on the maternal side of Petitioner's family. (Petitioner's trial counsel never developed any information at all about the paternal side of the family.)

5. The present status of this case is that n November 6, 2005, Petitioner's counsel filed a motion pursuant to 28 U.S.C. § 2255 seeking to set aside Petitioner's conviction and sentence. The Government, in a motion presently pending before this Court, has requested that it be allowed until January 20, 2006 to reply to the 2255 motion. (Petitioner's counsel have advised the Government that there is no objection to the request for additional time.) One aspect of the 2255 motion filed on November 6 is that Petitioner's trial counsel were ineffective in failing to explore the issue of Petitioner's mental health. Despite having secured court-approved funding to undertake such an evaluation, Petitioner's counsel failed

entirely to have him examined by a neuropsychologist and only had him seen by a clinical psychologist in early October 2001, shortly before trial was scheduled to commence.[2] That psychologist, Daniel V. Foster, Psy.D., later filed a report, in the form of an affidavit, noting that his initial contacts with Petitioner had been "spent in trust building and history taking" and that "numerous additional factors clarifying Mr. Nelson's current mental status could have been presented . . ." had Dr. Foster been allowed "to further evaluate and subsequently testify . . . ." Dr. Foster's incomplete interview of Petitioner was the essence of too little too late.

______6. In 1983, Professor Gary Goodpaster published an article entitled, "The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases," 58 N.Y.U.L.REV. 299 (1983). In the article, Professor Goodpaster discussed the role of the advocate in a death-penalty case in the following terms:

> As an advocate, . . . defense counsel has the related but distinct function of attempting to persuade the jury to exercise mercy. Defense counsel therefore has both the opportunity and the duty to present potentially beneficial mitigating evidence and to attempt to convince the sentencer that, notwithstanding the defendant's guilt, he or she is a person who should not die. Once the defendant has been found guilty of a capital crime, a life sentence is counsel's only remaining advocacy goal. As an

---

[2]Shortly thereafter, on October 18, 2001, this Court entered an order barring Petitioner from presenting mental health evidence if he did not cooperate with the Government's experts. At an evidentiary hearing in this matter, Petitioner's present counsel are prepared to prove, through the testimony of Petitioner's two trial attorneys, that Petitioner's refusal to cooperate with the Government's mental-health experts came at the advice of his attorneys. In essence, not having explored the issue of Petitioner's mental health, there was nothing to lose by refusing to see the Government's experts.

> advocate for life, counsel must attempt to demonstrate that mitigating factors outweigh aggravating factors and must present the sentencer with the most persuasive possible case for mercy.

58 N.Y.U.L.REV. at 318. In his article, the author also outlined the steps an attorney handling a capital case should follow, including the absolute duty of trial counsel "to investigate the client's life history, *and emotional and psychological make-up*, as well as the substantive case and defenses" noting further that, "The importance of this investigation, and the thoroughness and care with which it is conducted, cannot be overemphasized." *Id.* at 324 (emphasis added). Despite this long-established performance standard, Petitioner's trial counsel failed to meet their obligations to make a serious and focused inquire into the status of Petitioner's mental health.

7. In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court formulated the now familiar two-prong approach for evaluating claims that defense attorneys in criminal cases did not provide the level of assistance guaranteed by the Sixth Amendment to the United States Constitution. First, counsel's performance must fall "below an objective standard of reasonableness," *Strickland*, 466 U.S. at 680, and second, there must be a "reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different." *Id.* at 693-94.[3] The first prong of *Strickland* is met where, in light of all the circumstances of the case, counsel's "acts or omissions were outside the range of professionally competent assistance." *Id.* at 690. *See also, Burger v. Kemp*, 483

[3]On November 14, 2005, Petitioner's counsel filed an extensive memorandum outlining the law of ineffective assistance of counsel and the controlling legal standards.

U.S. 776, 795 (1987); *United States v. Kauffman*, 109 F.3d 186, 190 (3d Cir. 1997). The second prong of *Strickland* is met where, but for counsel's unprofessional performance, there is a reasonable probability that the "result" of the proceeding would have been different.[4] *Kauffman*, 109 F.3d at 190 (quoting *United States v. Nino,* 878 F.2d 702, 711 (3d Cir. 1989).

8. There is, of course, no specific set of rules for judging reasonable performance. *Strickland*, 466 U.S. at 688-89. Instead, "[i]n any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances," *Strickland*, 466 U.S. at 688, although "[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides."[5] *Strickland*, 466 U.S. at 688.

9. It is the heart of this application that Petitioner's trial counsel, in the absence of a complete exploration of Petitioner's mental health could not have made reasonable tactical judgments about the scope and nature of the case in mitigation that would be

---

[4]In the context of a capital case where, as in the federal system, a non-unanimous jury spares a defendant's life, the prejudice prong of *Strickland* requires proof only of "a reasonable probability that at least one juror would have struck a different balance." *Wiggins v. Smith,* 123 S.Ct. at 2543.

[5]In *Wiggins*, and more recently in *Rompilla*, the Court specifically cited the American Bar Association's 1989 "Standards for the Appointment and Performance of Counsel in Death Penalty Cases" as providing a guide to "'determining what is reasonable.'" *Wiggins*, 123 S.Ct. at 2537, quoting *Strickland*, 466 U.S. at 688. In interpreting *Wiggins*, at least one court has concluded that the 2003 revision of those guidelines should control since the 2003 Guidelines "simply explain in greater detail the 1989 Guidelines," especially in the area of "the obligations of counsel to investigate mitigating evidence." *Hamblin v. Mitchell*, 354 F.3d 482 (6th Cir. 2003).

presented. Neither were trial counsel in a position to determine whether it would be advantageous to cooperate with the Government's mental-health experts. Of particular import here, is that numerous courts have found counsel's performance unreasonable in cases challenging a failure to present evidence favorable to a defendant, where counsel failed to make "reasonable investigations or to make a reasonable decision that makes particular investigation unnecessary." *Strickland*, 466 U.S. at 691; *see also, Rompilla v. Beard*, 125 S.Ct. 2456 (2005); *Williams v. Taylor*, 529 U.S. 362, 396 (2000); *Mayfield v. Woodford*, 270 F.3d 915 (9th Cir. 2001) (en banc); *Coleman v. Mitchell*, 268 F.3d 417 (6th Cir. 2001); *Ainsworth v. Woodford*, 268 F.3d 868 (9th Cir. 2001); *Jermyn v. Horn*, 266 F.3d 257, 312 (3d Cir. 2001); *Carter v. Bell*, 218 F.3d 581, 596 (6th Cir. 2000); *Smith v. Stewart*, 189 F.3d 1004, 1008 (9th Cir. 1999) (9th Cir. 1999); *Berryman v. Morton*, 100 F.3d 1089, 1101 (3d Cir. 1996); *Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995); *Workman v. Tate*, 957 F.2d 1339, 1345 (6th Cir. 1992); *Kenley v. Armontrout,* 937 F.2d 1298, 1309 (8th Cir. 1991).

10. The American Bar Association's guidelines for counsel in death penalty cases have come to play an increasingly important role in assessing the performance of counsel in a capital case. The 2003 guidelines set forth the following about investigation and preparation:

> GUIDELINE 10.7 – INVESTIGATION
>
> A. Counsel at every stage have an obligation to conduct through and independent investigations relating to the issues of both guilt and penalty.
>
> GUIDELINE 10.10.1– TRIAL PREPARATION OVERALL

A. As the investigations mandated by Guideline 10.7 produce information, trial counsel should formulate a defense theory. Counsel should seek a theory that will be effective in connection with both guilt and Penalty, and should seek to minimize any inconsistencies.

In disusing the scope of the investigation to be undertaken pursuant to Guideline 10.7, the ABA Commentary states the following:

> Because the sentencer in a capital case must consider in mitigation, "anything in the life of the defendant which might militate against the appropriateness of the death penalty for the defendant," "Penalty Phase preparation requires extensive and generally unparalleled investigation into personal and family history." In the case of the client, this begins with the moment of conception. Counsel needs to explore:
>
> (1) Medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage);
>
> (2) Family and social history (including physical, sexual or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment and peer influence); other traumatic events such as exposure to criminal violence, the loss fo a loved one or a natural disaster, experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (*e.g.*, failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities);
>
> (3) Educational history (including achievement, performance, behavior and activities), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof and activities;
>
> (4) Military service, (including length and type of service, conduct, special training, combat exposure, health and mental health

services);

(5) Employment and training history (including skills and performance, and barriers to employability);

(6) Prior juvenile and adult correctional experience (including conduct while under supervision, in institutions of education or training, and regarding clinical services).

ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (Rev. Ed. 2003).

11. The importance of the ABA Guidelines is illustrated by *Wiggins* where the Court specifically cited the ABA's 1989 Standards as the benchmark for "'determining what is reasonable'" to expect of counsel in a capital case. *Wiggins*, 123 S.Ct. at 2537, quoting *Strickland*, 466 U.S. at 688. *Wiggins* thus stands squarely for the proposition that the "prevailing professional norms" by which the performance of counsel in a capital case is measured are those set forth in the ABA Guidelines. *Wiggins* also stated the following with regard to defense counsel's obligations to prepare and, more importantly, *investigate*, a case in mitigation:

> Investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) . . . . Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources.

*Wiggins*, 123 S.Ct. at 2537 (emphasis in original).[6] More recently, in *Rompilla v. Beard*, 125 S.Ct. 2456 (2005), the Court found that the Petitioner had not received effective assistance of counsel at the penalty-phase of his Pennsylvania capital case, reversing the United States Court of Appeals for the Third Circuit. In the course of the opinion, the Supreme Court re-emphasized the importance of defense counsel conducting a full penalty-phase investigation. In describing the case before it, the majority observed that, "This case, like some others recently, looks to norms of adequate investigation in preparing for the sentencing phase of a capital trial . . . ." The Court also emphasized and reiterated the importance of the American Bar Association's Guidelines on criminal cases in general and capital cases in particular in resolving a claim of ineffective assistance of counsel. *See* discussion, *id*., at nn.6, 7.

12. In discussing the issue of mental health, the ABA Guidelines are specific and emphatic:

> In particular, mental health experts are essential to defending capital cases. Neurological and psychiatric impairment, combined with a history of physical and sexual abuse, are common among persons convicted of violent offenses on death Evidence concerning the defendant's mental status is relevant to numerous issues that arise at various junctures during the proceedings, including competency to stand trial, sanity at the

---

[6]The Summer 2003 edition of the Hofstra Law Review contains a complete rendition of the 2003 ABA Guidelines, together with the official commentary and accompanying scholarly articles regarding the Guidelines themselves and issues concerning the defense of death penalty cases. *See*, "The Guiding Hand of Counsel: ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases," 31 HOFSTRA L.REV. 903-1211 (2003).

time of the offense, capacity to intend or premeditate death, ability to comprehend Miranda warnings, and competency to waive constitutional rights. The Constitution forbids the execution of persons with mental retardation, making this a necessary area of inquiry in every case. Further, the defendant's psychological and social history and his emotional and mental health are often of vital importance to the jury's decision at the punishment phase. Creating a competent and reliable mental health evaluation consistent with prevailing standards of practice is a time-consuming and expensive process. Counsel must compile extensive historical data, as well as obtain a thorough physical and neurological examination. Diagnostic studies, neuropsychological testing, appropriate brain scans, blood tests or genetic studies, and consultation with additional mental health specialists may also be necessary.

Counsel's own observations of the client's mental status, while necessary, can hardly be expected to be sufficient to detect the array of conditions (e.g., post-traumatic stress disorder, fetal alcohol syndrome, pesticide poisoning, lead poisoning, schizophrenia, mental retardation) that could be of critical importance. Accordingly, Subsection A(2) mandates that at least one member of the defense team (whether one of the four individuals constituting the smallest allowable team or an additional team member) be a person qualified by experience and training to screen for mental or psychological disorders or defects and recommend such further investigation of the subject as may seem appropriate.

Although mental health issues are so ubiquitous in capital defense representation that the provision of resources in that area should be routine, it bears emphasis that every situation will also have its own unique needs. The demands of each case - and each stage of the same case - will differ. Jurisdictions must therefore construe this Guideline broadly, keeping in mind the superior opportunity of defense counsel to determine what assistance is needed to provide high quality legal representation under the particular circumstances at hand and counsel's need to explore the potential of a variety of possible theories. For example, it might well be appropriate for counsel to retain an

> expert from an out-of-state university familiar with the cultural context by which the defendant was shaped or a professional who is skilled at retrieving elusive paper or electronic records. While resources are not unlimited, of course, jurisdictions should also be mindful that sufficient funding early in a case may well result in significant savings to the system as a whole.

Commentary to Guideline 4.1, 31 HOFSTRA L. REV., *supra*, at 956-57 (footnotes omitted).

13. Petitioner's counsel understand fully that they are seeking additional significant resources by this application. However, as the United States Supreme Court has made very clear, the failure of counsel in a capital case to conduct an adequate investigation, whether that takes place in the in the context of family history or mental health, can be the essence of ineffective assistance. *Rompilla v. Beard*, *supra*; *Wiggins v. Smith*, *supra*; *Williams v. Taylor*, *supra*. By this application, Petitioner, through his counsel, seeks access to the resources necessary to show that his sentence of death should be set aside. It will avail Petitioner little if his present counsel succeed in establishing that his trial counsel fell below prevailing norms in the nature of their investigation of Petitioner's mental health, if Petitioner's present counsel cannot also show that the failure was of consequence.

WHEREFORE, Petitioner's counsel request that this Court approve this application and/or, if deemed necessary, for subsequent review by the Chief Judge, or his designee, in the Eighth Circuit.

Respectfully submitted,

/s/ Gary E. Brotherton
1390 Boone Industrial Drive, Suite 120
Columbia, MO 65202-3381
(573)875-1571
(573)875-1572 (fax)
gebrotherton@legalwritesllc.com
Co-counsel to Keith Nelson

/s/ David A. Ruhnke
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
(973)744-1000
(973)746-1490
davidruhnke@ruhnkeandbarrett.com
Co-counsel to Keith Nelson

Dated: Columbia, Missouri
Montclair, New Jersey
November 23, 2005