SUBMITTED *EX PARTE* AND UNDER SEAL

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| KEITH D. NELSON, | : | |
| Petitioner, | : | |
| vs. | : | 4:04-cv-8005(JFG) |
| UNITED STATES OF AMERICA, | : | |
| Respondent. | : | |

PETITIONER KEITH NELSON'S SEALED *EX PARTE* MOTION
FOR EXPERT AND INVESTIGATIVE ASSISTANCE

COMES NOW Petitioner, Keith D. Nelson, by his undersigned counsel, and moves for an order appointing George Kendall, Esquire, to provide expert assistance in this post-conviction challenge to Petitioner's conviction and sentence of death. Mr. Kendall is a highly experienced and respected capital-defense attorney who, until recently, served as the chief death penalty attorney and strategist for the Legal Defense and Educational Fund, Inc.,

of the NAACP ("LDF"). Petitioner seeks approval of up to 100 hours of Mr. Kendall's services at an hourly rate of $200, and reasonable expenses.[1] (A copy of Mr. Kendall's c.v. is appended to this motion.) The grounds for the motion are set forth in the following numbered paragraphs. Permission is also sought to maintain this motion *ex parte* and under seal.

1. This motion is brought pursuant to 21 U.S.C. § 848(q)(10)(B), and the guarantees of the Fifth, Sixth and Eighth Amendments to the United States Constitution. The motion discusses defense strategy, and, therefore, constitutes protected attorney work-product. Permission is therefore sought, pursuant to 21 U.S.C. § 848(q)(9), to submit this application *ex parte* and under seal of the Court. This Court has granted previous orders permitting applications of this nature to be filed and maintained under seal.

2. This motion seeks the appointment of a legal expert, George Kendall, Esquire. If the appointment is approved, Petitioner's present counsel will ask Mr. Kendall to review the file created in this matter, including information developed by Petitioner's present counsel in their post-conviction investigation, and evaluate the performance of Petitioner's trial and appellate counsel in light of prevailing professional norms. The Legal Defense and Educational Fund, Inc., which was founded by Thurgood Marshall, has long been one of this nation's most visible and effective civil rights organizations and has been active for many

[1]The 100 hours is a maximum figure that covers file review, report-writing, testimony and preparation for testimony. It is estimated that the review process – with the assistance of counsel – will occupy approximately 40 hours. If Mr. Kendall reaches a conclusion that counsel deem helpful to Petitioner's case, another 60 hours will be required for report-preparation, travel, witness-preparation, and testimony.

decades in opposing capital punishment.[2] Mr. Kendall spent 15 years of his distinguished career serving as LDF's lead attorney on the issue of capital litigation. He, therefore, brings an extraordinary breadth of knowledge and experience to the issue of what are and are not the professional norms that prevail among capital-defense attorneys at both the trial and appellate levels on a nation-wide basis.[3] As noted in the discussion which follows, there is a strong trend among the state and federal courts to permit testimony of this nature since, per force, most judges are simply not familiar with the prevailing professional norms of the highly specialized and constantly evolving field of capital representation.

3. In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court formulated the now familiar two-prong approach for evaluating claims that defense attorneys in criminal cases did not provide the level of assistance guaranteed by the Sixth Amendment to the United States Constitution. First, counsel's performance must fall "below an objective standard of reasonableness," *Strickland*, 466 U.S. at 680, and second, there must be a "reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different." *Id.* at 693-94.[4] The first prong of *Strickland* is met where, in light of all the circumstances of the case, counsel's "acts or omissions were outside

---

[2]More than three decades ago, attorneys from LDF argued successfully for the abolition of capital punishment in *Furman v. Geogia*, 408 U.S. 238 (1972).

[3]For obvious reasons, there is no "regional component" to the Sixth Amendment's guarantee that defendants facing the death penalty will receive the effective assistance of counsel. This is *a fortiori* so in a federal capital case.

[4]On November 14, 2005, Petitioner's counsel filed an extensive memorandum outlining the law of ineffective assistance of counsel and the controlling legal standards.

the range of professionally competent assistance." *Id.* at 690. *See also, Burger v. Kemp*, 483 U.S. 776, 795 (1987); *United States v. Kauffman*, 109 F.3d 186, 190 (3d Cir. 1997). The second prong of *Strickland* is met where, but for counsel's unprofessional performance, there is a reasonable probability that the "result" of the proceeding would have been different.[5] *Kauffman*, 109 F.3d at 190 (quoting *United States v. Nino,* 878 F.2d 702, 711 (3d Cir. 1989).

4. As the American Bar Association has recognized, "death penalty cases have become so specialized that defense counsel have duties and functions definably different from those of counsel in ordinary criminal cases." American Bar Association, GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES ("ABA Guidelines"), Guideline 1.1, Commentary (2003). As the ABA Guidelines further explain:

> Today, it is universally accepted that the responsibilities of defense counsel in a death penalty case are uniquely demanding, both in the knowledge that counsel must possess and in the skills he or she must master. At every stage of a capital case, counsel must be aware of specialized and frequently changing legal principles, scientific developments, and psychological concerns.

*Id*.[6]

---

[5] In the context of a capital case where, as in the federal system, a non-unanimous jury spares a defendant's life, the prejudice prong of *Strickland* requires proof only of "a reasonable probability that at least one juror would have struck a different balance." *Wiggins v. Smith,* 123 S.Ct. at 2543.

[6] The ABA Guidelines have been recognized as authoritative by the Supreme Court and by federal circuits around the country. See, e.g, *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (Counsel's conduct "fell short of the standards for capital defense work articulated by the American Bar Association (ABA) standards to which we long have referred as guides to determining what is reasonable." ) (citing *Strickland*, 466 U.S., at 690-691); *see, e.g.,*

5. The overarching importance of the ABA Guidelines to cases of this nature is further illustrated by *Wiggins v. Smith*, 539 U.S. 510 (2003), where the Court specifically cited the ABA's 1989 Standards as the benchmark for "'determining what is reasonable'" to expect of counsel in a capital case. *Wiggins*, 123 S.Ct. at 2537, quoting *Strickland*, 466 U.S. at 688. *Wiggins* thus stands squarely for the proposition that the "prevailing professional norms" by which the performance of counsel in a capital case is measured are those set forth in the ABA Guidelines. *Wiggins* also stated the following with regard to defense counsel's obligations to prepare and, more importantly, to *investigate*, a case in mitigation:

> Investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) . . . . Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources.

*Wiggins*, 123 S.Ct. at 2537 (emphasis in original).[7] More recently, in *Rompilla v. Beard*, 125 S.Ct. 2456 (2005), the Court found that the Petitioner had not received effective assistance

---

*Hamblin v. Mitchell*, 354 F.3d 482, 486, 487 (6th Cir. 2003); (following ABA Guidelines) *Canaan v. McBride*, 395 F.3d 376, 384 (7th Cir. 2005) (same); *Allen v. Woodford,* 395 F.3d 979, 1001 (9th Cir. 2005) (same).

[7]The Summer 2003 edition of the Hofstra Law Review contains a complete rendition of the 2003 ABA Guidelines, together with the official commentary and accompanying scholarly articles regarding the Guidelines themselves and issues concerning the defense of death penalty cases. *See*, "The Guiding Hand of Counsel: ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases," 31 HOFSTRA L.REV. 903-1211 (2003).

of counsel at the penalty-phase of his Pennsylvania capital case, reversing the United States Court of Appeals for the Third Circuit. In the course of the opinion, the Supreme Court re-emphasized the importance of defense counsel conducting a full penalty-phase investigation. In describing the case before it, the majority observed, "This case, like some others recently, looks to norms of adequate investigation in preparing for the sentencing phase of a capital trial . . . ." The Court also emphasized and reiterated the importance of the American Bar Association's Guidelines on criminal cases in general and capital cases in particular in resolving a claim of ineffective assistance of counsel. *See* discussion, *id.*, at nn.6, 7.

6. There is, of course, no specific set of rules for judging reasonable performance. *Strickland*, 466 U.S. at 688-89. Instead, "[i]n any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances," *Strickland*, 466 U.S. at 688, although "[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides."[8] *Strickland*, 466 U.S. at 688.

7. This is where expert testimony has a vital role to play. Opinion testimony from attorney experts in connection with claims of ineffective assistance of counsel is now routinely received by state and federal courts around the country as relevant, at the very least,

---

[8]In interpreting *Wiggins*, at least one court has concluded that the 2003 revision of those guidelines should control since the 2003 Guidelines "simply explain in greater detail the 1989 Guidelines," especially in the area of "the obligations of counsel to investigate mitigating evidence." *Hamblin v. Mitchell*, 354 F.3d 482 (6th Cir. 2003).

to the performance prong of the *Strickland* inquiry.[9] *See, e.g., Torres v. State*, 120 P.3d 1184, 1188 (Okla. Crim. App. 2005) (in the trial [post-conviction] court, an experienced capital criminal defense attorney testified that, in her opinion, trial counsel's performance fell below prevailing professional norms for failing to employ a gunshot residue expert or to have bloodstain evidence tested); *Marshall v. Cathel*, ___ F.3d ___, 2005 WL 2861987 at *15 (3rd Cir. 2005) (affirming the district court's grant of relief, and noting that the district court had received testimony from both prosecution and defense expert witnesses concerning prevailing professional norms in capital cases at the time the case was tried and whether trial counsel's performance diverged from that prevailing standard); *Lewis v. Commissioner of Correction*, 877 A.2d 11, 18 (Conn. App. 2005) (expert witness testified that trial counsel had a duty to conduct a complete and thorough pretrial investigation and that failure to do so constituted deficient performance and that trial counsel's investigative efforts fell below the competent level of practice of criminal defense lawyers in Connecticut); *State v. Rieger*, 695 N.W.2d 678, 685 (Neb. App. 2005) ( Nebraska attorney with a concentration in criminal law testified as an expert witness that trial counsel was ineffective when making a record to show compliance with the Interstate Agreement on Detainers); *Bowers v. State*, 2005 WL 1021563 (Tenn. Crim. App. 2005) at *11 (post-conviction court allowed an attorney to be qualified as an expert witness on the issue of trial counsel's performance and ruled that the

[9]By way of anecdotal support to this application, undersigned attorney David A. Ruhnke notes that he has testified on six occasions, in both state and federal trial courts, as an expert on the subject of capital-case preparation and trial. In each instance the testimony was offered in support of a post-conviction challenge to a sentence of death where the quality of representation was at issue.

expert could testify as to the degree of knowledge, skill, prudence, and diligence, commonly possessed and exercised by lawyers and the standard of care employed); *Jones v. Suthers*, 130 Fed.Appx. 235, 242 (10th Cir. 2005) (unpublished) (petitioner presented an expert on criminal defense at the post-conviction hearing); *Lambert v. Blodgett*, 393 F.3d 943, 970 (9th Cir. 2004) (state court had considered expert testimony from a criminal defense attorney and an attorney specializing in juvenile law); *Jones v. Calderon*, 116 Fed. Appx. 868, 869-70 (9th Cir. 2004) (unpublished) (testimony of attorney expert was presented in the district court that prevailing professional norms required a more thorough investigation of the facts than conducted by trial counsel); *Mapes v. Tate*, 388 F.3d 187, 190-91 (6th Cir. 2004) (petitioner presented testimony of a legal expert regarding the viability of potential appellate issues with claim of ineffective assistance of direct appeal counsel); *Beardslee v. Woodford*, 358 F.3d 560, 569 (9th Cir. 2004) (expert attorney testified in district court that trial counsel failure to object to certain questioning fell below an objectively reasonable level of legal assistance; *McLuckie v. Abbott*, 337 F.3d 1193, 1196 (10th Cir. 2003) (criminal-defense expert testified that the case clearly called for a mental-state defense and that a theory of self defense was completely inconsistent with the facts of the case and presenting such a defense fell below prevailing professional norms); *Fisher v. Gibson*, 282 F.3d 1283, 1309 (10th Cir. 2002) (expert testified regarding prevailing professional standards for death penalty counsel); *Odanuyi v. Scott*, 41 Fed. Appx. 854, 861 (7th Cir. 2002) (unpublished ) (in district court, petitioner presented as an "expert [an] experienced criminal defense attorney [who] opined that there might have been a defense to the trafficking charge"); *Miller v.*

*Francis*, 269 F.3d 609, 612 (6th Cir. 2001) (at evidentiary hearing, petitioner presented the expert testimony of an experienced local criminal defense attorney who testified that, in his opinion, trial counsel's decision to leave a particular juror on the jury was unreasonable under prevailing professional standards); *Fernandez v. Galetka*, 229 F.3d 1163, 2000 WL 1133127, *2 (10th Cir. 2000) (unpublished) (state court heard testimony from "a lawyer who appeared as an expert in criminal defense"); *Cox v. Compton*, 205 F.3d 1339, 2000 WL 84458, *2 (6th Cir. 2000) (unpublished) (petitioner presented "expert testimony from E.E. Edwards, a well qualified criminal defense attorney [, who] testified that, in his opinion, [trial counsel's failure to request a competency hearing or mistrial was unreasonable . . ."); *Cannon v. Johnson*, 134 F.3d 683, 687 (5th Cir. 1998) (petitioner "presented legal experts who explained that Texas criminal defense clinics have been teaching the art of humanization of capital defendants since the late 1970s and that reasonable defense lawyers would never decline to present mitigating evidence when the state has offered evidence of a prior burglary conviction and the facts of the murder are so horrific"); *Demarest v. Price*, 130 F.3d 922, 938 (10th Cir. 1997) (petitioner presented testimony of a "legal expert, who testified that ... trial counsel should have introduced medical and psychological evidence . . ."); *Cockrum v. Johnson*, 119 F.3d 297, 304 (5th Cir. 1997) (petitioner called "an experienced criminal defense lawyer" as an "expert witness at the federal habeas hearing"); *Lewis v. Alexander*, 11 F.3d 1349, 1351-52 (6th Cir. 1993) (petitioner presented testimony of a "legal expert witness," who testified that "any competent defense attorney," performing within prevailing professional norms, would have recognized the need to consult certain forensic experts);

*Magill v. Dugger*, 824 F.2d 879, 887-88 (11th Cir. 1987) (state habeas court heard testimony from "an expert in the field of capital defense" who critiqued trial counsel's performance).

7. The lesson of this representative collection of cases is that courts recognize the usefulness of expert testimony concerning attorney performance and prevailing professional norms in the context of evaluating a claim of ineffective assistance of counsel. This is even more so the case in the context of *capital* litigation. *See, e.g., State v. DiFrisco*, 804 A.2d 507 (N.J. Supreme Court 2002) (the post-conviction trial court erred when it refused to consider capital defense expert David Bruck's opinion.) In *DiFrisco*, the Court stated:

> The field of capital litigation is a constantly evolving, specialized area of the law. All judges, irrespective of their experience level, can be informed by such information. Thus, when [post-conviction] counsel offers that form of testimony in a capital case, the court should hear it or at least consider it in written form.

*DiFrisco*, 804 A.2d at 533, citing *Bailey v. State*, 424 S.E.2d 503, 507 (S.C. 1993) (quoting capital defense expert on specialized demands of capital litigation)). *See also, In re Avena*, 909 P.2d 1017, 1032 (Cal. 1996) (noting that, in responding to a prosecution objection to petitioner's attorney expert testimony, that reliance on attorney experts is commonplace in habeas corpus cases, citing three illustrative cases from 1990-1993 in which such testimony was considered); *id.* at 1048 n. 4 (dissenting opinion) (the majority acknowledge, such [attorney] expert testimony is not only admissible, it is commonplace.[10]

---

[10]It is not only petitioners who turn to attorney experts in litigating claims of ineffective assistance of counsel. *See, e.g., Bugh v. Mitchell*, 329 F.3d 496, 514 (6th Cir. 2003) (noting that the prosecution presented a legal expert at the habeas hearing to testify that trial counsel strategic decision was reasonable); *Murtishaw v. Woodford*, 255 F.3d 926,

8. Petitioner asserts that the Court would find it useful, in assessing the adequacy of trial counsel's performance in this highly-specialized area of the law, to hear the testimony of a highly-qualified expert on what the range of professional norms consists of. The Court would remain free to give that testimony whatever weight, if any, it concludes is appropriate. The Government would be free to call a counter expert. Were this a case seeking money damages for legal malpractice, the case could not even proceed without the opinion of an expert that the attorney's performance was below prevailing professional norms. Here the issue is not money, but life or death. With a life in the balance, heightened reliability is required. *Strickland*, 466 U.S. at 715, citing *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality).

9. Petitioner's counsel understand fully that they are, once again, seeking additional significant resources. By this application, Petitioner, through his counsel, seeks access to the resources necessary to show that his sentence of death should be set aside and to provide this Court with the information it needs to reach a correct result.

---

948 (9th Cir. 2001) (Warden called legal expert to rebut claim of deficient performance); *Thompson v. Calderon*, 109 F.3d 1358, 1364 (9th Cir. 1997) (same); *Marshall v. Cathel*, ___ F.3d ___, 2005 WL 861987 at *15 (3rd Cir. 2005) (same).

WHEREFORE, Petitioner's counsel request that this Court approve this application and, if deemed necessary, present the application for subsequent review by the Chief Judge, or his designee, in the United States Court of Appeals for the Eighth Circuit.

Respectfully submitted,

/s/ Gary E. Brotherton
1390 Boone Industrial Drive, Suite 120
Columbia, MO 65202-3381
(573)875-1571
(573)875-1572 (fax)
gebrotherton@legalwritesllc.com
Co-counsel to Keith Nelson

/s/ David A. Ruhnke
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
(973)744-1000
(973)746-1490
davidruhnke@ruhnkeandbarrett.com
Co-counsel to Keith Nelson

Dated: Columbia, Missouri
Montclair, New Jersey
December 5, 2005

## ATTACHMENT TO MOTION
## VITA OF GEORGE KENDALL, ESQUIRE

VITA

**GEORGE H. KENDALL**
Senior Counsel
Holland & Knight
195 Broadway
New York, NY 10007-3189
212-513-3358
george.kendall@hklaw.com

George Kendall was born in New London, Connecticut on July 8, 1952, and received his secondary education in the Groton, Connecticut public schools.

In 1974, he earned a Bachelor of Arts degree in philosophy and government from the University of Richmond, Richmond, Virginia. He thereafter spent two years in VISTA, working with a prisoner reentry program in southeastern Connecticut.

In 1979, Mr. Kendall earned a Bachelor of Law degree from the Antioch School of Law in Washington, D.C. Thereafter he entered the private practice of law in Washington, and specialized in criminal trial and appellate work, and in Freedom of Information Act litigation.

Mr. Kendall left Washington in April, 1983, when he became Staff Attorney for the American Civil Liberties Union Eleventh Circuit Capital Litigation Project in Atlanta, Georgia. In this position, he represented numerous Georgia capitally-sentenced inmates in state and federal post-conviction proceedings. He also recruited attorneys in private practice from throughout the United States to represent other indigent, condemned inmates in post-conviction proceedings in Georgia and the southeast, and worked closely with those attorneys in many cases.

Mr. Kendall left the ACLU in early 1988, and in September of that year joined the NAACP Legal Defense and Educational Fund, Inc., in New York as a

staff attorney in its criminal justice project. At the LDF, he handled a wide variety of matters, including capital cases at trial, on appeal, and in state and federal post-conviction proceedings, and regularly consulted with attorneys throughout the country who represent capital defendants. For LDF, he monitored all capital, habeas, and race litigation before the Supreme Court of the United States, and regularly consulted with attorneys handling cases before the Court. From 1989 through 1996, he monitored Congress' efforts to amend the federal *habeas corpus* statute, and since April of 1996 coordinated a nationwide effort to assist attorneys representing prisoners in *habeas corpus* proceedings with understanding the many revisions made to the habeas remedy by the Antiterrorism and Effective Death Penalty Act of 1996. He also monitored Congress' review of numerous other criminal justice matters.

In 1999, he edited, along with LDF colleagues Deborah Fins and Miriam Gohara and Cornell Law Professor Sheri Lynn Johnson, a newsletter *Race Notes*. This publication identified new and imaginative arguments and strategies that citizens can use to lessen the influence of racial bias in the criminal justice system. In that same year, LDF's criminal justice project joined forces with NYU School of Law to offer clinical placements for ten students. Mr. Kendall has worked closely with teams of NYU students since.

Mr. Kendall has also taught courses on criminal justice issues at several law schools. In the fall of 1989, he co-taught a course on Racism and the Death Penalty at Yale Law School with former LDF colleague Richard Burr, and in February, 1994 he taught a similar course at the Florida State University College of Law. He taught a course on the death penalty in 20th century America at St. John's School of Law from 1999 through 2001.

Throughout his career in capital litigation, he has often appeared as a panelist or keynote speaker at capital litigation seminars held throughout the country. From 1992 through 2003, he was principally responsible for organizing LDF's annual capital punishment training conference that is attended by senior litigators in the public and private sectors from throughout the country. He has also been invited to speak about capital punishment in the United States, in England, and by the UN in Geneva and Albania. He also regularly is asked to comment on developments in criminal justice matters by the national media.

In 1987, Mr. Kendall was the recipient of the Stuart Stiller Memorial Award, and the ACLU of Georgia Bill of Rights Award, and in 1992 was one of four attorneys honored by the NAACP LDF for service to advance the civil and human rights of all Americans. In 1995, he was awarded the New York State Defenders Association Service of Justice Award. In January, 1997, he was identified by the *American Lawyer* as one of 45 lawyers working in the public sector who is making a difference. In March, 1999, he was awarded the Life in the Balance Lifetime Achievement Award by the National Legal Aid and Defender Association. On October 30, 2003, he received the Equal Justice Award from the Southern Center for Human Rights for his twenty years of representing indigent, capitally-sentenced prisoners throughout the country. On April 16, 2005, he was awarded the Champion of Justice Award by the National Association of Criminal Defense Lawyers.

Mr. Kendall sits on the board of several non-profit organizations. The Death Penalty Information Center, a DC-base public education organization that collects and disseminates information about the death penalty to the press and public; *Amicus*, a British charity that trains and places British solicitors and barristers with non-profit legal organizations in the United States that provide representation to indigent condemned prisoners; and Pro Bono Net, a national organization based in New York that seeks to increase access to justice for poor and moderate-income people. He also serves as a member of an advisory group to the Carter Center on capital punishment issues, and on the advisory board of Georgetown Law Center's Supreme Court Institute, a group that moots a large number of the cases argued before the Supreme Court each term.

In July, 2003, Mr. Kendall joined the law firm of Holland & Knight as a senior counsel and works exclusively on their community services team that devotes all of its attention to *pro bono* matters. In December, 2003, he successfully argued on behalf of indigent Texas death row prisoner Delma Banks before the United States Supreme Court. *Banks v. Dretke*, 540 U.S. 668 (2004).

Mr. Kendall is happily married to Tanya E. Coke, an attorney who presently is a consultant to non-profit organizations. He and Ms. Coke are the proud parents of three children, daughters, Halle, age 8 and Selah, age 6, and son Drue, age 2. They reside in Montclair, N.J.