**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **KEITH D. NELSON**, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | Case No. 04-8005-CV-W-FJG |
| v. | ) | Crim. No. 99-00303-01-CR-W-FJG |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent. | ) | |

**GOVERNMENT'S SUGGESTIONS IN OPPOSITION TO PETITIONER'S MOTION UNDER 28 U.S.C. § 2255**

The respondent, the United States of America, appears by Todd P. Graves, United States Attorney, and Matt J. Whitworth, Deputy United States Attorney, both for the Western District of Missouri, and provides the following suggestions in opposition to Keith D. Nelson's motion under U.S.C. § 2255:

## I. Background

### *A. Procedural History*

On October 12, 1999, ten-year-old Pamela Butler was kidnapped by the movant, Keith D. Nelson, in broad daylight from near her Kansas City, Kansas, home while she was roller skating. Two days later, a complaint was filed charging Nelson with kidnapping. On October 15, 1999, Pamela Butler's dead body was recovered from the woods near a church in Grain Valley, Missouri.

One week later, a federal grand jury in the Western District of Missouri returned a two-count indictment charging Nelson with kidnapping resulting in death, in violation of 18 U.S.C. § 1201, and transportation of a minor for sexual relations resulting in

death, in violation of 18 U.S.C. § 2241. The United States subsequently filed a "Notice of Intent to Seek the Death Penalty."

On October 25, 2001, over two years since the crime, Nelson entered a guilty plea to the charge of kidnapping resulting in death.

On November 13, 2001, a jury was selected to hear the penalty proceedings of the case, which began on November 19. On November 28, the jury returned a verdict of death against Nelson for the kidnapping and subsequent murder of Pamela Butler.

Judgment was imposed by this Court in accordance with the jury's verdict on March 12, 2002, and Nelson was sentenced to death; a monetary penalty of $100 also was imposed. At the time of sentencing, the United States dismissed Count Two of the indictment.

Nelson appealed his conviction and sentence to the United States Court of Appeals for the Eighth Circuit Court in Case No. 02-1757. On October 22, 2003, Nelson's conviction and sentence were affirmed in *United States v. Nelson*, 347 F.3d 701 (8th Cir. 2003).

Nelson raised the following issues on direct appeal:

> 1. Whether Nelson received a fair trial by an impartial jury when the district court properly denied Nelson's (1) motion for change of venue; (2) motion for sequestered jury; and (3) motion for additional peremptory strikes;
>
> 2. Whether the district court conducted a constitutionally effective voir dire that reasonably assured Nelson's right to a fair and impartial jury;
>
> 3. Whether the district court properly denied Nelson's challenges for cause and properly granted the Government's challenges for cause;

4. Whether the district court properly instructed the jury on the correct legal standards that it was to use in deliberating on a just verdict; and

5. Whether the district court properly admitted victim impact evidence.

On November 8, 2004, the Supreme Court of the United States denied Nelson's request for a writ of certiorari review in Case No. 03-10620. *See Nelson v. United States*, 543 U.S. 978 (2004).

Although Nelson alleges a multitude of sub-issues that he claims warrant an order vacating his conviction and sentence, essentially Nelson alleges two grounds in support of his motion. Nelson first claims that he was denied the effective assistance of trial counsel and denied the effective assistance of appellate counsel. Nelson alleges his rights guaranteed by the Fifth and Sixth Amendments of the United States Constitution and the laws of the United States were violated because the performance of both his trial and appellate counsel fell below an objective standard of reasonableness under prevailing professional norms, and there is a reasonable probability that, but for counsels' unprofessional errors, the result of the proceedings at trial and on appeal would have been different.

Nelson was represented at trial by Patrick Berrigan and Susan Hunt, two highly experienced litigators who specialize in the field of criminal defense. On appeal, Nelson was represented by Ms. Hunt and Jennifer Brewer, both experienced appellate counsel.

Nelson has demanded an evidentiary hearing on all factual issues raised in his § 2255 motion. Although the Government believes that all of Nelson's claims of

ineffectiveness are without merit, and that most of them are refuted by the record, an evidentiary hearing on at least a few of those claims will probably be necessary. To date, Nelson's attorneys have been unwilling to provide the Government with affidavits relating to their actions and decisions at trial. The United States believes it will be necessary to obtain the testimony of Mr. Berrigan and Ms. Hunt in order to demonstrate why all of Nelson's ineffective-assistance-of-counsel claims are without merit.

Both Mr. Berrigan and Ms. Hunt have indicated that they both believe an attorney-client privilege still exists even though Nelson has alleged ineffective assistance in their representation of him at trial and on appeal. Both Ms. Hunt and Mr. Berrigan believe that in order to overcome the privilege they will need to be subpoenaed for the hearing and ordered by the Court to respond to Nelson's allegations of ineffective assistance.

Without their sworn testimony, it will be difficult for the United States to adequately respond to at least some of Nelson's allegations. The United States has attached as Exhibits A and B the communications received from Mr. Berrigan and Ms. Hunt concerning the Government's unsuccessful requests for affidavits responding to Nelson's allegations.[1]

---

[1]This Court might want to enter an order requiring Mr. Berrigan and Ms. Hunt to prepare responsive affidavits. It has long been the rule in the federal courts that, where a habeas petitioner raises a claim of ineffective assistance of counsel, he waives the attorney-client privilege as to all communications with his allegedly ineffective lawyer. *United States v. Bittaker*, 331 F.3d 715, 716 (9th Cir. 2003); *Tasby v. United States*, 504 F.2d 332, 336 (8th Cir.1974).

In the remainder of this response, the United States will endeavor to respond to as many of Nelson's allegations as possible. However, it will be necessary to obtain testimony or affidavits from Mr. Berrigan and Ms. Hunt in order to fully address all of the allegations raised. The United States requests the Court set this matter for an evidentiary hearing at its earliest convenience.

### *B. <u>Aggravation Evidence</u>*

On September 29, 1999, Nelson picked up James Shannon Robinson at a temporary labor service to do construction work. (Trial Tr. 90-91.)[2] During the day they spent working together, Nelson revealed that he wanted to kidnap a female, take her to a remote location where he could torture her, rape her, electrocute her, and then kill and bury her. (Trial Tr. 95.) Nelson bragged that he was going back to the pen[itentiary] anyway, and "wanted to go for something big." (Trial Tr. 96.) Robinson did not report this to the authorities at the time because he simply did not believe Nelson. (Trial Tr. 99.)

Ten days before the kidnapping of Pamela Butler on October 2, 1999, in the middle of the night, Nelson, holding a knife to the throat of Michanne Mattson, a medical student, attempted to drag her kicking and struggling from her apartment parking lot to his white Ford pickup. (Trial Tr. 105, 118, 146.) Finally, she dropped limply to the pavement. Despite the fact that Nelson had managed to get handcuffs around one of her wrists, he could drag her no more, and he broke off the attack,

---

[2]"Trial Tr." refers to the trial transcript in this case.

warning her over and over, "If you look at me, bitch, I'll kill you." (Trial Tr. 115-16.) He fled in his pickup truck.

Around 4 p.m., on Tuesday, October 12, 1999, Nelson told a friend of his that he knew where a 14-year-old girl was and that "right now is the time to get her, take her, kill her, rape her." (Trial Tr. 149.)

A little over one hour later in Kansas City, Kansas, ten-year-old Pamela Butler left her home on her roller skates to go one and one-half blocks to the local gas station to buy some cookies and soda. (Trial Tr. 171-75, 188-89.) Her sister, 11-year-old Penny Butler, was playing on the front porch and watched her sister leave. (Trial Tr. 174.)

Meanwhile, a white Ford pickup had parked along Scott Street, the route Pamela had taken, with the driver's door left ajar. (Trial Tr. 61-63, 175.) Pamela skated the same route home. As she neared the pickup, Nelson "came up from out the truck and grabbed her and threw her in the truck and slammed the door." (Trial Tr. 176.)

Seeing this, Penny Butler began screaming. (Trial Tr. 176, 189.) Hearing her screams, her teenage sister Casey Eaton came out of the house and looked to where Penny was pointing and saw a white pickup pulling away. (Trial Tr. 189.) As the pickup drove past the screaming girls, Nelson gestured to them with his middle finger. (Trial Tr. 177, 192.)

The sounds of the screams and the squealing of tires attracted the attention of Paul Wilt who was sitting in his truck visiting a friend nearby. (Trial Tr. 206.) Wilt



Case 4:04-cv-08005-FJG Document 39 Filed 02/24/06 Page 6 of 49

gave chase and, although he eventually lost sight of Nelson's truck, he was able to get its license tag number – 177CE2. (Trial Tr. 210.)

Between 6:30 p.m. and 7:00 p.m. that same evening, Carl and Shirley Condra drove to their church, the Grain Valley, Missouri Christian Church, on an errand. Parked behind the church was a white Ford pickup, license plate number 177CE2. The truck was unlocked and empty. Suspicious of the truck, they tried to find a police officer. Finding none, they went home. After seeing the 10 p.m. news of the abduction and description of the truck used, they immediately called the police. (Trial Tr. 69-70.)

Sometime around 8 p.m. or thereafter that same evening, Nelson drove to his mother's house in Kansas City, Missouri. (Trial Tr. 77.) Thereafter, Nelson and his mother drove to the Oasis Bar which was a block and a half away from the victim's home. (Trial Tr. 77.) While Nancy Nelson drank, her son played a video game. (Trial Tr. 89, 699.) After leaving the bar, they stopped at the gas station where Pamela Butler had bought her cookies and soda. Nelson purchased Pepsi and some cigarettes. (Trial Tr. 700-01.)

Nelson and his mother were at his girlfriend's house when the news was broadcast about the child's abduction. Nelson registered no anxiety, no remorse, no grief or other reaction. They left and returned to the Nancy Nelson residence. (Trial Tr. 77, 699-702.)

At around 11:00 p.m., Patti Griffith, the next-door neighbor to Nancy Nelson, saw Nelson on the passenger side of the white pickup wiping the dashboard and

underneath areas while periodically glancing up and down the street. (Trial Tr. 220-22.) Later that same night, Mrs. Griffith was awakened by a noise. When she looked out of her window, she noticed that the pickup truck was gone and that Nelson was pacing around in his yard. (Trial Tr. 223-24.)

Around 2 a.m., in the morning of Wednesday, October 13th, Nelson called for a cab. The dispatcher who took the call remembered him as calm, as "real cool" and "cool as a cucumber," even to the point of telling her a joke. (Trial Tr. 226-27.)

Around 9:00 a.m., on Wednesday morning, the white Ford pickup truck, license number 177CE2, was found abandoned ten blocks from Nelson's residence. (Trial Tr. 79.) The truck, which appeared to have been recently cleaned, had been left unlocked with the keys lying on the floorboard. (Trial Tr. 79-80, 252-53.)

The manhunt for Nelson and the search for the child continued throughout Wednesday with no success except for a brief sighting of Nelson in the vicinity of his girlfriend's home. (Trial Tr. 233-36.)

On Thursday, October 14th, Laurie Torrez, a civilian employee of the Kansas City, Kansas Police Department, took lunch to her husband at the Santa Fe rail yards and, taking a detour along the dike road (Trial Tr. 237-39), spotted Nelson under the 18th Street Bridge. She summoned the police. (Trial Tr. 240-41.)

Nelson had injured his leg while attempting to lower himself from the bridge and, being unable to escape, submitted to capture. (Trial Tr. 585-87.) Before a helicopter arrived to extract him from the area, a considerable crowd of watchers had

assembled. (Trial Tr. 266-68.) From somewhere in the crowd, a voice yelled out, "What about the girl?" (Trial Tr. 268.) Nelson looked at Officer Keith, the arresting officer, and said, "I know where she's at, but I'm not saying right now." (Trial Tr. 269.) Nelson was airlifted to KU Medical Center for treatment for his injured knee. (Trial Tr. 270.)

Later that same day, a complaint was filed against Nelson for the kidnapping of 10-year-old Pamela Butler. Her body, however, had not yet been found.

The information provided by the Condras had prompted law enforcement to intensify searching efforts on the fields, woods, and ponds in the vicinity of the Grain Valley, Missouri, Christian Church.

On Friday, October 15, law enforcement personnel, searching shoulder to shoulder in the woods and fields east of the church, discovered the white sports bra Pamela had last been wearing. Nearby, they found her underpants, and then 10-year-old Pamela Butler's nude body buried under a pile of brush. (Trial Tr. 85, 285-93.) A ligature of wire was around her throat. (Trial Tr. 303, 319.)

Results of the autopsy revealed numerous scrapes and abrasions and blunt trauma injury to the mouth and head. (Trial Tr. 321-27.) Her hymen had been torn near the time of death and there was evidence of redness and irritation in the genital area consistent with a sexual assault having occurred. (Trial Tr. 327-29.) The cause of death was strangulation. (Trial Tr. 329.)

The child's underpants were submitted to the Federal Bureau of Investigation for DNA analysis. (Trial Tr. 87.) Examination revealed the presence of semen in the crotch area of the underpants. (Trial Tr. 345.) When compared to a sample of Nelson's blood, test results conclusively showed that he was the source of the DNA in the semen stain. (Trial Tr. 346.)

On October 21, 1999, the federal grand jury returned a two-count indictment charging Nelson with murder during a kidnapping, and transportation for sexual relations with a minor resulting in death. Nelson pleaded not guilty to both charges.

On April 5, 2000, the Government filed a notice of intent to seek the death penalty (amended June 9, 2000), alleging both statutory and non-statutory aggravators. Among the non-statutory aggravators alleged was that the offense was particularly cruel and involved serious mental and physical abuse to this child and that Nelson completely lacked remorse for having killed her. These allegations were most evident from the trial testimonies of inmate Frazier, who described the torture cell which Nelson intended to build in order to hold captive his victims before raping and killing them (Trial Tr. 503-04), and inmate Bailey who overheard Nelson mimicking the child's "high-pitched screams . . . cries for mommy. Help me. Don't hurt me. Don't kill me." (Trial Tr. 362.) In obvious disgust, Bailey asked Nelson "[h]ow could [he] do that to that little girl?" Nelson simply responded, "You wouldn't believe it." (Trial Tr. 363.)

Trial dates were set and continued several times until a final trial date of October 29, 2001, was ordered. On October 25, 2001, Nelson pleaded guilty to Count One of the indictment charging murder during a kidnapping. Under the terms of the plea agreement, the case would proceed to a penalty trial to begin November 5, 2001. (See Plea Agreement dated October 25, 2001, attached as Exhibit C.) Sometime on October 28, 2001, Nelson ingested a quantity of pills. He was taken from his place of confinement at CCA to a hospital for treatment and observation.

On October 31, 2001, Nelson filed both a motion for a continuance and a motion for a competency examination.

On November 7, 2001, the court heard evidence from Assistant Warden Moore, CCA, that Nelson told Assistant Shift Supervisor Allen that he had no intention of killing himself, but "that in a case like his, the name of the game, or the idea is to postpone, postpone, postpone." Assistant Warden Moore testified that Nelson had made a similar statement to Correctional Officer Taylor. (Hrng. Tr. 12-13.)[3]

The court hired psychiatrist Dr. William Logan to examine Nelson for purposes of assisting the court in determining whether there existed sufficient doubt about Nelson's competency.

Dr. Logan reported that Nelson had both a rational and a factual understanding of the charges and could assist his attorneys in preparation of his defense. Dr. Logan

[3]"Hrng. Tr." hereinafter refers to the hearing on the mental competency motion that took place on November 7, 2001.

further reported that Nelson suffered from depression, but was not currently suicidal. (Logan Proc. Tr. 5.)[4] Defense counsel, acquainted with Dr. Logan's qualifications, recommended that (1) Dr. Logan be appointed as a mental health treatment professional for Nelson; (2) that he be allowed to prescribe any medications for him that he adjudged necessary (Logan Proc. Tr. 11, 15-16); and (3) and that the trial proceed on schedule, barring any delays attributable to medication and assuming no further issue of competency. (Logan Proc. Tr. 16.)

Jury selection began on November 13, 2001, and trial of the penalty phase began the following week during which the jury heard evidence of the offense, the uniqueness of the victim and the impact of her death on the lives of her family, and that Nelson had, among other things, three prior Missouri state convictions for stealing and a conviction for attempted escape from custody. (Trial Tr. 475-77.) While in custody on this offense at CCA, Nelson talked about escaping (Trial Tr. 518-19), he unraveled a section of the prison fencing (Trial Tr. 520-521), and he fashioned two workable handcuff keys. (Trial Tr. 424-26.) Nelson threatened to mace his State probation officer (Trial Tr. 486) and while at CCA, in an unprovoked assault, he beat a correctional officer (Trial Tr. 455) and threatened to kill yet another correctional officer. (Trial Tr. 589.)

[4]"Logan Proc. Tr." hereinafter refers to the transcript of proceedings with Dr. William Logan on November 7, 2001.

On November 28, 2001, the jury received the case, deliberated, and returned a unanimous verdict that death should be imposed, finding unanimously that all aggravating factors submitted had been established, with only one juror finding the existence of but a single mitigating factor. (Special Verdict Form.)

### *C. Mitigation Evidence*

Nelson called a large number of mitigation witnesses to testify during the sentencing phase of his trial. These witnesses each testified about the difficult circumstances of Nelson's childhood and his neglectful, alcoholic mother, and abusive, absent father. The witnesses included his mother, aunts, siblings, former teacher, principal, family, friends, a landlord, prison guards, an employer, a former babysitter and her daughter, and an expert forensic psychologist who specializes in mitigation defense in capital cases. Nelson also introduced a recorded conversation with a girlfriend who is the mother of Nelson's child.

The first witness was Nancy Nelson, Nelson's mother, who testified in detail concerning Nelson's violent and abusive father, Kenneth Morse. Ms. Nelson testified that Morse frequently beat her and was also abusive to her boys. Ms. Nelson described for the jury in disturbing detail how on one occasion Morse tied her up and shocked her with an electrical cord. Morse would also lock her in closets in their home. Ms. Nelson testified she moved her and the children, including Keith, to California and Texas to get away from Morse.

Ms. Nelson also testified that Keith was diagnosed with dyslexia and was a poor student. She testified Keith frequently had fights and behavior problems in school. Ms. Nelson also testified that Keith had a bed-wetting problem well into his teen years. She also testified that she was an alcoholic and that two of her children were schizophrenic. Ms. Nelson told the jury that because she had to work long hours to support her children she was frequently away from the home, which required the boys to take care of themselves. As a result, the boys often got into trouble at school and in the community. (Trial Tr. 598-694.)

Mary Smith, Nelson's aunt (Nancy Nelson's sister), testified that she and Nancy's stepfather was an abusive alcoholic. She testified that Kenneth Morse, Nelson's father, regularly beat Nancy and that he would also lock her up in the home. Ms. Smith testified that she helped Nancy and the kids get away from Morse when they moved to California and Texas. Ms. Smith also testified about Keith Nelson's disadvantaged and difficult childhood. (Trial Tr. 712-24.)

Georganna Romero, another aunt (also Nancy Nelson's sister), testified that Morse beat and tortured Nancy and related how on one occasion Morse tried to electrocute Nancy. Ms. Romero also testified about the poor living conditions of Nancy Nelson's home in Texas and further described how the house smelled of urine. (Trial Tr. 725-38.)

Irene Wood testified that she helped Nancy Nelson and her five boys get a home, clothing, and personal items when they moved to Texas. She also testified

concerning the poor conditions of Nelson's childhood in Texas. Ms. Wood testified that she insisted that Nancy Nelson use the last name of Smith so that Morse could not locate her in Texas. (Trial Tr. 740-49.)

Melvin Lister, a guard at the Community Corrections of America (CCA) federal holding facility in Leavenworth, Kansas, testified that he worked in the segregation area of CCA when Nelson was housed in that facility. Lister testified that Nelson was frequently threatened and harassed by other inmates at the facility. (Trial Tr. 749-57.)

Lieutenant Bruce Roberts, another CCA employee, also testified that Nelson was frequently verbally harassed by other inmates. Roberts testified that during the 25 months that Nelson had been housed at CCA he had never tried to escape. Roberts testified that he did not consider Nelson to be a threat while he was housed at CCA. (Trial Tr. 767-84.)

Kenneth Nelson, Nelson's twin brother, testified he was a satellite communications maintenance operator and installer in the U.S. Army. Kenneth Nelson described a successful career in the U.S. Army. He also testified he had graduated from high school with a 3.69 grade point average. Kenneth Nelson testified about his family's disadvantaged and impoverished childhood. He also described an abusive boyfriend of his mother, Nancy Nelson. Kenneth testified that he and Keith would frequently burglarize and steal from homes when they lived in Texas.

Kenneth told the jury that his mother seriously neglected him and his brothers. He also testified that his mother was never around and that she was always at the bar

working or drinking alcohol. Kenneth testified that he straightened his life out when he moved back to Missouri and lived with his aunt and uncle. Kenneth testified that he became involved in high school football, worked at a grocery store as a stocker, and subsequently did well in school. (Trial Tr. 798-839.)

David Cunningham, Nelson's employer, testified he owned a basement waterproofing business. Cunningham testified Nelson was a pleasant employee and a good worker. He also testified Nelson was reliable and conscientious when working for his business. (Trial Tr. 849-55.)

Nelson also played a recorded conversation to the jury between he and his girlfriend, Kerri Dillon. The phone conversation was recorded when Nelson called his mother who then patched Ms. Dillon into a third-party phone call. The conversation was recorded by CCA officials as a part of a routine practice in which all phone conversations of inmates are recorded. In the conversation, among other things, Dillon and Nelson discuss her recent pregnancy by Nelson. In the conversation, Nelson also appears to express remorse for his involvement in the murder of ten-year-old Pamela Butler. Nelson tells Dillon of his intent to tell law enforcement authorities of his involvement in the crime. Nelson states in the conversation as follows: "I'm just gonna do the right thing for once in my life." (See transcript of recording at p. 16.) (Trial Tr. 861.)

Steven Nelson, Keith Nelson's youngest brother, testified that he was employed as an engineer and was successful in his career. Steven Nelson testified that following

high school he attended DeVry Institute in Kansas City and had a 3.9 grade point average. Steven Nelson described his disadvantaged childhood in Texas and further described how his mother Nancy neglected him and his brothers. Steven also described Keith's bed-wetting problem. Steven told the jury his mother was never home and was either working or drinking and that he and brothers had to take care of themselves most of the time. (Trial Tr. 863-87.)

Gene Thompson testified for Nelson and told the jury that he was the landlord for Nelson family when they lived in Texas. Thompson testified Nelson family lived in Section 8 housing. He described the poor, unkempt conditions of Nelson home. Thompson testified that when Nelson family left the rental property it was in extremely poor condition. (Trial Tr. 895-903.)

Rhonda Monroe, a former babysitter in Texas, testified she was the babysitter for Nelson children when Nancy Nelson was at work. Nancy Nelson would bring the children to her home and leave them when she went to work. Ms. Monroe testified Keith Nelson had a bed-wetting problem. She testified her husband would punish Keith by spanking him with a belt. She also testified that her husband, an alcoholic, was very abusive towards Keith and his brothers and that they were scared of her husband. Ms. Monroe testified that when her husband was home Nelson boys would be required to stay in one room in her home. If they left the room her husband would spank the boys with a belt. (Trial Tr. 904-16.)

Jennifer Monroe, daughter of Rhonda, testified Nelson boys were always required to stay in one room when her mother was babysitting them. She testified her stepfather, Billy Reese, was always spanking the boys with a belt. She testified Nelson boys were extremely afraid of her stepdad. (Trial Tr. 919-27.)

Ellen Crutsinger, a former teacher of several of Nelson boys in Texas, testified Keith was in a special education class and that he struggled while in school. She further described Keith helping a crippled girl in a wheelchair while in elementary school. Ms. Crutsinger testified that Keith would push the girl around the school grounds in her wheelchair and that they developed a friendship. Ms. Crutsinger further testified that Nancy Nelson never attended the "meet the teacher" nights at the school. (Trial Tr. 928-36.)

Michael Griffith, a former neighbor of Nelsons in Texas, testified that Nancy Nelson was never at home and the boys were frequently left alone to fend for themselves. Mr. Griffith testified he did little things to try to help Nelson family such as doing plumbing repairs at no charge. He testified Nelson house was always messy and unclean. He also testified that Keith's brothers would make fun of Keith because of his bed-wetting problem. (Trial Tr. 940-51.)

Homer Dear, Nelson's former school principal and also a former Texas State Representative, testified that he knew Nelson family when they were living in Texas and he was their principal at an elementary school. Mr. Dear testified he believed Nelson boys were physically and mentally abused. He described Nelson family as a

very poor family and further described how he had tried to help Nelson family. He described the poor hygiene of Nelson boys and told the jury how he would require the boys to take showers and would give them clothing at the school. Mr. Dear testified that he bought clothes for the boys at a store on at least one occasion. He also visited Nelson home and described Nelson house as unclean. (Trial Tr. 951-59.)

Finally, Nelson called expert defense witness Dr. Mark Cunningham to testify on his behalf. Dr. Cunningham is a clinical and forensic psychologist who frequently testifies as a mitigation and sentencing expert in capital cases around the United States. Dr. Cunningham testified concerning the effect of childhood abuse and neglect on Nelson's character and development. In his lengthy testimony, Dr. Cunningham explained to the jury how the squalid conditions and abusive and violent nature of Keith Nelson's childhood affected the formation of Nelson's character. Dr. Cunningham also told the jury that Nelson would be less violent as he aged. (Trial Tr. 964-1025.)

## *D.* ***Sentencing***

At sentencing Nelson, in a stream of unrepentant hostility, demeaned the victim ("They say I'm evil; how can you kill a ten-year-old girl? It's not that hard . . . nobody is special.") (Sent. Tr. 4); defamed the victim's family ("They weren't sad. They weren't depressed. They were happy to have the money.")[5] (Sent. Tr. 7); defied the

[5] An apparent reference to the money collected from friends, neighbors, and the community to assist the family following Pamela's death.

justice system ("I will never bow down to the system.") (Sent. Tr. 5); and scoffed at the penalty he faced ("Sitting on death row, you think that's a burden on our back? . . .I basically don't give a ----- (expletive deleted) . . . I don't care about life or death. Either which way."). (Sent. Tr. 5.)[6]

Pointing around the courtroom, Nelson insulted the prosecution team, the victim's family, one of his own attorneys and court personnel with a two-word expletive and ended his invective with the final valediction, "Some of you will beat me to hell, if I do go to hell, so I'll see you when you get there." (Sent. Tr. 8.)

## II. Legal Authority – Ineffective Assistance of Counsel

The Supreme Court has set out a two-pronged test for constitutionally ineffective assistance of counsel in *Lockhart v. Fretwell*, 506 U.S. 364 (1993). Counsel is constitutionally ineffective when: (1) counsel's representation falls below an objective standard of reasonableness; and (2) the efforts are so prejudicial that the adversariable balance between the defense and prosecution is upset. *Id.* at 369. A court may examine the "prejudice" aspect of a claim without having to first determine whether the representation fell below the objective standard of reasonableness. *McCann v. Armontrout*, 973 F.2d 655, 660 (8th Cir. 1992) (citing *Strickland v. Washington*, 466 U.S. 668, 697 (1984)).

[6]"Sent. Tr." hereinafter refers to the sentencing transcript of proceedings held on March 11, 2002.

It is a Nelson's burden to affirmatively prove the prejudice aspect of his claim. *Lawrence v. Armontrout*, 961 F.2d 113, 115 (8th Cir. 1992). The review of counsel's performance is deferential and the presumption is that counsel is competent and effective. *Smith v. Lockhart*, 921 F.2d 154, 156 (8th Cir. 1990). Finally, in order to demonstrate prejudice, "Nelson must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

In Nelson's many claims that his trial counsel were constitutionally ineffective, Nelson appears to be second-guessing the performance of trial counsel. In evaluating an attorney's performance, a court must begin with "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" because individual criminal defense attorneys might employ different trial strategies. *Strickland*, *id.* at 689. Courts should avoid "the distorting effects of hindsight" and try to evaluate counsel's conduct by looking at the circumstances as they must have appeared to counsel at the time. *Id.* at 689. The burden is on the petitioner to show that counsel's representation was not within the range of sound defense strategy. *See id.* at 690. To establish prejudice, Nelson must demonstrate only that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

To prevail on a claim of ineffective assistance of counsel where there has been a guilty plea, petitioner must show that counsel's representation fell below an objective

standard of reasonableness, and that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52 (1985). If the claimed error is counsel's failure to notify the petitioner of a potential defense, the inquiry "will largely depend on whether the affirmative defense likely would have succeeded at trial." *Id.* at 52. A Nelson "faces a heavy burden" to establish ineffective assistance of counsel pursuant to § 2255. *United States v. Apfel*, 97 F.3d 1074, 1076 (8th Cir. 1996).

## III. <u>Argument</u>

### *A.* *<u>Introduction</u>*

In this case, Nelson's attorneys presented a total of 17 live witnesses, two videotaped statements and one audio-taped telephone conversation as mitigation evidence designed to persuade the jury not to impose a death penalty. The majority of the witnesses testified concerning Nelson's difficult circumstances during childhood and during his teen years. Defense counsel did an excellent job of re-creating for the jury Nelson's abusive and disadvantaged childhood. However, any suggestion that trial counsel Pat Berrigan and Susan Hunt were constitutionally ineffective either at trial or on appeal is without any basis in fact.

The problem which Nelson refuses to acknowledge is that the facts of this case were so shocking, that is, the kidnapping, rape and murder of an innocent ten-year-old child, coupled with Nelson's complete lack of remorse, that the imposition of the death penalty was all but inevitable. Any suggestion that Nelson received the death penalty

because of an incomplete or inadequate mitigation presentation defies logic and common sense. Further, the record of the trial and on appeal does not support such a claim. The United States suggests that Nelson, in his § 2255 pleadings alone, has not met his burden of demonstrating "prejudice" or that his trial and appellate counsel's performance was unreasonable as required by *Strickland*. Nelson has most certainly not established in any sense that the jury's result would have been different.

### *B.* ***<u>Nelson's Decision Not to Present Mental Health Evidence</u>***

Nelson's primary attack on his sentence concerns his decision not to present mental health mitigation evidence. Indeed, at page 8 of Nelson's "Memorandum of Law in Support of Motion to Vacate the Conviction and Sentence Imposed," counsel for Nelson writes, "It is the heart of this application that petitioner's trial counsel could not have made a reasonable tactical judgment not to offer the results of a neuropsychological evaluation, or other mental-health evaluations, without having conducted such evaluations in a timely fashion or, indeed, at all."

However, the decision not to present mental health mitigation evidence was Nelson's choice and decision, not the choice of his trial counsel. A lawyer can give advice to a client, but the ultimate decision on how to proceed is the client's. Here, the record is clear that it was Nelson who insisted that he did not want to pursue a mental health defense. In addition, contrary to Nelson's assertion, trial counsel did consult mental health experts and Nelson met with Dr. Foster, a mental health expert.

Indeed, the record is clear beyond any doubt that Nelson made a knowing, informed and voluntary decision not to present mental health mitigation evidence. Under Rule 12.2(d) of the Federal Rules of Criminal Procedure, the law is clear concerning the consequences of failing to submit to an examination by a government mental health expert. Rule 12.2(d) states as follows:

> **(d) Failure to comply.** If Nelson fails to give notice under Rule 12.2(b) or does not submit to an examination when ordered under Rule 12.2(c) the court may exclude any expert evidence from Nelson on the issue of Nelson's mental disease, mental defect, or any other mental condition bearing on Nelson's guilt or the issue of punishment in a capital case.

Here, Nelson refused to submit to an examination by the government's mental health experts, Dr. Park Dietz and Dr. Dan Martell. At the pretrial conference on October 18, 2001, the issue of Nelson's refusal to submit to an examination by the government's mental health experts was discussed in detail. At the hearing, Nelson made it abundantly clear that he understood the consequences of his refusal to submit to an examination by the government's mental health expert. The record makes it clear Nelson understood his rights and the consequences of his refusal to submit to an examination. The following discussion occurred on October 18 before United States Magistrate Sarah Hays:

> MR. MILLER: Judge, my only concern is that if we are going to talk about the mental health issue, that it be impressed upon Mr. Nelson what the consequences may be of his failure to participate in any interviews or testing by government experts.
>
> * * *

MR. BERRIGAN: . . . This morning we did file a supplemental response to Nelson's mental health evidence indicating that, if called to testify, Nelson's expert would allege Nelson suffers from pervasive developmental disorder. Not otherwise specified, that could be found in the DSM Space IV TR, which is the 2000 edition of the DSM IV, at Section 299.80.

THE COURT: My understanding is that the government has gone ahead – and I don't know what you were anticipating – but went ahead and had an expert go to CCA to interview Nelson.

MR. MILLER: Correct, your honor. And I informed Mr. Berrigan prior to it. We have the government's expert, actually it's a team of persons, just two persons, Dr. Martell and Dr. Dietz, and Dr. Martell does the initial psychological testing, the sort of standardized testing that they do prior to doing an interview. The interview was scheduled for Monday. Both of these experts are from Newport Beach, California, so they come here at some expense to the government - -

* * *

MR. MILLER: Dr. Martell showed up last Monday, the 15th. Nelson refused to participate. I think told him that was his problem or something to that effect. In any event, it was not accomplished. I called Mr. Berrigan, Ms. Hunt. They indicated to me it was, or at least in a general sense, that it was Nelson's decision. It wasn't some sort of legal objection. I'm also - - they also - - I've also informed them that Monday, this coming Monday, Dr. Dietz is scheduled to perform his psychological - - his interview of Nelson. That is to be videotaped. As I indicated, they both come from California - - Newport. I think it's Newport Beach, so it's - - we pay for them whether it's done or not. So, there was some expense incurred on Monday.

I don't know if Dr. Martell can come back. I'm sure he can, but we need - - we would like to know for our purposes at least, financial purposes, whether or not Nelson plans on participating on the 21st, which would be his interview with Dr. Dietz.

(Off Record Whispering)

MR. BERRIGAN: I think what Mr. Miller said is accurate in terms of the record with the exception that I don't believe he nor certainly I or Ms. Hunt was present when Dr. Martell had any conversation with Mr. Nelson if, in fact, he did. But we'll acknowledge that Mr. Nelson refused to see Dr. Martell or participate in the psychological testing that Dr. Martell apparently showed up to engage in. And I do not anticipate Nelson's position changing regarding future efforts by the government to procure psychiatric evaluation should Dr. Dietz arrive at the CCA facility in Leavenworth, Kansas, on Monday the 22nd. So, to the extent, your Honor, that aids the government in making a determination as to whether he should show up, we would be willing to stipulate that if he did arrive, that Mr. Nelson would likewise not see Dr. Dietz or participate in any psychiatric interview with him either.

THE COURT: And I think you've probably already made this clear, but let's make sure I understand. This is not something that counsel have directed Nelson to take this position, is that correct?

MR. BERRIGAN: Well, I - - Mr. Miller, in a kind of roundabout way, I guess, asked me the same question, your Honor, but I'm not willing to disclose conversations with Mr. Nelson that we've had regarding any strategy decisions or any decisions that have been made regarding his defense, including this one. I can say that Mr. Nelson realizes well the consequences, at least the potential consequences of this decision, or that the court may direct that he not be allowed to present any mental health testimony of its own in

either the first or second phase of the trial. And we've already provided notice to the government that we intend to present mental health testimony in the penalty phase of the trial. So the consequences to this refusal, we well realize are that the court may enter an order prohibiting Mr. Nelson from presenting mental health evidence because he failed to participate in the government's psychiatric evaluation that has been ordered by the court.

THE COURT: All right. When I asked if this had been done at your direction, Mr. Berrigan, I wasn't really asking that necessarily that confidential communications be disclosed, but there is an appeal pending on which should have to be disclosed, if anything, to Judge Gaitan. And I guess what I'm trying to find out is if this position may change when Judge Gaitan rules on that motion because my concern is at that point it may be too late to - - in other words, I don't know if your position is - -

MR. BERRIGAN: Right. I understand.

THE COURT: - - We won't submit right now because there is an appeal pending and we want to see what Judge Gaitan rules.

MR. BERRIGAN: I understand now, your Honor. I appreciate that explanation. The answer to your question is no, Mr. Nelson is not likely to comply with the order, even if Judge Gaitan denies the appeal by the defense of this particular issue. And I think we're willing to stipulate to that as well, if the court needs such a stipulation.

* * *

MR. MILLER: Right. So, I believe that is an order. Is that this will preclude Mr. Nelson from presenting mental health evidence during the penalty phase of the trial. I think that needs to be impressed upon him. I believe that we have complied, or we were

attempting to get the examinations as granted by your order. The consequences are clear and I think it really is kind of that cut and dried, your Honor.

THE COURT: Well, I know Mr. Berrigan stated for the record that one of the potential consequences if Nelson does not comply is that the court may direct that no mental health testimony be presented by way of expert testimony and certainly I cannot speak, and do not mean to speak for Judge Gaitan. And this may be an issue that you need to address with him on Tuesday. But based on past cases that I am aware of in connection with his rulings, I mean I believe that you need to understand, Mr. Nelson, it's going to be - - when your counsel says the court may ___ that leaves open to me some possibility that this mental health evidence may come in. It is my impression that Judge Gaitan, if he does uphold the court's order directing that these disclosures be made, once he's directed that disclosures be made, I think he will say absent from such disclosure and absent Nelson making himself available for an examination, mental health testimony by way of expert testimony will not be allowed. So I just want you to understand that I don't think there will even be a possibility of you offering expert testimony if you do not submit to an examination by the government's psychiatrist or psychologist. Do you understand that?

MR. NELSON: I understand the whole - - everything going on in this whole thing here.

THE COURT: All right.

MR. NELSON: There is nothing I don't understand about Gaitan maybe not letting it be an issue and everything. I understand all of it.

THE COURT: All right. Well, we just - - I mean, it is a very serious matter because if you get to a stage of the trial where you and your counsel feel like it is in

your best interests to offer mental health testimony by way - -

MR. NELSON: I will - -

THE COURT: - - Of your psychologist or psychiatrist, - -

MR. NELSON: I will not participate.

THE COURT: - - That may not be available to you.

MR. [NELSON][7]: I'm not participating with the government's psychiatrist in no way shape or form, no matter what Gaitan does, what order he makes what order you make. I will not participate with their psychiatrist under any conditions.

THE COURT: All right. And do you understand what the impact may be at trial?

MR. NELSON: I understand the consequences of my actions no matter whatever he rules, either which way.

THE COURT: And what is it that you understand is the consequence of your action if you fail to participate?

MR. NELSON: If Gaitan overrides the appeal, then we can't bring any mental testimony into court.

THE COURT: All right. Is there any further record that anyone thinks we need to make with Nelson?

See Pretrial Conf. Tr. (Doc. 334) at 9-19.

---

[7]Although the transcript indicates that "Mr. Berrigan," rather than Nelson made this statement, it seems clear that this is an error by the court reporter. If the Court deems it necessary, the actual live recording of the hearing can be reviewed to determine the actual speaker.

As a consequence of Nelson's refusal to submit to an examination by government mental health experts, this Court entered an order on November 19, 2001, granting in part and denying in part the Government's motion to bar Nelson from presenting mental health evidence (Doc. 341). This Court permitted Nelson to offer the testimony of Dr. Cunningham, but refused to allow Nelson to present the testimony of Dr. Foster. In the Court's detailed order the background of Nelson's refusal to submit to an examination by government experts was described. (See attached Exhibit C, Doc. 403.) In its order of November 19, this Court noted the August 17, 2001, order from Magistrate Hays which set forth certain procedures regarding mental health evidence. In paragraph 6 of Judge Hays' order, the Court wrote:

> 6) Consequences of Non-Compliance: Failure of Nelson to provide notice or to participate in a court-ordered examination or to confirm his first notice shall result in forfeiture of the right to present mental health testimony at trial.

The Court further noted that Nelson had refused to participate in an examination by a government expert. The Court also noted the hearing held before Magistrate Hays on October 18, 2001 at which in response to questioning from Judge Hays, Nelson indicated that he would refuse to participate in a mental examination by a government expert. The Court also noted that the Eighth Circuit had recently stated in *United States v. Allen*, 247 F.3d 741 (8th Cir. 2001), "[t]here is no doubt that a district court has the authority to order a defendant who states that he will use evidence from his own psychiatric examination in the penalty phase of a trial to undergo a psychiatric examination by a government-selected psychiatrist before the start of the penalty

phase." *Id.* at 773 (citing *United States v. Webster*, 162 F.3d 308, 338-40 (5th Cir. 1998)). "The government must be able to put on a fair rebuttal to a defendant's mitigation evidence during sentencing." *Allen*, 247 F.3d at 773.

The Court further noted that Nelson's counsel had stated that Dr. Foster was the forensic psychologist hired by the defense to evaluate Nelson's mental health. Dr. Foster had met with Nelson for approximately nine hours and had also reviewed written materials. The Court noted that after having reviewed the information submitted by Nelson, that it would be unfair to allow the testimony of Dr. Foster, as it appeared that his testimony would be based at least in part on extensive interviews conducted with Nelson. The Court further noted that because Nelson had refused to submit to a psychological examination by a government psychiatrist, the Government would not be able to fairly rebut Dr. Foster's testimony. *See* Order at 4-5.

In addition, when Nelson entered his guilty plea to the charge of kidnapping resulting in death on October 25, 2001, a record was made of Nelson's mental health. The following exchange occurred:

MS. HUNT: Mr. Nelson, do you agree that at the time this crime was committed, you were not suffering from a mental disease or defect that would exclude criminal responsibility?

DEFENDANT: That I was not? No, I was not.

MS. HUNT: Would you agree today you are not suffering from a mental disease or defect that makes you incompetent to enter this plea of guilty?

DEFENDANT: I would agree.

MS. HUNT: Okay.

THE COURT: All right. I need to - - because I'm not clear on the response, I need you to state then once again if you would, and Mr. Nelson, you need to project your voice so I can hear you.

MS. HUNT: At the time this crime occurred you were not suffering from a mental disease or defect that would exclude criminal responsibility; is that correct?

DEFENDANT: No.

MS. HUNT: That's correct, you are not?

DEFENDANT: Right.

MS. HUNT: And today you are not suffering from a mental disease or defect that would exclude your competence to enter this plea? In fact you are competent and know what's going on and you are voluntarily entering this plea?

DEFENDANT: Right.

THE COURT: Let me make sure, Mr. Nelson, at the time that the acts occurred for which you are pleading guilty here, you are not suffering from any mental disease that would not allow you - - or that would preclude you from understanding the nature and scope of what you were doing? You knew what you were doing, in other words?

DEFENDANT: Yes, sir.

THE COURT: And you weren't suffering from a mental disease that prevented you from knowing that?

DEFENDANT: No, sir.

Plea Tr. (Doc. 451) at 20-22.

While the above exchange does not relate to potential mental health evidence that could possibly have been presented by Nelson at the sentencing phase as mitigation evidence, it does provide some insight into Nelson's belief that he was not suffering from any kind of mental disease or defect. The record is abundantly clear that Nelson understood the consequences of his refusal to submit to an examination as required by Fed. R. Crim. P. 12.2(d).

The record is also clear that it was Nelson's decision, not defense counsel's, to not present mental health mitigation evidence. Trial counsel took the necessary steps to secure a mental health expert, Dr. Foster, who spent a great deal of time with Nelson and who was prepared to offer testimony in support of mitigation at the sentencing phase of the trial. Nelson made a choice to abandon his mental health mitigation evidence by not submitting to an examination by the government's expert witness.

Consequently, Nelson's assertion in his § 2255 motion that trial counsel failed to conduct an adequate investigation of his mental health, including a failure to conduct a neuropsychological examination and/or to have him examined by a qualified clinical psychologist or psychiatrist, is simply not supported by the record.

In addition, Nelson's new claim that he has indications of frontal lobe disturbance/dysfunction, which supposedly affects his every-day thinking and reasoning capacities and thus is indicative of brain dysfunction, also is unpersuasive. While not conceding Nelson has any frontal lobe dysfunction, it is a well-known scientific fact that evidence of brain injury does not mean an individual will have

increased criminal behavior. There is no study, test or evidence that exists that will support a claim that because a defendant may have or has some evidence of brain injury will result in an inability to control his behavior/anger. Indeed, according to both Dr. William Landau, M.D., Professor of Neurology, and Dr. John Olney, M.D., Professor of Psychiatry, Neuropathy and Neuropsychopharmacology, both of the Washington University School of Medicine, there is no scientific method available for establishing a causal connection between brain injury and criminal behavior. If necessary, the United States is prepared to offer expert testimony in support of its position.

***C. Nelson's Representation by Qualified Capital Counsel***

Nelson also contends there were times when he had no counsel who met the qualifications of 18 U.S.C. § 3005, that is, being "learned in the law applicable to capital cases . . ." Nelson's assertion in this regard is simply without any basis in fact. Nelson was arrested on October 17, 1999. On October 21, Nelson had his first appearance before Magistrate Hays. At that time, the Court appointed the Federal Public Defender to represent Nelson along with voluntary counsel Daniel Franco. Larry C. Pace, an Assistant Federal Public Defender who is qualified to represent defendants in capital cases, was assigned to Nelson's case. In addition, on November 2, the Court appointed Susan Hunt and William E. Shull, who is also qualified to represent defendants in capital cases.

Mr. Pace filed a motion to withdraw and the motion was granted on August 21, 2000. On September 6, 2000, Nelson filed a motion to have Mr. Franco discharged as counsel. The Court granted that request on March 2, 2001. On February 20, 2001, the Court granted Mr. Shull's oral motion to withdraw as Nelson's counsel. On the same date, Patrick Berrigan was appointed as counsel for Nelson. Mr. Berrigan is also qualified to represent defendants in capital cases.

Consequently, based upon a review of the record it would appear the only time Nelson did not have qualified capital counsel was in the five-day period between the time of his arrest, October 17, 1999, and his first appearance on the complaint on October 21, 1999. During this five-day period there were no critical court hearings and the United States had not declared an intention to seek the death penalty.

***D. <u>Mitigation Presentation</u>***

Nelson also claims his trial counsel failed to conduct an adequate mitigation investigation. While it is difficult to respond to Nelson's contention without the assistance of trial counsel in the form of an affidavit, it would appear from a review of the record of the trial that a great deal of mitigation evidence was presented on behalf of Nelson. The mitigation evidence has previously been set forth in this response and it is unnecessary to repeat the detailed mitigation evidence presented on Nelson's behalf here.

Nelson also complains his trial counsel failed to elicit a complete and accurate family story from Nancy Nelson, his mother, because she was uncomfortable talking

about her childhood and the manner in which Nelson and his brothers were raised. However, as described earlier, there was a wealth of evidence presented in mitigation concerning Nelson's abusive and neglected childhood. Dr. Cunningham and a multitude of other witnesses testified about the poor circumstances of Nelson's childhood. Nancy Nelson's testimony would have merely been cumulative of the other witnesses' testimony.

***E. Failure to File Pretrial Capital Motions***

Nelson also contends his trial counsel failed to file appropriate pretrial motions challenging the capital aspects of his case. However, the record does not support Nelson's claim. On July 28, 2000, counsel for Nelson filed a "Motion to Preclude the Imposition of the Death Penalty." Defense counsel also filed a "Motion for an Order Dismissing the Government's Notice of Intent to Seek the Death Penalty" on the same date.

***F. Voir Dire Examination***

Nelson also contends his trial counsel failed to conduct an adequate voir dire of prospective jurors on, among other issues, the prospective jurors' views regarding capital punishment and the exposure of potential jurors to publicity regarding Nelson's then recent suicide attempt. Nelson raised this same issue on direct appeal and may not

raise it again in a § 2255 motion.[8] In *United States v. Nelson*, 347 F.3d 701, 706 (8th Cir. 2003), the Court wrote as follows:

> Nelson contends that the district court conducted a constitutionally deficient voir dire on the sentencing phase jury. Specifically, Nelson contends that he did not have enough time to ask the jurors enough follow-up questions concerning death penalty qualification, pretrial publicity, Nelson's attempted suicide, and other topics, including whether the jurors had relatives in law enforcement. Generally, "[t]he form and scope of voir dire rests primarily in the discretion of the district court." *United States v. Granados*, 117 F.3d 1089, 1092 (8th Cir. 1997). We thus review whether the district judge conducted voir dire in a way that protected Nelson's right to a fair and impartial jury only for an abuse of discretion. *Id.* "The district court abuses its discretion when the overall examination of the prospective jurors and the charge to the jury fails to protect [the] defendant from prejudice or fails to allow the defense to intelligently use its peremptory challenges." *Id.*

The Eighth Circuit ruled against Nelson on this issue when it found that the district court did not abuse its discretion in limiting counsel's ability to ask questions during voir dire, or the jurors had already announced their ability to be impartial and apply the law, and the time for questioning merely supplemented responses previously given in an exhaustive questionnaire and prior rounds of questioning. *Id.* at 706-07.

In other words, Nelson is merely trying to re-litigate an issue which has already been decided on direct appeal. Clearly, the record on appeal indicates trial counsel for Nelson did try to ask additional questions and the Court prohibited the additional questioning. In addition, the Eighth Circuit has already determined the questioning

[8]In proceedings to vacate sentence, movant could not assert claim which had already been passed upon in movant's direct appeal. *Scott v. United States*, 545 F.2d 1116 (8th Cir. 1976); *Evans v. United States*, 346 F.2d 512 (8th Cir. 1965).

was adequate. Consequently, Nelson cannot seriously contend his trial counsel is ineffective in this regard.

### G. ***Other Alleged Trial Errors***

Nelson contends that a certain statement made by Mr. Berrigan during opening statement relating to Nelson being born a month premature was harmful to the defense position. This statement by Mr. Berrigan was apparently a strategic decision. Nelson cannot seriously contend that a statement by Mr. Berrigan that "he [Nelson] recovered just fine" after having been born a month premature would have affected the jury's decision to impose a death sentence in this case. It would be helpful to obtain an affidavit or testimony from Mr. Berrigan concerning why these statements were made in opening statement.

Nelson also criticizes the failure of trial counsel to call William R. Criss, a Shift Supervisor at CCA, to testify concerning statements made by Nelson after he spoke with his girlfriend and said he wanted to "do something right for the first time in [his] life." The testimony of Mr. Criss was unnecessary because the jury heard Nelson make this statement when it listened to the recorded conversation between Nelson and his girlfriend. As a result, the testimony of Mr. Criss would have been cumulative and would also have been inadmissible self-serving hearsay. (See Trial Tr. at 861, p. 16 of transcript of recording.) The best evidence of the conversation was the tape of the conversation itself, which the jury heard.

Nelson next contends that trial counsel was ineffective when Mr. Berrigan asked Kenneth Nelson about his intelligence but failed to make an offer of proof after the district court told him the court had heard enough and to move on. This contention is meaningless in light of the fact that Kenneth Nelson testified that he had a 3.69 grade point average in high school and had a successful career in the U.S. Army.

Nelson also contends trial counsel was ineffective when Mr. Berrigan failed to object when the district court admitted testimony about a knife taken from Nelson's kitchen. It is true there was no evidence the knife was connected to the crime. Consequently, the testimony concerning the knife may have been irrelevant but certainly not so prejudicial as to affect the jury's imposition of the death sentence in question. The Government never made any claim or inference that the knife was used by Nelson in connection with the crime. Rather, the testimony concerning the knife occurred when the law enforcement officer was describing items taken from Nelson's kitchen. It should also be noted that this was a sentencing hearing, not a determination of guilt or innocence. Nelson had already pled guilty and different rules of procedure apply to sentencing hearings in capital cases. The rules governing the admission of information presented in a capital sentencing hearing are governed by 18 U.S.C. § 3593(c), which states in pertinent part as follows:

> At the sentencing hearing, information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered under Section 3592. . . . The government may present any information relevant to an aggravating factor for which notice has been provided under subsection (a). Information is admissible regardless of its admissibility under the rules

> governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury. . . .

Nelson also contends Mr. Berrigan was ineffective when he failed to object to testimony from witness Paul Wilt that he had won an award from the Kansas City, Kansas, Police Department for his actions in this case. This criticism of trial counsel's performance can only be classified as second-guessing or nitpicking. It would appear trial counsel's failure to object to this testimony was simply a matter of trial strategy and a recognition that it is sometimes counterproductive to object to every arguably objectionable question asked by a prosecutor. Again, it would be helpful to obtain an affidavit or the testimony of trial counsel in order to shed further light on why there was no objection to this line of inquiry.

Nelson next contends trial counsel was ineffective when Mr. Berrigan failed to elicit from the Medical Examiner certain findings relating to the question of whether Pamela Butler was sexually assaulted by Nelson. Clearly, this was a matter of trial strategy in light of the fact that trial counsel would likely have insulted the jury's intelligence if he had seriously tried to dispute the fact that Pamela Butler was sexually assaulted. Pamela Butler, a ten-year-old child, was found lying nude under a pile of brush with a ligature wire around her throat. (Trial Tr. at 85, 285-93, 303, 319.) The little girl's hymen had been torn near the time of death and there was evidence of redness and irritation in the genital area consistent with a sexual assault having occurred. (Trial Tr. at 327-29.) The child's underpants were submitted to the Federal

Bureau of Investigation for DNA analysis. (Trial Tr. at 87.) Examination revealed the presence of semen in the crotch area of the underpants. (Trial Tr. at 345.) When compared to a sample of Nelson's blood, testing showed conclusively that he was the source of the DNA in the semen stain. (Trial Tr. at 346.) It is a well-known fact that juries believe DNA evidence to be incredibly persuasive evidence.

Nelson also contends his trial counsel failed to make appropriate objections at trial. Nelson contends his trial counsel should have objected to the case proceeding as a capital case after the jury was sworn, since Nelson now contends the requisite elements of the capital murder were not contained in the indictment. However, inclusion of aggravating factors in the indictment was not the law at the time this case was indicted and later tried. *See Ring v. Arizona*, 536 U.S. 584 (2002); *United States v. Barnette*, 390 F.3d 775, 786 (4th Cir. 2004), *United States v. Bernard*, 299 F.3d 467, 488 (5th Cir. 2002).

Nelson contends trial counsel was ineffective because he failed to object to a statement by government counsel during opening statement that the death penalty in Nelson's case was being recommended "without reservation." It should be noted this case was a sentencing hearing, not a jury trial on the issue of guilt or innocence. There is nothing improper about the statement of government counsel.

Nelson contends trial counsel was ineffective when he failed to object to additional comments in the government's opening statement that Nelson would present "a continuing threat to society." There is also nothing improper about this statement.

One of the aggravating factors pled in the Government's "Notice of Intent to Seek the Death Penalty" was the issue of future dangerousness. It was the contention of the United States and the jury heard evidence that Nelson posed an escape risk because while at CCA he had made homemade handcuff keys which were able to open a set of handcuffs. In addition, it was the United States' belief that Nelson, even if given a life sentence, posed a danger to other inmates in custody. Consequently, Nelson's argument that the above statement implied to jurors that government counsel was suggesting that Nelson might someday be released from confinement is without merit. No such argument was ever made or suggested by government counsel.

Nelson also contends trial counsel was ineffective when Mr. Berrigan agreed not to object to certain hearsay statements from Special Agent Cullen Scott during his testimony. However, the record will reflect that Mr. Berrigan did object to some portions of the testimony of Agent Scott. Here, Nelson pled guilty before trial. In order to acquaint the jury with the facts of the crime to which Nelson pled guilty, Agent Scott testified to an overview of the investigation of the kidnapping and murder of Pamela Butler from the date of her kidnapping on October 12, 1999, to the discovery of her body on October 15, 1999.

Agent Scott's testimony recounted the investigation of the crime, including the statement of witnesses, the results of the various searches, the review of relevant records, and how the investigation then progressed based on this information. Agent Scott further identified photographs, maps, and diagrams taken or made by the FBI

regarding important locations in the investigation, such as the kidnap site, the church and wooded area where the child's body was found, and the street where the abandoned truck was found. This was done to provide the jury with an understanding of the details and circumstances of the crime and its investigation. As has been noted, "It is proper for the jury to consider, during the penalty phase of a capital trial, all evidence concerning the nature and circumstances of the offense." *Mason v. Mitchell*, 95 F.Supp.2d 744, 767 (N.D. Ohio 2000).

Subsequent to Agent Scott's testimony virtually all of the witnesses described in his testimonial summary actually testified in person. Consequently, Nelson was not deprived of his Sixth Amendment right to confront and cross-examine his accusers. The only persons providing significant information to the investigation who did not testify but whose information was related by Special Agent Scott in his testimony were Mr. and Mrs. Condra, who discovered the pickup truck parked behind the church in Grain Valley on October 12, later leading law enforcement to center their search for the child's body in that area.

In addition, Nancy Nelson did not testify. Ms. Nelson provided information that she was with Nelson between 8 and 10 p.m. on the evening of October 12. Finally, David Cunningham, employer of Nelson and owner of the pickup truck, did not testify for the Government. However, both Nancy Nelson and David Cunningham testified in Nelson's case-in-chief. Notably, neither witness refuted or contradicted any matter related by Special Agent Scott in his testimony.

Nelson contends that Special Agent Scott's testimony deprived him of the right to confront witnesses against him. The proof at a sentencing phase of a capital case is not governed by traditional rules of evidence. As mentioned previously, 18 U.S.C. § 3593(c) provides in part, "Information is admissible regardless of its admissibility under rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." Therefore, the fact that part of Special Agent Scott's testimony may have been hearsay does not make it inadmissible.

The next issue is whether Nelson was deprived in any meaningful way of his right to confront his accusers. Clearly, he was not. First, it must be remembered that Nelson had pled guilty to the offense and thereby forfeited any factual defense to the crime. Secondly, all but two of the various witnesses mentioned by Agent Scott in his testimony testified and were subject to cross-examination by Nelson's counsel. The admission of Agent Scott's testimony did not in any way deprive Nelson of any rights guaranteed to him.

Nelson next attacks his trial counsel by claiming that objections should have been made to government counsel's closing argument during the sentencing phase of his trial. Nelson sets forth in his § 2255 motion a large number of comments that current counsel now find objectionable. However, it can be fairly said that lodging objections during closing argument to opposing counsel's argument is a matter of

strategy. Many skilled practitioners do not make it a practice to continually object during closing argument because it is counterproductive with the jury and the attorney can be viewed as an obstructionist. Consequently, testimony from trial counsel would be of assistance in responding to this allegation.

Moreover, none of the statements made by government counsel during closing argument were improper. It is important to note this was a sentencing hearing under the relaxed standards as described in 18 U.S.C. § 3593. In *Brooks v. Kemp*, 762 F.2d 1383 (11th Cir. 1985) (en banc), the Eleventh Circuit considered the standard for federal habeas corpus review of alleged errors in prosecutorial closing arguments. The standard, first explicitly discussed in *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 (1974), is not whether the complained-of comments are egregious or "universally condemned," but whether they rendered Nelson's trial "fundamentally unfair." *Id.*, 416 U.S. at 642. To make that determination regarding argument in a capital sentencing hearing, a reviewing court should ask whether there is a reasonable probability that, in the absence of the offending remarks, the sentencing outcome would have been different. *Brooks v. Kemp*, 762 F.2d at 1402; *also see Strickland v. Washington*, 466 U.S. at 2068. Here, the United States contends the remarks made by government counsel were not improper. However, assuming *arguendo* some of the remarks may have been improper, one cannot seriously contend they would have led to a different result in the sentence of the jury in light of the horrific facts involved in this case.

Nelson next contends that his trial counsel were ineffective when they failed to call a forensic pathologist, Dr. Thomas L. Bennett, who was present in the courthouse and prepared to testify that the physical findings at an autopsy did not support a conclusion that the victim had been sexually penetrated. The decision not to call Dr. Bennett can only be answered by testimony or an affidavit from trial counsel. However, it is apparent that the decision not to call Dr. Bennett was a matter of trial strategy.

Nelson next contends his trial counsel were ineffective when the Government asked Penny Butler, the victim's sister, if she was scared when she testified. This question is not improper. The question does not suggest Ms. Butler was afraid of Nelson; rather, it merely implied that she might be nervous about testifying in court.

Nelson also contends his trial counsel were ineffective when they advised and convinced him to plead guilty to Count One of the indictment in exchange for the Government dismissing Count Two, thereby allowing the defense argue that Nelson had accepted responsibility for his actions, a contention that was unanimously rejected by the jury. Nelson had a right to waive his constitutional right to a jury trial and plead guilty. An extensive record was made at the guilty plea hearing and it is clear from my review of the record that it was a knowing and voluntary plea of guilty by Nelson. Any discussions between Nelson and trial counsel on his decision to enter a plea of guilty to Count One are discussions of which government counsel has no information. Again,

it will be necessary to have testimony at a hearing or an affidavit in order to learn all of the circumstances surrounding this decision.

Nelson also contends trial counsel failed to argue in his motion for a new trial that the district court had been in error in refusing to let the defense ask a witness, Fred Lawrence, whether the Bureau of Prisons was equipped to handle the security of Nelson. First, Fred Lawrence was the Warden at CCA and was not an employee of the Bureau of Prisons. In addition, other witnesses testified on Nelson's behalf in the mitigation presentation and testified Nelson had not been a security risk at CCA. For example, Lt. Bruce Roberts, a CCA employee, testified favorably for Nelson in this regard.

Nelson next contends trial counsel failed to argue in his motion for a new trial that the district court had erred in refusing to let trial counsel cross-examine Roger Moore, Jr., Assistant Warden at CCA, concerning alleged statements Mr. Moore made to Nelson. Again, the reason why this issue was not raised in the motion for a new trial is only a matter which can be answered by trial counsel.

Similarly, Nelson contends defense counsel failed to argue in his motion for a new trial that the district court abused its discretion in letting the Government present evidence through Lt. Bruce Roberts that an inmate had told Roberts that Nelson had threatened to harm the inmate's five-year-old daughter. Again, it will be necessary to obtain testimony or an affidavit from trial counsel on this question as well.

***H.*** ***Ineffective Assistance of Counsel on Appeal***

Finally, Nelson contends his appellate counsel were ineffective by failing to raise a variety of issues on appeal. The decision on which issues to raise on appeal is only a question which can be answered by appellate counsel, Ms. Susan Hunt. Government counsel can only assume Ms. Hunt, a very experienced criminal defense attorney, attempted to only raise the claims which she and her client believe were meritorious and which might result in a reversal on appeal. Again, it will be necessary to obtain testimony from Ms. Hunt on the questions surrounding issues raised on appeal. In determining whether counsel performed effectively on appeal, the *Strickland* test applies. *Smith v. Robbins*, 528 U.S. 259, 287 (2000); *accord Bell v. Lockhart*, 795 F.2d 655, 657 (8th Cir. 1986). Nelson must show both that counsel's representation fell below an objective standard of reasonableness and that the deficiencies prejudiced him. *See Strickland*, 466 U.S. at 687-88. The United States does not believe Nelson can meet this burden.

## IV. <u>Conclusion</u>

The United States respectfully requests that the Court enter an order denying Nelson's motion filed pursuant to 28 U.S.C. § 2255 following an evidentiary hearing in this case. Nelson has not met his burden by demonstrating his trial and appellate counsel's performance was unreasonable and he has not demonstrated the efforts of counsel were so prejudicial that the adversarial balance between the defense and prosecution was upset. However, the United States believes it will be necessary to obtain testimony from both Patrick Berrigan and Susan Hunt in order to adequately create a record to address all of the issues raised by Nelson in his motion.

Alternatively, the Court could enter an order requiring Mr. Berrigan and Ms. Hunt to prepare affidavits in response to Nelson's allegations.

Respectfully submitted,

TODD P. GRAVES
United States Attorney

By *[/s/ Matt J. Whitworth]*

MATT J. WHITWORTH
Deputy United States Attorney

Charles Evans Whittaker Courthouse
400 East Ninth Street, Suite 5510
Kansas City, Missouri 64106
Telephone: (816) 426-3122

*Attorneys for Respondent*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing was delivered on February 24, 2006, to the CM-ECF system of the United States District Court for the Western District of Missouri for electronic delivery to all counsel of record.

*/s/ Matt J. Whitworth*
Matt J. Whitworth
Deputy United States Attorney

MJW/dc