IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| KEITH D. NELSON, | : | |
| Movant, | : | |
| vs. | : | 4:04-cv-8005(FJG) |
| UNITED STATES OF AMERICA, | : | |
| Respondent. | : | |

MOVANT'S REPLY IN FURTHER SUPPORT OF HIS MOTION
TO VACATE THE CONVICTION AND SENTENCE IMPOSED

COMES NOW Keith D. Nelson ("Movant"), by his undersigned counsel, and files this reply to the government's suggestions in opposition ("US Reply") filed with this Court on February 24, 2006. Movant reiterates his request for a hearing on all disputed issues of fact. Movant reserves the right to amend his petition, and this reply, in accordance with law. The following constitutes Movant's reply to the government's opposition.

**A. Supplemental procedural history**

On November 6, 2005, Movant filed a motion pursuant to 28 U.S.C. § 2255 seeking to set aside his judgment of conviction and sentence of death ("the 2255 motion"). On November 14, 2005, he filed a memorandum of law in further support of the claims presented in that motion. The government, as noted, filed its suggestions in opposition to the 2255 motion on February 24, 2006.

**B. Scope of this reply**

Many of the issues presented in the government's reply simply reflect the government's disagreement with the factual and/or legal basis of certain aspects of the 2255 motion. It is not counsels' intention to repeat each and every claim presented in the original petition. Instead, counsel will focus on particular areas of legal and/or factual dispute that, in counsels' judgment, require specific attention by way of a reply.

**C. A hearing will be required; affidavits are inadequate**

Throughout its answer, the government concedes that an evidentiary hearing "on at least a few of [Movant's] claims will probably be necessary." (US Reply, *e.g.*, at 3,4.) Movant agrees that a hearing is needed, but rejects the limited scope of such a hearing suggested by the government and also objects to the government's suggestion that affidavits would suffice.

The government notes that it will have difficulty responding to the 2255 motion without sworn testimony from at least Movant's trial counsel, Patrick Berrgian, Esquire, and Susan Hunt, Esquire.[1] (*Id.*) The government suggests, however, that affidavits from trial counsel would suffice. That suggestion denigrates the importance of the overall decision this Court must eventually reach and is also impractical. There are a host of issues presented in this petition regarding matters primarily or exclusively within the knowledge of trial counsel. Movant's counsel have conducted many hours of one-on-one interviews with trial counsel in attempting to understand the course of this case, decisions made by counsel, and to gain

[1]In this regard, the government apparently finds the record far less certain than this Court did when, acting through Judge Gaitan, it concluded, having heard no evidence, that trial counsel's performance more than satisfied the requirements of *Strickland v. Washington*, 466 U.S. 668 (1984). Because, *inter alia*, the entry of that order would lead a reasonable person to doubt Judge Gaitan's impartiality, Movant, on today's date, has filed a motion seeking to disqualify Judge Gaitan from further participation in this matter.

an overall sense of the nature and quality of trial counsel's representation.[2] Reducing those discussions to affidavits would be difficult indeed. Moreover, testimony in the traditional Q & A format would allow full development of the evidence and offer the government the opportunity to cross-examine and, finally, will allow this Court to make reliable and responsible credibility findings from a comprehensive record. A judicial decision on something as serious as life or death ought not to be determined on the basis of affidavits.

Section 2255 provides for a hearing: "Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States Attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255; *accord*, *Koskela v. United States*, 235 F.3d 1148 , 1149 (8th Cir. 2001) (cause remanded for an evidentiary claim that counsel rendered ineffective assistance in failing to call certain witnesses); *Donahue v. United States*, 2000 U.S. App. LEXIS 18 (8th Cir. 2000) (Evidentiary hearing was required to resolve a post-conviction claim of ineffective assistance of counsel where the government presented only the affidavit of defendant's trial counsel as evidence to rebut the claim.); *Smith v. United States*, 182 F.3d 1023 (8th Cir. 1999) (Judgment dismissing prisoner's motion to set aside a criminal conviction was overturned, where the district court failed to hold an evidentiary hearing regarding prisoner's ineffective assistance of counsel claim.); *Rose v. United States*, 513 F.2d 1251 (8th Cir. 1975) (A defendant was entitled to a hearing on his post-conviction motion to set aside his sentence based on his alleged incompetence at the time of his guilty plea, when there had

[2]Movant's counsel take exception to this Court's observation in its order of February 2006 that such efforts amount to nothing but "second-guessing" motivated by a desire to "vilify" trial counsel. It is a simple fact of life that good lawyers are capable of making serious mistakes.

never been a previous federal hearing on the issue.)

At an evidentiary hearing, Movant proposes to call, at a minimum, the following witnesses:[3]

1. Patrick Berrigan, Esquire: Mr. Berrigan served as Movant's trial counsel and would be expected to provide testimony on the broad range of issues set out in the 2255 motion. He did not enter the case until February 2001. Of particular relevance, Mr. Berrigan is expected to testify that, as of the fall of 2001, Movant's case was not ready to go to trial and that Mr. Berrigan should have moved to adjourn the trial, but did not do so. Mr. Berrigan is also expected to testify that Movant's decision not to cooperated with the government's mental health experts was on the advice of his counsel and not an independent decision reached by Movant. Mr. Berrigan would also be expected to testify that despite having funding for mental-health experts, no mental-health evaluation of Movant was undertaken until October 2001, shortly before the commencement of the trial.

2. Susan M. Hunt, Esquire: Ms. Hunt served as Movant's trial counsel and would be expected to provide testimony on the broad range of issues set out in the 2255 motion. She served as Movant's counsel from early in the case. In addition to confirming certain statements by Mr. Berrigan, Ms. Hunt is expected to testify about the efforts she made to gather evidence in mitigation and to supervise the activities of mitigation specialist Tena Francis. By the time the case came to trial in the fall of 2001, it was Ms. Hunt's belief that an adjournment should have been requested. She is expected to confirm the fact that Movant's refusal to be evaluated by government mental-health experts was on the advice of counsel. Ms. Hunt also served as one of Movant's appellate counsel and will provide testimony regarding appellate representation and the process through which issues were selected for appellate briefing.

3. Jennifer Herndon, Esquire: Ms. Herndon served as one of two of Movant's appellate counsel. She is expected to testify that, because of time constraints and other pressures, she was unable to conduct an adequate review of the record of Movant's case and, as a result, did not file a complete and adequate appellate brief.

4. Daniel V. Foster, Psy.D.: Dr. Foster was a psychologist who evaluated Movant during the week-end of October 5 and 6, 2001. Dr. Foster would describe his evaluation as, in essence, only a beginning and as "too little, too

[3]This listing is not intended to serve as a formal proffer of the proposed testimony, beyond a good faith effort to indicate that each proffered witness has relevant information to bring to this dispute. Neither is this list exhaustive in the sense of setting out the universe of potential witnesses.

late." Dr. Foster never completed his evaluation and was not asked to do so.[4] In his report, he described his time spent with Movant as "primarily spent in trust building and history taking."

5. Tena Francis: Ms. Francis served as the mitigation specialist in Movant's case. The application to have her serve in that capacity was filed on December 12, 2000. Ms. Francis would be expected to testify regarding the incomplete status of the mitigation investigation when she entered the case and the difficulties she encountered in conducting her investigation. She is expected to testify that in June 2001 she advised trial counsel, in a detailed memorandum and telephone conference, of many areas of the ongoing mitigation investigation that needed to be completed prior to trial. Ms. Francis would be expected to testify that she had very little involvement in the case following the June memo and conference and. to the best of her knowledge and ability, very few of the necessary investigative steps were accomplished.

6. Donna Haddid: Ms. Haddid was an investigator who worked for Ms. Francis. She would be expected to testify about the investigative steps that she took in attempting to prepare a case-in-mitigation. As importantly, Ms. Haddid would be expected to testify regarding investigative steps that were not taken.

7. Jill Miller, MSSW: Ms. Miller is a highly-experienced and respected mitigation investigator. She was appointed by this Court, on the application of Movant's counsel, to assess the status of the mitigation investigation at the time movant's case came to trial and to develop a plan for completing an adequate mitigation investigation so that this Court would be in a position to make an accurate judgment regarding the failure of trial counsel to conduct an adequate investigation and to present an adequate penalty-phase. When additional funding was sought from this Court to have Ms. Miller continue her work, the application was denied.

8. Michael M. Gelbort, Ph.D.: In early 2001, Movant's trial counsel secured funds to conduct a neuropsychological examination of Movant. That examination, however, was never done. This Court subsequently approved a motion brought by Movant's present counsel to conduct such an examination. Dr. Gelbort thereafter examined Movant for evidence of organic brain dysfunction and reached the conclusion that there was such evidence.[5]

Additionally, it may be necessary to call as witnesses Movant's prior counsel in order

---

[4]The record of this case reflects that on September 4, 2001, Movant's trial counsel filed a notice that the defense would offer expert evidence on the issue of Movant's mental condition. However, a motion to have Dr. Foster approved to serve as an expert was not filed until September 17, 2001. The first (and only) motion to have Dr. Foster travel to interview and evaluate Movant was not filed until October 2, 2001.

[5]A copy of Dr. Gelbort's c.v. and report will be supplied separately to the government.

to establish the nature of any investigation conducted and the capital qualifications of those attorneys. Movant may also seek to present mitigation witnesses not called by Movant's trial counsel. Finally, Natalie Novik Brown, Ph.D., a psychologist expert in the diagnosis of Fetal Alcohol Syndrome Effect, has begun a review of the records in the case and has reached a tentative initial conclusion that Movant may fall within that diagnosis. Dr. Brown's analysis is ongoing.

It is likely that the most important function this Court will perform in reference to this motion is fact-finding. The overall legal principles governing a 2255 motion are relatively settled and, therefore, it will be the application of facts to legal principles that will determine the outcome of this case.

**D. The scope of any waiver of the attorney-client privilege**

In footnote in its response to the 2255 motion, the government asserts that "[Movant] waives the attorney-client privilege as to *all communications* with his allegedly ineffective lawyer." (US Reply at p. 4, n. 1, *citing United States v. Bittaker,* 331 F.3d 715, 716 (9th Cir. 2003); *Tasby v. United States,* 504 F.2d 332, 336 (8th Cir. 1974).) This position paints with too broad a brush. The filing of a motion that seeks to set aside a judgment, *inter alia* on the basis of a lawyer's ineffective assistance, does not carry an automatic waiver of all confidential or privilege matters A lawyer's ethical responsibilities in this area provide as follows:

> A lawyer may reveal . . . information [relating to representation of a client] *to the extent the lawyer reasonably believes necessary . . . to establish a claim or defense* on behalf of the lawyer in a controversy between the lawyer and the client, to establish a defense to a criminal charge or civil claim against the lawyer based upon conduct in which the client was involved, or to respond to allegations in any proceeding concerning the lawyer's representation of the client.

Rule 1.6(b)(2) of the Model Rules of Professional Conduct (emphasis added). The Model Rules only anticipate counsel being able to disclose those communications reasonably necessary to testify with regard to a claim of ineffectiveness. *See, United States v. Ballard*, 779 F.2d 287, 292 (5th Cir. 1986) (an attorney may reveal those communications with his client in order to defend against a claim of ineffectiveness). Throughout its response, the government complains about trial counsels' refusal to disclose confidential communications (*See* US Reply at pp. 4, 5, 38, 40, 45, 47, 48). Obviously, however, trial counsel do not find it necessary to breach Movant's attorney-client privilege, and they should not be forced to do so.

> It is the glory of the legal profession that its fidelity to its clients can be depended upon; that a man may safely go to a lawyer and converse with him upon his legal rights in litigation with absolute assurance that that lawyer's tongue is tied from ever discussing it.

*People v. Curry,* 272 N.E.2d 669, 672 (Ill.App. 4th Dist. 1971) (citations omitted).

"The right to hire and consult an attorney is protected by the First Amendment's guarantee of freedom of speech, association and petition." *Denius v. Dunlap*, 209 F.3d 944, 953-954 (7th Cir. 2000), *citing DeLoach v. Bevers,* 922 F.2d 618, 620 (10th Cir. 1990) ("The right to retain and consult an attorney . . . implicates not only the Sixth Amendment but also clearly established First Amendment rights of association and free speech."). Whether the attorney-client privilege is housed in the constitution had not been squarely addressed until 2000. *Cf.,* S.E.C. *v. Forma*, 117 F.R.D. 516, 522 (S.D. NY 1987); *Denius*, 209 F.3d at 954; *see also United States v. Khan,* 309 F.Supp2d 789, 799 (E.D. Va. 2004). The Ninth Circuit – in a case relied upon by the government – has since assumed, without deciding, that the privilege takes on a constitutional dimension. *Bittaker,* 331 F.3d at 723, n.9;

This First Amendment right to consult with an attorney has, as an essential element, the ability to maintain confidentiality in attorney-client communications. *Denius*, *supra*. "The right to confer with counsel would be hollow if those consulting counsel could not speak freely about their legal problems." *Martin v. Lauer*, 686 F.2d 24, 32 (D.C. Cir. 1982). The privilege protects the client's ability to receive the best possible legal advice through open communication and it protects the public's ability to maintain confidence in observance of the law and administration of justice. *Swindler & Berlin v. United States*, 524 U.S. 399, 403, 118 S.Ct. 2081 (1998), *citing Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677 (1981).

Movant recognizes that courts have rejected the notion that a blanket privilege remains after allegations of ineffective assistance have been made. "To be sure, litigants cannot hide behind the privilege *if they are relying upon privileged communications to make their case*." *In re Lott*, 424 F.3d 446, 454 (6th Cir. 2005) (emphasis added). This is premised on the notion that by raising such claims of ineffectiveness, Movant has waived his privilege. That does not mean, however, that Movant has waived his privilege "as to all communications with his allegedly ineffective lawyer." *See,* Government's Suggestions in Opposition at p. 4, n.4. "The attorney-client privilege cannot at once be used as a shield and a sword." *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991). While the sword may remain sheathed, the privilege stands. *Lott*, 424 F.3d at 454.

The fundamental purpose of the attorney-client privilege is to "encourage full and frank communication between attorneys and their clients." *United States v. Zolin*, 491 U.S. 554, 109 S.Ct. 2619, 2626 (1989). The privilege "recognizes that sound legal advice

and advocacy serves the public ends and that such advice or advocacy depends upon the lawyer being fully informed by the client." *Upjohn,* 449 U.S. at 389.

"Because the maintenance of [the privilege] is vital to the ability of an attorney to effectively counsel her client, interference with this confidentiality impedes the client's First Amendment right to obtain legal advice." The attorney-client privilege is one of the oldest recognized privileges for confidential communications. *See, Hunt v. Blackburn,* 128 U.S. 464, 470, 9 S.Ct. 125 (1888). The waiver of such an entrenched and fundamental constitutional right must be knowing and voluntary. *Johnson v. Zerbst*, 304 U.S. 458, 465, 58 S.Ct. 1019, 1023 (1938). Indeed, this Court has a "serious and weighty" duty to protect against unwarranted intrusions upon Movant's attorney-client privilege. *Id.* This responsibility "is not to be discharged by a matter of mere rote, but with sound and advised discretion, with an eye to avoid unreasonable or undue departures from that mode of trial or from any of the essential elements thereof...." *Glasser v. United States*, 315 U.S. 60, 71, 62 S.Ct. 457, 465 (1942). Courts *may not* "presume acquiescence in the loss of fundamental rights." *Johnson v. Zerbst*, 304 U.S. at 464, 58 S.Ct. at 1023 (citation omitted).

Consequently, to encourage full and frank communication, any waiver of the privilege must be limited in reach. "[W]hen a habeas petitioner such as [Movant] launches an attack on the reasonableness of his attorney's strategy in conjunction with a claim of ineffective assistance of counsel, he puts at issue his communications with counsel *relating to those strategic choices.*" *Johnson v. Alabama*, 256 F.3d 1156, 1179 (11th Cir. 2001) (emphasis added); *accord Jackson v. United States*, 2001 U.S. Dist. LEXIS 23013 at 24 (ND Tex. 2001) ("In Section 2255 proceedings in which the movant

alleges his former counsel rendered ineffective assistance by virtue of certain specific acts or omissions, the movant has effectively waived the attorney client privilege with regard to *all communications relevant to those specific allegations* of ineffective assistance.") (emphasis added); *Harrelson v. United States*, 967 F. Supp. 909, 915 (WD Tex. 1997) ("insofar as movant premises his claims of ineffective assistance on either his communications regarding certain subjects with his former attorney or on allegations that his former attorney failed to communicate relevant information on those subjects to movant, [counsel] is free to disclose the full extent of his communications with movant *regarding those same subjects*.") (emphasis added).

The government's claim of wholesale waiver must be rejected.

**E. The "strength" of the mitigation case presented to the jury**

At trial, the government denigrated and mocked the case presented in mitigation as "all this excuse testimony" a "guilt trip," "the abuse excuse," an effort to claim the crime was "somebody else's fault," a smoke screen," an effort "to divert [the jury] from what this case is really about, the slaughter of an innocent," and a conscious effort by Movant's trial counsel to have him "escape justice." In replying to the 2255 motion, the government spends several pages (US Reply at 13-19) describing the evidence it had mocked and derided at trial, this time around describing the evidence as probative of, "the difficult circumstances of Nelson's childhood and his neglectful, alcoholic mother, and abusive, absent father." (US Reply at 13.) In the government's view, "Defense counsel did an excellent job of re-creating for the jury Nelson's abusive and disadvantaged childhood." (US Reply at 23.)

The government's position is hypocritical. The praise for trial counsels' efforts is further belied by the fact that of the 10 mitigating factors presented to the jury, only one

juror was persuaded that just one of the mitigating factors put forward by the defense had been established. Thus, the jury rejected unanimously nine of the ten factors and were 11-1 in favor of rejecting the remaining mitigating factor. The jury returned a death verdict after deliberating only two hours.

Without a doubt, as the government observes, this was an aggravated case. (US Reply at 22.) The result, however, was hardly "all but inevitable." (*Id.*) Theoretically, *all* capital cases brought by the government are highly aggravated. Federal capital prosecutions are relatively rare. Figures current as of June 28, 2006 reflect that, since the 1988 enactment of a modern federal death penalty, of 2,125 potential federal capital defendants, various Attorneys General have authorized capital prosecutions against a total of just 382, fewer than one in five.[6] Despite this presumably informed selectivity, federal juries do not routinely return death verdicts. Indeed, of the 146 federal capital cases that have proceeded to a penalty trial, juries (and in one case, a judge) have imposed 95 life sentences and 51 sentences of death. Thus, the government succeeds in having a jury agree with the government's position on the death penalty in only 37% of the cases tried.[7] Thus, the government fails to convince juries to return death verdicts in nearly two-thirds of the capital cases it brings, meaning that life verdicts are returned by juries in any number of cases where, but for the contrary verdict, a government prosecutor might well

---

[6]*See* Declaration of Kevin McNally of the Federal Death Penalty Resource Counsel Project; available on line at http://capdefnet.org/pdf_library/Frequency, last visited July 26, 2006.

[7]*See,* "Overview of the Federal Death Penalty Process, http://capdefnet.org/fdprc/contents/shared_filed/docs/1_overview_of_fed_death_process.asp. (Last visited July 26, 2006; figures current as of June 28, 2006).

have asserted that the penalty was "all but inevitable." Thus, it is no answer to defense counsels' failings in this case to suggest an inevitability of the outcome.[8]

### F. Mental health evidence

There was no mental health evidence presented on Movant's case at trial. This was squarely the result of failings by counsel. This is an area that Movant's counsel are prepared to develop at length during a hearing.

A review of orders entered by this Court demonstrate that Movant's trial counsel sought and received authorization to retain the services of mental health professionals at an early stage of the case. In June 2000, a motion was presented to the Court and granted to retain the services of a psychiatrist, Dr. Peterson. Dr. Peterson never examined Movant. In January 2001, a motion was presented to have a neuropsychological examination performed. No such examination took place until Dr. Gelbort examined Movant in the fall of 2005 as part of the preparation for the filing of this motion. It was not until the eve of trial, the fall of 2001, that the services of a forensic psychologist were requested. The motion for the appointment of Dr. Foster, as noted earlier, was not even filed until September 17, 2001, and Dr. Foster did not actually examine Movant until October 5 and 6, 2001. Dr. Foster himself described his evaluation as incomplete and preliminary. Despite the fact that two of Movant's brothers were diagnosed schizophrenics, no effort was made to locate a mental health professional with expertise in schizophrenia.[9]

---

[8]Attached to this reply is a summary of every federal death penalty case that has proceeded to a penalty-phase verdict.

[9]When Movant's present counsel sought such an appointment, this Court denied the application on the basis of pre-judging the case. This leaves Movant in the unfortunate posture of not being able to predict what the evaluation would have uncovered.

There is no excuse for having delayed the mental-health evaluation of Movant until the fall of 2001. Applications for the funding of such examinations had been approved by this Court far in advance of the trial date. Dr. Foster believed that, had he done a complete examination, he would have developed powerful evidence in mitigation. The neuropsychological examination conducted by Dr. Gelbort as part of these proceedings in fact developed evidence that Movant is brain-damaged and suffers from a condition beyond his control, "frontal lobe disturbance/dysfunction [that] has an effect on his everyday thinking and reasoning capacities" and which will lead to "episodes of impaired reasoning . . . ."

With regard to the "waiver" of the presentation of mental health evidence discussed by the government in its reply (US Reply at 23-34), Movant is prepared to establish at an evidentiary hearing that Movant acted at the direction and advice of counsel. Movant will further establish that trial counsel were motivated by the desire to preserve for appeal a perceived trial error, *i.e.* this Court's exclusion of Dr. Foster's evidence.[10] This was not, however, a reasonable tactical choice since Movant's trial counsel had failed to explore in any comprehensive way a potential mental-health mitigation case and, therefore, the decision to forgo such a presentation was dictated by a lack of preparation, not reasonable tactical choices.

Recognizing that Dr. Gelbort's neuropsychological testing revealed significant evidence of brain dysfunction, the government denigrates the evidence by offering to present expert testimony that there is "no scientific method available for establishing a

---

[10]In this regard, it is noteworthy that Mr. Berrigan artfully deflected Magistrate-Judge Hays' direct question on this issue. (*See* proceedings quoted in US Reply at 26-27.) Mr. Berrigan and Ms. Hunt will testify at a hearing that the decision not to submit to examination by the government's experts was the result of defense counsels' advice.

causal connection between brain injury and criminal behavior." (US Reply at 33-34.) Movant will be prepared to meet such testimony if and when it is presented. Moreover, the government is in error when it implies that for the evidence to be mitigating, a causal connection to the crime must be proven. This was exactly the point of the Supreme Court's decisions in *Tennard. Dretke*, 542 U.S. 274 (2004) and *Smith v. Texas*, 543 U.S. 37 (2004). In *Smith*, decided five months after *Tennard*, the Court reiterated its rejection of the "nexus" requirement that the Texas Court of Criminal Appeals, as endorsed by the Fifth Circuit, had erected as a barrier to the admission of mitigating evidence, stating, "[w]e rejected the Fifth Circuit's 'nexus' requirement in *Tennard* . . . ." *Smith v. Texas*, 543 U.S. at 45. The absence of a nexus to the crime does not render neuropsychological testing irrelevant. Neither does Movant concede that a nexus requirement could not be established.

**G. Failure to object to certain evidence and argument; failure to call Dr. Bennet**

While recognizing that there was evidence and argument that may have been improper, the government correctly notes that an explanation as to counsel's failure to object must await an evidentiary hearing. (US Reply at 38-45.) The same is true with regard to the decision not to call Dr. Bennett. (US Reply at 46.)

**H. Effective assistance of appellate counsel**

The government recognizes the need for a hearing on this issue (US Reply at 47-48) and Movant will rely on the averments in his 2255 motion.

## CONCLUSION

As stated at the outset of this reply, it was not the intent of Movant's counsel to reply to every issue raised in the government's answer. Every issue presented in the 2255 motion, however, has now been joined. Counsel respectfully suggest that the Court set a status conference for a discussion of the scheduling of further proceedings. For the reasons expressed in this reply and in Movant's initial motion for 2255 relief, his conviction and sentence of death should be vacated.

Respectfully submitted,

/s/ Gary E. Brotherton
Legal Writes, LLC
2101 Chapel Plaza Court, Suite 13
Columbia, MO 65202-3381
(573)875-1571
(573)875-1572 (fax)
gebrotherton@legalwritesllc.com
Co-counsel to Movant, Keith Nelson

/s/ David A. Ruhnke
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
(973)744-1000
(973)746-1490
davidruhnke@ruhnkeandbarrett.com
Co-counsel to Movant, Keith Nelson

Dated: Columbia, Missouri
Montclair, New Jersey
August 21, 2006

## CERTIFICATE OF SERVICE

This will certify that, on today's date, Movant's counsel served this reply, with attachments, upon the United States by filing the document via ECF.

/s/ David A. Ruhnke
DAVID A. RUHNKE

Dated: Columbia, Missouri
Montclair, New Jersey
August 21, 2006