IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| KEITH D. NELSON, | : | |
| Movant, | : | |
| vs. | : | 4:04-CV-8005(JFG) |
| UNITED STATES OF AMERICA, | : | |
| Respondent. | : | |

MOTION FOR RELIEF PURSUANT TO F.R.CIV.P. 59

COMES NOW Keith D. Nelson ("Movant"), by his undersigned counsel, and files this motion, pursuant to F.R.CIV.P 59, for a new trial and/or amendment of the judgment, re-opening of the judgment, the taking of testimony, the entry of amended findings of fact and conclusions of law, and for a new judgment granting relief in Movant's favor on the underlying action, together with any additional relief the Court may deem just or proper.

STATEMENT OF THE CASE

**A. Procedural history**

1. Trial level proceedings

On October 14, 1999, a complaint was filed in this Court charging Keith Nelson ("Movant" or "Mr. Nelson") with various federal offenses arising from his alleged involvement in the October 12, 1999 kidnap and murder of 10-year old Pamela Butler. Thereafter a two-count indictment was returned charging Mr. Nelson with the following

violations of the federal criminal code: count one, 18 U.S.C. § 1201(a)(1) and (g) (interstate kidnapping resulting in death); and, count two, 18 U.S.C. § 2241(c) (interstate travel with intent to engage in a sexual act with a child under age 12). Count one of the indictment provided for a potential maximum sentence of death.

On October 25, 2001, shortly before his trial was scheduled to begin, Mr. Nelson entered a plea of guilty to count one of the indictment and proceeded to trial solely on the issue of penalty. As part of the agreement allowing him to plead guilty to count one, the Government agreed to dismiss count two at the time of sentencing. On November 13, 2001, a jury was selected and trial commenced the following day. On November 28, 2001 the jury recommended imposition of a sentence of death.

On February 28, 2002, this Court denied Mr. Nelson's motion for a new trial. On March 11, 2002, the trial court imposed a sentence of death. Judgment was entered on March 12, 2002. A timely notice of appeal was filed.

2. Appellate proceedings

A timely appeal of the judgment of conviction and sentence of death was taken to the United States Court of Appeals for the Eighth Circuit. The matter was argued before the Eighth Circuit on January 16, 2003. On October 22, 2003, the Court of Appeals affirmed the conviction and sentence. Rehearing was denied in the Eighth Circuit on December 24, 2003. The United States Supreme Court denied Movant's petition for *certiorari* review on November 8, 2004. *Nelson v. United States*, 125 S.Ct. 486 (2004).

3. Post-conviction proceedings

On November 10, 2004, Mr. Nelson, through counsel, filed a motion seeking the appointment of counsel to represent him in connection with a post-conviction challenge to his conviction and sentence. On December 14, 2004, Movant's present counsel were

appointed by the Court. On November 6, 2005, Movant filed a motion pursuant to 28 U.S.C. § 2255 to set aside his conviction and sentence of death. A memorandum of law in support of the motion was filed on November 14, 2005. Movant hereby adopts by reference the averments contained in his 2255 motion.

After several extensions, the government answered the motion on February 24, 2006. In its reply, the government conceded the need for the taking of testimony. Movant filed his response to the government's answer on August 21, 2006. On that same date, August 21, 2006, Movant filed a motion to disqualify the trial judge from further participation in the case. On September 18, 2006, the government answered the disqualification motion. Movant filed his reply to that answer on October 24, 2006.

On November 21, 2006, without taking any testimony or additional evidence, the Court filed a two-page order denying both the disqualification motion and the motion to set aside the judgment. The Court made no fact-findings and engaged in no analysis, and simply adopted by reference the arguments of the government except to the extent that the government had conceded the need for an evidentiary hearing. Movant now seeks a new trial pursuant to F.R.CIV.P. 59 and such other relief as permitted by the Rule.

## LEGAL ARGUMENT

THIS COURT SHOULD VACATE THE JUDGMENT AND TAKE TESTIMONY REGARDING THE ALLEGATIONS PRESENTED IN THE PETITION.

In dismissing the 2255 motion, the Court appears to have tried to have matters both ways. In dismissing the motion without a hearing, the Court per force accepted as true the allegations in Movant's motion to vacate his conviction and sentence. On the other hand, the Court made contrary "fact-findings" with no basis in the record for doing so regarding the performance of trial and appellate counsel, finding that, "The claims of ineffective assistance of trial and appellate counsel fall within the broad perimeters of trial strategy." There was nothing in the record to support that conclusion and Movant made a specific offer of proof on these issues, and set out specific factual assertions in his 2255 motion, that should have precluded such a finding. The government, as noted in the order dismissing the motion, "requested that movant's trial and appellate counsel submit affidavits or to a hearing to further explain their reasons for this strategy . . . ." Although the reference to "this strategy" is unclear, at such a hearing trial counsel would have testified subject to cross-examination and penalties of perjury that there were not strategic components, or even good explanations, for many of the actions, and inactions, of counsel.

On the issue of Mr. Nelson's refusal to undergo evaluation by the government's experts, this Court discusses only the aspect of that refusal which was visible outside the confines of the attorney-client privilege and without knowledge of the actual facts, all of which would have been developed at a hearing. The truth is that, despite long having the funds to have Mr. Nelson evaluated by mental-health professionals, defense counsel simply neglected to get it done. Indeed, by the time the defense was required to filed a notice of its intent to offer mental-health evidence, Mr. Nelson had *still* not been seen or evaluated by any

mental health professional. By the time Dr. Foster visited Mr. Nelson it was, in the psychologist's own words, "too little, too late" and a competent evaluation was never completed. Defense counsels' subsequent advice to Mr. Nelson that he should refuse to be evaluated by the government's experts was born of desperation, not trial strategy. All of this, and more, would have been established at a hearing.

It is worth remembering at this juncture that, in his reply to the government's answer to the 2255 motion, Mr. Nelson, through counsel, was explicit about the witnesses he planned to call at a hearing. Thus, at the evidentiary hearing the government conceded was necessary, Movant proposed to call, at a minimum, the following witnesses:[1]

1. Patrick Berrigan, Esquire: Mr. Berrigan served as Movant's trial counsel and would be expected to provide testimony on the broad range of issues set out in the 2255 motion. He did not enter the case until February 2001. Of particular relevance, Mr. Berrigan is expected to testify that, as of the fall of 2001, Movant's case was not ready to go to trial and that Mr. Berrigan should have moved to adjourn the trial, but did not do so. Mr. Berrigan is also expected to testify that Movant's decision not to cooperate with the government's mental health experts was on the advice of his counsel and not an independent decision reached by Movant. Mr. Berrigan would also be expected to testify that despite having funding for mental-health experts, no mental-health evaluation of Movant was undertaken until October 2001, shortly before the commencement of the trial.

2. Susan M. Hunt, Esquire: Ms. Hunt served as Movant's trial counsel and would be expected to provide testimony on the broad range of issues set out in the 2255 motion. She served as Movant's counsel from early in the case. In addition to confirming certain statements by Mr. Berrigan, Ms. Hunt is expected to testify about the efforts she made to gather evidence in mitigation and to supervise the activities of mitigation specialist Tena Francis. By the time the case came to trial in the fall of 2001, it was Ms. Hunt's belief that an adjournment should have been requested. She is expected to confirm the fact that Movant's refusal to be evaluated by government mental-health experts was on the advice of counsel. Ms. Hunt also served as one of Movant's appellate counsel and will provide testimony regarding appellate representation

[1] This listing was not intended to serve as a formal proffer of the proposed testimony, beyond a good faith effort to indicate that each proffered witness had relevant information to bring to this dispute. Neither was the list intended to be exhaustive in the sense of setting out the universe of potential witnesses.

and the process through which issues were selected for appellate briefing.

3. Jennifer Herndon, Esquire: Ms. Herndon served as one of two of Movant's appellate counsel. She is expected to testify that, because of time constraints and other pressures, she was unable to conduct an adequate review of the record of Movant's case and, as a result, did not file a complete and adequate appellate brief.

4. Daniel V. Foster, Psy.D.: Dr. Foster was a psychologist who evaluated Movant during the week-end of October 5 and 6, 2001. Dr. Foster would describe his evaluation as, in essence, only a beginning and as "too little, too late." Dr. Foster never completed his evaluation and was not asked to do so.[2] In his report, he described his time spent with Movant as "primarily spent in trust building and history taking."

5. Tena Francis: Ms. Francis served as the mitigation specialist in Movant's case. The application to have her serve in that capacity was filed on December 12, 2000. Ms. Francis would be expected to testify regarding the incomplete status of the mitigation investigation when she entered the case and the difficulties she encountered in conducting her investigation. She was expected to testify that in June 2001 she advised trial counsel, in a detailed memorandum and telephone conference, of many areas of the ongoing mitigation investigation that needed to be completed prior to trial. Ms. Francis would be expected to testify that she had very little involvement in the case following the June memo and conference and. to the best of her knowledge and ability, very few of the necessary investigative steps were accomplished.

6. Deborah Haddid: Ms. Haddid was an investigator who worked for Ms. Francis. She would be expected to testify about the investigative steps that she took in attempting to prepare a case-in-mitigation. As importantly, Ms. Haddid would be expected to testify regarding investigative steps that were not taken.

7. Jill Miller, MSSW: Ms. Miller is a highly-experienced and respected mitigation investigator. She was appointed by this Court, on the application of Movant's counsel, to assess the status of the mitigation investigation at the time Movant's case came to trial and to develop a plan for completing an adequate mitigation investigation so that this Court would be in a position to make an accurate judgment regarding the failure of trial counsel to conduct an adequate investigation and to present an adequate penalty-phase. When additional funding was sought from this Court to have Ms. Miller continue her

---

[2]The record of this case reflects that on September 4, 2001, Movant's trial counsel filed a notice that the defense would offer expert evidence on the issue of Movant's mental condition. However, a motion to have Dr. Foster approved to serve as an expert was not even filed until September 17, 2001. The first (and only) motion to have Dr. Foster travel to interview and evaluate Movant was not filed until October 2, 2001.

work, the application was denied.

8. Michael M. Gelbort, Ph.D.: In early 2001, Movant's trial counsel secured funds to conduct a neuropsychological examination of Movant. That examination, however, was never done. This Court subsequently approved a motion brought by Movant's present counsel to conduct such an examination. In 2005, Dr. Gelbort examined Movant for evidence of organic brain dysfunction and reached the conclusion that there was such evidence.

Additionally, Movant noted in his reply that it would be necessary to call as witnesses all of Movant's prior counsel in order to establish the nature of any investigation conducted and the capital qualifications of those attorneys. Movant also noted that he intended to present mitigation witnesses not called by Movant's trial counsel. Finally, Movant noted in prior pleadings that Natalie Novik Brown, Ph.D., a psychologist expert in the diagnosis of Fetal Alcohol Syndrome Effect, had begun a review of the records in the case and had reached a tentative initial conclusion that Movant falls within that diagnosis. Dr. Brown's analysis is still ongoing.[3]

Section 2255 provides for a hearing as follows: "Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States Attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255; *accord*, *Koskela v. United States*, 235 F.3d 1148 , 1149 (8th Cir. 2001) (cause remanded for an evidentiary claim that counsel rendered ineffective assistance

[3]Filed herewith as Attachment A is an affidavit prepared by Dr. Brown documenting her work-to-date and her tentative conclusions. Dr. Brown asserts in her affidavit that, "Based upon the initial review of source documents sent to me by [Movant's counsel] as well as an interview with birth mother Nancy Nelson, I believe there is a substantial possibility that Keith Nelson may suffer from Fetal Alcohol Spectrum Disorder." Her tentative findings in this regard are fully documented in the affidavit. (Attachment A to this motion at p. 3.) Movant's counsel will be filing a motion with the Court shortly for additional funding of Dr. Brown's evaluation. At the very least, this court should re-open the judgment for the purpose of taking testimony from Dr. Brown.

in failing to call certain witnesses); *Donahue v. United States*, 2000 U.S. App. LEXIS 18 (8th Cir. 2000) (Evidentiary hearing was required to resolve a post-conviction claim of ineffective assistance of counsel where the government presented only the affidavit of defendant's trial counsel as evidence to rebut the claim.); *Smith v. United States*, 182 F.3d 1023 (8th Cir. 1999) (Judgment dismissing prisoner's motion to set aside a criminal conviction was overturned, where the district court failed to hold an evidentiary hearing regarding prisoner's ineffective assistance of counsel claim.); *Rose v. United States*, 513 F.2d 1251 (8th Cir. 1975) (A defendant was entitled to a hearing on his post-conviction motion to set aside his sentence based on his alleged incompetence at the time of his guilty plea, when there had never been a previous federal hearing on the issue.)

It is also respectfully noted that many of the claims presented in Movant's 2255 motion focused on matters counsel *failed* to pursue and, therefore, no tactical judgment can be assigned to those decisions (if ever) without at least hearing from counsel.

There was no mental health evidence presented on Movant's case at trial. This was squarely the result of failings by counsel. This is an area that Movant's counsel were (and remain) prepared to develop at length during a hearing. A review of orders entered by this Court demonstrate that Movant's trial counsel sought and received authorization to retain the services of mental health professionals at an early stage of the case. In June 2000, a motion was presented to the Court and granted to retain the services of a psychiatrist, Dr. Peterson. Dr. Peterson never examined Movant. In January 2001, a motion was presented to have a neuropsychological examination performed. No such examination took place. It was not until the eve of trial, the fall of 2001, that the services of a forensic psychologist were requested. The motion for the appointment of Dr. Foster was not even filed until September 17, 2001, and Dr. Foster did not actually examine Movant until October 5 and 6, 2001. Dr.

Foster himself described his evaluation as incomplete and preliminary. Despite the fact that two of Movant's brothers had long been diagnosed as schizophrenics, including one who was incarcerated in Texas for murder and had been deemed incompetent for a substantial period of time, no effort was made to locate a mental health professional with expertise in schizophrenia.[4]

There is no excuse for having delayed the mental-health evaluation of Movant until the fall of 2001. Applications for the funding of such examinations had been approved by this Court far in advance of the trial date. Dr. Foster believed that, had he done a complete examination, he would have developed powerful evidence in mitigation. The neuropsychological examination conducted by Dr. Gelbort in 2005 as part of these proceedings in fact developed evidence that Movant is brain-damaged and suffers from a condition beyond his control, "frontal lobe disturbance/dysfunction [that] has an effect on his everyday thinking and reasoning capacities" and which will lead to "episodes of impaired reasoning . . . ."

With regard to the "waiver" of the presentation of mental health evidence, Movant was (and remains) prepared to establish at an evidentiary hearing that Movant acted at the direction and advice of counsel. Movant would further establish that trial counsel were motivated by the desire to preserve for appeal a perceived trial error, *i.e.* this Court's exclusion of Dr. Foster's evidence.[5] This was not, however, a reasonable tactical choice

[4]When Movant's present counsel sought such an appointment, this Court denied the application on the basis of pre-judging the case. This left Movant in the Catch-22 posture of not being able to predict what the evaluation would have uncovered and, therefore, vulnerable to an argument that he had not established prejudice.

[5]In this regard, it is noteworthy that Mr. Berrigan artfully deflected Magistrate-Judge Hays' direct question on this issue. (*See* proceedings quoted in US Reply at 26-27.) Mr. Berrigan and Ms. Hunt will testify at a hearing that the decision not to submit to examination by the government's experts was the result of defense counsels' advice.

since Movant's trial counsel had failed to explore in any comprehensive way a potential mental-health mitigation case and, therefore, the decision to forgo such a presentation was dictated by a lack of preparation, not reasonable tactical choices.

Recognizing that Dr. Gelbort's neuropsychological testing revealed significant evidence of brain dysfunction, the government later denigrated the evidence by offering to present counter expert testimony, at a hearing, that there is "no scientific method available for establishing a causal connection between brain injury and criminal behavior." (US Reply at 33-34.) Movant was (and remains) prepared to meet such testimony if and when it is presented. For evidence to be mitigating, a causal connection to the crime need not be proven. This was exactly the point of the Supreme Court's decisions in *Tennard v. Dretke*, 542 U.S. 274 (2004) and *Smith v. Texas*, 543 U.S. 37 (2004). In *Smith*, decided five months after *Tennard*, the Court reiterated its rejection of the "nexus" requirement that the Texas Court of Criminal Appeals, as endorsed by the Fifth Circuit, had erected as a barrier to the admission of mitigating evidence, stating, "[w]e rejected the Fifth Circuit's 'nexus' requirement in *Tennard* . . . ." *Smith v. Texas*, 543 U.S. at 45. The absence of a nexus to the crime does not render neuropsychological testing irrelevant. Neither does Movant concede that a nexus requirement could not be established.

While recognizing that there was evidence and argument that may have been improper, the government, in reply to Movant's 2255 motion, correctly noted that an explanation as to counsel's failure to object required an evidentiary hearing. (US Reply at 38-45.) The same was true with regard to the decision not to call Dr. Bennett. (US Reply at 46.) The government recognized, as well, the need for a hearing on the issue of ineffective assistance of appellate counsel. (US Reply at 47-48.) As stated above, at such a hearing Movant's appellate counsel was expected to testify that, because of time constraints

and other pressures, she was unable to conduct an adequate review of the record of Movant's case and, as a result, did not file a complete and adequate appellate brief.

It was a critical aspect of Movant's challenge to his conviction and sentence of death that his defense counsel failed to conduct an adequate mitigation investigation. A properly-conducted investigation should have consisted of efforts to discover all reasonably available mitigating evidence and to rebut any aggravating evidence to be introduced by the Government. That was not done. Movant further asserted that trial counsel provided less than effective representation in other aspects of the case as well. The challenge to Movant's conviction and sentence of death asserted that, but for the failings of his counsel: (1) there is a reasonable probability that the results of these proceedings would have been different, (2) confidence in the reliability of the outcome has been undermined; and (3), one or more jurors would have struck a different balance.

The prejudice prong of the test enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984) requires a defendant in Movant's position to show that "there is a *reasonable* probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694 (emphasis added). In *Wiggins v. Smith*, 539 U.S. 510 (2003), the Court noted that in a death penalty scheme where a non-unanimous jury spares the defendant's life, such as the federal system, confidence in the outcome is undermined where there is "a reasonable probability that at least one juror would have struck a different balance." *Id.* at 536. The United States Supreme Court has stressed that "the adjective ["reasonable"] is important." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). In *Kyles*, the Court observed as follows:

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

*Id*.; *see also Strickland*, 466 U.S. at 693 ("a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case"); *Nix v. Whiteside*, 475 U.S. 157, 175 (1986) ("a defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice"). As explained in *Strickland* itself:

> "[R]easonable probability of a different result" is thus *less than a preponderance of the evidence*. It is present when an evaluation of all of the evidence that should have been before the jury is "sufficient to undermine confidence in the outcome."

*Strickland*, 466 U.S. at 693 (emphasis added). In a capital case, a "reasonable probability" of a different result occurs when the full "body of mitigation evidence" that could have been presented case "might well have influenced the jury's appraisal of [the defendant's] moral culpability." *Williams*, 529 U.S. at 398.

The task of defending a capital case, and preparing a case in mitigation, is unfamiliar to most courts and most attorneys, no matter how experienced in the area of criminal law. In 1983, Professor Gary Goodpaster published an article entitled, "The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases," 58 N.Y.U.L.REV. 299 (1983). In the article, Professor Goodpaster discussed the role of the advocate in a death-penalty case in the following terms:

> As an advocate, . . . defense counsel has the related but distinct function of attempting to persuade the jury to exercise mercy. Defense counsel therefore has both the opportunity and the duty to present potentially beneficial mitigating evidence and to attempt to convince the sentencer that, notwithstanding the defendant's guilt, he or she is a person who should not die. Once the defendant has been found guilty of a capital crime, a life sentence is counsel's only remaining advocacy goal. As an advocate for life, counsel must attempt to demonstrate that mitigating factors outweigh aggravating factors and must present the sentencer with the most persuasive possible case for mercy.

58 N.Y.U.L.REV. at 318. In his article, the author also outlined the steps an attorney handling a capital case should follow, including the absolute duty of trial counsel "to investigate the client's life history, and emotional and psychological make-up, as well as the substantive case and defenses" noting further that, "The importance of this investigation, and the thoroughness and care with which it is conducted, cannot be overemphasized." *Id.* at 324. In describing the nature of such an investigation, Professor Goodpaster emphasized both its difficulty and time-consuming nature:

> Such investigations present more obstacles than those conducted in furtherance of an ordinary criminal defense, primarily because of the difficulty in locating relevant witnesses. Over the years, the witnesses who are acquainted with the defendant are likely to have become geographically dispersed and more difficult to trace than guilt-phase witnesses. Indeed, constructing a mitigating case on the basis of the life-history investigation is perhaps best viewed as a successive winnowing process: the attorney's investigator tracks down all mitigating leads; the attorney next interviews the most promising contacts and then chooses to call some of them at the penalty phase of the trial in accordance with a coherently developed strategy.

*Id.*

In *Strickland*, the Supreme Court established the now familiar two-prong test for evaluating claims that defense attorneys in criminal cases did not provide the effective assistance of counsel guaranteed by the Sixth Amendment to the United States Constitution. First, counsel's performance must fall "below an objective standard of reasonableness," *Strickland*, 466 U.S. at 680, and second, there must be a "reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different." *Id.* at 693-94. The first prong of *Strickland* is met where, in light of all the circumstances of the case, counsel's "acts or omissions were outside the range of professionally competent assistance." *Id.* at 690. *See also, Burger v. Kemp*, 483 U.S. 776, 795 (1987); *United States v. Kauffman*, 109 F.3d 186, 190 (3d Cir. 1997). The second prong of *Strickland* is met

where, but for counsel's unprofessional performance, there is a reasonable probability that the "result" of the proceeding would have been different.[6] *Kauffman*, 109 F.3d at 190 (quoting *United States v. Nino,* 878 F.2d 702, 711 (3d Cir. 1989).

There is, of course, no specific set of rules for judging reasonable performance. *Strickland*, 466 U.S. at 688-89. Instead, "[i]n any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688. However, "[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides." *Strickland*, 466 U.S. at 688. In *Wiggins*, and quite recently in *Rompilla v. Beard*, 125 S.Ct. 2456 (2005), the Court specifically cited the American Bar Association's 1989 "Standards for the Appointment and Performance of Counsel in Death Penalty Cases" as a guide to "'determining what is reasonable.'" *Wiggins*, 123 S.Ct. at 2537, quoting *Strickland*, 466 U.S. at 688. In interpreting *Wiggins*, at least one court has concluded that the 2003 revision of those guidelines should control the analysis of cases tried prior to 2003 since the 2003 Guidelines "simply explain in greater detail the 1989 Guidelines," especially in the area of "the obligations of counsel to investigate mitigating evidence." *Hamblin v. Mitchell*, 354 F.3d 482 (6th Cir. 2003).

It is the heart of this application that Petitioner's trial counsel could not have made a reasonable tactical judgment not to offer the results of a neuropsychological evaluation, or other mental-health evaluations, without having conducted such evaluations in a timely fashion or, indeed, at all. Similarly, in the absence of a complete mitigation investigation,

---

[6]As noted earlier, in the context of a capital case where a non-unanimous jury spares a defendant's life, which is the situation in the federal system, the prejudice prong of *Strickland* requires proof only of "a reasonable probability that at least one juror would have struck a different balance." *Wiggins v. Smith,* 123 S.Ct. at 2543.

Movant's trial counsel could not have made reasonable tactical judgments about the scope and nature of the case in mitigation that would be presented.

Courts have found counsel's performance unreasonable in cases challenging a failure to present evidence favorable to a defendant, where counsel failed to make "reasonable investigations or to make a reasonable decision that makes a particular investigation unnecessary," *Strickland*, 466 U.S. at 691; *see also, Rompilla v. Beard*, 125 S.Ct. at 2463; *Williams v. Taylor*, 529 U.S. at 396; *Marshall v. Cathel*, 428 F.3d 452 (3d Cir. 2005); *Mayfield v. Woodford*, 270 F.3d 915 (9th Cir. 2001) (en banc); *Coleman v. Mitchell*, 268 F.3d 417 (6th Cir. 2001); *Ainsworth v. Woodford*, 268 F.3d 868 (9th Cir. 2001); *Jermyn v. Horn*, 266 F.3d 257, 312 (3d Cir. 2001); *Carter v. Bell*, 218 F.3d 581, 596 (6th Cir. 2000); *Smith v. Stewart*, 189 F.3d 1004, 1008 (9th Cir. 1999); *Berryman v. Morton*, 100 F.3d 1089, 1101 (3d Cir. 1996); *Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995); *Workman v. Tate*, 957 F.2d 1339, 1345 (6th Cir. 1992); *Kenley v. Armontrout,* 937 F.2d 1298, 1309 (8th Cir. 1991).

The American Bar Association's guidelines for counsel in death penalty cases have come to play an increasingly important role in assessing the performance of counsel in a capital case. The 2003 guidelines set forth the following about investigation and preparation:[7]

> GUIDELINE 10.7 – INVESTIGATION
>
> A. Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty.
>
> GUIDELINE 10.10.1– TRIAL PREPARATION OVERALL

---

[7]Movant urges this Court to follow the lead of *Hamblin v. Mitchell*, 354 F.3d 482 (6th Cir. 2003) which, as noted earlier, concluded that the 2003 revision of those guidelines should control the analysis of cases tried prior to 2003 since the 2003 Guidelines "simply explain in greater detail the 1989 Guidelines," especially in the area of "the obligations of counsel to investigate mitigating evidence."

A. As the investigations mandated by Guideline 10.7 produce information, trial counsel should formulate a defense theory. Counsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies.

In discussing the scope of the investigation to be undertaken pursuant to Guideline 10.7, the ABA Commentary states the following:

> Because the sentencer in a capital case must consider in mitigation, "anything in the life of the defendant which might militate against the appropriateness of the death penalty for the defendant," "Penalty Phase preparation requires extensive and generally unparalleled investigation into personal and family history." In the case of the client, this begins with the moment of conception. Counsel needs to explore:
>
> (1) Medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage);
>
> (2) Family and social history (including physical, sexual or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment and peer influence); other traumatic events such as exposure to criminal violence, the loss of a loved one or a natural disaster, experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (*e.g.*, failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities);
>
> (3) Educational history (including achievement, performance, behavior and activities), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof and activities;
>
> (4) Military service, (including length and type of service, conduct, special training, combat exposure, health and mental health services);
>
> (5) Employment and training history (including skills and performance, and barriers to employability);

> (6) Prior juvenile and adult correctional experience (including conduct while under supervision, in institutions of education or training, and regarding clinical services).

ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (Rev. Ed. 2003).

The importance of the ABA Guidelines is illustrated by *Wiggins* where the Court specifically cited the ABA's 1989 Standards as the benchmark for "'determining what is reasonable'" to expect of counsel in a capital case. *Wiggins*, 123 S.Ct. at 2537, quoting *Strickland*, 466 U.S. at 688. *Wiggins* thus stands squarely for the proposition that the "prevailing professional norms" by which the performance of counsel in a capital case is measured are those set forth in the ABA Guidelines. *Wiggins* also stated the following with regard to defense counsel's obligations to prepare and, more importantly, *investigate*, a case in mitigation:

> Investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) . . . . Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources.

*Wiggins*, 123 S.Ct. at 2537 (emphasis in original).[8] Earlier this year, in *Rompilla v. Beard*, *supra*, the Court found that the Petitioner had not received effective assistance of counsel at the penalty-phase of his Pennsylvania capital case, reversing the United States Court of

---

[8]The Summer 2003 edition of the Hofstra Law Review contains a complete rendition of the 2003 ABA Guidelines, together with the official commentary and accompanying scholarly articles regarding the Guidelines themselves and issues concerning the defense of death penalty cases. *See*, "The Guiding Hand of Counsel: ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases," 31 HOFSTRA L.REV. 903-1211 (2003).

Appeals for the Third Circuit. In the course of the opinion, the Supreme Court re-emphasized the importance of defense counsel conducting a full penalty-phase investigation. In describing the case before it, the majority observed that, "This case, like some others recently, looks to norms of adequate investigation in preparing for the sentencing phase of a capital trial . . . ." The Court also, once again, emphasized and reiterated the importance of the American Bar Association's Guidelines on criminal cases in general and capital cases in particular in resolving a claim of ineffective assistance of counsel. *See* discussion, *id*., at nn. 6, 7.

The importance of mitigating evidence in capital sentencing proceedings is a fundamental tenet of the Supreme Court's capital jurisprudence. *Perry v. Lynaugh*, 492 U.S. 302, 307 (1989); *Eddings v. Oklahoma*, 455 U.S. 104, 110-12 (1982); *Lockett v. Ohio*, 438 U.S. 586, 605 (1978). It is critical to the reliability of the capital sentencing proceeding that the jury render an individualized decision. *Gregg v. Georgia*, 428 U.S. 153, 206 (1976). A jury cannot make that decision in a reliable, individualized, and constitutional way without mitigating evidence about the defendant. Reasonable investigation of the mitigation in a capital case is therefore an absolute prerequisite to constitutional representation. The core Eighth Amendment principle that "respect for humanity" requires consideration of information about the offender, *Lockett*, 438 U.S. at 602 (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976)), allows for no less. "It is critical to the reliability of a capital sentencing proceeding that the jury render an individualized determination." *Harris v. Dugger*, 874 F.2d 756, 763 (11th Cir. 1989) (citing *Gregg v. Georgia*, *supra*, 428 U.S. at 206; *Armstrong v. Dugger*, 833 F.2d 1430, 1433 (11th Cir. 1987).

Under clearly established United States Supreme Court precedent, a defendant's Sixth Amendment right to the effective assistance of counsel is violated whenever counsel provides

professionally deficient representation that results in prejudice. *Strickland v. Washington*, *supra*; *Williams v. Taylor*, *supra*; *Wiggins v. Smith*, *supra*. Counsel's performance at capital sentencing must be evaluated in light of the fundamental principle that a capital defendant has "a right – indeed, a constitutionally protected right – to provide the jury with [all reasonably available] mitigating evidence" in his case. *Williams v. Taylor*, 529 U.S. at 363. Accordingly, capital counsel have an "obligation to conduct a thorough investigation of the defendant's background" for mitigating evidence, *Williams*, 529 U.S. at 396 (citing 1 ABA STANDARDS FOR CRIMINAL JUSTICE 4-4.1, commentary, p. 4-55 (2d ed. 1980)),[9] quoted in *Wiggins v. Smith*, 123 S. Ct. at 2535, and anything less than a "thorough investigation" constitutes deficient performance under *Strickland*. *Wiggins*, 123 S. Ct. at 2536; *Williams*, 529 U.S. at 396; *Jacobs v. Horn*, 129 F. Supp. 2d 390, 406 (M.D. Pa. 2001) ("the duty to investigate encompasses an investigation into mitigating circumstances including family background and mental health mitigating evidence").

The Supreme Court has made clear, the Sixth Amendment requires that "investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be

[9] *Williamson v. Ward*, 110 F. 3d 1508, 1514 (10th Cir. 1997) ("in a capital case, counsel's duty to investigate all reasonable lines of defense is strictly observed"); *Antwine v. Delo*, 54 F.3d 1357, 1367 (8th Cir. 1995) (counsel has a heightened "duty . . . to collect as much information as possible about [the defendant] for use at the penalty phase"); *Hill v. Lockhart*, 28 F.3d 832, 845 (8th Cir. 1994) ("Given the severity of the potential sentence and the reality that the life of [the defendant] [is] at stake," it is capital counsel's "duty . . . to collect as much information as possible about [the defendant] for use at the penalty phase."). The *American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* make clear that capital counsel must "make efforts to discover all reasonably available mitigating evidence." ABA GUIDELINES § 11.4.1; *id.* § 11.8.6 ("Counsel should present to the sentencing entity or entities all reasonably available evidence in mitigation"). As the United States Supreme Court explained as early as *Strickland* in 1984, and more recently in both *Wiggins* and *Rompilla*, decided, respectively in 2003 and 2005, the ABA standards serve as important guides for determining the reasonableness of counsel's performance.

introduced by the prosecutor," *Wiggins v. Smith*, *supra*, 123 S.Ct. at 2537 (quoting ABA Guideline 11.4.1(C) (emphasis in *Wiggins*), and "among the topics counsel should consider presenting are medical history, educational history, employment and training history, family and social history . . . . " *Id.* (citing ABA Guideline 11.8.6; emphasis omitted).

This duty to investigate and present mitigating evidence has several distinct components. Counsel has an obligation to collect all reasonably available institutional records that may contain relevant mitigating evidence. AMERICAN BAR ASSOCIATION GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES, Guideline 11.4.1, Investigation, §§ 2C & 2D (capital counsel should secure releases and obtain hospital, treatment, school and mental health records). Consequently, counsel's performance is deficient when his efforts to obtain available institutional records containing mitigating evidence are inadequate. *See Williams v. Taylor*, 529 U.S. at 396 (failure to obtain juvenile and social services records "graphically describing Williams' nightmarish childhood.")[10]

Counsel has an obligation to interview all witnesses who may be able to provide information in mitigation. ABA GUIDELINES, Guideline 11.4.1, Investigation, §§ D.2.C, D.3.B & D.3.C (directing counsel to seek out information regarding "family and social history (including physical, sexual or emotional abuse)" by, inter alia, interviewing family

[10]*See*, *e.g.,* *Glenn v. Tate*, 71 F.3d 1204 (6th Cir. 1995) (failure to obtain school records evidencing mental retardation); *Clabourne v. Lewis*, 64 F.3d 1373, 1385 (9th Cir. 1995) (failure to obtain institutional records from mental hospital and prison treatment facility for mitigating evidence); *Hill v. Lockhart*, 28 F.3d at 845 (failure to obtain records from mental hospital for mitigating evidence); *Martinez-Macias v. Collins*, 810 F. Supp. 782, 787 (W.D. Tex 1991) (failure to utilize records from state rehabilitation center to demonstrate good conduct and efforts to rehabilitate while in custody), *aff'd*, 979 F.2d 1067 (5th Cir. 1992); *cf.* *Williams v. Washington*, 59 F.3d 673, 680 (7th Cir. 1995) (failure to become familiar with documentary evidence in discovery materials); *Sims v. Livesay*, 970 F.2d 1575, 1580-81 (6th Cir. 1992) (failure to examine physical evidence).

members and others familiar with the defendant's life history); *id*., Guideline 11.8.3, Preparation for the Sentencing Phase, § F ( same). Counsel's failure to interview a witness who has relevant mitigating information constitutes deficient performance. *Williams*, 529 U.S. at 415 (O'Connor, J., concurring) (counsel ineffective where he presented testimony from defendant's mother and two friends but failed to fully interview and present evidence from other "friends, neighbors and family"); *Jermyn v. Horn*, 266 F.3d at 310 (3d Cir. 2001) (counsel ineffective for failing to interview and present evidence of child abuse from relatives and for failing to present mental health testimony on psychological implications of the abuse); *United States v. Gray*, 878 F.2d 702, 712 (3d Cir. 1989) (counsel's failure to interview potential witnesses violates the duty to investigate and constitutes deficient performance).[11]

Counsel also has an obligation to properly prepare all mitigation witnesses so they are ready to testify to all relevant mitigating evidence within their knowledge, and to bring out, during the course of each witness's mitigating testimony all relevant mitigating evidence that the witness is able to present. *See, e.g., Williams*, 529 U.S. at 398 (counsel must make an evidentiary presentation that "explain[s to the jury] the significance of all the available evidence"); *Collier v. Turpin*, 177 F.3d 1184, 1199-1204 (11th Cir. 1999) (in case in which counsel traveled out of state to interview more than fourteen family members and others who knew defendant, subpoenaed fourteen of those persons interviewed, and called ten to testify at capital sentencing, counsel ineffective for failing to elicit all of the mitigating evidence

[11] *See, E.g., Hill v. Lockhart*, 28 F.3d at 845 (8th Cir. 1994); *Kubat v. Thieret*, 867 F.2d 351, 367 (7th Cir. 1989) (failure to interview and present mitigating testimony from, *inter alia*, neighbors and coworkers); *United States ex rel. Emerson v. Gramley*, 883 F. Supp. 225, 244 (M.D. Ill. 1995) (failure to interview "at least seven" potential mitigation witnesses), *aff'd*, 91 F.3d 898 (7th Cir. 1996); *Martinez-Macias v. Collins*, 810 F. Supp. at 787(failure to interview family members about defendant's good character traits), *aff'd*, 979 F.2d 1067 (5th Cir. 1992).

from the ten witnesses that were called).[12] *Jacobs v. Horn*, 129 F. Supp. 2d 390, 408 (M.D. Pa. 2001) ("petitioner's background history of abuse and/or the reality that he was mentally retarded and suffered from other cognitive and psychological problems might well have influenced the jury's appraisal of his moral culpability").

When it comes to describing the scope of mitigation evidence that may properly be presented to a jury in a capital case – especially in a weighing jurisdiction – the sky is virtually the limit. Starting with the Federal Death Penalty Act of 1994 itself ("FDPA"), the Act sets out seven specific mitigating factors and one "catch-all" factor. 18 U.S.C. § 3592(a)(1)-(8). Moreover the FDPA itself notes that the finder of fact in such cases, "Shall consider any mitigating factor, including the following . . ." suggesting that the range of permissible evidence a defendant may present in mitigation is broader even than the "catch-all" set forth at 18 U.S.C. § 3592(a)(8). This is entirely consistent with established Supreme Court precedent.

The United States Constitution requires that, in a death-penalty prosecution, no limitation may be placed on the right of the accused to present, for the sentencer's consideration, any relevant mitigating evidence. This firmly-established tenet of capital jurisprudence is rooted in *Lockett v. Ohio*, 438 U.S. 586 (1978), where a plurality of the Court held that "in all but the rarest kind of capital cases," a sentencing authority may not "be

[12] *See also Martinez-Macias v. Collins*, 810 F. Supp. at 787 (deficient performance for failure to "investigate[ ] and present[ ] evidence from family members concerning Petitioner's good character traits" and failing to prepare petitioner's wife for sentencing stage testimony), *aff'd*, 979 F.2d 1067 (5th Cir. 1992). This obligation applies to expert witnesses as well as lay witnesses. *E.g., Bloom v. Calderon*, 132 F.3d 1267 (9th Cir. 1997) (failure to provide mental health records, including evidence of black-outs or transient psychotic episodes); *Clabourne v. Lewis*, 64 F.3d 1373, 1384-85 (9th Cir. 1995) (failure to provide mental health experts with background materials for accurate mental health profile is ineffective); *Hendricks v. Calderon*, 864 F. Supp. 929 (N.D. Cal. 1994) (failure to provide life history information about client to mental health experts deficient), *aff'd*, 70 F.3d 1032, 1044 (9th Cir. 1995).

precluded from considering, as a mitigating factor, any aspect of a defendant's character or record . . . as a basis for a sentence less than death." *Id*. at 113-14 (emphasis omitted); see also, *Skipper v. North Carolina*, 476 U.S. 1 (1986); *Eddings v. Oklahoma*, 455 U.S. at 112. In *McCleskey v. Kemp*, 481 U.S. 279 (1987), the Court held that a constitutional death-penalty scheme

> cannot limit the sentencer's consideration of *any relevant circumstance* that could cause it to decline to impose the penalty. In this respect, the State cannot channel the sentencer's discretion, but must allow it to consider *any relevant information* offered by the defendant.

*Id*. at 305-06 (emphasis added); *see also*, *Green v. Georgia*, 442 U.S. 95 (1979) (State's evidence rules may not be invoked to bar otherwise relevant mitigating evidence.)

In *Buchanan v. Angelone*, 522 U.S. 269 (1998), Chief Justice Rehnquist, writing for a majority of the Court, stated:

> [I]n the [penalty] phase, we have emphasized the need for a broad inquiry into all relevant mitigating evidence to allow an individualized determination.
>
> * * *
>
> In the [penalty] phase, our cases have established that the sentencer may not be precluded from considering any constitutionally relevant mitigating evidence.

*Id*. at 276 (citations omitted). In *Williams v. Taylor*, *supra*, the Court noted that mitigating evidence can serve to lessen a defendant's "moral culpability" even where such evidence "does not undermine or rebut the prosecution's death-eligibility case." *Williams*, 529 U.S. at 398.

In fact, the line of cases supporting the liberal admission of mitigating evidence is unbroken, and was most recently lengthened by *Tennard v. Dretke*, 125 S.Ct. 2562 (2004). There, a six-member majority of the Court reversed the Fifth Circuit and bluntly criticized

the Circuit's longstanding practice of imposing an erroneously restrictive standard of relevance for mitigating evidence at the penalty phase of capital cases. *Tennard* reiterated that the threshold of relevance for mitigating evidence is minimal, stating:

> When we addressed directly the relevance standard applicable to mitigating evidence in capital cases in *McKoy v. North Carolina,* 494 U.S. 433, 440-441, 108 L. Ed. 2d 369, 110 S. Ct. 1227 (1990), we spoke in the most expansive terms. We established that the "meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding" than in any other context, and thus the general evidentiary standard – "'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence'"– applies. *Id*., at 440, 108 L. Ed. 2d 369, 110 S. Ct. 1227 (*quoting New Jersey v. T. L. O*., 469 U.S. 325, 345, 83 L. Ed. 2d 720, 105 S. Ct. 733 (1985)). We quoted approvingly from a dissenting opinion in the state court: "'Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value.'" 494 U.S., at 440, 108 L. Ed. 2d 369, 110 S. Ct. 1227 (*quoting State v. McKoy*, 323 N. C. 1, 55-56, 372 S.E.2d, 12, 45 (1988) (opinion of Exum, C. J.)). Thus, a State cannot bar "the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death." 494 U.S., at 441, 108 L. Ed. 2d 369, 110 S. Ct. 1227.
>
> Once this low threshold for relevance is met, the "Eighth Amendment requires that the jury be able to consider and give effect to" a capital defendant's mitigating evidence. *Boyde v. California,* 494 U.S. 370, 377-378, 108 L. Ed. 2d 316, 110 S. Ct. 1190 (1990) (*citing Lockett v. Ohio*, 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978); *Eddings v. Oklahoma*, 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869 (1982); *Penry I*, 492 U.S. 302, 106 L. Ed. 2d 256, 109 S. Ct. 2934 (1989)); *see also Payne v. Tennessee,* 501 U.S. 808, 822, 115 L. Ed. 2d 720, 111 S. Ct. 2597 (1991) ("We have held that a State cannot preclude the sentencer from considering 'any relevant mitigating evidence' that the defendant proffers in support of a sentence less than death. . . . [V]irtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances." (*quoting Eddings, supra*, at 114, 71 L. Ed. 2d 1, 102 S. Ct. 869)).

*Id.* at 2570. In *Smith v. Texas*, 125 S.Ct. 400 (2004), decided five months after *Tennard*, the

Court firmly emphasized its rejection of the "nexus" requirement that the Texas Court of Criminal Appeals, as endorsed by the Fifth Circuit, had erected as a barrier to the admission of mitigating evidence, stating, "We rejected the Fifth Circuit's 'nexus' requirement in *Tennard* . . . ." *Smith v. Texas*, 125 S.Ct. at 405.

Thus, counsel's constitutional duty in this case was to investigate, discover, and present, in the language of *McCleskey*, *supra*, evidence of "any relevant circumstance that could cause [a jury] to decline to impose the penalty [of death]." Trial counsel were also required to protect Movant's legal rights at trial, and to advocate zealously on his behalf. The Eighth Circuit has not hesitated to apply the principles discussed above and to grant relief in similar cases. *See, e.g.*, *Antwine v. Delo*, 54 F.3d 1357, 1365 (8th Cir 1995) ("The issue is whether the failure to discover and present evidence of Antwine's mental condition undermines our confidence in the outcome of either the guilt or sentencing phase of the trial. We are concerned, then, with whether the jury – not the motion court – would have found the evidence of Antwine's mental condition credible."); *Simmons v. Luebbers,* 299 F.3d 929, 939 (8th Cir 2002) ("[T]he state portrayed Simmons as an individual who responded violently when his advances were not accepted by women. During the penalty phase, Simmons's attorneys could have presented evidence of Simmons's background to demonstrate that his compulsive, violent reactions were the result of an abusive and traumatic childhood. Further, a vivid description of Simmons's poverty stricken childhood, particularly the physical abuse, and the assault in Chicago, may have influenced the jury's assessment of his moral culpability."); *Parkus v. Delo,* 33 F.3d 933, 940 (8th Cir 1994) (Counsel must conduct an adequate investigation of facts, consider viable theories, and develop evidence to support those theories. The failure of counsel to adequately investigate a petitioner's mental health history and background necessitated an evidentiary hearing.); *Steinkuehler v. Meschner,* 176

F.3d 441 (8th Cir 1999) (The habeas relief granted related solely to petitioner's intoxication defense. Trial counsel failed to present evidence that a crucial police witness on the issue of petitioner's state of intoxication had pressured another witness to "forget" that petitioner was intoxicated and that the police witness had a habit of "forgetting" exculpatory evidence. The deficient performance prejudiced petitioner and a reasonable probability existed that the result would have been different if counsel had presented the evidence. Petitioner was denied his right to effective assistance of counsel.); *Driscoll v. Delo*, 71 F.3d 701 (8th Cir 1995) (The court agreed that a writ of habeas corpus should issue on three independent bases: Appellant was denied effective counsel because his lawyer allowed the jury to retire with the factually inaccurate impression that the victim's blood was on appellant's knife; second, appellant's trial counsel was also ineffective for failing to impeach a state eyewitness using his prior inconsistent statements; finally, appellant's sentence violated U.S. Const. amend. VIII because the prosecutor made repeated statements to the jury that diminished the jury's sense of responsibility for its sentence of death.); *Copeland v. Washington*, 232 F.3d 969, 975 (8th Cir 2000) ("The improper argument would have had a significant prejudicial effect on the jurors, and it was unreasonable, in light of Supreme Court precedent, to conclude that the argument did not result in a deprivation of due process. The district court correctly determined that the argument was improper and the failure to object to the argument constituted ineffective assistance of counsel. Accordingly, the petitioner's death sentence is vacated.);

Movant respectfully suggests that applying the above principles to the facts as found by this Court after the evidentiary hearing that both sides contended was required, this court would have been required to grant relief on the issue of ineffective assistance of trial counsel.

With regard to the quality of appellate representation, Movant was represented on the

direct appeal of his conviction and sentence of death by Susan M. Hunt, Esquire, who had served as one of Movant's trial counsel, and by Jennifer Herndon, Esquire. There is no constitutional right to an appeal; that right is statutorily created. *McKane v. Durston*, 153 U.S. 684, 687 (1894). Where an appeal is granted by statute, equal protection and due process converge to require the assistance of an effective attorney. *Smith v. Robbins,* 528 U.S. 259, 276 (2000). In the non-capital context, appellate counsel need not raise every non-frivolous claim of error. *Evitts v. Lucey,* 469 U.S. 387, 394 (1985), *citing Jones v. Barnes,* 463 U.S. 745 (1983). However,

> the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

*Strickland v. Washington*, 466 U.S. at 715, *quoting Woodson v. North Carolina,* 428 U.S. 280, 305 (1976) (plurality). The ABA GUIDELINES take into account this need for heightened reliability in capital cases in identifying what a reasonably competent appellate attorney must do in a capital case.

> GUIDELINE 10.15.1 – DUTIES OF POST-CONVICTION COUNSEL
>
> C. Post-conviction counsel should seek to litigate all issues, whether or not previously presented, that are arguably meritorious under the standards applicable to high quality capital defense representation, including challenges to any overly restrictive procedural rules. Counsel should make every professionally appropriate effort to present issues in a manner that will preserve them for subsequent review.
>
> * * *
>
> E. Post-conviction counsel should fully discharge the ongoing obligations imposed by these Guidelines, including the obligations to:

1. maintain close contact with the client regarding litigation developments;

2. continually monitor the client's mental, physical and emotional condition for effects on the client's legal position;

3. keep under continuing review the desirability of modifying prior counsel's theory of the case in light of subsequent developments; and

4. continue an aggressive investigation of all aspects of the case.

In discussing the precise duties of appellate counsel in the post-conviction setting, the ABA commentary notes the paramount importance of appellate counsel's duty to "proceed, like all post-conviction counsel, in a manner that maximizes the client's ultimate chance of success." ABA Guidelines, *supra*; 31 HOFSTRA L.REV. 913, 1083 (2003):

> Practice varies among jurisdictions as to the limits of the appellate process and the relationship between direct appeals and collateral post-conviction challenges to a conviction or sentence. (footnote omitted). Issues that are only partially or minimally reflected by the record, or that are outside the record, should be exploited by appellate counsel as a predicate for informed decision making about legal strategy.
>
> As Subsection C emphasizes, it is of critical importance that counsel on direct appeal proceed, like all post-conviction counsel, in a manner that maximizes the client's ultimate chances of success. *"Winnowing" issues in a capital appeal can have fatal consequences.* Issues abandoned by counsel in one case, pursued by different counsel in another case and ultimately successful, cannot necessarily be reclaimed later. *When a client will be killed if the case is lost, counsel should not let any possible ground for relief go unexplored or unexploited.*

*Id.* (footnote omitted) (emphasis added).

Appellate counsel in capital cases must raise all arguable legal issues for the client; nothing less will facilitate the court's review of the death sentence. *See Ellis v. United States*, 356 U.S. 674, 674-675 (1958) (appellate counsel acted more like *amici curiae*; much

more is required); *accord Thompson v. State* 492 N.E.2d 264, 278 (Ind. 1986) (appeal counsel simply listed possible errors for the court to independently review). Counsel must "research relevant facts and law, or make an informed decision that certain avenues will not prove fruitful." *United States v. Reinhart*, 357 F.3d 521, 525 (5th Cir. 2004) (counsel rendered ineffective assistance in failing to brief and argue Reinhart's accountability as it related to his sentence); *Roe v. Delo,* 160 F.3d 416 (8th Cir. 1998) (appellate counsel failed to argue that the trial court erroneously blurred the distinction between first and second degree murder); *Bell v. Lockhart,* 795 F.2d 655 (8th Cir. 1986) (appellate counsel rendered ineffective assistance in failing to properly advise client of the risks of waiving a direct appeal because post-conviction appeal was not an adequate substitute); *Matire v. Wainwright*, 811 F.2d 1430, 1438 (11th Cir. 1987) (ineffective assistance when appellate counsel failed to raise issue of prosecutor's improper use of defendant's post-arrest silence in state's case-in-chief); *Ballard v. United States*, 400 F.3d 404 (6th Cir. 2005) (appellate counsel rendered ineffective assistance in failing to raise *Apprendi*[13] error); *Mapes v. Tate*, 388 F.3d 187 (6th Cir. 2004) (appellate counsel rendered ineffective assistance in failing to argue that the trial court erred in refusing to let the jury consider mitigating factors related to an out-of-state conviction)

In determining whether counsel performed effectively on appeal, the *Strickland* test applies. *Smith v. Robbins*, 528 U.S. 259, 287 (2000); *accord Bell v. Lockhart*, 795 F.2d 655, 657 (8th Cir. 1986). Movant must show both that counsel's representation fell below an objective standard of reasonableness and that the deficiencies prejudiced him. *See Strickland*, 466 U.S. at 687-88. As fully discussed, *supra*, the ABA GUIDELINES provide the best glimpse at what level of performance is required to meet the objective standard of

[13] *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

reasonableness. One court has identified the following questions as relevant to the reasonableness inquiry:

> (1) Were the omitted issues "significant and obvious"?
>
> (2) Was there agreeably contrary authority on the omitted issues?
>
> (3) Were the omitted issues clearly stronger than those presented?
>
> (4) Were the omitted issues objected to at trial?
>
> (5) Were the trial court's rulings subject to deference on appeal?
>
> 6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
>
> (7) What was appellate counsel's level of experience and expertise?
>
> (8) Did the petitioner and appellate counsel meet and go over possible issues?
>
> (9) Is there evidence that counsel reviewed all the facts?
>
> (10) Were the omitted issues dealt with in other assignments of error?
>
> (11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Whiting v. Burt,* 395 F.3d 602, 616 (6th Cir. 2005), *citing Mapes v. Coyle,* 171 F.3d 408, 427-28 (6th Cir. 1999).

But, what about prejudice?

> Although [analyzing for prejudice] necessarily involves an evaluation of the underlying claims, it does *not* require a decision on or a determination of these issues. All that is required is a determination that, based on the nature of the underlying claims, there is "a reasonable probability that, but for his counsel's [failings] . . ., [the defendant] would have prevailed on his appeal."

*Mapes v. Tate*, 388 F.3d 187, 194 (6th Cir. 2004), *citing Strickland, supra*; *accord Roe v.*

*Delo*, 160 F.3d 416, 420 (8th Cir. 1998).

Thus, "[Mr. Nelson] must show that there is 'a reasonable probability' – 'a probability sufficient to undermine confidence in the outcome,' but less than a preponderance of the evidence – that his appeal would have prevailed had counsel's performance satisfied constitutional requirements." *United States v. Cross*, 308, F.3d 308, 315 (3rd Cir. 2002), *citing Strickland,* 466 U.S. at 694-695 ("The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.").

> The assessment of prejudice should proceed on the assumption that the decision maker is reasonably, conscientiously, and impartially applying the standards that govern the decision. It should not depend on the idiosyncracies (sic) of the particular decision maker, such as unusual propensities toward harshness or leniency. Although these factors may actually have entered into counsel's selection of strategies and, to that limited extent, may thus affect the performance inquiry, they are irrelevant to the prejudice inquiry.

*Strickland*, at 695; *accord Roe v. Delo,* 160 F.3d at 420 ("Our review of these cases leaves us uncertain whether the Missouri Court of Appeals would have found plain error had this issue been raised in Roe's direct appeal. But the question before us is limited to whether there is a reasonable probability that the outcome would have been different, the test for determining whether Roe received constitutionally ineffective assistance of counsel.").

Upon a finding that appellate counsel rendered ineffective assistance, courts seek to neutralize the effect of the constitutional deprivation. *Mapes v. Tate, supra* at 195. Thus, the courts must grant the Movant a new direct appeal where the omitted issues may be properly presented for review. *Roe v. Delo, supra; Bell v. Lockhart, supra*.

Plainly – as both sides contended – an evidentiary hearing was needed to resolve this issue and allow this Court to make informed fact-findings.

<u>CONCLUSION</u>

For the reasons set forth above, the relief requested pursuant to F.R.CIV.P. 59 should be granted. This Court should enter an order for a new trial and/or amendment of the judgment, re-opening of the judgment, the taking of testimony, the entry of amended findings of fact and conclusions of law, and for a new judgment granting relief in Movant's favor on the underlying action, together with any additional relief the Court may deem just or proper.

Respectfully submitted,

/s/ Gary E. Brotherton
Legal Writes, LLC
2101 Chapel Plaza Court, Suite 13
Columbia, MO 65202-3381
(573)875-1571
(573)875-1572 (fax)
gebrotherton@legalwritesllc.com
Co-counsel to Movant, Keith Nelson

/s/ David A. Ruhnke
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
(973)744-1000
(973)746-1490
davidruhnke@ruhnkeandbarrett.com
Co-counsel to Movant, Keith Nelson

<u>Dated</u>: Columbia, Missouri
Montclair, New Jersey
December 5, 2006

<u>CERTIFICATE OF SERVICE</u>

This will certify that, on today's date, Movant's counsel served this reply, with attachments, upon the United States by filing the document via ECF.

/s/ David A. Ruhnke
DAVID A. RUHNKE

<u>Dated</u>: Columbia, Missouri
Montclair, New Jersey
December 5, 2006