IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| KEITH D. NELSON, | : | |
| Movant, | : | |
| vs. | : | 4:04-CV-8005(JFG) |
| UNITED STATES OF AMERICA, | : | |
| Respondent. | : | |

MOTION FOR ISSUANCE OF A CERTIFICATE OF APPEALABILITY

COMES NOW Keith D. Nelson ("Movant" or "Mr. Nelson"), by his undersigned counsel, and files this motion, pursuant to 28 U.S.C. 2253(c), for the issuance of a certificate of appealability ("COA") together with any additional relief the Court may deem just or proper.

STATEMENT OF THE CASE

**A. Procedural history**

1. Trial level proceedings

On October 14, 1999, a complaint was filed in this Court charging Keith Nelson with various federal offenses arising from his alleged involvement in the October 12, 1999 kidnap and murder of 10-year old Pamela Butler. Thereafter a two-count indictment was returned charging Mr. Nelson with the following violations of the federal criminal code: count one, 18 U.S.C. § 1201(a)(1) and (g) (interstate kidnapping resulting in death); and, count two, 18

U.S.C. § 2241(c) (interstate travel with intent to engage in a sexual act with a child under age 12). Count one of the indictment provided for a potential maximum sentence of death.

On October 25, 2001, shortly before his trial was scheduled to begin, Mr. Nelson entered a plea of guilty to count one of the indictment and proceeded to trial solely on the issue of penalty. As part of the agreement allowing him to plead guilty to count one, the Government agreed to dismiss count two at the time of sentencing. On November 13, 2001, a jury was selected and trial commenced the following day. On November 28, 2001 the jury recommended imposition of a sentence of death.

On February 28, 2002, this Court denied Mr. Nelson's motion for a new trial. On March 11, 2002, this Court imposed a sentence of death. Judgment was entered on March 12, 2002. A notice of appeal was filed.

2. Appellate proceedings

An appeal of the judgment of conviction and sentence of death was taken to the United States Court of Appeals for the Eighth Circuit. The matter was argued on January 16, 2003. On October 22, 2003, the Court of Appeals affirmed the conviction and sentence. Rehearing was denied in the Eighth Circuit on December 24, 2003. The United States Supreme Court denied Movant's petition for *certiorari* review on November 8, 2004. *Nelson v. United States*, 125 S.Ct. 486 (2004).

3. Post-conviction proceedings

On November 10, 2004, Mr. Nelson, through counsel, filed a motion seeking the appointment of counsel to represent him in connection with a post-conviction challenge to his conviction and sentence. On December 14, 2004, Movant's present counsel were appointed by the Court. On November 6, 2005, Movant filed a motion pursuant to 28 U.S.C. § 2255 to set aside his conviction and sentence of death. A memorandum of law in support

of the motion was filed on November 14, 2005. Movant hereby adopts by reference the averments contained in his 2255 motion.

The government answered the motion on February 24, 2006. In its reply, the government conceded the need for the taking of testimony. Movant filed his response to the government's answer on August 21, 2006. On that same date, Movant also filed a motion to disqualify the trial judge from further participation in the case. On September 18, 2006, the government answered the disqualification motion. Movant filed his reply to that answer on October 24, 2006.

On November 21, 2006, without taking any testimony or additional evidence, the Court filed a two-page order denying both the disqualification motion and the motion to set aside the judgment. The Court made no fact-findings and engaged in no analysis, and simply adopted by reference the arguments of the government except to the extent that the government had conceded the need for an evidentiary hearing. No hearing of any kind was conducted.

On December 5, 2006, Movant, acting pursuant to F.R.CIV.P. 59, sought a new trial and any such other relief as permitted by the Rule. The government answered the motion on January 3, 2007 and Movant replied on March 22, 2007. On April 13, 2007, this Court denied the motion.

## LEGAL ARGUMENT

THIS COURT SHOULD ISSUE A CERTIFICATE OF APPEALABILITY FOR ALL ISSUES PRESENTED IN THE 2255 MOTION, AND ALSO WITH REGARD TO THE RECUSAL AND FUNDING MOTIONS, BECAUSE THE ISSUES ARE FAIRLY DEBATABLE AMONG JURISTS OF REASON, DESERVE FURTHER DEVELOPMENT, AND ARISE IN THE CONTEXT OF A CAPITAL CASE.

### A. The legal standard governing issuance of a certificate of appealability

The Anti-terrorism and Effective Death Penalty Act ("AEDPA") requires, as a pre-condition to appellate review of the denial of a motion brought pursuant to 28 U.S.C. § 2255, that a certificate of appealability issue upon a showing that the applicant has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Supreme Court of the United States has determined definitively what standards must be met by a litigant who seeks a COA. *See, Miller-El v. Cockrell*, 537 U.S. 322 (2003); *Slack v. McDaniel*, 529 U.S. 473 (2000). In essence, the Court has adopted to AEDPA the standards that applied to the issuance of the former certificate of probable cause required in pre-AEDPA *habeas* litigation, as that standard was enunciated in *Barefoot v. Estelle*, 463 U.S. 880 (1983).[1] In *Miller-El*, the Court summarized its view as follows:

> Consistent with our prior precedent and the text of the habeas corpus statute, we reiterate that a prisoner seeking a COA need only demonstrate "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c). A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented are adequate to deserve encouragement to proceed further.

*Miller-El*, 537 U.S. at 327. The Court explained further:

---

[1] Prior to AEDPA, there was no requirement that a certificate of probable cause issue as a precondition to appellate review of a challenge to a *federal* conviction. The former requirement of a certificate of probable cause applied only to state prisoners acting pursuant to 28 U.S.C. § 2254.

> The COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits. We look to the District court's application of AEDPA to petitioner's constitutional claims and ask whether that resolution was debatable among jurists of reason. This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims. In fact, the statue forbids it.

*Miller-El*, 537 U.S. at 336. In *Slack*, the Court stated:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The Petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.

*Slack*, 529 U.S. at 484. As developed further in *Miller El*, the insurance of a COA,

> does not require a showing that the appeal will succeed. Accordingly, a court of appeals should not decline the application for a COA merely because it believes the applicant will not demonstrate an entitlement to relief. The holding in *Slack* would mean very little if appellate review were denied because the prisoner did not convince a judge, or, for that matter, three judges, that he or she would prevail. It is consistent with § 2253 that a COA will issue in some instances where there is no certainty of ultimate relief. After all, when a COA is sought, the whole premise is that the prisoner "has already failed in that endeavor." *Barefoot*, *supra*, [463 U.S.] at 893, n.4.

*Miller El*, 537 U.S. at 337. Also in accord with this approach are *Tennard v. Dretke*, 124 S.Ct. 2562, 2569, 2573 (2004) and *Banks v. Dretke*, 540 U.S. 668, 705 (2004); *see also*, *Carson v. Director*, 150 F.3d 973, 975 (8th Cir. 1998) ("[Petitioner] had made a 'substantial showing that reasonable courts might differ' as to whether the jury instructions violated his due process rights," and, therefore, a COA properly issued).

There is one additional facet to this discussion. That this 2255 arises in the context of a death-sentence is an additional reason that favors granting the COA. In *Barefoot v. Estelle*, the Court noted that "in a capital case, the nature of the penalty is a proper

consideration" in determining whether to issue a COA. *Barefoot*, 463 U.S. at 893. *See also, e.g.*, *Graves v. Cockrell*, 351 F.3d 143, 150 (5th Cir. 2003) ("Any doubt regarding whether to grant a COA is resolved in favor of the petitioner, and the severity of the penalty may be considered in making this determination."; *Valerio v. Crawford,* 306 F.3d 742, 767 (9th Cir. 2002) ("Because this is a capital case, we resolve in Valerio's favor any doubt about whether he has met the standard for a COA."); *Jermyn v. Horn*, 266 F.3d 257, 279 n. 7 (3d Cir. 2001) ("'In a capital case, the nature of the penalty is a proper consideration in determining whether to issue a [COA].'"); *Clark v. Johnson*, 202 F.3d 760, 763 (5th Cir. 2000) ("[I]n capital cases, doubts as to whether a COA should issue must be resolved in favor of the petitioner.")

**B. A COA should issue with regard to the following issues**

1. <u>A COA should issue to review the question of whether this Court correctly decided the issues of ineffective assistance of trial counsel or, alternatively, whether a hearing should have been conducted regarding those claims</u>.

Movant made specific and focused averments regarding the issue of effective assistance of trial counsel. Specifically, Movant alleged, and was prepared to prove, the following:

(1) Movant's case was characterized by numerous changes of counsel. There were times when Movant had no counsel who met the qualifications required by 18 U.S.C. § 3005 as being "learned in the law applicable to capital cases . . . ." The following summarizes the history of Movant's representation by counsel in the district court:

- Immediately following Movant's arrest on October 17, 1999, he was represented by a "volunteer" retained attorney, Daniel L. Franco, who has since been disbarred. Thereafter, the Court appointed the Federal Public Defender (effective October 21, 1999), Susan Hunt, Esquire (effective November 2, 1999), and William E. Shull, Esquire (effective November 2, 1999).

- Larry C. Pace, Esquire, of the Federal Public Defender, remained in the case for approximately 10 months. On July 28, 2000, Movant filed a motion to withdraw Mr. Pace as Movant's counsel. The motion was granted on August 21, 2000, although the actual order was apparently not entered on the docket until March 2, 2001.

- On September 6, 2000, Movant filed a notice with the Court that Mr. Franco had been discharged as Movant's counsel. An order withdrawing Mr. Franco was entered on the docket on March 2, 2001.

- With regard to Mr. Shull, an order was docketed on November 14, 2000 denying Movant's request to withdraw Mr. Shull as counsel. (There does not appear to be a docket entry for the motion itself.) Thereafter, on February 20, 2001, an order was docketed granting Mr. Shull's oral motion to withdraw as Movant's counsel.

- On the same date as Mr. Shull's withdrawal, February 20, 2001, Patrick Berrigan, Esquire was appointed as counsel to Movant

- For the purposes of this motion, Movant's trial-level attorneys will be referred to simply as "defense counsel."

(2) Defense counsel failed to conduct an adequate mitigation investigation, an investigation that should have, but did not, consist of efforts to discover all reasonably available mitigating evidence and to rebut any aggravating evidence to be introduced by the Government. A properly-conducted mitigation investigation would have yielded significant evidence in mitigation.

(3) In the Spring of 2001, a mitigation investigator appointed by the Court to assist defense counsel in preparation of the case advised defense counsel that the mitigation investigation was incomplete and that there was substantial investigation that remained to be completed. Despite this warning, defense counsel did not take the steps required to complete the mitigation investigation. By the Fall of 2001, with the

trial date imminent, defense counsel were aware that an adequate mitigation investigation had not been conducted, that the investigation was incomplete, and that a substantial amount of additional time was required in order to complete an adequate investigation. Despite this knowledge, and despite a specific request from Movant that his counsel seek to adjourn the trial because counsel were not ready to proceed, no such motion was made.

(4) Despite the availability of court-authorized funding, defense counsel failed to conduct an adequate investigation of Movant's mental health, including a failure to conduct a neuropsychological examination and/or to have Movant examined by a qualified clinical psychologist or psychiatrist. A properly-conducted mental-health investigation would have yielded significant clinical findings of mental illness. A properly-conducted neuropsychological examination would have revealed that Movant shows indications of frontal lobe disturbance/dysfunction, which is a circumstance that affects Movant's everyday thinking and reasoning capacities, and that testing Movant would have shown that his brain does not conform with what is seen in individuals with normal functioning brains, and that his overall testing performance was consistent with and indicative of brain dysfunction.

(5) The failure of defense counsel to conduct a timely and adequate mental-health investigation lead counsel to instruct Movant that he should decline to submit to mental-health testing by Government experts, advice that was followed by Movant, resulting in a court order barring

Movant from presenting any mitigating evidence relating to his mental health.

(6) Defense counsel failed to elicit a complete and accurate family history from Nancy Nelson, Movant's mother, because she was uncomfortable talking about her childhood and the manner in which Movant and his brothers were raised. Counsel knew that Dr. Mark Cunningham would later describe a family history of abuse as a risk factor affecting subsequent generations. Nevertheless, counsel "agreed" not to ask Nancy Nelson uncomfortable questions, the answers to which would have provided the foundation for the presence of significant risk factors in Movant's childhood, including regular and significant levels of pre-natal exposure to alcohol, a circumstance that would have established the presence of Fetal Alcohol Spectrum Disorder.

(7) Defense counsel failed to file appropriate pre-trial motions challenging the capital aspects of Movant's case.

(8) Defense counsel failed to conduct an adequate *voir dire* of prospective jurors on, among other issues, the prospective jurors' views regarding capital punishment and the exposure of potential jurors to publicity regarding Movant's then recent suicide attempt.

(9) Defense counsel told the jury in opening statements that Movant was born a month premature, suffered from low birth-weight and respiratory distress, but that "he recovered just fine." Counsel's assertion was based on an inadequate investigation of Movant's life history, including a failure to consult with appropriate experts or proper utilization of

hospital records in possession of the defense. When Dr. Mark Cunningham later testified that the circumstances of Movant's birth were risk factors, the jury was prepared to reject the testimony because MOvant's counsel had already conceded the contray view, *i.e.*, that Movant since had "recovered just fine."

(10) Defense counsel failed to call William R. Criss, Shift Supervisor for Corrections Corporation of America, to testify. Counsel knew that Criss could have testified that, as early as January 20, 2000, Movant wanted to take responsibility for his actions in this case. After talking to his girlfriend, Movant became emotional and stated he wanted to "do something right for the first time in [his] life." Such testimony would have refuted the Government's view that Movant was emotional with his girlfriend only because he was sorry he had gotten caught.

(11) Defense counsel asked Kenneth Nelson about his intelligence but failed to make an offer of proof after the District Court told him the Court had heard enough and to move on. The omitted evidence was critical to showing that Kenneth Nelson had a protective factor that Movant simply did not have – *i.e.*,a native intelligence which opened doors for Kenneth that were not open to MOvant.

(12) Defense counsel failed to object when the District Court admitted testimony about a knife taken from Movant's kitchen. This testimony had no tendency to prove or disprove any fact in issue; rather, the testimony simply diverted the jurors' attention away from the issue at hand – should Movant live or die.

(13) Defense counsel failed to object when the District Court allowed testimony that Paul Wilt had won an award from the Kansas City, Kansas Police Department, "as a testament to [his] quick thinking or quick action in this case." This evidence had no tendency to prove or disprove any fact in issue; rather, it served only to divert the jurors' attention away from the issues surrounding the only question the jurors had to answer – whether should Movant live or die?

(14) Defense counsel failed to elicit from Dr. Thomas Young, Medical Examiner, that his initial findings indicated: (1) that it would be "difficult" to determine whether the victim's hymenal tear was the result of a fresh injury; and (2) that, without positive results from the rape kit, "no determination of sexual assault can be conclusively made." This evidence would have explained refuted or undercut the Government's theory that Movant sexually assaulted the victim at the time of the murder.

(15) Defense counsel failed to make appropriate objections at trial, including, but not limited to, the following:

(a) Once the jury was sworn, defense counsel failed to object to the case proceeding as a capital case since the requisite elements of capital murder were not contained in the indictment.

(b) Defense counsel failed to object to comments in the Government's opening that the Government sought the death penalty in Movant's case "without reservation" or "without hesitation" implying that the Government had undertaken a comparison of Movant's case with other potentially capital cases and that Movant's case was, in the opinion of the Government prosecutors, worse than those other cases and, therefore, more deserving of a sentence of death.

(c) Defense counsel failed to object to comments in the Government's opening that Movant would present "a continuing threat to society," implying erroneously that Movant might some day be released from confinement.

(d) Defense counsel agreed pretrial not to object to certain prefatory hearsay statements about which Agent Cullen Scott would testify. This agreement resulted in the Government presenting hearsay testimony at will, using Agent Scott as something of a narrator for its case from beginning to end. Such hearsay was not admissible under any exception to the rule and its use deprived Movant of his Sixth Amendment right to confront his accusers.

(e) Defense counsel failed to object to numerous inflammatory and improper comments in the Government's initial and rebuttal summations, and failed to request a mistrial or a new trial based on blatantly improper comments, including, but not limited to, the following:

<u>The initial summation</u>:

- Argument that the jury should vote for death because, "If this crime doesn't call for the death penalty, what crime does?"
- Argument that the jury should vote for death because, "We need to protect our children. We need to send a message to guys like the defendant . . . ."
- Argument that the death penalty should be imposed because, "The community cries out for justice."
- Argument that legally appropriate and relevant mitigating evidence was "all this excuse testimony" and a "guilt trip."
- Argument that the jury should impose a death penalty because the Government recommended it "without reservation."

<u>Rebuttal summation</u>:

- Argument that the case was about the "slaughter" of "our children."
- Argument that denigrated legally appropriate and relevant mitigating evidence as "an excuse," "the blame

game," "the abuse excuse," and an effort by defense counsel to claim the crime was "somebody else's fault."

- Argument that the mitigating evidence was not worthy of jury consideration since it didn't "explain why" the crime occurred.

- Argument that described Movant as "a rotten human being."

- Argument that personally denigrated defense counsels' efforts to persuade the jury of mitigating evidence as "a smoke screen" and an attempt to "divert [the jury] from what this case is really about, the slaughter of an innocent."

- Argument that personally denigrated defense counsels' efforts to persuade the jury of mitigating evidence as masking counsels' true motive, *i.e.*, "What they want you to do is have him escape justice."

- Argument that equated mercy with weakness.

- Argument that described Movant as "evil at his core."

- Argument that invited jurors to rely on the prosecution's experience by telling the jury that, "There is no clearer call for the death penalty than there is in this case," and, later, "If not him, who? If not now, when? If killing and raping a kid isn't enough, then we don't need a death penalty. We don't need a death penalty."

- Argument that suggested that the jury should impose a sentence of death since the jury "represent[ed] the people of the United States in this case . . . ."

- Argument that instructed the jurors to close their eyes and re-live the horrors of the victim's last hours, calling upon the jury to "Think about . . . what that little girl was thinking," and to imagine,"What was she thinking?," and to, "Imagine what she experienced in that last part of her life," and to "Close your eyes, and . . . envision [the abduction and murder]."

- Argument that a verdict of death was the only just verdict and that the jury was "the dispensers of justice," and that the victim's mother "Waits for you to give her some justice. And justice in this case can only be had by

imposing a sentence of death," essentially suggesting to the jury, *inter alia* that a sentence of death should be imposed because that's what the victim's survivors wished.

- Argument that, "[T]he death penalty was enacted for crimes like this."

(16) Defense counsel failed to call a highly-qualified forensic pathologist, Thomas L. Bennett, M.D., who was present in the courthouse and prepared to testify that the physical findings at autopsy did not support a conclusion that the victim had been sexually penetrated. Dr. Bennett was prepared to testify that the opening in the hymen's mid-part discovered at autopsy is a normal condition for young girls and "any statements offering that there are injuries [to the vaginal vault] are directly in conflict with the forensic evidence." The emotional centerpiece of the Government's case for death was the alleged rape of the victim, and Dr. Bennett could have and would have refuted that evidence. Without Dr. Bennett's testimony, the Government was able to argue in closing, with no evidence presented to the contrary, that the hymen was unnaturally torn, as a result of the victim's sexual assault by Movant, while drawing the jury's attention to the graphic and disturbing post-mortem photographs, and pointing, "right there and right there."

(17) Defense counsel failed to object when the Government asked Penny Butler, the victim's sister, if she was scared as she testified. The child's fear had no tendency to prove or disprove any fact in issue; rather, it served only to inflame the passions and prejudices of the jury by

implying that Movant had scared Penny twice – once during the kidnapping and once during the trial.

(18) Defense counsel advised and convinced Movant to plead guilty to count one of the indictment in exchange for the Government dismissing count two of the indictment and letting the defense argue that Movant had accepted responsibility for his actions, a contention that was unanimously rejected by the jury To reach this agreement, Movant was required to waive any post-conviction challenge as to the guilty plea. This is an unenforceable condition and trial counsel were placed in a conflicted position when they advised Movant to accept the conditions of the offer while ostensibly avoiding post-conviction review of the reasonableness of that advice as it pertained to Movant's decision to enter a guilty plea.

(19) Defense counsel failed to argue in Movant's motion for a new trial that the District Court had been in error in refusing to let the defense ask a witness, Fred Lawrence, whether the Bureau of Prisons was equipped to handle the security of Movant. To bolster its theory that Movant was a future danger to society, the Government had elicited from Lawrence that Movant posed a security risk, and the defense should have been permitted to explain, deny, refute, or lessen the impact of that testimony.

(20) Defense counsel failed to argue in Movant's motion for a new trial that the District Court had erred in refusing to let the defense ask Roger Moore, Jr., why two inmates would have claimed that he had called

Movant a "sissy" or a "punk." This evidence was not being offered to prove the truth of Moore's statement, but rather to show that he made them. The evidence was necessary to put the altercation with Moore into context by showing that Moore had been goading and taunting Movant.

(21) Defense counsel failed to argue in Movant's motion for new trial that the District Court abused its discretion in letting the Government present evidence through a witness, Bruce Roberts, that an inmate had told Roberts that Movant had threatened to harm the inmate's five-year old daughter. This alleged statement of Movant was never disclosed to the defense. Further, this was precisely the class of evidence that the District Court precluded Movant from presenting through Roger Moore, Jr.

(22) There were additional instances of prejudicial ineffective assistance of defense counsel which individually, and cumulatively in combination with other instances of ineffective assistance, denied Movant the Sixth Amendment's guarantee of the effective assistance of counsel.

In dismissing the motion without a hearing, the Court appears to have tried to have matters both ways. On the one hand, the Court per force accepted as true the allegations in Movant's motion to vacate his conviction and sentence. On the other hand, the Court made contrary "fact-findings" with no basis in the record for doing so regarding the performance of trial and appellate counsel, finding that, "The claims of ineffective assistance of trial and appellate counsel fall within the broad perimeters of trial strategy." There was nothing in the record to support that conclusion and Movant made a specific offer of proof on these issues,

and set out specific factual assertions in his 2255 motion, that should have precluded such a finding. The government, as noted in the order dismissing the motion, "requested that movant's trial and appellate counsel submit affidavits or to a hearing to further explain their reasons for this strategy . . . ." Although the reference to "this strategy" is unclear, at such a hearing trial counsel would have testified subject to cross-examination and penalties of perjury that there were not strategic components, or even good explanations, for many of the actions, and inactions, of counsel.

Mr. Nelson, through counsel, was explicit about the witnesses he planned to call at a hearing. Thus, at the evidentiary hearing the government conceded was necessary, Movant proposed to call, at a minimum, the following witnesses:[2]

- Patrick Berrigan, Esquire: Mr. Berrigan served as Movant's trial counsel and was expected to provide testimony on the broad range of issues set out in the 2255 motion. He did not enter the case until February 2001. Of particular relevance, Mr. Berrigan was expected to testify that, as of the fall of 2001, Movant's case was not ready to go to trial and that Mr. Berrigan should have moved to adjourn the trial, but did not do so. Mr. Berrigan was also expected to testify that Movant's decision not to cooperate with the government's mental health experts was on the advice of his counsel and not an independent decision reached by Movant. Mr. Berrigan was also expected to testify that despite having funding for mental-health experts, no mental-health evaluation of Movant was undertaken until October 2001, shortly before the commencement of the trial.

- Susan M. Hunt, Esquire: Ms. Hunt served as Movant's trial counsel and would be expected to provide testimony on the broad range of issues set out in the 2255 motion. She served as Movant's counsel from early in the case. In addition to confirming certain statements by Mr. Berrigan, Ms. Hunt was expected to testify about the efforts she made to gather evidence in mitigation and to supervise the activities of mitigation specialist Tena Francis. By the time the case came to trial in the fall of 2001, it was Ms. Hunt's belief that an adjournment should have been requested. She was expected to confirm the fact that Movant's refusal to be evaluated by government mental-health

[2] This listing was not intended to serve as a formal proffer of the proposed testimony, beyond a good faith effort to indicate that each proffered witness had relevant information to bring to this dispute. Neither was the list intended to be exhaustive in the sense of setting out the universe of potential witnesses.

experts was on the advice of counsel. Ms. Hunt also served as one of Movant's appellate counsel and will provide testimony regarding appellate representation and the process through which issues were selected for appellate briefing.

- Jennifer Herndon, Esquire: Ms. Herndon served as one of two of Movant's appellate counsel. She was expected to testify that, because of time constraints and other pressures, she was unable to conduct an adequate review of the record of Movant's case and, as a result, did not file a complete and adequate appellate brief.

- Daniel V. Foster, Psy.D.: Dr. Foster was a psychologist who evaluated Movant during the week-end of October 5 and 6, 2001. Dr. Foster would have described his evaluation as, in essence, only a beginning and as "too little, too late." Dr. Foster never completed his evaluation and was not asked to do so.[3] In his report, he described his time spent with Movant as "primarily spent in trust building and history taking."

- Tena Francis: Ms. Francis served as the mitigation specialist in Movant's case. The application to have her serve in that capacity was filed on December 12, 2000. Ms. Francis was expected to testify regarding the incomplete status of the mitigation investigation when she entered the case and the difficulties she encountered in conducting her investigation. She was expected to testify that in June 2001 she advised trial counsel, in a detailed memorandum and telephone conference, of many areas of the ongoing mitigation investigation that needed to be completed prior to trial. Ms. Francis was expected to testify that she had very little involvement in the case following the June memo and conference and. to the best of her knowledge and ability, very few of the necessary investigative steps were accomplished.

- Deborah Haddid: Ms. Haddid was an investigator who worked for Ms. Francis. She was expected to testify about the investigative steps that she took in attempting to prepare a case-in-mitigation. As importantly, Ms. Haddid was expected to testify regarding investigative steps that were not taken.

- Jill Miller, MSSW: Ms. Miller is a highly-experienced and respected mitigation investigator. She was appointed by this Court, on the application of Movant's counsel, to assess the status of the mitigation investigation at the time Movant's case came to trial and to develop a plan for completing an adequate mitigation investigation so that this Court would be in a position to make an accurate judgment regarding the failure of trial counsel to conduct an

---

[3]The record of this case reflects that on September 4, 2001, Movant's trial counsel filed a notice that the defense would offer expert evidence on the issue of Movant's mental condition. However, a motion to have Dr. Foster approved to serve as an expert was not even filed until September 17, 2001. The first (and only) motion to have Dr. Foster travel to interview and evaluate Movant was not filed until October 2, 2001.

adequate investigation and to present an adequate penalty-phase. When additional funding was sought from this Court to have Ms. Miller continue her work, the application was denied.

- Michael M. Gelbort, Ph.D.: In early 2001, Movant's trial counsel secured funds to conduct a neuropsychological examination of Movant. That examination, however, was never done. This Court subsequently approved a motion brought by Movant's present counsel to conduct such an examination. In 2005, Dr. Gelbort examined Movant for evidence of organic brain dysfunction and reached the conclusion that there was such evidence.

Additionally, Movant noted in his reply memorandum that it would be necessary to call as witnesses all of Movant's prior counsel in order to establish the nature of any investigation conducted and the capital qualifications of those attorneys. Movant also noted that he intended to present mitigation witnesses not called by Movant's trial counsel. Finally, Movant noted in prior pleadings that Natalie Novik Brown, Ph.D., a psychologist expert in the diagnosis of Fetal Alcohol Spectrum Disorder, had completed the first stage of a two-stage analysis and had reached a tentative initial conclusion that Movant fell within that diagnosis. Dr. Brown's analysis was, at the time, ongoing.[4]

Section 2255 provides for a hearing as follows: "Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States Attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255; *accord*, *Koskela v. United States*, 235 F.3d 1148 , 1149 (8th Cir.

---

[4]Filed as Attachment A to Movant's Rule 59 motion was an affidavit prepared by Dr. Brown documenting her work-to-date and her tentative conclusions. Dr. Brown asserted in her affidavit that, "Based upon the initial review of source documents sent to me by [Movant's counsel] as well as an interview with birth mother Nancy Nelson, I believe there is a substantial possibility that Keith Nelson may suffer from Fetal Alcohol Spectrum Disorder." Her tentative findings in this regard were fully documented in the affidavit. (Attachment A to the Rule 59 motion at p. 3.) Movant's counsel thereafter filled a motion with the Court for additional funding of Dr. Brown's evaluation. That motion was denied and the Court declined to re-open the judgment for the purpose of taking testimony from Dr. Brown.

2001) (cause remanded for an evidentiary claim that counsel rendered ineffective assistance in failing to call certain witnesses); *Donahue v. United States*, 2000 U.S. App. LEXIS 18 (8th Cir. 2000) (Evidentiary hearing was required to resolve a post-conviction claim of ineffective assistance of counsel where the government presented only the affidavit of defendant's trial counsel as evidence to rebut the claim.); *Smith v. United States*, 182 F.3d 1023 (8th Cir. 1999) (Judgment dismissing prisoner's motion to set aside a criminal conviction was overturned, where the district court failed to hold an evidentiary hearing regarding prisoner's ineffective assistance of counsel claim.); *Rose v. United States*, 513 F.2d 1251 (8th Cir. 1975) (A defendant was entitled to a hearing on his post-conviction motion to set aside his sentence based on his alleged incompetence at the time of his guilty plea, when there had never been a previous federal hearing on the issue.)

It is also respectfully noted that many of the claims presented in Movant's 2255 motion focused on matters counsel *failed* to pursue and, therefore, no tactical judgment could have been assigned to those decisions without at least hearing from counsel.

On the issue of Mr. Nelson's refusal to undergo evaluation by the government's mental-health experts, the record reveals only the aspect of that refusal visible outside the confines of the attorney-client privilege. The truth is that, despite long having the funds to have Mr. Nelson evaluated by mental-health professionals, defense counsel simply neglected to get it done. Trial counsel would have so testified at a hearing. Indeed, by the time the defense was required to file a notice of its intent to offer mental-health evidence, Mr. Nelson had *still* not been seen or evaluated by any mental health professional. By the time Dr. Foster visited Mr. Nelson it was, in the psychologist's own words, "too little, too late" and a competent evaluation was never completed. Defense counsels' subsequent advice to Mr. Nelson that he should refuse to be evaluated by the government's experts was born of

desperation, not trial strategy. All of this, and more, would have been established at a hearing.

There was no mental health evidence presented on Movant's case at trial. This was squarely the result of failings by counsel. This is an area that Movant's counsel were (and remain) prepared to develop at length during a hearing. A review of orders entered by this Court demonstrate that Movant's trial counsel sought and received authorization to retain the services of mental health professionals at an early stage of the case. In June 2000, a motion was presented to the Court and granted to retain the services of a psychiatrist, Dr. Peterson. Dr. Peterson never examined Movant. In January 2001, a motion was presented to have a neuropsychological examination performed. No such examination took place. It was not until the eve of trial, the fall of 2001, that the services of a forensic psychologist were requested. The motion for the appointment of Dr. Foster was not even filed until September 17, 2001, and Dr. Foster did not actually examine Movant until October 5 and 6, 2001. Dr. Foster himself described his evaluation as incomplete and preliminary. Despite the fact that two of Movant's brothers had long been diagnosed as schizophrenics, including one who was incarcerated in Texas for murder and had been deemed incompetent for a substantial period of time, no effort was made to locate a mental health professional with expertise in schizophrenia.[5]

There is no excuse for having delayed the mental-health evaluation of Movant until the fall of 2001. Applications for the funding of such examinations had been approved by this Court far in advance of the trial date. Dr. Foster believed that, had he done a complete

[5]When Movant's present counsel sought such an appointment, this Court denied the application on the basis of pre-judging the case. This left Movant in the Catch-22 posture of not being able to predict what the evaluation would have uncovered and, therefore, vulnerable to an argument that he had not established prejudice.

examination, he would have developed powerful evidence in mitigation. The neuropsychological examination conducted by Dr. Gelbort in 2005 as part of these proceedings in fact developed evidence that Movant is brain-damaged and suffers from a condition beyond his control, "frontal lobe disturbance/dysfunction [that] has an effect on his everyday thinking and reasoning capacities" and which will lead to "episodes of impaired reasoning . . . ."

With regard to the "waiver" of the presentation of mental health evidence, Movant was (and remains) prepared to establish at an evidentiary hearing that Movant acted at the direction and advice of counsel. Movant would further establish that trial counsel were motivated by the desire to preserve for appeal a perceived trial error, *i.e.* this Court's exclusion of Dr. Foster's evidence.[6] This was not, however, a reasonable tactical choice since Movant's trial counsel had failed to explore in any comprehensive way a potential mental-health mitigation case and, therefore, the decision to forgo such a presentation was dictated by a lack of preparation, not reasonable tactical choices.

Recognizing that Dr. Gelbort's neuropsychological testing revealed significant evidence of brain dysfunction, the government later denigrated the evidence by offering to present counter expert testimony, at a hearing, that there is "no scientific method available for establishing a causal connection between brain injury and criminal behavior." (US Reply at 33-34.) Movant was (and remains) prepared to meet such testimony if and when it is presented. Moreover, as a matter of law, for evidence to be mitigating a causal connection to the crime need not be proven. This was exactly the point of the Supreme Court's decisions

---

[6]In this regard, it is noteworthy that Mr. Berrigan artfully deflected Magistrate-Judge Hays' direct question on this issue. (*See* proceedings quoted in US Reply at 26-27.) Mr. Berrigan and Ms. Hunt will testify at a hearing that the decision not to submit to examination by the government's experts was the result of defense counsels' advice.

in *Tennard v. Dretke*, 542 U.S. 274 (2004) and *Smith v. Texas*, 543 U.S. 37 (2004). In *Smith*, decided five months after *Tennard*, the Court reiterated its rejection of the "nexus" requirement that the Texas Court of Criminal Appeals, as endorsed by the Fifth Circuit, had erected as a barrier to the admission of mitigating evidence, stating, "[w]e rejected the Fifth Circuit's 'nexus' requirement in *Tennard* . . . ." *Smith v. Texas*, 543 U.S. at 45. Accordingly, the absence of a nexus to the crime does not render neuropsychological testing irrelevant. Neither does Movant concede that a nexus requirement could not be established.

While recognizing that there was evidence and argument that may have been improper, the government, in reply to Movant's 2255 motion, correctly noted that an explanation as to counsel's failure to object required an evidentiary hearing. (US Reply at 38-45.) The same was true with regard to the decision not to call Dr. Bennett. (US Reply at 46.) The government recognized, as well, the need for a hearing on the issue of ineffective assistance of appellate counsel. (US Reply at 47-48.) As stated above, at such a hearing Movant's appellate counsel was expected to testify that, because of time constraints and other pressures, she was unable to conduct an adequate review of the record of Movant's case and, as a result, did not file a complete and adequate appellate brief.

It was a critical aspect of Movant's challenge to his conviction and sentence of death that his defense counsel failed to conduct an adequate mitigation investigation. A properly-conducted investigation should have consisted of efforts to discover all reasonably available mitigating evidence and to rebut any aggravating evidence to be introduced by the Government. That was not done. Movant further asserted that trial counsel provided less than effective representation in other aspects of the case as well. The challenge to Movant's conviction and sentence of death asserted that, but for the failings of his counsel: (1) there is a reasonable probability that the results of these proceedings would have been different,

(2) confidence in the reliability of the outcome has been undermined; and (3), one or more jurors would have struck a different balance.

The prejudice prong of the test enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984) requires a defendant in Movant's position to show that "there is a *reasonable* probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694 (emphasis added). In *Wiggins v. Smith*, 539 U.S. 510 (2003), the Court noted that in a death penalty scheme where a non-unanimous jury spares the defendant's life, such as the federal system, confidence in the outcome is undermined where there is "a reasonable probability that at least one juror would have struck a different balance." *Id.* at 536. The United States Supreme Court has stressed that "the adjective ["reasonable"] is important." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). In *Kyles*, the Court observed as follows:

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

*Id.*; *see also Strickland*, 466 U.S. at 693 ("a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case"); *Nix v. Whiteside*, 475 U.S. 157, 175 (1986) ("a defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice"). As explained in *Strickland* itself:

> "[R]easonable probability of a different result" is thus *less than a preponderance of the evidence*. It is present when an evaluation of all of the evidence that should have been before the jury is "sufficient to undermine confidence in the outcome."

*Strickland*, 466 U.S. at 693 (emphasis added). In a capital case, a "reasonable probability" of a different result occurs when the full "body of mitigation evidence" that could have been

presented in the case "might well have influenced the jury's appraisal of [the defendant's] moral culpability." *Williams*, 529 U.S. at 398.

The task of defending a capital case, and preparing a case in mitigation, is unfamiliar to most courts and most attorneys, no matter how experienced in the area of criminal law. In 1983, Professor Gary Goodpaster published an article entitled, "The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases," 58 N.Y.U.L.REV. 299 (1983). In the article, Professor Goodpaster discussed the role of the advocate in a death-penalty case in the following terms:

> As an advocate, . . . defense counsel has the related but distinct function of attempting to persuade the jury to exercise mercy. Defense counsel therefore has both the opportunity and the duty to present potentially beneficial mitigating evidence and to attempt to convince the sentencer that, notwithstanding the defendant's guilt, he or she is a person who should not die. Once the defendant has been found guilty of a capital crime, a life sentence is counsel's only remaining advocacy goal. As an advocate for life, counsel must attempt to demonstrate that mitigating factors outweigh aggravating factors and must present the sentencer with the most persuasive possible case for mercy.

58 N.Y.U.L.REV. at 318. In his article, the author also outlined the steps an attorney handling a capital case should follow, including the absolute duty of trial counsel "to investigate the client's life history, and emotional and psychological make-up, as well as the substantive case and defenses" noting further that, "The importance of this investigation, and the thoroughness and care with which it is conducted, cannot be overemphasized." *Id.* at 324. In describing the nature of such an investigation, Professor Goodpaster emphasized both its difficulty and time-consuming nature:

> Such investigations present more obstacles than those conducted in furtherance of an ordinary criminal defense, primarily because of the difficulty in locating relevant witnesses. Over the years, the witnesses who are acquainted with the defendant are likely to have become geographically dispersed

> and more difficult to trace than guilt-phase witnesses. Indeed, constructing a mitigating case on the basis of the life-history investigation is perhaps best viewed as a successive winnowing process: the attorney's investigator tracks down all mitigating leads; the attorney next interviews the most promising contacts and then chooses to call some of them at the penalty phase of the trial in accordance with a coherently developed strategy.

*Id*.

In *Strickland*, the Supreme Court established the now familiar two-prong test for evaluating claims that defense attorneys in criminal cases did not provide the effective assistance of counsel guaranteed by the Sixth Amendment to the United States Constitution. First, counsel's performance must fall "below an objective standard of reasonableness," *Strickland*, 466 U.S. at 680, and second, there must be a "reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different." *Id.* at 693-94. The first prong of *Strickland* is met where, in light of all the circumstances of the case, counsel's "acts or omissions were outside the range of professionally competent assistance." *Id.* at 690. *See also, Burger v. Kemp*, 483 U.S. 776, 795 (1987); *United States v. Kauffman*, 109 F.3d 186, 190 (3d Cir. 1997). The second prong of *Strickland* is met where, but for counsel's unprofessional performance, there is a reasonable probability that the "result" of the proceeding would have been different.[7] *Kauffman*, 109 F.3d at 190 (quoting *United States v. Nino,* 878 F.2d 702, 711 (3d Cir. 1989).

There is, of course, no specific set of rules for judging reasonable performance. *Strickland*, 466 U.S. at 688-89. Instead, "[i]n any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering

---

[7]As noted earlier, in the context of a capital case where a non-unanimous jury spares a defendant's life, which is the situation in the federal system, the prejudice prong of *Strickland* requires proof only of "a reasonable probability that at least one juror would have struck a different balance." *Wiggins v. Smith,* 123 S.Ct. at 2543.

all the circumstances." *Strickland*, 466 U.S. at 688. However, "[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides." *Strickland*, 466 U.S. at 688. In *Wiggins*, and quite recently in *Rompilla v. Beard*, 125 S.Ct. 2456 (2005), the Court specifically cited the American Bar Association's 1989 "Standards for the Appointment and Performance of Counsel in Death Penalty Cases" as a guide to "'determining what is reasonable.'" *Wiggins*, 123 S.Ct. at 2537, quoting *Strickland*, 466 U.S. at 688. In interpreting *Wiggins*, at least one court has concluded that the 2003 revision of those guidelines should control the analysis of cases tried prior to 2003 since the 2003 Guidelines "simply explain in greater detail the 1989 Guidelines," especially in the area of "the obligations of counsel to investigate mitigating evidence." *Hamblin v. Mitchell*, 354 F.3d 482 (6th Cir. 2003).

It is the heart of this application that Petitioner's trial counsel could not have made a reasonable tactical judgment not to offer the results of a neuropsychological evaluation, or other mental-health evaluations, without having conducted such evaluations in a timely fashion or, indeed, at all. Similarly, in the absence of a complete mitigation investigation, Movant's trial counsel could not have made reasonable tactical judgments about the scope and nature of the case in mitigation that would be presented.

Courts have found counsel's performance unreasonable in cases challenging a failure to present evidence favorable to a defendant, where counsel failed to make "reasonable investigations or to make a reasonable decision that makes a particular investigation unnecessary," *Strickland*, 466 U.S. at 691; *see also, Rompilla v. Beard*, 125 S.Ct. at 2463; *Williams v. Taylor*, 529 U.S. at 396; *Marshall v. Cathel*, 428 F.3d 452 (3d Cir. 2005); *Mayfield v. Woodford*, 270 F.3d 915 (9th Cir. 2001) (en banc); *Coleman v. Mitchell*, 268 F.3d 417 (6th Cir. 2001); *Ainsworth v. Woodford*, 268 F.3d 868 (9th Cir. 2001); *Jermyn v. Horn*,

266 F.3d 257, 312 (3d Cir. 2001); *Carter v. Bell*, 218 F.3d 581, 596 (6th Cir. 2000); *Smith v. Stewart*, 189 F.3d 1004, 1008 (9th Cir. 1999); *Berryman v. Morton*, 100 F.3d 1089, 1101 (3d Cir. 1996); *Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995); *Workman v. Tate*, 957 F.2d 1339, 1345 (6th Cir. 1992); *Kenley v. Armontrout,* 937 F.2d 1298, 1309 (8th Cir. 1991).

The American Bar Association's guidelines for counsel in death penalty cases have come to play an increasingly important role in assessing the performance of counsel in a capital case. The 2003 guidelines set forth the following about investigation and preparation:[8]

> GUIDELINE 10.7 – INVESTIGATION
>
> A. Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty.
>
> GUIDELINE 10.10.1– TRIAL PREPARATION OVERALL
>
> A. As the investigations mandated by Guideline 10.7 produce information, trial counsel should formulate a defense theory. Counsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies.

In discussing the scope of the investigation to be undertaken pursuant to Guideline 10.7, the ABA Commentary states the following:

> Because the sentencer in a capital case must consider in mitigation, "anything in the life of the defendant which might militate against the appropriateness of the death penalty for the defendant," "Penalty Phase preparation requires extensive and generally unparalleled investigation into personal and family history." In the case of the client, this begins with the moment of conception. Counsel needs to explore:

---

[8]Movant urges this Court to follow the lead of *Hamblin v. Mitchell*, 354 F.3d 482 (6th Cir. 2003) which, as noted earlier, concluded that the 2003 revision of those guidelines should control the analysis of cases tried prior to 2003 since the 2003 Guidelines "simply explain in greater detail the 1989 Guidelines," especially in the area of "the obligations of counsel to investigate mitigating evidence."

(1) Medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage);

(2) Family and social history (including physical, sexual or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment and peer influence); other traumatic events such as exposure to criminal violence, the loss of a loved one or a natural disaster, experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (*e.g.*, failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities);

(3) Educational history (including achievement, performance, behavior and activities), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof and activities;

(4) Military service, (including length and type of service, conduct, special training, combat exposure, health and mental health services);

(5) Employment and training history (including skills and performance, and barriers to employability);

(6) Prior juvenile and adult correctional experience (including conduct while under supervision, in institutions of education or training, and regarding clinical services).

ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (Rev. Ed. 2003).

The importance of the ABA Guidelines is illustrated by *Wiggins* where the Court specifically cited the ABA's 1989 Standards as the benchmark for "'determining what is reasonable'" to expect of counsel in a capital case. *Wiggins*, 123 S.Ct. at 2537, quoting *Strickland*, 466 U.S. at 688. *Wiggins* thus stands squarely for the proposition that the "prevailing professional norms" by which the performance of counsel in a capital case is

measured are those set forth in the ABA Guidelines. *Wiggins* also stated the following with regard to defense counsel's obligations to prepare and, more importantly, *investigate*, a case in mitigation:

> Investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) . . . . Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources.

*Wiggins*, 123 S.Ct. at 2537 (emphasis in original).[9] In *Rompilla v. Beard*, *supra*, the Court found that the Petitioner had not received effective assistance of counsel at the penalty-phase of his Pennsylvania capital case, reversing the United States Court of Appeals for the Third Circuit. In the course of the opinion, the Supreme Court re-emphasized the importance of defense counsel conducting a full penalty-phase investigation. In describing the case before it, the majority observed that, "This case, like some others recently, looks to norms of adequate investigation in preparing for the sentencing phase of a capital trial . . . ." The Court also, once again, emphasized and reiterated the importance of the American Bar Association's Guidelines on criminal cases in general and capital cases in particular in resolving a claim of ineffective assistance of counsel. *See* discussion, *id*., at nn. 6, 7.

The importance of mitigating evidence in capital sentencing proceedings is a fundamental tenet of the Supreme Court's capital jurisprudence. *Perry v. Lynaugh*, 492 U.S.

---

[9]The Summer 2003 edition of the Hofstra Law Review contains a complete rendition of the 2003 ABA Guidelines, together with the official commentary and accompanying scholarly articles regarding the Guidelines themselves and issues concerning the defense of death penalty cases. *See*, "The Guiding Hand of Counsel: ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases," 31 HOFSTRA L.REV. 903-1211 (2003).

302, 307 (1989); *Eddings v. Oklahoma*, 455 U.S. 104, 110-12 (1982); *Lockett v. Ohio*, 438 U.S. 586, 605 (1978). It is critical to the reliability of the capital sentencing proceeding that the jury render an individualized decision. *Gregg v. Georgia*, 428 U.S. 153, 206 (1976). A jury cannot make that decision in a reliable, individualized, and constitutional way without mitigating evidence about the defendant. Reasonable investigation of the mitigation in a capital case is therefore an absolute prerequisite to constitutional representation. The core Eighth Amendment principle that "respect for humanity" requires consideration of information about the offender, *Lockett*, 438 U.S. at 602 (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976)), allows for no less. "It is critical to the reliability of a capital sentencing proceeding that the jury render an individualized determination." *Harris v. Dugger*, 874 F.2d 756, 763 (11th Cir. 1989) (citing *Gregg v. Georgia*, *supra*, 428 U.S. at 206; *Armstrong v. Dugger*, 833 F.2d 1430, 1433 (11th Cir. 1987).

Under clearly established United States Supreme Court precedent, a defendant's Sixth Amendment right to the effective assistance of counsel is violated whenever counsel provides professionally deficient representation that results in prejudice. *Strickland v. Washington*, *supra*; *Williams v. Taylor*, *supra*; *Wiggins v. Smith*, *supra*. Counsel's performance at capital sentencing must be evaluated in light of the fundamental principle that a capital defendant has "a right – indeed, a constitutionally protected right – to provide the jury with [all reasonably available] mitigating evidence" in his case. *Williams v. Taylor*, 529 U.S. at 363. Accordingly, capital counsel have an "obligation to conduct a thorough investigation of the defendant's background" for mitigating evidence, *Williams*, 529 U.S. at 396 (citing 1 ABA STANDARDS FOR CRIMINAL JUSTICE 4-4.1, commentary, p. 4-55 (2d ed. 1980)),[10] quoted in

[10] *Williamson v. Ward*, 110 F. 3d 1508, 1514 (10th Cir. 1997) ("in a capital case, counsel's duty to investigate all reasonable lines of defense is strictly observed"); *Antwine v. Delo*, 54 F.3d 1357, 1367 (8th Cir. 1995) (counsel has a heightened "duty . . . to collect as

*Wiggins v. Smith*, 123 S. Ct. at 2535, and anything less than a "thorough investigation" constitutes deficient performance under *Strickland*. *Wiggins*, 123 S. Ct. at 2536; *Williams*, 529 U.S. at 396; *Jacobs v. Horn*, 129 F. Supp. 2d 390, 406 (M.D. Pa. 2001) ("the duty to investigate encompasses an investigation into mitigating circumstances including family background and mental health mitigating evidence").

The Supreme Court has made clear, the Sixth Amendment requires that "investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor," *Wiggins v. Smith*, *supra*, 123 S.Ct. at 2537 (quoting ABA Guideline 11.4.1(C) (emphasis in *Wiggins*), and "among the topics counsel should consider presenting are medical history, educational history, employment and training history, family and social history . . . . " *Id.* (citing ABA Guideline 11.8.6; emphasis omitted).

This duty to investigate and present mitigating evidence has several distinct components. Counsel has an obligation to collect all reasonably available institutional records that may contain relevant mitigating evidence. ABA Guidelines, Guideline 11.4.1, Investigation, §§ 2C & 2D (capital counsel should secure releases and obtain hospital, treatment, school and mental health records). Consequently, counsel's performance is

---

much information as possible about [the defendant] for use at the penalty phase"); *Hill v. Lockhart*, 28 F.3d 832, 845 (8th Cir. 1994) ("Given the severity of the potential sentence and the reality that the life of [the defendant] [is] at stake," it is capital counsel's "duty . . . to collect as much information as possible about [the defendant] for use at the penalty phase."). The *American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* make clear that capital counsel must "make efforts to discover all reasonably available mitigating evidence." ABA GUIDELINES § 11.4.1; *id.* § 11.8.6 ("Counsel should present to the sentencing entity or entities all reasonably available evidence in mitigation"). As the United States Supreme Court explained as early as *Strickland* in 1984, and more recently in both *Wiggins* and *Rompilla*, decided, respectively in 2003 and 2005, the ABA standards serve as important guides for determining the reasonableness of counsel's performance.

deficient when his efforts to obtain available institutional records containing mitigating evidence are inadequate. *See Williams v. Taylor*, 529 U.S. at 396 (failure to obtain juvenile and social services records "graphically describing Williams' nightmarish childhood.")[11]

Counsel has an obligation to interview all witnesses who may be able to provide information in mitigation. ABA GUIDELINES, Guideline 11.4.1, Investigation, §§ D.2.C, D.3.B & D.3.C (directing counsel to seek out information regarding "family and social history (including physical, sexual or emotional abuse)" by, inter alia, interviewing family members and others familiar with the defendant's life history); *id*., Guideline 11.8.3, Preparation for the Sentencing Phase, § F ( same). Counsel's failure to interview a witness who has relevant mitigating information constitutes deficient performance. *Williams*, 529 U.S. at 415 (O'Connor, J., concurring) (counsel ineffective where he presented testimony from defendant's mother and two friends but failed to fully interview and present evidence from other "friends, neighbors and family"); *Jermyn v. Horn*, 266 F.3d at 310 (3d Cir. 2001) (counsel ineffective for failing to interview and present evidence of child abuse from relatives and for failing to present mental health testimony on psychological implications of the abuse); *United States v. Gray*, 878 F.2d 702, 712 (3d Cir. 1989) (counsel's failure to interview potential witnesses violates the duty to investigate and constitutes deficient

[11] *See*, *e.g., Glenn v. Tate*, 71 F.3d 1204 (6th Cir. 1995) (failure to obtain school records evidencing mental retardation); *Clabourne v. Lewis*, 64 F.3d 1373, 1385 (9th Cir. 1995) (failure to obtain institutional records from mental hospital and prison treatment facility for mitigating evidence); *Hill v. Lockhart*, 28 F.3d at 845 (failure to obtain records from mental hospital for mitigating evidence); *Martinez-Macias v. Collins*, 810 F. Supp. 782, 787 (W.D. Tex 1991) (failure to utilize records from state rehabilitation center to demonstrate good conduct and efforts to rehabilitate while in custody), *aff'd*, 979 F.2d 1067 (5th Cir. 1992); *cf. Williams v. Washington*, 59 F.3d 673, 680 (7th Cir. 1995) (failure to become familiar with documentary evidence in discovery materials); *Sims v. Livesay*, 970 F.2d 1575, 1580-81 (6th Cir. 1992) (failure to examine physical evidence).

performance).[12]

Counsel also has an obligation to properly prepare all mitigation witnesses so they are ready to testify to all relevant mitigating evidence within their knowledge, and to bring out, during the course of each witness's mitigating testimony all relevant mitigating evidence that the witness is able to present. *See, e.g., Williams*, 529 U.S. at 398 (counsel must make an evidentiary presentation that "explain[s to the jury] the significance of all the available evidence"); *Collier v. Turpin*, 177 F.3d 1184, 1199-1204 (11th Cir. 1999) (in case in which counsel traveled out of state to interview more than fourteen family members and others who knew defendant, subpoenaed fourteen of those persons interviewed, and called ten to testify at capital sentencing, counsel ineffective for failing to elicit all of the mitigating evidence from the ten witnesses that were called).[13] *Jacobs v. Horn*, 129 F. Supp. 2d 390, 408 (M.D. Pa. 2001) ("petitioner's background history of abuse and/or the reality that he was mentally retarded and suffered from other cognitive and psychological problems might well have influenced the jury's appraisal of his moral culpability").

---

[12]*See, E.g., Hill v. Lockhart*, 28 F.3d at 845 (8th Cir. 1994); *Kubat v. Thieret*, 867 F.2d 351, 367 (7th Cir. 1989) (failure to interview and present mitigating testimony from, *inter alia*, neighbors and coworkers); *United States ex rel. Emerson v. Gramley*, 883 F. Supp. 225, 244 (M.D. Ill. 1995) (failure to interview "at least seven" potential mitigation witnesses), *aff'd*, 91 F.3d 898 (7th Cir. 1996); *Martinez-Macias v. Collins*, 810 F. Supp. at 787(failure to interview family members about defendant's good character traits), *aff'd*, 979 F.2d 1067 (5th Cir. 1992).

[13]*See also Martinez-Macias v. Collins*, 810 F. Supp. at 787 (deficient performance for failure to "investigate[ ] and present[ ] evidence from family members concerning Petitioner's good character traits" and failing to prepare petitioner's wife for sentencing stage testimony), *aff'd*, 979 F.2d 1067 (5th Cir. 1992). This obligation applies to expert witnesses as well as lay witnesses. *E.g., Bloom v. Calderon*, 132 F.3d 1267 (9th Cir. 1997) (failure to provide mental health records, including evidence of black-outs or transient psychotic episodes); *Clabourne v. Lewis*, 64 F.3d 1373, 1384-85 (9th Cir. 1995) (failure to provide mental health experts with background materials for accurate mental health profile is ineffective); *Hendricks v. Calderon*, 864 F. Supp. 929 (N.D. Cal. 1994) (failure to provide life history information about client to mental health experts deficient), *aff'd*, 70 F.3d 1032, 1044 (9th Cir. 1995).

When it comes to describing the scope of mitigation evidence that may properly be presented to a jury in a capital case – especially in a weighing jurisdiction – the sky is virtually the limit. Starting with the Federal Death Penalty Act of 1994 itself ("FDPA"), the Act sets out seven specific mitigating factors and one "catch-all" factor. 18 U.S.C. § 3592(a)(1)-(8). Moreover the FDPA itself notes that the finder of fact in such cases, "Shall consider any mitigating factor, including the following . . ." suggesting that the range of permissible evidence a defendant may present in mitigation is broader even than the "catch-all" set forth at 18 U.S.C. § 3592(a)(8). This is entirely consistent with established Supreme Court precedent.

The United States Constitution requires that, in a death-penalty prosecution, no limitation may be placed on the right of the accused to present, for the sentencer's consideration, any relevant mitigating evidence. This firmly-established tenet of capital jurisprudence is rooted in *Lockett v. Ohio*, 438 U.S. 586 (1978), where a plurality of the Court held that "in all but the rarest kind of capital cases," a sentencing authority may not "be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record . . . as a basis for a sentence less than death." *Id*. at 113-14 (emphasis omitted); see also, *Skipper v. North Carolina*, 476 U.S. 1 (1986); *Eddings v. Oklahoma*, 455 U.S. at 112. In *McCleskey v. Kemp*, 481 U.S. 279 (1987), the Court held that a constitutional death-penalty scheme

> cannot limit the sentencer's consideration of *any relevant circumstance* that could cause it to decline to impose the penalty. In this respect, the State cannot channel the sentencer's discretion, but must allow it to consider *any relevant information* offered by the defendant.

*Id*. at 305-06 (emphasis added); *see also*, *Green v. Georgia*, 442 U.S. 95 (1979) (State's evidence rules may not be invoked to bar otherwise relevant mitigating evidence.)

In *Buchanan v. Angelone*, 522 U.S. 269 (1998), Chief Justice Rehnquist, writing for a majority of the Court, stated:

> [I]n the [penalty] phase, we have emphasized the need for a broad inquiry into all relevant mitigating evidence to allow an individualized determination.
>
> * * *
>
> In the [penalty] phase, our cases have established that the sentencer may not be precluded from considering any constitutionally relevant mitigating evidence.

*Id*. at 276 (citations omitted). In *Williams v. Taylor*, *supra*, the Court noted that mitigating evidence can serve to lessen a defendant's "moral culpability" even where such evidence "does not undermine or rebut the prosecution's death-eligibility case." *Williams*, 529 U.S. at 398.

In fact, the line of cases supporting the liberal admission of mitigating evidence is unbroken, and was most recently lengthened by *Tennard v. Dretke*, 125 S.Ct. 2562 (2004). There, a six-member majority of the Court reversed the Fifth Circuit and bluntly criticized the Circuit's longstanding practice of imposing an erroneously restrictive standard of relevance for mitigating evidence at the penalty phase of capital cases. *Tennard* reiterated that the threshold of relevance for mitigating evidence is minimal, stating:

> When we addressed directly the relevance standard applicable to mitigating evidence in capital cases in *McKoy v. North Carolina,* 494 U.S. 433, 440-441, 108 L. Ed. 2d 369, 110 S. Ct. 1227 (1990), we spoke in the most expansive terms. We established that the "meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding" than in any other context, and thus the general evidentiary standard – "'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence'"– applies. *Id*., at 440, 108 L. Ed. 2d 369, 110 S. Ct. 1227 (*quoting New Jersey v. T. L. O*., 469 U.S. 325, 345, 83 L. Ed. 2d 720, 105 S. Ct. 733 (1985)). We quoted approvingly from

> a dissenting opinion in the state court: "'Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value.'" 494 U.S., at 440, 108 L. Ed. 2d 369, 110 S. Ct. 1227 (*quoting State v. McKoy*, 323 N. C. 1, 55-56, 372 S.E.2d, 12, 45 (1988) (opinion of Exum, C. J.)). Thus, a State cannot bar "the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death." 494 U.S., at 441, 108 L. Ed. 2d 369, 110 S. Ct. 1227.
>
> Once this low threshold for relevance is met, the "Eighth Amendment requires that the jury be able to consider and give effect to" a capital defendant's mitigating evidence. *Boyde v. California,* 494 U.S. 370, 377-378, 108 L. Ed. 2d 316, 110 S. Ct. 1190 (1990) (*citing Lockett v. Ohio*, 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978); *Eddings v. Oklahoma*, 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869 (1982); *Penry I*, 492 U.S. 302, 106 L. Ed. 2d 256, 109 S. Ct. 2934 (1989)); *see also Payne v. Tennessee,* 501 U.S. 808, 822, 115 L. Ed. 2d 720, 111 S. Ct. 2597 (1991) ("We have held that a State cannot preclude the sentencer from considering 'any relevant mitigating evidence' that the defendant proffers in support of a sentence less than death. . . . [V]irtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances." (*quoting Eddings, supra*, at 114, 71 L. Ed. 2d 1, 102 S. Ct. 869)).

*Id.* at 2570.[14] In *Smith v. Texas*, 125 S.Ct. 400 (2004), decided five months after *Tennard*, the Court firmly emphasized its rejection of the "nexus" requirement that the Texas Court

---

[14]These principles were recently reiterated by the Supreme Court in a series of decisions rendered on April 25, 2007. *Brown v. Quatermain,* ___ U.S. ___, 2007 U.S. LEXIS 4538 (2007); *Smith v. Texas*, ___ U.S. ___, 2007 U.S. LEXIS 4537 (2007); *Abdul-Kabir v. Quatermain*, ___ U.S. ___, 2007 U.S. LEXIS 4536 (2007). In *Abdul-Kabir* the Court summarized as follows:

> [O]ur cases [have] firmly established that sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future.

*Id.* at *27.

of Criminal Appeals, as endorsed by the Fifth Circuit, had erected as a barrier to the admission of mitigating evidence, stating, "We rejected the Fifth Circuit's 'nexus' requirement in *Tennard* . . . ." *Smith v. Texas*, 125 S.Ct. at 405.

Thus, counsel's constitutional duty in this case was to investigate, discover, and present, in the language of *McCleskey*, *supra*, evidence of "any relevant circumstance that could cause [a jury] to decline to impose the penalty [of death]." Trial counsel were also required to protect Movant's legal rights at trial, and to advocate zealously on his behalf. The Eighth Circuit has not hesitated to apply the principles discussed above and to grant relief in similar cases. *See, e.g.*, *Antwine v. Delo*, 54 F.3d 1357, 1365 (8th Cir 1995) ("The issue is whether the failure to discover and present evidence of Antwine's mental condition undermines our confidence in the outcome of either the guilt or sentencing phase of the trial. We are concerned, then, with whether the jury – not the motion court – would have found the evidence of Antwine's mental condition credible."); *Simmons v. Luebbers,* 299 F.3d 929, 939 (8th Cir 2002) ("[T]he state portrayed Simmons as an individual who responded violently when his advances were not accepted by women. During the penalty phase, Simmons's attorneys could have presented evidence of Simmons's background to demonstrate that his compulsive, violent reactions were the result of an abusive and traumatic childhood. Further, a vivid description of Simmons's poverty stricken childhood, particularly the physical abuse, and the assault in Chicago, may have influenced the jury's assessment of his moral culpability."); *Parkus v. Delo,* 33 F.3d 933, 940 (8th Cir 1994) (Counsel must conduct an adequate investigation of facts, consider viable theories, and develop evidence to support those theories. The failure of counsel to adequately investigate a petitioner's mental health history and background necessitated an evidentiary hearing.); *Steinkuehler v. Meschner,* 176 F.3d 441 (8th Cir 1999) (The habeas relief granted related solely to petitioner's intoxication

defense. Trial counsel failed to present evidence that a crucial police witness on the issue of petitioner's state of intoxication had pressured another witness to "forget" that petitioner was intoxicated and that the police witness had a habit of "forgetting" exculpatory evidence. The deficient performance prejudiced petitioner and a reasonable probability existed that the result would have been different if counsel had presented the evidence. Petitioner was denied his right to effective assistance of counsel.); *Driscoll v. Delo*, 71 F.3d 701 (8th Cir 1995) (The court agreed that a writ of habeas corpus should issue on three independent bases: Appellant was denied effective counsel because his lawyer allowed the jury to retire with the factually inaccurate impression that the victim's blood was on appellant's knife; second, appellant's trial counsel was also ineffective for failing to impeach a state eyewitness using his prior inconsistent statements; finally, appellant's sentence violated U.S. Const. amend. VIII because the prosecutor made repeated statements to the jury that diminished the jury's sense of responsibility for its sentence of death.); *Copeland v. Washington*, 232 F.3d 969, 975 (8th Cir 2000) ("The improper argument would have had a significant prejudicial effect on the jurors, and it was unreasonable, in light of Supreme Court precedent, to conclude that the argument did not result in a deprivation of due process. The district court correctly determined that the argument was improper and the failure to object to the argument constituted ineffective assistance of counsel. Accordingly, the petitioner's death sentence is vacated.);

Movant respectfully suggests that applying the above principles to the facts as found by this Court after the evidentiary hearing that both sides contended was required, this Court would have been required to grant relief on the issue of ineffective assistance of trial counsel.

2. A COA should issue to review the constitutional adequacy of Movant's appellate counsel.

With regard to the quality of appellate representation, Movant was represented on the direct appeal of his conviction and sentence of death by Susan M. Hunt, Esquire, who had served as one of Movant's trial counsel, and by Jennifer Herndon, Esquire. There is no constitutional right to an appeal; that right is statutorily created. *McKane v. Durston*, 153 U.S. 684, 687 (1894). Where an appeal is granted by statute, equal protection and due process converge to require the effective assistance of appellate counsel. *Smith v. Robbins,* 528 U.S. 259, 276 (2000). In the non-capital context, appellate counsel need not raise every non-frivolous claim of error. *Evitts v. Lucey,* 469 U.S. 387, 394 (1985), *citing Jones v. Barnes,* 463 U.S. 745 (1983). However,

> the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

*Strickland v. Washington*, 466 U.S. at 715, *quoting Woodson v. North Carolina,* 428 U.S. 280, 305 (1976) (plurality). The ABA Guidelines take into account this need for heightened reliability in capital cases in identifying what a reasonably competent appellate attorney must do in a capital case.

> GUIDELINE 10.15.1 – DUTIES OF POST-CONVICTION COUNSEL
>
> C. Post-conviction counsel should seek to litigate all issues, whether or not previously presented, that are arguably meritorious under the standards applicable to high quality capital defense representation, including challenges to any overly restrictive procedural rules. Counsel should make every professionally appropriate effort to present issues in a manner that will preserve them for subsequent review.
>
> * * *

> E. Post-conviction counsel should fully discharge the ongoing obligations imposed by these Guidelines, including the obligations to:
>
> 1. maintain close contact with the client regarding litigation developments;
>
> 2. continually monitor the client's mental, physical and emotional condition for effects on the client's legal position;
>
> 3. keep under continuing review the desirability of modifying prior counsel's theory of the case in light of subsequent developments; and
>
> 4. continue an aggressive investigation of all aspects of the case.

In discussing the precise duties of appellate counsel in the post-conviction setting, the ABA commentary notes the paramount importance of appellate counsel's duty to "proceed, like all post-conviction counsel, in a manner that maximizes the client's ultimate chance of success." ABA Guidelines, *supra*; 31 HOFSTRA L.REV. 913, 1083 (2003):

> Practice varies among jurisdictions as to the limits of the appellate process and the relationship between direct appeals and collateral post-conviction challenges to a conviction or sentence. (footnote omitted). Issues that are only partially or minimally reflected by the record, or that are outside the record, should be exploited by appellate counsel as a predicate for informed decision making about legal strategy.
>
> As Subsection C emphasizes, it is of critical importance that counsel on direct appeal proceed, like all post-conviction counsel, in a manner that maximizes the client's ultimate chances of success. *"Winnowing" issues in a capital appeal can have fatal consequences.* Issues abandoned by counsel in one case, pursued by different counsel in another case and ultimately successful, cannot necessarily be reclaimed later. *When a client will be killed if the case is lost, counsel should not let any possible ground for relief go unexplored or unexploited.*

*Id.* (footnote omitted) (emphasis added).

Appellate counsel in capital cases must raise all arguable legal issues for the client;

nothing less will facilitate the court's review of the death sentence. *See Ellis v. United States*, 356 U.S. 674, 674-675 (1958) (appellate counsel acted more like *amici curiae*; much more is required); *accord Thompson v. State* 492 N.E.2d 264, 278 (Ind. 1986) (appeal counsel simply listed possible errors for the court to independently review). Counsel must "research relevant facts and law, or make an informed decision that certain avenues will not prove fruitful." *United States v. Reinhart*, 357 F.3d 521, 525 (5th Cir. 2004) (counsel rendered ineffective assistance in failing to brief and argue Reinhart's accountability as it related to his sentence); *Roe v. Delo,* 160 F.3d 416 (8th Cir. 1998) (appellate counsel failed to argue that the trial court erroneously blurred the distinction between first and second degree murder); *Bell v. Lockhart,* 795 F.2d 655 (8th Cir. 1986) (appellate counsel rendered ineffective assistance in failing to properly advise client of the risks of waiving a direct appeal because post-conviction appeal was not an adequate substitute); *Matire v. Wainwright*, 811 F.2d 1430, 1438 (11th Cir. 1987) (ineffective assistance when appellate counsel failed to raise issue of prosecutor's improper use of defendant's post-arrest silence in state's case-in-chief); *Ballard v. United States*, 400 F.3d 404 (6th Cir. 2005) (appellate counsel rendered ineffective assistance in failing to raise *Apprendi*[15] error); *Mapes v. Tate*, 388 F.3d 187 (6th Cir. 2004) (appellate counsel rendered ineffective assistance in failing to argue that the trial court erred in refusing to let the jury consider mitigating factors related to an out-of-state conviction)

In determining whether counsel performed effectively on appeal, the *Strickland* test applies. *Smith v. Robbins*, 528 U.S. 259, 287 (2000); *accord Bell v. Lockhart*, 795 F.2d 655, 657 (8th Cir. 1986). Movant must show both that counsel's representation fell below an objective standard of reasonableness and that the deficiencies prejudiced him. *See Strickland*,

---

[15] *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

466 U.S. at 687-88. As fully discussed, *supra*, the ABA GUIDELINES provide the best glimpse at what level of performance is required to meet the objective standard of reasonableness. One court has identified the following questions as relevant to the reasonableness inquiry:

> (1) Were the omitted issues "significant and obvious"?
>
> (2) Was there agreeably contrary authority on the omitted issues?
>
> (3) Were the omitted issues clearly stronger than those presented?
>
> (4) Were the omitted issues objected to at trial?
>
> (5) Were the trial court's rulings subject to deference on appeal?
>
> 6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
>
> (7) What was appellate counsel's level of experience and expertise?
>
> (8) Did the petitioner and appellate counsel meet and go over possible issues?
>
> (9) Is there evidence that counsel reviewed all the facts?
>
> (10) Were the omitted issues dealt with in other assignments of error?
>
> (11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Whiting v. Burt,* 395 F.3d 602, 616 (6th Cir. 2005), *citing Mapes v. Coyle,* 171 F.3d 408, 427-28 (6th Cir. 1999).

But, what about prejudice?

> Although [analyzing for prejudice] necessarily involves an evaluation of the underlying claims, it does *not* require a decision on or a determination of these issues. All that is required is a determination that, based on the nature of the underlying claims, there is "a reasonable probability that, but for

> his counsel's [failings] . . ., [the defendant] would have prevailed on his appeal."

*Mapes v. Tate*, 388 F.3d 187, 194 (6th Cir. 2004), *citing Strickland, supra*; *accord Roe v. Delo*, 160 F.3d 416, 420 (8th Cir. 1998).

Thus, "[Mr. Nelson] must show that there is 'a reasonable probability' – 'a probability sufficient to undermine confidence in the outcome,' but less than a preponderance of the evidence – that his appeal would have prevailed had counsel's performance satisfied constitutional requirements." *United States v. Cross*, 308, F.3d 308, 315 (3rd Cir. 2002), *citing Strickland,* 466 U.S. at 694-695 ("The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.").

> The assessment of prejudice should proceed on the assumption that the decision maker is reasonably, conscientiously, and impartially applying the standards that govern the decision. It should not depend on the idiosyncracies (sic) of the particular decision maker, such as unusual propensities toward harshness or leniency. Although these factors may actually have entered into counsel's selection of strategies and, to that limited extent, may thus affect the performance inquiry, they are irrelevant to the prejudice inquiry.

*Strickland*, at 695; *accord Roe v. Delo,* 160 F.3d at 420 ("Our review of these cases leaves us uncertain whether the Missouri Court of Appeals would have found plain error had this issue been raised in Roe's direct appeal. But the question before us is limited to whether there is a reasonable probability that the outcome would have been different, the test for determining whether Roe received constitutionally ineffective assistance of counsel.").

Upon a finding that appellate counsel rendered ineffective assistance, courts seek to neutralize the effect of the constitutional deprivation. *Mapes v. Tate, supra* at 195. Thus, the courts must grant the Movant a new direct appeal where the omitted issues may be properly presented for review. *Roe v. Delo, supra; Bell v. Lockhart, supra*.

Movant put forward the following specifics regarding the inadequacy of appellate counsel:

(1) At the time Movant's brief was prepared and filed by appellate counsel, neither of his appellate counsel had conducted an adequate review of the record or the applicable law in order to determine which issues should be presented on Movant's behalf. Despite this lack of preparedness, appellate counsel knowingly filed an inadequate brief instead of seeking additional time from the Court of Appeals in which to prepare an adequate brief on Appellant's behalf.

(2) Appellate counsel failed to brief and argue the following issues, which individually or in combination, undercut confidence in the reliability of the outcome:

(a) Appellate counsel failed to argue on appeal that the indictment was inadequate as not alleging the requisite elements of capital murder, including Movant's age, his state-of-mind at the time of the offense, and the existence of aggravating factors.

(b) Appellate counsel failed to argue on appeal that the District Court abused its discretion in admitting numerous disturbing, gruesome, and inflammatory photographs. While such photographs may have had some tendency to prove issues of fact relevant to a guilt-phase trial, this was simply a penalty phase case where the defense did not contest the manner or nature of death.

(c) Appellate counsel failed to argue on appeal numerous instances of improper closing argument by the Government, including, but not limited to, the following:

<u>The initial summation</u>:

- Argument that the jury should vote for death because, "If this crime doesn't call for the death penalty, what crime does?"
- Argument that the jury should vote for death because, "We need to protect our children. We need to send a message to guys like the defendant . . . ."
- Argument that the death penalty should be imposed because, "The community cries out for justice."

- Argument that legally appropriate and relevant mitigating evidence was "all this excuse testimony" and a "guilt trip."

- Argument that the jury's verdict was simply a recommendation and, "You're not killing anybody . . . ." This improper argument diminished the jurors' sense of responsibility and the Government's final notation that "If you recommend the death penalty it will happen" did not purge the taint of the improper argument. There was a contemporaneous objection below and a mistrial motion premised on this remark.

- Argument that the jury should impose a death penalty because the Government recommended it "without reservation."

<u>Rebuttal summation</u>:

- Argument that the case was about the "slaughter" of "our children."

- Argument that denigrated legally appropriate and relevant mitigating evidence as "an excuse," "the blame game," "the abuse excuse," and an attempt to claim the crime was "somebody else's fault."

- Argument that the mitigating evidence was not worthy of jury consideration since it didn't "explain why" the crime occurred.

- Argument that described Movant as "a rotten human being."

- Argument that personally denigrated defense counsels' efforts to persuade the jury of mitigating evidence as "a smoke screen" and an attempt to "divert [the jury] from what this case is really about, the slaughter of an innocent."

- Argument that personally denigrated defense counsels' efforts to persuade the jury of mitigating evidence as masking counsels' true motive, *i.e.*, "What they want you to do is have him escape justice."

- Argument that equated mercy with weakness.

- Argument that described Movant as "evil at his core."

- Argument that invited jurors to rely on the prosecution's experience by telling the jury that, "There is no clearer call for the death penalty than there is in this case," and, later, "If not him, who? If not now, when? If killing and raping a kid isn't enough, then we don't need a death penalty. We don't need a death penalty."

- Argument that suggested that the jury should impose a sentence of death since the jury "represented] the people of the United States in this case . . . .."

- Argument that instructed the jurors to close their eyes and re-live the horrors of the victim's last hours, calling upon the jury to "Think about . . . what that little girl was thinking," and to imagine,"What was she thinking?," and to "Imagine what she experienced in that last part of her life," and to "close your eyes, and . . . envision [the abduction and murder]."

- Argument that instructed the jury that a verdict of death was the only just verdict and that the jury was "the dispensers of justice" and that the victim's mother "waits for you to give her some justice. And justice in this case can only be had by imposing a sentence of death," essentially suggesting to the jury, *inter alia* that a sentence of death should be imposed because that's what the victim's survivors wished.

- Argument that, "[T]he death penalty was enacted for crimes like this."

(d) Appellate counsel failed to argue on appeal that the District Court abused its discretion in overruling defense counsel's objections that Agent Scott's hearsay testimony was merely cumulative to the anticipated testimonies of Penny Butler, Casey Butler, Paul Wilt, David Cunningham, Steven Underwood, Patti Griffith, Robert Howell and Lauri Torrez, and that the testimony violated the Confrontation Clause of the Sixth Amendment.

(e) Appellate counsel failed to argue on appeal that the District Court abused its discretion in not declaring a mistrial during Dr. Mark Cunningham's testimony when the Government alleged that mitigation didn't really matter in the context of the murder of a ten year old girl.

(f) Appellate counsel failed to argue on appeal that the District Court erred in finding that Officer Keith did not interrogate

Movant when he looked Movant "dead in the eye," when a bystander asked, "What about the girl?" This "look" was designed to elicit an incriminating response; indeed, Officer Keith agreed that he hoped to get an answer from Movant.

(g) Appellate counsel failed to argue on appeal that the District Court erred in letting the Government ask Penny Butler if she was scared as she testified. Penny's fear had no tendency to prove or disprove any fact in issue; rather, it served only to inflame the passions and prejudices of the jury by implying that Movant had scared Penny twice – once during the kidnapping and once during the trial.

(h) Appellate counsel failed to argue on appeal that the District Court abused its discretion and erred in refusing to let the defense ask Fred Lawrence whether the Bureau of Prisons was equipped to handle the security of Movant. To bolster its theory that Movant was a future danger to society, the Government elicited from Lawrence that Movant poses a security risk, and the defense should have been allowed to explain, deny or refute that testimony.

(i) Appellate counsel failed to argue on appeal that the District Court abused its discretion and erred in refusing to let the defense ask Roger Moore, Jr., why two inmates would have claimed that he had called Movant a "sissy" or a "punk." This evidence was not being offered to prove the truth of Moore's statement, but rather to show that he made them. Such evidence was necessary to put the altercation with Moore into context by showing that Moore had been goading Movant.

(j) Appellate counsel failed to argue on appeal that the District Court abused its discretion and erred in letting the Government present evidence through Bruce Roberts that an inmate had told him that Movant had threatened to harm the inmate's five year old daughter. This alleged statement of Movant was never disclosed to the defense. Further, this was precisely the class of evidence that the District Court precluded Movant from presenting through Roger Moore, Jr.

(k) Appellate counsel failed to argue on appeal that the District Court abused its discretion and erred in admitting testimony about an unrelated knife taken from Movant's kitchen. This testimony had no tendency to prove or disprove any fact in issue; rather, it simply diverted the jurors' attention away from the issue at hand – should Movant live or die.

(l) Appellate counsel failed to argue on appeal that the District Court abused its discretion and erred when it admitted testimony that Paul Wilt had won an award from the Kansas City, Kansas Police Department, "as a testament to [his] quick thinking or quick action in this case." This evidence had no tendency to prove or disprove any fact in issue; rather, it served only to divert the jurors' attention away from the issues surrounding the only question the jurors had to answer – to wit: should Movant live or die.

(m) Appellate counsel failed to argue on appeal other meritorious issues that individually, or cumulatively, denied Movant the effective assistance of appellate counsel.

Plainly – as both sides contended – an evidentiary hearing was needed to resolve this issue as well as for this Court to make informed fact-findings and rulings of law. At the very least, "jurists of reason could disagree with the district court's resolution" of this issue and, as well, such jurists "could conclude that the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, *supra*, 537 U.S. at 336. Reasonable jurists could also disagree with the Court's decision to resolve the issue of ineffective assistance of appellate counsel without conducting a hearing or that the question of the court's failure to conduct a hearing on this issue deserves encouragement to proceed further in this capital case.

3. A COA should issue to review the Court's denial of the recusal motion.[16]

[16] While this issue combines constitutional and statutory claims, the Supreme court in *Slack v. McDaniel*, *supra*, made it clear that the COA process also applies where the Court has denied relief on non-constitutional procedural grounds. *Slack v. Mcdaniel, supra*, 529 U.S. at 477:

> [W]hen the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue (and an appeal of the district court's order may be taken) if the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

In an effort to establish the harmful nature of the alleged ineffective assistance of trial counsel, Movant's present counsel from time to time requested that this Court approve funding for expert, investigative, and other assistance, as previously permitted by 21 U.S.C. § 848(q)(9).[17] In a series of such motions filed in the fall of 2005, Movant's counsel requested, *inter alia*, the following funding of expert and investigative assistance: (1) on October 30, 2005, funding of additional hours for the services of mitigation specialist Jill Miller, MSSW; (2) on November 23, 2005, funding for the services of a clinical forensic psychologist; and (3), on December 5, 2005, funding for an attorney to evaluate trial counsels' representation and potentially to testify as an expert in the trial and preparation of capital cases.[18] On February 28, 2006, this Court issued an order denying all three funding requests. In that order, the court also revealed that, without hearing any evidence or argument, it had pre-determined the merits of this litigation so far as it challenged the level of assistance Movant received from his trial counsel. The Court explained its reasons for denying the funding requests as follows:

> The above-referenced motions [for investigative and expert assistance] have been denied because the Court does not agree with the assertions therein. Appellate[19] counsel, with the benefit of hindsight, is attempting to vilify trial counsel's judgment on trial strategy. In reality, trial counsel's conduct and strategy far exceed those standards of *Strickland v. Washington,* 466 U.S. 669 (1984). Further, the resources requested by

---

529 U.S. at 477.

[17]Effective March 9, 2006, the procedural aspects of the Title 21 federal death penalty, including the above-cited provision, were repealed and reenacted at 18 U.S.C. § 3599.

[18]Although those applications were initially sealed, Movant's counsel filed a motion, subsequently granted by the Court, to unseal the applications and orders.

[19]In context, the Court's comments made it clear that by "appellate counsel" the Court was referring to Movant's present counsel, not to counsel who represented Movant on his direct appeal.

> counsel in these motions are not likely to lead to a different result. Mr. Nelson received a fair trial. Appellate counsel is reminded that excessive expenditures of judicial resources have their limits.

A clearer case of judicial bias can hardly be imagined. So far as the Court was concerned, the issue of *Strickland* effectiveness was a foregone conclusion, Movant received "a fair trial," and was therefore entitled to no relief. Moreover, the order gratuitously denigrated the efforts of present counsel, characterizing counsel's decision to raise the issue of ineffective assistance as an exercise guided by the "benefit of hindsight" and, worse, motivated by a desire to "vilify" trial counsel. The tone of the order reflected a level of hostility to the efforts of present counsel on Movant's behalf, and to the merits of this litigation, that was the antithesis of impartiality. As a matter of law, the Court should have reused itself himself from further involvement in this case. The failure to do so was constitutional error that would be, at the very least, subject to debate among reasonable jurists and is certainly an issue that deserves further encouragement. Accordingly a COA should issue on this ground as well.

The fair trial guarantees of the Due Process Clause of the Fifth Amendment encompass a litigant's right to have "a neutral and detached judge" preside over judicial proceedings. *Ward v. Village of Monroe*, 409 U.S. 57, 62 (1972). In *In re Murchison*, 349 U.S. 133 (1959) the Supreme Court observed:

> A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias. But our system of law has always endeavored to prevent even the probability of unfairness. . . . Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way "justice must satisfy the appearance of justice."

*Id* at 136 (citations omitted). So important is this constitutional guarantee that its denial is not subject to the harmless error rule. *See, e.g.*, *Tumey v. Ohio*, 273 U.S. 510 (1927).

In addition to the guarantees of due process, two acts of congress aim to protect a federal litigant's entitlement to impartial justice. Section 144 of Title 28 provides:

> Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.
>
> The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten[20] days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

Similarly, § 455(b)(1) of Title 28 provides:

> (b) He shall also disqualify himself in the following circumstances:
>
> (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding….

Sections 144 and §455(b)(1) thus set out identical grounds for recusal except that §455 makes those grounds applicable to all justices, judges and magistrates and places the obligation to identify the existence of those grounds upon the judge, rather than requiring recusal only in response to a party affidavit. *Liteky v. United States*, 510 U.S. 540, 548

[20]"The 10 day rule has been an anachronism since 1963, when Congress abolished formal terms of court for United States district courts. See 28 U.S.C. §138." *Liteky v. United States*, 510 U.S. 540, 560 (1994) (Kennedy, J. concurring).

(1994). It is also true that neither statute sets up an automatic right to judicial disqualification:

> [i]n assessing the reasonableness of a challenge to his impartiality, each judge must be alert to avoid the possibility that those who would question his impartiality are, in fact, seeking to avoid the consequences of his expected adverse decision. Disqualification for lack of impartiality must have a *reasonable* basis. Nothing in [the legislative history of §455] should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a "reasonable fear" that the judge will not be impartial. Litigants ought not to have to face a judge where there is a reasonable question of impartiality, but they are not entitled to judges of their own choice. S.Rep. No. 93-419, 93d Cong., 1st Sess. 1973, p.5.

*Ouachita National Bank v. Tosco Corp.,* 686 F.2d 1291, 1300 (8th Cir. 1982) (emphasis in original) (quoting H.R. Rep. No. 1453, *reprinted in* 1974 U.S. Code Cong. & Ad. News 6351, 6355).

Once a motion to disqualify is filed under §144, however, the judge must pass on the sufficiency of the affidavit, but not the truth of the matters asserted. *See e.g., Henderson v. Dept. of Public Safety and Corrections*, 901 F.2d 1288, 1296 (5th Cir. 1990). A legally sufficient affidavit must be material and must be stated with particularity. The facts must be such that, if true, they would convince a reasonable person that a bias exists. *Id*. The previous requirement that the affidavit establish facts that show the bias is personal and not judicial appears to have been abolished by the Supreme Court in *Liteky*.[21] The Court, in *Liteky*, found that, while an "extrajudicial source" is the common basis for establishing a disqualifying bias, it is not the exclusive reason a predisposition can be wrongful or inappropriate:

[21]In *Liteky,* the Court had to consider whether the so-called "extrajudicial source doctrine" applied as well to § 455(a). Recasting it as an "extrajudicial factor" rather than a dogmatic doctrine, the Court applied it to § 455(a).

> A favorable or unfavorable predisposition can also deserve to be characterized as "bias" or "prejudice" because, even though it springs from the facts adduced or the events occurring at trial, it is *so extreme as to display clear inability to render fair judgment.*

*Liteky*, 510 U.S. at 551 (emphasis added). Indeed, "the extrajudicial source doctrine is not a *per se* rule and, thus, is neither a necessary nor a sufficient condition for recusal. Instead, the source of bias is one factor a judge should consider in recusal." T. Citera, "Supreme Court Review: A Look at the Extrajudicial Source Doctrine under 28 U.S.C. 455, *Liteky v. United States*, 114 S. Ct. 1147 (1994)," 85 J. CRIM. L. & CRIMINOLOGY 1114 (1995) (footnotes and citations omitted).

In *United States v. Sciuto*, 531 F.2d 842 (7th Cir. 1976), the motion to disqualify was supported by two affidavits – one by Sciuto and one by his attorney. *Id.* at 844. The attorney's affidavit averred that in the telephone conversation the district court judge had stated as follows:

> . . . that he would not agree to a continuance because all that would be necessary would be to go in and make a record . . . that although Affiant, as an Attorney could give his client the benefit of the doubt and believe him, [the court] had talked with . . . the Probation Officer, and that he was convinced that the Defendant had been dishonest and deceitful with the Probation Officer and in all probability with Affiant. . . . also. . . . that his [the court's] mind had been made up that the Defendant had violated the terms of his probation.

*Id.* at 844-845. The government assumed that this motion was one made pursuant to §144, but Sciuto denied such in his reply. *Id.* at 845. Then at oral argument, Sciuto's attorney asked to rely on § 144 alternatively. The Seventh Circuit observed,

> We believe 28 U.S.C. § 144 would have been applicable if petitioner had invoked it, since the affidavit must be taken as true for purposes of the motion, *Berger v. United States*, 255 U.S. 22, 32-33, 35-36 (1921), and stated facts sufficient to show bias or prejudice if true.

*Sciuto*, 531 F.2d at 845. The Seventh Circuit did not decide whether Sciuto had properly invoked § 144 because "[t]he right to a tribunal free from bias or prejudice is based, not on § 144, but on the Due Process Clause." *Id.* Since the trial court's decision to revoke probation had been prejudged, that order was reversed and the case remanded to a new and impartial judge. *Id.* at 846.

In *United States v. Zarowitz*, 326 F.Supp. 90 (C.D. CA 1971), the parties alleged bias and prejudice stemming from two facts: First, the court had issued two decisions, compelling testimony of recalcitrant but immunized witnesses in the Grand Jury investigation of the defendants, *id.* at 91; and, second, the judge had authorized wiretapping in the case and had necessarily received and reviewed periodic reports of the Title III interceptions and, in authorizing the interceptions in the first place, had reviewed, *ex parte*, evidentiary facts by way of affidavits submitted in support of the wiretap orders. *Id.* at 92. The district court judge concluded that, while the allegations did not establish an actual bias or prejudice, taken together, without evidentiary contradiction, they did establish the *appearance* of *possible* personal bias or prejudice. *Id.* As the judge put it:

> Finally, a circumspect and punctilious devotion to the ideal of justice in the abstract as it appears to the public at large, as well as the ideal of fairness as it is applied concretely in the case before us, affirms our determination to disqualify and recuse ourself. Like Caesar who parted from his wife Pompeia because she was not above suspicion, so here to avoid even the appearance of the possibility of personal bias or prejudice, wise discretion and sound judgment compel us to leave this case, however reluctant we are to thrust its burden upon another Judge of our Court or to cause any delay or inconvenience to the parties.

*Id.* at (footnote and citation omitted).

Finally, in *United States v. Zerillie*, 328 F.Supp. 706 (C.D. CA 1971), the parties' affidavit alleged three bases for disqualification:

> 1) a judgment of conviction for contempt rendered against Mr. Polizzi in a recent case involving Polizzi's failure to obey a Grand Jury subpoena;
>
> 2) a prosecution of Mr. Giardano conducted by the judge some thirty years earlier when the judge was an Assistant United States Attorney; and
>
> 3) two decisions by the Judge that compelled testimony of recalcitrant but immunized witnesses in the Grand Jury investigation

*Id.* at 707. The judge flatly denied an actual bias or prejudice against any defendant in the case. *Id.*

> However, the allegations of the affidavits which the Court and Judge must accept as true, are, in the absence of any contradictory evidence which as we have noted is absolutely impermissible under 28 U.S.C. § 144, *legally* sufficient to show that there is perhaps the *appearance* of a *possibility* of personal bias or prejudice of the Judge against at least two of the Defendants, Messrs. Michael Santo Polizzi and Anthony Giardano.

*Id.* (emphasis in original); *accord Id.* at 708. The judge then reused himself from hearing the case. *Id.*

Similarly, in this case, the Court's ultimate decision as to whether trial counsel rendered ineffective assistance of counsel had been prejudged. (Indeed every issue raised seems to have been pre-judged since the Court found that Movant received "a fair trial.") Here, Movant's affidavit – filed contemporaneously with this motion – alleged that the Court's decision was based, not on a disputed *ex parte* communication, but on a now public order prematurely finding that trial counsels' performance in this case satisfied *Strickland's* standards. This allegation taken, as it must be, as true for purposes of ruling on this motion, shows a predisposition that can certainly be characterized as a bias and prejudice even though it may have resulted from his involvement in the underlying criminal case.

In addition to the constitutional guarantee, 28 U.S.C. § 144, and 28 U.S.C. § 455(b), Movant also invoked 28 U.S.C. § 455, a statute which traces its antecedents to 1792. 13A Wright, Miller & Cooper, *Federal Practice and Procedure* (2nd Ed. 1984), § 3541 at 550. ("Federal Practice and Procedure".) See also, *Liteky*, *supra*, 510 U.S. at 543-48 where the Court traced the history of federal recusal statutes. Specifically, Movant relies on § 455(a) which, as amended in 1974, provides as follows:

> Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

The 1974 amendments to § 455 – particularly the amendment which became § 455(a) – worked what the Wright treatise describes as "a drastic change in the practice in the federal courts." Federal Practice and Procedure (2006 Supp.) § 3549 at p. 920. In *Liteky*, the Supreme Court described the 1974 revision as making "massive changes" in the law governing recusal. *Liteky*, 540 U.S. at 546. Prior to 1974, language in the predecessor to § 455(a) had been interpreted as imposing on a trial judge an affirmative duty to sit on all cases unless a compelling reason to recuse was presented. By enacting § 455(a), Congress explicitly intended to overrule the so-called "duty-to-sit" cases in favor of a less stringent standard that would, in turn, promote greater public confidence in the impartiality of the judiciary. *In re Drexel Burnham Lambert, Inc.*, 861 F.2d 1307, 1313 (2d Cir. 1988); Federal Practice and Procedure, *supra*, *id*. at p. 962; see also, Comment, "Questioning the Impartiality of Judges: Disqualifying Federal District Court Judges Under 28 U.S.C. § 455(a)," 60 TEMPLE L.Q. 697, 701 n.30 (1987). The purpose of the 1974 re-working of § 455 was to "'broaden and clarify the grounds for judicial disqualification.'" *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 849 (1988), in order "to promote public confidence in the integrity of the judicial process." *Liljeberg*. 486 U.S. at 860.

The standard to be applied to § 455(a) motions is an objective one. The inquiry is not whether a litigant honestly and truthfully believes that a judge lacks impartiality. Neither is the standard whether the judge is in fact impartial or even whether the judge in question honestly and truthfully so believes. *Hall v. Small Business Administration*, 695 F.2d 175, 178-79 (5th Cir.1983). Instead, the situation is viewed from the perspective of an objective observer. As summarized by the Supreme Court in *Liteky*,

> [W]hat matters is not the reality of bias or prejudice but its appearance. Quite simply and quite universally, recusal was required [pursuant to § 455(a)] whenever "impartiality might reasonably be questioned."

*Liteky*, 510 U.S. at 548. This approach is fully consistent with the legislative purpose since the simple existence of reasonable questions regarding a judge's impartiality undermines public confidence in both the judiciary and the judicial process – including the outcome of trials such as this one – whether or not the judge's impartiality is truly compromised. As stated in *Liljeberg*:

> [P]eople who have not served on the bench are often all too willing to indulge suspicions and doubts concerning the integrity of judges. The very purpose of § 455(a) is to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible.

*Liljeberg*, 486 U.S. at 864-65 (footnote omitted).

In *Apple v. Jewish Hosp. and Medical Center*, 829 F.2d 326 (2d Cir. 1987), the court ruled that "the substantive standard for recusal is whether a reasonable person, knowing all the facts, would conclude that the court's impartiality might reasonably be questioned." *Id*. at 333; see also, *United States v. Pitera*, 5 F.3d 624, 626 (2d Cir. 1993); *United States v. Lovaglia*, 954 F.2d 811, 814-15 (2d Cir. 1992), *United States v. Pepper & Potter, Inc.*, 677 F.Supp. 123, 125-26 (E.D.N.Y. 1988). In *In re IBM Corp.*, 45 F.3d 641, 643 (2d Cir. 1995), the Court quoted with approval from *In re Drexel Burnham Lambert, Inc.*, supra, that, "the

test to be applied is an objective one which assumes that a reasonable person knows and understands all the relevant facts." At a second point in its IBM opinion, the Second Circuit reiterated that the key to applying an objective standard is that the mythical objective observer must be "fully informed as to the circumstances . . . " that give rise to the recusal issue. 45 F.3d at 644. Moreover, the standard is broadest – that is most tending to favor recusal – when, as in this case, the challenge is brought under 455(a) as distinct from other statutes and/or sub-sections of 455(a). Liljeberg, 486 U.S. at 860 n.8 (Making reference to "the broader coverage of 455(a) . . . ."); *United States v. Sibia*, 624 F. 2d 864, 867 (9th Cir., 1980); *United States v. Wolfson;* 558 F.2d 59, 63 (2d Cir. 1977); *Lamborn v. Dittmer*, 726 F.Supp. 510 (S.D.N.Y. 1989).

A judge is required to maintain actual impartiality and, as important, the appearance of impartiality. Disqualification may be required even when there is no actual bias or prejudice. *In re Kansas Public Employees Retirement System*, 85 F.3d 1353 (8th Cir. 1996). "[The] appearance of impartiality is virtually as important as the fact of impartiality." *United States v. Singer*, 575 F.Supp. 63, 67 (D. Minn. 1983). Accordingly,

> "[A] judge … ought to consider how his participation in a given case looks to the average person on the street. Use of the word 'might' in the statute was intended to indicate that disqualification should follow if the reasonable man, were he to know all the circumstances, would harbor doubts about the judge's impartiality."

*United States v. Poludniak*, 657 F.2d 948, 954 (8th Cir. 1981), *quoting Potashnick v. Port City Construction Co.,* 609 F.2d 1101, 1111 (5th Cir.), *cert. denied*, 449 U.S. 820 (1980); *accord United States v. Honken,* 381 F.Supp.2d 936, 970 (N.D. IA 2005) (the question is whether an objective, disinterested observer fully informed of the underlying facts, would entertain significant doubt that justice would be done absent recusal).

Cases under § 455 are driven by their facts and circumstances. *Honken, supra.* This is not to say, however, that analogous cases are irrelevant to the equation. In *Alexander v. Primerica Holdings,* 10 F.3d 155 (3rd Cir. 1993), for example, the petitioners claimed that the trial judge, Judge Lechner, had prejudged their case because of "his pique at having been reversed" by the court of appeals on numerous occasions during the litigation of a hotly-contested class action lawsuit and because of his alleged animus towards petitioners' counsel. *Id.* at 158. Petitioners sought to have Judge Lechner disqualified, as Movant does here, pursuant to § 455(a). *Id.* at 161. In granting the motion the Third Circuit stated:

> For purposes of § 455(a) disqualification, it does not matter whether the district court judge actually harbors any bias against a party or the party's counsel. This is so because § 455(a) concerns not only fairness to individual litigants, but, equally important, it concerns *the public's confidence in the judiciary*, which may be irreparably harmed if a case is allowed to proceed before a judge who appears to be tainted.

*Id.* at 162 (emphasis added) (citation and quotation omitted). After independently reviewing the record, the Third Circuit felt impelled to conclude that the outcome of this case "would be shrouded [in] suspicion" if Judge Lechner were to continue to preside as trier of the fact. *Id.* at 163.

> This is not to say that the record discloses actual bias on Judge Lechner's part. Quite to the contrary, we have made, and make, no such determination. What we do decide, however, is that *the record suffices to establish that Judge Lechner's impartiality may reasonably be questioned*.

*Id.* (emphasis added).

In this case, had the Court simply denied Movant's requests for additional investigative and expert assistance, Movant would have no good-faith basis for a challenge to the Court's impartiality. But this is not a case where Movant is simply a disgruntled litigant. *See, e.g., Little Rock School District v. Pulaski County Special School,* 839 F.2d

1296, 1302 (8th Cir 1988) ("Not surprisingly, the parties have generally discovered grounds for disqualification at approximately the same time that the district court ruled for their adversaries on the merits."). The basis for the motion was that, in denying the requests for funding, the Court revealed that it had pre-judged the merits of the case despite having heard no evidence regarding trial counsels' strategies or effectiveness. One would be hard-pressed indeed to posit a clearer example of a judge displaying, at the very least, the appearance of a lack of impartiality. Nor is there any factual dispute as to the Court's position, since the lack of impartiality is established in an order issued by th Court itself. Those observations plainly establishe the appearance of bias. The Court's impartiality was open to reasonable questions, and therefore, the Court should have reused itself from further participation in this case.

At the very least, as stated earlier, the failure to recuse was error that would be, at the very least, subject to debate among reasonable jurists and is, as well, an issue that deserves further encouragement in this capital case. Accordingly a COA should issue on this ground as well.

3. A COA should issue to allow review of the Court's unwillingness adequately to fund efforts to establish the claims of ineffective assistance.

As stated earlier, in a series of such motions filed in the fall of 2005, Movant's counsel requested, *inter alia*, the following funding of expert and investigative assistance: (1) on October 30, 2005, funding of additional hours for the services of mitigation specialist Jill Miller, MSSW; (2) on November 23, 2005, funding for the services of a clinical forensic psychologist; and (3), on December 5, 2005, funding for an attorney to evaluate trial counsels' representation and potentially to testify as an expert in the trial and preparation of

capital cases.[22] On February 28, 2006, this Court issued an order denying all three funding requests. In that order, the Court also revealed that, without hearing any evidence or argument, it had pre-determined the merits of this litigation so far as it challenged the level of assistance Movant received from his trial counsel. The Court explained its reasons for denying the funding requests as follows:

> The above-referenced motions [for investigative and expert assistance] have been denied because the Court does not agree with the assertions therein. Appellate[23] counsel, with the benefit of hindsight, is attempting to vilify trial counsel's judgment on trial strategy. In reality, trial counsel's conduct and strategy far exceed those standards of *Strickland v. Washington,* 466 U.S. 669 (1984). Further, the resources requested by counsel in these motions are not likely to lead to a different result. Mr. Nelson received a fair trial. Appellate counsel is reminded that excessive expenditures of judicial resources have their limits.

The Court also denied Movant's motion for additional funding for Dr. Natalie Novick Brown, an expert in Fetal Alcohol Spectrum Disorder ("FASD"). This Court did fund preliminary work by Dr. Brown, but when she reached an initial conclusion that Movant in fact likely suffered from FASD, the Court denied the further funding needed to conclude the examination and evaluative process. Respectfully, that approach made no sense. If the outcome of the examination was going to be irrelevant, why fund the initial inquiry?

The denial of adequate funding was a denial of due process of law and equal protection since Movant, an indigent, was unable to fund these experts on his own. *Cf. Ake v. Oklahoma*, 470 U.S. 68, 83 (1985). The denial of funding, as well, violated Movant's

---

[22]Although those applications were initially sealed, Movant's counsel filed a motion, subsequently granted by the Court, to unseal the applications and orders.

[23]In context, the Court's comments make it clear that by "appellate counsel" the Court was referring to Movant's present counsel, not to counsel who had represented Movant on his direct appeal.

entitlement to a full and fair hearing since, on the one hand, the Court was free to deny Movant's allegations of ineffective assistance of counsel without providing the resources necessary to prove his claims. *Cf. Davis v. Norris*, 423 F.3d 868, 875 (8th Cir. 2005) (Noting COA was granted on the issue of failure to appoint psychiatric expert).

## CONCLUSION

For the reasons set forth above, a certificate of appealability should issue with regard to the above-specified issues, together with any additional relief the Court may deem just or proper.

Respectfully submitted,

/s/ Gary E. Brotherton
Legal Writes, LLC
2101 Chapel Plaza Court, Suite 13
Columbia, MO 65202-3381
(573)875-1571
(573)875-1572 (fax)
gebrotherton@legalwritesllc.com
Co-counsel to Movant, Keith Nelson

/s/ David A. Ruhnke
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
(973)744-1000
(973)746-1490
davidruhnke@ruhnkeandbarrett.com
Co-counsel to Movant, Keith Nelson

Filed electronically: Kansas City, Missouri
June 10, 2007

## CERTIFICATE OF SERVICE

This will certify that, on today's date, Movant's counsel served this motion upon the United States by filing the document via ECF.

/s/ David A. Ruhnke
DAVID A. RUHNKE

Dated: June 10, 2007