IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| KEITH D. NELSON, | : | |
| Movant, | : | |
| vs. | : | 4:04-CV-8005(JFG) |
| UNITED STATES OF AMERICA, | : | |
| Respondent. | : | |

MOVANT'S REPLY TO THE GOVERNMENT'S OPPOSITION TO MOVANT'S MOTION FOR THE ISSUANCE OF A CERTIFICATE OF APPEALABILTY

COMES NOW Keith D. Nelson ("Movant"), by his undersigned counsel, and files this reply to the government's opposition to his motion, brought pursuant to 28 U.S.C. § 2253(c)(1), for the issuance of a certificate of appealability ("COA"), together with any additional relief the Court may deem just or proper.

## LEGAL ARGUMENT

BECAUSE, AT THE VERY LEAST, REASONABLE JURISTS COULD TAKE A DIFFERENT VIEW OF THIS CASE, A CERTIFICATE OF APPEALABILITY SHOULD ISSUE AS TO ALL ISSUES PRESENTED.

### A. The government correctly recognizes the minimal standards Movant must satisfy in order for a COA to issue.

In opposing the motion, the government recognizes, as it must, that the showing Movant must make in order to garner the issuance of a COA is minimal. The government

also does not dispute Movant's corollary point that the severity of the penalty – here a sentence of death – is properly factored into the COA decision.[1] To reiterate briefly, in *Miller-El v. Cockerell*, 537 U.S. 322 (2003), the Court summarized the standards for issuing a COA as follows:

> A petitioner satisfies [the COA] standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented are adequate to deserve encouragement to proceed further.

*Miller-El*, 537 U.S. at 327. The Court explained further:

> The COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits. We look to the district court's application of AEDPA to petitioner's constitutional claims and ask whether that resolution was debatable among jurists of reason. This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims. In fact, the statue forbids it.

*Miller-El*, 537 U.S. at 336. In *Slack v. McDaniel*, 529 U.S. 473 (2000), the Court stated:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The Petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.

*Slack*, 529 U.S. at 484. As explained further in *Miller El*, the insurance of a COA

---

[1]This proposition was initially established in the leading pre-AEDPA case on the standard for the issuance of a certificate of probable cause, *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983). The *Barefoot* standard has now become the standard for reviewing applications for a COA. *See, e.g.*, *Graves v. Cockrell*, 351 F.3d 143, 150 (5th Cir. 2003) ("Any doubt regarding whether to grant a COA is resolved in favor of the petitioner, and the severity of the penalty may be considered in making this determination."); *Valerio v. Crawford,* 306 F.3d 742, 767 (9th Cir. 2002) ("Because this is a capital case, we resolve in Valerio's favor any doubt about whether he has met the standard for a COA."); *Jermyn v. Horn*, 266 F.3d 257, 279 n. 7 (3d Cir. 2001) ("'In a capital case, the nature of the penalty is a proper consideration in determining whether to issue a [COA].'"); *Clark v. Johnson*, 202 F.3d 760, 763 (5th Cir. 2000) ("[I]n capital cases, doubts as to whether a COA should issue must be resolved in favor of the petitioner.")

> does not require a showing that the appeal will succeed. Accordingly, a court of appeals should not decline the application for a COA merely because it believes the applicant will not demonstrate an entitlement to relief. The holding in *Slack* would mean very little if appellate review were denied because the prisoner did not convince a judge, or, for that matter, three judges, that he or she would prevail. It is consistent with § 2253 that a COA will issue in some instances where there is no certainty of ultimate relief. After all, when a COA is sought, the whole premise is that the prisoner "has already failed in that endeavor." *Barefoot*, *supra*, [463 U.S.] at 893, n.4.

*Miller El*, 537 U.S. at 337.

As noted above, the government disputes none of this. (US opposition memo at pp. 1, 2.) Nonetheless, the government opposes the motion.

**B. Effective assistance of counsel and the intertwined need for a hearing.**

1. <u>The need for a hearing</u>

The government seems to have forgotten its early well-taken concession in this case that a hearing, or other form of fact-finding, would be needed to resolve the issues of the level of trial and appellate representation provided by Movant's counsel. The government also correctly notes that the legal grounds for denying a hearing in a 2255 proceeding is limited to instances where the factual assertions of the moving party are insufficient, even if true, to require relief or are contradicted by the trial record or otherwise inherently incredible. (US opposition memo at p. 3 n.1.) In his moving papers, briefing, and again in his application for a COA, Movant made repeated and specific factual assertions that have never been developed by way of a hearing. (*See* motion for COA at pp. 6-19.)

Mr. Nelson, through counsel, was also explicit about the witnesses he planned to call at a hearing. Thus, at the evidentiary hearing the government conceded was necessary,

Movant proposed to call, at a minimum, the following witnesses:[2]

1. Patrick Berrigan, Esquire: Mr. Berrigan served as Movant's trial counsel and was expected to provide testimony on the broad range of issues set out in the 2255 motion. He did not enter the case until February 2001. Of particular relevance, Mr. Berrigan was expected to testify that, as of the fall of 2001, Movant's case was not ready to go to trial and that Mr. Berrigan should have moved to adjourn the trial, but did not do so. Mr. Berrigan was also expected to testify that Movant's decision not to cooperate with the government's mental health experts was on the advice of his counsel and not an independent decision reached by Movant. Mr. Berrigan was also expected to testify that despite having funding for mental-health experts, no mental-health evaluation of Movant was undertaken until October 2001, shortly before the commencement of the trial.

2. Susan M. Hunt, Esquire: Ms. Hunt served as Movant's trial counsel and would be expected to provide testimony on the broad range of issues set out in the 2255 motion. She served as Movant's counsel from early in the case. In addition to confirming certain statements by Mr. Berrigan, Ms. Hunt was expected to testify about the efforts she made to gather evidence in mitigation and to supervise the activities of mitigation specialist Tena Francis. By the time the case came to trial in the fall of 2001, it was Ms. Hunt's belief that an adjournment should have been requested. She was expected to confirm the fact that Movant's refusal to be evaluated by government mental-health experts was on the advice of counsel. Ms. Hunt also served as one of Movant's appellate counsel and will provide testimony regarding appellate representation and the process through which issues were selected for appellate briefing.

3. Jennifer Herndon, Esquire: Ms. Herndon served as one of two of Movant's appellate counsel. She was expected to testify that, because of time constraints and other pressures, she was unable to conduct an adequate review of the record of Movant's case and, as a result, did not file a complete and adequate appellate brief.

4. Daniel V. Foster, Psy.D.: Dr. Foster was a psychologist who evaluated Movant during the week-end of October 5 and 6, 2001. Dr. Foster would have described his evaluation as, in essence, only a beginning and as "too little, too late." Dr. Foster never completed his evaluation and was not asked to do so.[3]

---

[2]This listing was not intended to serve as a formal proffer of the proposed testimony, beyond a good faith effort to indicate that each proffered witness had relevant information to bring to this dispute. Neither was the list intended to be exhaustive in the sense of setting out the universe of potential witnesses.

[3]The record of this case reflects that on September 4, 2001, Movant's trial counsel filed a notice that the defense would offer expert evidence on the issue of Movant's mental

In his report, he described his time spent with Movant as "primarily spent in trust building and history taking."

5. Tena Francis: Ms. Francis served as the mitigation specialist in Movant's case. The application to have her serve in that capacity was filed on December 12, 2000. Ms. Francis was expected to testify regarding the incomplete status of the mitigation investigation when she entered the case and the difficulties she encountered in conducting her investigation. She was expected to testify that in June 2001 she advised trial counsel, in a detailed memorandum and telephone conference, of many areas of the ongoing mitigation investigation that needed to be completed prior to trial. Ms. Francis was expected to testify that she had very little involvement in the case following the June memo and conference and. to the best of her knowledge and ability, very few of the necessary investigative steps were accomplished.

6. Deborah Haddid: Ms. Haddid was an investigator who worked for Ms. Francis. She was expected to testify about the investigative steps that she took in attempting to prepare a case-in-mitigation. As importantly, Ms. Haddid was expected to testify regarding investigative steps that were not taken.

7. Jill Miller, MSSW: Ms. Miller is a highly-experienced and respected mitigation investigator. She was appointed by this Court, on the application of Movant's counsel, to assess the status of the mitigation investigation at the time Movant's case came to trial and to develop a plan for completing an adequate mitigation investigation so that this Court would be in a position to make an accurate judgment regarding the failure of trial counsel to conduct an adequate investigation and to present an adequate penalty-phase. When additional funding was sought from this Court to have Ms. Miller continue her work, the application was denied.

8. Michael M. Gelbort, Ph.D.: In early 2001, Movant's trial counsel secured funds to conduct a neuropsychological examination of Movant. That examination, however, was never done. This Court subsequently approved a motion brought by Movant's present counsel to conduct such an examination. In 2005, Dr. Gelbort examined Movant for evidence of organic brain dysfunction and reached the conclusion that there was such evidence.

Additionally, Movant noted in his reply memorandum that it would be necessary to call as witnesses all of Movant's prior counsel in order to establish the nature of any investigation conducted and the capital qualifications of those attorneys. Movant also noted

---

condition. However, a motion to have Dr. Foster approved to serve as an expert was not even filed until September 17, 2001. The first (and only) motion to have Dr. Foster travel to interview and evaluate Movant was not filed until October 2, 2001.

that he intended to present mitigation witnesses not called by Movant's trial counsel. Finally, Movant noted in prior pleadings that Natalie Novik Brown, Ph.D., a psychologist expert in the diagnosis of Fetal Alcohol Spectrum Disorder, had completed the first stage of a two-stage analysis and had reached a tentative initial conclusion that Movant fell within that diagnosis. Dr. Brown's analysis was, at the time, ongoing.[4]

**C. An inconvenient truth**

Despite all that this Court should have heard before considering whether to grant or deny relief, the government continues to maintain the untenable position that no hearing was necessary, drawing comfort from the fact that, "This is not a case where petitioner's trial counsel failed to develop any mitigation evidence or call any mitigation witnesses."[5] (US opposition memo at p. 3.) That, of course, is not the standard. As the Supreme Court made clear in *Wiggins v. Smith*, *supra*, it is the duty of counsel in a capital case to *investigate*, a case in mitigation thoroughly and completely:

> Investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and

[4]Filed as Attachment A to Movant's Rule 59 motion was an affidavit prepared by Dr. Brown documenting her work-to-date and her tentative conclusions. Dr. Brown asserted in her affidavit that, "Based upon the initial review of source documents sent to me by [Movant's counsel] as well as an interview with birth mother Nancy Nelson, I believe there is a substantial possibility that Keith Nelson may suffer from Fetal Alcohol Spectrum Disorder." Her tentative findings in this regard were fully documented in the affidavit. (Attachment A to the Rule 59 motion at p. 3.) Movant's counsel thereafter filled a motion with the Court for additional funding of Dr. Brown's evaluation. That motion was denied and the Court declined to re-open the judgment for the purpose of taking testimony from Dr. Brown.

[5]The same may be said of the Supreme Court's recent series of cases finding counsel ineffective at penalty because, despite their presentation of some evidence in mitigation, an inadequate investigation failed to uncover significant additional evidence in mitigation. *See*, *Rompilla v. Beard*, 545 U.S. 374 (2005); *Williams v. Taylor*, 529 U.S. 362, 396 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003). The Supreme Court has made it clear that the days are over where doing "a little" would satisfy a capital attorney's obligation to his or her client to present all available evidence in mitigation.

> evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) . . . . Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources.

*Wiggins*, 539 U.S. at 524 (emphasis in original). The government – while singing the praises of the efforts of defense counsel in this case – also ignores the inconvenient truth that only a single juror found any of defense counsels' efforts persuasive; and that only as to a single mitigating factor.

This is not a case of second-guessing. Had defense counsel done their job, there is at least the possibility that a single juror might have struck a different balance and spared Movant's life.[6]

**D. The fallacy of the "waiver" argument regarding mental-health evidence.**

---

[6]In *Wiggins*, the Court noted:

> Wiggins' sentencing jury heard only one significant mitigating factor--that Wiggins had no prior convictions. Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance. Cf. *Borchardt v. Maryland,* 367 Md. 91, 139-140, 786 A.2d 631, 660 (2001) (noting that as long as a single juror concludes that mitigating evidence outweighs aggravating evidence, the death penalty cannot be imposed); App. 369 (instructing the jury: "If you unanimously find that the State has proven by a preponderance of the evidence that the aggravating circumstance does outweigh the mitigating circumstances, then consider whether death is the appropriate sentence").

*Wiggins v. Smith*, 539 U.S. at 537. In the federal system, a jury that is not unanimous for death spares a defendant's life. *Jones v. United States*, 537 U.S. 3 (1999). Moreover, in the federal system a capital defendant need not prove that the mitigating factors outweigh the aggravating factors. In fact, the converse is true. The government must satisfy a unanimous jury that the aggravating factors outweigh the mitigating factors and that the margin is sufficient to justify imposition of a sentence of death. 18 U.S.C. § 3593(e).

The government continues to shift the issue of defense counsel's failure to investigate Movant's mental health onto Movant himself, in essence blaming the victim. On the issue of Mr. Nelson's refusal to undergo evaluation by the government's mental-health experts, the record reveals only the aspect of that refusal visible outside the confines of the attorney-client privilege, as unilluminated by a hearing. The truth is that, despite long having the funds to have Mr. Nelson evaluated by mental-health professionals, defense counsel simply neglected to get it done. Nothing tactical or strategic informed that action. Trial counsel would have so testified at a hearing. Indeed, by the time the defense was required to file a notice of its intent to offer mental-health evidence, Mr. Nelson had *still* not been seen or evaluated by any mental health professional. By the time Dr. Foster visited Mr. Nelson it was, in the psychologist's own words, "too little, too late" and a competent evaluation was never completed. Defense counsels' subsequent advice to Mr. Nelson that he should refuse to be evaluated by the government's experts was born of desperation, not trial strategy. All of this, and more, would have been established at a hearing.

There was no mental health evidence presented on Movant's case at trial. This was squarely the result of failings by counsel. This is an area that Movant's counsel were (and remain) prepared to develop at length during a hearing. A review of orders entered by this Court demonstrate that Movant's trial counsel sought and received authorization to retain the services of mental health professionals at an early stage of the case. In June 2000, a motion was presented to the Court and granted to retain the services of a psychiatrist, Dr. Peterson. Dr. Peterson never examined Movant. In January 2001, a motion was presented and granted to have a neuropsychological examination performed. No such examination took place. It was not until the very eve of trial, the fall of 2001, that the services of a forensic psychologist were requested. Indeed, the motion to appoint Dr. Foster was not even filed until September

17, 2001, and Dr. Foster did not actually examine Movant until October 5 and 6, 2001. Dr. Foster himself described his evaluation as incomplete and preliminary. Despite the fact that two of Movant's brothers had long been diagnosed as schizophrenics, including one who was incarcerated in Texas for murder and had been deemed incompetent for a substantial period of time, no effort was made to locate a mental health professional with expertise in schizophrenia.[7]

There is no excuse for having delayed the mental-health evaluation of Movant until the fall of 2001. Applications for the funding of such examinations had been approved by this Court far in advance of the trial date. Dr. Foster believed that, had he done a complete examination, he would have developed powerful evidence in mitigation. The neuropsychological examination conducted by Dr. Gelbort in 2005 as part of these proceedings in fact developed evidence that Movant is brain-damaged and suffers from a condition beyond his control, "frontal lobe disturbance/dysfunction [that] has an effect on his everyday thinking and reasoning capacities" and which will lead to "episodes of impaired reasoning . . . ."

With regard to the "waiver" of the presentation of mental health evidence, Movant was (and remains) prepared to establish at an evidentiary hearing that Movant acted at the direction and advice of counsel. Movant would further establish that trial counsel were motivated by the desire to preserve for appeal a perceived trial error, *i.e.* this Court's exclusion of Dr. Foster's evidence.[8] This was not, however, a reasonable tactical choice

[7]When Movant's present counsel sought such an appointment, this Court denied the application on the basis of pre-judging the case. This left Movant in the Catch-22 posture of not being able to predict what the evaluation would have uncovered and, therefore, vulnerable to an argument that he had not established prejudice.

[8]In this regard, it is noteworthy that Mr. Berrigan artfully deflected Magistrate-Judge Hays' direct question on this issue. (*See* proceedings quoted in US Reply at 26-27.) Mr.

since Movant's trial counsel had failed to explore in any comprehensive way a potential mental-health mitigation case and, therefore, the decision to forgo such a presentation was dictated by a lack of preparation, not reasonable tactical choices.

Recognizing that Dr. Gelbort's neuropsychological testing revealed significant evidence of brain dysfunction, the government later denigrated the evidence by offering to present counter expert testimony, at a hearing, that there is "no scientific method available for establishing a causal connection between brain injury and criminal behavior." (US Reply at 33-34.) Movant was (and remains) prepared to meet such testimony if and when it is presented. Moreover, as a matter of law, for evidence to be mitigating a causal connection to the crime need not be proven. This was exactly the point of the Supreme Court's decisions in *Tennard v. Dretke*, 542 U.S. 274 (2004) and *Smith v. Texas*, 543 U.S. 37 (2004). In *Smith*, decided five months after *Tennard*, the Court reiterated its rejection of the "nexus" requirement that the Texas Court of Criminal Appeals, as endorsed by the Fifth Circuit, had erected as a barrier to the admission of mitigating evidence, stating, "[w]e rejected the Fifth Circuit's 'nexus' requirement in *Tennard* . . . ." *Smith v. Texas*, 543 U.S. at 45. Accordingly, the absence of a nexus to the crime does not render neuropsychological testing irrelevant. Neither does Movant concede that a nexus requirement could not be established.

While recognizing that there was evidence and argument that may have been improper, the government, in reply to Movant's 2255 motion, correctly noted that an explanation as to counsel's failure to object required an evidentiary hearing. (US Reply at 38-45.) The same was true with regard to the decision not to call Dr. Bennett. (US Reply at 46.) The government recognized, as well, the need for a hearing on the issue of

---

Berrigan and Ms. Hunt would have (and will) testified at a hearing that the decision not to submit to examination by the government's experts was the result of defense counsels' advice, not because of any obstinate behavior on the part of Movant.

ineffective assistance of appellate counsel. (US Reply at 47-48.) As stated above, at such a hearing Movant's appellate counsel was expected to testify that, because of time constraints and other pressures, she was unable to conduct an adequate review of the record of Movant's case and, as a result, did not file a complete and adequate appellate brief.

It was a critical aspect of Movant's challenge to his conviction and sentence of death that his defense counsel failed to conduct an adequate mitigation investigation. A properly-conducted investigation should have consisted of efforts to discover all reasonably available mitigating evidence and to rebut any aggravating evidence to be introduced by the Government. That was not done. Movant further asserted that trial counsel provided less than effective representation in other aspects of the case as well. The challenge to Movant's conviction and sentence of death asserted that, but for the failings of his counsel: (1) there is a reasonable probability that the results of these proceedings would have been different, (2) confidence in the reliability of the outcome has been undermined; and (3), one or more jurors would have struck a different balance.

## CONCLUSION

Because reasonable jurist could differ regarding the outcome of this case, and because the issues are worthy of further development, a COA should issue with regard to all claims presented.

Respectfully submitted,

/s/ Gary E. Brotherton
Legal Writes, LLC
2101 Chapel Plaza Court, Suite 13
Columbia, MO 65202-3381
(573)875-1571
(573)875-1572 (fax)
gebrotherton@legalwritesllc.com
Co-counsel to Movant, Keith Nelson

/s/ David A. Ruhnke
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
(973)744-1000
(973)746-1490
davidruhnke@ruhnkeandbarrett.com
Co-counsel to Movant, Keith Nelson

Filed electronically: Kansas City, Missouri
July 30, 2007

## CERTIFICATE OF SERVICE

This will certify that, on today's date, Movant's counsel served this motion upon the United States by filing the document via ECF.

/s/ David A. Ruhnke
DAVID A. RUHNKE

Dated: July 30, 2007