IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| KEITH D. NELSON, | : | |
| Movant, | : | |
| vs. | : | 4:04-CV-8005 (FJG)<br>99-cr-00303-W (FJG) |
| UNITED STATES OF AMERICA, | : | |
| Respondent. | : | |

MOVANT'S SUGGESTIONS IN OPPOSITION TO GOVERNMENT'S MOTION TO ESTABLISH PROCEDURES BY WHICH A MENTAL HEALTH EXAMINATION OF MOVANT WILL BE CONDUCTED

COMES NOW Keith D. Nelson ("Movant" or "Mr. Nelson"), by his attorneys, David A. Ruhnke and Gary E. Brotherton, and files the following suggestions in opposition to the Government's motion to establish procedures by which a mental heath examination of Mr. Nelson will be conducted.[1] As is explained in more detail below, Mr. Nelson objects to certain procedures requested by the government, and re-asserts the relief he requested in his Motion Opposing, And/Or To Establish Conditions of Government Mental-Health Evaluation, filed on April 9, 2010. (Doc. No. 134).

The procedural history of this particular aspect of the case is somewhat unusual and, therefore, Movant's counsel sets forth the following chronology on how the issues have

[1] Movant stands by his earlier position that this Court has the discretion not to permit a government examination at all. *See* Doc. 134 at pp. 2, 3.

come to be joined:

- April 9, 2010: Movant filed Doc. 134 objecting to any mental-health examination by the Government or, alternatively, proposing conditions under which such an examination would be conducted if ordered by the Court.

- April 15, 2010: Instead of simply replying to Movant's April 9 papers, the Government filed an independent motion (Doc. 137) seeking permission to conduct a mental-health examination of Movant, acknowledging that, on April 7, 2010, Movant had filed a notice pursuant to F.R.Crim.P. 12.2 and, as well, that Movant had filed the above-referenced motion to preclude a mental-health examination and/or to establish conditions under which a mental health examination would take place.

- April 20, 2010: The Government filed an independent motion to establish procedures for a mental health examination while, at the same time, responding to the proposed conditions set forth in Movant's April 9, 2010 motion. (Doc. 138.) It is to the April 20, 2010 motion by the Government that the within suggestions in opposition are directed. Movant incorporates by reference his motion of April 9, 2010 to which the Government has never filed a reply.

**1. The government's request for a joint examination of the Movant by two government mental health experts is unreasonable and should be denied.**

The government proposes that its experts, Dr. Park Dietz and Dr. Daniel Martell, be permitted to "conduct a joint, two or three day examination of the movant," Mot. at 5, and claims that this proposal is supported by ABA Standard 7-3.6(e), which encourages joint evaluations by the prosecution and the defense. The government states that "[s]ince defense counsel has already conducted its own mental health evaluation of movant, *this proposal applies to a mental health evaluation conducted by two government hired professionals.*"

USA Mot. at 5, n.2. (Emphasis added). The Movant objects to this proposal.

First, the government's interpretation of the phrase "joint examination" in ABA Standard 7-3.6(e) is plainly incorrect. It does not mean "a mental health evaluation conducted by two government hired professionals," but rather a mental health evaluation conducted jointly by the prosecution and defense. As both the plain language of the Standard and the accompanying Commentary make clear, a "joint examination" consists of either: (1) a simultaneous evaluation by prosecution and defense experts; or (2) a single evaluation by one mental health expert agreed upon by both parties. *See* ABA Standard 7-3.6(e) ("[Joint evaluations] should be permitted when agreed upon by the prosecutor and defense attorney. A joint evaluation involves either a simultaneous evaluation by two or more mental health or mental retardation professionals or a single evaluation by a mental health or mental retardation professional agreed on by both parties."); Commentary to ABA Standard 7-3.6(e) ("Paragraph (e) advocates the premise that a *prosecuting attorney* and *defense counsel* should consider joint evaluations and reports.") (Emphasis added).

Second, the government is not entitled to have Mr. Nelson be examined by both a psychologist and a psychiatrist, regardless of whether such evaluations would be conducted simultaneously or serially. Under Rule 12.2 – which the government agrees governs mental health evaluations in the instant proceedings – any government examination of Mr. Nelson must be limited in scope to those areas noticed by the defense. That is, although Rule 12.2 states that the court may order the defendant to submit to a rebuttal examination by the government, the defense's 12.2 notice does not necessarily "open the door for any type of

mental testing" by the government. *United States v. Taylor*, 320 F. Supp. 2d 790, 794 (N.D. Ind. 2004).[2]

Here, the defense has provided the government notice of its intent to proffer expert mental health testimony from Dr. Xavier Amador, Ph. D., a clinical psychologist, and the government has been provided with a copy of Dr. Amador's preliminary report. That is, the noticed mental health evidence is in the domain of clinical psychology, not psychiatry. To the extent that any government examination of the Movant is permitted by this Court, it must be limited to a psychological evaluation in order to comport with the proper scope of rebuttal examinations contemplated by Rule 12.2. Under the Rule, the government would be precluded from introducing as rebuttal evidence any expert evidence on which the defense does not present evidence. See Fed. R. Crim. P. 12.2, Advisory Committee Notes, 2002 Amendments ("The Committee believed that, in this context, it was appropriate to limit the government's ability to use the results of its expert mental examination to instances in which

---

[2] The government also specifically requests that its experts be permitted to conduct a "two or three day examination" of Mr. Nelson. USA Mot. at 5. The government's request is unduly vague and fails to articulate the purpose or necessity of such an extended examination. As is argued in more detail *infra*, the government should be required to follow the procedures adopted by other courts which require that the government provide the defense with advance notice of any tests or instruments it seeks to administer. Indeed, to the extent that the government's experts intend to engage in any activities beyond clinical interviews or the administration of tests and/or instruments to Mr. Nelson, the undersigned specifically object. *See United States v. O'Reilly*, No. 05-80025, 2010 U.S. Dist. LEXIS 14621, *12-*14 (E.D. Mich. Feb. 19, 2010) (requiring government to provide advance notice of any tests its experts wished to perform and ordering that "Government experts can only subject [the defendant] to examination or testing that was performed by defense experts").

the defendant has first introduced expert evidence on the issue."); *Taylor*, 320 F. Supp. 2d. at 791-94 (where defense mental health evidence under Rule 12.2 was limited to defendant's "developmental history and mental condition regarding substance abuse," government was prohibited from "us[ing] the limited notice" provided by the defense "as an open door for any type of mental testing"; government testing was restricted to instruments containing test scales for substance abuse and government was barred from introducing any materials outside the scope of mental health testing "as it relates to substance abuse"); *United States v. Johnson*, 383 F. Supp. 2d 1145, 1162-1164 (D. Iowa 2005) (government's mental health expert not be permitted to interview defendant concerning charged crimes because such questions would not be necessary to rebut defendant's mental condition mitigation evidence).

For the foregoing reasons, the Movant objects to the government's proposal that both Dr. Dietz and Dr. Martell evaluate Mr. Nelson.

**2. The government's request to record its examination has no support in any extant authority, will only serve to diminish the validity and reliability of the examination, and runs counter to security concerns consistently raised by Bureau of Prisons officials.**

The government cites Standard 7-3.6(d) of the ABA Criminal Justice Mental Health Standards[3] as support for the proposition that the mental health examination should be audio-

---

[3] The government states that given the Supreme Court's reliance on "ABA Standards" in *Strickland v. Washington*, 466 U.S. 668 (1984) and *Wiggins v. Smith*, 539 U.S. 510 (2003), similar deference should be given to Standard 7-3.6(d). *See* USA Mot. at 3, 4, 6-7. The government, however, is imprecise in its description of Supreme Court precedent; the "ABA Standards" approvingly cited in *Strickland* and *Wiggins* were not the ABA Criminal Justice Mental Health Standards. In *Strickland*, the Court cited to the ABA Standards for (continued...)

or video-taped. However, as noted in the Commentary to Standard 7-3.6(d), this provision was enacted *to protect the rights of defendants*; it does not confer a right on the prosecution to record the examination. Specifically, the rationale behind the provision was to safeguard Fifth and Sixth Amendment rights, not to provide the government with a prosecutorial tool:

> [P]aragraph (d) takes the position that the evaluation should be recorded, *as a substitute for defense counsel's presence. This recording requirement, though, is not intended to enable a prosecuting attorney to obtain additional evidence*, which would occur, for example, if a defense-initiated evaluation interview were recorded and a recording made available to the prosecution.
>
> *Note that paragraph (c)(iii) opposes the presence of a member of the prosecution staff at any evaluation interview with a defendant.*

---

[3](...continued)
Criminal Justice ("The Defense Function"). *See Strickland*, 466 U.S. at 688. In *Wiggins*, the Court cited to both the ABA Standards for Criminal Justice and the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases. *Wiggins*, 539 U.S. at 524. It is these "ABA Standards" which the Court has relied upon as the relevant "standards for capital defense work," "well-defined norms," and "guides to determining what is reasonable" with respect to capital counsel's performance. 539 U.S. at 524.

It should be noted that the government agrees with the undersigned that "[g]iven the ABA Standards repeated reference by the Supreme Court as being the guide that helps to determine reasonableness, it seems objectionably reasonable to follow those Standards here." USA Mot. at 6-7. Presumably, the government will continue to honor this agreement even though the "ABA Standards" that the Supreme Court "repeatedly referenced" in its line of *Strickland* capital cases are the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, not the ABA Criminal Justice Mental Health Standards. For the government to do otherwise would be "completely inconsistent," "inherently unreasonable, " and "arguably a stratagem designed to frustrate the [Movant] and this Court from fairly coming to a conclusion on [the ineffective assistance of counsel claims]," USA Mot. at 3, 4.

Commentary to ABA Standard 7-3.6(d), ABA Criminal Justice Mental Health Standards (emphasis added).

Similarly, the Commentary unambiguously states that the purpose of recording an examination is *for potential use by the defense* – the prosecution's ability to use the recording is expressly conditioned upon, and only triggered by, the defense's introduction of the recording at a proceeding:

> Paragraph (d) *permits the defense* to use a recording of an evaluation interview with a defendant for any evidentiary purpose permitted by the jurisdiction. . . *If a defendant chooses to offer such a recording at trial, the prosecution should also be permitted to do so as well.*

Therefore, ABA Standard 7-3.6(d) does not entitle the government to record its mental health examination of Mr. Nelson. The rationale behind the Standard – i.e., that recording is permitted for the benefit of the defense, not the prosecution – is consistent with extant caselaw. Indeed, to the extent that other courts have permitted the recording of the government's mental health evaluation, it has only been at the request of the *defendant*, in order to protect the *defendant's* interests, and *with the consent of the defense*. *See*, *e.g.*, *United States v. Johnson*, 362 F. Supp. 2d 1043, 1088-1089 & n. 13 (N.D. Iowa 2005) (authorizing audio-taping of government's interview of client and same-day disclosure to defense counsel in order to protect defendant's Fifth Amendment rights, and noting that defense consented to the audiotaping procedure); *United States v. Sampson*, 335 F. Supp. 2d 166, 246-247 (D. Mass. 2004) (authorizing tape-recording of government's interview of client and same-day disclosure to defense counsel in order to protect defendant's Fifth and

Sixth Amendment rights, and noting that defense consented to the recording procedure).

Notably, the government cites no federal rule, statute or caselaw which *entitles* the government to audio- and/or video-record its examination of Mr. Nelson. Nor does the government attempt to distinguish any of the caselaw cited in Mr. Nelson's previously-filed motion objecting to the use of recording devices. *See, e.g., United States v. Minerd*, 197 F. Supp. 2d 272, 276 (W.D. Pa. 2002) (prohibiting government from audio- or video-taping its examination of the defendant absent express written consent of defense counsel). As demonstrated above, the one authority upon which the government relies to advance its position – ABA Standard 7-3.6(d) – was taken out of context and does not support the government's argument.

More significantly, however, the government offers no explanation as to why a recording device is necessary for the examination to be clinically and forensically reliable. Despite bromides about the need for achieving truth, USA Mot. at 7, the government has yet to cite any authority – be it legal, medical or forensic – that establishes that a microphone or a camcorder are indispensable tools of a mental health evaluation. The fact of the matter is that recording devices are not clinically indicated; their use in mental health examinations has only been allowed at the insistence and consent of defense counsel for *legal* reasons – i.e., to safeguard Fifth and Sixth Amendment rights – not because they are necessary to effectuate the goals of the mental health examination itself.

In this particular instance, the introduction of a recording device poses a significant risk that the truth-seeking goal will be compromised. As numerous courts have observed,

the use of recording devices during mental health examinations can actually undermine the accuracy of the examination. *See, e.g., Shirsat v. Mutual Pharm. Co.*, 169 F.R.D. 68, 70 (E.D. Pa. 1996) (presence of "recording device" during psychiatric examination "would constitute a distraction during the examination and work to diminish the accuracy of the process"); *Tomlin v. Holecek*, 150 F.R.D. 628 (D. Minn. 1993) (prohibiting tape-recording of mental health examination because the presence of a recording device "is inimical to the conduct of a valid psychiatric examination"; "psychological examinations necessitate an unimpeded, one-on-one exchange between the doctor and the patient" and "[g]iven the apparent sensitivity of the subject matter which may well be explored in this interview, the need for a private and personal interchange, between the Plaintiff and [the psychiatrist], would seem self-obvious"); *Favale v. Roman Catholic Diocese of Bridgeport*, 235 F.R.D. 553, 557 (D. Conn. 2006) (while tape recording is less intrusive than permitting attendance of third party, it is still objectionable because it would impede one-on-one communication between patient and psychologist, and tend to undermine psychologist's evaluatory technique); *Abdulwali v. Washington Metro Transit Auth.*, 193 F.R.D. 10, 13 (D.D.C. 2000) (finding that videotaping is inimical to conduct of psychiatric examination, court ruled plaintiff failed to show sufficient need to be permitted to record her examination); *Hertenstein v. Kimberly Home Health Care, Inc.*, 189 F.R.D. 620, 631 (D. Kan. 1999) (presence of recording device might influence plaintiff to exaggerate or diminish her reactions to examination). *Cf. Holland v. United States*, 182 F.R.D. 493, 496 (D. S.C. 1998) (presence of videorecording device during medical examination "could influence [plaintiff],

even unconsciously, to exaggerate or diminish his reactions to [the doctor's] physical examination. [The plaintiff] could perceive the videotape as critical to his case and fail to respond in a forthright manner."); *Johnson*, 362 F. Supp. 2d at 1089 n. 13 (deferring to defense counsel's request to audio-record rather than video-record government's evaluation because video-recording would be more "intrusive").[4]

As the undersigned have already explained in their prior submission on this matter, there is a substantial risk that the presence of a recording device at Mr. Nelson's mental health examination might actually inhibit an open exchange between the examiner and Mr. Nelson, especially given the sensitive and personal nature of the information which is likely to be discussed regarding Mr. Nelson's troubled upbringing and background. In light of the fact that the use of a recording device is not necessary to obtain valid forensic mental heath results, the introduction of such a device needlessly risks "contamination of the testing process by deviating from standardized test administration practices." USA Mot. at 8. The

[4] It should be noted that in the *Johnson* case, the audiotape procedure was followed so that *defense counsel* could have access to same-day or next-day delivery of the testing and interviews conducted by the government's mental health experts upon the conclusion of each testing or interview session. The prosecutors were expressly prohibited from having access to those same tapes until and unless disclosures became appropriate pursuant to Rule 12.2(c)(2). *Johnson,* 362 F. Supp. 2d at 1113. Indeed, the only government prosecutors that were allowed access to those tapes were an outside "taint" team of AUSAs, who were to have no contact with the actual prosecuting attorneys, and who had no role in prosecuting the case. *Id*. The district court followed this procedure in order to ensure that the defendant's Fifth and Sixth Amendment rights were scrupulously safeguarded, and so that the prosecuting attorneys would never receive any information obtained during the government examinations that went beyond the scope of the specific mental health evidence offered by the defense in mitigation. *Id*. at 1082-85.

absence of a recording device will not affect the reliability or validity of the examination, whereas the presence of a recording device likely will. Under such circumstances, the government simply cannot demonstrate a compelling need for recording the examination.

Finally, it should be noted that as recently as January of this year, the Government and the Bureau of Prisons have taken the position that video-recording equipment should not be allowed into the Special Confinement Unit ("SCU") at USP-Terre Haute where federally death-sentenced prisoners are housed. Attachment E to this reply is the declaration of Hector Joyner, the Chief Correctional Supervisor at Terre Haute, which was filed on January 15, 2010, in support of the United States' Brief In Opposition To Defendant's Motion For Access Of Videographer To Special Confinement Unit At The USP Terre Haute. Mr. Joyner is "in charge of the overall security of the institution," (E1) and he is "the resident expert on all custodial and security questions arising at the complex." (E2.) He states: "It is my determination, based on sound correctional judgment, that allowing video recording equipment onto the complex and into the SCU to videotape [a federally death-sentenced prisoner] threatens and is detrimental to the order and security of the SCU and may violate the privacy of other individuals." (E4.) Mr. Joyner specifically distinguishes a prior occasion in which video-recording equipment was used to tape a mental health examination by noting that that instance occurred in April 2005, when the SCU was located in a different part of the complex, and when the SCU only housed 32 inmates and 2 non-death-sentenced inmates; in July of 2005, however, the SCU was relocated to a substantially more secure state-of the-art facility within the United States Penitentiary that is part of the complex. Moreover, the

unit has almost doubled in size in terms of the number of prisoners confined within that unit. (E2, 3.) As Mr. Joyner notes: "[T]o the best of my knowledge, no video cameras have been allowed into the SCU since the inmates were transferred from the existing SCU to the SCU at the new USP Terre Haute in July 2005."

The security concerns identified by Mr. Joyner are also echoed in the declaration of Thomas B. Smith, the previous Chief Correctional Supervisor at Terre Haute. On January 30, 2008. Mr. Smith provided the FBI with a declaration (Attachment F) stating that for security reasons, he opposed the use of a video-recording device in the SCU to videotape the deposition of a death-sentenced inmate housed in the SCU. As he declared at the time: "It is my determination, based on sound correctional judgment, that allowing videorecording equipment onto the complex and into the SCU to videotape the deposition of [the inmate] threatens and is detrimental to the order and security of the SCU and may violate the privacy of individuals." (F3.)

Mr. Joyner and Mr. Smith are BOP employees specifically charged with being the "resident experts" on all custodial and security issues arising at the complex at Terre Haute. Both have declared, under penalty of perjury, that permitting video-recording equipment into the SCU would pose an intolerable security risk. This has been the consistent position of both the government and the BOP since the SCU was relocated to a more secure facility in August of 2005. For the government to seek an exception to the policy prohibiting video recording equipment in the SCU, merely because the shoe is on the other foot and it is the Government requesting the use of the that equipment, rather than the party opposing it,

would be not only immeasurably hypocritical, but would – in the words of Mr. Joyner and Mr. Smith – pose a "threat" and be "detrimental to the order and security of the SCU." Nothing in the Government's submissions to date suggests that the view of BOP officials have been taken into account at all. Thus, for all the foregoing reasons, it is respectfully submitted that the government's request should be denied.

**3. Appropriate limitations must be placed on any information the government obtains during its examinations in order to safeguard Mr. Nelson's Fifth and Sixth Amendment rights.**

The undersigned has requested that no statements made by Mr. Nelson in the course of any examination ordered by the court, no testimony by the expert based on such statements, and no other fruits of the statement may be admitted into evidence against the defendant in any criminal proceeding, except on an issue regarding mental condition on which Mr. Nelson has given notice pursuant to the requirements of Rule 12.2, with the understanding that if Mr. Nelson elects to proceed with such evidence from his expert at the hearings to be conducted pursuant to 28 U.S.C. § 2255, the testimony is admissible only at that proceeding and for no other purposes, including later utilization of any fruits of that testimony. The authority for this request is derived from subsection (c)(4) of Rule 12.2, which the government agrees is the operative rule governing the mental health examinations for the instant proceedings. In other words, the undersigned's request merely seeks to enforce directly applicable federal law and procedure. Indeed, the request is modeled on almost the exact language of Rule 12.2(c)(4).

As was explained in Mr. Nelson's prior submission, Rule 12.2(c)(4) was designed to

safeguard the Fifth and Sixth Amendment rights of persons compelled to undergo a government-conducted mental health examination. Since neither the government nor any of its agents (mental health experts) would ordinarily ever be permitted to question a defendant and compel him to respond to any questions that potentially implicate his constitutional rights, strict limitations have been placed on the government's ability to use any such statements, or fruits of such statements, in any future criminal proceedings. These limitations have been codified in subsection (c)(4) of Rule 12.2, and the government has offered no authority for why those limitations should not be applied here. Accordingly, it is respectfully submitted that this Court overrule the government's objection to this request.

**4. Counsel for Mr. Nelson must be given advance notice of the tests which the government mental health expert plans to administer and the opportunity to object to the administration of those tests.**

The purpose of providing undersigned counsel with advance notice of the tests to be administered has nothing to do with "coaching" Mr. Nelson;[5] rather it would give the

[5] The government argues that it should not be required to provide advance notice of the tests its expert plans to administer during the examination of Mr. Nelson because "if a subject has advance notice of the testing to be employed, they can either be coached, or have thought of their answers in advance." USA Mot. at 8. Whether or not it was intended, Movant's counsel take offense at any the suggestion that they would coach Mr. Nelson regarding what answers to give on a mental health examination.

Moreover, the government's apparent concern that Mr. Nelson could "think of his answers in advance" does not make any sense. Simply knowing the name of the test to be administered does not allow one to divine the *content* of the test. Indeed, it is unclear in the government's scenario just how it is that Mr. Nelson would go about "thinking of his answers in advance" when he has no access to any of the relevant testing materials. The government's concerns regard advanced preparation are simply unfounded.

undersigned the opportunity to object to any tests which are irrelevant to the § 2255 claims in the instant proceedings, or otherwise unreliable. This is consistent with extant federal practice in the 12.2 context. For example, in *United States v. Taylor*, *supra*, the defense noticed its intent to introduce expert mental health evidence regarding the defendant's "developmental history and mental condition regarding substance abuse." 320 F. Supp. 2d at 791. In response, the government notified the defense that it intended to administer a number of personality instruments, including the MMPI, the PAI, MCMI, and the PCL-R.[6] The defense objected, arguing that the PCL-R had been discredited and that the personality inventories proposed by the government exceeded the limited notice provided by the defense. Following a hearing on the matter, the court sustained the defendant's objections. It agreed that serious questions had been raised concerning the PCL-R's validity and reliability. It further agreed that the government would not be allowed to "use the limited notice" provided by the defense "as an open door for any type of mental testing" and held that government must be limited to "parallel testing of substance abuse." *Id*. at 794. The court, accordingly, prohibited the government's use of the PCL-R and restricted the government's testing to instruments containing test scales for substance abuse and barred the government from introducing any materials outside the scope of mental health testing "as it relates to substance

---

[6] Respectively, the Minnesota Multiphasic Personality Inventory (MMPI); Personality Assessment Inventory (PAI); Millon Clinical Multiaxial Inventory (MCMI); and the Interview Schedule for Psychopathy Checklist Revised (PCL-R).

abuse." *Id*.[7]

Here, the government has already suggested in its Motion that it will direct its expert to administer a test for "psychopathology." USA Mot. at 8. The undersigned specifically object to any such testing, which numerous courts have found unreliable. Indeed, one of the government's own favored experts in federal capital cases, Dr. Thomas Ryan, has disavowed expert testimony he has given on behalf of the government on such "psychopathology" testing, having concluded that such testing is unreliable and improper in the context of capital cases. The circumstances of Dr. Ryan's disavowal are worth discussing in detail, as they illuminate the reasons why counsel must be afforded advance notice of any tests which the government seeks to administer, as well as the opportunity to object to any particular tests.

**A. The government should be barred from administering "psychopathology" testing because it is both unreliable and irrelevant to the instant proceedings.**

For a period of time between 1997 and 2000, the most lethal weapon in the

---

[7] Similarly, in *United States v. O'Reilly*, No. 05-80025, 2010 U.S. Dist. LEXIS 14621 (E.D. Mich. Feb. 19, 2010), the district court adopted Rule 12.2 procedures requiring that: (1) "[b]efore any expert for the Government conducts rebuttal mental health testing, the Government must provide defense counsel a list of tests its expert(s) wish to perform," *O'Reilly*, at *12; (2) defense counsel must be given "at least five days advance notice of the name(s) and profession(s) of the Government expert(s) who will perform rebuttal examination, and the tests the expert(s) expect to perform," *id*. at *13; (3) defense counsel must file any objections to any expert or to a particular test within three business days after receiving notice of the expert or test, and "[n]o rebuttal examination or testing can be conducted until the Court has held the required hearing [on the defense objections]," *id*.; and (4) "[t]he Government's experts can not administer more than one test to measure the same mental function. Further, Government experts can only subject [the defendant] to examinations or testing that was performed by defense experts." *Id.* at *14.

government's death penalty arsenal was expert testimony and evidence about psychopathy and future dangerousness. The government had three "go-to" experts it used in cases across the country, of which Dr. Ryan was one.[8] Dr. Ryan has had an extensive professional relationship with the government, having been retained in a number of federal capital cases to perform risk assessments of defendants using the Hare Psychopathy Checklist Revised ("PCL-R"). As noted, Dr. Ryan has since disavowed the use of the PCL-R in capital sentencing proceedings, and has specifically stated that the use of the PCL-R and the concept of psychopathy as a predictor of future dangerousness in prisons is inappropriate, as there is no scientific evidence to support such claims. Dr. Ryan's reversal of his prior views on this matter came to light as part of the proceedings in another federal capital case, *United States v. Willis Haynes*, No. PJM-98-0520 (D. Md.), which was tried in the District of Maryland in May of 2000.

In *Haynes*, Dr. Ryan was retained by the government to perform a risk assessment of the capital defendant (Willis Haynes) using the PCL-R and give expert testimony regarding his potential psychopathy and future dangerousness. In May of 2000, after the written report of his evaluation was submitted to counsel, the defense filed a motion seeking to exclude Dr. Ryan's expert testimony regarding the PCL-R and the diagnosis of psychopathy. The basis for the motion was that such evidence was unscientific and not probative of future

[8] The other two were Dr. Scott Duncan, whose expert testimony was the subject of the reversal in *United States v. Barnette*, 211 F.3d 803 (4th Cir. 2000), and Dr. Daniel Martell, the expert the government apparently plans to retain in this case.

dangerousness, and the motion was supported by five affidavits from prominent clinical and forensic psychologists who variously attested that there was no scientific basis for claiming that a high PCL-R score supported a future dangerousness determination.[9] After reviewing these affidavits, Dr. Ryan reevaluated his position on this issue and voluntarily withdrew his expert report in the *Haynes* case. Nor did he testify regarding the PCL-R or psychopathy at the trial. As Dr. Ryan himself later explained:[10]

> The reasons why it is inappropriate to rely on the PCL-R for assessing the future dangerousness of a capital defendant became apparent to me in the Spring of 2000 when I was preparing to testify as an expert witness for the prosecution in the matter of United States v. Willis Haynes. In that case, after the written report of my evaluation was submitted, the defense filed a motion to preclude testimony about the PCL-R and psychopathy. The motion included opinions provided by a number of well-respected authorities on the PCL-R that the scientific literature did not establish a relationship between prison violence and a high PCL-R score that would support a future dangerousness determination. I reviewed those experts' opinions, re-evaluated the scientific literature and consulted with several other forensic psychologists. I then determined that I would withdraw my report.
>
> As a result, no testimony about psychopathy or the PCL-R was introduced at that trial.

5/12/03 Declaration of Thomas V. Ryan, Ph.D, ABPP at ¶5 (Attachment B to this reply at B2; hereafter "Ryan Declaration.".

---

[9] Those affidavits are Attachment A to this reply.

[10] The following is excerpted from Dr. Ryan's sworn declaration filed in the capital § 2255 proceedings in *United States v. Richard Thomas Stitt*, No. 2:98-CR-47 (E. D. Va.). As will be explained in more detail *infra*, Dr. Ryan provided expert testimony at the *Stitt* trial in 1998 regarding the capital defendant's psychopathy and future dangerousness, but subsequently repudiated that testimony for the same reasons that he withdrew his testimony in the *Haynes* case.

Subsequent to the *Haynes* case, Dr. Ryan was contacted by Dr. Stephen David Hart and Dr. Donald D. Bersoff, both of whom had filed affidavits in *Haynes*. (Attachment A2 and A 16 respectively.) Dr. Hart had worked with Dr. Hare on the development and validation of the PCL-R, and in his expert opinion, he attested that there was "no direct scientific evidence that the PCL-R . . . [is] predictive of institutional violence in correctional offenders in the United States," and that the PCL-R is "not generally accepted within the scientific community of clinical-forensic psychologists for the purpose of predicting institutional violence in correctional offenders in the United States." (A4.) Dr. Bersoff is an elected fellow of the American Psychological Association (APA) and an expert in the standards and ethics of testifying as a psychological expert witness in legal proceedings. He attested that Dr. Ryan had "acted below the professional standards of those holding themselves out as forensic psychologists" in rendering the conclusion that the defendant was a "relatively high risk of engaging in violence recidivism," because there was a "dearth of data generally accepted in the relevant psychological community to support this opinion" and Dr. Ryan had made "misleading use of the extant studies" regarding the PCL-R in order to render his opinion. (A25.) [11]

---

[11] An ethical complaint was eventually filed against Dr. Ryan with the APA based on his misleading expert reports and/or testimony in three capital cases, including Haynes, on the issue of psychopathy and future dangerousness. (Attachment C to this reply.) Additionally, a description of Dr. Ryan's conduct with respect to psychopathy and future dangerousness testimony in *Haynes* was published in a peer-reviewed journal for psychologists and described as "not only incompetent and factually misleading, but also highly unethical." Edens, J.F., *Misuses of the Hare Psychopathy Checklist-Revised in Court,*
(continued...)

Dr. Hart and Dr. Bersoff contacted Dr. Ryan because they were aware that he had rendered a similarly unscientific and misleading expert opinion regarding psychopathy and future dangerousness in another federal capital case that was tried prior to Haynes – *United States v. Richard Thomas Stitt*, No. 2:98-CR-47 (E. D. Va.), a federal capital trial which was tried in the Eastern District of Virginia in September and October of 1998. There, Dr. Ryan performed a risk assessment on the defendant (Richard Stitt) using the PCL-R and testified that based on the defendant's score on that instrument, the defendant presented a high risk of future violence even in the context of a maximum security federal prison, and that the defendant's psychopathy meant that he was not amenable to rehabilitation and would continue to be a future danger if sentenced to life without parole. The defendant was ultimately sentenced to death. Dr. Hart and Dr. Bersoff strongly encouraged Dr. Ryan to review his testimony in that case and write a letter to the court indicating that his testimony was inaccurate.[12]

Dr. Ryan ultimately provided a sworn declaration, which was filed with the court as part of the *Stitt* § 2255 proceedings. In that declaration, Dr. Ryan recanted his prior expert testimony made at trial and disavowed the notion that a capital defendant's potential psychopathy, as measured by the PCL-R, is predictive of his future dangerousness in prison:

---

[11](...continued)
*Two Case Examples*, 16 Journal of Interpersonal Violence 1082-93 (2001).

[12] See Testimony of Thomas V. Ryan, Ph. D., 7/15/04 Transcript of § 2255 Proceedings in *United States v. Stitt*, No. 2:98cr47 (E.D. Va.) at 59.

> Based upon my current understanding of the literature and the obvious controversy about forensic clinicians' use of the PCL-R, I would choose not to use this instrument. Although I did not recognize it at the time, I am aware now that the PCL-R is not, and was not, appropriately relied upon to assess an individual's future dangerousness in federal prison. As an ethical and responsible clinician, I am informing all concerned that the statements about the defendant's future dangerousness that I made at trial were not grounded in current scientific literature and I do not stand by them now.
>
> . . .
>
> It was not and still is not possible to conclude to a reasonable degree of scientific certainty, based on studies that were published at the time of the Stitt trial or on relevant research published since then, that a correlation exists between high PCL-R scores and federal prison violence.

(B2; see also id. at B3:"Since withdrawing my report in the [*United States v. Willis*] *Haynes* case [in the Spring of 2000], I have been retained by the government in several other federal death penalty cases, and testified in those that went to trial. In no case have I relied on the PCL-R, because I no longer believe that the PCL-R is a reliable indicator of a defendant's future dangerousness in federal maximum-security prisons due to the lack of peer reviewed empirical studies. Indeed, to the best of my knowledge, the government has not introduced testimony about the PCL-R or psychopathy in any trial since Haynes.")

As Dr. Ryan explained in his declaration in the *Stitt* case, a comprehensive review of the scientific literature demonstrated that "the position that PCL-R scores for any one offender provide much useful information regarding his relative or absolute risk for future institutional violence while incarcerated is untenable[.]" (B3.) (internal citation omitted). At the evidentiary hearing in the *Stitt* §2255 proceedings, Dr. Ryan was called as a witness and testified further regarding his current views on the PCL-R and psychopathy. His testimony made unmistakably clear that predictions about future dangerousness in prison based on a

defendant's PCL-R score and alleged psychopathy are not valid. See Testimony of Thomas V. Ryan, Ph. D., 7/15/04 Transcript of § 2255 Proceedings in *United States v. Stitt*, No. 2:98cr47 (E.D. Va.) at 63 ("the Hare Psychopathy Checklist Revised is just not appropriate to be used in making predictive statements about adjustment within the prison system"). Dr. Ryan also made clear that as far back as the time of the *Stitt* trial in 1998, there was no scientific research supporting the use of the PCL-R to make risk assessments about an individual's future dangerousness in prison. Id. at 78 ("Q. Was there any study at the time you testified that established that [the PCL-R] was predictive of future dangerousness in prison? A. No.").

Additionally, it should be noted that the district court in *Stitt*, although granting relief on different grounds, did find that Dr. Ryan's testimony at trial was based on unsupported scientific assumptions and erroneous:

> the Court is reasonably satisfied that Dr. Ryan's testimony was erroneous. Dr. Ryan's material testimony predicted Petitioner's future dangerousness based upon a scientific instrument that Dr. Ryan now believes he inaccurately applied. At the time of Petitioner's trial, Dr. Ryan did not realize that the PCL-R was not an accurate predictor of prison violence, as opposed to future dangerousness in the community at large. (Decl. Dr. Ryan PP3, 5, 8.) Dr. Ryan indicates that the scientific literature has come to reflect the view that the PCL-R is not a reliable predictor of future dangerousness of individuals confined in a federal prison, and the Government has not provided any evidence to refute this claim. (Id. at PP9-10.) The Court has not found any precedent providing guidance in a situation where an expert witness has discovered that the scientific basis for a test used to support a material fact was incorrect. However, if a DNA test indicated that an individual was guilty of a crime, and the Government's DNA expert later discovered that a change in DNA science indicated that the old test was inherently flawed, the Court cannot conceive that this would not be sufficient basis for the Court to at least consider such a petitioner's collateral attack. Therefore, the Court finds that Dr. Ryan's

testimony was erroneous and has been recanted.

*Stitt v. United States*, 369 F. Supp. 2d 679, 699 (E.D. Va. 2005), *affirmed by, remanded by United v. Stitt*, 441 F.3d 297 (4th Cir.), *recalled by, vacated by, appeal dismissed by United States v. Stitt*, 459 F.3d 483 (4th Cir. 2006).[13]

Similarly, in *United States v. Taylor*, 320 F. Supp. 2d 790 (N.D. Ind. 2004), a federal capital case prosecuted in the Northern District of Indiana, the district judge prohibited the government's mental health expert from even using the PCL-R on the capital defendant in its pre-trial evaluation. In the district court's judgment, "the uncertainty of the validity and reliability of the PCL-R as it is used in capital sentencing hearings" would undermine the reliability of the defendant's sentencing proceedings if testimony about the defendant's PCL-R score was injected into the trial. 320 F. Supp. 2d at 794.

Simply put, a diagnosis of psychopathy, as measured by the PCL-R, is not – and never has been – probative of, or a valid predictor of, an individual's future dangerousness in prison. This is a position that is fully supported by the forensic psychology community. In support

---

[13] After hearing argument, the Fourth Circuit initially published an opinion affirming the district court's judgment in all respects and remanding the case for resentencing. *See United v. Stitt*, 441 F.3d 297 (4th Cir. 2006). However, prior to issuance of the mandate, the Fourth Circuit discovered that, since the defendant had not yet been resentenced, it lacked jurisdiction over the appeal. *See United States v. Stitt*, 459 F.3d 483 (4th Cir. 2006). In particular, the Circuit Court noted that under United States Supreme Court precedent, an order reversing a death in a § 2255 case sentence did not become final until resentencing had occurred. Additionally, the Circuit Court noted that it lacked jurisdiction over the district court's order denying the defendant relief as to his guilt phase claims, which also did not become final until resentencing. Accordingly, the Fourth Circuit vacated its previously issued decision, dismissed the appeal for lack of jurisdiction, and remanded the case for resentencing.

of that claim, the undersigned respectfully submit the affidavit of Dr. John F. Edens (Attachment D), a licensed forensic clinical psychologist with extensive forensic, clinical and research experience in the area of psychopathy and the PCL-R.[14] As Dr. Edens states, there is no scientific basis for the claim that a high PCL-R score is predictive of an individual's future dangerousness:

> [T]he PCL-R has not been demonstrated to be a valid and reliable indicator of increased violence risk for all people in all circumstances. As such, blanket statements that persons who are more psychopathic are 'more dangerous' than non-psychopathic offenders are significant oversimplifications of what is known about the relationship between psychopathy and violence across various contexts.
>
> I am aware of four published studies (two of which were co-authored by me) and one unpublished doctoral dissertation that specifically have examined the relationship between psychopathy scores and violent behavior in male U.S. prison inmates. Although these studies have found some significant correlations between PCL-R scores and various measures of institutional adjustment (e.g., non-compliance, hostility), not one has reported a statistically significant relationship between psychopathy and acts of physical violence. Moreover, it is important to note that one of these research projects (Walters, Duncan, & Geyer, 2003) specifically studied a large sample of prison inmates in the U.S. Federal Bureau of Prisons and failed to find a significant relationship between psychopathy and acts of physical aggression. Thus, the claim that a high PCL-R score indicates a high risk of future violence in a federal prison runs counter to existing evidence that does not support such an assertion. I do not believe that could ethically and responsibly make such an assertion in the face of the available research in this area.

(D2.)

---

[14] This affidavit was also submitted in the *Stitt* case. The statements made by Dr. Edens in this affidavit are not specific to the facts in *Stitt*, but rather address the PCL-R and its inapplicability to future dangerousness assessments in prison settings. Dr. Edens' affidavit provides a fair summary of the research regarding the PCL-R, and its uses and misuses in performing risk assessments.

"Psychopathology" testing has been thoroughly discredited. Indeed, as all the above-referenced research demonstrates, there is no valid reason for administering such a test to a prison inmate, and the undersigned therefore strongly object to the administration or use of such testing for any purpose in connection with the instant proceeding. It is precisely for this reason that, if the government is serious in its intention to direct its expert to pursue such testing, the undersigned must be afforded reasonable notice (at least 10 days) of such intention, as well as the opportunity to object and be heard by this Court to obtain an Order barring any such testing. Mr. Nelson should not be required to submit to testing that is patently unreliable and otherwise irrelevant to any of the issues before this Court as part of the § 2255 proceedings.

**B. The undersigned should be given 10 days' notice and the opportunity to object to any other testing the government is contemplating.**

As the foregoing discussion regarding "psychopathology" demonstrates, not all psychological testing is equal, and valid grounds exist to exclude certain kinds of testing from the instant proceeding. Indeed, the PCL-R is not the only instrument that is considered controversial or inappropriate within capital sentencing context. For this reason, it is respectfully submitted that the undersigned must receive the same such notice and opportunity to object to any other testing that the government is contemplating in order to ensure the reliability of any such testing.

Additionally, the undersigned must be given the opportunity to object to the relevancy of any testing which the government intends to pursue. The mere fact that Mr. Nelson intends

to introduce mental health mitigating evidence at the hearing does not give the government unfettered license to pursue any testing and examinations it wants. Indeed, given that the mental health examinations are governed by Rule 12.2, any testing or evidence which the government seeks to pursue must necessarily be limited to appropriate *rebuttal* evidence. *Taylor*, 320 F. Supp. 2d at 794; *Johnson*, 383 F. Supp. 2d at 1162-1164; *United States v. O'Reilly*, No. 05-80025, 2010 U.S. Dist. LEXIS 14621, *12 & *14 (E.D. Mich. Feb. 19, 2010) (holding that the "sole purpose of the Government's rebuttal examination(s) must be to confirm or rebut expert mental health testimony presented by [the defense]," and that "Government experts can only subject [the defendant] to examination or testing that was performed by defense experts"). Moreover, since the relevant *Strickland* prejudice inquiry that will be the focus of the evidentiary hearing will require the Court to assess prejudice in terms of the evidence that could have presented at the original sentencing hearing, the government's testing and presentation of evidence at the evidentiary hearing must be similarly limited in scope. As the extant law at the time of Mr. Nelson's trial demonstrates, the government's rebuttal presentation at trial would have been limited based on the scope of the mental health mitigating evidence introduced by the defense in its penalty phase case-in-chief. *See, e.g., United States v. Vest*, 905 F. Supp. 651 (W. D. Mo. 1995); *United States v. Haworth*, 942 F. Supp. 1406 (D. N.M. 1996); *United States v. Beckford*, 962 F. Supp. 748 (E.D. Va. 1997); *United States v. Edelin*, 134 F. Supp. 2d 45 (D. D.C. 2001); *United States v. Minerd*, 197 F. Supp. 2d 272 (W.D. Pa. 2002). For this very reason, the government's examination of Mr. Nelson, if permitted, should be similarly limited based on the scope of

the defense evaluation; any inquiries that go beyond the scope of the defense evaluation would not constitute proper rebuttal evidence, and therefore would not have been admitted at the penalty phase proceedings. As such, that evidence would be irrelevant to the *Strickland* prejudice inquiry, and therefore not germane to the § 2255 evidentiary hearing.

## Conclusion

For the reasons expressed above, Mr. Nelson respectfully requests that, in the event that Mr. Nelson is ordered to submit to a government mental health examination, the relief and procedures requested above, and in Movant's motion filed on April 9, 2010, should be granted, and that the government's objections to those requests should be denied. Additionally, as it is evident that there exists a dispute between the parties as to the procedures to be utilized in the event of a government mental health examination, Mr. Nelson respectfully requests a hearing to resolve the procedures that will be employed before any court-ordered examination takes place.

Respectfully submitted
Co-counsel to Movant

/s/ David A. Ruhnke
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
(973)744-1000
(973)746-1490 (fax)
davidruhnke@ruhnkeandbarrett.com

/s/ Gary E. Brotherton
Legal Writes, LLC
601 W. Nifong Blvd.
Building 1, Suite C
Columbia, MO 65202-3381
(573)875-1571
(573)875-1572 (fax)
gebrotherton@legalwrites.com

Filed via ECF: Kansas City, MO
May 7, 2010

CERTIFICATE OF SERVICE

This will certify that, on May 7, 2010, this reply was served upon the United States by filing via ECF.

/s/ David A. Ruhnke
DAVID A. RUHNKE

Dated: May 7, 2010