Affidavits Submitted in Support of
Motion in Limine to Exclude Expert Testimony
Regarding the PCL-R and HCR-20 Risk Assessment Instruments
and the Diagnosis of Psychopathy,
in *U.S. v. Willis Haynes*, May 24, 2000

ATTACHMENT A1

AFFIDAVIT OF STEPHEN D. HART

I, Dr. Stephen David Hart, do declare the following:

1. I am an Associate Professor of Psychology at Simon Fraser University in Burnaby, British Columbia, Canada, where I teach, conduct research, and supervise graduate students in the areas of clinical and forensic psychology, with a particular focus on the assessment of psychopathy and risk for violence.

2. I obtained a doctoral degree in clinical and forensic psychology from the University of British Columbia in Vancouver, British Columbia, Canada, a graduate training program accredited by the American and Canadian Psychological Associations, where my studies focused on the assessment of psychopathy and my clinical training included supervised practice in the assessment and treatment of violent offenders.

3. I have written more than 150 books, chapters, and peer-reviewed articles in the area of forensic psychology and, more specifically, assessment of psychopathy and violence risk; presented more than 150 papers at academic and professional meetings on the same topics; and have co-authored psychological test and assessment procedures for assessing psychopathy and violence risk.

4. I am professionally active in the field of forensic psychology being, *inter alia*, a member of the executive committee of the American Psychology-Law Society (Division 41 of the American Psychological Association); a member of the editorial boards of academic journals, including *Law and Human Behavior* and *Legal and Criminological Psychology*; and a reviewer of articles submitted to academic journals and applications for funding submitted to granting agencies in Canada and the United States.

5. I have conducted more than 100 training workshops for legal, law enforcement, correctional, and forensic mental health agencies in the United States (including the U.S. Federal Bureau of Prisons, the U.S. Army, and the U.S. Navy), Canada (including the Correctional Service of Canada and the Royal Canadian Mounted Police), and the United Kingdom (including Her Majesty's Prison Service and the Scottish Prison Service), as well as in Sweden, Norway, Germany, and New Zealand.

6. I have testified as an expert witness concerning the topic of forensic psychology and, specifically, assessment of violence risk before courts, hearings, and tribunals in the Canadian provinces of British Columbia, Alberta, Manitoba, and Ontario; in the states of Florida, Washington, and Wisconsin; and before the Canadian Parliament.

7. I worked with Prof. Robert Hare, first as a student and later as a colleague, on the development and validation of the Hare Psychopathy Checklist-Revised (PCL-R), a psychological test for the assessment of psychopathic personality disorder; and I have conducted numerous training workshops on the use of the PCL-R, often with Prof. Hare.

8. I worked with Prof. Christopher Webster, Dr. Derek Eaves, and Mr. Kevin Douglas on the development and validation of the HCR-20, a set of structured professional guidelines for the assessment of violence risk; and I have conducted numerous training workshops on the use of the HCR-20, often with Prof. Webster.

9. The PCL-R, when used for clinical purposes, is scored on the basis of a comprehensive review of case history information and an interview; in cases where an interview is not possible, the test manual allows that the PCL-R can be administered on the basis of case history information if that information is sufficiently detailed.

10. Research indicates that PCL-R Total scores are correlated with violence in various contexts; but to date there are no published, peer-reviewed studies examining the predictive validity of the PCL-R with respect to institutional violence in correctional offenders in the North America.

11. Research indicates that PCL-R Total scores are reliable when assessed in many populations; but to date only one published, peer-reviewed study has examined systematically the reliability of PCL-R scores in African-American correctional offenders in the United States. The results of that study were ambiguous, suggesting the need for further research on the reliability and applicability of the PCL-R in this context.

12. Research indicates that PCL-R Total scores are correlated violence when scored on the basis of case history information only; but the absence of an interview may negatively impact the reliability and predictive validity of PCL-R scores, particularly on items that rely heavily on behavioral observations of the offender and information concerning his future plans (i.e., Items 1, 2, 6, 7, 8, 13, and 16).

13. The HCR-20, when used for clinical purposes, is scored on the basis of a comprehensive review of case history information and an interview; in cases where an interview is not possible, the manual allows that the HCR-20 can be administered on the basis of case history information if that information is sufficiently detailed.

14. A limited body of scientific research indicates that HCR-20 ratings are correlated with violence in various contexts; but to date there are no published, peer-reviewed studies examining the predictive validity of HCR-20 ratings with respect to institutional violence in correctional offenders in the United States.

15. A limited body of scientific research indicates that HCR-20 ratings are reliable; but to date there are no published, peer-reviewed studies examining systematically the reliability of HCR-20 ratings in correctional offenders in the United States.

16. A limited body of scientific research indicates that HCR-20 ratings are reliable; but to date there are no published, peer-reviewed studies examining systematically the reliability of HCR-20 ratings in African-American individuals.

17. A limited body of scientific research indicates that HCR-20 ratings are correlated with violence when based on case history information only; but the absence of an interview may negatively impact the reliability and predictive validity of HCR-20 scores, particularly on items that rely heavily on behavioral observations of the offender and information concerning his future plans (i.e., Items C1 through C5 and R1 through R5).

18. It is my opinion, which I hold with a reasonable degree of scientific certainty, that there is no direct scientific evidence that the PCL-R and HCR-20 are predictive of institutional violence in correctional offenders in the United States; and that the PCL-R and HCR-20 are not generally accepted within the scientific community of clinical-forensic psychologists for the purpose of predicting institutional violence in correctional offenders in the United States.

I declare under penalty of perjury that the foregoing is true and correct.

Stephen D. Hart, Ph.D.
19 May 2000

**MCP Hahnemann University**

Operated by Drexel University

**Kirk Heilbrun, Ph.D.**
Professor and Acting Chair
**School of Health Professions**
**Department of Clinical and Health Psychology**
Mail Stop 626 • 245 N. 15th Street • Philadelphia, PA 19102-1192
**TEL** 215.762.3634 • **FAX** 215.762.8625 • **E-MAIL** kheilbrun@compuserve.com
**www.mcphu.edu**

Affidavit of Kirk Heilbrun

I, Kirk Heilbrun, state as follows:

1. I am currently Professor and Chair of the Department of Clinical and Health Psychology at MCP Hahnemann University. I am also Co-Director of the Law-Psychology Program, joint program in the Department of Clinical and Health Psychology at MCP Hahnemann and Villanova School of Law. I hold a Ph.D in Clinical Psychology from the University of Texas at Austin (1980), and completed a Postdoctoral Fellowship in Psychology and Law at Florida State University (1981-82). I am a Diplomate in Clinical Psychology and in Forensic Psychology, American Board of Professional Psychology.

2. I currently serve as a Violence Risk Assessment Consultant to the New Jersey Department of Human Services, Division of Mental Health Services and to the Pillsbury Corporation and the Giant Food Corporation as a Fitness for Duty Assessment consultant. I serve on the Advisory Board to the Forensic Psychology Program of the Federal Bureau of Investigation, and have previously served as a grant reviewer for the Office of Victims of Crimes for the United States Department of Justice. Between 1991 and 1993, I was the Clinical Director of Forensic Services for Central State Hospital in Florida, and prior to that was staff psychologist

and later Chief Psychologist in the Forensic Service, Florida State Hospital.

3. Since 1981, I have presented more than 80 lectures and workshops, primarily on risk assessment and risk management, to mental health and legal professionals. These have included invited lectures and presentations to the United States Department of Justice, the Federal Bureau of Prisons, the U.S. Medical Center for Federal Prisoners, the American Academy of Forensic Psychology, and the Forensic Services Unit of the Cook County Circuit Court. I have been the principal investigator or co-principal investigator on several grants to conduct research on risk assessment and criminal recidivism.

4. I have published extensively in the leading journals in my field on risk assessment and criminal behavior. These publications include more than 40 peer reviewed articles, five book chapters, and eight technical manuals. I am currently on the editorial boards of Law and Human Behavior, Journal of Threat Assessment, Criminal Justice and Behavior, Correctional Mental Health Report and the Journal of Behavioral Health Services and Research, and am an ad hoc reviewer for numerous additional journals.

5. Risk assessment and risk management have been a primary focus of my work since completion of my doctorate in 1980.

6. As a result of my extensive work in the field of risk assessment, I am familiar with the use of Psychopathy Checklist - Revised (PCL-R), having used it as a research instrument and in some applied clinical settings and forensic contexts with adults. I have administered the PCL-R and supervised its use in research. I am familiar with the published literature on the PCL-R and other risk assessment tools. Additionally, I have personal expertise in risk assessment and in the evaluation of reliability and validity as it relates to assessment instruments such as the PCL-R. I

believe that the PCL-R can be a useful too with which to assess the risk of future violent and nonviolent criminal behavior when used in the proper context and for the proper purposes.

7. Currently, insufficient research has been conducted to justify the use of the PCL-R for assessing future dangerousness or future risk for aggression amongst populations of criminal offenders during their incarceration. Because of the lack of scientific empirical research on the PCL-R for prediction of institutional violence, we do not know whether an individual's score on the instrument is related to the likelihood that this individual will commit acts of violence or aggression while in a secure prison environment. This is particularly true for prison settings that are the most structured and restrictive (the highest level of security). While it is certainly possible to conduct scientific studies to assess the validity of the PCL-R in predicting future violent behavior in such correctional settings, very few studies have addressed the institutional adjustment of *any* population (e.g., civil psychiatric, forensic psychiatric, jail, or prison) according to PCL-R score, let alone the specific population from the immediate case (death-sentenced or life-sentenced inmates) in the particular environment in which the defendant will be incarcerated (a maximum security prison). Until more relevant research has been completed and sufficient data are available in the published, peer reviewed literature to assess the instrument's predictive capacity in a prison setting, the PCL-R should not be used to judge an individual's risk of future violence in such a prison setting.

8. Although the predictive accuracy of the PCL-R has been studied in other settings, including psychiatric hospitals, that research does not provide an adequate basis on which to generalize the results to a different population, namely criminal offenders, in a different custodial setting. Those studies do not allow us to reach any conclusions about the predictive validity of

the PCL-R in the secure correctional institution setting because it is expected that a) civil and forensic psychiatric patients and convicted prisoners are dissimilar in significant ways, b) the treatment and psychiatric intervention needs of psychiatric patients are different than for prisoners, and c) the highly structured environment of prison is different in certain respects from even a structured forensic psychiatric hospital. Research based on psychiatric and community samples are substantially different from incarcerated samples, with whom little research has been focused on institutional adjustment. At this time, there is insufficient research to make generalizations from community behavior to prison behavior, and from psychiatric to life or death-sentenced correctional populations.

9. In any event, even the research conducted upon a secured psychiatric population suggests that the PCL-R may not be a strong predictor of institutional violence. I am the lead author on a study that examined how well the PCL-R predicted aggression in a mentally disordered offender population while in a forensic hospital (see, Kirk Heilbrun, Stephen Hart, Robert Hare, David Gustafson, Catherine Nunez and Adam White (1998) "Inpatient and postdischarge aggression in mentally disordered offenders" Journal of Interpersonal Violence 13(4) 514-27). We measured the PCL-R's predictive validity during the first two months and the last two months of secure forensic hospitalization. The PCL-R failed to predict aggressive behavior for the last two months of custody, as PCL-R scores were not significantly correlated with aggression during these final two months. The PCL-R had a statistically significant but modest-sized correlation with physical aggression during the first two months of custody. That correlation coefficient was .14, meaning that the PCL-R was accounting for approximately 2% of the variance in observed aggression. One conclusion of the study was that the PCL-R was not a

consistent predictor of institutional behavior, ranging from a modest association with aggression early in hospitalization to no association with aggression later in hospitalization. Any attempt to use the PCL-R to predict institutional aggression, therefore, would have resulted in a substantial rate of error. It should be added that none of the aggression observed in this study resulted in the death or serious injury of another individual.

10. While this study does not provide evidence about behavior in a prison setting, and should not be generalized to do so, it does provide some information concerning the overall predictive power of the PCL-R in a setting more similar to prison than in previous studies, which have followed individuals after they have been released into the community. Such research could be done, but has not, in a maximum security prison setting to determine the predictive validity of the PCL-R in relation to institutional violence by incarcerated life- or death-sentenced offenders. At this time, the PCL-R has not been tested and evaluated in this context.

11. There is also limited research at present using the PCL-R with African Americans or youth. Insufficient research has been performed to date to determine whether the meaning of PCL-R scores are comparable when the PCL is administered to African Americans.

12. Similarly, insufficient research has been done to determine whether the instrument is reliable and valid when used with a youthful or adolescent population. We do not currently know whether an adolescent who scores high on the PCL-R at the age 16 will persist in aggressive behavior beyond the late teens or early 20s. We do not yet have data to discriminate between "life course persistent" vs. "desistent" youth with respect to aggression; both may score high on the PCL when administered at the ages of 15 or 16, and the score may fail to discriminate between those who will persist and those who desist in aggression later in life. In

addition, not all adolescents achieve comparable levels of developmental maturity at a given chronological age. Influences such as child abuse and neglect, family dysfunction, cognitive deficits, learning problems, school problems, poverty, chronic exposure to violence, substance abuse, antisocial peers, and mental health problems can result in developmental delays, which could in turn mean that a particular adolescent was significantly less mature than comparably-aged peers. When an assessment instrument is applied with an individual at the very lower end of the technically-acceptable age range (e.g., 18 years old for the PCL-R), and such an individual has significant deficits in the areas described above, the instrument may yield results that are somewhat misleading if there is the assumption that a stable, adult "core personality structure" has been formed.

13. Absent such research, we cannot assume that the instrument possesses similar predictive validity when administered to African Americans or youths as it does with adult white males.

14. The PCL-R is a useful tool when used with a population and in a context in which it has been validated. Research conducted in non-prison settings cannot be generalized to the prison setting, and currently, there is insufficient scientific research to validly apply the PCL-R toward assessing future violence risk in a highly structured prison environment. Until sufficient research has been conducted with the PCL-R with this population and for this purpose, the scientifically sound conclusion is that it should not be used in this way.

15. The HCR-20, which is a risk assessment instrument that incorporates the PCL-R score as one of its items is a promising but new tool. Only in the past 1-2 years have studies begun to be published in the scientific literature. At this time, insufficient validation and

research has been completed on the HCR-20 to determine its predictive power. Use of the HCR-20 at present to predict violent behavior in a correctional setting would result in all the problems discussed in relation to the PCL-R (in the context of correctional populations and sentencing). As with the PCL-R, the HCR-20 should not presently be used to assessing future violence risk in a highly structured prison environment until that research has been conducted, peer reviewed, and published.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Kirk Heilbrun — 5-15-07

Kirk Heilbrun Date

Affidavit of Norman Poythress

I, Norman Poythress, state as follows:

1. I am currently a professor in the Department of Mental Health Law and Policy at the University of South Florida, where I teach forensic assessment (psychological evaluations for legal contexts) and conduct research on a variety of law-and-psychology issues.

2. I hold a Ph.D in clinical psychology from the University of Texas at Austin (1977) and am currently licensed to practice psychology in Florida. I have previously been licensed in Michigan and Alabama. I am a fellow of the American Psychological Association (APA) and past-president of the American Psychology-Law Society (Division 41 of APA).

3. I have published more than 50 book chapters and articles in peer-reviewed journals, most on psychology-and-law issues. I am a co-author of Psychological Evaluations for the Courts: A Handbook for Mental Health Professionals and Lawyers (1997), which is widely recognized as a leading resource on issues relating to psychological evaluations in the courts. I have served as faculty on risk assessment and risk management workshops for both clinical and legal (FBI, Secret Service) audiences and have served as a consultant to the Secret Service on issues related to risk management of persons who threaten government officials under their protection.

4. Prior to my academic career at the University of South Florida (1990-present) I worked as a forensic psychologist in maximum security forensic psychiatric hospitals (Center for

*Mental Health Law & Policy The Louis de la Parte Florida Mental Health Institute*
University of South Florida 13301 Bruce B. Downs Boulevard Tampa, Florida 33612-3807
(813) 974-4510 SunCom 574-4510 FAX (813) 974-9327 PDC/IJTA FAX (813) 974-4696



The University of South Florida is an Affirmative Action/Equal Access/Equal Opportunity Institution

Forensic Psychiatry, Ann Arbor, MI; Taylor Hardin Secure Medical Facility, Tuscaloosa, AL). In these settings my primary clinical duties were to conduct forensic psychological evaluations for the state courts on issues such as competence-to-proceed, insanity defense, and sentencing (including, in Alabama, capital sentencing). I have testified as an expert witness in state courts in Michigan, Florida, Alabama, and New Mexico, and before the House Armed Services Committee of the U.S. Congress regarding the U.S.S. Iowa incident.

5. Only very limited research is available that investigates the utility of the Psychopathy Checklist - Revised (PCL-R) in correctional settings for assessing the risk of violence posed by an individual while in custody. There is no such research available on individuals sentenced to life terms in maximum security prisons in the United States.

6. Error rates for the PCL-R, including false positive rates (the number of people who test high on the PCL-R and do nót act aggressively), have not been established for estimates of risk for institutional violence for prison inmates generally or for maximum security detainees in particular. In order to assess these error rates, prospective studies which followed people sentenced to sufficiently long terms in custody need to be conducted. As a result of the lack of research, the predictive validity of a high score on the PCL-R in this context is unknown.

7. In a study which I co-authored, we administered the PCL-R to a group of youthful offenders in Florida and retrospectively assessed in-custody aggressive behavior [John Edens, Norman Poythress and Scott Lilienfeld (1999) *Identifying Inmates at Risk for Disciplinary Infractions: A Comparison of Two Measures of Psychopathy*, Behavioral Sciences and the Law 17:435-43]. We found a relatively low statistical association between PCL-R scores and institutional violence during the first year of incarceration, and we concluded that the PCL-R has only limited utility for purposes of individual classification. As our study is one of the few to

assess in-custody behavior, albeit using a retrospective methodology, and given our findings, it is inappropriate to conclude that sufficient research has been conducted at this time to reliably assess future behavior of the incarcerated based on PCL-R scores.

8. I know of no empirical research (e.g., survey of practitioners) that has attempted to establish a consensus in the psychological community as to the reliability and validity of using the PCL-R in the context of determining future dangerousness in a maximum security prison. In my opinion, the conclusions reached by Cunningham and Reidy in their recent review article [Mark D. Cunningham and Thomas J. Reidy (1998), *Antisocial Personality Disorder and Psychopathy: Diagnostic Dilemmas in Classifying Patterns of Antisocial Behavior in Sentencing Evaluations*, Behavioral Sciences and the Law: 16, 333-351] fairly represent the state of the field:

> "In summary, there is limited research regarding the prison behavior of psychopaths and most of the existing research is flawed by definition problems, lack of independent external criteria, small samples, and low base rates. Although some promising trends are apparent, estimations of the institutional assaultive potential of psychopaths remain tentative, particularly as a few studies cite no differences according to psychopathy ratings. Until a better research base develops caution should be exercised in utilizing the PCL-R in forecasting the likelihood of future serious person violence" (p. 343).

I hereby declare under penalty of perjury that the foregoing is true and correct.

Norman Poythress — 6/23/00 Date

1. I, John F. Edens, Ph.D., am a licensed clinical psychologist in the state of Texas (license number 3-1105) and a faculty member in the Department of Psychology at Sam Houston State University (SHSU). I received my doctoral degree in clinical psychology from Texas A&M University in 1996, after which I completed a two-year post-doctoral fellowship in forensic psychology in the Department of Mental Health Law and Policy at the Louis de la Parte Florida Mental Health Institute at the University of South Florida. I have been a faculty member at SHSU since 1998.

I have conducted research on the area of risk assessment since 1997 and have published a professional manual, two book chapters, and eleven professional journal articles related to forensic assessment generally, and five articles specifically related to psychopathy.

I also occasionally conduct risk assessments on convicted sex offenders who are being evaluated for possible civil commitment in the state of Texas. These evaluations by statute require an assessment of psychopathy. When conducting these assessments I administer the Psychopathy Checklist-Revised (PCL-R).

2. I am familiar with the PCL-R, having used it in both clinical and research settings. Being familiar with the literature on it and having published original research related to its use, I believe it is an appropriate risk assessment instrument that can be helpful in making judgments regarding future violence in certain instances in which there is sufficient scientific support to justify its use.

3. At this time, however, there are relatively few studies examining the utility of the PCL-R in estimating the likelihood or risk for aggressive acts of incarcerated people. Those studies that have been conducted among inmates suggest an inconsistent association (e.g., some studies showing a weak to moderate relationship and others showing no significant relationship) between being identified as a "psychopath" (i.e., PCL-R score $\geq$ 30) and engaging in higher rates of various forms of prison violence. I am unaware of any published studies that have examined specifically the utility of the PCL-R to predict violence among inmates with life sentences who are kept in 23-hour per day lock-down facilities.

4. In my own study of a multi-cultural (54% African American, 32% Caucasian, 12% Hispanic) sample of 50 youthful offender prison inmates incarcerated in Florida (Edens, Poythress, & Lilienfeld, 1999), which is one of the few to use the PCL-R to assess in-custody infractions, my colleagues and I found a non-significant association between PCL-R scores and violent infractions during inmates' first year of incarceration. More specifically, we found that 5 of the 10 (50%) PCL-R-identified psychopaths committed some form of violent act that was judged by staff to warrant a disciplinary report. Of the 40 inmates whose PCL-R score was below 30 (i.e., "non-psychopaths"), 18 (45%) committed a violent infraction during this same time period. Notably, our study, as well as most others that have examined institutional misbehavior among psychopaths, was a postdictive (rather than predictive) design, in that we used PCL-R scores in an attempt to predict behavior that had already occurred rather than predict future behavior. Whether it would have performed similarly in terms of predicting inmates' subsequent violent acts is unknown.

5. In conclusion, I have significant concerns about the appropriateness of using the PCL-R to identify inmates who are highly likely to commit future acts of institutional violence, given the current scientific research base that exists to support the association between psychopathy and institutional aggression while incarcerated.

I declare under penalty of perjury that the foregoing is true and correct.

John F. Edens, Ph.D.

5/22/00
Date

## AFFIDAVIT OF DONALD N. BERSOFF

I, Donald N. Bersoff, Ph.D., J.D., state that:

1. I am a tenured full professor, Department of Clinical and Health Psychology, Medical College of Pennsylvania-Hahnemann University, and a tenured full professor, Villanova Law School. I have served in those capacities since January 1990.

2. As a faculty member in the above universities, I direct a J.D./Ph.D. Program in Law & Psychology jointly sponsored by both institutions.

3. I received a Ph.D. in School Psychology from New York University in 1965 and a J.D. from Yale Law School in 1976.

4. I have been a full member of the American Psychological Association (APA) since 1965 and was elected a fellow in 1974. I was granted Diplomate status from the American Board of Professional Psychology in 1974. Since 1997 I have presented annual workshops on the ethics of forensic testimony for the American Academy of Forensic Psychology. From 1980-1981 I served as president of the American Psychology-Law Society and am a Fellow of that group.

5. I have been a faculty member at several universities, including the University of Maryland School of Law, the Department of Psychology at the Johns Hopkins University, the University of Georgia, and the Ohio State University.

6. From 1979-1989 I served as general counsel to the APA during which time I attended every meeting of the APA Ethics Committee and conducted all appeal hearings from decisions of the

Ethics Committee. From 1991-1994 I served on the APA's legislative body, the Council of Representatives, which adopted the current APA Code of Conduct (Code of Ethics) in 1992. From 1994-1997 I served on APA's 11-member elected Board of Directors. Part of my role was as a member of the Board's ethics subcommittee, reviewing all decisions of the Ethics Committee that led to expulsion or a stipulated resignation of APA members. I currently serve again on the Council of Representatives (1999-2001) and served as chair of the APA's Policy and Planning Board (1999-2000).

7. I am the author of Ethical Conflicts in Psychology, originally published by APA in 1995, and subsequently published in a second edition in 1999. It is a textbook used by a number of graduate departments of psychology as the basic text for courses in ethics. In that book I devote an entire chapter to the standards and ethics of testifying as a psychological expert witness in legal proceedings.

8. In all, I have published four texts, 25 chapters in texts, 47 articles in peer-reviewed journals, and presented at least 150 papers at major scientific and professional meetings. A great many of those publications and presentations concern ethical, legal, and policy issues in psychology. Most particularly, I have written and presented on the use and misuse of social science evidence in the legal system. In March 2000, I served as chair of a symposium on the impact of Daubert v. Merrell Dow Pharmaceutical Co. on the admissibility of social science evidence and presented a paper on that topic at the biennial meeting of the American

Psychology-Law Society. In July 1997, at the invitation of the Federal Judicial Center, I gave an address at the National Workshop for Magistrate Judges on The Application of Daubert to Forensic and Social Science Evidence in Denver, Colorado. In March and April 1996 I presented papers on the admissibility of expert psychological testimony at the Sixth Annual National Symposium on Mental Health and the Law and at American Psychology-Law Society, respectively. I am currently drafting a law review article entitled, The Admissibility of Forensic and Social Science Evidence from Daubert to Kumho: A Quantitative and Qualitative Analysis. I have been selected to moderate an all-day session of a 3-day National Conference on Science and Law, co-sponsored by the National Institute of Justice, the Criminal Justice Section of the ABA, the American Academy of Forensic Sciences, the National Center for State Courts, the National District Attorneys Association and the National Science Foundation in collaboration with the National Academy of Sciences and the Federal Judicial Center. I was the counsel of record for a Group of American Law Professors, submitting an amicus curiae brief in the original Daubert case before the U.S. Supreme Court in 1993.

9. I have been retained, on a pro bono basis, by counsel for Defendant in the instant case for the purpose of advising this court regarding the validity of the conclusion drawn by Thomas V. Ryan, Ph.D. that the defendant "is at a relatively high risk for engaging in violence recidivism, even given the structure of incarceration in a federal maximum security penitentiary," based on

the Psychopathy Check List Revised (PCL-R) and the HCR-20. Ryan, Capital Sentencing Evaluation, May 12, 2000, at 7.

10. For the purposes of this affidavit, I have reviewed Dr. Ryan's Capital Sentencing Evaluation ("Evaluation") of the instant defendant, and the affidavits of Kirk Heilbrun, Ph.D., Stephen D. Hart, Ph.D., Norman Poythress, Ph.D., and John F. Edens, Ph.D. in this case.

11. Dr. Ryan's psychological evaluation of the defendant, a 22 year old African-American male, consisted solely of administration of the PCL-R, the HCR-20, and Dr. Ryan's assessment of a variety of historical and demographic factors deemed to be associated with violence recidivism. In arriving at his opinion, he also relied on materials supplied by county, state and federal agencies, including audio and videotapes. He never personally saw, interviewed, nor tested the defendant. Nevertheless, Dr. Ryan asserted "that the impact of not personally examining Mr. Haynes resulted in essentially no limitations regarding conclusions rendered." Evaluation at 2.

12. Dr. Ryan makes three other statements that are relevant herein. First, he concludes that the defendant exhibits psychopathic features and asserts, "There is a plethora of empirical studies which demonstrate that individuals with psychopathic personalities are at very high risk for violence recidivism, including those who are institutionalized." Evaluation at 6. Second, based on the HCR-20, Dr. Ryan concludes the defendant is "at the high range regarding final risk judgement."

Evaluation at 6. Finally, his ultimate conclusion is that the defendant "is at a relatively high risk for engaging in violence recidivism, even given the structure of incarceration in a federal maximum security penitentiary." Evaluation at 7.

13. Based on my knowledge of the American Psychological Association's Code of Ethics[1] ("Ethics Code"), the Specialty Guidelines for Forensic Psychologists[2] ("Specialty Guidelines"), the Heilbrun, Hart, Pothress, and Edens affidavits, and my research on the application of Daubert to forensic psychological testimony, it is my opinion, to a reasonable certainty, that the opinions of Dr. Ryan, quoted above, do not represent an appropriate application of generally accepted ethical principles to the issues presented and violate the generally accepted standards of forensic psychological practice.

14. One of the major purposes of the Ethics Code and the Specialty Guidelines is to safeguard against the misuse of science and to ensure that empirically-supported and generally accepted scientific conclusions are presented to the court. Forensic experts recognize that their credentials and testimony may have a profound impact on jury decisionmaking and, therefore, have a responsibility to confirm that their opinions are firmly grounded in science and that any inferences they draw from science are generally supported.

---

[1] APA, Ethical Principles of Psychologists and Code of Conduct, 47 **Amer. Psychologist** 1597 (1992).

[2] Committee on Ethical Guidelines for Forensic Psychologists, 15 **L. & Hum. Behav.** 655 (1991).

15. Dr. Ryan first states that a plethora of empirical studies demonstrates that institutionalized psychopaths are at a very high risk of recidivism for violent conduct. That statement is misleading because it implies that the studies referred to involved criminal offenders in correctional institutions. In fact, there are many kinds of institutionalized populations, including those with mental disabilities who are civilly committed and those who are in forensic criminal institutions. Based on the affidavits of Drs. Hart, Heilbrun, and Edens, there are no published, peer-reviewed studies examining the predictive validity of the PCL-R or the HCR-20 with respect to institutional violence in correctional offenders in the United States. See Hart Affidavit at paras. 10, 14, 20; Heilbrun Affidavit at paras. 7, 8, 9, 14, 15; Edens Affidavit at para. 4.

16. Second, Dr. Ryan fails to acknowledge the fact that the defendant is a young African-American adult. Both Drs. Hart and Heilbrun indicate that at most there is one study on the PCL-R and none on the HCR-20 evaluating the psychometric soundness (i.e., reliability) of these instruments with African-American correctional offenders, particularly youthful ones. See Hart Affidavit, paras. 11, 15, 16; Heilbrun Affidavit, paras. 11, 12, 13, 15. Dr. Ryan makes no mention of this fact and fails to acknowledge the resulting potential for inaccuracy in his conclusion.

17. Third, Dr. Ryan, based solely on a subjective impression, concluded that his opinions were in no essential way limited by the

fact that he did not personally examine the defendant. This opinion is at variance with that of Dr. Hart, one of the authors of the PCL-R, that "the absence of an interview may negatively impact the reliability and predictive validity of PCL-R scores," particularly on 7 of the 20 items that rely heavily on behavioral observations and the assessment of future plans. Hart Affidavit at para. 11. See also para. 17 (same conclusion regarding the HCR-20). It is also at variance with at least one study indicating that administration of the PCL-R based solely on file review, as here, results in higher psychopathy scores than when combined with a personal interview.[3] Dr. Ryan fails to acknowledge this source of inaccuracy as well.

18. Based on the evidence of Drs. Hart, Heilbrun, Poythress, and Edens that: (1) There is not a generally accepted set of published, peer-reviewed studies examining violent recidivism on the population of offenders represented by defendant (young African-American males incarcerated in secure correctional facilities); (2) there are no studies using the PCL-R or the HCR-20 that establish error rates for in-custody populations concerning predictions of violent recidivism; (3 ) the use of the PCL-R and the HCR-20 to predict institutional violence in correctional offenders in the United States is not generally accepted in the relevant scientific community; and given that many federal cases have rejected psychological evidence in situations where the tests

[3] R. C. Serin, Diagnosis of Psychopathy With and Without an Interview, 49 J. Clin. Psychology 367 (1993).

have not been validated for the specific purposes used in litigation, where there is insufficient published literature addressing the validity of the technique used in litigation, where there is the absence of a personal evaluation of the party by the expert, or, in the alternative, where the expert relied improperly on statements by the party calling the expert, it is my opinion that the evidence represented by Dr. Ryan's evaluation is inadmissible under Daubert.

19. Dr. Ryan's conclusions are not only inadmissible in my opinion under Daubert, but may also be at variance with accepted professional standards. The following provisions of the APA's Code of Ethics are relevant:

> Standard 1.06: Psychologists rely on scientifically and professionally derived knowledge when making scientific or professional judgments . . . .

> Standard 1.15: Because psychologists' scientific and professional judgments and actions may affect the lives of others, they are alert to and guard against personal, financial, social, organizational, or political factors that might lead to misuse of their influence.

> Standard 2.01(b): Psychologists' assessments, recommendations, reports, and psychological diagnostic or evaluative statements are based on information and techniques (including personal interviews of the individual when appropriate) sufficient to provide appropriate substantiation of their findings.

> Standard 2.02: (a) Psychologists who . . . administer, score, interpret, or use psychological assessment techniques . . . do so in a manner and for purposes that are appropriate in light of the research on or evidence of the usefulness and proper application of techniques.

> (b) Psychologists refrain from misuse of assessment techniques, interventions, results, and interpretations and take reasonable steps to prevent others from misusing the information these techniques provide.

> Standard 2.04: (a) Psychologists who . . . administer,

score, interpret, or use assessment techniques are familiar with the reliability, validation, and related standardization or outcome studies of, and proper application and the uses of the techniques they use.

(b) Psychologists recognize limits to the certainty with which diagnoses, judgments, or predictions can be made about individuals.

(c) Psychologists attempt to identify situations in which particular . . . assessment techniques or norms may not be applicable or may require adjustment in administration or interpretation because of factors such as individuals' . . . age, race, ethnicity . . . .

Standard 2.05: [P]sychologists . . . indicate any significant reservations they have about the accuracy of their interpretations.

Standard 3.03: Psychologists do not make public statements that are false, deceptive [or] misleading . . . .

Standard 7.01: Psychologists who perform forensic functions . . . base their forensic work in appropriate knowledge of and competence in the areas underlying such work, including specialized knowledge concerning special populations.

Standard 7.02: (a) Psychologists' forensic assessments, recommendations and reports are based on information and techniques (including personal interviews of the individual, when appropriate) sufficient to provide appropriate substantiation for their findings.

(b) Except as noted in (c) below, psychologists provide written or oral forensic reports or testimony of the psychological characteristics of an individual only after they have conducted an examination of the individual adequate to support their statements or conclusions.

(c) When, despite reasonable efforts, such an examination is not feasible, psychologists clarify the impact of their limited information on the reliability and validity of their reports and testimony, and they appropriately limit the nature and extent of their conclusions or recommendations.

Standard 7.04(b): Whenever necessary to avoid misleading, psychologists acknowledge the limits of their data or conclusions.

20. Similarly, Dr. Ryan's report may be at variance with relevant provisions of the Specialty Guidelines:

Guideline VI(A): Because of their special status as persons qualified as experts to the court, forensic psychologists have an obligation to maintain current knowledge of scientific, professional, and legal developments within their area of claimed competence.

Guideline VI(H): Forensic psychologists avoid giving written or oral evidence about the psychological characteristics of particular individuals when they have not had an opportunity to conduct an examination of the individual adequate to the scope of the statement, opinion, or conclusions to be issued. Forensic psychologists make every reasonable effort to conduct such examinations. When it is not possible or feasible to do so, they make clear the impact of such limitations on the reliability and validity of their professional products, evidence, or testimony.

Guideline VII(A): Forensic psychologists make reasonable efforts to ensure that the products of their services, as well as their own public statements and professional testimony, are communicated in ways that will . . . avoid deception.

Guideline VII(B): Forensic psychologists realize that their public role as "expert to the court" or as "expert representing the profession" confers upon them a special reponsibility for fairness and accuracy in their public statements.

Guideline VII(D): Forensic psychologists do not, by either commission or omission, participate in a misrepresentation of their evidence . . . .

21. Only the APA ethics committee can judge whether an APA member has violated the APA's code of ethics. However, it is my opinion, to a reasonable certainty, that in rendering the conclusion that the defendant is a "relatively high risk for engaging in violence recidivism," given the dearth of data generally accepted in the relevant psychological community to support his opinion, his improper generalization of the test scores to the defendant, his failure to appropriately address the lessened accuracy of his findings as a result of the absence of a personal interview, and his misleading use of extant studies, Dr. Ryan acted below the professional standards of those holding themselves out as

forensic psychologists.

I declare under the penalty of perjury that the foregoing is true and correct.

Donald N. Bersoff, Ph.D., J.D.
May 24, 2000