IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| KEITH D. NELSON, | : | |
| Movant, | : | |
| vs. | : | 4:04-CV-8005 (FJG) |
| | : | 99-cr-00303-W (FJG) |
| UNITED STATES OF AMERICA, | : | |
| Respondent. | : | |

MOTION OBJECTING TO PERSONALITY TESTING BY
GOVERNMENT MENTAL HEALTH EXPERT

COMES NOW Keith D. Nelson, by his attorneys, Paula Harms, David A. Ruhnke and Gary E. Brotherton, and pursuant to Fed. R. Crim. Pro. 12.2, moves for an order prohibiting the government's mental health expert from subjecting Mr. Nelson to personality testing as part of its rebuttal examination. As is explained in more detail below, under Rule12.2 and relevant caselaw, the sole purpose of the government's rebuttal examination must be to confirm or rebut the expert mental health testimony to be presented by the defense experts. Since none of the defense experts administered any personality testing, and since no testimony based on personality testing will be offered by the defense at the hearing, it would be improper for the government's expert to administer personality tests as part of its evaluation, since such testing would go beyond the scope of proper rebuttal under Rule 12.2. In support of the motion, Movant states as follows:

## I. Background and Procedural History

On April 7, 2010, undersigned counsel provided notice to the government, pursuant to Fed. R. Crim. Pro. 12.2, that "at the hearing to be conducted in this matter, expert evidence will be offered relating to a mental disease or defect, or any other mental condition, bearing on the issue of punishment." *See* Doc. #133 at 1. Thereafter, defense counsel promptly provided the government with the preliminary mental health report of Xavier Amador, Ph.D., and the reports of Natalie Novick Brown, Ph.D., Michael M. Gelbort, Ph.D., and Daniel V. Foster, Psy.D.[1] Only one of the defense experts, Dr. Gelbort, administered any tests to Mr. Nelson. As is explained in more detail below, the tests utilized by Dr Gelbort consisted of a comprehensive neuropsychological battery to assess Mr. Nelson's cognitive functioning, intelligence, academic achievement, learning and memory, lateral brain dominance, and sensory perceptions.[2] Neither Dr. Gelbort nor any defense expert administered any personality testing instruments as part of their evaluation of Mr. Nelson.

Following briefing by the parties regarding the scope of the government's rebuttal mental examination of Mr. Nelson, this Court issued an Order on May 18,

---

[1] The government, in fact, had been in possession of the Gelbort, Brown and Logan reports for several years.

[2] Specifically, Dr. Gelbort administered the following tests: (1) Wechsler Adult Intelligence Scale-III; (2) Wechsler Memory Scale-III; (3) Trail-making Test; (4) Category Test; (5) Lateral Dominance Exam; (6) Strength of Grip; (7) partial Sensory Exam; (8) Wide Range Achievement Test-III; (9) Aphasia Screening; (10) Items from Luria Nebraska; (11) Diagnostic Interview with Mental Status Testing.

2010, delineating the procedures to be followed by the government's expert. That Order states in pertinent part:

> [T]he Government's mental health expert witness shall provide Nelson's counsel a list of which tests he would like to perform, five days in advance of when the tests will be administered. If Nelson's counsel object to any of the tests, the parties must first attempt to resolve the objection themselves. If no agreement can be reached, Nelson shall file his objection with the Court before the end of three business days after receiving notice of the tests from the Government. The Court will then make a prompt determination whether the test(s) will be allowed to be administered to Nelson.

Order at 6.

In August of this year, the government and the defense agreed that the government's expert, Daniel A. Martell, would perform his evaluation of Mr. Nelson at USP-Terre Haute on September 9 and 10, 2010.

On Friday afternoon, September 3, 2010, the government provided to the undersigned, via e-mail, notice of the tests that Dr. Martell intended to administer. Those are as follows:

1. Structured Neuropsychological Interview
2. Wechsler Adult Intelligence Scale
3. Wechsler Memory Scale
4. Lateral Dominance Exam
5. Strength of Grip
6. Sensory Perceptual Exam
7. Aphasia Screening Test
8. U. Penn Smell Identification Test
9. Stroop Test
10. Trails A&B
11. Wisconsin Card Sort
12. Validity Indicator Profile
13. Test Of Memory Malingering
14. Minnesota Multiphasic Personality Inventory-II ("MMPI-II")
15. Personality Assessment Inventory ("PAI")

16. Detailed Assessment of Posttraumatic Stress
17. Boston Naming Test
18. F-A-S/Animal Naming
19. California Verbal Learning Test-2
20. Dissociative Experiences Scale
21. Frontal Systems Behavior Scale

On Sunday morning, September 5, 2010, undersigned counsel contacted the government via e-mail to notify it that of the 21 proposed tests, the defense objected to only two: the Minnesota Multiphasic Personality Inventory-II ("MMPI-II"), and the Personality Assessment Inventory ("PAI"). Unlike the other 19 tests, the MMPI-II and the PAI are personality tests. As the undersigned explained, under Rule12.2 and extant caselaw, the sole purpose of the government's rebuttal examination must be to confirm or rebut the expert mental health testimony to be presented by the defense experts. Since none of the defense experts administered any personality testing, and since no testimony based on personality testing would be offered by the defense at the hearing, it would be improper for the government expert to administer the MMPI-II and the PAI as part of its evaluation, since such testing would go beyond the scope of proper rebuttal under Rule 12.2.

At 2:55 PM (eastern) on Tuesday, September 7, 2010, the government indicated to the undersigned via e-mail that it would not voluntarily withdraw the MMPI-II and PAI from the list of testing to be performed by Dr. Martell. Since no agreement could be reached by the parties, the undersigned submits the following objection to the government's use of personality testing as part of its examination

of Mr. Nelson.

## II. Under Rule 12.2 and Relevant Caselaw, the Government's Rebuttal Examination Must Be Limited to Parallel Testing of the Tests Conducted by the Defense Experts.

As the parties and the Court have already agreed, the mental health procedures in Mr. Nelson's § 2255 proceedings are governed by Rule 12.2 of the Federal Rules of Criminal Procedure. Under that Rule, any testing or evidence which the government seeks to pursue must necessarily be limited to appropriate *rebuttal* evidence. That is, the mere fact that Mr. Nelson intends to introduce mental health mitigating evidence at the hearing does not give the government unfettered license to pursue any testing; the government's rebuttal testing must be limited to parallel testing of the types of tests conducted by the defense experts.

For example, in *United States v. Taylor*, 320 F.Supp.2d 790 (N.D. Ind. 2004), the defense filed notice pursuant to Rule 12.2 of its intent to introduce expert mental health evidence regarding the defendant's "developmental history and mental condition regarding substance abuse." 320 F.Supp.2d at 791. In response, the government notified the defense that it intended to administer a number of personality testing instruments, including the Multiphasic Personality Inventory ("MMPI"), the Personality Assessment Inventory ("PAI"), the Millon Clinical Multiaxial Inventory ("MCMI"), and the Interview Schedule for Psychopathy Checklist Revised ("PCL-R"). The defense objected, arguing that the PCL-R had been discredited and that the personality testing instruments proposed by the government exceeded the limited notice provided by the defense.

Following a hearing on the matter, the district court sustained the defendant's objections. It agreed that the government would not be allowed to "use the limited notice" provide by the defense "as an open door for any type of mental testing" and held that the government must be limited to "parallel testing of substance abuse." *Id.* at 794. The court, accordingly, restricted the government's testing to instruments containing test scales for substance abuse and barred the government from introducing any materials outside of the mental health testing "as it relates to substance abuse." *Id.*

In *United States v. O'Reilly*, No. 05-80025, 2010 U.S. Dist. LEXIS 14621 (E.D. Mich. February 19, 2010), the district court issued a detailed pre-trial ruling in a federal capital case regarding the mental health examination procedures to be followed pursuant to Rule 12.2. It noted that the "*sole purpose* of the Government's rebuttal examination(s) must be to confirm or rebut the expert mental health testimony presented by [the defense]." 2010 U.S. Dist. LEXIS 14621 at *12 (emphasis added). Citing to Rule 12.2(c)(4), the court further stated that "[n]o statement that [the defendant] made in the course of rebuttal examination(s), no testimony by the expert(s) based on the statement, and no other fruits of the statement, can be introduced or used by the Government for any purpose, except to rebut expert mental health testimony [the defendant] offers during the penalty phase on the issue of his mental condition." *Id.* Consequently, the district court ordered that the government's experts could "not administer more than one test to measure the same mental function" and, moreover, that the

government's experts could "only subject [the defendant] to examination or testing that was performed by defense experts." *Id.* at 14.

In *United States v. Williams*, No. 06-00079 DAE-KSC, 2010 U.S. Dist. LEXIS 84359 (D. Hawaii August 16, 2010), the defense issued a notice pursuant to Rule 12.2 that it intended to introduce expert testimony and evidence relating to a mental defect and condition, specifically borderline intellectual functioning ("BIF") and brain damage. The defense thereafter filed an objection to the scope of the psychological testing of the government's experts, arguing that the government's testing, which sought to determine whether there was "any possible alternative diagnosis for explaining why Defendant allegedly committed the acts as charged," 2010 U.S. Dist. LEXIS 84359 at *12, was broader than necessary to rebut the defense's mental health evidence. After a hearing, the court ruled that "the government's experts are limited to rebutting Defendant's mental status evidence, not ascertaining another possible motive for Defendant's actions." *Id.* (footnote omitted). The court noted that "[t]he Government points to no case law holding that a defendant's decision to raise a mental status defense opens the door to allow the prosecution to assert diagnoses or defects other than to rebut those specifically placed at issue by the defendant." *Id.* As the court further explained, to permit the government's experts to except the scope of permissible rebuttal testing would violate the defendant's Fifth Amendment rights:

> To allow the Government experts to go beyond rebutting Defendant's expert testimony that he has BIF and affirmatively assert that Defendant suffers from psychosis or Anti-Social

> Personality Disorder and that either of those conditions actually caused him to commit the alleged acts, is tantamount to using Defendant's own statements, for which he has not waived his Fifth Amendment rights, against him in a criminal proceeding. The Government may rebut Defendant's mental status defense, not prosecute based upon Defendant's mental health. Accordingly, the Court finds that *the Government's rebuttal expert testimony must be limited in scope to that which directly rebuts* Defendant's assertion of BIF and which is based upon expert examinations *that parallel the exploration of the examinations conducted by defense experts.*

*Id.* at 21-22 (emphasis added) (footnote omitted).

In *United States v. Johnson*, 383 F.Supp.2d. 1145 (D. Iowa 2005), following the court's granting of the government's motion for a rebuttal mental health examination under Rule 12.2, the defense notified the government that the defendant would assert the Fifth Amendment as to any questions concerning the charged crimes. Defense counsel had directed their experts not to question defendant about the charged crime or her mental state at that time, and argued that the mental health presentation at sentencing would be limited to the defendant's past and present mental state, without reference to her mental state at the time of the crimes. *Id.* at 1149, 1164. The district court upheld the defendant's assertion of her privilege against self-incrimination. It held that the defendant's Fifth Amendment waiver is limited: "[T]he waiver is only to the extent necessary to allow the government the opportunity for adequate rebuttal." *Id.* at 1160, 1162. Accordingly, the court concluded that the government's expert would not be permitted to interview the defendant concerning the charged crimes to the extent that the defendant could demonstrate that such questions would not be necessary

to rebut the defendant's mental condition mitigating evidence. *Id.* at 1162, 1164. Given the defense representations on the limits of their experts' examinations and the limited mitigation circumstances the defense contended it would introduce, the district court agreed that questions about the offense were not necessary for rebuttal and would not be permitted.

As the foregoing cases demonstrate, under Rule 12.2, the government rebuttal examination and presentation must be limited in scope based on the expert mental health evidence that the defense intends to introduce. *See also United States v. Vest*, 905 F. Supp. 651 (W. D. Mo. 1995); *United States v. Haworth*, 942 F. Supp. 1406 (D. N.M. 1996); *United States v. Beckford*, 962 F. Supp. 748 (E.D. Va. 1997); *United States v. Edelin*, 134 F. Supp. 2d 45 (D. D.C. 2001); *United States v. Minerd*, 197 F. Supp. 2d 272 (W.D. Pa. 2002).[3] Accordingly, the government must not be allowed "to use the opportunity to examine [the defendant] as a fishing expedition for any other mental defect," *Williams*, *supra*, at *14, and therefore the government's rebuttal testing must be limited to parallel testing of the tests conducted by the defense experts.

[3] It should be noted that the decisions in *Vest*, *Haworth*, *Beckford*, *Edelin* and *Minerd* all pre-date the amendments to Rule 12.2 that went into effect in December 2002, and that created greater protections than before for the Fifth Amendment rights of defendants.

## III. The Scope of the Government's Proposed Psychological Testing is Broader than Necessary to Rebut the Defense Mental Health Evidence, Therefore the Government's Expert Should Be Prohibited From Using the MMPI-II and PAI Because These Constitute Personality Tests and Do Not Parallel the Examinations Conducted by the Defense Experts.

As the government is aware, having been provided with the defense experts' reports, the only defense expert who administered any psychological tests to Mr. Nelson was Dr. Gelbort. The tests which Dr. Gelbort administered were part of a comprehensive neuropsychological battery that assessed Mr. Nelson's intelligence and cognitive functioning. The tests which he administered are as follows:

> **(1) Wechsler Adult Intelligence Scale-III ("WAIS-III")**: The WAIS-III is used to assess adult intelligence and measure an individual's intelligence quotient ("I.Q."). It is not a personality testing instrument.
>
> **(2) Wechlser Memory Scale-III**: This is a neuropsychological test designed to measure different memory functions in a person. The test is sensitive to memory impairments associated with a variety of clinical conditions including dementia, neurological and neuropsychiatric conditions. It is not a personality testing instrument.
>
> **(3) Trail-making Test**: This is one of the sub-tests of the Halsted-Reitan Neuropsychological Test Battery, which is used to evaluate brain and nervous system functioning in individuals aged 15 years or older. The Trail-making test is a neuropsychological test of visual attention and task switching. The task requires a subject to 'connect-the-dots' of 25 consecutive targets on a sheet of paper or computer screen. The goal is to finish the test as quickly as possible, and the time taken to complete the test is used as the primary performance metric. The test was initially used for assessing general intelligence, but has since become a common diagnostic tool in clinical settings as well, as poor performance is known to be associated with many types of brain impairment; in particular frontal lobe lesions. It is not a personality testing instrument.
>
> **(4) Category Test**: This is also one of the sub-tests of the Halsted-Reitan Neuropsychological Test Battery. In the Category Test, a total of 208 pictures consisting of geometric figures are presented. For each picture,

individuals are asked to decide whether they are reminded of the number 1, 2, 3, or 4. They press a key that corresponds to their number of choice. If they chose correctly, a chime sounds. If they chose incorrectly, a buzzer sounds. The pictures are presented in seven subtests. The key to this test is that one principle, or common characteristic, underlies each subtest. The numbers 1, 2, 3, and 4 represent the possible principles. If individuals are able to recognize the correct principle in one picture, they will respond correctly for the remaining pictures in that subtest. The next subtest may have the same or a different underlying principle, and individuals must again try to determine that principle using the feedback of the chime and buzzer. The last subtest contains two underlying principles. The Category Test is considered the battery's most effective test for detecting brain damage, but does not help determine where the problem is occurring in the brain. The test evaluates abstraction ability, or the ability to draw specific conclusions from general information. It is not a personality testing instrument.

**(5) Lateral Dominance Exam**: This test consists of a series of performances used to determine an individual's preference for using (1) the right or left hand on a unimanual task, and (2) the right or left foot on a unipedal task. It is not a personality testing instrument.

**(6) Strength of Grip**: This test compare the grips of the left and right hands. It is a test of motor function, but also provides information about brain system functioning. It is not a personality testing instrument.

**(7) Sensory Exam**: This test assesses the adequacy of perception of auditory, visual, and tactile (touch) stimuli. It is significant as the effect of inadequate perception can mimic higher level impairment and result in misinterpretation and misunderstanding of the subject's functioning. It is not a personality testing instrument.

**(8) Wide Range Achievement Test-III ("WRAT-III")**: The WRAT-III is an achievement test that measures an individual's ability to read words, comprehend sentences, spell, and compute solutions to math problems. It is not a personality testing instrument.

**(9) Aphasia Screening**: Aphasia is an acquired language disorder in which there is an impairment of any language modality. This may include difficulty in producing or comprehending spoken or written language. This instrument assesses for language dysfunction, including aural/oral and written language receptive and expressive (basic) abilities. It is not a personality testing instrument.

**(10) Items from the Luria Nebraska**: This is s a standardized test battery used in the screening and evaluation of neuropsychologically impaired individuals. The battery is used by clinicians as a screening tool to determine whether a significant brain injury is present or to learn more about known brain injuries. It is also used to determine what the patient is or is not able to do with regard to neuropsychological functioning. It is not a personality testing instrument.

**(11) Diagnostic Interview with Mental Status Testing**: This is simply a clinical interview and a history as related by the subject. It is not a personality testing instrument.

As Dr. Gelbort indicates in his report, the purpose of the neuropsychological tests that he administered were to assess Mr. Nelson's intelligence, academic achievement, cognitive functioning, learning and memory, motor functioning and other brain dysfunction and impairments. None of the tests administered were used to assess Mr. Nelson's personality, and neither Dr. Gelbort nor any of the other defense experts will testify regarding personality assessments of Mr. Nelson.

It should be noted that Dr. Gelbort's report, as well as the other defense experts' reports, have already been provided to the government. In other words, the Rule 12.2 notice that the government received was not simply a broad description of the kind of mental health evidence that the undersigned intend to present at the evidentiary hearing; rather, the undersigned provided the government with the actual expert reports detailing the specific mental health evidence about which the defense experts will testify at the hearing. Moreover, the government has been in possession of these reports for months (and in some cases years) prior to its own rebuttal examination of Mr. Nelson. In other words,

the government has known for some time now that no personality testing instruments were administered to Mr. Nelson by the defense experts, nor would the subject of any such personality instruments be introduced by the undersigned at the evidentiary hearing.

Despite this fact, the government has provided notice to the defense that its expert, Dr. Martell, intends to administer personality tests – specifically, the MMPI-II and the PAI – during its examination of Mr. Nelson. Unlike the other nineteen (19) tests that Dr. Martell plans to administer, and to which the undersigned do not object, the MMPI-II and PAI are not neuropsychological tests, but rather personality testing instruments, or "multi-scale inventories." The MMPI-II consists of 567 true-false questions. The PAI consist of 344 questions, but individuals are allowed four gradations of response ("false," "slightly true," "mainly true," and "very true").[4] They do not test for intelligence, academic

---

[4] The sheer length of time it takes to administer the MMPI-II and PAI is also a concern here. Both of these tests are composed of hundreds of questions that the examinee must read and respond to individually. The MMPI-II's 567-question exam "is not timed and can take anywhere from one to three hours to complete." *About Psychological Tests – Minnesota Multiphasic Personality Inventory (MMPI-2)* (<http://www.oregoncounseling.org/Test/AboutTests.htm>) (last visited on September 6, 2010.) The PAI's 344-question exam is also not timed and "requires 50-60 minutes to administer." Morey, Leslie C., *Personality Assessment Inventory – Description*, (<http://www.sigmaassessmentsystems.com/assessments/pai.asp>) (last visited on September 6, 2010). In other words, these two tests could potentially require fours to complete, assuming normal reading comprehension abilities. To the extent that the government requests that this Court simply defer any decision regarding the propriety of using these tests until the time of the hearing – that is, allow Dr. Martell to administer the tests, but rule on the admissibility of evidence based on this testing at a later time – the undersigned strenuously object. It is respectfully

achievement, cognitive functioning, learning and memory, motor functioning, or other brain dysfunction and impairments. Instead, such tests are used to assess an individual's personality traits.[5]

---

submitted that Mr. Nelson should not be subjected to an additional four hours of testing that is not directed at any of the anticipated defense mental health evidence. Such a procedure would be unduly burdensome on Mr. Nelson, especially considering that he has already agreed to be administered nineteen (19) other tests as part of Dr. Martell's evaluation over the course of two full days (8 AM to 3 PM), with only limited breaks for lunch and to use the restroom. Moreover, waiting to rule on the propriety of the MMPI-II and PAI until after they have been administered creates potential Sixth Amendment problems because the undersigned needs to be able to advise his client appropriately with respect to these testing instruments – i.e., in order for the right to counsel to be meaningful, the undersigned must know which tests will be administered and to what end those tests can be employed so that he can advise his client accordingly. *See, e.g.*, *Estelle v. Smith*, 451 U.S. 454, 470-71 (1980); *Powell v. Texas*, 492 U.S. 680 (1989). Additionally, as is explained *infra*, the very administration of tests which are beyond the scope of the testing conducted by the defense expert, Dr. Gelbort, raises serious concerns of a Fifth Amendment violation which cannot be remedied after the fact. For the foregoing reasons, it is respectfully submitted that this Court should not defer a ruling on the use of the MMPI-II and PAI, and should prohibit the administration of these tests at the outset.

[5] Such multi-scale inventories are sometimes referred to as "objective tests." However, as one prominent psychologist has explained:

> The term "objective tests" is a misnomer that may create a false impression among mental health professionals. Although the *scoring* is objective, the *interpretation* is not. In practice, clinicians generally select specific interpretations from a panoply of already published possible interpretations, such as those found in the MMPI-2 handbook or a computerized report.

Rogers, R., *Forensic Use and Abuse of Psychological Tests: Mutliscale Inventories*, 9(4) JOURNAL OF PSYCHIATRIC PRACTICE 316 (July 2003). As the author went on to note, settling on an interpretation of the scores yielded on a personality test can give rise to "cherry-picking":

> How does the clinician select the "correct" interpretation of a test

Indeed, the testing that the government wants to perform is not a "test" in the same sense as the neuropsychological testing that Dr. Gelbort performed, which measures aspects of the subject's cognitive functioning and brain impairments. Rather, the administration of the MMPI-II and PAI is more akin to an interrogation, in which the defendant is subjected to a combined total of almost 1,000 questions which he must answer, and then face the prospect of having his answers to those questions used against him in court.[6] That is, the testing that the

---

> when faced with dozens – sometimes hundreds – of possibilities? Clinicians with sophisticated knowledge of the test validation may be able to select those interpretations that are best validated. A common error for most clinicians, however, is selecting the interpretation that "best fits" the individual patient. This process of "taking the best and leaving behind the rest" is known as *cherry-picking*. It is a dangerous enterprise that involves self-selecting confirming interpretations and discarding interpretations that do not fit one's own clinical view. *Cherry-picking constitutes an extreme form of confirmatory bias and should not be used in clinical or forensic practice.*

*Id.* at 317 (emphasis in original).

[6] *Cf. United States v. Byers*, 740 F.2d 1104, 1151 (D.C. Cir. 1984) (*en banc*) (Bazelon, J., dissenting) ("The compelled psychiatric examination significantly intrudes into the 'private enclave' of the human personality. The very goal of the examination is to discover and to analyze the intricacies of the individual's thought processes. The psychiatrist seeks to uncover aspects of the personality which the individual ordinarily does not reveal to others and which he may not consciously perceive. The information elicited – thoughts, dreams, fantasies, anxieties – is often that which the conscious mind tries to repress. The articulation of these previously hidden thoughts may be profoundly threatening to the individual. Far more than the police interrogation, which seeks objective facts of a crime, the psychiatric examination probes the core of the 'inviolable[le] . . . human personality.'") (footnotes omitted).

government requests to conduct is uniquely testimonial in nature;[7] the subject is not asked to perform a timed task in order to assess the subject's cognitive skills and deficits, but rather is required to provide "true or false" responses to questions similar to the following: "I wake up with a headache almost every day"; "I certainly feel worthless sometimes"; "I have had peculiar and disturbing experiences that most other people have not had"; "I would like to do the work of a choir director"; "If I could sneak into the county fair or an amusement park without paying, I would." *See* MINNESOTA MULTIPHASIC PERSONALITY INVENTORY – DESCRIPTION (<http://www.minddisorders.com/Kau-Nu/Minnesota-Multiphasic-Personality-Inventory.html>) (last visited September 7, 2010). In other words, the defense expert has asked Mr. Nelson one set of "questions," and the government wants to not only get its own answers to that same set of questions (by re-administering the same or similar battery of neuropsychological tests), but also wants to ask Mr. Nelson an entirely different and unrelated set of questions, and use those answers against him.[8]

---

[7] *See Estelle v. Smith*, 451 U.S. 454, 464-66 (1981) (substantive statements made during course of psychiatric interview are testimonial and implicate Fifth Amendment privilege).

[8] Indeed, a review of the ten clinical scales on which the MMPI-II rates subjects demonstrates just how far afield this test goes:

> Scale 1 (a.k.a. the Hypochondriasis Scale): Measures a person's perception and preoccupation with their health and health issues.
> Scale 2 (a.k.a. the Depression Scale): Measures a person's depressive symptoms level.
> Scale 3 (a.k.a. the Hysteria Scale): Measures the emotionality of a person.

The proposed personality testing by Dr. Martell is clearly beyond the scope of any testing administered by Dr. Gelbort, and therefore does not constitute proper rebuttal examination under Rule 12.2. As previously noted, the relevant caselaw establishes that the government's rebuttal examination and expert testimony "must be limited in scope to that which directly rebuts [the defense mental health evidence] and which is based upon expert examinations that parallel the exploration of the examinations conducted by defense experts." *Williams*, 2010 U.S. Dist. LEXIS 84359 at * 21-*22. The MMPI-II and PAI clearly do not "parallel the exploration of the examinations conducted by defense experts," and therefore Dr. Martell should be prohibited from subjecting Mr. Nelson to such testing.

The government indicated to the undersigned that Dr. Martell wishes to administer the MMPI-II and PAI in order to assess whether Mr. Nelson suffers from post-traumatic stress disorder ("PTSD") and other psychotic disorders. However, Dr. Martell has already included other testing instruments in his

---

Scale 4 (a.k.a. the Psychopathic Deviate Scale): Measures a person's need for control or their rebellion against control.
Scale 5 (a.k.a. the Femininity/Masculinity Scale): Measures how a person compares to a gender stereotype.
Scale 6 (a.k.a. the Paranoia Scale): Measures a person's inability to trust.
Scale 7 (a.k.a. the Psychasthenia Scale): Measures a person's anxiety levels and tendencies.
Scale 8 (a.k.a. the Schizophrenia Scale): Measures a person's unusual/odd cognitive, perceptual, and emotional experiences.
Scale 9 (a.k.a. the Mania Scale): Measures a person's energy.
Scale 0 (a.k.a. the Social Introversion Scale): Measures whether people enjoy and are comfortable being around other people.

proposed battery that will allow for such assessment:[9] (1) the Detailed Assessment of Posttraumatic Stress (104-item, detailed, and comprehensive clinical measure of trauma exposure and post-traumatic stress in individuals ages 18 years and older who have a history of exposure to one or more potentially traumatic events); (2) the Dissociative Experiences Scale (28-item questionnaire designed to identify subjects with dissociative psychopathology and to provide a means of quantifying dissociative experiences, and which taps a broad range of dissociative experiences including disturbances in memory, identity, and cognition, and feelings of derealization, depersonalization, absorption, and imaginative involvement); and (3) the Structured Neuropsychological Interview (collects a subject's history and evidence of current functioning from the following seven broad areas: identifying information/biographic information, referral information/chief complaint, medical history, history of psychiatric/psychological evaluation and/or treatment, personal and social history, psychiatric and neurologic family history, and birth and development). The use of the MMPI-II and PAI is therefore unnecessary to preserve the government's opportunity to conduct a rebuttal examination.

---

[9] Indeed, the MMPI-II and PAI are not diagnostic measures of mental disorders, nor do they formally evaluate the DSM-IV inclusion and exclusion criteria for psychiatric diagnoses. *See* Rogers, R., *Forensic Use and Abuse of Psychological Tests: Multiscale Inventories*, 9(4) JOURNAL OF PSYCHIATRIC PRACTICE 316, 319 (July 2003).

## IV. The Use of Personality Testing Would Violate Mr. Nelson's Fifth Amendment Right Against Compelled Self-Incrimination.

When a defendant waives his Fifth Amendment right against self-incrimination by voluntarily providing testimony in his own defense, he does so only on the matters raised by his own testimony on direct examination. *Brown v. United States*, 356 U.S. 148, 154-155, 78 S. Ct. 622, 2 L. Ed. 2d 589 (1958) ("[T]he breadth of his waiver is determined by the scope of relevant cross-examination."); *see also id.* at 155 (a defendant "determines the area of disclosure and therefore of inquiry"). In *Powell v. Texas*, 492 U.S. 680 (1989), the United States Supreme Court applied this principle in the context of a capital defendant's introduction of psychiatric evidence on the issue of sanity. There it held that the introduction of such evidence did not open the door to the admission of psychiatric evidence on future dangerousness at the penalty phase. *Powell*, 492 U.S. at 685 n.3. Similarly, in *Buchanan v. Kentucky*, 483 U.S. 402 (1987), the Court demonstrated application of a limited waiver when it stated that there is no constitutional violation when the prosecution offers examination evidence for a "limited rebuttal purpose." *Buchanan*, 483 U.S. at 424, 422-23.

Here, Mr. Nelson has arguably engaged in a limited waiver of his Fifth Amendment rights by giving notice that he intends to introduce mental health evidence in his defense at the upcoming evidentiary hearing.[10] However, although

[10] The relevant caselaw is somewhat ambiguous as to whether this actually constitutes a waiver. *See, e.g.*, *Estelle v. Smith*, 451 U.S. 454, 471 n.16 (1980) (no waiver found); *United States v. Byers*, 740 F.2d 1104, 1113 (D.C. Cir. 1984) (*en*

that requires Mr. Nelson to submit to a government psychiatric examination, it does not mean that the government is allowed, through its expert, to exceed the scope of that limited waiver. Rather, the government is only allowed to compel Mr. Nelson to submit to the examination to the extent necessary for it to fulfill its designated "limited rebuttal purpose." To allow the government's expert to exceed the scope of the defense examination and conduct testing that goes beyond rebutting the defense expert testimony and evidence would be "tantamount to using Defendant's own statements, for which he has not waived his Fifth Amendment rights, against him in a criminal proceeding." *Williams*, *supra*, at 21. *See also Johnson*, 383 F. Supp. 2d at 1162 (questions that exceed the scope of what is necessary for the government's experts to rebut the defendant's mental

---

*banc*) (Scalia, J.) ("It seems to us at best a fiction to say that when the defendant introduces his expert's testimony he 'waives' his Fifth Amendment rights. What occurs is surely no waiver in the ordinary sense of a known and voluntary relinquishment, but rather merely the product of the court's decree that the act entails a consequence – a decree that remains to be justified. Even if the average defendant pleading insanity were aware of this judicially prescribed consequence (an awareness that the doctrine of waiver would normally require), his acceptance of it could hardly be called unconstrained. And although the Constitution does not forbid every government-imposed choice in the criminal process that has the effect of discouraging the exercise of constitutional rights, it is doubtful whether such a 'waiver' could meet the high standard required for a voluntary, free and unconstrained relinquishment of the Fifth Amendment privilege. . . . Defendants in appellants position make no representations or promises, either express or implied in fact. And we think the proper scope of any implied-in-law promise would be that they would not object to the Government's use of the "physical evidence" theory *for the same purpose* of overcoming the hearsay rule.") (internal quotation marks and citations omitted) (emphasis in original). Without conceding that such notice and introduction of expert testimony actually constitutes a waiver of the Fifth Amendment privilege, the relevant caselaw appears to establish that, at most, it is a *limited* waiver.

condition evidence would exceed the scope of the defendant's limited waiver of her Fifth Amendment right against self incrimination); *Centeno v. Superior Court*, 117 Cal. App. 4th 30, 40-44 (2004) (holding that a defendant who tenders his mental condition as an issue waives his Fifth Amendment right against self-incrimination only to the extent necessary to permit a proper examination of that condition, "[o]therwise there is a danger that defendants will be improperly subjected to mental examinations beyond the scope of the precise issue they have tendered and their resulting waiver of constitutional rights").

For the foregoing reasons, the government should not be allowed to compel Mr. Nelson to be examined using the MMPI-II and PAI. As demonstrated above, such personality testing exceeds the scope of proper rebuttal examination under Rule 12.2 and extant case law. Therefore, subjecting Mr. Nelson to such testing would violate the limited waiver of his Fifth Amendment rights and result in an impermissible constitutional violation.[11]

---

[11] Indeed, this concern with safeguarding against a potential Fifth Amendment violation is codified in Rule 12.2 itself, which states in part:

> No statement made by a defendant in the course of any examination conducted under this rule (whether conducted with or without the defendant's consent), no testimony by the expert based on the statement, and no other fruits of the statement may be admitted into evidence against the defendant in any criminal proceeding except on an issue regarding mental condition on which the defendant:
> . . .
> (B) has introduced expert evidence in a capital sentencing proceeding requiring notice under Rule 12.2(b)(2).

Fed. R. Crim. Pro. 12.2(c)(4).

V. **In Addition To Being Inadmissible Under Rule 12.2, the MMPI-II and PAI Should Not Be Administered Because They are Unreliable Testing Instruments In This Setting.**

In addition to the arguments above, the MMPI-II and PAI should not be used in this case for any purpose because they are unreliable testing instruments in this setting. With respect to the MMPI-II, the authors of the MMPI-II manual indicate that the usefulness of the information obtained by personality tests such as the MMPI-II "depends heavily on the ability of the test subject to understand the test instructions, to comply with the requirements of the task, to comprehend and interpret the content of the items as they relate to him or her, and to record these self-attributions in a reliable way", and that

> A number of physical conditions or emotional states may impair this ability. It is vital that the test administrator be alert to the presence of one or more incapacitating conditions, such as: limited visual acuity, *dyslexia* or receptive aphasia, *learning disorder*, drug or alcohol intoxication or withdrawal states, toxic reactions to various infectious agents or other organic deliria, disorientation arising from brain injury or concussion, post-seizure confusion in an epileptic disorder, *residual neurological impairment.*

Hathaway, S., & Mc-Kinley, J.C., MINNESOTA MULTIPHASIC PERSONALITY INVENTORY (MMPI-II) (1989), Columbus, OH: Merill/Prentice Hall, pp. 13–14. (Emphasis added).

Since Dr. Gelbort's report itself indicates that Mr. Nelson is dyslexic, was in special education while in school, and has indications of frontal lobe disturbance/dysfunction (Gelbort Report, p. 1, 4), it is clear that Mr. Nelson suffers from "one or more incapacitating conditions" as outlined in the manual,

and therefore it is inappropriate to subject him to the MMPI-II or to draw any conclusion of malingering based thereon.

Second, the authors of the MMPI-II user's manual state that ''[a]n eighth grade elementary-school level of reading comprehension is required, as is a satisfactory degree of cooperation and commitment to the task of completing the inventory.'' Hathaway, S., & McKinley, J. C., supra, at 1, 13-14. See also, Roger Greene, Forensic Applications of the Minnesota Multiphase Personality Inventory-2, in Goldstein, FORENSIC PSYCHOLOGY: EMERGING TOPICS AND EXPANDING ROLES (2007), p. 73 ("The MMPI-2 can be administered to examinees 18 years of age and older who can read English at the sixth-to eighth-grade level.") There are similar literacy and cooperation requirements for the PAI. As noted in Goldstein and Weiner, FORENSIC PSYCHOLOGY (2003), p. 93, "[a]dministration (especially self-administration) of self-report measures requires substantially intact literacy or intellectual ability on the part of the respondent. Self-report measures vary according to recommended minimum level of reading ability (e.g., fourth grade for the PAI, eighth grade for the MMPI-2) and to the degree of sustained attention (e.g., . . . 567 items on the MMPI-2) necessary to complete them." See also Rogers, R., Forensic Use and Abuse of Psychological Tests: Multiscale Inventories, 9(4) JOURNAL OF PSYCHIATRIC PRACTICE 316, 317 (July 2003) ("The essential prerequisite for multiscale inventories is that patients have adequate reading comprehension. Many patients are embarrassed to admit their limited literacy and may guess at the meaning of difficult words.

Psychiatrists and other mental health professionals should not rely on years of completed education as a guide for reading grade level. Forensic research suggests an average disparity of approximately 4 years between school attainment and reading comprehension.").

The undersigned have concerns as to whether Mr. Nelson has the requisite reading comprehension level to take the MMPI-II. Dr. Gelbort did not formally test Mr. Nelson's reading comprehension level,[12] but based on other aspects of Mr. Nelson's educational history, there is reason to doubt that his reading comprehension level is at the eighth grade level. For example, Mr. Nelson is dyslexic, flunked the fifth grade twice, and has been in special education classes for a significant portion of his schooling. According to testing by Dr. Gelbort, his spelling is at the sixth grade level, which puts that skill at the cusp between functional and dysfunctional for an adult. Without any formal data to support the claim that Mr. Nelson has reading comprehension skills at the eighth grade level, the use of the MMPI-II would not be appropriate.

Additionally, the undersigned object on *Daubert* grounds to use of the MMPI-II. As explained in Roger Greene, *Forensic Applications of the Minnesota*

[12] Although Dr. Gelbort indicated in his report that Mr. Nelson can "sight read" at the tenth grade level, it is counsel's understanding that sight reading is not the same thing as reading comprehension. Sight reading merely involves the ability to memorize a word by adopting strategies of seeking out salient visual features from a word; it is not the same as using phonetics to read a word, or otherwise learning how to decode a word. Furthermore, counsel inquired of Dr. Gelbort today whether he formally tested Mr. Nelson for reading comprehension, and he indicated to the undersigned that he did not.

*Multiphase Personality Inventory-2*, in Goldstein, FORENSIC PSYCHOLOGY: EMERGING TOPICS AND EXPANDING ROLES (2007), p. 75:

> At its most basic level, interpretation of the MMPI-2 is largely based on the inference that an examinee who produces a T score in a specific range on a certain scale will have similar behavioral correlates as the clinical patients in the external correlates research who produced similar scores. However, the forensic psychologist must realize that there were few, if any, forensically involved examinees in these studies of clinical patients. In addition, there are few studies directly demonstrating that despite any context effects of taking the MMPI-2 in a forensic setting and forensic purpose, the behavioral correlates are maintained.
>
> …
>
> Scores on the MMPI-2 scales are heavily influenced by whether the examinee is willing to report problematic behaviors and symptoms of psychopathology and the ability of the K-correction process to correct for these potential distortions in the willingness or unwillingness to report. The few studies in clinical settings have suggested that the K-correction process does correct for these potential distortions in willingness to report problematic behaviors and symptoms of psychopathology... There is no research that demonstrates the effectiveness of the K-correction process in any forensic setting, so the forensic psychologist needs to be very cautious when making any interpretation of the K scale without consideration of the demands of the forensic setting.

Indeed, in *Usher v. Lakewood Engineering & Mfg. Co.*, 158 F.R.D. 411, 413 (N.D. Ill., 1994), the trial court denied defendant's request to conduct an MMPI on plaintiff because of the "inadequacy of the correlation factors and the validity factors" of the MMPI. *See also State v. Cavaliere*, 663 A.2d 96 (N.H. 1995) (refusing to allow MMPI-II results to be used for profiling sex abusers). Similarly, researchers have questioned the forensic use of the MMPI-II because of problems of validity and reliability when used in forensic settings; numerous questions have been raised in the scholarly literature about scoring procedures,

computerized scoring and interpretive cookbooks that are often used to analyze the MMPI-II. *See* Senior, G., & Douglas, L., *Misconceptions and misuse of the MMPI-2 in assessing personal injury claimants*, 16 NEUROREHABILITATION 203; Allard, G., & Faust, D., *Errors in scoring objective personality tests*, 7(2) ASSESSMENT 119 (2000). Based on the concerns expressed here, the government should not be allowed to administer the MMPI-II for the same reasons.[13]

Finally, the undersigned object to the use of, or reliance upon, the MMPI-II or PAI for any evidence or testimony regarding so-called antisocial personality disorder. As explained by Dr. Richard Rogers,

> Multiscale inventories are something like utility players in baseball. They perform well for a variety of purposes but do not excel at any highly specialized task. Psychiatrists are therefore likely to value multiscale inventories for the general clinical information they provide; however, clinicians should not try to make direct linkages between test interpretations and specific diagnoses or legal capacities. For example, each of the three multiscale inventories discussed here [the MMPI-II, PAI, and MCMI] has individual scales

[13] Moreover, from the government's e-mail regarding the tests that Dr. Martell plans to administer, it is unclear what Scales of the MMPI Dr. Martell intends to rely upon. This is problematic because in addition to the clinical scales, there are also dozens of content scales that exist, and not all of them have been justified for use in a clinical or forensic setting. As one prominent psychologist discussing these scales has explained, "forensic psychologists must realize that a specific scale as scored on the Caldwell Report or the Pearson Assessment Extended Score Report does not guarantee that it will meet the admissibility standards for trustworthy evidence. Most of the Harris-Lingoes subscales, the Overcontrolled-Hostility (O-H) Scale and the Ego Strength (Es) scale, to provide a few examples, are generally lacking in adequate empirical data to justify their use in forensic or clinical settings." Roger Greene, *Forensic Applications of the Minnesota Multiphase Personality Inventory-2*, in Goldstein, FORENSIC PSYCHOLOGY: EMERGING TOPICS AND EXPANDING ROLES (2007), p. 76-77. The undersigned object to the use of these specific scales and any others that are lacking in adequate empirical data to justify their use in forensic or clinical settings.

> designed to discover and assess antisocial features. Should elevations on these scales— even marked ones—be seen as evidence of antisocial personality disorder?
>
> The answer is *definitely not.* Although they measure antisocial characteristics, these scales are not effective in establishing a DSM-IV diagnosis of antisocial personality disorder. Moreover, these scales on the different tests are not highly correlated with each other, which indicates that they are measuring different facets of antisocial, asocial, and delinquent characteristics. Like the metaphor of the utility player, multiscale inventories can provide general information about antisocial characteristics but are ineffective at furnishing detailed data regarding diagnosis or risk management.

Rogers, R., *Forensic Use and Abuse of Psychological Tests: Multiscale Inventories*, 9(4) JOURNAL OF PSYCHIATRIC PRACTICE 316, 319-20 (July 2003) (emphasis in original).

## Conclusion

For the foregoing reasons, the Movant objects to the government's use of the MMPI-II and PAI and respectfully requests an Order from this Court prohibiting the government's expert from administering these two personality tests to Mr. Nelson.

Respectfully submitted,

/s/ David A. Ruhnke
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
(973)744-1000
(973)746-1490
davidruhnke@ruhnkeandbarrett.com

/s/ Gary E. Brotherton
Legal Writes, LLC
601 W. Nifong Blvd.
Building 1, Suite C
Columbia, MO 65202-3381
(573)875-1571
(573)875-1572 (fax)
gebrotherton@legalwritesllc.com

/s/Paula K. Harms
Jon M. Sands
Federal Public Defender
Paula K. Harms
Capital Habeas Unit
850 W. Adams Suite 201
Phoenix, AZ 85007
paula_harms@fd.org

Filed via ECF: Kansas City, Missouri
September 8, 2010

**CERTIFICATE OF SERVICE**

This will certify that, on September 8, 2010, this notice was served upon the United States by filing via ECF.

/s/ Gary E. Brotherton
Gary E. Brotherton

Dated: September 8, 2010