IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

KEITH D. NELSON, )
Movant, ) Case No.
vs. ) 04-8005-CV-W-FJG
UNITED STATES OF AMERICA, ) Pages 1-273
Respondent. )

TRIAL TRANSCRIPT - VOLUME I OF IV

On April, 14, 15, 16, and 17, 2014, the above-entitled cause came on before the Honorable Fernando J. Gaitan, Jr., United States District Judge, sitting in Kansas City, Missouri.

APPEARANCES

For the Movant:

MR. DAVID A. RUHNKE
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042

MS. PAULA K. HARMS
Federal Public Defender
850 West Adams, Suite 201
Phoenix, Arizona 85007

MR. GARY E. BROTHERTON
Legal Writes, LLC
503 E. Nifong Blvd., #377
Columbia, Missouri 64201

For the Respondent:

MR. DAVID M. KETCHMARK
MR. JEFFREY E. VALENTI
United States Attorney's Office
400 East 9th Street, Ste. 5510
Kansas City, Missouri 64106

# I N D E X

MONDAY, APRIL 14, 2014
VOLUME I OF IV


| | Page |
|---|---|
| SUSAN HUNT | |
| Direct Examination by Mr. Ruhnke | 16 |
| Cross-examination by Mr. Ketchmark | 82 |
| Redirect Examination by Mr. Ruhnke | 111 |
| JENNIFER HERNDON | |
| Direct Examination by Mr. Ruhnke | 114 |
| Cross-examination by Mr. Ketchmark | 128 |
| BILL SHULL | |
| Direct Examination by Mr. Ruhnke | 144 |
| Cross-examination by Mr. Ketchmark | 167 |
| Redirect Examination by Mr. Ruhnke | 172 |
| PATRICK JOSEPH BERRIGAN | |
| Direct Examination by Mr. Ruhnke | 173 |
| Cross-examination by Mr. Ketchmark | 245 |
| Redirect Examination by Mr. Ruhnke | 266 |


TUESDAY, APRIL 15, 2014
VOLUME II OF IV


| | Page |
|---|---|
| RUSSELL STETLER | |
| Direct Examination by Mr. Ruhnke | 276 |
| Cross-examination by Mr. Valenti | 315 |
| Redirect Examination by Mr. Ruhnke | 329 |
| Recross-examination by Mr. Valenti | 334 |

# I N D E X

TUESDAY, APRIL 15, 2014
VOLUME II OF IV


| | | Page |
|---|---|---|
| JILL MILLER | | |
| | Direct Examination by Mr. Ruhnke | 335 |
| | Cross-examination by Mr. Valenti | 374 |
| | Redirect Examination by Mr. Ruhnke | 383 |
| MICHAEL GELBORT, Ph.D. | | |
| | Direct Examination by Mr. Ruhnke | 385 |
| | Cross-examination by Mr. Valenti | 403 |
| | Redirect Examination by Mr. Ruhnke | 412 |
| | Recross-examination by Mr. Valenti | 414 |
| XAVIER AMADOR | | |
| | Direct Examination by Mr. Ruhnke | 415 |
| | Cross-examination by Mr. Valenti | 445 |
| | Redirect Examination by Mr. Ruhnke | 464 |


WEDNESDAY, APRIL 16, 2014
VOLUME III OF IV


| | | Page |
|---|---|---|
| TENA FRANCIS | | |
| | Direct Examination by Mr. Ruhnke | 471 |
| | Cross-examination by Mr. Ketchmark | 495 |
| | Redirect Examination by Mr. Ruhnke | 510 |
| CAROLYN S. CRAWFORD, MD | | |
| | Direct Examination by Ms. Harms | 514 |
| | Cross-examination by Mr. Valenti | 526 |
| LESLIE LEBOWITZ, Ph.D. | | |
| | Direct Examination by Ms. Harms | 527 |

## I N D E X

WEDNESDAY, APRIL 16, 2014
VOLUME III OF IV


| | Page |
|---|---|
| RUBEN GUR, Ph.D. | |
| Direct Examination by Ms. Harms | 551 |
| Cross-examination by Mr. Valenti | 588 |
| Redirect Examination by Ms. Harms | 601 |
| LARRY PACE | |
| Direct Examination by Mr. Ketchmark | 603 |
| Cross-examination by Mr. Ruhnke | 618 |
| Redirect Examination by Mr. Ketchmark | 627 |


THURSDAY, APRIL 17, 2014
VOLUME IV of IV


| | |
|---|---|
| DAN MARTELL, Ph.D. | |
| Direct Examination by Mr. Valenti | 631 |
| Cross-examination by Mr. Ruhnke | 651 |
| Reporter's Certificate | 686 |

## INDEX OF EXHIBITS


| Exhibit No. | Description | Admitted by Stipulation |
|---|---|---|
| Movant's 1 | Docket Sheet | 18 |
| Movant's 2 | Briefing | 18 |
| Movant's 3 | Opinion | 18 |
| Movant's 4 | Billing Records | 18 |
| Movant's 5 | Billing Records | 18 |
| Movant's 5A | Billing Records | 18 |
| Movant's 6 | Notes | 18 |
| Movant's 7 | Curriculum Vitae | 18 |
| Movant's 8 | Foster Report | 18 |
| Movant's 9 | Documents | 18 |
| Movant's 9A | Binder | 18 |
| Movant's 10 | Notes | 18 |
| Movant's 11 | Billing Records | 18 |
| Movant's 12 | Juvenile Records | 18 |
| Movant's 13 | No Document | 18 |
| Movant's 13A | School Records | 18 |
| Movant's 13B | School Records | 18 |
| Movant's 14 | Correctional Records | 18 |
| Movant's 15 | Declaration | 18 |
| Movant's 16 | Declaration | 18 |
| Movant's 17 | Billing Records | 18 |
| Movant's 17A | Billing Records | 18 |
| Movant's 17B | Calendar | 18 |
| Movant's 17C | Calendar | 18 |

INDEX OF EXHIBITS

| Exhibit No. | Description | Admitted by Stipulation |
| --- | --- | --- |
| Movant's 18 | Notes | 18 |
| Movant's 19 | Testimony | 18 |
| Movant's 20 | Memo | 18 |
| Movant's 21 | Ninemire Materials | 18 |
| Movant's 22 | Trial File | 18 |
| Movant's 23 | Billing Records | 18 |
| Movant's 24 | File | 18 |
| Movant's 25 | Notes | 18 |
| Movant's 26 | Docket Sheet | 18 |
| Movant's 27 | Pleadings | 18 |
| Movant's 28 | Pleadings | 18 |
| Movant's 29 | Transcripts | 18 |
| Movant's 30 | Transcripts | 18 |
| Movant's 31 | Billing Records | 18 |
| Movant's 31A | Billing Records | 18 |
| Movant's 32 | No Document | 18 |
| Movant's 33 | Billing Records | 18 |
| Movant's 34 | Billing Records | 18 |
| Movant's 35 | Billing Records | 18 |
| Movant's 36 | Billing Records | 18 |
| Movant's 36A | Billing Records | 18 |
| Movant's 37 | Curriculum Vitae | 18 |
| Movant's 38 | Report | 18 |

INDEX OF EXHIBITS


| Exhibit No. | Description | Admitted by Stipulation |
|---|---|---|
| Movant's 38A | Report | 18 |
| Movant's 39 | Excerpt | 18 |
| Movant's 40 | Excerpts | 18 |
| Movant's 41 | Earnings Statement | 18 |
| Movant's 41A | Report | 18 |
| Movant's 42 | Declaration | 18 |
| Movant's 43 | Declaration | 18 |
| Movant's 44 | Curriculum Vitae | 18 |
| Movant's 45 | Report | 18 |
| Movant's 46 | Hospital Records | 18 |
| Movant's 47 | Medical Records | 18 |
| Movant's 48 | Report | 18 |
| Movant's 49 | Curriculum Vitae | 18 |
| Movant's 50 | Billing Records | 18 |
| Movant's 50A | Billing Records | 18 |
| Movant's 51 | Presentation | 18 |
| Movant's 52 | Curriculum Vitae | 18 |
| Movant's 53 | Report | 18 |
| Movant's 54 | Report | 18 |
| Movant's 55 | Curriculum Vitae | 18 |
| Movant's 56 | PET Report | 18 |
| Movant's 57 | MRI Report | 18 |
| Movant's 58 | Report | 18 |

INDEX OF EXHIBITS

| Exhibit No. | Description | Admitted by Stipulation |
|---|---|---|
| Movant's 59 | Report | 18 |
| Movant's 60 | Curriculum Vitae | 18 |
| Movant's 61 | Report | 18 |
| Movant's 62 | Report | 18 |
| Movant's 63 | Report | 18 |
| Movant's 64 | Report | 18 |
| Movant's 65 | Report | 18 |
| Movant's 66 | Curriculum Vitae | 18 |
| Movant's 67 | Report | 18 |
| Movant's 68 | Curriculum Vitae | 18 |
| Movant's 69 | Report | 18 |
| Movant's 69A | Report | 18 |
| Movant's 69B | Table | 18 |
| Movant's 70 | Records | 18 |
| Movant's 71 | Records | 18 |
| Movant's 72 | Records | 18 |
| Movant's 73 | Records | 18 |
| Movant's 74 | Records | 18 |
| Movant's 75 | Records | 18 |
| Movant's 76 | Photos | 18 |
| Movant's 77 | Records | 18 |
| Movant's 78 | Records | 18 |
| Movant's 79 | Chronology | 18 |

INDEX OF EXHIBITS

| Exhibit No. | Description | Admitted by Stipulation |
|---|---|---|
| Movant's 80 | Billing Summary | 18 |
| Movant's 81 | Presentation | 18 |
| Movant's 82 | Spencer Report | 18 |
| Movant's 83 | Spencer Report Update | 18 |
| Government's 1 | Motion | 18 |
| Government's 2 | Motion | 18 |
| Government's 3 | Order | 18 |
| Government's 4 | Order | 18 |
| Government's 5 | Motion | 18 |
| Government's 6 | Motion | 18 |
| Government's 7 | Order | 18 |
| Government's 8 | Motion | 18 |
| Government's 9 | Letter | 18 |
| Government's 10 | List | 18 |
| Government's 11 | Motion | 18 |
| Government's 12 | Order | 18 |
| Government's 13 | Motion | 18 |
| Government's 14 | Information | 18 |
| Government's 15 | Letter | 18 |
| Government's 16 | Motion | 18 |
| Government's 17 | Motion | 18 |
| Government's 18 | Order | 18 |
| Government's 19 | Motion | 18 |

INDEX OF EXHIBITS


| Exhibit No. | Description | Admitted by Stipulation |
|---|---|---|
| Government's 20 | Order | 18 |
| Government's 21 | Travel Document | 18 |
| Government's 22 | Fax | 18 |
| Government's 23 | Fax | 18 |
| Government's 24 | Oral Motion | 18 |
| Government's 25 | No Document | 18 |
| Government's 26 | Meeting Notes | 18 |
| Government's 27 | Motion | 18 |
| Government's 28 | Order | 18 |
| Government's 29 | Order | 18 |
| Government's 30 | Meetings | 18 |
| Government's 31 | Notes | 18 |
| Government's 32 | Order | 18 |
| Government's 33 | Report | 18 |
| Government's 33A | Report | 18 |
| Government's 34 | Report | 18 |
| Government's 34A | Report | 18 |
| Government's 34B | Report | 18 |
| Government's 34C | Letter | 18 |
| Government's 35 | Motion | 18 |
| Government's 36 | Extension Request | 18 |
| Government's 37 | 2nd Extension | 18 |
| Government's 38 | Phone Conference | 18 |

INDEX OF EXHIBITS

| Exhibit No. | Description | Admitted by Stipulation |
|---|---|---|
| Government's 39 | Fax | 18 |
| Government's 40 | Phone Conference | 18 |
| Government's 41 | Response | 18 |
| Government's 42 | Letter | 18 |
| Government's 43 | Notes | 18 |
| Government's 44 | Hearing | 18 |
| Government's 45 | Response | 18 |
| Government's 46 | Letter | 18 |
| Government's 47 | Response | 18 |
| Government's 48 | Order | 18 |
| Government's 49 | Travel Information | 18 |
| Government's 50 | Travel Information | 18 |
| Government's 51 | Extension Request | 18 |
| Government's 52 | Letter | 18 |
| Government's 53 | Travel Information | 18 |
| Government's 54 | Notice of Intent | 18 |
| Government's 55 | Motion | 18 |
| Government's 56 | Motion | 18 |
| Government's 57 | No Document | 18 |
| Government's 58 | Appeal | 18 |
| Government's 59 | Report | 18 |
| Government's 60 | Order | 18 |
| Government's 61 | Disclosure | 18 |

## INDEX OF EXHIBITS

| Exhibit No. | Description | Admitted by Stipulation |
|---|---|---|
| Government's 62 | Order | 18 |
| Government's 62A | Copy of 62 | 18 |
| Government's 63 | Notes | 18 |
| Government's 64 | Hearing | 18 |
| Government's 64A | Copy of 64 | 18 |
| Government's 64B | Form | 18 |
| Government's 65 | Response | 18 |
| Government's 66 | Conference | 18 |
| Government's 67 | Plea | 18 |
| Government's 68 | Order | 18 |
| Government's 69 | Fax | 18 |
| Government's 70 | No Document | 18 |
| Government's 71 | Motion | 18 |
| Government's 72 | No Document | 18 |
| Government's 73 | Memo | 18 |
| Government's 74 | Transcript | 18 |
| Government's 75 | Email | 18 |
| Government's 76 | Motion | 18 |
| Government's 77 | Motion | 18 |
| Government's 78 | Transcript | 18 |
| Government's 79 | Order | 18 |
| Government's 80 | Letter | 18 |
| Government's 81 | Fax | 18 |

INDEX OF EXHIBITS

| Exhibit No. | Description | Admitted by Stipulation |
|---|---|---|
| Government's 82 | Response | 18 |
| Government's 83 | Motion | 18 |
| Government's 84 | Letter | 18 |
| Government's 85 | Transcript | 18 |
| Government's 86 | Notes | 18 |
| Government's 87 | Order | 18 |
| Government's 88 | Order | 18 |
| Government's 89 | Transcript | 18 |
| Government's 90 | Order | 18 |
| Government's 91 | Letter | 18 |
| Government's 92 | Letter | 18 |
| Government's 93 | Letter | 18 |
| Government's 94 | Letter | 18 |
| Government's 95 | Response | 18 |
| Government's 96 | Notice | 18 |
| Government's 97 | Reply | 18 |
| Government's 98 | Order | 18 |
| Government's 99 | Letter | 18 |
| Government's 100 | Letter | 18 |
| Government's 101 | Order | 18 |
| Government's 102 | Notice | 18 |
| Government's 103 | Letter | 18 |
| Government's 104 | Witness List | 18 |

INDEX OF EXHIBITS

| Exhibit No. | Description | Admitted by Stipulation |
|---|---|---|
| Government's 105 | Exhibit List | 18 |
| Government's 106 | Report | 18 |
| Government's 107 | Transcript | 18 |
| Government's 108 | Transcript | 18 |
| Government's 109 | Transcript | 18 |
| Government's 110 | Transcript | 18 |
| Government's 111 | Transcript | 18 |
| Government's 112 | Transcript | 18 |
| Government's 113 | Transcript | 18 |
| Government's 114 | Transcript | 18 |
| Government's 115 | Transcript | 18 |
| Government's 116 | Transcript | 18 |
| Government's 117 | | 18 |
| Government's 118 | Report | 18 |
| Government's 119 | Timeline | 18 |

MONDAY, APRIL 14, 2014

THE COURT: Good morning.

MR. VALENTI: Good morning.

MR. RUHNKE: Good morning.

THE COURT: Okay. Introductions? I know everybody at the prosecution table, but I don't know all the folks here.

MR. RUHNKE: Okay. Good morning, Your Honor. I'm David Ruhnke appearing on behalf of Keith Nelson this morning. Good morning.

MS. HARMS: Paula Harms.

MR. BROTHERTON: And Gary Brotherton.

MS. TAYLOR: Kimberly Taylor.

THE COURT: I think we all know what the mission is here, and I intend to keep us on task in terms of those areas that the Eighth Circuit requested additional inquiry.

Mr. Ruhnke or whomever is starting off for Mr. Nelson may get started.

MR. RUHNKE: Yes, sir. I wondered if the court wanted a brief overview.

THE COURT: No.

MR. RUHNKE: We'll call Susan Hunt.

THE COURT: I read all your documents again, so I don't need that.

MR. RUHNKE: Thank you.

SUSAN HUNT, being duly sworn by the courtroom deputy,

testified:

MR. RUHNKE: May I proceed, Your Honor?

THE COURT: You may.

DIRECT EXAMINATION BY MR. RUHNKE:

Q Ms. Hunt, good morning.

A Good morning.

Q How are you employed?

A I'm self-employed as an attorney.

Q And for how many years have you been an attorney?

A Since 1986, like 23, 24, little more than that.

Q And where do you primarily practice law?

A This court.

Q And are you a member of any bars?

A Yes.

Q Which bars?

A Missouri, Western District of Missouri, Eighth Circuit, Seventh Circuit, Tenth Circuit, Kansas Federal Court.

Q And what is the primary nature of your practice? Do you specialize in any area of law?

A Criminal defense.

Q I'm going to start off by asking you about a document marked P15.

MR. RUHNKE: If we could display P15. Could we just highlight the affidavit of Susan Hunt in the first couple paragraphs.

Q (BY MR. RUHNKE) Do you recognize this document?
A Uh-huh.
Q Is this a declaration that you filed pursuant to a court order?
A It is.
Q Have you recently had occasion to review the declaration?
A I did.
Q Is what's contained in the declaration true and accurate to the best of your ability?
A It is.
Q I'm also going to display on the overhead Elmo only because I don't have an electronic workable version of it right now, a document that bears a government exhibit when it eventually comes about marked United States Exhibit 116. Let me switch over.
And do you see that document?
A I do.
Q Did you participate in a deposition a couple years back in this courthouse?
A Yes, I did.
Q And have you recently had occasion to review your deposition?
A I read through it yesterday afternoon.
Q And is it true and accurate to the best of your ability?

Anything major you want to change in it?

A It's accurate to the best of my recollection. It was quite document intensive, and at the time I saw the documents, they were like, you know, 12, 13 years since I'd seen them. And I didn't have the benefit yesterday of looking at the documents as I read the answers, but, yes.

Q So bottom line that's a true and accurate document?

A Yes.

Q Thank you.

MR. RUHNKE: Your Honor, just as a matter of housekeeping, both sides, number one, have agreed that -- not to insist on sequestration of any witnesses and have agreed to stipulate to the admissibility of all exhibits by both sides with a couple of caveats, and I'll just tell you what they are.

On Saturday we had met with Mr. Berrigan, who provided copies of his calendars and a diary from 2001. We made copies and got those to the government, but they simply haven't had the time to look through them.

The government has indicated on its exhibit list several documents from the United States v. Lisa Montgomery prosecution as they relate to Dr. Ruben Gur. Those documents have not actually been provided yet to us, and -- but subject to those caveats, we agree to the admissibility of all exhibits.

THE COURT: Okay. Very good.

MR. RUHNKE: Thank you.

Q (BY MR. RUHNKE) I'm going to take you back now, Ms. Hunt, to the fall of 1999, and were you practicing in this court in the fall of 1999?

A Yes, I was.

Q And were you practicing primarily on Criminal Justice Act, CJA, cases?

A A mix of that and retained, yes.

Q Did you have in the fall of 1999, any experience with capital cases?

A When I worked for Charlie Atwell years ago in a law firm, I did work on a death penalty appeal, and then I had a little bit of -- and it's primarily state postconviction at that time, but never any direct capital representation, no.

Q Had you attended any seminars or other capital training prior to the fall of 1999?

A Just I'd gone maybe a year or two to the capital habeas training.

Q Okay. And as of the fall of 1999, I gather then that you had never tried a capital case or been in charge of a capital case?

A No.

Q In the fall of 1999, did you get a telephone call asking you to serve as counsel in the Keith Nelson case?

A Actually I was doing, I think, a suppression hearing, and Judge Hays wanted to see me in chambers after that. And that's when she asked me.
Q That's United States Magistrate Judge Hays?
A Correct.
Q And without going in detail in the conversation, bottom line did she ask you to accept an appointment into the Keith Nelson case?
A Yes.
Q And did you accept that appointment?
A Couple of days later. I thought about it.
Q So in the fall of 1999, at the time you came into the case, who were the attorneys representing Keith Nelson?
A Dan Franco basically volunteered, retained, I'm not sure which, from the day he was arrested. So he was involved. He had no experience that I was aware of.
Q No capital experience you mean?
A No. The court had already appointed the public defender's office, and Larry Pace was assigned to the case. I believe either right at the same time I was appointed or maybe a day before, Bill Shull was appointed, who also had capital -- the court knew I had none, but there were two lawyers, Bill Shull and Larry Pace, that did have capital experience.
Q And as the team was formed, yourself, Mr. Pace, Mr. Shull, Mr. Franco, did anybody assume the role of lead

counsel, or was there a decision made as to who would be in charge of the capital aspects of the case, any discussions along those lines?
A Shortly after we all got appointed, we had a meeting in the public defender's office, and Larry Pace at that meeting announced that he was going to be lead counsel. And he and Ron Ninemire, who was the investigator for the public defender's office, were going to handle the mitigation.
Q And had you had any experience in preparing a case in mitigation?
A Absolutely none.
Q Was there any discussion at that meeting or as matters developed as to what your role was to be in the case?
A Assist Larry and Ron and Bill and just learn and do some motion work, and we identified early on a pretrial publicity issue and so I was assigned. I did most of the work on that issue.
Q Was there scientific evidence that also was developed in the case, forensic evidence?
A Yes.
Q DNA?
A Yes.
Q Do you have any experience in your own personal background with forensics?
A Yes. Well, first job I had out of college was I taught

high school biology for five and a half years.

Q What's your undergraduate degree in, ma'am?

A I have a bachelor's of science in education. I have a double major in biology and then chemistry.

Q And besides teaching high school biology, did you have any other experience in forensic --

A After I quit teaching, I took a job at the Kansas City, Missouri Police Department Crime Lab as a forensic chemist.

Q Okay. And you were a forensic chemist?

A Yes. I did a lot of drug work, and I did some -- back then we didn't do DNA. We obviously had the blood stain evidence, but we were only doing enzyme work. DNA was not -- I mean, I studied DNA. I taught DNA in high school, but as far as the forensic aspects, it really hadn't been developed then.

Q And do you remember what the original trial date that was set in the case?

A I'd be guessing.

MR. RUHNKE: Could we display P26, which is a copy of the docket entries, Your Honor, and go to docket entry 38, please.

Q (BY MR. RUHNKE) Do you see that there's an order entered on January 12, 2000, setting an accelerated docket for October 23, 2000?

A Yes.

Q Did that correspond to the trial date?
A Yes.
Q Okay. And that would have been, what, about a year after the arrest that took place in the case in October of 1999, correct?
A Roughly a year.
Q Do you remember that there was a motion -- let me back up a bit.
As the case went forward, there came a time in August of 2000, when the federal public defender withdrew from the case. Do you recall that?
A I do.
Q There was a conflict that had developed and the federal defender moved to withdraw and that motion was granted, correct?
A Correct.
Q And in the course of the 10 or 11 months between your appointment and the federal public defender's withdrawal, do you recall whether the federal defender did any investigation or hiring of mental health experts?
A There was -- well, there was mitigation investigation done, but there were no experts, no mental exams if that's what you're asking me, no, and there were no experts hired to do that.
Q That's what I am asking you.

Did through yourself and Mr. Shull, were applications made to hire various experts?

A There were.

MR. RUHNKE: I'm going to ask that we produce P28 at page 7, and if we could go to the first page of -- go back a couple of pages -- I'm sorry -- to page maybe 5 or 4 or 3 or 2. All right.

Can we highlight the caption on the -- enlarge the caption, the first third of that page, and the filing -- including the filing date. Just blow that up. Little more of that.

Q (BY MR. RUHNKE) So you see that a motion was filed on April 6th, 2000, and you see that the motion was for funds to hire --

MR. RUHNKE: Let's get a little bit more of that if we can, please.

Q (BY MR. RUHNKE) The motion for funds to hire an investigator slash mitigation specialist and for approval to exceed certain funding, funding limits. Do you remember that motion? Did you have a role in preparing that motion?

A It looks here like it was written by Mr. Shull, which means I would not have prepared it. That was before ECF and so I didn't automatically get a copy. I assume at some point he mailed me a copy or I got a copy of it.

Q All right. If we can go through this motion.

MR. RUHNKE: Go to page 2, please, and just highlight the paragraph marked 2 on page 2. Okay.

Q (BY MR. RUHNKE) The motion starts off with the idea that Mr. Nelson is charged with capital offenses, correct?

A Correct.

MR. RUHNKE: And let's blow up paragraph 2 on that.

Q (BY MR. RUHNKE) That he's indigent and he needs expert assistance, correct?

A Correct.

Q And as the motion goes on, does it discuss the need in capital cases for a mitigation investigation?

A Yes, I'm sure it does.

MR. RUHNKE: Could we go to the next page of that document, please, page 4. Please highlight the second paragraph, which is paragraph 6, and blow that one up.

Q (BY MR. RUHNKE) Can you see that on the monitor in front of you?

A Yes.

Q Discussion in there of how broad the requirements of mitigation can be in a capital case, citation to Lockett against Ohio, which talks about mitigation being any aspect of the defendant's background or character such in the cases where lawyer has been found ineffective for failing to investigate mitigation in a particular case.

MR. RUHNKE: And if we can now have a look at the

next paragraph.

Q (BY MR. RUHNKE) Further discussion of what a mitigation specialist is. Did you review this document at the time it was filed or at or about the time it was filed?

A I would assume I did, yes.

Q And this is a discussion perhaps you and Mr. Shull had had about the need for someone to begin doing mitigation investigation in the case?

A We all talked about that.

Q Okay. Going on to the next paragraph, the next page, there's a need to investigate statutory, nonstatutory mitigating factors, records must be gathered, and so the question is whether it's -- this is not an optional task, it's necessary. The only issue is who's going to do it, correct?

A Correct.

Q So -- and this motion was filed in the spring of 2000 in April, and at that point there was a trial date of October 2000, correct?

A Correct.

Q All right. So as of this point, who was leading the mitigation investigation?

A Ron Ninemire at the direction of Larry Pace.

Q And as the case proceeded, was this motion ultimately granted?

A I believe it was.

MR. RUHNKE: And if we could look at the next paragraph in the motion.
Q (BY MR. RUHNKE) Discussion of how often state trial courts have uniformly recognized the need for effective defense to employ the expertise provided by mitigation specialists. I mean, this is standard practice in the year 2000, correct, to use mitigation specialists?
A Yes, it was.
Q Long been standard practice in capital cases, correct?
A Correct.
Q As this motion proceeds, the actual relief sought is the appointment of a man named Daniel Grothaus, correct?
A Correct.
Q Do you know Mr. Grothaus?
A I do now. I didn't at the time.
Q Okay. Do you know him to be a mitigation specialist or more of a private investigator?
A Actually Larry -- it was Larry Pace's idea to get Daniel Grothaus on board. I think he's the only one -- I can't speak for Bill Shull, but my recollection is he's the only one of the team that knew him. And he's a former investigative reporter out of Houston, I want to say, and he'd had -- he had some work prior to this, I'm not sure where, in capital investigation or mitigation. That's all I knew about him at the time I think.

Q And -- but he was sought to be -- to serve really a dual role, as the caption of the motion indicates, to do mitigation investigation and sort of regular investigation, correct?
A Right. And it was -- my recollection was it was primarily in Kansas City because Ron Ninemire had been going to White Settlement, Fort Worth area where Mr. Nelson grew up. So they didn't -- they didn't hire him to travel down there is what I'm saying. It was to do work in Kansas City.
Q Now, as the matter proceeded, did you also seek to employ a mental health expert; do you recall?
A Yes.
Q Do you remember who that was?
A Dr. Stephen Peterson, I believe.
MR. RUHNKE: If we could display P28 at page 22, and if we could go on just a little further from that. Looking for the Peterson motion. I'll look on the exhibit list. We have to go back a little bit. We're into Dr. Peterson's description of his services. Right there where we come to the motion. Sorry about that. Let's highlight the caption, the filing date of that as well.
Q (BY MR. RUHNKE) Do you see that on June 7th, 2000, there was an ex parte application for funds to hire a psychiatrist and for approval to exceed the general funding limits for -- provided by the then Title 21 death penalty law? That was Dr. Peterson and that's the reference you just made reference

to, correct?

A Correct.

MR. RUHNKE: If we could go into the body of the motion on the second page and highlight the paragraphs 2 and 3.

Q (BY MR. RUHNKE) Again, that -- the standard of care, the standard of practice in the year 2000, reciting Supreme Court cases, that service of experts including psychiatrists may well be critical to the effective presentation of a capital litigant's defense. Expenses may properly be paid by the federal courts.

And, you know, you're looking at that -- you know, at the need for a psychiatrist at that point, correct?

A Correct.

Q And in the course of the motion, do you discuss Keith Nelson in particular?

A Yes.

Q Okay.

MR. RUHNKE: Could we go on to the next paragraph and blow that one up. Again, further Supreme Court supports the idea that experts may well be critical. Next paragraph, please. Relevant issues may be quite broad in Lockett v. Ohio.

Next paragraph. Blow it up, please.

THE COURT: Why are we going into every paragraph of

this? I mean the document speaks for itself.

MR. RUHNKE: It does speak for itself, Your Honor, but I'm trying to highlight the idea that back in --

THE COURT: It's already highlighted by the appeal.

MR. RUHNKE: But back in 2000, that they were actively seeking the assistance of mental health professionals; that they had recognized the --

THE COURT: Well, the document says that, though, doesn't it?

MR. RUHNKE: It does. And I'm trying to get this through the witness to put some life into a --

THE COURT: We only have so much time, Mr. Ruhnke. You spend a lot of time on this, you're going to lose time on the other end.

MR. RUHNKE: We're actually going pretty well, I think.

THE COURT: I don't think so.

MR. RUHNKE: I think we're going to go pretty well. I do. We've tried it out. I think we're going to be faster than anybody anticipated we were going to be.

THE COURT: I'll take that under advisement.

MR. RUHNKE: Maybe I shouldn't have said that. Yeah, I think -- seriously I think respectfully we will be well within the schedule.

THE COURT: I understand you're making your record

for the Court of Appeals and I think with the admission of these exhibits. The questions you're asking are good questions, but I don't think we have to go through each paragraph.

MR. RUHNKE: That's fine, Your Honor. Let me move through it a bit.

Q (BY MR. RUHNKE) And ultimately was Dr. Peterson's services approved?

A Yes.

Q Do you recall how much funding was approved for him?

A I don't right today.

MR. RUHNKE: Could we just show P28 at page 6, I hope. That's page 22. If we could get to page 6 of the exhibit.

Q (BY MR. RUHNKE) Ultimately it was approved. Does the figure $20,000 sound right to you?

A Yes. I just don't remember.

Q All right. Do you know whether the services of Dr. Peterson were ever actually utilized in the sense that he ever saw Mr. Nelson or ever performed an evaluation of Mr. Nelson?

A I don't believe he did.

Q I'm going to take your attention now to July 30 of 2000, and do you recall filing a motion to continue the trial date?

A Yes.

MR. RUHNKE: If we could have P28, the very end, the last document in P28, displayed. Okay. And if we could just highlight the caption of that document. Thank you.

Q (BY MR. RUHNKE) So you see on July 30, 2000, the defense moved for a continuance and sent out its reasons for wanting to move -- wanting to move this trial date along. Do you recall that happening?

A I do.

Q And do you recall what the reasons were that an adjournment, a continuance of the trial date, which was as of July 30, about three months off, was necessary? Do you recall of your own recollection?

A I believe it was because we hadn't gotten the mitigation case ready. We just -- we just simply needed more time. We weren't ready at all.

Q Were you interested in investigating mental health issues --

A Yes.

Q -- at the time?

A I believe so.

MR. RUHNKE: I won't go through every paragraph of this, but this is an important document because it shows what the defense felt they needed to do as of the end of July 2000 when the case is in its early stages.

So would you look at the next page and just page

down on the document. Next page. Next page of the document, please. Next page of the document, please. The next page of the document. If you highlight the middle paragraph of that, please, and blow it up.

Q (BY MR. RUHNKE) There's discussion of what mitigation investigation needs to be undertaken, and this is an example of it, the need to go to California, for example, and interview witnesses?

A Correct.

MR. RUHNKE: And if you would go further in the document, please, and I'm going to try to pull it out and follow along with you. I'll get to the particular paragraph I want in a second. If you would go to page 126 of this document and highlight the final paragraph. Blow it up.

Q (BY MR. RUHNKE) You see a reference to mental health issues in this motion to continue?

A Yes.

Q Two of the defendant's brothers are schizophrenic, there's been funds requested to have a psychiatrist and that you need to do a social history and you need to do a mental health evaluation of Mr. Nelson. All those are reasons supporting your motion for continuance, correct?

A Right. And also, according to this, the motion we just looked at for Dr. Peterson had not been approved when this one was filed.

Q And for -- Dr. Peterson's services were approved actually at some point in about August. Is that your recollection?
A Yeah, something like that.
Q Not yet but it was pending?
A Right.
Q And then in August of 2000, it was established Mr. Pace is forced to withdraw and the public defender is out of the case.
What is Mr. Grothaus doing for the defense at that point, as you recall?
A Chasing down rumors, wild goose chases that we didn't ask him to do.
Q Was he focused on the mitigation investigation?
A No.
Q Was he even focused on the facts and circumstances of the underlying crime?
A According to him. There were a lot of rumors and speculation, and that's what he was looking into, which were complete dead ends.
Q Did you think that his services were helping advance the defense of Mr. Nelson?
A No.
Q So you're now in late August 2000. The public defender's office had been providing litigation investigation

and the services of the federal public defender's office.

So what does the defense team of Keith Nelson consist of at that point?

A Bill Shull and myself. And I have -- just to go back, I'm a little surprised. I don't dispute this record, but I don't know why the public defender wasn't hiring these experts because they're the ones that have the funds, and normally that's what happens. But they put that onus on us for some reason, and I'm not sure -- because Larry at that time was wanting to get out. I don't know.

Q And whatever the reason, certainly the public defender's office perhaps asked the CJA lawyers on the case to seek CJA funding so it wouldn't come out of their budget perhaps, correct?

A Right. But that isn't the normal way it works.

Q Whatever the reasons were, in the spring of 2000, you were seeking funds for a mental health evaluation of Keith Nelson?

A Right.

Q Whose ever choice it was?

A Right.

Q And ultimately approximately $20,000 were approved for that purpose?

A Correct.

Q And I guess it was established it never took place.

So now Nelson case enters a different stage. Mr. Pace is out of the case. The federal defender's office is out of the case.

Do you remember what the court did with regard to the continuance application that was filed on July 30th?

A It was granted.

Q And do you remember when it was granted to?

A I want to say -- I don't remember for sure. I want to say the spring of the next year sometime. I'm not sure.

MR. RUHNKE: If we could highlight P28 at page -- I'm sorry. I'm in the wrong section of my outline.

If we could highlight P26 at docket entry 119.

Q (BY MR. RUHNKE) Do you see that the trial -- the motion to continue was granted and now you have a trial date of April 23, 2001?

A Correct.

Q So what is the nature of your and Mr. Shull's discussions during that period of time?

A Well, after Larry Pace was removed from the case, Bill and I met and talked about what we needed to do, you know, to pick up the pieces and figure out the mitigation and any penalty phase issues we had and make a game plan of how we were going to proceed, having lost two people now.

MR. RUHNKE: Could we also highlight docket entry 121 on that same page, might be the next page.

Q (BY MR. RUHNKE) All right. And the same day that the motion to continue was granted, the order allowing Mr. Pace to withdraw is also granted, and that's reflected in the docket entry we just looked at, correct?
A Correct.
Q Okay. So now you're in the fall of 2000, trial date's fortunately been moved to the following spring, and you're trying to figure out how to move forward from this point.
Do you remember encountering an individual named Mark Cunningham at, perhaps, a seminar?
A Yes.
Q Would you tell us about that?
A I attended, I believe, one of those capital habeas seminars or it might have been a death penalty seminar, I'm not sure, and he was a speaker.
Q Was that in the fall of 2000?
A I believe so.
Q Okay.
A And after he gave his presentation, there was a break, and I found him in the hallway or whatever. And we sat out and talked, and I told him about this case we had because I -- after I listened to him speak, I thought, well, maybe he's somebody we could use. And so he and I talked briefly about that at that point.
Q And as a result of those conversations, what did you

determine to do?

A Came back and talked to Bill Shull. We decided we needed to interview this man and potentially hire him, which is what we eventually did.

Q Did Dr. Cunningham make any suggestions to you about help with the mitigation investigation aspect of the case?

A Before we went -- we went to Dallas to actually meet with him personally, both Bill and I did. Prior to that trip, I think one or both of us, probably both of us, talked to him on the phone. We were in need of a mitigation investigator because we'd lost Ron Ninemire, and he suggested Tena Francis, who had an office, I believe, in Fort Worth or Dallas, which was good because that was where a lot of mitigation was in this case. He'd worked with her in the past. He recommended her. Bill and I thought let's try to schedule her after we meet with him that same day, which is what we did, and we hired her.

Q And when you say that a lot of the mitigation was in that area, what do you mean by that?

A Keith grew up in White Settlement, which is outside of Fort Worth.

Q Town called White Settlement, Texas?

A Yes.

Q And do you recall participating in a telephone call with Ms. Francis in mid November of 2000?

A After we had met with her or before?
Q Before.
A Could have -- maybe to set the meeting. There wasn't a lot of contact that I remember.
Q Okay.
MR. RUHNKE: Can we display P -- sorry, display P9 at page 7.
Q (BY MR. RUHNKE) Do you happen to recognize the handwriting of Ms. Francis?
A Not really.
Q Do you remember -- this is dated -- you see the date of 11/15 in the left-hand corner?
A Correct.
Q Do you see the reference to telephone call? It appears to be it's cut off from the top. Bill Shull and telephone numbers.
Do you know whether or not you participated in this call? Were you there when Mr. Shull was talking to Ms. Francis?
A As I sit here today, I don't have any independent recollection.
Q Okay. If you look at it and look at the document, if we can highlight the first four bullet points on it, does this sound like the discussion is of the Keith Nelson case, 23-year-old white male, kidnap, rape, murder, 11-year-old,

Kansas to Missouri, high profile, motion for venue change pending? Was that what was going on in Mr. Nelson's case at the time?

A Yes, it was.

MR. RUHNKE: If we could go to the next couple of paragraphs.

Q (BY MR. RUHNKE) Originally federal PD was cocounsel and investigator had to conflict out. Has fact investigator. Has done little or nothing.

Does that sound about right, that Mr. Grothaus had done little or nothing at that point?

A Yes.

Q And, finally, the bottom third of the -- the rest of it, including the -- and will be in Dallas three or four days.

Were you guys planning on traveling -- you guys, meaning you and Mr. Shull, planning at that point to travel to Dallas?

A Yes.

Q And reference to April trial date, will fax an FBI affidavit, reference to the Harvey Motel, which I assume is someplace where maybe you were staying.

But in any event you went to Dallas and you had a meeting with Ms. Francis; is that correct?

A We did, yes.

MR. RUHNKE: And if we go to P10 at page 8, and if

we could just highlight the top third of that. I'm going to represent for the record that this is the handwriting of Ms. Francis from that meeting. She will testify and verify that is her handwriting. The document is in evidence by agreement, Your Honor.

Q (BY MR. RUHNKE) You see a meeting on November 17th, 2000, Bill Shull, Susan Hunt. You participated in that meeting, correct?

A Yes.

Q And these are notes Ms. Francis is apparently making of things that you're telling her; for example, that you have TYC records. Is that a reference to the Texas Youth Commission?

A Yes.

Q Missouri prison records, parole records, certain records had been gathered, and if we go to the next section, there's a comment that the AUSA is rabid about this case, that there's an April trial date, a man hunt, and that there's -- you know, there was a lot of publicity about this case.

And if we go on to the next page of this, and the headline -- under the heading "fact investigator," Dan Grothaus has gotten hung up on conspiracy theory that somehow somebody was hired to kill for insurance money. This was investigated by the police. It was a rumor from day one.

Is that the red herring that Mr. Grothaus was -- seemed to be chasing?

A That and others, yeah, it was.

MR. RUHNKE: If we could go down to the next page and finally one more page now.

Q (BY MR. RUHNKE) At the top do you see the reference and we just highlighted the first line, has neuropsych hired, double exclamation mark. Ms. Francis is obviously glad or -- anyway, she can explain it herself. But did you have a neuropsych hired at that point?

A Whether he'd actually been hired, I'm not sure. I know a motion had been filed for funding. We had a name. I got the name Dennis Cowan from Cindy Short. She highly recommended him. Because he's local, she has used him in the past in state death penalty cases and really thought he was good.

Q Okay.

A And so we -- there was a motion filed to hire him. Whether it had been granted at that time, the record will say. I'm not sure. It was eventually granted.

Q You either had identified or already actually tried to have Dr. Cowan appointed at that point?

A Correct.

Q Are you sure whether you had actually filed the motion yet?

A It's right in that timeframe so --

Q Okay. And after the meeting --

MR. RUHNKE: We can take that down, please.

Q (BY MR. RUHNKE) After the meeting, did you determine that you would attempt to retain Ms. Francis?

A Yes.

Q Was there also any discussion of retaining Dr. Cunningham?

A Yes.

Q And what was that discussion?

A We wanted to hire him also.

Q And I'm going to direct your attention to December 12, 2000, and ask that we display P28 at page 52.

MR. RUHNKE: And if we could just highlight the caption and the filing date.

Q (BY MR. RUHNKE) So on December 12th, you're seeking funds to employ Dr. Cunningham as a mitigation specialist, not as a mental health evaluator, but as a mitigation specialist; is that correct?

A Correct.

Q And in broad terms, what was it that you expected Dr. Cunningham to bring to the table?

A Basically to review the records that we had collected and were continuing to collect, look at all the evidence in the case and basically be kind of a teaching witness, putting them in perspective at the penalty phase hearing.

Q A teaching witness on Mr. Nelson's background; is that

correct?

A Right. The -- from what we discovered, which we hadn't discovered it all yet, one thing we knew about trauma, abuse, that kind of things, we had already uncovered that. Anything else we would uncover, he could put in perspective for the jury.

Q The motion itself was ultimately filed. Did you also on or about the same date seek to employ Tena Francis as an investigator in the case?

A Yes.

MR. RUHNKE: And I'm going to ask that we highlight P28 at page 39, and so highlight the caption of that, if you will, please.

Q (BY MR. RUHNKE) So on that date you're seeking to employ a mitigation specialist, and at that point you have an April trial date still, correct?

A Correct.

Q You do not yet have a mitigation specialist on the team; is that correct?

A At that time, no.

Q All right.

MR. RUHNKE: And if we can go to page 49 of P28.

Q (BY MR. RUHNKE) Do you recall that Ms. Francis filed an affidavit in support of your application?

A Right.

Q Explaining her background and what a mitigation specialist -- what role a mitigation specialist fulfills in a capital case.

MR. RUHNKE: And if we could highlight on the next page paragraph 7 -- sorry, paragraph 6 on the next page.

Q (BY MR. RUHNKE) This is Ms. Francis outlining what a mitigation specialist should do in a capital case. Compiling information used by the attorneys, looking at a psychosocial history for factors that bear on the behavior, developing themes of mitigation of the defense, identifying witnesses, the idea of expert testimony to support the witnesses. This was all things that you expected Ms. Francis to do, correct?

A Correct.

Q And look at -- and let's highlight the next paragraph.

Discusses the importance of a social history, investigating every aspect of the client's life, and you expected Ms. Francis to look into that as well, correct?

A Yes.

Q And in paragraph 8, further discussion of the social history investigation, including birth records, medical, psychological history background, the whole -- every aspect of the defendant's life, correct?

A Yes.

Q Were you aware at that time of the circumstances of Mr. Nelson's birth?

A Yes.
Q You were aware that he was the second born of twins and was born prematurely?
A Yes.
Q Were you aware that he had suffered oxygen deprivation during birth?
A I was.
Q And was hospitalized for a considerable period after his birth?
A Yeah. I believe he was life flighted to Children's Mercy right after birth for that.
Q Do you recall any discussions at that time about perhaps hiring a neonatologist or someone qualified to look at those birth records to determine whether the circumstances of his birth had led to neurological damage or anything of that nature?
A No. We hadn't considered it, no, but that was one of the reasons we had put in place the neuropsych exam. That's where we were starting based on that information we just went over.
Q And you were talking -- when you say putting in place the neuropsych examine, you're discussing the motion that was or soon to be filed with regard to Dr. Cowan, correct?
A Correct.
Q And ultimately was Ms. Francis appointed to represent --

to serve as a mitigation specialist in the case of Keith Nelson?

A Yes.

MR. RUHNKE: Can we look at P28 at page 85. If we'd highlight the date of the filing and the caption at the top.

Q (BY MR. RUHNKE) Do you see the date of January 24, 2001?

A Yes.

Q And at that point, not to keep beating a dead horse, you're about three months away from trial, correct?

A Right.

Q And if we could go to the body of the order, please.

Do you see in that order Magistrate Judge Hays approves Ms. Francis and her organization, approves Mark Cunningham, Dr. Mark Cunningham, and also approves Dr. Cowan for -- sorry, approves $2,500 for a neuropsychological examination, correct?

A Correct.

Q And, again, at that point, even though Dr. Peterson had been on the scene since the spring of 2000, he had never seen Mr. Nelson, correct?

A Right. Because the decision was made basically in consulting with Dr. Cunningham to do the neuropsych exam first, see what, if anything, that uncovered, and then maybe proceed with the mental health or Dr. Peterson.

Q And to just cut to the chase, did a neuropsychological

examination of Keith Nelson ever take place?

A No.

Q I'm going to go to P28 at page 67.

MR. RUHNKE: Could we just do the caption.

Q (BY MR. RUHNKE) You see the date on that as January -- it's hard to read, but January 4, 2000?

A Yes.

Q And that's the motion that we've been discussing to employ Dr. Cowan as a -- to do a neuropsychological examination of Mr. Nelson, correct?

A Correct.

MR. RUHNKE: And if we could go to paragraph 4 of that motion, highlight that.

Q (BY MR. RUHNKE) You see the discussion of Mr. Nelson's premature birth, that he spent the first four months hospitalized with breathing difficulties, and the statement, this fact, combined with other factors, raise the suspicion that defendant may have organic brain defects which may lead to mitigation evidence in this case.

Was that an issue, therefore, that you were pursuing and interested in resolving as of January of 2001?

A Yes.

Q And as we noted, the motion was granted in late January -- early January of 2001. The next motion -- just look at P28, page 79, same exhibit, page 79.

MR. RUHNKE: Highlight the caption, please.
Q (BY MR. RUHNKE) Was a decision also made in January of 2001, to replace Mr. Grothaus with another fact investigator?
A Yes.
Q And who was that?
A Timothy Murphy.
Q Did you know Mr. Murphy prior to this event?
A He was a -- not sure what his role was, but he worked for Jackson County court prosecutor's office, I think, or did. I think at this time he was out on his own as an investigator. I knew of him. I really didn't know him personally. I think Bill knew him better than I or knew more about him than I did.
Q But eventually Mr. Murphy was appointed to substitute for Mr. Grothaus?
A He was.
Q Now, as the case moved along, did a circumstance arise where Mr. Shull withdrew from the case?
A Yes.
Q All right. And do you recall approximately when Mr. Shull had to withdraw from the case?
A I believe it was February, sometime in February.
Q Of 2001?
A Yeah, sometime in February.
MR. RUHNKE: If I can look at -- have P -- well, the docket sheet, which is P26, if I could look at docket entry

121. Sorry, not 121. 204, docket entry 204.

Q (BY MR. RUHNKE) At some point Mr. Shull withdrew from the case and you believe that was approximately February, late February of 2001. Who came into the case at that point?

A Pat Berrigan.

Q And did you know Mr. Berrigan?

A No. I knew of him. I really didn't know him personally.

Q And what occasioned Mr. Berrigan's appointment into the case, the fact that Mr. Shull was now out of the case?

A Yes. Because I wasn't death qualified.

Q So now it's you and Mr. Berrigan are the attorneys?

A Right.

Q Did you have any initial discussion with Mr. Berrigan about your role in the case versus his role in the case, levels of responsibility, division of responsibilities?

A Shortly after -- I mean, within a day, I think, after he was appointed, he and I met, and I basically brought him up to speed on where we were at, you know, filled him in on the background of the case. And he -- at that point, I mean, I deferred to him, and he said he was going to take over the mitigation part. We had still been working on the change of venue, so I was to continue doing that and any guilt, you know, innocence phase work that was to be done, but he was going to handle the mitigation.

Q Did you have -- as the case proceeded, for example, did Mr. Berrigan file a motion to continue the trial date?
A Yes.
Q And do you recall when the trial date was continued to?
A I believe it was the end of October.
Q 2001?
A Correct.
Q And as the months proceeded, how much contact did you and Mr. Berrigan have?
A Sporadic. I mean, telephone calls every now and then, e-mail occasionally. We had some meetings. We had some meetings, a few anyway, with the client at CCA, joint meetings. You know, we talked off and on.
Q And what were you spending your time doing?
A I was doing, like I said, the change-of-venue thing. I also was doing -- we had gotten funds to have an expert relook at the government's forensic evidence, the DNA seminal stains, so I was handling that. I also had gotten funds -- Mr. Nelson was always adamant that he did not rape Pamela Butler, and so I hired a forensic pathologist in Billings, Montana, who reviewed all the autopsy reports, and his conclusion was that she was not raped. I went out and met with him. So I was doing those kind of, you know, guilt/innocence phase type work.
Q Okay. I'm going to display a document marked P80.

MR. RUHNKE: For Your Honor's information, we'll present the evidence later. P80 is a chart based on CJA billings of the attorneys as to the number of hours they were spending on this particular case. If you could highlight the top of that, Hunt hours.

Q (BY MR. RUHNKE) So you and I have looked at this chart together representing that it comes from the CJA filings that you submitted, and it shows that in -- as this case proceeds in its final stage, which is now January into 2001 in November through the trial, you know, January of that year you're spending 100 hours on the case; February, less than that; March, less than that; April, less than that; May, less than that; June, less than that. June is a little more than 20 hours. In July, 40 hours; in August, 20 hours. And then in September, October, November, as the trial begins to approach and actually takes place, substantially more hours.

You know, I didn't ask you to do the addition on your CJA voucher, but I assume your vouchers were accurate, correct?

A Yes.

MR. RUHNKE: If we could go down to the second half of the page and highlight that.

All this looks more complicated than it ought to be. It's not really. It took me awhile to figure it out, but it's color coded so that the -- for example, the blue on the top of

each graph represents time in court, and the next entry represents interviews and conferences with the client, et cetera, et cetera, so you have an idea of what the attorney is spending his or her time actually doing.

It appears obtaining and reviewing documents and the court record, which is the orange color, was a lot of your time in at least the first couple of months of the year 2001, and you were also spending at least some time with Mr. Nelson, which is kind of a reddish, interviews and conferences with clients. Basically that was what you were doing for those ten months or so between -- 11 months between January and November.

If we could go to the next page of the exhibit and just highlight the top of it, and what these do is it totals up the number of hours that each activity was engaged in each month by category over that period of time. And if we could go to the bottom of that.

Q (BY MR. RUHNKE) This is a chart that we will establish showed Mr. Berrigan's hours during the period leading up to trial.

Do you recall in the motion to continue that Mr. Berrigan cited many ongoing commitments in addition to preparing for the Keith Nelson case that would require a continuance?

A Yes.

Q Okay. And in January obviously Mr. Berrigan would have spent no time on the case, but at least, according to our summary chart, in February, it looks 30, 40 hours; March, it looks like about 45 hours; April, 3 or 4 hours; May, maybe 10, 15 hours; same in June; same in July; same in August. And then September, October, November, the hours increase as you go to trial.

Did you have a sense Mr. Berrigan was working on the case with -- spending a lot of time on the case or not based on your interactions with him?

A Based on the conversations I had with him, I assumed he was spending a lot of time on it.

Q But you didn't know?

A I didn't know, no.

Q And when it came to the mitigation investigation, who had the primary contact with Ms. Francis?

A Pat Berrigan.

Q Did you have any real role in the preparation of the mitigation case?

A No.

Q Do you recall that Ms. Francis had an employee who was working on the case named Deborah Haddad?

A When we hired her, we didn't know that, but we came to learn that later on.

Q Let's stay with that for a second.

When you hired Ms. Francis, who did you expect would be doing the mitigation investigation?

A I suspected she would because she didn't talk about having any employees or any other help that worked with her at the time.

Q All right. And had you met Deborah Haddad prior to her working on this case?

A No, never heard of her.

Q Did you know anything about her qualifications?

A Nothing.

Q How did Ms. Haddad's name, it's H-a-d-d-a-d, how did Ms. Haddad's name come into the equation?

A I believe I got a phone call or an e-mail or something from Tena Francis saying that she worked -- that this Deborah Haddad worked for her, I think, even part time she said, I'm not sure, and that she was going to travel to Kansas City to interview a lot of witnesses up here over this particular time. I think it was in May. And she wanted me to file the motion for funds for travel for her to come up here, which I did.

Q And were the funds for travel approved?

A Yes.

Q And did a conflict arise as a result of that particular trip? I think we can focus it on May of 2001.

Did something happen on the trip that got your

attention and made you a little angry?

A Yes.

Q Would you tell us what that was?

A What was told to me was that this Deborah Haddad was going to travel to Kansas City on Friday, rent a car, and spend Friday, Saturday, Sunday, Monday, and part of Tuesday interviewing witnesses, doing background, you know, and mitigation investigation in Kansas City and then fly back to Dallas Tuesday afternoon.

But what actually happened was, and I didn't know this until after it had already occurred, was that she flew to Kansas City, rented a car, and drove to St. Louis and visited her parents over the weekend and didn't return to Kansas City until, I think, Monday morning. And so all she spent was Monday and part of Tuesday, and we basically paid for her time or expenses while she visited her parents, which was not what we wanted.

Q And as the mitigation investigation went forward, did you have further discussions with Tena Francis in and about June of 2001?

A Right, I did. I was upset about the Deborah Haddad thing. Tena Francis and Ann Busterud, who was the CJA financial person here that paid her vouchers, they got into it all the time because Tena wouldn't do her vouchers correct. I'm not sure what -- but I got drawn in the middle of that.

So I was constantly putting out fires, financial fires for Tena Francis.

MR. RUHNKE: And if I could look at Exhibit 10 at page 4, just go to the end of it, if you can. Try to get to the date of it. Okay. Would you highlight the date of that particular document.

Q (BY MR. RUHNKE) Do you recall that there were discussions about additional funding required for Ms. Francis?

A Yes.

Q And those discussions took place in the month of June 2001?

A Correct.

MR. RUHNKE: And the document we're looking at is an affidavit prepared by Ms. Francis. If we -- at that time and on that date. If we could highlight the last paragraph on the report.

Q (BY MR. RUHNKE) So as of the end of June, she is seeking an additional 220 hours of authorization in order to complete that investigation, correct?

A Yes.

MR. RUHNKE: And if we could also highlight paragraph 9 and 10 of that affidavit.

Q (BY MR. RUHNKE) Do you see that one of the issues that Ms. Francis was concerned about was raising is a significant history of mental illness in Keith Nelson's family and issues

related to his neurological functioning, and that research is ongoing as further issues are identified.

And in the following -- the next paragraph she, again, we just -- let's -- paragraph 10. Go back a page, please.

Do you see that the issues have been identified, fetal alcohol syndrome, exposure to violence, childhood sexual abuse, emotional neglect, mental, physical disease, dysfunctional family, mental illness. And in the final sentence, and we'll go on to the next page, there's reason to suspect Keith might suffer neurological impairment caused by hereditary factors, prenatal damage, birthing problems, head injuries suffered as a child, and a possible exposure to neurotoxins.

Now, this is in June, the end of June of 2001. What had happened to Dr. Cowan? Funds had been approved for Dr. Cowan. Had a neuropsychological examination taken place?

A When I had that initial meeting with Pat Berrigan after he was appointed, that's one of the issues we talked about. I told him that we'd gotten funds approved and that we'd hired Dr. Cowan to do the neuropsych. In fact at that point an appointment had already been made for him to travel to CCA to do the examination. I think that is coming up in the next week or two.

Pat's immediate response was I don't like Dr. Cowan,

I'm going to cancel that appointment, and don't worry about it, I'll figure out somebody else.

Q And to your knowledge, was anybody else ever figured out?

A No.

Q And, again, to your knowledge did Mr. Nelson ever have a neurological assessment?

A No.

Q Okay. Do you recall having a phone conference involving yourself, Mr. Berrigan, and Ms. Francis earlier in the month of June 2001, about the status of the mitigation investigation?

A Probably did.

Q Okay.

MR. RUHNKE: If we could display P9 at page 114. If you highlight just the date and the title of this document.

Q (BY MR. RUHNKE) Do you see there's a caption "Nelson defense team meeting 6/13/01, 4 p.m."? Do you recall having -- do you recall an in-person meeting with Ms. Francis during June, or would this have been a phone call? Or are you not sure?

A I'm not sure. We had one in-person meeting, but I think it was probably earlier than June.

Q If I suggested a meeting that occurred in late February, would that be more like it?

A Right. About when Pat had been appointed.
Q Do you remember during the February meeting, Ms. Francis had a meeting with Mr. Nelson, met with you and Mr. Berrigan? In fact, you remember that there was a meeting that took place at the Hereford House after a visit out to CCA?
A Yes. That's what I'm thinking of. That was not this.
Q So now this is June 13th, 2001, and there's a meeting and a discussion about the mitigation case.
MR. RUHNKE: If we could just go to highlight the first maybe third of that. Again, I represent Ms. Francis would expand on what these notes are. These are her notes.
Q (BY MR. RUHNKE) It appears to be things that Pat is going to do. He's going to ask for more money, and he's sceptical about neuropsychological testing. Mr. Berrigan wants more objective medical testing of a neurologist. That way the expert would not delve into the defendant's past bad history, and there's a discussion about an expert on spinal fluid looking for low serotonin.
Do you know if Mr. Berrigan ever followed up on this, ever found a neuropsychologist to his liking or for that matter a neurologist to examine Mr. Nelson?
A To my knowledge, no. I do remember he had gone to a death penalty seminar, and when he came back, he in passing told me about he watched a presentation on this low serotonin and spinal fluid, and he had never heard of that before. And

he said that's something he wants to look at for Nelson. That's the only time I ever heard about that.

Q All right. Do you also recall -- let's go back. I'm sorry. Let's go to the next section of these notes.

You know, they're basically bringing everybody up to date on the status of the case. There's a June 28th hearing it says in re government request to use and just trails off.

Do you remember during that period of time there was litigation ongoing about the government's access or ability to have their own experts access to and assess Mr. Nelson?

A Correct.

Q Is it reasonable that that's a reference to that hearing?

A That was my interpretation.

Q And this is all materials attributed to Mr. Berrigan in the guilt/innocence phase. We're not going to argue over unimportant stuff like he did not rape her. We're only going to attack the rats, quote, unquote. Does that reflect what you recall about Mr. Berrigan's view of how the case would proceed?

A Yes.

MR. RUHNKE: Highlight the final paragraph on that page.

Q (BY MR. RUHNKE) And you see there's a tape of a phone call with Kerri. Who was Kerri? Do you remember who Kerri

was?

A That was Keith Nelson's girlfriend at the time.

Q Okay. And do you remember at the actual trial that a tape recording was played from -- at the penalty phase of the trial, which was the only trial there was, that a recording was played of Mr. Nelson talking to his girlfriend and his mother about wanting to take -- wanting to confess to the murder?

A Right. This was a conversation that CCA recorded right after this crime happened, I mean, within a few days.

Q Yes. And basically in the conversation Mr. Nelson says, I've told the people here to have the FBI come out and I'm going to make a complete confession, and he sounds crying and upset, correct?

A Correct.

Q All right. Let's go on to the next page of this, please.

MR. RUHNKE: And just highlight the remainder of those notes.

Q (BY MR. RUHNKE) And these are further notes from the call. Not supposed to contact government witnesses directly. There's an agreement that that will not happen. There's a discussion that E. coli causing respiratory problems.

Do you recall from Mr. Nelson's birth records that there had been a problem of an E. coli infection or not?

A I've never heard that before until just now.

Q There's a reference to Larry Pace found nothing, probably ran criminal and civil indexes. Do you know what that's a reference to?

A I would assume running criminal and civil indexes, you know, court records in Dallas/Fort Worth, White Settlement.

Q All right. And the final -- the final notation on that page is a reference to an affidavit before June 28th, that Mr. Berrigan wanted Ms. Francis' affidavit before June 28th in support of the motion for additional funding.

Is that your interpretation?

A Yes.

Q You were at that phone conference?

A I'm not sure if I was or not. It might have been a telephone conference. I'm not sure. He had primary contact with her after a period of time in that timeframe.

Q And as the case went forward, do you recall in May receiving a document that Ms. Francis transmitted, which she described as a mitigation binder or a binder of mitigation materials?

A Yes, I do.

MR. RUHNKE: And I'm just going to look for the reference to that. If we look at Exhibit 9 at page 108, and if we could just highlight the first couple of paragraphs of that. First of all, let's look at the date at the top.

Q (BY MR. RUHNKE) It's a letter dated May 21, 2001, from Capital Punishment Investigation and Educational Services. Was that Ms. Francis' organization, the name of her organization?
A Yes.
Q And in the second paragraph and the third paragraph -- second paragraph, third paragraph is fine. Let's blow those up.
Enclosed is a binder containing materials related to the investigation into Keith's social history and she's providing written reports. She's providing various records. She's providing various materials, as much information as they have at present to, you know, to deal with Mr. Nelson's situation.
Do you recall receiving a binder?
A Yes.
Q Did you spend time reviewing the contents of the binder?
A Yes.
Q Do you recall that there was research attached to the -- included with the materials in the binder, articles about neurological impairments, neuropsychological examinations? Do you recall that --
A Yeah. There was a section in the binder for that, yes.
Q And did you and Mr. Berrigan ever sit down together, review this binder, discuss a plan for the mitigation case

going forward, or was that Mr. Berrigan's responsibility?

A We never talked about it at all.

Q Do you know what Mr. Berrigan did with the materials that were in this binder?

A I'm assuming that, you know, he reviewed them because that -- he was handling that mitigation portion.

Q Do you know whether he reviewed it or just assuming it?

A I just assumed.

Q Do you become aware as the summer of 2001 went forward that Mr. Berrigan had some health issues?

A Yes.

Q And do you recall what those were?

A I believe he needed a bypass surgery in late August or early September, sometime in that timeframe.

Q I think we'd all agree based on the records we have, that the actual surgery took place on August 8th, 2001. Does that sound within the timeframe?

A Yes.

Q And was there a discussion or any discussion at the time about the impact of Mr. Berrigan's surgery on the October trial date?

A He had called me and told me that the doctors told him he needed to have this surgery and when it was scheduled for. During that phone conversation, we talked about the need for a continuance at that point. I asked him how long his recovery

time was, and I think it was like eight weeks, six weeks. I can't remember.

Q Substantial period?

A Yeah. It was a substantial period of time. And so we agreed to meet at CCA with Keith and explain to him what was going on because Pat -- when I talked to him and said, well, I think we need to continue this case, he said, well, I don't know, I want to think about that. Then we decided to meet with Keith, and he said let's the three of us sit down, talk about this, and make a decision. I said that's fine. So we set a meeting up, I'm not sure when, but in the next day or two after that.

Q This is prior to the surgery?

A Prior to the surgery.

Q How did the meeting go with Mr. Nelson, Mr. Berrigan, and yourself about the possibility of continuing the trial date?

A Well, Pat basically explained to him what the -- the kind of surgery that he needed, that when it was scheduled. We talked about how long it would take for him to recover, and then we talked about the continuance. And Keith was very much in favor of continuing the case so he could have time to recover.

Q And at the conclusion of the meeting, what decision was reached or who decided about whether a continuance would be

granted -- I'm sorry -- would be requested or not?

A Well, both Keith and myself made it very clear to Pat that we both thought we needed to have a continuance. At the end of the meeting he said, well, I've thought about it, I'm not going to ask for one.

Q There was a time when the issue arose regarding Mr. Nelson's examination by government experts. Do you recall that issue?

A Yes.

Q And the issue would arise in some substance as to, one, whether Mr. Berrigan -- I'm sorry, whether Mr. Nelson would submit to an examination by the government's experts and what would the consequences be if he failed to submit to the examination. Do you recall that?

A I do.

Q Do you recall being in court on or about October 18th, 2001, before Judge -- Magistrate Judge Hays when that issue came up?

A Yes.

Q Had there been a prior discussion of whether Mr. Nelson would submit to a mental health examination?

A I think just prior to going into court that day, we'd gone to the lockup and seen Keith and talked about it briefly. Whether he talked to him about it in more detail, I don't know.

Q Do you recall what Mr. Berrigan advised Mr. Nelson to do and how strongly he expressed his opinion?
A Well, his advice was not to submit to a government exam, and he was pretty adamant about it.
Q And based on what you know about Mr. Nelson and your relationship with Mr. Nelson, had his attorneys -- did you have a good relationship with him?
A I always did, yes.
Q And did it appear that Mr. Berrigan had a good relation with him?
A Yes.
Q Based on your assessment and knowledge and the nature of that relation, had the attorneys advised Mr. Nelson to cooperate with a mental health evaluation, do you think he would have?
A I think he would have.

MR. RUHNKE: I'm going to ask that we put on the screen Exhibit 29, which is the transcript, at page 668. If you highlight the last section where Mr. Miller is speaking. This is Mark Miller, former AUSA. In his office he was more of a trial counsel.

Q (BY MR. RUHNKE) Were you there for that court proceeding?
A I was.
Q And there's a discussion that Dr. Martell had come out

to CCA the Monday earlier and Mr. Nelson had refused to meet with him. Do you recall those discussions?

A Yes.

Q And that the other mental health expert, Dr. Park Dietz, is planning to come out there next week with video equipment, and the issue now is whether it's worth doing all that if Mr. Nelson is going to refuse. Do you recall those discussions?

A Yes, I do.

MR. RUHNKE: If we could go on to the next page. Let's go to the -- we'll just look at the transcript itself. Let's start with what Mr. Berrigan says about two-thirds -- a third of the way down the page, bottom two-thirds of the page. Higher. Where it begins with Mr. Berrigan speaking.

Q (BY MR. RUHNKE) This is Mr. Berrigan responding to Mr. Miller's discussion that Dr. Martell had shown up there, that Mr. Nelson had not -- refused to cooperate, and Mr. Berrigan says we'll acknowledge that Mr. Nelson refused to see Dr. Martell. He does not anticipate the defendant's position changing regarding future efforts, so, you know, the -- they're willing to stipulate the -- the defense is willing to agree at that point that Mr. Nelson would not see Dr. Dietz if he came to do an evaluation.

You remember that discussion?

A I do.

MR. RUHNKE: And let's go to the next page, please. If you would highlight the court -- what the court has to say.

Q (BY MR. RUHNKE) Magistrate Judge Hays asks, You've probably already made this clear, but let me make sure I understand. This is not something that counsel have directed the defendant to take this position; is that correct?

Based on your knowledge of the circumstances, had counsel in essence directed Mr. Nelson not to cooperate with the evaluation?

A Basically, yes.

Q Or strongly advised him. The decision would always be his, but counsel had strongly advised him not to do it?

A Right.

Q Thank you.

MR. RUHNKE: Would you highlight Mr. Berrigan's answer to that.

Q (BY MR. RUHNKE) Mr. Berrigan begins by noting that the AUSA Miller had asked him basically the same question, but he's not willing to answer it because it involves confidential communications between the defense and the client, advises the court that Mr. Nelson does understand the consequences of a refusal, and, you know, they want to put on -- the defense wants to put on mental health evidence, but that the position is that Mr. Nelson will not cooperate; is that correct?

A Correct.

Q Okay. So at that point Mr. Berrigan does not disclose his conversations with his client, that he had advised -- confidential conversations, that he had advised Mr. Nelson not to participate. That's a fair summary of that exchange?

A Yes, it is.

MR. RUHNKE: I want to display a document. I think it's P79, which is a chronology of the -- what took place with regard to the issue of mental health evaluations of Mr. Nelson. It's a step-by-step, date-by date summary of what occurred. If we could highlight just basically the top third of the case -- of the document.

Q (BY MR. RUHNKE) So in the summer of 2000, the trial was continued. If any of this doesn't sound right to you, please let us know. We've tried to make an accurate summary, though, based on docket entries and pleadings.

The trial was continued to April 2001. This is the same date that Mr. Pace withdraws from the case, public defender withdraws from the case. A few days later the court authorized $20,000 to retain Stephen Peterson, MD, but these funds were never utilized.

July -- sorry, January 2001, 24th, the court authorized $2,500 for a neuropsychological evaluation, but those funds were never utilized.

Then on February 13 Mr. Berrigan steps in. On February 28 Mr. Berrigan canceled the neuropsychological exam

that had been scheduled for March 1.

On March 8th the trial is continued to October 29. October 8 Mr. Berrigan underwent quintuple bypass surgery. You go to the next section. Next few entries.

Then we get into September where, pursuant to court orders, Mr. Berrigan files a notice of -- the defense files a notice that they're going to present mental health mitigation at penalty, and they attach the CV of an expert, Daniel Foster, doctor of psychology.

Did you have any contact with Dr. Foster?

A None to this day.

Q Did you have any role in selecting Dr. Foster?

A No. I never heard of him before.

Q And no discussion with Mr. Berrigan that the mental health expert is going to be selected?

A I think he had told me that he was going to try to hire this guy. He knew him. But that's all.

Q Okay. And as the chronology -- so on September 4, the defense is putting everyone on notice that they're intending to call Dr. Foster, but it's another 13 days later when there's even a motion to appoint Dr. Foster. In actuality Dr. Foster doesn't see Mr. Nelson until October 5. Are you aware of those events?

A No, I'm not.

Q Again, this is a -- this predates the era of ECF

filings?

A Correct.

Q So you're not automatically getting electronic bounces in your e-mail every day about what's being filed, correct?

A Right.

Q The next event in the chronology is Dr. Foster interviews Nelson for an hour on the 5th, eight hours on the 6th, and basically describes the meeting in his report as history taking and trust building.

Next event is on October 10 the court grants the motion to authorize Dr. Foster's services up to $7,500.

Bring it down to the final third of that page.

And then we come to the 18th, which is the transcript we just visited that Mr. Berrigan advises Magistrate Judge Hays that Mr. Nelson will not cooperate in the government's assessment. We'll see later when Mr. Berrigan testifies that -- there's a hearing before this court on the 23rd and that position is reiterated. On the 25th he enters a guilty plea. The next day the court rules -- this court rules, not the magistrate -- affirms the magistrate judge's recommendation that the failure to cooperate means he'll be -- the defense will be barred from mental health evidence.

You recall all these issues taking place?

A I do, yes.

Q You were in court when these discussions took place?
A I was.
THE COURT: It says the 26th, 2013?
MR. RUHNKE: That's not correct. 2001, Your Honor. Thank you for pointing that out. Obviously not 2013. It should be 2001. We'll correct that.
Next page down. Just highlight what remains of this chronology.
Q (BY MR. RUHNKE) On October 28 Mr. Nelson attempted suicide. His competency was challenged. The court ordered William Logan to assess Mr. Nelson's competency on November 7. The next day the court found that Mr. Nelson was competent, and there was no further inquiry required, and jury selection begins and the case goes forward.
THE COURT: My recollection is that Mr. Nelson was seen or Dr. Logan was on call to see Mr. Nelson every day to determine his status.
MR. RUHNKE: He had offered to cooperate -- Dr. Logan had offered to counsel Mr. Nelson if the -- if he required it. It's my understanding that that never took place. The offer was made for sure.
THE COURT: He was on standby to do that every day.
MR. RUHNKE: He was on standby.
THE COURT: He may not have done it, but that's not in your chronology.

MR. RUHNKE: He was on standby, but I believe it was never taken advantage of.

THE COURT: I don't dispute that. I'm just -- your chronology has a gap in it. That's what I'm saying.

MR. RUHNKE: I'll fill that gap, Your Honor.

THE COURT: Let's take a break.

MR. RUHNKE: Okay. Thank you.

THE COURT: About ten minutes.

(A recess was taken.)

THE COURT: Before we proceed, I want to talk about a couple things. We're probably going to break at about noon for 30 minutes for lunch. Then we'll break for the day somewhere between 4 and 4:30.

MR. RUHNKE: That's fine, Your Honor. We've got witnesses on call, and I will tell you it's going faster than I ever thought it would.

THE COURT: From where I sit, it's going pretty darn slow.

The other thing I wondered is how much of this is in her deposition that you took?

MR. RUHNKE: Some, but certainly not in this detail. The deposition was more of a discovery deposition by the government.

THE COURT: We're not going to get it done in the time allotted if you do each witness like this, so when you're

out of time, you're out of time. Okay.

MR. RUHNKE: I'm willing to take that risk. I do think we're going to go faster.

THE COURT: I just wanted you to know.

MR. RUHNKE: We'll see.

SUSAN HUNT, previously being sworn, resumed the stand:

DIRECT EXAMINATION (continued) BY MR. RUHNKE:

Q Ms. Hunt, let's pick up where we left off, which was the retention of Daniel Foster to do an exam.

Did you ever discuss with Mr. Berrigan the results of that exam?

A No.

Q Whether it was a complete evaluation or anything of that nature?

A No, I did not.

MR. RUHNKE: If we could display P8.

THE COURT: You're asking Ms. Hunt about discussions she had with Mr. Berrigan on issues that she's already said she was not -- that was not part of her responsibility. I hope we're not going to go over these same things in the detail with Mr. Berrigan because he's the one you ought to be asking these questions to.

MR. RUHNKE: What it is we're establishing is the general lack of communication.

THE COURT: But you also established that that

wasn't her duty.

MR. RUHNKE: I understand, Your Honor. I understand your point.

Q (BY MR. RUHNKE) So looking at P8 on the monitor in front of you, what was the first -- do you recognize the document? Have you seen it before?

MR. RUHNKE: Can we just blow up --

A Is this his report or the CV?

MR. RUHNKE: Just blow it up and we'll --

Q (BY MR. RUHNKE) Do you recognize ever having seen the report? I represent this is Dr. Foster's report.

A I never saw Dr. Foster's report until you sent it to me about a year and a half or so ago.

Q Okay. So you didn't see it at the time of the trial?

A No, I did not.

MR. RUHNKE: Could we go to the very top of the page. If we could highlight the fax header.

Q (BY MR. RUHNKE) Do you see that document was transmitted November 27, 2001, at 4:13 in the afternoon by someone named Rebecca Crawford-Foster? Do you recall what was going on in the Nelson case on November 27, 2001?

A We were either in trial or we just finished.

Q The docket will reflect, I won't pull it up, that the next day Mr. Nelson was sentenced to death. This was received the afternoon before the case went to jury.

A Okay.
Q What was your role in presenting a mitigation case at the trial? We know that Mr. Nelson entered a guilty plea so the only issue was penalty. There was no guilt or innocence phase. What was your role at that penalty trial?
A Even though there was no guilt or innocence phase, the government called a lot of the witnesses they would have called had we not pled guilty, so my role was to do any cross-examination of those witnesses that they called. They didn't call everybody, but they called a handful of those people.
Q And did you participate, however, in interviews of, lack of a better term, mitigation witnesses in Texas, some of whom actually testified at the penalty phase?
A Pat Berrigan and I went to Texas to interview numerous witnesses right before trial. We -- shortly before, yes.
Q Do you recall you and Mr. Berrigan went to Texas twice in September?
A Yes.
Q Of 2001?
A Yes.
Q When you went to Texas, did you meet with Tena Francis?
A You know, I don't think we ever met with her. We met with Lisa Murphy, who was working for her at the time.
Q Did you know prior to going to Texas, who Lisa Murphy

was, or had you had any contact with her prior to going to Texas?
A I think just before going to Texas, we knew that she worked -- was working with Tena, but I'd never talked to her or had no interaction with her.
Q One of the issues that the Eighth Circuit remanded to the court is the issue of no objections made during closing arguments at the penalty phase of this case.
What was your understanding of your role as far as lodging any objections to closing arguments?
A I didn't have any. I mean, it's the court's rule that if they're your witnesses or you do the opening or the closing, you're the one that does the objection, and Pat did both opening and closing. So, you know, I mean, I could have passed him a note to say object, but it was his job or duty to stand up and object at that point.
Q I think if you pull that microphone a little bit towards you, we can hear you a little better.
A It's kind of weird. Okay.
Q Okay. So Mr. Nelson was sentenced to death on, I believe, November 28, 2001. Did you have a role in the appeal?
A Yes.
Q What was your -- were you appointed by the Eighth Circuit to do the appeal?

A Yes.

Q Were you the only attorney appointed to do the appeal?

A No.

Q Who else was tagged to work on the appeal?

A I think initially Pat Berrigan was because he was cocounsel with me in the trial, but he wasn't in there very long. And Jennifer Herndon -- I think it was Jennifer Brewer at the time, I'm not sure, was appointed.

Q So do you know Ms. Herndon, Ms. Brewer?

A I didn't know her well. I knew her. She was a good friend of Pat's and worked with him in the public defender capital unit at state, I believe.

Q Do you know if she had capital case experience?

A Yes. More than I did.

Q Trial and appellate?

A Yes.

Q And physically where was Ms. Herndon located during the preparation of the appellate briefing?

A St. Louis, Missouri.

Q Where were you located?

A Here in Kansas City.

Q Do you recall any face-to-face meetings between the two of you to discuss the appeal?

A I don't. I know she came -- you know, she still has family in Kansas City, and I know early on she came up here

and met with Pat to get his transcript and parts of his file that she could take back to St. Louis and use for preparation of the appeal. And they met and talked about it. I did not -- I was not part of that meeting, nor did I talk to her. I talked to her by phone or through e-mail.

Q Was there a division of labor when it came to authoring the appellate brief?

A Yes.

Q What was your recollection of the division of labor?

A I was going to handle the appeal of the change-of-venue issue since I did 99 percent of the work on that issue at the trial level and the statement of the facts as it related to that and some other issues. She, as I said, had a lot more appellate capital experience than I did and was going to handle all the appeal issues relating to the penalty phase.

Q And is that how it remained between the two of you?

A That was my understanding, yes.

Q Did -- was there frequent phone conversation during the appellate preparation?

A I don't feel it was phone so much as it was e-mail or e-mailing drafts back and forth to each other.

Q And did you apply for and receive several extensions from the Eighth Circuit on the filing of your briefing?

A Yes, right, yes.

MR. RUHNKE: Can I have just a moment, Your Honor?

THE COURT: Absolutely.

MR. RUHNKE: I have nothing further on direct examination, Your Honor.

CROSS-EXAMINATION BY MR. KETCHMARK:

Q Good morning, Ms. Hunt.

A Good morning.

Q I think you indicated that you've been an attorney since 1986, and your primary focus has always been on criminal cases. Is that an accurate statement?

A That's correct.

Q And with respect to death penalty, Mr. Nelson's would have been your first foray into working on a death penalty trial; is that correct?

A That's correct.

Q Since you've been an attorney since 1986, am I correct in the statement that you've never been found to be ineffective by any court in connection with your representation in an ineffective-assistance-of-counsel claim?

A Never.

Q And have you ever had a bar complaint filed based on ineffective representation?

A Not on that or any other reason, no.

Q Not that you're aware of?

A I would probably be aware of it.

Q If I might, let me start kind of in reverse order that

Mr. Ruhnke finished with and talk about the appeal.

You indicated that it was your understanding that you were going to be handling the appeal and that Ms. Brewer, who's now Ms. Herndon, was also going to be working with you on the appeal, correct?

A Correct.

Q And that your only issue was going to be focusing on the change of venue and that Ms. Brewer, now Herndon, was going to handle all the other issues, correct?

A That was my understanding, yes.

Q In fact, ma'am, the first you had heard that there was an accusation that you were supposed to handle other issues, was that when we had the deposition and I informed you that that's what Ms. Herndon had indicated to us when we spoke with her?

A Yes, yes.

Q In fact, I think you indicated to me, So she says I was supposed to do that, question mark, that's news to me?

A Correct.

Q So the first time you're hearing that there was ever any additional work that you were supposed to be doing would have been when we did this deposition in our office back in, I believe it was, October of 2000 -- or 2012?

A Right. Can I explain that a little bit?

Q Sure.

A You know, her office was in St. Louis where the Court of Appeals sits. We were down to the -- you know, close to the deadline. That was before ECF, again, and so you had to copy, bind, you know, personally get the briefs to the court. So that was all her responsibility.

Q Right.

A She is the last one that ever saw that brief before it was filed. It wasn't me.

Q Right.

A And so if there were missing issues, I would have thought she would have said something to me about it at that time, but I never heard a word.

Q That's my point is you never were -- she never confronted you and said, Susan, where are these other issues, I thought you were handling these?

A Never. And even when we argued the case together, did she ever mention that to me.

Q Am I correct that the page limitation -- you received an extension to file a brief that was about 25,000 words. Does that sound familiar with --

A Probably, yes.

Q Again, there was never any discussion with her about the fact that when we're putting this thing together, because obviously there would have had to have been work together, whether it's e-mail, whether it's phone calls to get this

thing blended together, to ensure that you didn't go over the page limits?

A Right. Again, I think she filed some of those motions because she knew it was going to be over length.

Q Is it also accurate, ma'am, that while you had not worked on any death penalty cases and hadn't done any appellate work in that death penalty area, you had done extensive trial work in terms of appeal of trial verdicts?

A Yes.

Q And in fact when we talked with you at the deposition, I think you had indicated that you had had substantial amount of work at the appellate level in basically taking cases up that you had tried and taking those up at the appellate level. Is that a fair statement?

A Right. And the one right before that was the firefighters case that was tried here in 1997. I was trial counsel in it, and that was a huge case, and appellate counsel, yes.

Q Right. And you also indicated, Ms. Hunt, that while you might not have been the one responsible for doing objections, when you do your appellate work -- again, not in the capital context. But when you do your appellate work, you're going to sit down and you're going to go through as trial counsel everything that happened in the trial, correct?

A Correct.

Q As you're going through the trial record, am I correct that you're going to be making notations about things that you think are potentially an appellate issue or something that you want to make certain that you remember so that you can potentially look at that as an appellate issue? Fair statement?
A Right. You don't always raise them, but you make notations of them.
Q Because, as we talked about in the deposition and I think you indicated, that one of the things you have to do is you have to try to figure out what are your best arguments and you put those arguments forward. Fair statement?
A Correct.
Q And I think you would agree with me that you can't raise every possible issue under the sun because you don't get an unlimited length of a brief to file, right?
A Right. You wouldn't want to waive what you think is a good argument though.
Q That's my point is in evaluating the record and the work that you do in representing the trial, you're going to go through and make an assessment of these are potentially meritorious and we're going to put those in the brief, right?
A Correct. Now, when I was reading the transcript to prepare this, I was more focused on the change-of-venue issues and the jury selection issues, but you're correct.

Q Well, when Mr. Berrigan was making the closing arguments or when the government was making closing arguments, at any point did you in your notes write down this should be objected to?
A Not that I remember, no.
Q And is that something you normally would have done if you found the argument the government was making was objectionable?
A When I'm not doing the oral argument, I don't really take that many notes, and, no, I mean, I don't think I even took any notes in the oral arguments that I remember.
Q Okay.
MR. RUHNKE: Could we just clarify, when she says oral argument, does she mean the closing argument?
A Yes, I mean the closing, yes, yes.
Q (BY MR. KETCHMARK) Now, with respect to the trial, my understanding, and correct me if I'm wrong, is that you were primarily going to focus on the guilt phase aspects of the case and that the capital or penalty phase were going to be handled ultimately by Mr. Berrigan, who ended up coming on to the case, correct?
A Correct.
Q And before Mr. Berrigan got on to the case, those were roles that were focused on by Mr. Shull before he left the case, correct?

A Actually we both did at that point.

Q Am I correct that -- and we talked about some of your traveling, but you did do some traveling not only to Texas, but you also traveled out to California to try to do some mitigation investigation, correct?

A Yes.

Q And you actually got funds approved and you went out and tried to develop some records or see what you could find in connection with Ms. Nelson having lived in a battered women's shelter back in Sacramento, correct?

A Visalia, California.

Q Okay. You mentioned Mr. Ninemire having been on the case with Mr. Pace and that he was primarily the one -- after Larry indicated that he would be the one responsible for being lead counsel, that Ron Ninemire was the chief investigator in connection with the mitigation phase; is that correct?

A Correct.

Q And, ma'am, have you seen a letter that Mr. Ninemire put together that was dated September 12th of 2000, when he was getting off of the case and basically set forth a rather detailed letter of approximately four pages of a to-do list of what's been done and what needs to be done?

A Yes.

Q And that was information that Mr. Ninemire would have put together and would have passed along to you when Mr. Pace

and himself were removed from the case?

A To me and Mr. Shull also.

Q Right. So it was given to you as counsel?

A Correct.

MR. KETCHMARK: That for the record, Your Honor, I'm not going to go through it, but I would note it's been marked and will be offered as Government's Exhibit No. 9.

Q (BY MR. KETCHMARK) In addition, Ms. Hunt, you mentioned an individual by the name of Dan Grothaus; is that correct?

A Yes.

Q And I think you indicated that it was your belief that Mr. Grothaus really wasn't doing anything other than chasing conspiracy theories and dead ends?

A That's all I ever saw of his work product, yes.

Q Do you remember, ma'am -- let me show you what we've marked as Government's Exhibit No. 10, and this is a document that I will purport to you indicates it's Grothaus Investigations, it's multiple pages, and it sets forth what appears to be information Mr. Grothaus had done. Have you seen that document before?

A Yeah, a long time ago, yeah.

Q Okay. So this was information that you were familiar with?

A Well, this first page are things he needs to do or somebody needs to do. These are all question marks.

Q Right. So it's setting out kind of a to-do list of things that may or may not need to be done in connection with the mitigation phase?
A Right. Not things he's done; things that are --
Q Right.
A Yes.
Q And this document is dated with the rough draft of October 25th of 2000; is that correct?
A I believe so.
Q Well, you have no reason to dispute that?
A No.

MR. KETCHMARK: Again, Your Honor, I'm not going to belabor and go through that document, but I would note it's been marked and would be offered as Government's Exhibit No. 10.

THE COURT: In case I neglected to do so when it was presented to the court but there was mutual agreement on the acceptability of exhibits, I will receive all of those exhibits pursuant to that agreement, okay.

MR. KETCHMARK: Thank you, Your Honor.

MR. RUHNKE: Thank you, Your Honor.

Q (BY MR. KETCHMARK) So while you aren't necessarily focusing on the mitigation aspect, you did do some investigation. You traveled to Texas and you traveled to California. Would you agree with me that there were other

individuals, Mr. Ninemire in particular, as well as Mr. Grothaus, who were at least looking at the mitigation aspect back in the timeframe of the year 2000?
A Ron Ninemire was gathering a lot of records. He had interviewed several people in White Settlement. Mr. Grothaus, I don't know that he ever interviewed mitigation, to my recollection, witnesses. He has this list that he put together, but I don't know that he ever accomplished any of it.
Q Let me ask you this, kind of fast forwarding, I know Ms. Francis gets involved and Mr. Ruhnke talked about the fact that you had a disagreement with her that surfaced in May of 2001, with -- when Ms. Haddad came up and in your opinion traveled over to St. Louis when she was supposed to be working on the case, correct?
A It wasn't my opinion. That's what she did.
Q Well --
A Yes.
Q Do you have any idea whether she did any interviews in connection with that trip up here?
A She did some when she came back to Kansas City on that Monday, yes, but not over the weekend like I was led to believe.
Q Is it a fair statement, Ms. Hunt, that you weren't the one focusing on the mitigation aspect, you were focusing on

the guilt phase during this timeframe because Mr. Nelson hadn't made a decision whether he was going to plead guilty?

A That's correct. It doesn't mean I wasn't involved in any part of it.

Q And I understand. You're getting made aware of information, interviews that are being done if they are being done, and discussions. Obviously there was discussions about the mental health issues, correct?

A Well, and I also filed a lot of these motions for these people to travel instead of Pat, so I was aware of those things, correct.

Q But your primary focus was on the guilt aspect and the other attorneys in the end, Mr. Berrigan and Mr. Shull and Mr. Pace, were the ones focusing on the mitigation because that was their -- you weren't learned counsel in death penalty, you had never done one of these cases, correct?

A Right. With the exception, like I said, when Bill Shull was involved, we worked together on it much more so than any other time.

Q Right.

Mr. Ruhnke asked you about these trial settings and he went through all of the trial settings, the first being in June of 2000, and the continuance and then ultimately April, and there was some discussion about activities that were leading up to the months preceding those. Do you remember

that line of questions?
A Yes.
Q Let me ask you this, ma'am: At any point in time did you think that those early trial settings were actually dates that this case was going to be tried?
A No, I didn't.
Q Those were placeholders to keep the case docketed, correct?
A Correct.
Q And in fact you knew that that's what those were and that those weren't months where you actually knew the case was going to go to trial?
A Although I think before Bill Shull was removed from the case or asked to be removed, I think we were thinking that --
Q April date was?
A Right. Because we had sent out the jury questionnaires, and that was part of the publicity change-of-venue issue.
Q But with the --
A And all those became null and void at that point.
Q But with the exception of that April 23rd, 2001, those other trial settings were in fact placeholders?
A That's correct.
Q And Mr. Ruhnke talked to you extensively and questioned you about the mental health issues that cropped up and whether or not you used the funds to employ doctors.

My question is this: Would you agree with me, ma'am, that the mental health issues presented themselves early on in the case, and in fact in 2000, you all were aware that there were issues regarding Mr. Nelson's family history of mental illness?

A We were aware of family history, correct.

Q And so it's not like this was an area that was unexplored. In fact, Pat Berrigan heavily litigated the issue of mental health and whether or not the government would be allowed access to your client, correct?

A There were no experts ever hired, no testing ever done, so it wasn't explored.

Q Well --

A It was known it was a potential but it wasn't explored, no.

Q But you're aware that Mr. Berrigan handled a substantial amount of litigation back and forth with the government as to whether or not the government would be allowed access to Mr. Nelson to have him submit to any type of mental health treatment -- or evaluations?

A I was aware of that and I wondered why he was making such a big deal of it since we hadn't done any evaluations. We'd done nothing.

Q Let me ask you this: Were you aware -- you talked a little bit with Mr. Ruhnke about kind of what the standard was

in 2001, regarding these cases. Do you remember that line of questioning?

A Yes.

Q Were you aware in 2001, what the standard was with respect to mental health and whether the government had a right to have access to the client?

A Yes.

Q What was the standard?

A If we were going to put on mental health, if we were going to have an expert testify, they had a right to have their own expert evaluate him.

Q And that's your understanding, that that was settled law at the time in 2001, when this was being litigated?

A That was my understanding, yes.

Q Okay. With respect to Dr. Peterson and the motion that was filed to do the neuropsych, isn't it in fact correct that when you met with Mr. Cunningham or Dr. Cunningham, he was the one that suggested that it was too soon and that you postpone any type of evaluation by Dr. Peterson at that time?

A I believe he was the one when we discussed that, that advised us to do the neuropsych exam first, see what, if anything, we came up with and then make those decisions, and that's the way we basically put Dr. Peterson on hold and filed the motion for Dennis Cowan. That's what we did.

Q Right. Are you familiar with an individual by the name

of Dick Burr?
A Yes.
Q And who is Mr. Burr?
A He was -- he may still be but he was resource counsel at the time.
Q And in fact before you reached out to Mr. Cunningham, did you in fact have discussions with Mr. Burr about Mr. Cunningham? Was he part of the reason that you reached out and retained Mr. Cunningham?
A He's part of it. He reached out to us after Larry Pace because the public defenders never wanted to get involved with resource counsel, but once Larry was out of the case, I think he contacted me and I had already met Dr. Cunningham. But, yes, he was helpful in that.
Q In terms of the mitigation work that was done, is it a correct statement, ma'am, that by the fall of 2000, there was a substantial amount of records that had been collected?
A There were a lot of records. I'm not sure -- I don't know the quantity.
Q Would you remember, ma'am, in the fall of 2000, filing a motion requesting a paralegal to assist in the organization of the mitigation because there was a substantial amount of records, in fact, over 2,000 pages that had been amassed by the fall of 2000 when you filed that motion?
A It was not only for mitigation. It was also the guilt

and innocence. There were a lot of DNA records. There was a lot of records.

Q Would you agree with me, though, in the motion that you filed, you indicated that -- in fact, I think the language was that there was significant mitigation evidence that had been collected and needed to be organized?

A There probably was too, but I'm saying there were both phases of evidence, yes.

Q But you would agree with me then by the fall of 2000, that there was a significant amount of mitigation evidence that had been collected?

A There were a lot of school records, lot of -- yeah, incarceration records, that kind of thing, yes.

Q Ms. Francis, while you had never worked with her, you brought her into the case in large part based on the recommendation of Dr. Cunningham, correct?

A And I could be wrong but I think also Dick Burr, but I'm not sure, yes.

Q So it's possible Mr. Burr also referred to Ms. Francis as being somebody who was a good person to bring onto the team?

A Possibly. I know that Dr. Cunningham had actually worked with her in the past.

Q And would you agree with me, ma'am, that when you brought her on in November or December of 2000, that

Ms. Francis had a wealth of experience in investigating and putting together mitigation-related evidence that you did not have?

A Yeah, yes, that's fair.

Q With respect to Mr. Nelson, is it a correct statement that he wasn't a shrinking violet or flower, if he didn't like what the attorney was doing or didn't think the attorney was working, that he would take steps to get the court involved to have those attorneys removed from his case?

A No, that's not fair.

Q Okay.

A If he didn't think the attorney was working for him, he'd take steps. He never, ever voiced any concerns to me or anybody else that I'm aware of that, you know, I'm proceeding down this path he didn't want me to or Pat is. His concern was are you working on my case.

Q Okay.

A And if you were working on his case, no matter what work you were doing, that was our decision, and he respected that.

Q What I think you indicated to me when we talked in the deposition that with respect to Mr. Shull, Mr. Nelson kind of presented him with a pop quiz and threw out some names of individuals to see if Mr. Shull knew who those names were, and when Mr. Shull failed, that's when he brought it to Judge Hays' attention and asked that Shull be removed from the case?

A And those were all guilt and innocence phase witnesses, correct.

Q So if he -- if Mr. Nelson didn't believe that the attorney was working hard enough on the case, he would bring it -- he wasn't afraid to bring it to the court's attention?

A If he didn't think you were working on it -- and Bill Shull had very little contact with him phone or in person. You could hardly get a hold of him, you know, on the phone.

Q Right.

A And when he did this one time, he just asked him a bunch of questions. Bill didn't know the answer. It was in the first part of the discovery we ever got on the case, and, yeah, he was upset that he didn't think he ever read the discovery.

Q You knew Bill Shull prior?

A Yes.

Q And what's your opinion of whether or not he was a good attorney or is a good attorney?

A I think he's a good attorney. Keith always thought he was a good attorney too, but he just didn't think he was working on the case.

Q When Mr. Berrigan is asked and brought into the case in February of 2001, I think you indicated that you didn't know him but you knew him by reputation. Is that a correct statement?

A I may have met him, but that's correct, yes.
Q And you were aware that his work was primarily exclusively in capital litigation, correct?
A Yes.
Q And in fact I think you indicated that you thought highly of him and that he was well regarded with respect to what he did and how he did it. Fair statement?
A Yes. I was glad to have him on the case, yes.
Q In 2001, in February when you're meeting at the Hereford House and it's you and Mr. Berrigan and Ms. Francis, at that time the consensus was that there was an extensive amount of or substantial amount of mitigation evidence that had been collected but there was more to be done. Fair statement?
A Yeah, fair.
Q And with respect to Dr. Cowan, it was Mr. Berrigan's decision to cancel that because he didn't think that Dr. Cowan was the right person and that he was going to handle making the assessment of where to go but it wasn't going to be Cowan, correct?
A Correct.
Q So with respect to the mitigation aspect, Pat was the one who was making the calls in terms of how and in what direction mitigation was going to go, correct?
A He was calling all the shots, yes.
Q And I think you indicated in the deposition that from

the minute Pat got on the case, he took over mitigation?
A He did.
Q Because that was what his expertise was and his experience, correct?
A That's correct.
Q The problem or disagreement that you had with respect to Tena Francis, that blew up in around May of 2001, correct?
A Yeah, yes.
Q And at that point is it correct in going forward, Ms. Hunt, that Mr. Berrigan was the one who had primary contact with Ms. Francis and you kind of took a secondary role at that time?
A Yes.
Q And so what Mrs. Francis or other individuals that might have been working with her were doing, that was all being done -- coordinated through Pat, you weren't the point person on any of that. Is that a fair statement?
A That's fair.
Q You talked about Ms. Haddad and you talked about Ms. Murphy. Do you have any reason to believe that they were incompetent or unqualified to do what they were doing?
A No. I didn't know if -- I still don't know much about them.
Q So you're upset with Ms. Francis was the fact she had these individuals working for her, it wasn't so much their

qualifications because you didn't know, it was the fact she hadn't informed you that she wasn't going to be doing it, it was going to be delegated. Is that a fair statement?

A I was surprised that she wasn't. I wasn't really upset that she had other people working for her. What upset me was that they basically came up here and took a trip on our dime.

Q There was some discussion about the affidavit that Ms. Francis prepared, and I will talk more extensively with her about that. But at the end of June she makes a representation that she had put in some 267 hours, I believe, and that there was additional mitigation work to be done. Do you remember looking at that affidavit with Mr. Ruhnke?

A Yes.

Q Do you have any reason to dispute that Ms. Francis was making an accurate representation that she had -- she and her company had spent that amount of time in working on collecting the mitigation information?

A I have nothing to dispute that, no.

Q And do you know whether or not after you got -- no longer were involved as a point person, whether they continued to work on and did the additional 220 hours that they indicated that they thought they would need to do?

A I don't know.

Q That was all stuff that would have been handled by and Pat would have been running the show on?

A Right.

Q Again, ma'am, you were shown a motion that you filed, it's file stamped September 19th of 2001, requesting authorization for you and Pat to travel to Dallas at the end of September of 2001, and in that you made a representation that extensive mitigation work had been done in Texas and that you now needed to meet with the persons and discuss the investigation that still needed to be accomplished. Do you remember filing that motion?

A I do.

Q And was that an accurate representation in the motion that there had been a significant amount or extensive mitigation work completed by the date of filing, which was September 19th of 2001?

A What the purpose of that motion was, there was work done and witnesses identified, but we needed to go down and interview those witnesses. And that's why we went.

Q Well, my question, ma'am, is you authored the motion and you were the one who chose the language to suggest that there was completed extensive mitigation work on the case done in Texas. That was language that you selected when you typed up the motion, correct?

A Correct.

Q And so is that an accurate representation that you were making as an officer of the court that that was your belief as

of September 19th of 2001?

A That there was extensive work but it wasn't complete, yes.

Q Right. Okay.

Then there was some discussion, ma'am, about Mr. Berrigan and the health concerns obviously associated with his bypass surgery that occurred in August of 2001, correct?

A Yes.

Q And your testimony was that your recollection is that you and Mr. Berrigan and Mr. Nelson had a discussion about how Pat's health was going to impact whether or not you could get ready for trial in October, correct?

A Correct.

Q My recollection of what you testified to was that you and Mr. Nelson were of the strong opinion that the case couldn't get ready and that you needed to ask for a continuance, correct?

A Correct.

Q And Pat was on the other side saying we can get it done, correct?

A Yes.

Q You never took steps on your own as an attorney representing Mr. Nelson to file any motion asking for a continuance, correct?

A No.

Q Mr. Nelson -- did Mr. Nelson to your knowledge ever make Judge Hays or Judge Gaitan aware of his concerns that this wasn't going to be ready in his mind?
A No.
Q So it's your testimony that Mr. Berrigan simply overruled you and Mr. Nelson and that you and he accepted that thinking it wasn't in his best interest?
A That's accurate.
Q Even though you knew it was a death penalty case and he was facing possible execution if he was convicted?
A Like I told you, Pat was calling the shots in the mitigation. He said, I believe I can get it ready, I'm not going to ask for a continuance. I respected that.
Q Did you make any notation or any notes in your own internal file saying I disagree with this, this is a mistake?
A I don't normally make those kinds of notes, no.
Q Even though it was a death penalty case?
A That's not my practice to do that. I mean, I might have notes of meeting -- you know, interviews where there were meetings with my client but not about this I didn't.
Q And then in terms of the October 18th, 2001, transcript that Mr. Ruhnke went over where Mr. Nelson was present and there was a discussion about whether he would submit -- you're nodding your head. You know what I'm talking to?
A Right.

Q You indicated that you and Mr. Berrigan and your client had discussions in the lockup about whether or not he should submit to an examination by the government's doctors, correct?
A I know that there was some short, brief conversation that day at some point. I can't remember if it was in the lockup before. It was like a short, little thing at the counsel table. I have a vague recollection of a short, little meeting.
Q Okay.
A I couldn't tell you when it occurred but it was that day.
Q And is it your belief that that was the only time that either yourself or Mr. Berrigan met with Mr. Nelson to discuss that issue?
A I never met with him, but, like I said, Pat and I didn't go to CCA together, so he may have or through a phone call. I'm not aware of that.
Q And would it be accurate that because this is -- you're focusing on guilt, the decision hasn't been made to plead guilty, you've got a lot of stuff that you need to do to get ready for the trial in the event there's going to be a guilt phase of the trial, correct?
A Correct.
Q So while you might not be communicating on a daily basis with Mr. Berrigan, you're focusing on what you need to focus

on in the case and your assumption is that he's focusing on what he needs to focus on?

A Correct.

Q Now, in that meeting at the lockup, at any point in time did you or Mr. Berrigan coerce or compel Mr. Nelson to agree to not submit to that evaluation?

A No. Strongly suggest, strongly advise, is that coercion? No, but --

Q And let me ask you this: Is it accurate that Mr. Berrigan is engaging in extensive litigation with regard to whether or not the government's doctors are going to have access, and if they're going to have access, who the government doctor should be, and there's a multitude of issues that Pat is litigating back and forth on the issue of the mental health?

A Correct.

Q Okay. And so during that meeting with Mr. Nelson, Mr. Berrigan is -- is he voicing concerns that he doesn't like Park Dietz and Dan Martell as the two government doctors who have been selected to do the interviews? Do you remember any discussion about that?

A I do not.

Q Do you remember any discussion about Mr. Berrigan informing the client that these two government doctors have a reputation in the defense community and they do more harm than

good and it could be very damaging if they're allowed access and the government's allowed to present this, it could hurt more than it could help? Do you remember discussions about that?

A I don't remember that. You'd have to ask Pat these questions. I don't remember.

Q That's fair enough.

Let me ask you this: Was it your belief that -- am I correct in my assumption that when you're in this lockup, that Pat's the one that's driving the boat because this is an issue that he would have been focusing on?

A Yes.

Q So you're more or less there, you're observing and listening, but Pat and the client are the ones having this exchange?

A That's correct.

Q Would you agree with me that it's not like Mr. Berrigan pulls this out of thin air that, oh, you know what, today I just decided you shouldn't do this and that's why he's advising the client? There was some reason behind Pat's decision in advising the client, correct?

A I'm sure he had a reason. Frankly, I wasn't aware of what the reason was.

Q Okay.

A And I kind of wondered myself. This all occurred very

fast that day. There wasn't a lot of time to sit down and discuss and rehash all this.

Q At that point in time had Mr. Nelson made the decision to plead guilty yet?

A There might have been conversations that he had with me. That was October 18th and he pled about a week later. Is that pretty accurate?

Q Yes.

A So we may have discussed it. He hadn't made the final decision. He called me at the end and said I want to plead guilty.

Q Let me ask you this, Ms. Hunt: You were the consistent and a constant individual who represented Mr. Nelson more or less from start to finish. Is that a fair statement?

A That's fair.

Q And you had a very good relationship with him?

A I did.

Q And he trusted you?

A I think so.

Q And what I'm curious about is, back to this issue of the continuance and the discussion, even though you didn't voice it to Pat, did you have discussions yourself with Mr. Nelson and advise him whether or not you thought Pat was going to be able to get done what he needed to do on the mitigation side even though you weren't involved in that?

A We talked about it. I remember his statement was, you know, why did we all have this big meeting when you've already made your mind up. That's what he said to Pat when Pat said I'm not doing it, and he was a little angry about that. Pat goes, I think I can get it done, don't worry about it, I've got this, and I'll have time to do it. We accepted that.

We never -- did Keith and I talk about it after that? He may have brought it up a couple of times, but it wasn't a big subject of conversation, no.

Q Did you tell Mr. Nelson that you knew who Mr. Berrigan was, you knew what his experience was, and if he was representing that he believes he can get this done, that I believe he can get it done? Did you ever have that type of conversation?

A Basically those statements were -- Pat didn't think the recovery would be that bad, okay. He thought he would be back up to speed pretty fast.

Q You looked at the billing records and they focused on yours. Would you agree with me in the CJA billing records, it looks like Mr. Berrigan put a substantial amount of time into the case in August, September, and October?

A Not prior to that didn't look like, but, yeah, you're right it did.

Q In terms of these billing records --

MR. RUHNKE: Can I make a quick objection? The

exhibit speaks for itself and certainly --

MR. KETCHMARK: Okay. Well, the exhibit speaks for itself. We'll look at the exhibit.

THE COURT: Keep that in mind, will you, the exhibits speak for themselves.

MR. RUHNKE: Except when we speak for them.

Q (BY MR. KETCHMARK) With respect to that exhibit, that doesn't detail any of your work that happened in 2000 -- that started in January through November of 2001, correct?

A Yeah, I think that's correct, yes.

MR. KETCHMARK: One moment, please, Your Honor.

That's all I have, Judge.

MR. RUHNKE: Could I have P -- I'll look through for a second. Could I have our Exhibit P21 at page 7 displayed, P21 at page 7. Could you just blow up the federal public defender part and the address part of it.

REDIRECT EXAMINATION BY MR. RUHNKE:

Q Showing you a letter that's dated September 14th, 2000, is that the letter that you received from Ron Ninemire when he bowed out of the case?

A Yes.

MR. RUHNKE: Your Honor, I'll just note for the record that the Government's Exhibit 10, which is the same letter, shows a date of September 2010, which is a result apparently of a default date printout. But this is the actual

date that the case was sent, the letter was sent, and if you look at the second page header, you see that that's the date or close to it that it was sent.

Q (BY MR. RUHNKE) Mr. Ninemire had been in the case at that point for, what, maybe ten months as an investigator?

A About that time, yes.

Q And do you know if he's trained as a mitigation specialist?

A At the time I thought he was. He represented himself that he was. Subsequently when I was involved in the Lisa Montgomery case, I became very aware of the fact that he wasn't.

Q Didn't have the qualifications to be a mitigation specialist, correct?

A And in fact made numerous statements during that case he didn't believe in mitigation.

Q Okay. And I think we'd all agree that a mitigation specialist who doesn't believe in mitigation isn't going to be much help in a capital case?

A Probably not.

Q All right. Could we go down to the last page of that letter, which is -- it's four pages long.

MR. RUHNKE: Would you highlight and blow up the last -- just blow up the last full paragraph.

Q (BY MR. RUHNKE) And this is the letter that

Mr. Ketchmark referred to earlier, and I'm just going to read the closing paragraph by Mr. Ninemire to yourself. During my investigation, information suggested that the boys were abused physically and/or sexually during their formative years while living in White Settlement, Texas. This abuse came from men who were brought into the home by Nancy. This has not been confirmed as yet.

Also it was interesting that Keith was placed in a hospital for a long period of time at the time of his birth. This needs to be explored more fully. It would appear that all the boys, with the exception of Steven and Kenny, suffer from a form of mental illness, parens, schizophrenia. It seems prudent that any mitigation investigation must include a psychiatric examination for Keith.

This is Mr. Ninemire's assessment of the case as of September 2010. Am I correct about that?

A Yes.

Q To your knowledge was there ever a full mental health evaluation of Keith Nelson that ever took place in this case?

A No, never did.

MR. RUHNKE: I have nothing further on redirect, Your Honor.

MR. KETCHMARK: I have no further questions, Your Honor.

THE COURT: Thank you.

MR. KETCHMARK: Your Honor, I have no objection to her being finally excused.

I don't know if they have any objection or want her to be retained.

MR. RUHNKE: No, we have no objection to that. I thought you said you wanted to be excused.

MR. KETCHMARK: That too.

(Witness excused.)

MS. HARMS: Movant would call Jennifer Herndon.

JENNIFER HERNDON, being duly sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MS. HARMS:

Q Good morning.
A Good morning.
Q Could you introduce yourself to the court?
A My name is Jennifer Herndon.
Q What's your profession?
A I'm an attorney.
Q Where are you licensed?
A In the state of Missouri.
Q And where do you practice?
A In St. Louis, Missouri.
Q Okay. And how long have you been practicing as a lawyer?
A Twenty-four years.

Q And what type of practice do you have?
A I have a criminal defense, death penalty defense practice.
Q At what phase did you represent Keith Nelson?
A On direct appeal.
Q And who was your cocounsel?
A Susan Hunt.
Q When were you appointed in this case?
A In May of 2002.
Q And when was the opening brief filed?
A September of 2002, I believe.
Q How does that length of time compare to other capital briefs that you've filed?
A That's a very short period of time. I would say that I've never filed a brief that quickly before in a capital case.
Q If you had to give an average if pressed, what's the average length of time for a brief, capital brief?
A I would say 9 to 12 months.
Q Did you feel like you had enough time to prepare the opening brief that you did file?
A No.
Q Why is that?
A Well, we were under no further extension orders from the Eighth Circuit, and I'm not sure why. Maybe it was because

back then federal capital cases were still kind of new because now in that short a period of time, you wouldn't be under a no-further-extension order. But we basically had to get it filed, and we weren't done with it.

Q When you say you weren't done with it, what do you mean by that?

A Well, I remember the day it was due or the day before it was due trying to put it together and having the realization that we had too many words in it and we didn't have all the issues that should have been in it in it and feeling like it had to be filed despite -- I mean, obviously the word count, we had to slice that down, but with the issues, there really wasn't anything that could be done.

Q So there were additional issues you felt needed to be briefed?

A Yes.

Q And do you have a memory of who was to prepare those issues?

A Susan.

Q What issues did she prepare?

A She prepared the venue issue.

Q So what was your reaction when you saw her section of the brief?

A Well, I was -- when she sent me her portion of it, I was -- my reaction was this is it? I mean I remember specifically

having this sort of pit in my stomach, oh, my God, this thing is due and this is all she's sending me reaction.

Q Had you had discussions previously that led you to believe there was going to be more in her section?

A Yes.

Q Did you discuss the potential appellate issues with Mr. Berrigan?

A You know, I don't remember. I'm sure that I did informally, but I don't think we ever met specifically for the purpose of discussing what should be included in the appeal.

Q Okay. But you understood that Berrigan was lead counsel in the case?

A Yes.

Q Were you aware this was Susan Hunt's first capital trial?

A Yes.

Q Are you familiar with the ABA guidelines for capital counsel?

A Yes.

Q Do you know what they say about narrowing issues in a capital appeal?

A I know that they say every possible issue should be explored, that a capital appeal is different from a noncapital appeal where you have to selectively choose your best issues, and in a capital appeal, it should be more of an exploring and

including not every conceivable issue but, you know, every issue that has some merit.

Q In preparation for your testimony, did you review any transcripts from sentencing?

A I did.

Q Did you review the closing arguments of the government in this case?

A Yes.

Q I would like to -- well, first of all, what is your overall opinion of the closing argument of the government in the case?

A That it was improper in several respects.

Q Was there precedent to support the idea that the arguments were improper?

A Well, yeah. My conclusion it was improper would be based on Supreme Court case law as to what's proper and improper in an argument.

Q I would like to have you look at P30 at Bates page 1609, the section that starts, "We submit to you," and that ends with, "ultimate price."

MS. HARMS: Would you blow that up, please?

Q (BY MS. HARMS) Could you take a look at that argument and perhaps read it into the record?

A Sure. It says, "We submit to you that if this crime doesn't warrant the death penalty, then what crime does? We

need to protect our children. We need to send a message to guys like the defendant if they do this, they're going to pay the ultimate price that Congress has provided for this type of" -- and then it goes on.

Q Do you see anything improper about this argument?

A Well, yes. The send-a-message argument is improper.

Q Is there case law supporting that idea?

A Yes. There's case law that says that -- well, first of all, I mean, one of the sort of bedrock principles of death penalty law is individualized sentencing determination, and, you know, there's a hundred cases that go into detail about the individualized sentencing requirement. And so it violates that by saying send a message to guys like the defendant. It violates the individualized sentencing requirement.

And it also violates the case law that talks about how making the jury sort of a consciousness [as spoken] of the community is -- puts too big of a burden on that singular defendant and may make the jury feel like they're, you know, somehow solving the world's problems if they sentence this guy to death.

Q Do you think that you should have raised this argument on appeal?

A Yes.

Q Now, there was no objection when this was argued in closing. Would that have stopped you from raising it on

appeal?

A Not in this instance because there's clearly case law that says that's improper.

Q So this is one example of improper argument in the government's closing?

A Yes.

Q I would like to go now to P30 at Bates page 1621, lines 4 through 6.

MS. HARMS: If you could highlight those for me.

A Okay. The part that says you're not -- that's intended to put a guilt trip on you. You're not killing anybody, you're making a recommendation of the death penalty.

Q (BY MS. HARMS) Do you have any opinion on this argument?

A That would also be improper.

Q How so?

A Well, it takes away the jury's responsibility. The -- I mean, the -- it's contrary to the jury instructions that say it is the -- it's not just a recommendation. If the jury recommends it, the judge is going to impose it.

Q And if you'll go down to P30, Bates page 1621, do you see how Mr. Berrigan reacts to that comment?

A Right. He objected to it and basically, I think, said what I just said, that it's trying to deflect the responsibility for that awesome decision from the jury to somebody else. It's not merely a recommendation. So, yeah,

he makes a proper objection to it.

MS. HARMS: If you could go down --

A I'm sorry. Do you want me to read the rest of it?

MS. HARMS: No. I'm actually talking to Ms. Taylor. If you could highlight the paragraph down where the court rules on it. Next page. About lines 10 through 17.

A Yeah. The court sustained the objection, basically agreed with Mr. Berrigan, and then Mr. Berrigan asked him to disregard -- instruct the jury to disregard the prosecutor's comments, and the court refused to do that, which, you know, in my opinion, that's one of the reasons that this is error because it really has no effect sustaining the objection if the court let's the comments stand to the jury.

Q (BY MS. HARMS) Let's see how the prosecutor restated it.

MS. HARMS: Can we go to Bates page 1623, lines 1 through 5, highlight "you're not killing anybody."

A Okay. So this is when the prosecutor tries to go back and comply with the judge's orders that they -- that he not take away the personal responsibility. So he says, quote, You're not killing anybody. The United States government will be the entity responsible for putting the defendant to death, and Congress has said that in a crime, in this kind of a rare crime, the death penalty may be appropriate. We submit to you that it is.

Q (BY MS. HARMS) Do you think that's a fair restatement

that informs the jury of their responsibility?

A No. Because it still takes away -- it's you're not killing anybody and that's not correct.

Q And then, again, on Bates page 1623, lines 9 through 13, look at the court's reaction to the restatement.

A Right. And that's -- Mr. Berrigan didn't even object. The court called him up there and said, I don't think you've gone far enough, Mr. Whitworth. I think the instructions tell them that they are imposing the death penalty, and you can't say it any different than that. And I think you have. Now, I mean, you can correct it or I'll correct it. And then the prosecutor agrees that he'll correct it.

Q Given this exchange and the fact that this argument was repeated, do you agree that you should have raised this on appeal?

A Yes. Because I mean if you go further, he doesn't correct it. He goes back and says something else, but he doesn't correct his statement to the jury that it's not their responsibility. He never corrects that.

Q Perhaps -- would you agree that perhaps this may have been a stronger issue than some of the issues that were raised in the brief?

A Yes. I mean, I -- I've got to tell you I was never a fan of the venue issue, not that it shouldn't have been raised, but it was not going to win.

Q I would like to direct your attention to some of the language in the rebuttal closing, P30 at Bates page 1651, line 17 where it starts, "It's about something evil" and ends with "I want you to think about our children."

Do you see anything wrong with this argument?

A Well, it's improper personalization.

Q So do you agree that this is something you may have raised on appeal as part of the improper closing argument?

A Right. If this had been the only isolated comment, it wouldn't have gone anywhere, but in the context of everything else throughout the argument, it certainly is another instance of something that was objectionable and improper.

Q And just to be clear, I'm not going to belabor every single instance with you on the stand, but I just wanted to go through some examples.

A Sure.

Q And if we can go now to Bates page 1657, lines 11 through 15 where it starts "people who are evil" and ends with "this is the case," do you see anything improper in this argument?

A Yes. It says, And in this case this man, who is evil at his core, can only have justice -- or justice can only be imposed by the death penalty. And the improper -- that's improper. Calling the defendant evil is improper. Again, it goes back to sort of a bedrock principle of death penalty law

which is that the decision has to be based on only the facts, and it has to be free of arbitrariness and capriciousness, and name calling has specifically been identified as something that violates the individualized sentencing based only on the facts.

Q And you agree this is something you could have raised on appeal as part of the argument about improper closing?

A Yes. I mean, there's a -- I can think of examples off the top of my head where cases have been reversed or at least prosecutors have been called out for calling the defendant things such as evil or other --

Q And I just want to bring two more instances to your attention as examples. P30 at Bates page 1654 through 55 starting at line 20 at the bottom of 54. "He committed it because he is" and ending with "escaped justice" on the next page.

A Okay. "He committed it because he is rotten at his core. He's a rotten human being. He is bad." And then, "The mitigating evidence is nothing more than a smokescreen." I mean, it's the same thing as before.

MS. HARMS: And the top of the next page, please.

Q (BY MS. HARMS) Just that very first sentence.

A "What they want you to do is have him escape justice."

Q Okay. Do you see anything improper with this argument, the prior page and this?

A Yeah. It goes back to the same stuff of name calling and of encouraging the jury to decide the sentence based on emotion rather than based on what the facts are, and also there's some improper -- it's not proper to accuse the defense of sort of making up their defense.

Q One final example, Bates 1655 at lines 9 through 15 where it starts, "It was a plea for mercy" and ends with "most vicious members."

A Okay. "It was a plea for mercy. Don't confuse mercy with weakness. Don't confuse the natural tendency of decent persons like yourselves to be kind to other people. You have an obligation to uphold the law and that takes courage. Mercy, mercy. Under what twisted notion of fairness would a society reward its most vicious members?"

Q Do you see anything improper about that argument?

A Well, there's -- I know in Missouri it's improper to equate mercy with weakness, and beyond that, I know that the Supreme Court has said that it's improper to accuse the jury of not doing their job if they don't return a death sentence, and really that's what this is. It's saying if you don't return a death sentence, it's because you're weak and you have no courage and you haven't done your job, and that's -- there's Supreme Court case law that says that's improper.

Q Do you think the closing argument in this case and the statements that we've gone over but not limited to those, were

significant issues that could have been raised on appeal?

A Yes.

Q Do you think they were obvious issues?

A Yes.

Q Do you think they were stronger than some of those you presented in your brief?

A Yes.

Q Did you make a strategic choice to omit these arguments?

A No.

Q So you agree that you should have raised these issues on appeal?

A Yes.

Q You're familiar with Pat Berrigan, correct?

A Yes.

Q And you've worked with him in several cases?

A Yes.

Q I would like to go now to P18. This is notes and materials from the Berrigan file at page 26.

MS. HARMS: If you could highlight the circled handwritten thing on the left-hand side. Leave it up for a while.

Q (BY MS. HARMS) If you look at the top, what does this note appear to be about?

A It looks to be Pat's handwritten notes to the rebuttal closing argument given by Mark Miller in the case.

Q Do you see where he's noted it looks like "should have objected"?

A Yes.

Q If you had spoken to Pat about the appellate issues, do you think he may have brought this up?

A Yes. I mean, by -- evidenced by the fact that he notes on the side that he should have objected to it, obviously he's -- I mean, that's sort of a common thing. He and I both do that when we were in trial. We kind of look at what the appellate record should be while we're in trial to try to either help ourselves or the next counsel by noting things that we either did wrong or the government did wrong or rulings we felt like were wrong from the court.

Q And so you're pretty familiar with Mr. Berrigan's style as a lawyer, correct?

A Yes. I've worked with him for many years.

Q Do you think Pat -- or Mr. Berrigan is the kind of lawyer who might fail to object in a capital case because he doesn't want to be seen as obstructionist by the jury?

A No. He's quite the opposite of that.

Q I want to switch gears a little bit and talk about your prior representation of Mr. Nelson. Did you represent Mr. Nelson when he was a teenager?

A I did.

Q And where was that at?

A I was the public defender in Bates County, Missouri, which is south of here, and I represented him in that context.

Q Do you have any general memories about what the Nelson family was like?

A Yes. You know, it was -- Bates County is a very small county, and everybody kind of knew each other. Keith was my client several times in his teenage years there, and he also had a brother, who, I believe, I represented. The general, you know, just knowing Keith and his family was the prosecutor and the judge and myself and kind of everybody in the courtroom would always feel like Keith deserved a break because nothing was ever really his fault just because you couldn't expect anything else from him, you know, because of where he came from and the absence of any parental controls and some, like, complete lay evidence that there was a lot of craziness in the family.

MS. HARMS: That's all I have.

CROSS-EXAMINATION BY MR. KETCHMARK:

Q Good morning, Ms. Herndon.

A Good morning.

Q And just so I'm clear and I have an understanding, I think I do, it's your testimony here today that you and Ms. Hunt were ineffective in how you went about raising in the brief and that you didn't raise issues that you think should have been in there. Is that a correct statement?

A Well, that's a legal conclusion that's not my place to make. I can tell you that that's an issue that should have been in there, but that's as far as I can go.
Q You have in other cases where you've been represented -- where you've been involved in the appellate representation, you've basically come into a courtroom similar to this and said we made mistakes, we made errors, correct?
A If I make a mistake, I'll tell you I made a mistake.
Q Okay. In fact, you've done that in cases where the judge has ultimately disagreed with you and found legally at least it wasn't ineffective assistance of representation, correct?
A Sure, yes.
Q And so if I'm understanding you correctly, then, what you're saying is that you and Susan had a disconnect in that we never came to the same understanding of who was going to be raising what issues, correct?
A I didn't -- there was no disconnect on my part. I don't -- I mean, she was in here. I assume she told you her story, which I don't know what it is.
Q Let me ask you this: How long have you been an attorney?
A Twenty-four years.
Q How long have you done appellate work?
A I rarely do direct appeals, but -- I mean, I've done

enough to know what I'm doing, I guess.

Q And you actually before you moved over to St. Louis and have focused exclusively on the habeas stuff, which I think you indicated is about 99 percent of your work now; is that correct?

A That's correct.

Q Before that you were here in the Kansas City state public defender's office with Mr. Berrigan in the capital unit, correct?

A Correct.

Q And in fact you and Mr. Berrigan were fired or left about the same time but it had nothing to do with your performance; is that correct?

A Well, that's what they said.

Q Okay. Did you think that it had to do with your performance and your representation of clients while you and Pat were working there?

A No, not at all.

Q Okay. And you know Mr. Berrigan and you've worked with him not only there but you obviously were brought into this case at his recommendation, correct?

A Probably.

Q Well, if I were to tell you that a motion was filed by Mr. Berrigan asking for leave to withdraw from the case and recommending you as substitute counsel and setting forth your

experience and why he thought you would be a good fit, you would have no reason to dispute that, would you?

A No, not at all. I mean, I'm sure he would endorse me as a fit. I just don't remember if he was the one that asked me to take over or not, but if he was, I mean, I don't dispute that at all.

Q On that note, with respect to your bar license, have you ever been found to be ineffective by a court, whether federal or state?

A No.

Q Have you ever had a bar complaint filed against you suggesting that you were ineffective?

A Yes.

Q Has that ever been validated or found -- a bar finding that you were in fact ineffective?

A No.

Q When you handle and you go through the process of working on an appeal, isn't it correct that the first thing you're going to do is you're going to review the trial record and the transcripts from start to finish, whether you tried the case or not?

A The first thing I do is read the trial transcript, yes.

Q And in fact you also then would have contact, if you didn't try the case, with the attorneys that represented the defendant at the trial level, correct?

A Ideally.

Q You did that in this case. You in fact had conversations with Mr. Berrigan, who was your friend, as well as Ms. Hunt, who was still on the appeal; is that correct?

A I definitely talked to Susan about it. I mean -- so because we were preparing the appeal, obviously Susan Hunt and I talked about it. I don't -- I mean, this was a long time ago in my life. I don't think I ever had a formal discussion with Pat Berrigan about it, you know, where I said, hey, I need to talk to you about Nelson, can I come over to your office and sit down and talk about it. I don't believe that ever happened.

Q Ma'am, do you remember when you were deposed in our office back on October 17th of 2012, Mr. Valenti was asking you the questions, and he asked you, "Did you have access to trial counsel?"

"Answer: Yes.

"Did you speak with trial counsel in this matter?

"Answer: Yes.

"And those would be who?"

And you indicated Pat Berrigan and Susan Hunt. Do you remember that exchange with Mr. Valenti?

A Yes.

Q So you would have had some discussion with Pat and with Susan?

A Well, I think that's what I just testified to, but what I want you to understand is that I don't believe I ever sat down with Pat and said, let's go through this and figure out what the appeal issues are.
Q Well, because you obviously had experience in your ability to review the record yourself and make your own assessments as to what you thought should be the issues that should be raised, correct?
A Yeah. And I had Susan, and, I mean, you know --
Q Let me ask you this, Ms. Herndon: When you were going through and reviewing the transcript, did you review the entire transcript in terms of all of it, including the closing argument?
A Yes. I read the whole transcript.
Q And when you're going through that, are you reviewing it to try to determine what issues you think potentially should be raised? That's why you do it, correct?
A Yes.
Q And you would make notes, I assume, on the transcript or something saying here's a possible issue, should have been objected to, things of that nature? I mean, that's part of the process of doing that review, correct?
A Well, yeah. You have my entire files, so if I have notes in there, then you have them.
Q And the reason you did a review of the transcript is to

try to figure out what issues you're going to raise, correct?
A Yes.
Q With respect to this particular brief, you indicated that you and Susan had divided the labor up and it was your understanding that she was doing more than the venue issue, correct?
A Correct.
Q Now, you understood, did you not, that Ms. Hunt had no prior capital experience and that she was primarily on the case for the guilt phase and she handled the venue issue at the trial level? Did you know that?
A Yes.
Q I'm trying to figure out from somebody who has extensive capital experience in the appellate arena, why are you under the assumption or belief that Ms. Hunt was going to be the one responsible for briefing the issues on closing argument in the penalty phase of the trial?
A Well, there was only a penalty phase of the trial, so if I had taken the other -- if I had taken all the penalty phase issues, then she wouldn't have written any part of the brief which --
Q She would have written the venue issues, correct, because that was briefed and you didn't think it should have gotten as much attention that it did, but that was in the brief, correct?

A That was the only part -- that was the only issue that she thought was really very relevant.

Q Let me ask you this: Wouldn't you get -- you have a word limit of 25,000 words, right?

A Right.

Q You're in St. Louis. You're the one primarily responsible for filing the brief?

A In terms of physically filing it. In terms of drafting it, no, but getting it to the Eighth Circuit, yes.

Q Who was responsible for taking your portion and her portion and melding them together into one cohesive document?

A Me.

Q So she briefed her issue or she briefed what she briefed and sent it to you and you were responsible for taking that and blending it together?

A Right.

Q And in fact you ended up coming in one word under -- I think you were at 24,999 words, correct?

A Well, no. Actually when I put her part and my part together, we were over 25,000 words. So I cut it down.

Q At that point, ma'am, did you reach out to Ms. Hunt by phone, by e-mail, by whatever, and say we've got a problem here, where are the issues on the closing argument?

A No.

Q Why?

A Because the brief was due that day, and I was having a hard enough time getting it -- getting what we had put to the court.

Q Well, you indicated and there was some discussion about there was no further extensions, correct?

A Correct.

Q You remember that testimony?

A Yes.

Q With respect to that, you in fact had a no further extension order in this case and you asked for an extension and it was granted by the court, correct?

A Correct.

Q And in fact you knew that, this being a death penalty case, the court's going to give you more time if you ask for it, correct?

A Well, I certainly know that now, but you have to keep in mind that this was 12 years ago. I started doing federal death penalty work in 1997, so at this time I had five years of experience, and that's not primarily what I did anyway. And so I wasn't -- I mean, if this had happened now, I would pick up the phone and call Michael Gans and say I can't do this.

Q And I understand. I'm not focusing on what you would do now. What I want to focus on is back then at the time.

So you're telling me that while you saw there were

issues that you believed were meritorious that should have been raised, because you were scared to ask the court for an extension of time, you didn't ask for the extension? That's what your testimony is?

A Well, not exactly. I wouldn't say I was scared. I would say I felt like we had to get the brief filed that day, and, you know, this is a capital case and this guy's life is at stake. And I'm not going to take any chances by not getting the brief filed on a day that I felt like it had to be filed.

Q And is it accurate, ma'am, that the reason you thought that was because you thought you were putting forth the best issues, and to put forth these issues on the closing argument, you have to cut something else out and you were already struggling to get it under the word limit?

A No.

Q So you thought that these were better arguments than what was being advanced in the brief but because you were on this deadline, you had to get this thing filed? That's what your testimony is?

A No. I think that you're failing to understand maybe --

Q Enlighten me. I am. Please explain to me why you've got a deadline, you've got issues that you think are meritorious or at least today you think they're meritorious, why are those left on the cutting room floor and other issues

being briefed?

A Well, okay, they weren't left on the cutting room floor because nobody drafted them.

Q You could have reviewed the record and you knew those were there, because did you identify those as issues when you reviewed the transcript?

A Yes. And it was my understanding that -- if you look at the issues that I did, they were all issues that were sort of, I don't know, complex or technical, capital-specific issues, issues I had drafted before or issues that I had experience with in capital litigation.

The other issues that I believed Susan was going to draft would have been the more guilt-phase related issues or issues that didn't require any particular capital experience.

Q But as you're drafting and melding the brief together, is that when you realize that she didn't do those other issues and she only did the venue issue?

A Yes. And you have to realize that this happened on the day the brief was due when she sent me her part of the brief and I was like -- I mean, I remember, and I have a bad memory -- I have a specific memory of having this feeling of, oh, no, you know, this is not good. This is not what I expected.

Q Because you expected that these other issues that you're testifying about today would have been included in the portion

that Susan was doing, correct?
A Because she told me she'd do them.
Q So when I say they were left on the cutting room floor, when you were blending the brief together and you're coming up with the determination of that --
THE COURT: All right. Mr. Ketchmark, I think you have done this enough.
MR. KETCHMARK: All right.
Q (BY MR. KETCHMARK) Did you keep any documentations or notes with respect to your conversation with Ms. Hunt?
A No.
MR. KETCHMARK: One moment, Your Honor.
Q (BY MR. KETCHMARK) Ms. Herndon, after you filed the initial brief, did you ever ask for leave to supplement the brief or file any 28(j) letters?
A No.
MR. KETCHMARK: That's all I have.
THE COURT: I've got a question. Maybe it's because I just missed it.
The division of labor that you had with Ms. Hunt, between her and yourself, what was it?
THE WITNESS: You didn't miss it. The issues that I included in the brief were specifically I said, you know, I'll do these three or four, however many they were, and she said, okay, I'll pick up the venue issue and the others. And

honestly I don't have a memory at this time if I knew what the others meant specifically, but that was my understanding. I had these three or four that I was definitely going to do, and her comment was to the effect of I'll take care of the venue issue and the others.

THE COURT: Any follow-up?

MS. HARMS: No further questions, Judge.

MR. KETCHMARK: No, Your Honor.

THE COURT: Thank you.

THE WITNESS: Thank you, Judge.

(Witness excused.)

MR. RUHNKE: Your Honor, we're moving a lot faster than I thought we would.

THE COURT: You keep telling me that.

MR. RUHNKE: I know I keep telling you that.

We're moving so fast that the witnesses I expected to be here this afternoon have been told to be here now. There's a witness coming from Clark County court?

MR. BROTHERTON: Clay County.

MR. RUHNKE: Mr. Shull is on his way here. I do apologize. I never thought we would go this fast.

THE COURT: You don't have anyone else?

MR. RUHNKE: I don't not at this point.

THE COURT: All right. When is he going to be here?

MR. RUHNKE: He said he'd be here in 25 minutes.

THE COURT: Why don't we take our lunch break now.

MR. RUHNKE: I appreciate that. I apologize. I really wanted to fill the time.

THE COURT: Get the rest of them ready to go.

MR. RUHNKE: Okay. You've given us four days and we appreciate it.

THE COURT: I'm not giving you four days.

MR. RUHNKE: You're giving the hearing four days. Understood.

THE COURT: I'm dividing that equally.

(A recess was taken.)

MR. RUHNKE: Your Honor, for your information, Mr. Shull is here. Mr. Berrigan is on his way here. We expect him here by one o'clock or thereabouts. In terms of the division of time, we've talked. The government and the defense in the case have been uncommonly cooperative with one another. I commend the government.

THE COURT: Uncommonly?

MR. RUHNKE: This peace in the valley, I'm used to it where I go, but it seems to have been a good relationship. The government has estimated they need approximately a day or less for their case. We see this going much faster than we had anticipated.

We've contacted our various out-of-town experts. We're making travel plans, changing travel plans, and trying

to get people in here as quickly as possible, and there may be some glitches in the schedule. And I'll take full responsibility for those, but we'll get this done. We'll get this done in the time you've allotted to both sides, Your Honor.

THE COURT: Well, here's what my expectation is, that you will have your case done by tomorrow.

MR. RUHNKE: Okay. That cannot happen and will not happen because we have out-of-town experts coming in, and I understand the government wants to see our case go in. They want us to see that Mr. Nelson gets a full shot to present his defense.

Again, this was based on conversations we've had with the government that they need about a day, and we said, fine, we'll take the first three days, and that was maybe never communicated to Your Honor. That was the idea that it wouldn't be even division.

THE COURT: The point is looking at your witnesses, it shouldn't take three days. It shouldn't take three days, and I can see that, and I'm hoping that you can see that. But you're spreading it over a period of time that you should have discussed with the court.

MR. RUHNKE: If I had seen it, I certainly would have not be standing here right now saying we did not anticipate how fast it would go.

THE COURT: What is your proposal?

MR. RUHNKE: Our proposal is that --

THE COURT: We're going to break Monday early?

MR. RUHNKE: I don't think so between Mr. Shull and Mr. Berrigan. We can put on the next witness after Mr. Berrigan, which is Mr. Stetler, so we can certainly fill up to at least four o'clock today.

THE COURT: I'm talking about tomorrow.

MR. RUHNKE: You're talking about tomorrow. We should have a full day tomorrow as well. We've got witnesses who certainly are out of town. We tried to schedule as we thought the case would go and also with a mind towards expenses.

The Arizona Capital Habeas Unit for the federal public defender is funding the travel and fees of the expert witnesses, and we did not want to run into a situation where they came into town, were sitting around, and extra travel expenses. So we're doing our best. We really are acting in good faith, and if I misestimated the amount of time that this would take, I do apologize.

We want an opportunity to present our case. I think the government wants an opportunity for us to present our case. The government is happy to have a day to put its own case in. If that is seen as maybe yielding some of the government's time to the defense, I don't think there's an

objection.

THE COURT: Well, we'll see, we'll see. Get your witnesses on. We'll talk about it later.

MR. RUHNKE: All right. Thank you, Your Honor. Call William Shull.

WILLIAM SHULL, being duly sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MR. RUHNKE:

Q Mr. Shull, will you spell your name for the court reporter for us?

A The last name is S-h-u-l-l.

Q How are you employed?

A I'm a lawyer.

Q And for how many years have you been an attorney?

A Since 1972.

Q And in terms of your career as an attorney, have you specialized in any particular area of law?

A It's been a general practice, but probably the greatest emphasis has been on either criminal defense or domestic relations.

Q And, generally speaking, where do you practice?

A Generally in the greater Kansas City area. I'm admitted both in Kansas and Missouri.

Q And do you practice in federal court?

A I do.

Q Are you a member of the CJA panel, or do you accept CJA appointments?
A I am.
Q And taking your experience as of 1999, so going back 13, 14 years, had you had any capital case death penalty experience?
A My recollection, again, is going back, I had three capital cases. Two were state and one was federal.
Q And do you -- back from 1999, about how many years before 1999, would those two state cases have been?
A It would have been within five or six or seven years.
Q And the federal case was when?
A Again, somewhere within that timeframe.
Q Focusing on the federal case for a moment, was the death penalty authorized or sought in that case in the long run?
A It was.
Q And did that case proceed to trial?
A No. We at the last minute were able to work out a recommendation for life without parole.
Q And did your client basically enter a life without parole plea and the government withdrew the death notice?
A That is correct.
Q Were there other defendants in the case?
A There were several other defendants.
Q And did any of them face the death penalty?

A They were all resolved by the plea.
Q All right. So the case did not proceed to trial at all?
A It did not.
Q With regard to your Missouri cases, state cases, I assume they were state cases in Missouri?
A They were.
Q Did either of those cases come to trial?
A The first one came to trial and resulted in an acquittal. The second one on the eve of trial again was a plea with life without.
Q So as of 1999, had you attended any capital training programs, seminars, anything of that nature?
A I attended a seminar in, I believe, Santa Clara, California, the Death Penalty College out there. It was a weeklong course.
Q Was that before or after your appointment in the Nelson case?
A That was about the time I was appointed.
Q Now, do you recall when it was that you were appointed?
A No, I apologize, I don't.
Q I think we can all agree it was in October of 1999.
And do you remember anything about the appointment, how you knew that you had been -- were going to be asked to represent Keith Nelson?
A My recollection is that I received a call asking if I

would be willing to accept the appointment. I acknowledged that and then received some type of correspondence after that.

Q And thereafter began to represent Mr. Nelson?

A Yes, sir.

Q Who else, again, focusing on this period of, let's say, from the fall of 1999 through August of 2000, nine, ten months, whatever that is, who else in terms of attorneys were involved in the defense of Mr. Nelson?

A Susan Hunt was appointed as another CJA attorney, and then there was an attorney from the Western District Public Defender's Office.

Q And you remember who that was?

A I apologize, I don't.

Q Larry Pace refresh your recollection?

A That would be it, yes, sir.

Q And was there another attorney who was involved to some extent in -- for some purposes in the case?

A There was. There was a lawyer by the name of David Franco, who intervened in the case shortly after Mr. Nelson was arrested, although he was not appointed or to the best of my knowledge was ever retained by anyone.

Q If I said Daniel Franco, would that change your mind from David?

A Yes.

Q Okay. Mr. Franco's role was what, as you recall?

A My recollection was that he came to Mr. Nelson's hospital room, told Mr. Nelson that he was an attorney and would be representing him, and other than that, he primarily was a tagalong. He would come to court. He would attend meetings that we had with Mr. Nelson and such.

Q From your perspective as part of the defense team, did Mr. Franco play a significant role in the case?

A In my opinion, not only did he not play a significant role, but he was a detriment to our initial handling of the case.

Q And how so?

A We had an agreement among the counsel that we would meet with Mr. Nelson together. We did not want to run into problems with different lawyers giving different advice or discussing strategies that everyone else was not comfortable with, and it came to our attention that Mr. Franco was actually meeting with Mr. Nelson over at CJA [as spoken] and was having discussions with him that we did not believe were consistent with a good defense.

Q And at some point did Mr. Franco basically withdraw or sort of whither away from the case?

A Yes.

Q The federal public defender, the attorney assigned to the case, was Larry Pace you've recalled. Who was taking the lead on the issue of mitigation again in this period of time,

fall of '99, summer, August of 2000?
A I don't know that I have a distinct recollection as to who that was. I'm not sure even at that point that we had divided up as far as the trial and the mitigation issues yet.
Q Okay. Are you familiar with a man named Ronald Ninemire?
A Yes. Mr. Ninemire was an investigator for the public defender's office.
Q And did he have a role in that case?
A Yes. He was the initial primary investigator that we used.
Q Did you, yourself, travel anywhere to interview members of Mr. Nelson's family or otherwise conduct what I would call a mitigation investigation?
A I believe that I made one trip to Texas to basically do some brief investigation and also to meet with a mitigation investigator down there.
Q Would that have been Tena Francis?
A Yes.
Q Just in terms of the timeline, and we'll come to that in a minute, this would have -- that would have been -- we'll come to it -- in November of 2000. And so let's set some other time mileposts.
You recall at some point Mr. Pace and the federal public defender's office moved to withdraw from the case?

A That's correct. It was my understanding there was some type of a conflict with one of the potential witnesses in the case.
Q And do you recall -- the record speaks for itself -- but do you recall that was in August of 2000?
A Again, I can't recall a specific date.
Q Okay. And the other CJA attorney, Criminal Justice Act attorney, in the case was Susan Hunt.
What role did she play in the case to your recollection?
A She played a very active role as far as discussing strategy, drafting motions, assisting me in drafting motions, attending various court hearings, and so forth.
Q And while the public defender was representing or was part of the defense team for Mr. Nelson, do you recall them engaging in any kind of mental health examination and hiring experts, mental health experts to evaluate Mr. Nelson?
A We originally had asked and I believe received approval to retain a forensic psychiatrist. I want to say Dr. Patterson, but I'm not certain on that.
Q Dr. Peterson?
A Peterson.
Q That was a motion that you filed.
Do you recall filing that motion?
A Vaguely, yes.

MR. RUHNKE: If we could see P28 at page 22, Bates page 22, and just back that up a couple pages to the actual motion. This is -- right.
Q (BY MR. RUHNKE) Do you see that on the screen in front of you, Mr. Shull?
A Yes, sir.
Q Do you see that this is a motion filed on June 7th, 2000, for funds to hire psychiatrist and for approval of funding in excess of the limits of the -- then the drug act, which was the death penalty funding source at the time?
So you filed this motion, prepared this motion?
A Yes. I believe it was in conjunction with Ms. Hunt, but I think I took the lead on it.
Q All right. And without going through the motion, it's in evidence, it speaks for itself, did you discuss in the motion the need for expert assistance in capital cases?
A Yes, sir.
Q The need for, especially in capital cases, for psychiatric examination or mental health examination?
A Yes, sir.
Q Based on your experience at the time, did you think those kinds of inquiries and examinations were important to capital defense?
A Not only important, but I thought that they were very critical.

Q And why? Why did you feel that way?
A Because at that point I'd been practicing law a little more than 20 years, and I believe very firmly that various types of cases, particularly with circumstances that were unusual, just demanded some type of a review by a qualified psychiatrist or psychologist to determine the mental condition of your client, the mental stability, any past history, or factors that might influence the commission of the offense.
Q And during this same period of time, did you also seek court approval for the appointment of essentially a combined mitigation specialist and fact investigator?
A We did.
MR. RUHNKE: If I could have P28 at, I hope, page 7 displayed, and the caption and filing date of that, please, enlarged. Let's go back up to the start of the document. Sorry.
Q (BY MR. RUHNKE) And, again, without going through it paragraph by paragraph by paragraph of the seven or eight-page motion, did you emphasize to the court when you filed this motion the importance of having a mitigation specialist to investigate mitigating evidence in a death penalty case?
A Yes, sir.
Q And that was the kind of thing that was very common in capital cases even back in 1999 and 2000; is that correct?
A Again, I believe that it was just almost mandatory

because of the nature of the offense and the potential punishment.

Q Meaning a capital offense?

A Yes, sir.

Q And in the -- that motion did you emphasize the broad range of mitigating circumstances that are potentially available in a capital case?

A Yes, sir.

Q Did you reference a potential investigation of mental health issues, birth issues, entire life history?

A Yes, sir. I think that reflected not only my personal experience with the defendants but also what I perceived to be the state of the case law at the time.

Q Were you aware at or about this time of the circumstances of Mr. Nelson's birth?

A Yes, I believe so.

Q What do you recall about that?

A My recollection was that there was a suggestion that based on his behavior, that there may well have been a fetal alcohol syndrome issue there; that the interviews that we had done suggested that when he was in approximately 9th grade, there was a very dramatic and sudden personality change and the people who were associated with him at that time had no excuse or explanation as to why that would have occurred other than some type of a genetic or organic issue.

Q Referring to fetal alcohol syndrome, are you aware from your simple knowledge in this field and representing capital defendants, that fetal alcohol syndrome can lead to neurological damage, neurological impairments?
A Yes.
Q Were you aware or do you recall, as you sit here today, that Mr. Nelson was born shortly -- that his mother went into labor shortly after she had been the victim of a vicious assault by the father of her children?
A That was the information that we had received.
Q And that his mother, Nancy Nelson, gave birth to premature twins that followed that assault. Do you remember that?
A Yes, sir.
Q Do you remember that Mr. Nelson was the second born of the twins?
A I believe that's correct.
THE COURT: Why are we going through this testimony, Mr. Ruhnke?
MR. RUHNKE: Because we're going through what counsel were aware of and what counsel knew in 2000 --
THE COURT: He already said he wanted to get a mitigation expert in here, so why are we going through this?
MR. RUHNKE: Your Honor, the reason we go through that specifically is that counsel in the case were well aware

of the issue of potential neurological damage. It wasn't a Johnny-come-lately argument.

THE COURT: That's a matter of record.

MR. RUHNKE: It's a matter of record. I'd just like a little leeway to develop the record that --

THE COURT: I've given you that. Let's move on.

MR. RUHNKE: Okay. I'll move on.

Q (BY MR. RUHNKE) And who is the person you selected or asked the court to appoint as a mitigation specialist at the time?

A Again, I believe it was the lady who we interviewed down in Texas.

Q Okay. I'm going to focus you in to the spring of 2000. Was there a time when Mr. Grothaus, Daniel Grothaus, was appointed to assist in the case?

A Yes.

Q You know Mr. Grothaus, I assume?

A Yes. He had been an investigator, and I had used him in some other matters.

Q Do you know him to be a trained mitigation specialist or more of a private investigator, fact --

A He was primarily a factual investigator, and I don't believe he had actually done any mitigation specialty work at that time.

Q Now, as the case moved on, do you recall at the end of

July of 2000, this is while Mr. Pace is still a part of the case, do you recall in the end of July 2000, moving to continue the trial?

A I don't have a memory of it, but, again, I think that would be in the record.

Q It is in the record, and I know it speaks for itself.

And part of the reasons for moving for a continuance is you did not feel that your mitigation investigation was complete. Do you recall that?

A Yes.

Q Do you recall that you did want to explore issues such as neurological impairment?

A Yes.

Q And ultimately that was filed on July 30 of 2000, several weeks later, two or three weeks later, and I'll just represent this for the record, Mr. Pace withdrew from the case, and I believe the date is August 21, 2000.

You do remember him leaving the case, correct?

A Yes.

Q What was Mr. Grothaus engaged in in terms of investigation as far as you recall?

A I don't remember a specific assignment, but he was investigating some of the various reports that we had received, contacting and identifying potential witnesses concerning Mr. Nelson's background, school record, juvenile

record, and general matters like that.

Q All right. And do you recall he was investigating as well what I'll refer to as a conspiracy theory that somehow the victim's family had been involved in her death and there had been rumors to that investigated by the police?

A Yes. That was one of the areas we asked him to look at because that was a very prevalent rumor at the time.

Q And it proved to be unfounded?

A We could find absolutely nothing to support it.

Q Okay. Does the name Tena Francis ring a bell with you now?

A Yes. She was the one that we visited with in Texas.

Q I'm going to direct your attention to later in the fall of 2000, and, again, the situation is Mr. Pace has withdrawn, Mr. Ninemire is no longer involved.

Do you recall having a phone conversation with Ms. Francis?

A I apologize. I don't remember the specific details of the phone call.

MR. RUHNKE: I'm going to ask that we display P9 at page 7. These documents are all in evidence, by the way, Mr. Shull, so they're not just to refresh. P9 at page 7. This is kind of plan B to the trial -- if we could blow that document up. I'm not quite sure why it's not coming up, although we'll get to it.

Easier to just put it on an Elmo. Maybe that was a little easier. Maybe we can just bring up the note version of it and we'll work on that one. Okay. Is -- blow up at page 7. Blow that up a little bit.

Q (BY MR. RUHNKE) At the top do you see -- and I represent to you these are Ms. Francis' notes of her conversation with you. She called you, according to this note, on November 15, wrote down office number, cell number. I note that's still your cell number, correct?

A That's correct.

Q Office number has changed?

A Yes, sir.

Q And did you discuss the nature of the case with her?

A Yes.

Q Do you recall now that you're looking at these notes your discussion with her?

A Yes.

Q The case involved a 24-year-old white male, kidnap, murder, federal PD was cocounsel, conflicted out, has fact investigator who has done little or nothing. Would that have been your assessment of Mr. Grothaus' work to date?

A Yes.

Q A comment that will be in Dallas three or four days beginning and there's a date. The defendant spent nine years in White Settlement.

Were you planning to take a trip to Dallas/Fort Worth at about that period of time?
A Yes. That would be part of our own investigation.
Q And the reference to White Settlement, White Settlement is a town, as you know now, outside of Dallas/Fort Worth, correct?
A That's correct.
Q If you look down further on this document, if we just scroll down a little bit, the -- you're telling apparently Ms. Francis that there's an April trial date, that you're going to fax to her the FBI affidavit. I assume that would be the affidavit in support of the complaint that led to Mr. Nelson's arrest?
A Yes, sir.
Q There was a reference to where you may be staying near Dallas/Fort Worth and finally the name Keith Nelson appears on that. Did you then travel to Dallas/Fort Worth and meet with Ms. Francis?
A Yes.
Q Did you meet with anybody else during that trip, if you recall?
A I believe Ms. Hunt went down with me, and we did meet with an attorney down there, if I recall correctly.
Q Do you recall meeting with a Dr. Cunningham as well, Mark Cunningham?

A Yes.
Q Okay. And what was his role, as you recall?
A I apologize. I can't independently remember that at the moment.
Q It's been a number of years, understood.
MR. RUHNKE: Can we display P10 at page 8. All right. And if we could just highlight the first half of that, the top half of that, and blow it up. Okay. That's fine.
Q (BY MR. RUHNKE) So you note the date on that, November 17, 2000, at the top, the reference meeting with Bill Shull and Susan Hunt? So is that a meeting that you did attend as you recall now?
A Yes, sir.
Q And during the meeting, it's obvious Ms. Francis is writing down things that you're telling her. You mention there that in the 5th grade -- I mentioned before 9th grade, but the 5th grade the defendant's personality changed drastically, according to his mother and 5th grade teachers. Ms. Francis is writing down you have certain records, Missouri prison records, parole records.
MR. RUHNKE: Can we go down further on that, please?
Q (BY MR. RUHNKE) For what it's worth, you mention to Ms. Francis that the U.S. Attorneys were rabid about the case meaning they were very geared up to got a conviction in a death sentence?

A Yes. It was very, very high profile, and they were very intent on prosecuting.

Q At that point you had an April trial date and there's a reference to even if venue granted.

At that point there was a pending motion to change the venue; is that correct?

A That's correct.

Q You go down to the lower part of the page.

These are various things that you're telling or Ms. Hunt is telling Ms. Francis for her own information about the circumstances of the case you're discussing. You're talking about Dan Franco came to the hospital, claimed to be his attorney, et cetera, and then the federal public defender was conflicted out because of, quote, a snitch.

MR. RUHNKE: If we can go to the last page of that document, page 4, I think it is, Bates 11. At the top can we just highlight the place with the double exclamation points.

Q (BY MR. RUHNKE) Ms. Francis writes down "Has neuropsych hired." This was November of 2000, November 17, 2000, according to the document.

At that point did you have a neuropsych actually hired, or were you contemplating hiring a neuropsychologist?

A We did receive approval from the court to retain the neuropsych, but I don't recall what the chronology of it was at that time.

Q And just for your own information, and the record will support, the motion wasn't actually filed until January, but were you at that point in the process of trying to get together motions for funds for a neuropsychological investigation?
A Yes.
Q And did you suspect, based on the investigation that had been developed to date, that Mr. Nelson may have had neurological impairments, including brain damage?
A Yes. And that's why we believed a neuropsych would be of some benefit in the matter.
Q Now, just to not dwell on the documents, did you hire Ms. Francis to work as a mitigation specialist on the case?
A Yes, sir.
Q And was that ultimately approved by the court?
A I believe so.
Q And if you recall, did you also seek approval for Dr. Cunningham's services, and were those approved by the court?
A I don't remember on that.
Q I'm going to take you to early January, and I want to bring up P28 at Bates page 67.
MR. RUHNKE: Can we just highlight the top caption, et cetera, of the case.
Q (BY MR. RUHNKE) You see this is a document hard to read

filed January 4, 2000, but it's an ex parte motion for funds to employ Dennis G. Cowan to conduct the neuropsychological examination of the defendant.

Did you know Dr. Cowan or do we know how Dr. Cowan's name came to be selected or suggested as a possible neuropsychological expert?

A My recollection is that we made phone calls to other lawyers who did criminal defense work, and Dr. Cowan was identified as the individual that we should consult with.

MR. RUHNKE: And in the body of the motion if I can go to the next page, please, would you highlight paragraph 4.

Q (BY MR. RUHNKE) The motion recites that investigation to date has revealed that defendant was born prematurely, spent the first four months of his life hospitalized with breathing difficulties. This fact combined with other factors raises the suspicion that defendant may have organic brain defects, which may lead to mitigation evidence in the case.

Was that an issue that you intended to explore with Dr. Cowan?

A Yes.

Q And to your knowledge, did the -- did Dr. -- sorry, roll back a bit.

The court approved Dr. Cowan's services in due course, correct?

A Yes.

Q At any time to your knowledge did Dr. Cowan ever actually see Mr. Nelson?
A I do not know. Shortly thereafter I believe I withdrew or was asked to withdraw from the case by Mr. Nelson, and I don't know of any further contact between Dr. Cowan.
Q All right. And one more document to show you is P28 at page 79, Bates page 79.
MR. RUHNKE: Just highlight the upper part.
Q (BY MR. RUHNKE) Do you recall at some point, and, again, this is filed January 11, 2001, do you recall that you decided, you and Ms. Hunt, because you were the only attorneys on the case at that point, that you would replace Mr. Grothaus with another investigator?
A I vaguely remember that. I don't specifically remember this specific pleading.
Q Okay. But was there a time when Mr. Grothaus left the case and Mr. Murphy assumed the investigative responsibilities?
A Yes. I believe Mr. Grothaus had other matters that he wanted to give priority to, and I think he began to feel uncomfortable about doing mitigation work.
Q And this is now January 2001. Shortly thereafter within a month or two, did you leave the case?
A Yes, I did.
Q And essentially Mr. Nelson had written a letter to the

magistrate judge that for whatever reason he no longer wanted you to be on his case. There was a hearing and you were asked your position on it and essentially said that the relationship had broken down, and no matter what the reasons, it would just not make sense for you to continue on the case; is that correct?

A I believe so.

Q In sum and substance?

A Yes, sir.

Q And at that point, which is around February, mid February 2001, did you withdraw from further representation of Mr. Nelson?

A I believe the court granted my motion allowing me to withdraw.

Q And, again, the record speaks for itself and your recollection is correct, the court granted it and you withdrew from the case at that point.

Funding was approved for Dr. Peterson in the spring of 2000 -- I'm sorry, was applied for in the spring of 2000, ultimately approved to the tune of roughly $20,000 in August of 2000, and yet Dr. Peterson never met or evaluated Mr. Nelson, never billed for anything.

Do you recall why that evaluation never occurred, never went forward?

A Well, while I was still in the case, Ms. Hunt and I had

had some discussions about Mr. Nelson's psychiatric or psychological condition, and if the matter were going to go to trial and if we were going to rely on that as some type of defense, how would we best present it. I think we were initially concerned, particularly after this thing with Dr. Peterson, that without further background or information, that we probably would end up with a diagnosis of simply Mr. Nelson being a sociopath, and we believed that there were stronger issues there. And I want to say that Dr. Peterson suggested then we do the neuroexam and then come back to him if there was something there.

Q So that the neuropsychological exam would be a prelude to further evaluation by Dr. Peterson if it yielded anything of significance?

A That's correct.

Q That was your thinking at the time?

A Yes, sir.

Q Did you, yourself, have any interaction with Tena Francis in terms of a mitigation case after that one meeting in Dallas/Fort Worth?

A If I did, it would have only been by telephone, and I don't have any specific recollection of those.

Q And after you withdrew from the case in February of 2001, did you have any further involvement in the case?

A No.

Q Okay.

MR. RUHNKE: Just a moment, Your Honor, if I may.

Nothing additional on direct, Your Honor.

MR. KETCHMARK: Thank you, Your Honor.

CROSS-EXAMINATION BY MR. KETCHMARK:

Q Afternoon, Mr. Shull.

A Mr. Ketchmark.

Q Just kind of picking up on where Mr. Ruhnke dropped or left, with respect to Dr. Peterson, you were aware obviously that there was money that was available, and I think it was your testimony that you and Ms. Hunt met with Dr. Peterson and it was the determination that you might only end up with a psychopathic diagnosis and additional testing needed to be done. Did I get that correctly?

A I think it was a sociopathic. And my recollection was that Dr. Peterson suggested that we have the neuroexam before he did his exam because the information could assist him.

Q So in addition to just getting the funding, you actually had taken time and you met with the doctor to discuss whether or not it would make sense to have him do a full exam of Mr. Nelson at that time?

A Without benefit of the neuroexam, yes, sir.

Q Okay. And there was some discussion about a Dr. Cunningham, and I think you indicated that you recall the name, but you don't really remember how he factored into the

case?

A That's correct.

Q With respect to Ms. Francis, had you ever had any contact with her prior to seeking to have her retained in this particular case?

A No, I had not.

Q And as you sit here today, do you remember, Mr. Shull, what her experience and background was in terms of conducting mitigation investigation and assisting in capital mitigation presentation?

A Again, my recollection was that we had received the names of three or four mitigation investigators, and part of that may have come from the school that I attended in California. We made phone calls and I don't remember her specific qualifications other than we felt that they were adequate to go forward in this case.

Q And in terms of Mr. Grothaus and the motion that was presented to you where you had filed a request to have him employed, I think the caption of the motion was mitigation investigator or slash specialist. Am I correct in my understanding, Mr. Shull, that you viewed him more as a factual investigator to gather factual information as it related to the mitigation investigation?

A That's correct. I'm not sure that I understood some of the psychological, sociological implications of the mitigation

specialist. Mr. Grothaus was a very, very good factual investigator.

Q So you weren't trying to have him employed as a mitigation specialist; that might have been a miscaption in the motion? Am I hearing that correctly?

A My understanding was that he would investigate many of the areas that a mitigation specialist would do, but apparently he did not feel comfortable dealing with the sociological and psychological issues.

Q And, Mr. Shull, if my timeline is correct, would you agree with me that Mr. Grothaus and Mr. Ninemire would have overlapped in terms of both being employed as investigators focusing primarily on the gathering of the mitigation-related evidence?

A I would have to go with your evidence or your timeline because I don't have a recollection.

Q If I were to tell you that Mr. Ninemire completed a document kind of summarizing where the mitigation was and where it needed to be and that was given in September of 2000, that would have overlapped obviously a period of three to four months that Mr. Grothaus would have been on the case? Is that a fair statement?

A Again, I have no independent recollection.

Q You indicated too, Mr. Shull, that your experience had consisted of prior to this three capital cases, none of which

ultimately ended up in trial. Is that a fair statement?

A No. My first trial ended up in an acquittal. The other two did not go to trial.

Q I apologize. I had that incorrect.

And that you obviously attended the training out at Santa Clara?

A Yes.

Q There was some discussion extensively with Mr. Ruhnke with respect to the mental health issues, and is it a fair statement that you realized early on based on your somewhat limited experience in this area that mental health was an issue that needed to be explored and developed?

A Yes, sir.

Q Are you aware of Mr. Berrigan in the attorney community here in Kansas City?

A Yes.

Q And how long have you known Mr. Berrigan?

A Many, many, many years, but I couldn't give you an exact number. I think because he and I were both in the criminal defense bar, we would have known each other about the time that we began practicing generally.

Q And are you aware of Mr. Berrigan's prior employment with the Missouri Public Defender's Office, specifically in their capital unit?

A I knew he worked for the public defender. I wasn't sure

what capacity.

Q When you withdrew or were asked to withdraw from the case in February of 2001, were you aware that Mr. Berrigan was going to be the replacement?

A No, I was not.

Q At some point did you become aware that Mr. Berrigan was the replacement?

A I did at one point. I think when I asked Susan who had gotten into the case, she mentioned Mr. Berrigan, but I don't know if it was a month later or three months later.

Q What's your opinion of Mr. Berrigan as it relates to his ability to represent capital defendants?

A I believe he's an extremely good criminal defense attorney.

Q And what about in particular with capital litigation, are you aware of whether he has extensive experience in that particular area?

A I knew he had been involved in capital cases, but I had not had any personal observation or reports on it.

Q From your appointment in November of 1999, until you got off of the case in February of 2001, would it be accurate to characterize that you were working both on guilt phase as well as penalty phase or mitigation phase?

A Yes, sir.

MR. KETCHMARK: One moment, Your Honor.

I don't have any other questions, Your Honor.

REDIRECT EXAMINATION BY MR. RUHNKE:

Q Mr. Shull, did I hear you say correctly that you really don't have enough information to offer an opinion about Mr. Berrigan's skills or reputation as a capital defense attorney?

A I am aware that he has been involved in the area, but do not have an opinion as to how good he may be.

Q Are you of the view that even the best of us can make serious mistakes in a case?

A Absolutely positively.

MR. RUHNKE: I have nothing further, Your Honor.

THE COURT: I think that's it, Mr. Shull.

THE WITNESS: Thank you, Judge.

(Witness excused.)

MR. RUHNKE: Your Honor, we're waiting for Mr. Berrigan. He's supposedly here by one o'clock.

(A discussion was had off the record.)

THE COURT: We'll take a short break while we wait for Mr. Berrigan.

(A recess was taken.)

MR. RUHNKE: Mr. Berrigan is here. We call Patrick Berrigan.

PATRICK JOSEPH BERRIGAN, being duly sworn by the courtroom deputy, testified:

THE WITNESS: Good afternoon, Your Honor.

THE COURT: Mr. Berrigan, good to see you.

THE WITNESS: Good to see you, sir.

DIRECT EXAMINATION BY MR. RUHNKE:

Q So state your name for the record, please.

A My name is Patrick Joseph Berrigan.

Q And how are you employed, Mr. Berrigan?

A I'm an Assistant Public Defender in the Missouri Public Defender System.

Q And what -- do you specialize within the Public Defender System in certain kinds of cases?

A I'm in the capital litigation division, which means that we handle cases in which the state has charged our clients with first-degree murder and has indicated they're seeking the death penalty.

Q I'm going to display on the screen in front of you a document marked P16.

Do you see that document in front of you?

A Yes.

MR. RUHNKE: Could we just highlight the first half of that page.

Q (BY MR. RUHNKE) Do you recall at the government's motion and at the court's direction in this case filing an affidavit addressing certain questions that had been remanded up by the Eighth Circuit?

A Yes.
Q Have you had occasion to review that affidavit?
A I haven't reviewed it recently.
Q Okay. Does it -- was it true and accurate to the best of your ability at the time you completed it?
A Yes.
MR. RUHNKE: I'm also going to display and ask that to display a document that's actually a government's exhibit, 112. Do you see that? We'll blow it up a little bit.
Q (BY MR. RUHNKE) Do you see that to be a transcript of a deposition that was taken in this building on October 19th, 2012, in connection with this case?
A I do.
Q Have you had recent occasion to review the deposition?
A Yes.
Q Do you stand by what is in that deposition?
A I stand by what I have in the affidavit and in the deposition.
MR. RUHNKE: We can take those down now.
Q (BY MR. RUHNKE) Mr. Berrigan, where did you go to law school?
A University of Missouri at Kansas City.
Q And what year did you graduate?
A 1984.
Q And I'm going to direct your attention now to the fall

of 1999, 2000, early 2001, particularly with regard to your education and experience as an attorney in the field of capital defense, okay. So it's sort of a long-winded intro.

At that period of time, did you have experience in the defense of capital cases, meaning, cases in which the state or federal government was seeking the death penalty?

A Yes.

Q Could you describe that experience for the court and the parties?

A Yes. I started in the Missouri State Public Defender System as a law student in 1983. I practiced before Judge Gaitan when he was a state court judge in Division 8 in the Circuit Court of Jackson County.

Q As a law student?

A As a law student and as a young lawyer.

Two years out of law school in 1986, I had my first capital case in front of Judge O'Leary, and I've been doing capital cases more or less continuously since then. So by 1999, 2000, I had done a number of cases.

In 1990, I transferred from being the director of the Jackson County Public Defender System supervising approximately 20 lawyers to the newly-formed capital division in the Missouri State Public Defender System, and from 1990 until 1997, I handled exclusively capital murder cases in the state courts in the state of Missouri.

Q And there came a time when there was some difficulty at the Missouri Public Defender's Office and you and several other staff members were terminated; is that correct?
A Yes.
Q When did that take place?
A In May 1997.
Q And did that termination to your recollection have anything to do with your abilities and skills as a lawyer?
A Well, I didn't terminate myself, so I'm not sure I'm in the best position to judge that. But not as far as I know.
Q And in fact did you bring legal action against the public defender's office in an attempt to regain your job?
A I did.
Q And what was the result of that?
A We settled it and I was allowed to return, but by that time I had been in private practice for about two or three years and decided not to go back.
Q During your years as a capital defense attorney, and, again, this is in the lead-up to 1990 [as spoken], 2001, that period of time, period of the Nelson case, did you attend capital training seminars, programs of that nature?
A Yes, sir.
Q For example?
A I attended regularly an annual seminar that's put on by the National Legal Aid & Defender Association called Life in

the Balance, which is typically a four-to-five-day intensive seminar that deals exclusively with capital defense.

I had also been to a number of capital training seminars. There's one in Chicago that I participated in. It was run by a lady named Andrea Lyon. I had been to a capital defense seminar in Ann Arbor, Michigan at the University of Michigan.

These are all weeklong programs. A weeklong seminar on capital representation at the Santa Clara University. I think it's called the Santa Clara Death Penalty College. Seminars such as these that Missouri State Public Defender System also did its own in-house training as well.

Q As of 2001, beginning in 2001, had you ever handled a federal capital case?

A I represented a gentleman named Plutarco, P-l-u-t-a-r-c-o, Tello, T-e-a -- T-e-l-l-o, in a capital prosecution in front of the Honorable Gary Fenner here in the Western District of Missouri, and my recollection is that that case went to trial in 2000.

Q Did they seek the death penalty against that client?

A Yes, sir.

Q And what was the result of the trial?

A Mr. Tello received a life verdict. His two co-defendants received death sentences.

Q That would be Mr. Sinisterra and --

A Mr. Ortiz, O-r-t-i-z.
Q Okay. All right. And how did these circumstances come about that you were appointed to represent Mr. Nelson? I mean, obviously there came a time in February of 2001, Mr. Shull had withdrawn and you were asked to accept an appointment as Mr. Nelson's learned counsel, attorney.
How did that come about?
A The Honorable Sarah Hays, who is a magistrate judge here in the Western District of Missouri, called me on the telephone at my office and asked me if I would be willing to represent Mr. Nelson after having explained the circumstances regarding Mr. Shull's departure or imminent departure, and we had a discussion on the phone at that time, the crux of which is that I agreed to represent Mr. Nelson.
Q And at the time you spoke with Magistrate Judge Hays, what was your understanding of the trial date?
A It was set in April. I don't mean that that's funny. It was just that she was calling me and the trial date was less than 90 days away, and so obviously that was a concern. But Judge Hays, although she would not be making that decision, of course, felt that Judge Gaitan under the circumstances would very, very likely grant a continuance.
Q And did you file -- first of all, did you agree to take on the case?
A I did.

Q And did you file a motion in due course to continue the trial date?
A Yes, sir.
Q I'd like to put up on the screen P27 at page -- let's try at page -- I'm not sure what the page is. So I need to locate that document.
A My copy on the top right-hand corner says P27-0001.
MR. RUHNKE: Let's go to the next page and see what we've got. Next page.
Q (BY MR. RUHNKE) You have a copy of the motion itself in front of you?
A No. I have an order.
MR. RUHNKE: The government has kindly lent me a copy of it. I'm going to switch to the document camera.
Q (BY MR. RUHNKE) You see -- that's the government's exhibit. That's why I'm not able to find it with the government's number.
I'm putting in front of you an application for a continuance of that trial date. Can you read that on the screen?
A Yes, sir.
Q And this is obviously a document filed by yourself, and among other things described the responsibilities you had in preparing the case. Am I correct about that?
A Yes, sir.

Q All right. And in the document, which, again, speaks for itself but I want to get some sense of this, that you needed additional time to prepare because the previous attorney has been relieved and that he was responsible for the mitigation case in large, you've been appointed to represent Mr. Nelson, and basically other than the publicity, are pretty unfamiliar with the circumstances of the case. That's the start of your motion, correct?
A Yes.
Q And then you also discuss some of your ongoing commitments at that period of time, particularly a capital murder trial. It says state of Missouri but it was actually in Kansas; am I correct?
A Yes, sir.
Q State of Kansas v. Martis, which was set to begin on April 23.
Let me stop here for a moment. Did the Martis case actually go forward on April 23?
A It did, sir.
Q And do you recall how long that went on?
A It was at least three weeks and possibly four.
Q And is it fair to say that in the days and weeks leading up to the trial date, you were heavily involved in preparing for that trial?
A Heavily involved, yes, sir.

Q And also mentioned a medical malpractice case, as it turns out, Jimmy Johnson v. Charles Keith Whitaker, MD, that was pending for July 16th, 2001. Did that case actually come to trial?
A That case settled two days before the scheduled trial date on July the 16th. So it settled on the morning -- Saturday morning, July the 14th.
Q Did that case itself involve significant levels of preparation for that trial?
A It did. It was a medical mal case involving a condition called Guillain-Barre syndrome, which frankly I don't even remember how to spell, but there were depositions done in Chicago, Washington DC, all over the country.
Q And depositions done leading up to the trial itself after the filing of this motion?
A Yes, sir.
Q Then you go on to say that you obviously need the time to come up to speed to the Nelson case because there's a lot of information, a lot of witnesses, and obviously you can't go to trial from February, start a capital trial in April?
A That's correct.
Q Cutting to the bottom line of all of this, was that motion granted?
A It was.
Q And do you recall what the trial date was as extended by

Judge Gaitan?

A My recollection it was October or November of 2001, roughly six months or so.

Q If I said to you October 23, 2001, would that sound about right?

A That's my birthday. I should remember that.

Q Okay. And after the trial in Kansas, did you begin to deal with issues in the case such as the government's expressed wish to have Mr. Nelson examined by mental health experts of their own choosing if you chose to go forward with a mental health based defense or mitigation?

A Yes, sir.

Q And I'm going to direct your attention to a motion to reply on a mental health issue. This is Government's Exhibit 36.

MR. RUHNKE: Could you display that for us and enlarge it, please, Ms. Welna?

Q (BY MR. RUHNKE) You see that you filed a motion for extension of time to respond to government's motion for discovery of mental health evidence, and we'll get to it on the document. But this was filed, as it turns out, on May 24, 2001.

But just in context, what was going on in the Nelson case at that time is there was some litigation, hot and heavy litigation, about under what circumstances Mr. Nelson would or

would not be examined by a government mental health professional, correct?

A Yes, sir.

Q And if we can look at the bottom part of that motion, and you begin by pointing out that you had just finished a three-week capital murder trial in Kansas. That's the Martis case that you attended. And thereafter it says you attended a death penalty seminar in Hanover, Michigan. Would that be a typo for Ann Arbor?

A Yes. I dictated this motion, and that should have been Ann Arbor, Michigan.

Q And you also point out that you were -- you had been engaged in several other criminal cases, which, I quote, languished, closed quote, during the month and a half that counsel was engaged in the preparation of trial of State v. Martis.

So your best estimate at that time was the Martis case had really engaged you for about six weeks, three weeks before trial and then three weeks in the actual trial itself.

And then if we just look at the next page, I think that's the end of the substance of it, and just we look at the top. The government's not opposed.

Do you recall, and I'm going to ask you to display 37, that shortly after you filed for another extension of time to respond to that mental health motion for discovery of

mental health evidence. And in the body of that motion, if we look down to the next two paragraphs, you point out in paragraph 1 that you had had a coronary angioplasty in recent days, which obviously diverted you from the research necessary, and that you were very much consumed with a preparation of a cert petition to the U.S. Supreme Court in the case of Paul Kreutzer v. Michael Bowersox, and that the cert petition was due June 9th, 2001.

What was the Kreutzer case all about and what was at stake at that point?

A Well, Kreutzer had been convicted of first-degree murder in Boone County, Missouri, and sentenced to death. I had been appointed, along with a fellow Kansas City attorney, Patrick Peters, to represent Mr. Kreutzer on his federal habeas petition.

We had failed in that endeavor. My recollection is that the Eighth Circuit had failed to grant a certificate of appealability, although I could be mistaken about that. In any case we lost the appeal in the Eighth Circuit, and we were in the process of preparing a petition for writ of certiorari in the United States Supreme Court in an effort, which turned out to be a vain effort, to spare Mr. Kreutzer from being executed.

Q And eventually he was executed?

A He was.

Q And were you also engaged in another certiorari case at the point that -- the case that eventually became Roper against Simmons?
A Yes. I represented Christopher Simmons, both in federal court and in -- eventually in the state habeas proceeding, which eventually led to Roper v. Simmons in the United States Supreme Court.
Q That's the case holding that juveniles under the age of 18 cannot be executed?
A That's correct. I represent him currently.
Q Who was working with you on that cert process?
A Jennifer Herndon.
Q It was Ms. Herndon who prepared the certiorari petition that ultimately got the Supreme Court's attention?
A Well, not exactly. We had no success, frankly, in the federal courts, but we filed a successive habeas petition in state court. Ms. Herndon did 90 percent of that work. I take very little credit. And she argued it, and Judge Stith, Laura Stith, who is the Missouri Supreme Court Chief Justice, along with three of the other judges, found merit in that state habeas petition. That is, that they ruled that if the United States Supreme Court had had an opportunity to consider whether or not executing juveniles violated the 8th Amendment, Judge Stith thought that that court would find it a violation of the 8th Amendment, and, therefore, they vacated the death

warrant of Christopher Simmons.

The state of Missouri took an immediate appeal to the United States Supreme Court, and the United States Supreme Court, as we all know, in 2005, affirmed the Missouri Supreme Court holding that the execution of juveniles was in fact a violation of the 8th Amendment.

Q At the time -- at this period of time, and now we're into May, June of 2001, how would you describe in general overall terms the level of your caseload in terms of how many cases you were handling, how many serious cases you were handling, matters of that general nature?

A I was busy. I had these matters in federal court, cert petitions in Mr. Kreutzer's case. We had ongoing litigation in Mr. Simmons' case. In addition to Mr. Nelson's case, I had other capital cases pending, and then I had a very active criminal docket both in state and federal court. And I, as you already made note of, was doing personal injury plaintiff's litigation primarily in state court but also in federal court.

Q At the time were you also involved in another federal capital prosecution in the Northern District of Iowa?

A Yes.

Q What case was that?

A United States v. Angela Johnson, which was in the Northern District of Iowa pending before the Honorable Mark

Bennett, B-e-n-n-e-t-t.

Q During this period of time, was that case active in the sense that it required your attention and required you to travel to Iowa on occasion?

A Yes. It was very active.

Q When you would travel to Iowa, how long a drive is that?

A Well, the case that was in -- Judge Bennett sits in Sioux City, but we were in front of the magistrate at that time. And he's in Cedar Rapids, and that's 202 miles if not more. It was a -- roughly a five-hour drive.

Q I'm going to show you a document. We can switch back over to the defense side and ask that we display P20.

I'll ask you if you recognize P20?

MR. RUHNKE: If we can blow up just the top of P20, the top third or so of P20.

Q (BY MR. RUHNKE) Is that a document that you provided to Mr. Nelson's counsel at some point?

A Yes, sir.

Q And what is P20 in general terms?

A P20 is -- it's an attachment regarding a continuance application that myself and fellow Kansas City attorney Sean O'Brien filed when we were jointly appointed to represent a gentleman named John Robinson in the District Court in Johnson County, Kansas. Mr. Robinson was charged with first-degree murder. The state of Kansas was seeking the death penalty in

six separate murders in his case.

Q Had that case drawn quite a bit of attention at the time?

A I'm sorry, would you repeat that?

Q Had that case drawn quite a bit of attention at the time?

A Yes, sir.

Q If I recall correctly, this involved the murder of women and burying the bodies in barrels and fields?

A Yes. These women -- there were at least eight women that were killed and only six bodies recovered. They were successive, that is, one after the other, over a period of years. When Mr. Robinson was finally arrested, these bodies were recovered in barrels. He had put these barrels in storage lockers in both Missouri and Kansas, so it generated national attention.

Q And in P20 do you summarize what your then, meaning the summer of 2001, caseload responsibilities were as far as major cases that you had responsibility for?

A It looks that -- yes, sir, I did.

Q And I want to look towards the end of the P20. I'm looking for a letter that you had written to the public defender's office in Missouri. Keep going. Right there.

MR. RUHNKE: Can we, first of all, highlight the date and the address.

Q (BY MR. RUHNKE) You see the date of August 8, 2001?
A Yes, sir.
Q Who is that letter written to?
A Pat Lawless was the, as you can see, the administrative counsel for the Board of Indigents' Defense Services, which is the Kansas equivalent of the Missouri Public Defender System. Kansas does not have a statewide public defender system, although certain counties have county-funded public defender offices. But Kansas did provide for indigent representation in capital cases. At the time Mr. Lawless was in charge of that.
Q And you see the date of that letter, August 8, 2001?
A Yes, sir.
Q Do you recall what else happened on August 8 of 2001?
A I had coronary bypass surgery on that day at St. Luke's Hospital here in Kansas City.
Q If we go to the body of the letter, essentially you're returning a contract accepting the appointment for Mr. Robinson in the case that we've just finished discussing, correct?
A Yes, sir.
Q So did you have ongoing responsibilities now for this case -- this death penalty case in Kansas as well as the other cases we've discussed?
A Yes, sir. That case in fact I believe was set that

December.

Q And --

MR. RUHNKE: We can take that exhibit down now.

Q (BY MR. RUHNKE) During this period of time, how much time were you able to devote to the Nelson case?

A I honestly don't remember. I know my billing records would reflect whatever time I devoted to Mr. Nelson's case.

MR. RUHNKE: Could we put up P80, please?

Q (BY MR. RUHNKE) This is a document you and I reviewed the other day. I want to go down to the next page.

MR. RUHNKE: Highlight the portion of the chart that deals with Berrigan hours. I should have probably said Mr. Berrigan's hours but Berrigan hours.

Q (BY MR. RUHNKE) Obviously during the month of January, you're not doing work on the case if you haven't been appointed in the case. But you see that in February, March, April, virtually no work on the case at all.

But what's going on in April?

A I think that was Gordon Martis' trial.

Q So you're in the six weeks or so, three weeks runup prep, almost exclusive prep probably, and the three-week trial of Martis.

Then you go off to the death penalty college at Ann Arbor, Michigan, University of Michigan. So for the month of April you put in, as this reflects, about three or four hours

on the Nelson case.

In May it looks like 20 hours maybe, 20 hours in April, May, 20 hours in June, little less in July, little less in August. It's not until September, according to this chart, that you begin to devote serious hours, what I call serious hours, to the Nelson defense.

Is it fair to say that from the period of February through the end of August, the overwhelming percentage of your practice is devoted to other cases than Nelson?

A Yes, sir.

Q And I want to then talk about the --

MR. RUHNKE: We can take that down now.

Q (BY MR. RUHNKE) Once you came into the Nelson case, who was in charge of developing the mitigation aspects of the case?

A I was.

Q Did you and Susan Hunt, your cocounsel, that -- we haven't established that.

Susan Hunt was your cocounsel in the case?

A She was.

Q She had been in the case from the beginning?

A Yes, that was my understanding.

Q Was there any other attorney who had been in the case from the beginning?

A Not that I know of, no.

Q Again, the record speaks for itself, but she started in initial appointment and went right through the end. But she's the only attorney from start to finish.

Did you have a discussion with her about division of labor in the case?

A I'm sure we did, yes, sir.

Q And what was that discussion?

A Susan, since she had been involved in the case from the beginning and had very limited experience in capital litigation, if any at all, devoted her energies and skills to the development of the first phase of the trial, what we sometimes call the guilt/innocence phase, and that I would be largely responsible for the penalty phase of the trial were we to get to that point.

Q Based on your training and other experience you've had as a capital defense attorney, do you believe that a mental health investigation is an important part or even an indispensable part of preparation for a capital murder trial?

A Yes, sir.

Q Do you believe that investigation of mental health is virtually mandated by the 8th Amendment in every case?

A Yes. And certainly the ABA guidelines make that very clear.

Q The ABA guidelines both as they existed in 2003 and the previous ABA guidelines in 1989; is that correct?

A Yes, sir. I think that's always been the rule as long as the ABA has had guidelines on death penalty representation.
Q You began trying capital cases with the Missouri Public Defender System in what year?
A In 1986.
Q Was it the standard practice to conduct mental health investigations in all of your cases?
A Yes, sir.
Q And --
A I should modify that somewhat. There were occasionally rare examples where cases were resolved very quickly, and mental evaluations may not have been done in those cases because of the short time that had elapsed. But if the case went on for any period of time, then a client would have been evaluated.
Q Certainly in a case where the prosecution announced it was actually seeking the death penalty, it would be the standard of care to have a mental health investigation and eventually evaluation, correct?
A Yes, sir.
MR. RUHNKE: I'm going to ask that we display P21 at page 7. I'm going to ask you whether it's a document -- if you just highlight the top of it and the addressee.
Q (BY MR. RUHNKE) It's a letter dated September 14th from the Federal Public Defender's Office to Susan Hunt. I'll tell

you for your information it's from a gentleman named Ron Ninemire, who was an investigator in that office. Do you know Mr. Ninemire?

A I do, yes, sir.

Q And do you know the public defender, Assistant Federal Public Defender Larry Pace, was also one of the attorneys who had represented Mr. Nelson prior to you coming into the case?

A Yes, I did.

Q Now, do you recall whether you ever read this? Let's look at the body of the letter a little bit, first four or five paragraphs. The letter is dated September 14th, 2000, and I'll tell you for sake of clarity, that Mr. Pace had withdrawn from the case approximately a month or so, three, four weeks earlier, and that this is from Mr. Ninemire just suggesting follow-up mitigation.

So my question is, again, do you recall reading this letter or having this letter as part of your file?

A I don't recall specifically reading the letter or having it as part of my file, although certainly a couple of these items are things Ms. Hunt and I discussed.

Q Okay.

MR. RUHNKE: Let me go to the last page of the document and highlight the final paragraph.

Q (BY MR. RUHNKE) Do you see that there's a suggestion that the Nelson boys were abused physically and sexually? Do

you see a suggestion that Keith Nelson had -- was in a hospital for a long time following his birth, that he has relatives who are schizophrenic, and, finally, Mr. Ninemire's suggestion that it seems prudent that any mitigation investigation must include a psychiatric examination for Keith? Do you recall reading that or --
A No.
Q Okay. But did you have those -- that set of facts at your command based on your knowledge of the case?
A I'd say largely, yes. Yeah, we knew most of this.
Q And coming into the case at that point, did you determine that as is the standard of care and of practice, that there should be a psychological examination, evaluation, investigation of Mr. Nelson?
A Yes, sir.
Q When you came into the case, were you aware or did you come -- become aware at some point of the circumstances of Mr. Nelson's birth?
A I was informed that Mr. Nelson had been born prematurely, and as a result, there were some complications that required hospitalization. I don't recall specifically for how long.
Q And, you know, you were doing medical malpractice at the time. Am I correct about that?
A Yes, sir.

Q Did you ever handle a case involving, say, an infant who had been brain damaged or was injured during the birth process?
A No, sir.
Q Are you aware of such cases?
A Of course, yes.
Q Did it occur to you with that information, that perhaps a neonatologist might be someone you should consult with?
A I can't honestly say that occurred to me at the time.
Q Did it occur to you at the time that you needed a neuropsychological examination to be done?
A Yes, yes.
Q And as we take it to the end of the case, was a neuropsychological evaluation ever conducted of Mr. Nelson?
A No, sir.
Q When you arrived in the case, was there to your knowledge a neuropsychologist who had been approved by the court and who in fact was poised to conduct an examination and evaluation of Mr. Nelson?
A Yes, sir.
MR. RUHNKE: I ask that we display P28 at page 67 and the next page and highlight paragraph 4, please.
Q (BY MR. RUHNKE) I'll represent to you that this is the motion filed by Mr. Shull and Ms. Hunt for Dr. Cowan's services and their representation that the defendant was born

prematurely and this fact raises the suspicion that the defendant may have organic brain defects, which may lead to mitigation evidence in the case.

As part of your getting up to speed on the case and reviewing what went on in the case, do you recall reading this motion, or would you in the due course of your review of the file have come across this motion?

A I'm confident I did not read the motion because I understood it had already been granted by the time I was involved in the case. There was no reason for me to kind of go back over that.

Q Was --

MR. RUHNKE: You can take that down now. Thank you.

Q (BY MR. RUHNKE) Was an issue of potential neurological impairment and neurological defects something you felt should be explored?

A Yes, sir.

Q When you got in the case, as we've established awhile ago, there was an appointment with Dr. Cowan that had been scheduled. When you learned about that, what action did you take?

A I canceled it.

Q All right. And do you recall in relation to when the examination was scheduled when you canceled it?

A I canceled it very shortly, if not the day before the

examination, but I don't recall the date.

MR. RUHNKE: If we can look at P17A at Bates 5 and highlight the first entry up on the top of the CJA worksheet. Can we make that a little larger?

Q (BY MR. RUHNKE) Any event, do you see in the upper left-hand side, and this is, I'll represent to you, from your billing records, your CJA billing records, that on February 28th you had a call with Dr. Cowan and with Ms. Hunt that afternoon.

Was that the event of canceling the neuropsychological examination?

A I think that's the only time I spoke to Dr. Cowan was canceling the evaluation.

Q If we could look at P11.

MR. RUHNKE: And if you highlight just the billing entries that are in the middle of the page.

Q (BY MR. RUHNKE) Do you see this is a -- Dr. Cowan is billing you for a late or canceled appointment, that you called on 2/28 to cancel the appointment, and he's trying to collect his $500 for the appointment? And I think the firm ultimately paid that or probably you may have paid it for the late fee.

A We paid Dr. Cowan for that canceled appointment. It wasn't appropriate obviously that the court pay it given the circumstances.

Q Okay. And did you ever engage the services of a neuropsychologist to examine Mr. Nelson?

A Not after that, no, sir.

Q Why did you cancel the Dr. Cowan appointment?

A I had had experience with Dr. Cowan in other cases. Some of it was good, and some of it was bad. He's unequivocally a very qualified neuropsychologist, but I thought given the seriousness of Mr. Nelson's case, the likelihood it would go to trial, that we could get a better expert than -- by that I mean somebody that had more of a regional and national reputation, might perhaps be a better witness than my experience with Dr. Cowan had revealed. And Dr. Cowan would not have been my first choice, and I saw no reason to stick with him merely because he had already been approved by the court.

Q And how long had you been in the case at this point?

A Less than a month.

Q Two weeks tops?

A Couple weeks.

Q Was part of your thinking is I just need to slow this down a little bit until I can find out more information?

A It wasn't so much that, although that's a factor. I mean, I would have certainly liked to have known a little bit more about the case before employing Dr. Cowan, but it was a concern about who we were hiring just as much as not having

enough time to absorb the information.

Q For any reason, tactical or otherwise, did you ever change your mind about the need for a neurological or neuropsychological examination of Mr. Nelson?

A No, sir.

Q Can you tell us why it never got done?

A We dropped the ball. It should have happened. Other things came up to the forefront, and I never got back to it. There's no good excuse, really no excuse at all.

Q Were you extraordinarily busy at that time?

A Yes, of course, I was busy, but that would not justify not getting another neuropsychologist in the case.

Q You did intend to get it done eventually then?

A Yes, sir.

Q And I want to show you two documents that you handed us on Saturday when we met. I'll hand you the originals which is the form that you gave it to us.

MR. RUHNKE: One is marked P17B, which is -- it's not marked. It's his original document but we have it electronically. But I'm going to ask Mr. Berrigan simply to leaf through these documents and see what they tell him about his practice at the time. The larger document is marked P17 --

THE COURT: I thought we had already gone over all that. We've got more?

MR. RUHNKE: Yes, there is more.

THE COURT: Why? Why do we need to go over more? You've shown from Mr. Berrigan's testimony already that he was very, very engaged in other cases. I don't think we need to go in depth into those other cases.

MR. RUHNKE: I wasn't going to go into depth, but these documents are in evidence, and if Your Honor wants me to move on with them, I certainly will.

THE COURT: I would like that.

MR. RUHNKE: Okay.

Q (BY MR. RUHNKE) At the time you came into the case, had there been a mitigation specialist hired, engaged, and approved by the court?

A Yes.

Q And you remember who that was?

A It was Tena Francis, T-e-n-a Francis.

Q And where was she -- where did she work out of?

A Texas. My recollection was it was Dallas, but it could have been Houston, somewhere in Texas.

Q In that period of time, 2001, was it standard practice to engage a mitigation specialist in the defense of a capital case?

A Yes. That had been standard practice for a long time by 2001.

Q When you worked in the Missouri Public Defender's Office

in the 1980s, what was the policy of hiring mitigation specialists?

A Well, we mostly used in-house people. Mary Goody, who is a nationally-known mitigation investigator, started at the Missouri Public Defender's Office essentially as an administrative assistant but became trained as a mitigation investigator. We trained a number of people, and then we employed them full time as mitigation investigators to save money to keep from having to hire outside people. But we always used mitigation investigators in our capital cases.

Q How does the role of a mitigation investigator specialist differ from that of, say, a private investigator who's interviewing witnesses and trying to talk about the facts in the case and eyewitness identification, that sort of thing?

A Well, a private investigator is what we all use to typically investigate your average criminal cases. They go out and talk to the witnesses, and they sometimes do diagrams, take pictures, whatever you need them to do, but their focus is on whether or not this client may have some evidence that would enable the defense lawyer to present some doubt to a jury, who is obligated under the law to convict beyond a reasonable doubt.

Sometimes they are able to come up with witnesses, eyewitnesses, all kinds of good things, but it has to do with

whether or not the defendant is guilty or not, whether or not the government can prove him guilty.

Mitigation investigators on the other hand rarely are involved in that type of investigation. Their investigation has to do with our client. What is the history and life experience of this client, how they performed in school, what's been their job history, how have they performed on the job, do they have issues, be it behavioral, mental health, all kinds of potential issues that a jury might want to hear about in deciding whether or not this is a person who's particularly suited for life or death as a punishment for the most severe crime.

Q And you've worked with various mitigation specialists over your years in capital offense?
A I have, yes.
Q Have you worked with Jill Miller?
A I have, yes. I've had that privilege.
Q Have you worked with Mary Goody?
A Yes.
Q Who else have you worked with as a mitigation specialist over the years?
A We've worked with Cecil -- Cecilia or --
Q Cecilia Alfonso?
A Cecilia Alfonso in New York. I've had a number of folks but I would say primarily I've worked with Mary more than

anybody, probably more than a dozen capital cases that she and I have worked on together. And in the public defender's office, as I mentioned, we had our own people, so my experience with actually being able to hire outside mitigation investigators has largely been limited to my federal capital appointments and my cases over in state court in Kansas.

Q At the time, and, again, we're referring to the time period of 2001, was it relatively common for a mitigation specialist to testify in a penalty phase, lay out the family history, introduce documents, and basically present an overview to the jury?

A I'd say that's a case-by-case thing. It happened certainly in many cases. I'm not sure even the majority of the cases. I don't know what the percentage -- it wasn't unusual but it didn't always work that way. Sometimes other witnesses were better suited for that than the mitigation investigator.

Q And in the role as a mitigation specialist investigator, do people in that role sometimes suggest areas of expert inquiry, appropriate witnesses?

A Often, very oftentimes because they're the primary investigator, for example, on family history, social history, background. They have contact with family members that lead them to other family members that lead them to friends or relatives or schoolmates that have significant information

about this client's life. The lawyers are oftentimes so involved in litigation and legal matters and things of that nature, that we couldn't possibly devote that effort to that part of the investigation, nor are we trained to do it.

In my experience mitigation investigators very frequently have had training in mental health issues and many other significant matters, and they're oftentimes very familiar with the leading mental health experts in the area and in the country. And I've gotten referrals many times for mental health experts from the mitigation investigators I've worked with.

Q And is part of the role of the mitigation specialist in your experience to meet regularly with a client?

A Yes, sir.

Q And when a capital case comes to trial and there's a penalty phase, has it been your experience that the mitigation specialist will often be there assisting witnesses and basically serve as kind of the case agent of the mitigation case?

A I'd say without exception. Uniformly in my experience, the mitigation investigator has always been there when the penalty phase of the case is ongoing, absent illness or injury, and they are the primary person upon whom the attorneys rely to marshal the witnesses, to make sure everybody's there, ready to go, prepared to testify and so on.

Q Did that happen in Keith Nelson's case?
A No, no, sir.
THE COURT: Did what happen?
MR. RUHNKE: I'm sorry.
Q (BY MR. RUHNKE) Was the mitigation specialist, Tena Francis, or any other representative of her office present during the penalty phase of this case?
A No, sir. My secretary handled the marshaling of witnesses in Mr. Nelson's case.
Q How much contact did you personally have with Ms. Francis or representatives who worked in her office or associates?
A I had one or two meetings with Ms. Francis herself when she came to Kansas City early on at least in my role of my experience with Mr. Nelson's case. I don't specifically remember the dates, but she came up to see -- visit with us, us being myself and Susan Hunt, and a visit with Keith and we had a meeting at that time.
Then I made some trips down to Texas to conduct mitigation investigation, and at that time I met with representatives of Ms. Francis' office. But I don't think that I met her in Texas, not that I recollect.
Q And the trips to Texas to interview witnesses, would that have been in September of 2001?
A I don't recall specifically. That sounds about right.

It was in the fall certainly.

Q The month of August you had had the quintuple bypass surgery and weren't doing much on the case. Is that a fair --

A Yes, sir.

Q Okay. I want to show on the screen P18, page 1. If we'd just enlarge the body of that. There's -- with the date and -- at the top.

First of all, do you recognize the handwriting on that?

A Yes, sir. And I think my signature and initials are at the bottom of the page as well.

Q And is this your practice to basically sign your notes as you make them? And I notice there's a checkmark and what appears to be your initials in the top in red. What does that refer to?

A Frankly, that's unusual and I'm going to guess that has something to do with billing. Very few of my notes usually have checkmarks at the top with my initials, but I think it's probably a billing issue where I might have dictated that to my secretary, Becky Walker, for billing, and then checked off so I didn't do that again.

Q All right.

A That's all I can tell you.

Q You see this reference is on February 21, 2001, a conference with Susan, reference to Susan Hunt, I assume?

A Yes, sir.
Q And Tena Francis at the Hereford House. That's a restaurant here in downtown Kansas City?
A It is, yes.
Q If we can highlight the body of that and bring -- enlarge that forward beginning with "call PD's office."
Are these ideas that you're discussing with Ms. Francis and Ms. Hunt during that meeting?
A Yes, sir.
Q One of the issues is you're trying to find somebody who can actually just spend time with the client and looking at the Leavenworth Public Defender's office to see if they have anybody, correct?
A That's right.
MR. RUHNKE: Can we go to the rest of it, please, and just highlight the balance of it.
Q (BY MR. RUHNKE) And this is a summary of this conversation. You're talking about Keith needs the attention but counseling is something he needed to explore.
This is February 21. You've really been in the case for about a week so you're just getting your feet in the case, and there's also a notion that you discussed family background extensively. That would have been during that meeting, correct?
A Yes, sir.

Q Okay. And I'm trying to think the meeting -- if we go to the bottom of the page. The meeting appears to have started at 7:40 p.m. and concluded at 9 -- I guess that's 18?
A 9:18 p.m.
Q Okay. So you're there talking for an hour and a half or so about Mr. Nelson's case.
You recall that you had also either been out the day before or went out the day later to see Mr. Nelson at CCA, the Correctional Corporation of America, at Leavenworth with Ms. Francis?
A It may have been that day, the 21st. I know we saw Mr. Nelson at or about the time of this meeting.
Q I'm not 100 percent sure these are the actual dates. Let's go to the next page and we'll find out.
MR. RUHNKE: And highlight the top of -- yeah, the top third or so of that.
Q (BY MR. RUHNKE) So you see this is dated the next day, February 22nd. It says second CCA jail visit with Keith Nelson. It says PJB and Tena Francis. It seems to suggest you, you know, took about 15 minutes -- 45 minutes to get out there, you had to wait for a period of time before you could get in to Mr. Nelson. The actual visit began at 9:22, and we just continue to the next section of that.
And, you know -- sorry. You talked with him about the penalty phase, voir dire. Basically you're letting

Mr. Nelson know what a capital trial involves and what it's like, right?
A Yes, sir.
Q Okay.
A And probably the need for the investigation as well.
Q All right. And you mentioned Dan Grothaus is now gone and Tim Murphy is now on the case. The name of Dan Franco came up, but he wasn't really his lawyer before he came up to the hospital to see him.
These are conversations you're having with the client and with Ms. Francis. This is the first time or second time that she's meeting Mr. Nelson; is that correct?
A Well, I'm not sure about her. I think this is the second time I'm meeting Mr. Nelson.
Q Let's go down to the next page on this. This is a continuing discussion of that meeting. If we go to the next page, still a continuing discussion. It appears that you're out of the meeting at about -- can we highlight that -- at 10:35 a.m.
So, you know, you said that 9:22 a.m. the meeting had begun; 10:35 a.m. you left. You recall whether Ms. Francis stayed with Mr. Nelson and continued the conversation?
A If I could see the section just above that, I can answer that question.

Q Okay. I had to go meet Kathy H. on our Jimmy Johnson case to prepare for a telephone conference and the neurologist today, left Tena with Keith.
The Jimmy Johnson case, what was that?
A That was the medical malpractice case we made reference to earlier involving Guillian-Barre syndrome. It settled two days before trial. It was a conference with a neurologist that was obviously previously scheduled. The neurologist charged a lot of money, so I felt I needed to be there for that. So I left Tena with Keith, and I thought at that time the conversation was going well.
Q Just for our own information, you don't have to spell it, what is Guillain-Barre syndrome?
A Guillain-Barre syndrome. It's a condition where the body becomes paralyzed, and it happened to this gentleman after a somewhat routine surgery. The doctor failed to recognize it in time to reverse that procedure, and so this gentleman ended up paralyzed for quite sometime. It's lucky for him he did recover.
Q This was a very, very serious case?
A Yes, sir.
Q Took a lot of your time?
A It did.
MR. RUHNKE: Can I go on to the next page, please?
Q (BY MR. RUHNKE) And the next heading seems to be Friday,

February 23 meeting at Judge Hays, which has nothing to do with the meeting at CCA.

So even under the best of circumstances, Ms. Francis may have seen him on back-to-back days. She may have gone out on her own the next day or been there for a long time the first day.

To your knowledge, did she ever come back and see Keith Nelson again for the next 9, 10, 11 months?

A Not that I'm aware of. Certainly not with me.

Q Did any representative of her office to your knowledge?

A Not that I recall.

Q Okay.

MR. RUHNKE: We can take that one down, please. I want to put up on the screen a letter dated -- sorry. Put on the screen P9, 108. Bring just the first paragraph of the letter. I should be more precise. Starting with the date via Federal Express down through the first paragraph of the letter.

Q (BY MR. RUHNKE) The letter dated May 21, 2001, to you, to Susan from Tena Francis, and do you recall in that letter she enclosed what she described as a mitigation binder?

A Yes, sir.

Q And did that mitigation binder, among other things, set out a draft chronology of Keith Nelson's life?

A Yes, it did.

Q And do you recall sitting down and making notations on your copy of the chronology?
A Yes, sir.
MR. RUHNKE: Could we display 34A? I'm sorry. Government's Exhibit 34A. Can we do that? If the government can do it easier, let's just do it that way.
Q (BY MR. RUHNKE) If we can go to the second -- first of all, if -- you can see generally that this is the life history chronology of Keith Nelson, and can you see in the upper right-hand corner it was last updated May 2, 2001?
A Yes, sir, I see that.
Q To your knowledge was this ever updated after this date?
A Not that I recall.
MR. RUHNKE: Can we go down to the next page, and blow up the two or three paragraphs that have the handwriting in the right margin. All right.
Q (BY MR. RUHNKE) Do you recognize the handwriting?
A I do. That's my handwriting.
Q And I'm going to represent to you and throughout this document you made various handwritten annotations and you were asking rhetorically do we have records, do we have this, do we have that, and it really goes on for 10 or 15 pages. Your annotations saying, all right, this is the chronology, here's a reference to said to have drunk alcohol during pregnancy, and you're asking do we have any of Nancy's medical records,

do we have birth records for Kenneth and Keith.

There's a reference to the fact that Nancy had no prenatal care at all for the twins that she was carrying and delivered literally nine months after giving birth to -- ten months after giving birth to another child. And your annotation is no prenatal care at all, question mark.

Do you know what you did with this handwritten document? Did you send it to Ms. Francis? Did you say, look, these are some of my questions, let's talk, let's get together, let's figure out what to do?

A I have no idea what I did with this document. I mean, it's obvious I was concerned about having supporting documentation of some of the stuff that was in this chronology, and then questions about issues that the chronology raised. But I don't know what I ended up doing with it after I went through and asked these questions or wrote these notes.

Q So you're -- the attorneys involved in the development of the mitigation case and Ms. Francis is the mitigation specialist, are you having any kind of regular communication?

A Myself personally, no. The communication that Ms. Francis had with the defense team was largely through Susan Hunt, not myself.

Q And I want to go back to the mitigation binder, which is P18. Wait. I'm sorry. That's not it. I'm incorrect about

that. It's P9 starting at page 108.

This is the letter, the transmittal letter, the cover letter. We see the next page. I'm not going to pause to read what's contained in it. You see the next page. If we could go all the way towards the end of this document.

Do you recall that Ms. Francis appended to the document research, articles about various issues in mitigation?

A Yes, sir, I do.

Q And the research of those documents included articles about neurological impairment, role of a neuropsychologist in the process, the role of brain damage, neurological impairment, brain damage in the mitigation process. Do you know if you read the articles or just glanced at them? Do you have any recollection at all?

A I did not read the articles because I was familiar with those issues. In other words -- in fact, I'm not exactly sure why Ms. Francis appended those other than perhaps she and I didn't know each other. She may have had no idea what my background was, but those were issues that I was already familiar with as a result of being engaged in this type of capital defense for a number of years.

Q So you came to this case fully aware of the knowledge that brain damage can be a significant mitigating circumstance to investigate?

A Yes, sir.
Q Neurological impairments can be the same?
A Of course.
Q And a neuropsychologist can do things that a clinical psychologist doesn't?
A I've used neuropsychologists many times, and I'm very familiar with what they do.
Q And a neuropsychologist does not need to delve into the facts and circumstances of the crime; is that correct?
A That's exactly correct. Frequently they don't. They're measuring and assessing client's neurological abilities and deficits. They do timed testing. A lot of times it's videotaped. Sometimes they do audiotapes of the testing.
But they're oftentimes not employed to actually speak to the client about the events at the time of the alleged crime. They're there to determine whether or not this client has neurological brain deformities, brain deficits, and to present that information to the attorney that's retained them.
Q And without oversimplifying it because I'm sure the neuropsychologists think it's not as simple as that, they basically administer standard testing. They score the testing. They often score it based on sometimes machine-scored versions, and the testing either indicates the presence of some kind of lobe or brain dysfunction or defect or

neurological impairment or it doesn't.

A That's right.

Q And are you familiar with the role that imaging sometimes plays in the area of brain dysfunction, brain defects, neurological impairments?

A Yes, sir. And in fact that's one of the things that a neurological examination such as the neuropsychologist would help the lawyer with. That is, they identify the impairments, if they're there. Then the attorney might want to consider other means by which to present that information to the jury, such as brain imaging or PET scan, SPECT scan. There's half a dozen different ways that information can be objectively presented to the jury visually so that they don't have to take the word of the neuropsychologist that there's brain deficit. They can see it on the screen in front of them.

Q The qualified neurologist or radiologist can interpret a CAT scan, a PET scan, an MRI scan --

THE COURT: I assume we're not going to have a neurologist person testify.

MR. RUHNKE: We are.

THE COURT: Well, then let's wait for him to tell us all this.

MR. RUHNKE: I'm trying to explore --

THE COURT: You've done that.

MR. RUHNKE: If it's established, it's established,

Your Honor, then fine. I will move on.

Q (BY MR. RUHNKE) Do you recall having a phone conference, I'm sure you don't recall the actual conference, but phone conversation with Tena Francis on June 13, 2000?

A I don't recall that conversation, but if it's in my notes, then I would trust those.

MR. RUHNKE: I'm going to ask we produce P9 at page 114. These are actually Ms. Francis' notes of the conversation. I'm going to ask you whether they help you recall what was being discussed. At the top -- could we highlight just the first paragraph of the top of the document? Okay.

Q (BY MR. RUHNKE) The actual top of the document says Nelson defense team meeting, 6/13/01. Do you recall if this was in person or by telephone?

A This is by telephone. I think it's reflected in my calendars.

Q Okay. And these are Ms. Francis' notes attributing certain things to Pat, to you. First, that you will ask for more money. Do you remember what that was about?

A I think we were running out of money or perhaps had run out of money to fund the mitigation investigation Ms. Francis was already engaged in. I think that's what that's talking about.

Q There's a note here attributed to you: Needs more

objective medical testing of neurologist. That way the expert would not delve into the defendant's past bad history.

Was that a discussion of the pluses and minuses of neuropsychological testing?

A Yes, sir, in part.

Q What do you mean "in part"?

A Well, the problem with the neuropsych testing is certainly if you don't talk about the defendant's history, that's going to be the subject of cross-examination by the government prosecutors. If you had a neurologist, that really isn't part of their job. I mean, somebody who's just doing, for example, objective medical testing, such as brain imaging, doesn't really have occasion to have any discussion with the client about their history or the events of the alleged crime.

So I think that's what I'm referring to or that's what Ms. Francis is --

Q That's what she wrote down?

A Right.

Q Is it still your belief, though, that when you do a neuropsychological exam, there really is no necessity to touch the circumstances of the crime?

A That's right. It's not necessary at all.

Q And is there anything about those thoughts about a neurologist that made you decide for tactical reasons or otherwise, that you would not employ a neuropsychological

exam?

A No. Because I didn't. I did not employ a neurologist in lieu of a neuropsych exam. We didn't employ anybody. The plan was to find somebody else, another neuropsychologist, to do the evaluation other than Dr. Cowan and that did not happen.

Q Did you have any concerns about Dr. Cowan's competence to do this kind of an exam?

A Not at all. He's a very, very competent, the most, in my opinion, qualified neuropsychologist in this area.

Q All right. And let's go back to the lower part of this document. Let's highlight the whole thing, blow the whole thing up.

There's a reference to a June 28 hearing, and Ms. Francis writes down in re government's request to use, and she doesn't finish the thought.

Was there litigation going on in the case at that point about using -- the government using mental health experts to evaluate Mr. Nelson?

A That litigation was definitely going on. I think it went on for months.

Q And there's a reference, guilt/innocence phase. "We're not going to argue over unimportant stuff like he did not rape her, only attack the rats." That's a pretty shorthand description of the guilt phase strategy.

But would that have come from you?

A If she has it under my name, I don't doubt it. That certainly -- I felt that way. I thought to have credibility with the jurors, that we should not argue about evidence that was largely irrefutable.

Q And there's -- she writes down, tapes of defendant on phone with Kerri. Sound like he's crying and upset. Will clean up the quality. Good evidence, it says, of report?

A Remorse. That should be remorse.

Q The word's remorse?

A Yes.

Q She wrote report but I think she probably met remorse. What's that in reference to?

A Keith had called his girlfriend from the CCA. Those calls are all recorded, as you would expect, and so we had access to them. We had listened to some of the calls that he made right after his arrest in initial housing at CCA, the Correctional Center of America, up in Leavenworth, and he was remorseful during those telephone conversations, not only in what he said but how he said it. He was crying and very emotional, and that's very helpful evidence in a penalty phase of a capital murder case.

Q This is June of 2001. I'm not trying to play got you, but do you remember a significant development in the federal death penalty that took place in June of 2001?

A I confess I do not, no, sir.
Q Do you know or recall that Timothy McVeigh was executed by the Department of Justice on June 11, 2001, and ten days later the Department of Justice executed Raul Garza, the first two modern federal executions to have taken place, sir?
A I remember Mr. McVeigh's case, I'm sure as we all do. It was a most unique experience in the recent history. Mr. Garza's name, I'm familiar with, but I wouldn't have been able to give you the dates on either one of those now, although at the time I'm sure it was much more familiar.
Q Somebody engaged in capital defense, and this was the first federal execution in 20, 30 years --
A Right.
Q -- you would have been aware of it?
A Yeah, absolutely, yeah.

THE COURT: It appears we're getting a little bit astray from those issues that the circuit asked us to take a look at.

MR. RUHNKE: Well, the circuit did ask about preparation, mental health evaluations.

THE COURT: We've been doing that for quite sometime now. How about some of these other issues you haven't gotten to?

MR. RUHNKE: We're going to get to them, Your Honor, I promise.

THE COURT: Let's get to them now.

MR. RUHNKE: I need to do a little more about the nature of the relationship and what's going on in the mitigation case. There's documents that deal with that. I'd like to do that, if I may.

THE COURT: You have those documents. They're admitted into evidence. Let's move on to the other things.

MR. RUHNKE: I'd like to -- what's not admitted into evidence respectfully is Mr. Berrigan's state of mind, his reaction to the documents, and what they are causing him to do and not do.

I can't do it without --

THE COURT: Mr. Berrigan's already said he dropped the ball. He's already said that he -- the mitigation evidence, the mitigation part of the case is deficient. He's already spoken to the lack of mental health evidence.

MR. RUHNKE: I want to be able to establish that this wasn't just a passing reference here and there. This was a constant theme of the documents that were going to and from Mr. Berrigan. One of the documents I'm going to be referring to is P10, which is an affidavit -- while we're referring to the documents, P10 is an affidavit that Ms. Francis completed at the end of June of 2001, in support of the application for additional fundings, which detailed what had been done and what hadn't been done, what needed to be done.

THE COURT: I thought we just saw that document.

MR. RUHNKE: We saw a note from her about a meeting. This is a 10 or 15 paragraph affidavit in which she notes, among other things, there's a reason to suspect that Keith might suffer neurological impairment caused by prenatal damage, birthing problems, head injuries, et cetera, and that's at paragraph 10.

THE COURT: We covered that area as well.

MR. RUHNKE: I recognize that we've covered it in the sense that it was an issue that came up in February. It was an issue that came up in March. It's an issue that now comes up again at the end of June two or three months away from the start of the trial, and I need to know --

THE COURT: What makes it different? It's the same evidence that applies to the same person. It never has been resolved. Why is it -- it's just cumulative.

MR. RUHNKE: It's not cumulative respect -- I don't mean to argue with Your Honor.

THE COURT: We're not arguing. We're discussing.

MR. RUHNKE: Okay. I like that characterization better.

Discussing this issue with you. In fact, I like the Midwest term of visiting with counsel. I'd never heard that before I read the record in this case.

The issue is it's now the end of June 2001.

Mr. Berrigan knows there's an October trial date. The mitigation specialist is saying to him this is an unexplored issue, that there's reason to believe that he may suffer from neurological impairment, we need to investigate that and go after that.

THE COURT: And that was not done?

MR. RUHNKE: That was not done.

THE COURT: Yeah. That's a matter of record.

MR. RUHNKE: It was not done despite repeated reminders that it had to be done.

THE COURT: Yes. You have the documents in. The Court of Appeals can go back and look and read them at their leisure.

MR. RUHNKE: Depending who takes the appeal, I think that's correct. Okay.

Q (BY MR. RUHNKE) Then let me go on. Do you recall at or about --

THE COURT: Let me ask a question, Mr. Berrigan.

THE WITNESS: Yes, sir.

THE COURT: I'm a little bit in the dark on what communications existed between you and Ms. Hunt --

THE WITNESS: Yes.

THE COURT: -- as this time was transpiring.

Was she involved in ongoing discussions with you about your theory of how to proceed with the case?

THE WITNESS: Ms. Hunt and I had, I believe, close communication, Your Honor. We're both here in town.

THE COURT: Did you share with her your thoughts about some of these issues that Mr. Ruhnke has brought up?

THE WITNESS: To be fair to Ms. Hunt, no. This was my responsibility.

THE COURT: I understand. I understand it was your responsibility, but did you talk with her at all about it?

THE WITNESS: I talked to her, for example, about why I didn't think we should go forward with Dr. Cowan. I certainly explained that to her.

THE COURT: Did you talk to her about why you decided to not go with Dr. Cowan and didn't go with anybody else?

THE WITNESS: No. That was -- that fell on me. Absolutely.

THE COURT: Did she ask you about it?

THE WITNESS: She did not. I think she was trying to focus on her part of the case, and to be fair to her, I was the more experienced counsel. And I'm sure she thought I knew what I was doing and felt confident that I wouldn't drop the ball, and I don't know that she ever gave another thought, frankly, to the neuropsych testing. You'd have to ask her.

THE COURT: Mr. Ruhnke has brought up earlier during your interrogation or examination about the issue of the

government's examination of Mr. Nelson's mental health.

THE WITNESS: Yes, sir.

THE COURT: That kind of was not completed at least to my satisfaction. What was that all about?

THE WITNESS: I don't know if you recall from your state practice, Your Honor, but Chapter 552 governs mental health defenses and mental health evidence in state court, and that had largely been my experience even though I'd had one federal case. And what had happened up until 2000, in state court is even though Chapter 552 never explicitly gave the government ever the opportunity to examine my client, if I was putting on mental health evidence in the penalty phase, courts would order that all the time. All the time.

And so I had had this experience of trying capital cases in state court where the last witness to testify in the penalty phase was the government's psychiatrist or psychologist, and I can tell you that was devastating testimony. The cases that I lost, which were fairly few, thankfully, invariably that in my humble opinion was a critical piece of evidence for the government because these guys would come in and say not only did the client confess to the crime but he wasn't the least bit remorseful, seemed to take pleasure in relating the circumstances of the horrible murders that the folks had already convicted him of. It was awful evidence.

And my recollection at this time that this case came up in 2000, was that Rule 12.2 was still proposed, that the evidence that governed this area was an Eighth Circuit decision that obviously had allowed the government to get mental health testing once we introduced the subject of mental health in any form in the penalty phase. But it wasn't settled.

So I was hoping, frankly, you might make the decision that maybe this evidence shouldn't come in, but it became very clear to me in the course of litigation and certainly in front of Magistrate Hays, that the government was going to get a mental health evaluation of our client if we went ahead and tried to put in mental health evidence of any form.

THE COURT: Did that factor in any way to your dropping the ball on this whole issue?

THE WITNESS: No, not on the neurologist, Your Honor, and I'm hoping I'm not confusing the court. The failure to get a neuropsych was a completely different issue than the one I'm talking about now. I actually did consult a psychologist, his name was Dan Foster, from Wyoming, had him come out and visit Mr. Nelson. He's not a neuropsych. He's just a psychologist. He came out and visited with Mr. Nelson.

But we never put him on because my view that the danger of the government coming back to rebut whatever

testimony that he gave was going to be far more damaging than whatever benefit Dr. Foster's testimony could provide. But that's a different issue.

The neuropsych had nothing to do with the litigation that was going on in court. I just dropped the ball on that. That shouldn't have happened. But we did litigate the issue does the government get access to Mr. Nelson, and the question had been resolved unequivocally, yes, if you go ahead, Berrigan, and put on any psych testimony in this case, even in the penalty phase, they get access to Mr. Nelson, and that means they get to testify. And I thought that was a bad idea.

MR. RUHNKE: Your Honor, your question on the refusal to see him, the mental health experts, comes up chronologically later in this. It doesn't happen until October. We're now -- I'm taking it through chronologically. There are several questions remanded including that one.

I don't know if Your Honor wants to take a break this afternoon or not.

THE COURT: We can take a break, but, you know, chronology, it's just repeating the same stuff over and over from my point of view. It's cumulative stuff. I want to get to the heart of some of these issues, and that's why I took the opportunity to talk with Mr. Berrigan myself.

Let's take about a ten-minute break.

(A recess was taken.)

MR. RUHNKE: May we continue?

THE COURT: Well, yes and no. Yes, you may continue, but I think if you have a timeline on the rest of this, let's move into the timeline and the record. I don't want to go over these events as you've described them. We've already talked about them. They're cumulative.

MR. RUHNKE: Yeah. I'm not going to go over them again.

PATRICK JOSEPH BERRIGAN, previously being sworn, resumed the stand:

DIRECT EXAMINATION (continued) BY MR. RUHNKE:

Q Mr. Berrigan, one of the issues remanded by the Eighth Circuit was whether counsel should have asked for an adjournment and failed to ask for an adjournment. Do you recall the discussion of that issue involving Ms. Hunt, Mr. Nelson, anybody else?

A I don't recall --

THE COURT: Motion for adjournment, what are you talking about?

THE WITNESS: A continuance I think. That's New York for a continuance.

MR. RUHNKE: Yes, for a continuance.

A The only discussion I can remember about the continuance came when I got involved in the case with Judge Hays.

Q (BY MR. RUHNKE) Do you remember following your bypass

surgery in the summer of 2001, a discussion of whether you were ready to go to trial in October?

A I don't recall that discussion, no, sir.

Q Do you think you were ready to go to trial in October, at the end of October?

A Depends on how you look at it. At the end of the bypass surgery, obviously we weren't ready because the trial was still, you know, I guess, a couple of months, 90 days away. Couple of months away.

As I look back on it now, of course, I know I wasn't ready. I felt, frankly, as we were coming up to trial, I wasn't ready, but I guess I didn't particularly assess whether I was ready or not right after having bypass surgery.

Q All right. Did there come a time when you felt that the trial was coming up, you really weren't ready, and did it occur to you that perhaps you should move to continue the trial date?

A I felt that we weren't ready, but I did not make any effort to continue the trial setting.

Q If you weren't ready, why not?

A Because I understood that we were going to trial in October, period. That was the basis upon which I had agreed to get involved in the case.

Admittedly, I did not know there would be a trial date in October when Judge Hays and I spoke. All she

suggested to me is she felt strongly Judge Gaitan would, of course, continue the case and not force me to trial in April, given I was just getting involved in February. Of course, I knew Judge Gaitan and I knew that wasn't going to happen, but there was never a promise, well, it will be continued eight months, nine months, a year.

I didn't know when it would be continued, but when I signed up to do it, Judge Hays made it pretty clear, look, this case started back in the fall of 2000, and the judge wants this case to get resolved and this is it, it's going to trial at the next setting. And I agreed to do it.

Q Did you feel to your responsibilities to Mr. Nelson that you should have moved for a continuance?

A Yes, sir.

Q And am I taking away from your answer that you didn't move because you felt you had implicitly agreed to go to trial on the first continued date?

A It's that and I felt the continuance application would have been futile in any case. I felt Judge Gaitan had made it clear he expected the case to go to trial by fall. Judge Hays had made it clear that the expectation was it would be tried at the next setting. Certainly the government, I think, even to the first continuance made objection. I know they certainly spoke at the continuance application. They weren't happy about it, and I didn't think there would be any chance

of getting a continuance. But I didn't ask for one.

Q Did you consider not using but pointing out the fact that you were in the recovery period from some very serious heart surgery?

A I didn't consider that. I mean, I've had coronary artery disease for a long time, since I was 30 years old. In the three months preceding that August 8th surgery I had had 12 angioplasties, and so this was an issue that I needed to address obviously and I did. But I've been loathe throughout my career to use health as an excuse for continuing anything, and I'd like to think that I never have.

I've never filed a continuance application that I can recall on the basis of, you know, being in poor health. Now, sometimes these angioplasties would come up on a date where I might have court scheduled or maybe a trial even and I couldn't avoid that. But, you know, I recovered. It took awhile but I recovered from that surgery, and I expected when it was over, I'd be ready for trial, try my very best to be ready for trial in the fall.

Q Even if you felt that you weren't ready to go?

A Yeah. You know, some might call this, I think, pride or conceit, I'm not sure, but we don't -- I don't think trial lawyers like to come up with personal excuses not to be ready to go. It's one of our responsibilities that you're entrusted to get the case prepared and try the case when it's scheduled,

and to you use health -- I mean, obviously there are exceptions and folks get cancer and terrible illnesses where they're physically not able to perform. But that wasn't the case here.

I just lost a bunch of time. I had to go through cardiac rehabilitation and all the stuff that happens after surgery. But I -- to this day I'm not sure even if I'd asked for a continuance, I needed a continuance, I'm not sure I would have used my health as the reason for the continuance.

Q So in any event, no motion for continuance was ever filed, correct?

A No, sir, there was no motion for continuance filed.

Q And one of the issues the Eighth Circuit remanded on was the circumstances under which Keith Nelson refused to be evaluated by mental health experts. You're aware of that?

A Yes, I am.

Q And to cut to the chase on that, you knew that Drs. Martell and Dietz were sent by the government to evaluate or going to be sent by the government to evaluate Mr. Nelson, correct?

A Yes.

Q Do you recall that Dr. Martell had been to CCA, had attempted to see Mr. Nelson for the purposes of evaluating him, and Mr. Nelson had refused to see him?

A Yes, I'm aware of that.

Q All right. And did you then become aware -- and had you discussed that with Mr. Nelson?
A Of course, I discussed it with him. That's why he refused to see Dr. Martell and would have refused to see Dr. Dietz as well.
Q In essence nobody can force a client to do anything, but did Mr. Nelson tend to listen to your advice and counsel?
A I thought I had an excellent relationship with Mr. Nelson. I'm sure the court will recall at sentencing maybe coming to a different conclusion but that wasn't true. I know that he had some difficulties with other individuals, Mr. Shull, perhaps Mr. Pace, but my own experience with him was almost uniformly positive. Frankly, I -- even his guilty plea was an idea that I suggested. I thought that he would incur some sympathy or at least some empathy from the public in taking responsibility for what he had done.
That turned out to be a disastrous decision, but this decision regarding not speaking to Dr. Dietz and Dr. Martell was unequivocally my very strong advice to Mr. Nelson based on my experiences I've described, and he followed it, as he did almost everything else I asked him to do.
Q And taking the converse of that, based upon the relationship with Mr. Nelson as you just described it, had you told him to go ahead and cooperate with the examination, is it

your belief that he would have done so?

A He relied on me to plead guilty to capital murder, so my answer to that is yes. Like I said, he did what I asked him to do. The only thing that I was never crazy about is he didn't like to come to court for some of the preliminary hearing matters that we had in front of Judge Hays, and the reason had to do with what would happen back at CCA when he left and people going through his cell and so on.

He never really felt that his presence at these pretrial hearings was very productive, and I would have liked to have had him there. Other than that, frankly, he followed my advice to a T without exception.

Q Do you recall that Dr. Martell or do you know that Dr. Martell is primarily a neuropsychologist?

A Yes. I'm familiar with Dr. Martell and Dietz. They had a national reputation even at that time as being government mental health experts that worked pretty much exclusively for the government in capital cases.

Q And you had no idea what Dr. Martell, for example, might find if he did a neurological examination because he never did it, correct?

A I -- no. I was concerned about what he might decide to testify about, but I had no idea what he would find, no.

Q All right. And you had obviously -- you didn't have your own neuropsychological findings, so you had nothing to

counter anything that he found, correct?

A Right. That's right.

Q Do you know that Dr. Martell did evaluate Keith Nelson in the course of this litigation and determined that he has brain damage and dysfunction?

A I've learned that from you in the course of the habeas proceedings, yes.

Q And that imaging has confirmed the brain damage?

A Yes, sir. I understand that's the case.

Q Did you consider the possibility that the U.S. experts might find significant mental health mitigation?

A To be honest, no, I did not. That had not been what I had heard about them up until that point.

Q Do you recall in your affidavit saying that you really had no information about these experts to justify a finding that they were going to go in there and do, for lack of a better word, a hatchet job?

A Yeah. That's true. I mean, I didn't know anything about their qualifications, their expertise, but I did know the names, and I knew that they were connected with the government, not -- these weren't folks that the defense, at least not that I knew, that any defense lawyers had hired. I understand that's changed since then, but at the time these guys were government guys is what I understood.

Q You mentioned before that you did have a psychologist,

Dr. Foster, Daniel Foster, meet with Mr. Nelson over two consecutive days, correct?

A Yes, sir, I did.

Q And you mentioned that you received a report from him, correct?

A I believe I did. I certainly know I spoke to him orally after he had seen Keith, and I don't doubt that he prepared a report.

MR. RUHNKE: Could I see P8 on the screen, please. Blow that up a little bit, that first -- oh, the first page, if you would.

Q (BY MR. RUHNKE) Do you see that this was telefaxed back before, I guess, we were e-mailing stuff on November 27, 2001, from Rebecca Crawford-Foster? I'm kind of assuming Rebecca Crawford-Foster is Dr. Foster's wife or --

A I believe that's true, yes.

Q Do you remember that November 27 was the day before the case went to the jury?

A Is that the first phase of the -- well, it was the penalty phase.

Q Yes.

A Yes, of course, yeah.

Q So about four o'clock that afternoon you were getting a report from Dr. Foster on his exam?

A Yes, sir.

Q And I think the next day or after the verdict had returned, you made this report a part of the record, correct?
A Right. I thought to preserve this issue, obviously we needed to make an offer of proof, and this was the offer of proof, this report.
MR. RUHNKE: Could we go to page 3 of the report, Bates stamped 3, and going down lower on that page, please. Lower, please.
Q (BY MR. RUHNKE) Do you recall a discussion in Dr. Foster's report that his interactions with Mr. Nelson were primarily devoted to, quote, history and trust building?
A Yes, sir.
Q Okay. Did you consider this a complete and a comprehensive mental health examination?
A No, sir.
MR. RUHNKE: Could we go down further down that page, please, and on the next page too. Excuse me. I'll find it sooner or later. Do you see the paragraph that begins "while sexual sadism is strongly suggested"? Could we highlight that paragraph, please?
Q (BY MR. RUHNKE) He states, Dr. Foster, we were unable to complete an evaluation. Our time was primarily spent in trust building and history taking. These conditions, referring to antisocial personality disorder and sexual sadism, are treatable and are manageable in an adult prison.

But, again, he's telling you he did not complete his evaluation, correct?
A Yes, sir. That's what he's saying.
Q All right. And on -- okay. Is it fair -- we won't go through this thing chapter and verse, but is it fair to say that a fair portion of his report is basically critical of Judge Gaitan's decision not to order further competency evaluation?
A Yes. We all know Mr. Nelson tried to commit suicide, and the court retained Dr. William Logan to do an evaluation of him and that was done. And I think Dr. Foster was critical about the brevity, sort of the speed, the comprehensiveness of that evaluation.
Q And speaking of Dr. Logan, do you recall that one of the things that Dr. Logan offered to do was to meet with or counsel Mr. Nelson as he went through the stress of a capital trial, I guess, in an effort to just help him deal with the trial?
A I do remember that. I think Judge Gaitan took that suggestion under advisement is my recollection.
Q And do you know whether Mr. Nelson ever in fact met with Dr. Logan throughout the course of the capital trial?
A Not once the trial started, he did not meet with Dr. Logan.
Q The -- I think the final remaining area on which the

Eighth Circuit remanded for inquiry was the lack of objection to certain comments that were made during the closing arguments.

You have had these read to you in the past, correct?

A You mean the comments?

Q The comments --

A Yes, sir. I'm well familiar with them.

Q And I believe you stated in your affidavit that they all should have been objected to and you had no tactical or other reason for not objecting to them; is that correct?

A That's correct.

Q Do you remember the -- in the opening -- sorry, in the rebuttal argument the prosecutor saying basically justice in this case can only be had by imposing a sentence of death?

MR. RUHNKE: And I'm just going to read through them, Your Honor.

THE COURT: We've already read through them, Mr. Ruhnke.

MR. RUHNKE: Not all of them.

THE COURT: We haven't? Ms. Herndon didn't go through them all?

MR. RUHNKE: Not all of them. There's a couple more.

Q (BY MR. RUHNKE) For example, do you remember --

THE COURT: They all fall in the same category, I

take it?

MR. RUHNKE: Some of them are actually a different kind of category.

THE COURT: Let's just hear only about those, okay?

MR. RUHNKE: Okay.

Q (BY MR. RUHNKE) Do you remember Mr., I think it was, Miller asking the jury to close your eyes, every one of you close your eyes, and I want to envision her skating. I want you to really think about it. I want you to envision the smile on her face.

I want you to now envision the horror on her face as she's abducted. I want you to envision the look on her face as she's dragged across the woods. I want you to envision the look on her face. Think about it as her clothes are ripped from her, as he is -- as she is ravished, as he mounts this ten-year-old girl and she's crying, crying for her mother. Think of the look on her face, my God, my God, the horror on her face as the cord squeezes around her and he squeezes every ounce of innocence out of her.

Do you remember that comment?

A Yes, sir, I do.

Q Do you remember a comment -- I'll come to it in a second.

THE COURT: It sounds to me like that falls in the same category of objections that were previously expressed.

MR. RUHNKE: Personalizing it to the victim is different.

THE COURT: No, it's not. We talked about that, so let's not waste any more time going over that kind of stuff, Mr. Ruhnke.

MR. RUHNKE: All right. And I have one more.

Q (BY MR. RUHNKE) Do you remember a comment that the jury was the only dispensers of justice and that the victim's mother waits for you to give her some justice?

A I do.

Q Implying that the victim's wishes are something that the jury should take into consideration?

A Yes.

Q Any of those comments objected to?

A No, sir.

Q Do you think you should have objected to them?

A Of course. Suggesting the victims want death is entirely objectionable.

Q And any reason you think of, as you sit here today, why you didn't object?

A Sadly, no.

Q Anything tactical about it?

A No. There's nothing tactical. It was a failure to object to those comments.

Q And I think we've already had displayed, and I won't do

it again, but you and I had looked at a note you had made, parenthetical note, on a -- a handwritten note saying "Should have objected"?

A    Yes, sir.

Q    When did you make that note, do you think?

A    I don't know.  Might have been right after the comments. It could have been at the end of the closing.  Usually those notes are contemporaneous with what's going on, so I don't go back and sort of fill in information.  So the placement of the note would suggest when I wrote it, frankly.  But obviously I was asleep at the switch and I guess recognized that I was asleep at the switch when I wrote that comment.

Q    So looking back to February of 2001, when you got that phone call asking you to take this case, should you have taken this case on?

A    Looking back, no, no.  I have the most -- utmost respect for Judge Hays.  In fact, I think she's a brilliant judge, and I've had nothing but wonderful experiences with her.  And the same is true of Judge Gaitan, frankly, who I've known almost -- I've known him since the start of my legal career and both as a state court trial judge and appellate judge and a federal district judge.  And I think looking back in my desire not to disappoint them in some way and the trust that they had put in me in taking Mr. Nelson's case, somehow blinded me to my responsibilities to Mr. Nelson, and there's no real good

excuse for that. It's nothing but pride and conceit, and I regret it now that I ever agreed to get involved in the case.

Q I think you said at your deposition, I never should have taken this case. I was just too damn busy.

A I was very busy.

THE COURT: I think we've established that, Mr. Ruhnke.

MR. RUHNKE: Pardon me?

THE COURT: We've gone over that.

THE WITNESS: Yeah.

Q (BY MR. RUHNKE) And you stand by that?

A I do, yes, sir.

MR. RUHNKE: Can I have a moment? And I don't think I have anything further.

I have nothing further on direct examination, Your Honor.

CROSS-EXAMINATION BY MR. KETCHMARK:

Q So, Mr. Berrigan, if I'm correct in my understanding, starting with the objections or the lack thereof, you just testified that those were clearly objectionable things and you should have objected to them but you were asleep at the switch?

A Yes. I don't mean literally asleep.

Q I understand. You weren't physically asleep in the courtroom?

A Right.

Q But you dropped the ball on those similar to dropping the ball on the neurological examination. Is that consistent with the theme here?

A Yes, sir. I mean, that closed-the-eyes thing, it's from a movie. That's --

Q Let me ask you this, Mr. Berrigan: Obviously you wrote at some point that you thought it was objectionable, you should have objected, you didn't, you would have relayed that information -- because you were originally on the appeal, you would have relayed that information to Ms. Herndon, who you knew quite well and you knew she was excellent in doing appellate work in this area, correct?

A All that's true except the --

MR. RUHNKE: I just want to object to the form of the question. There's about five different questions.

MR. KETCHMARK: I can break it down.

MR. RUHNKE: Yeah.

Q (BY MR. KETCHMARK) You obviously took notes saying you should have objected, correct?

A Yes.

Q You obviously took those notes with the thought that that was something to be noted for the appellate purpose, correct?

A I took -- I took those notes not for appellate purposes

unless I wrote down MNT you'll see in my notes, I hope, throughout my trial notes. I write capital M, capital N, as in Nancy, capital T with a circle, which means that that area was so egregious that it needs to be put in their new trial motion. I don't know that I did that or not. That note is just me recognizing I screwed up. It wasn't meant to send a signal to the appellate lawyers, but obviously I know I'm going to give them my notes so, hopefully, they'll read them and recognize that was a mistake.

Q And you knew Ms. Herndon?

A Of course.

Q Ms. Brewer at the time?

A Yes.

Q Had worked with her in the Missouri Capital Unit?

A Yes.

Q Respected her?

A Phenomenal lawyer. I have the great most -- great respect for her.

Q You were bragging about her, talking about her great work in the Roper matter?

A Yes.

Q When you talked with her, when you transitioned out of the case, would you have met with her?

A I did not meet with her to discuss issues regarding the appeal if that's what you're asking me. I absolutely met with

her on many occasions, we're friends, and undoubtedly we talked about Keith Nelson's case. But other than handing her my notes, I can't recall ever just sitting down and discussing with her what issues were going to be raised in the appeal.

Q Let me ask you this --

A Yes, sir.

Q -- is your opinion of her such that if she would have read that transcript, those would have jumped out to her like they jumped out to you?

A I would have expected that she would have included that in the appeal, yes, sir.

Q When you got onto this case in February of 2001, you got on with the belief that you would be able to get up to speed and be effective in representing Mr. Nelson in the fall. Is that a fair statement?

A All of that's true except I'm not sure about the fall. The record may reflect Judge Hays had the discussion about the trial date, but I don't think we knew what Judge Gaitan was going to do about the date. But absolutely I would not have agreed to represent Mr. Nelson unless I felt I could get prepared, whenever that date was.

Q And in fact you even commented in the deposition when the trial was still set in April, that if it was going to happen in April, it was going to happen without me because I knew there was no way I could get on with a trial setting that

close?

A It's common sense.

Q And what I'm curious about, Mr. Berrigan, is you, yourself, requested the November date, correct?

A That may have been. I honestly don't recall.

Q Well, if I were to represent to you that the motion was drafted for the continuance from the April date under your signature and it was the November date, you wouldn't dispute that, would you?

A I wouldn't. But -- and I don't mean to argue with you honestly, Mr. Ketchmark, but somebody might have told me these are the dates that Judge Gaitan has available. I mean, in my experience that's frequently how it works, that the judges are very busy and they have certain dates available for trials, particularly of this magnitude.

Q But as you sit here today, you have no independent recollection of that being told to you, you simply -- the date you put in the motion was the date that you requested?

A I have no recollection either way as to how that date ended up in there.

Q And my question, again, Mr. Berrigan, was you selected that date because it was your belief that you could effectively get up to speed and represent Mr. Nelson in this very important case?

A I don't mean to quibble, but you're suggesting that I

picked the November trial date. I'm not Judge Gaitan's scheduler, and I don't believe that I did select the date.

Q But what I'm asking you, sir, is would you have gone in there and known in your mind that you couldn't have got up to speed, filed the motion asking for the November date?

A Knowing ahead of time, no, of course not.

Q So can we then conclude or assume that by selecting the November date and putting it in the motion that you signed off on, it was your belief that you could get up to speed and be effective?

A Again, you keep saying select the date. I didn't select the date to my knowledge. But having -- knowing that that was going to be the date, did I object and say, no, that's too soon, no. I agreed to that date. If that's your point, I wholeheartedly acknowledge that whoever picked the November date, I agreed to it.

Q When you first got on the case, you met with Ms. Francis when she came up here. You had a meeting at the Hereford House after you had met with the client, and at that point in time you had a discussion about A to Z on the case, correct?

A We had the discussion that's been related already in my testimony.

Q And at that time your notes reflected that there was a substantial amount of mitigation work that had been done to date. Is that a fair statement?

A Yes, sir.

Q And obviously that there was more that needed to be done?

A Yes, sir.

Q So it wasn't like the mitigation had been totally neglected prior to you getting on the case?

A That is correct. You are correct.

Q Now, when you indicated that you have not worked with Ms. Francis, when you get up to speed and you're getting into the case, did you have an opportunity to review the CV that she had, or did you get information about her experience?

A I certainly didn't review her CV. Ms. Francis was already in the case. There was never going to be -- we weren't going to change. It didn't matter. So I didn't review her qualifications or her CV. There was no reason to do that.

Q Well, were you of the mindset that -- at any point in time did you look at her background and experience or have discussions with her about it?

A Well, I think she talks about it in her affidavit, and I was familiar with the affidavit. So to that extent, yes, I did review her affidavit, and whatever that says about her background, I'll acknowledge that I had access to that.

Q Well, in fact there was some discussion with Mr. Ruhnke about that at the end of June. Ms. Francis in fact prepared

an affidavit at your request, did she not, that was attached to the June 28th letter, Mr. Berrigan, that was filed with the court requesting additional money because there was additional mitigation work that needed to be done?

A Exactly.

Q Is that the affidavit you're referring to?

A Yes, sir.

Q So in May when you're getting the information in the letter from her and you were writing notes about additional stuff that needs to be done, it's that stuff that's referenced in that affidavit saying we need more money because there's stuff that we need to do and Ms. Francis has acknowledged it?

A I haven't compared the two, so I don't think I can honestly answer that question.

Q Well, the records are in and they'll speak for themselves.

I want to clear up something, and I think Judge Gaitan was getting to this in his questioning, but on the mental health issues, the way I view it, and correct me if I'm wrong, is there's two separate and distinct issues. There's the neuropsychological issue, which was the Dr. Cowan approach as one; is that correct?

A Yes. The failure to hire a subsequent neuropsychologist is one issue.

Q But that's that side. That's the objective -- more the

medical type testimony versus the other one which was the litigated issue which was the issue that was extensively litigated in court back and forth. Am I correct in separating those two separate, distinct issues?

A Well, they're different in my mind certainly. We were undergoing litigation about what evidence would be admissible over on the court side, and then there was the issue about why not replace Dr. Cowan with another competent neuropsychologist. I do view that as a different issue.

Q And that's your testimony as to the Dr. Cowan and the replacement, that's where you, quote, unquote, dropped the ball?

A I definitely dropped the ball on that issue, yes, sir.

Q With respect to the other issue, Mr. Berrigan, about government having access to the mental health and how the government would have access and all of that, that was significant litigation that in fact began in May, May 10th of 2001, and continued up through November the 16th of 2001. Would you agree with me on that?

A If that's what the records reflect, I would agree with you, sir. I don't -- obviously don't remember the dates, but I do remember that we went back and forth on that for quite awhile.

Q I'll show you what's been marked as Government's Exhibit No. 219 and represent that this was a photocopy of a document

that we found when we went to Arizona, and it was a binder purportedly set up by the defense setting forth the history and the chronology of all that back-and-forth litigation.

A Okay.

Q Does that document look familiar to you?

A No, to be perfectly honest. I don't -- I didn't prepare this document, and I don't know that I've ever seen it. But it is what it is. I don't have any qualms about it.

Q In terms of the motions, do you recognize the captions of the motion, the back and forth between you and Mr. Miller on this particular issue?

A Yes, sir, I do.

Q And would you agree with me, Mr. Berrigan, that this, I call it chess match, this is where you initially say they shouldn't have access, Mark Miller says we should, and then the court makes a ruling?

A I think there were, frankly, several rulings is my recollection, but, yes, we were back and forth as we've testified to.

Q But then the issue of, okay, the government's going to have access and then you file a motion saying, well, if the government's going to have access, we shouldn't have to select the doctors of their choosing and you litigate that aspect of it, correct?

A Yes.

Q Then it goes through, well, can we present it if we have testimony where we're not basing it on interviews with the client, can we do that, correct?
A There were several issues and I'm sure that was amongst them.
Q So the mental health issue, as it relates to at least this particular side of the mental health, was extensively litigated by you and Mr. Miller before Judge Hays and ultimately before Judge Gaitan, correct?
A Yes. This issue about whether the government would have access to Mr. Nelson and what evidence could be presented, I think was extensively litigated, yes, sir.
Q And in fact the reference to Dr. Foster's report that Mr. Ruhnke had, that was actually a report that you attached as part of your in-camera offer of proof to preserve that issue for the record, correct?
A That's the basis of that report if that's what you're asking me.
Q Yes.
A Yes. That report was my recollection is specifically so that we would have an offer of proof on that issue because I don't think Dr. Foster was available, or perhaps it was going to be too much money to bring him in. I honestly don't remember why we didn't have Dr. Foster himself come back and make a testimonial offer of proof because that's the preferred

way to do it. But we used the report instead.

Q I understand.

But it was pretty clear at that point because Dr. Foster had come out and interviewed, it was pretty clear at that point that Judge Gaitan was not going to allow you to present Dr. Foster in the penalty phase if the government didn't have access to your client, correct?

A Well, only if -- you know, if he had adhered to his earlier ruling. I mean, the reason we make offer of proofs, as you well know, is to give the opportunity to the trial court to make a different decision. These rulings are all interlocutory, and I might have been able to persuade Judge Gaitan to allow that testimony of Dr. Foster. But if he had done that, I'll have to admit that would have been somewhat of a surprise given the earlier rulings in the case.

Q Wouldn't that same logic apply to asking for a continuance before the court if you didn't think you were ready?

A Should I have? Yeah, absolutely.

Q Well, but obviously the court if you came and represented that I'm not ready, we're not ready, we're going to be ineffective in our presentation, it's your testimony that Judge Gaitan wasn't going to move the trial?

A In my humble opinion, Judge Gaitan would not have continued that case no matter what reason I gave for a

continuance absent a physical inability to perform.

Q Well, Mr. Berrigan, what about from an appellate standpoint that in terms of preserving that issue, if you really thought that you were ineffective and you were so ill prepared, why not lodge the request for the continuance, have it denied, and then have that become an appellate issue?

A That's exactly what should have happened. I didn't do it.

Q You dropped the ball because you let your pride get in the way is your testimony?

A To some extent, as I've already explained, that's true.

Q In terms of Dr. Cowan, I think you indicated that that's something that you learned very early on and you've known throughout your practice in doing this capital defense, that that is critical and that needs to be explored, correct?

A And I don't -- again, not to quibble, but if you --

Q I don't want to quibble.

A I don't always do neuropsych testing. We do explore issues regarding our client's mental health including brain deficits. There are a lot of different ways to do that, and neuropsych testing is one.

Q What are others?

A Brain imaging, PET scans, SPECT scans, MRIs. There's a whole variety of things that are employed in hospitals every day to diagnose brain issues. Those are also equally valuable

at trial.

Q You were well aware of all those options that were available, but it somehow slipped your mind that that's something you needed to do, Pat?

A Yes. I didn't do it. I mean, the record speaks for itself.

Q I guess what I'm a little bit confused about is Mr. Ruhnke presents all this history about all of these other capital cases that you're engaged in and it's almost to the point where you're too overqualified in this area, that you've got yourself spread too thin. Is that what your testimony is?

A No. I don't -- my qualifications and expertise and experience hadn't changed in Mr. Nelson's case. In other words, I'm -- this was an aberration in one respect only and that was time. I've never been involved in a case where I was appointed and tried a case essentially in six or seven months. That's never, ever been my experience.

That Angela Johnson case I was on for five years before trial. Typically there's at least a minimum 18 months, 24 months between my appointment and the case coming to trial. This was very, very quick, and it turned out to be that I had a lot of other obligations, previous obligations that ended up taking up a lot of my time.

Q So Ms. Johnson's case you were on that for four years?

A I think five -- at least five years. I think that case

went to trial in the summer -- excuse me, in the spring of 2005.

Q And I think that's correct.

And my question to you then is you had an occasion to testify in an evidentiary hearing in the 2255 in that case; did you not?

A Yes, sir.

Q And in fact before Judge Bennett when he questioned you about your level of representation of Ms. Johnson, you in fact told Judge Bennett in response to his questions that you believe that you were ineffective or that you dropped the ball on certain aspects of her representation, correct?

A Yes, sir.

Q Now, that's a case that you're involved in for five years and you're dropping the ball on that one, correct?

A Well, it wasn't as a result of time. Those were different issues than what we're talking about today.

Q And in fact Judge Bennett entered a finding after -- some 460-page finding, finding that there was ineffectiveness in that case. That death verdict got set aside and that's being retried; is that correct?

A Yes, sir. The penalty phase only is being retried.

Q Correct.

Silly question, but you obviously have a philosophical opposition to the death penalty, correct?

A I do, yes.
Q And by a court setting aside these verdicts of death, it gives the client another bite at the apple, correct?
A Well, obviously, yes, sir, at least in terms of the penalty.
Q Yeah, in terms of the penalty.
A Yes, sir.
Q After Judge Bennett found you to be ineffective, Mr. Berrigan, what steps did you take in order to get your representation up to snuff?
A Do you mean up to snuff on other cases?
Q Did you go to any training? Did you -- I mean, other than -- you've been found ineffective. Is that the only case you've ever been found to be ineffective in?
A Yes, sir.
Q Have you ever confessed to being ineffective in other cases?
A I'm not sure what you mean by "confessed to being ineffective."
Q Have you ever mentioned that you dropped the ball in other cases in terms of your representation?
A Not that I can recall, no, sir.
Q Did you tell us in your deposition about employing this same -- or talking about dropping the ball on a state case that you had represented?

A I may have but if you could refresh my recollection, I'd be happy to talk about it.

Q I'll have to look.

Let me talk to you then while I'm looking for that, Mr. Berrigan. You had substantial trial experience in capital cases prior to Mr. Nelson's matter, correct?

A I had tried a number of capital cases to verdict, yes, sir.

Q And not only had you tried a number of cases to the capital verdict -- or to verdicts, but you had also attended a number of trainings in terms of staying up to speed on current trends in the law?

A I would say at least annually, yes, sir.

Q In fact, you went to Life in the Balance in March of 2001, I think your calendar reflects, so you were doing that in the process of this representation?

A That's true, yes, sir.

Q And not only have you attended a number of these trainings, you've in fact lectured at a number of these as an expert in how to go about presenting the mitigation case to other attorneys who are engaging in this area, correct?

A The only qualm I'd have with that is the expert terminology. I mean, the fact is sometimes these organizers of these events need speakers and they'll come to individuals. It doesn't necessarily mean they're expert in that area, but I

have presented on occasion at capital training seminars.

Q It's the same reason you go to the training is because you want to learn, correct?

A Of course.

Q So as a presenter, you're going there to present your wisdom or give your experience or whatever you want to term it, correct?

A No, that's not correct. I go there because I'm asked to do it. It's a service that we provide for our colleagues in this area of practice. It's a difficult area of practice to become competent in.

Q With respect to your bypass surgery that happened in August of that year, you indicated that you never have used your health as a basis to justify a delay in a trial. Is that my -- am I remembering that testimony correct?

A I hope that I qualified that, I think I did, that occasionally there have been literal conflicts where the procedures that I've had have interfered with scheduling, but what we're talking about is a little bit different. And I haven't had this kind of experience before.

Q Have you had an opportunity to review the CJA billings that shows that your work on Mr. Nelson's matter increased exponentially in September, October, and November?

A Yes, sir.

Q And so while you had your surgery in August, you were

able to devote significant amount of time in terms of getting up to speed for Mr. Nelson's matter. Is that a fair statement?
A I had certainly more time, yes, sir.
Q And I think when you testified in direct examination with Mr. Ruhnke, you talked about having heard of Dr. Martell and Dr. Dietz and having concerns about how they could be very effective in testifying and do a lot of damage to a client's mitigation case. Is that an accurate summary?
A Not exactly, sir.
Q Okay.
A I told the judge when he asked me, that my experience in this area had been uniformly negative without Dr. Martell or Dietz being involved. That is my state cases. Neither of those gentlemen testified or were involved, and yet I had had bad experiences. I did know that these two guys were hired by the government frequently, and so I expected no different result, frankly.
Q But in terms of the other prior state cases, you talked about how you knew how damaging it could be to have a government's expert be the last one to testify before the jury goes back and ultimately starts to deliberate on this very important issue?
A Yes, sir.
Q And it was your belief that Dr. Dietz and Dr. Martell,

based on their reputation, were very good and, therefore, would be very effective and there would be a similar result. Is that a fair statement?

A Well, to be honest, bias was my main concern. They're obviously qualified but my concern was their pro-government bias.

Q But you also had concerns that they would be very effective in coming in and refuting it and you didn't want the jury to hear that as the last thing before they went back and began deliberating, correct?

A Yeah. No matter who it was, that's not the last thing you want the jury to have in their ears before the decision about life or death.

Q And that's part of the reason why you engaged, is it not, Mr. Berrigan, in this protracted litigation, to try to avoid having the government be able to have access to be able to present that testimony?

A In part, yes, sir.

Q And in fact you were able to through Dr. Cunningham present some evidence of social history because those were not done through interviews with your client; is that correct?

A Well, I don't think Dr. Cunningham offered psychological/psychiatric testimony. I don't think it had anything to do with -- well, you know, the court record will speak for itself, but I don't know that it was so much

Dr. Cunningham speaking to Mr. Nelson as to the subject of his testimony. If he had testified about psychological or mental health issues regarding Mr. Nelson, that might have been a real problem.

Q In terms of advising Mr. Nelson about whether or not he should submit or not submit to the interview --

A Yes, sir.

Q -- you indicated that you advised him unequivocally in very strong terms what your belief was, correct?

A Yes, sir.

Q That was your belief based on what you deemed to be the most appropriate strategy of whether or not to -- if we present this, then we're going to have to have you subject to being examined and that could be very bad for us?

A Yeah. Based on my experience, that was the strategic decision that I made, and I advocated it very strongly.

Q You didn't coerce or compel him, you didn't twist his arm, you basically gave him the facts and gave him the information and told him what you think very strongly what he should do, but he ultimately made that decision, correct?

A You'd have to ask him that, but it wasn't what do you want to do.

Q Right.

A That wasn't the discussion. It was this is what we're going to do, and he certainly didn't quarrel with me or say,

no, Pat, I really want to talk to these guys, please let me do it. But that decision was made. I made that decision. Now, you can say, well, Mr. Nelson could have done it himself, he could have gone against you. That's all true.

Q And, again, those were all -- that part of the mental health was being done for strategic reasons because you thought that there was more damage than good could come if Dietz and Martell had access to your client?

A That decision --

Q Yes.

A -- was made because I didn't want the jurors hearing the last word from the government. I didn't think that was a good idea based on my experience, as I've said several times now.

MR. KETCHMARK: One moment, Your Honor.

That's all I have, Judge.

REDIRECT EXAMINATION BY MR. RUHNKE:

Q Mr. Berrigan, at some point in the mental health litigation, Judge Gaitan issued an order describing what was to take place if Mr. Nelson refused to cooperate with the doctors. Am I correct about that?

A Yes, sir.

Q And the essence and the bottom line of the ruling was that if Mr. Nelson declined to be assessed by the government's choice of mental health professionals, he would not be permitted, the defense would not be permitted to put on a

mental health case. Is that a fair summary?

A Yes, it is.

Q And earlier had conditions under which the mental health evaluation and the decision-making process would be carried out, had also been put in place? Am I correct about that?

A Yes.

Q For example, had the government's mental health individuals evaluated your client and you determined that you didn't want the rebuttal, you would have been able to pull any mental health defense and proceed without a mental health defense and, therefore, not face the rebuttal, correct?

A Right. That's how Rule 12.2 works, and that's how the procedure was even in place at that time.

Q Sure. And 12.2 went into effect, I think, at the end of 2002, but at that point there had been a series of decisions, including within the Eighth Circuit, setting forth very, very similar proceedings to what actually became Federal Criminal Procedure 12.2. Am I correct about that?

A Virtually identical.

Q There was the Beckford decision out of Virginia, for example?

A Right.

Q Preceding Rule 12.2?

A Yes.

Q And at that point -- at the point that Mr. Nelson

refused to be evaluated on -- at your advice and you announced that to the court on October 18, 2001, what mental health case did you have?

A None.

Q So why were you pursuing this issue? Was this an appellate strategy?

A No, of course not.

Q You had no neuropsychological exam or mental health evidence to offer at that point; am I correct?

A At that point, yes, that's true.

Q Even if you had mental health evidence and even if you disclosed it to the government, you understood that their evidence was rebuttal, meaning that it was limited to mental health and it was limited to rebutting what was put forth in the defendant's presentation in the penalty phase; am I correct?

A Yes.

Q Was that your understanding?

A Yes. If we chose to present, let's say, Dr. Foster, for example, as a witness in the penalty phase, then the government's experts come in. If we choose not to do that, then the government's evidence is not permitted because obviously it's rebuttal evidence to whatever Dr. Foster would have offered.

Q Was there -- you had a history with Mr. Nelson of

someone whose mother was assaulted and immediately went into premature labor. You remember that?

A Yes, sir.

Q He was born prematurely, spent -- had oxygen deprivation during birth and spent at least a month in the hospital after birth, correct?

A Yes.

Q And evidence of traumatic brain injuries or traumatic head injuries throughout his growing-up years?

A Right.

Q And -- but no neuropsychological examination had taken place from the defense part, correct?

A That's correct.

Q Suppose this hypothetically, Dr. Martell does do an evaluation of Mr. Nelson and determines that there is brain damage, which is exactly what happened in this case --

THE COURT: Why are we going into hypotheticals? That's not what he's --

MR. RUHNKE: Because he's talking -- because he's discussing hypotheticals, and the government's talking hypotheticals.

THE COURT: No. That will not be asked and answered.

Q (BY MR. RUHNKE) And if you had a mental health case to go with, you could have pulled it, as you've said, but if

Dr. Martell had gone ahead with the investigation without your offering mental health, was it your understanding that Dr. Martell would have been permitted to testify at the penalty phase?
A No.
Q Because of the procedures that had been set in place, correct?
A I suppose we could have called Dr. Martell theoretically. It wasn't something I was considering at the time.
Q Was this some kind of appellate strategy?
A No. These cases are to be won in trial, not in appeal. It's way too late in the appellate proceedings.
Q Do you recall -- and I'm going to ask to put up U.S. Exhibit 51, if you don't mind. I'll switch the laptop.
Do you recall in late August, end of August the litigation was still going on about the conditions of mental health and you were seeking an extension of time because of the bypass surgery? It's now the end of August. And you recall putting in a motion, I won't quote it but it's there in the exhibit, that you weren't expected back to work until, quote, after Labor Day?
A Yes. And, I mean, I'm looking at paragraph 3. This is what Mr. Ketchmark was asking me about. I asked for an extension to file a response. I suppose you could -- maybe

there's no difference in your mind or Mr. Ketchmark's between that and not showing up for a hearing or for a trial, but there sure is in my mind.

This is in my view no big deal. Not showing up to a hearing or a trial that's been scheduled relying on the bypass surgery is not something I would have done.

Q You're essentially saying that, look, this is -- I'm being asked to respond to a motion, I just had bypass surgery, I'm really not expected to be back until after Labor Day, I need an extension, and you're drawing a distinction in your mind between saying I cannot do a trial or I can't handle this because of my health?

A Yeah. This is -- I mean, in my mind this has nothing to do with the court's calendar. You know, Judge Hays wasn't relying on me to show up in court. She just wants me to respond to a motion. I get it.

But I needed a little more time to do it. If this had been a hearing or something where I was supposed to be there, I doubt seriously I would have relied on the bypass surgery unless I couldn't have been there. But, you know, maybe that doesn't matter. In my mind it does.

Q Did you at any time basically take charge of the mitigation investigation in this case in your own assessment?

A When I was appointed.

Q And did you take it over and interact with the

mitigation specialist and supervise her work and those kinds of things?

A We met with Tena Francis, as you've pointed out, I think, on one or two occasions. That was it.

Q Has that been your typical experience in preparing mitigation cases?

A Not at all.

Q Okay. What is your typical experience?

THE COURT: We've done that. Let's go to another question. Okay.

Q (BY MR. RUHNKE) You mentioned on the cross-examination of Mr. Ketchmark that the issue in this case was time. What do you mean by that?

A Well --

THE COURT: I think he's answered that question too. He said this was a shorter period than he's ever had to respond.

THE WITNESS: Right.

Q (BY MR. RUHNKE) Do you believe that you did not have enough time to get ready for this case?

THE COURT: Yes, yes. Come on, Mr. Ruhnke. Let's not go back over this again.

MR. RUHNKE: I'm not sure he's actually said he didn't --

THE COURT: He did say that. The record will

reflect that.

MR. RUHNKE: I have no further questions on my redirect.

MR. KETCHMARK: I have no further questions.

THE COURT: You may step down, Mr. Berrigan.

MR. RUHNKE: Your Honor, our preference would be -- it's a quarter till four.

THE COURT: That's about when I said I wanted to break. Let's resume tomorrow about 8:30ish.

MR. RUHNKE: 8:30 will be perfect.

(Court adjourned at 3:50 p.m.)