IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| KEITH D. NELSON, | ) | |
| Movant, | ) | Case No. |
| vs. | ) | 04-8005-CV-W-FJG |
| UNITED STATES OF AMERICA, | ) | Pages 274-467 |
| Respondent. | ) | |

TRIAL TRANSCRIPT - VOLUME II OF IV

On April, 14, 15, 16, and 17, 2014, the above-entitled cause came on before the Honorable Fernando J. Gaitan, Jr., United States District Judge, sitting in Kansas City, Missouri.

APPEARANCES

For the Movant:
MR. DAVID A. RUHNKE
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042

MS. PAULA K. HARMS
Federal Public Defender
850 West Adams, Suite 201
Phoenix, Arizona 85007

MR. GARY E. BROTHERTON
Legal Writes, LLC
503 E. Nifong Blvd., #377
Columbia, Missouri 64201

For the Respondent:
MR. DAVID M. KETCHMARK
MR. JEFFREY E. VALENTI
United States Attorney's Office
400 East 9th Street, Ste. 5510
Kansas City, Missouri 64106

# I N D E X

TUESDAY, APRIL 15, 2014
VOLUME II OF IV


| | Page |
|---|---|
| **RUSSELL STETLER** | |
| Direct Examination by Mr. Ruhnke | 276 |
| Cross-examination by Mr. Valenti | 315 |
| Redirect Examination by Mr. Ruhnke | 329 |
| Recross-examination by Mr. Valenti | 334 |
| **JILL MILLER** | |
| Direct Examination by Mr. Ruhnke | 335 |
| Cross-examination by Mr. Valenti | 374 |
| Redirect Examination by Mr. Ruhnke | 383 |
| **MICHAEL GELBORT, Ph.D.** | |
| Direct Examination by Mr. Ruhnke | 385 |
| Cross-examination by Mr. Valenti | 403 |
| Redirect Examination by Mr. Ruhnke | 412 |
| Recross-examination by Mr. Valenti | 414 |
| **XAVIER AMADOR** | |
| Direct Examination by Mr. Ruhnke | 415 |
| Cross-examination by Mr. Valenti | 445 |
| Redirect Examination by Mr. Ruhnke | 464 |






Case 4:04-cv-08005-FJG Document 261 Filed 05/21/14 Page 2 of 194

TUESDAY, APRIL 15, 2014

THE COURT: Good morning.

MR. RUHNKE: Good morning, Your Honor.

THE COURT: Are we ready to proceed?

MR. RUHNKE: We are, Your Honor.

We have a lineup of four basically expert witnesses scheduled for today. The way things are going, I'm not sure how long they're going to actually take, but we're on schedule and we're going to finish it on Your Honor's timeline. So we may go short depending on how long the witnesses actually --

THE COURT: I'm sure if we finish early, you can use the time to do other things.

MR. RUHNKE: We sure can. Thank you very much. As long as you're not offended by that, we appreciate it.

THE COURT: I'm not offended in the least.

MR. RUHNKE: Thank you.

All right. Your Honor, we begin this morning by calling Russell Stetler.

RUSSELL STETLER, being duly sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MR. RUHNKE:

Q Mr. Stetler, good morning.

I'd like to begin by showing you three documents, just the first pages of them, on the screen that's in front of you.

MR. RUHNKE: Ms. Taylor, would you display P68, please, which is in evidence along with the other documents.

Q (BY MR. RUHNKE) What is P68, Mr. Stetler?

A That's my current CV.

Q And that's part of the record in this case. Can we look at P69.

And what is P69?

A This is a declaration that I provided. I'd have to look at the last page to see the date, but I believe this is the one that was --

Q Without going to the last page, I'll represent this is the one filed in 2012.

A Yes.

Q And, finally, 69A.

A Yes. That's an expanded version of the same declaration.

Q And with regard to 69A, is the document itself that's provided to the court electronically include linked tabs to exhibits that are appended to the report?

A That's correct.

Q So that if you go through the electronic version and wanted to look at a particular exhibit, you'd merely have to click on the tab and the exhibit would appear, correct?

A That's correct.

Q Assuming the technology is cooperative?

A Technology willing, yes.

MR. RUHNKE: So take that down.

Q (BY MR. RUHNKE) Mr. Stetler, how are you currently employed?

A I'm employed by the Federal Defender System as the national mitigation coordinator for the Federal Death Penalty Projects.

Q And what are your duties and responsibilities in that regard?

A I provide assistance to counsel handling federal case -- capital cases in the federal courts, either trial level cases prosecuted under the Federal Death Penalty Act or cases which arrive at federal court on habeas corpus.

Q Where are you physically based?

A I'm based in the Federal Public Defender Office in the Northern District of California in their Oakland office.

Q And when was your position created by Defender Services?

A It was actually authorized by the committee under Defender Services in 2004 and then advertised in 2005.

Q All right. And has your position been described and your duties described in reports prepared by the administrative office of the United States Courts?

A Yes. It's briefly described in the update to the -- what's commonly called Spencer Report.

MR. RUHNKE: Could we show P83 on the screen,

please?

Q (BY MR. RUHNKE) What's P83?

A It's a -- it's an update to the report on the cost and quality of defense representation in federal death penalty cases. The original report was in 1998, prepared by a subcommittee chaired by Judge Spencer from Virginia, and that's why it's commonly referred to as the Spencer Report. The September 2010 update merely reviews data between 1998 and then.

MR. RUHNKE: Could we go to pages 111 and 112 of that report. I'm not sure it corresponds exactly to the Bates stamping, but the report pages are numbered. That appears to be page 8. Okay. A little further. On page 111, if we could blow up the commentary section, please.

Q (BY MR. RUHNKE) Is there a description of your project?

A Yes.

Q And would you just read that into the record?

A Yeah. It says, "In 2004 the Defender Services Committee --

Q Slowly, slowly, please.

A Excuse me.

"In 2004 the Defender Services Committee authorized a position for a national mitigation coordinator in a federal defender office to assist in expanding the availability and quality of mitigation work in death penalty cases in the

federal courts. In addition to leveraging his own significant knowledge and skills through case consultations, the national mitigation coordinator has enhanced defense representation and contributed to cost containment efforts by recruiting more mitigation specialists to work on federal capital cases, matching mitigation specialists with counsel and providing expanded training opportunities both for defender staff and for private mitigation specialists who are authorized to work on federal cases."

Q All right.

MR. RUHNKE: We can take that down.

Q (BY MR. RUHNKE) This describes your current position, and the person they're describing in that is you, correct?

A Yes.

Q We're dealing with a case here where the period of prosecution was 1999 through 2001. Where were you working during that period of time?

A I was doing trial work in the New York State Capital Defender Office where I served as the director of investigation and mitigation.

Q And how large was the New York Capital Defender Office?

A It was a statewide office created when the death penalty was reinstated in New York in 1995. It had a main office in New York City and branch offices in Albany and Rochester, and we had a mandate to see that indigent defendants facing

capital prosecution anywhere in New York state received effective representation.
Q And how many attorneys, how many mitigation specialists, how many investigators roughly employed in that office?
A Well, I think when we started in the New York City office, we had an equal number of lawyers and nonlawyers, probably eight to ten lawyers and four or five fact investigators, four or five mitigation specialists and smaller numbers in the satellite offices but always balancing lawyers and nonlawyers.
Q When did you personally begin working on capital cases?
A 1980.
Q And you said 1980?
A 1980.
Q And where was that?
A That was in San Francisco, California.
Q And throughout your career through today, have you continued to work on capital cases?
A Yes, that's correct.
Q In what capacities leading up to the capital defender office?
A Well, immediately preceding the capital defender office, I was the chief investigator at the California Appellate Project in San Francisco, which was a nonprofit law office that provided assistance for lawyers representing death

sentenced prisoners on appeal or in habeas corpus. And for the ten years before that, I just worked privately on my own.

Q Have you attended continuing legal education programs in the topic of capital defense representation?

A Yes.

Q Approximately how many?

A Somewhere between 350 and 400.

Q Have you served as faculty in continuing legal education programs devoted to the topic of capital representation?

A Yes, I have.

Q Do you know approximately how many?

A Approximately 350.

Q And approximately how many states and jurisdictions?

A Most of the death penalty jurisdictions. I think the only ones that I haven't been in are New Hampshire, Nebraska, Montana, South Dakota. All the rest, and, of course, federal and military courts as well.

Q Have you presented on the topic of capital representation in defense within the state of Missouri?

A Yes, I have.

Q Do you -- where?

A I think eight times altogether. Four times here in Kansas City and a couple of times in St. Louis and a couple of times in other places in the middle of the state.

Q All right. And do you keep up to date with literature,

law review articles, legislation, and everything else associated with the death penalty as it exists today in the United States?

A Yeah. Particularly when it relates to mitigation evidence in death penalty cases.

Q Have you published in this area, for example, in law reviews and law journals?

A Yes, I have.

Q And what law reviews and law journals have you published in?

A I've done three articles for Hofstra Law Review, two articles for UMKC Law Review, one for the University of Pennsylvania Journal of Law and Social Change.

Q In the Hofstra Law Review, what were the topics of your law review articles?

A 2003, I did an article on the duty to seek negotiated dispositions in death penalty cases. It was kind of a commentary on the ABA guidelines section on that point. 2008, an article on the supplementary guidelines for the mitigation function, and in 2013, an article on how the ABA guidelines reflect prevailing professional norms in capital defense representation.

Q And for the Kansas City Journal?

A They had a symposium issue, I believe, about five years ago on death penalty stories. I did an article called The

Untold Story of a Motherless Child, which kind of tracked the mitigation investigation in a postconviction case and relying particularly on documentary evidence that had not been discovered at the time of trial. And the more recent 2014 article in UMKC Law Review is, again, in a symposium issue on mental health issues, and my article discusses prevailing norms in mental health evaluations in capital cases.

Q And having been qualified --

THE COURT: I've heard enough, heard enough. You got that in the record. Let's move on.

MR. RUHNKE: All right. I offer Mr. Stetler as an expert in the investigation and presentation of mitigation evidence, prevailing capital defense norms.

THE COURT: Absolutely.

MR. VALENTI: No objection.

THE WITNESS: Thank you, Your Honor.

Q (BY MR. RUHNKE) You've already identified copies of the reports. Are you familiar -- and in those reports do you discuss the standard of care for defense representation in capital cases?

A I'm sorry, which reports are you referring to?

Q Both your reports.

A Oh, yes. I'm sorry, yes.

Q Do you discuss the standards of care?

A Yes. And the language is the same in both 69 and 69A.

Q And I want to, again, to be clear that we're discussing the standard of care at or about the time this case was tried leading up to the arrest in 1999 through the trial in 2001.

Were you attending capital case seminars and programs into -- through the 1980s up until the 1990s -- I'm sorry, up until -- through the 1990s up until the point that this case began in this district in 1999?

A Yes.

Q Is there -- was there at the time a body of literature and a body of seminar materials that discussed the necessity for having a complete-and-thorough mitigation investigation of --

MR. RUHNKE: Whoops, we just lost the lights.

THE COURT: Keep working.

Q (BY MR. RUHNKE) Conducting a complete-and-thorough mitigation investigation of a capital defendant's entire life history?

A Yes. That was probably presented at all the training seminars. It was discussed in a lot of articles in the defense bar magazines as well as some law reviews.

Q And during the recent past 20 years, has the United States Supreme Court also in a series of decisions, five in particular, had occasion to discuss the standard of care in capital cases actually for the period preceding for trials before Mr. Nelson's trial here in 2001?

A Yes.
Q And those cases are?
A Williams v. Taylor, which is from 2000; Wiggins v. Smith, W-i-g-g-i-n-s. That's 2003. Rompilla v. Beard, R-o-m-p-i-l-l-a, Beard, common spelling; Porter v. McCollum from Florida, and Sears v. Upton.
Q And in those cases did the Supreme Court in each of those cases, as a matter of fact, determine that counsel's performance failed to comply with prevailing professional norms?
A Yes. And the simplest way to summarize it is prevailing professional norms with respect to thorough investigation of mitigation evidence.
Q And in -- is there a common thread that runs through each of those cases in terms of counsel's particular failing?
A Yeah. The common thread that I've observed is the failure to investigate cognitive impairments, brain damage. That's a theme in each of those cases, so to me it reflects two things, one, commonly missed and, two, a particularly significant area of mitigation.
Q And in reviewing those five cases and in your continuing contact with the capital defense community, if I can call it that, was there and is there and had there long been prior to 1999, a focus on investigation of a capital defendant's mental health issues or mental health -- investigation into the

mental health of the client?

A Yes. In fact, there are journal articles that go all the way back to the late '70s, that talk about the importance of mental health evidence in capital cases.

Q In terms of mitigation specialists, were the prevailing norms back in 1999 through 2001, were mitigation specialists commonly employed in capital cases?

A Yes. In fact, a 1998 report by Judge Spencer talked about mitigation specialists as part of the standard of care in capital representation.

Q The Spencer update, as referred to in 2010, was an update of a report prepared in 1998; is that correct?

A Yes. I'm talking about the 1998 version referred to the prevailing standard of care.

Q And it's referred to as the Spencer Report after Judge Spencer, who chaired the committee from the Eastern District of Virginia, correct?

A Correct.

Q And in your declaration you discuss the ABA guidelines that existed in 1989. What do they say about the investigation of a client's life history?

A Well, they talk about the necessity of conducting a thorough investigation, both of guilt/innocence, and every aspect of the penalty phase, particularly including mitigation, life history.

Q And in 2003, the ABA updated those guidelines.
Did the 2003 update reflect any kind of sea change or great difference in the expected practices in capital cases from 2001?
A It provided more detailed recommendations, but I don't -- I wouldn't refer to it as a sea change.
Q And how did those guidelines come to be?
A Well, the original guidelines in 1989 really came out of work of the public defender community around the country. The public defender association for the entire country is called the National Legal Aid & Defender Association, and they were tasked with the job of putting together standards for capital representation. They produced their own set of standards and then referred them to the ABA. And the ABA then sent those NLADA guidelines through various ABA committees, and then they were finally adopted by the ABA delegates in 1989.
Q And ABA, American Bar Association; NLADA, National Legal Aid & Defender Association?
A Correct.
Q You discussed in your -- and the guidelines themselves, have they been cited by the Supreme Court as referencing prevailing professional norms or prevailing standards?
A Yes.
Q Are they aspirational or are they -- how would you describe them?

A No. They're meant to reflect the existing standard of care.

Q They're not intended to reflect this is the absolute Cadillac gold standard?

A No. On the contrary. Again, as I said, they were produced originally by public defenders. There is no elite group of well-paid lawyers in capital defense work. It's all court-appointed indigent defense either through public defender offices or court appointment systems.

Q In the five Supreme Court cases you mentioned that found trial counsel to have been ineffective in their presentation of mitigation evidence, were these cases where counsel failed to investigate entirely or failed to present any mitigation evidence at all?

A No. They varied. In each case there was some investigation.

Q And in some of those cases were mental health experts employed?

A Yeah. I think three of the five cases involved mental health experts. In the Rompilla case from Pennsylvania in fact there were three mental health experts who had all seen the client.

Q And in that case, again, the Supreme Court determined that the performance was ineffective?

A Yes. Because the experts hadn't been provided with

critical documentary evidence that was available and counsel had failed to find or provide.

Q What is the relationship between the mitigation investigation and any mental health evaluations?

A Well, your mitigation investigation results in what we call a biopsychosocial history. It's multigenerational. It's based on a combination of documentary evidence and interviews, and --

Q Let me stop you there for a second. Why multigenerational? What difference does that make?

A I was going to get to that. Multigenerational investigation is important for identifying genetic predispositions, disorders, and vulnerabilities that may be embedded in the DNA, as well as behaviors that are replicated from one generation to the next. So it's called sometimes intergenerational modeling.

And social history is often referred to as the cornerstone of a sound, reliable mental health evaluation. So the social history does two things. It provides important background information about the client and his family, but it also helps lawyers decide what kind of expert do I need in this case and what sort of issues should they address.

Q And in terms of mitigation specialists, is it sometimes the function or often the function of a mitigation specialist to suggest certain experts that might be appropriate or

certain areas that might be appropriate for further expert development?

A Yes. And that's one of the points that is made in Judge Spencer's 1998 report.

Q And in terms of an investigation, is there a benefit to continuity of personnel who are doing the mitigation investigation?

A Absolutely.

Q Is there something called interview fatigue or witness fatigue?

A Witness fatigue.

Q And what is that meant to refer to?

A Well, when one different interviewer after another approaches witnesses, witnesses often respond I've already told somebody that, and then they become sort of locked into the first initial version of events that they may have given. They don't disclose easily to a second and third interviewer, whereas when you have continuity of representation, you build trust, rapport, overcome the barriers to disclosure of sensitive information, and you get, you know, just a more free-flowing disclosure of information the better the relationship you've established.

Q And how important, given standard practices and standard of care, is contact by the mitigation specialist with a client?

A It's absolutely essential for a couple of different reasons.

One, the mitigation specialist is usually the team member who has the most training and experience in screening for mental disorders and impairments, getting insights into mental health problems so they can provide longitudinal observation as they see the client over the life of the case. As things change in the custodial environment, how do they respond to those different situations, and if they have mental health issues, do they wax and wane, what kinds of symptoms can be observed over time.

But in addition, when you're interviewing family members and other people who knew the client at any point in his life, they naturally want to know what you're able to tell them about the client, how is he doing now. So if there's a disconnect between client contact and the field interviews, you're just not going to get the same rapport with the witnesses that you're talking to.

Q In terms of capital mental health examinations, how important is it to get to the mental health evaluator an accurate social history?

A Again, it's absolutely critical and for a couple of reasons. One is it's going to be clinically valuable. If you look at the articles on reliable assessments just in the -- you know, take the psychiatric textbook, Kaplan and Sadock,

back in the 1980s, it starts by saying history is going to be very, very important, and not just history from the person that the psychiatrist is interviewing. Put that in the forensic context and you also have the problem of an expert who relies entirely on self-report.

So self-report is not going to be reliable in any context, but it's going to be particularly viewed in a skeptical lens in the context of any kind of forensic proceeding. So you want to give your experts independently-corroborated information.

Q And before I turn to the Keith Nelson case specifically, one final area which is what is the relationship when you present a case in mitigation between lay testimony, expert testimony, and other evidence, documents?

A Well, you know, they have to be integrated. In other words, your lay witnesses will put out important factual information, but they're not going to provide a framework for jurors to understand. The value of mitigation is often explanatory. When horrible crimes happen, jurors want to know how this came about, you know, who is this person, how was he shaped, and how did this crime occur.

And so, you know, the lay witnesses aren't going to provide that kind of explanation. You're going to need a mental health person to provide that framework.

But in turn the mental health people on their own

are not going to be immediately credible to jurors unless they're supported with independently-corroborated lay testimony and documentary evidence.

Q Does mitigation testimony have to be linked to cause and effect of the crime?

A No. I mean, again, the Supreme Court has provided guidance on that when they talked in the Tennard v. Dretke case, T-e-n-n-a-r-d v. D-r-e-t-k-e. They say some things are inherently mitigating, so intellectual impairment, even if it doesn't exclude capital prosecution under the Atkins standard, it's, as described by the Supreme Court, it's mitigating in itself. You don't have to show what effect it had on premeditation and deliberation. It may be a reason to inspire compassion.

Q And were you asked to take a review of the Keith Nelson case?

A Yes, I was.

Q Do you happen to have a copy of your report with you? Do you need it to refer to, or are you fine without it?

A I don't have it with me. Let's go without it.

Q Okay.

A Or if you want to provide a hard copy, that's fine. Either way.

Q All right. I'll provide you with a hard copy because I'm going to be asking you specifics.

A That will probably speed things up. Thank you.
Q And prior to -- first of all, when do you recall becoming first involved in the Nelson case?
A I think it was about five years ago. I don't have a precise date in mind but I'd say roughly 2009.
Q And was that just basically a conversation between you and I and I asked you to get involved and take a look at the Nelson case?
A Exactly.
Q And prior to writing the declaration, your initial declaration of 2012, which is P69 in evidence, what materials did you review, if you can recall?
A I reviewed the Eighth Circuit opinion affirming the conviction and death sentence, the penalty phase testimony. That's all there was in this case, that is, the defense presentation in the penalty phase. The work product of Tena Francis, whose organization in Dallas had done the open mitigation investigation and the correspondence back and forth between Ms. Francis and various trial counsel.

I reviewed the docket from the criminal case just to get the progress of how the case had unfolded and then many of the pleadings as well. And I think by the time -- may have had this initially in 2009, but by the time I was writing the declaration in 2012, there were also affidavits from Ms. Hunt and Mr. Berrigan.

Q And did you review documents, records?
A Yes. I'm sorry. Of course. I reviewed the records, which had been collected at the time of trial.
Q And records had been collected subsequently?
A Yes.
Q In your declaration you outlined basically six areas where in your opinion prevailing professional norms were not complied with in the Keith Nelson case, and what are those six areas roughly? If you need your report --
A No. I think I can tell you what they were.

Failure to conduct a thorough mental health investigation, failure to investigate brain damage, and then the related question of failure to investigate thoroughly cognitive impairments, failure to investigate trauma, which was actually disclosed in a lot of the early investigations. There were a lot of red flags to pursue.

And then the last couple of areas related to records, failure to gather all the records that were particularly relevant, and then the kind of disconnect between the record gathering and the interviewing, failure to use the records to identify additional witnesses to be interviewed or to use the records to interview witnesses and prepare their testimony more effectively.
Q And at the time of Mr. Nelson's trial in 2001, he had two attorneys representing him, one of whom was clearly

experienced in capital defense. He had a mitigation specialist, Ms. Francis, apparently an investigator, Timothy Murphy, at that point. So didn't he have what he was entitled to?

A Well, on paper he had a team, but it was not functioning as a team. They did not regularly meet. They didn't even have a regular form of contact like telephone conferences at regular intervals. The team was also pretty dysfunctional. You heard the -- some of the complaints between Ms. Hunt and Ms. Francis, but also you had the turnover of staff.

Ms. Francis was the person that they thought they were hiring back in November 2000, but she made one trip to Kansas City, met Mr. Nelson a couple of times but really didn't continue on the case. The work was then delegated to her colleague, Deborah Haddad, and then after the conflict between Ms. Haddad and Ms. Hunt, a third person took over, Lisa Murphy.

So there was really that lack of continuity, and Mr. Berrigan certainly wasn't having regular contact with any of them until the very end.

Q And in terms of the defense lawyers themselves, where were they physically located?

A Well, the defense lawyers were here in the Kansas City area, but Ms. Francis was in Dallas, Texas.

Q And based on your review of the records and the

testimony in the declarations, how much contact did Ms. Francis and/or Ms. Haddad and/or Ms. Murphy, Lisa Murphy, have with Mr. Nelson, the client?

A Very, very little. Ms. Francis was the only member of that team who saw Mr. Nelson, and that was on one visit to Kansas City. She saw him on two consecutive days.

Q Did Ms. Haddad ever meet Mr. Nelson to your knowledge?

A No.

Q Did Ms. Murphy ever meet Mr. Nelson to your knowledge?

A No.

Q Or anything reflected in the records?

A No.

Q Was there anything that you saw from the records or from the declarations that would have prevented Ms. Francis, for example, from requesting more opportunities to see Mr. Nelson?

A No.

Q Did you see any request to see Mr. Nelson where, for example, travel was denied by the court or it just was scheduled and didn't happen or any evidence of anything other than the two consecutive days in February of 2001?

A No. I saw no financial impediments, and in fact as best as I could tell from the filings, all the funding requests were granted.

MR. RUHNKE: Could we have P80 on the screen, please. Can we look at the -- start with Hunt hours.

Q (BY MR. RUHNKE) First of all, Mr. Stetler, do you know how these charts were prepared?
A Yes, I do.
Q And how were they prepared?
A I think I prepared the spreadsheet of Ms. Hunt's hours, and you did the same for Mr. Berrigan's hours. It was simply a question of taking what was in the CJA vouchers and breaking them out by month. In other words, some of the vouchers didn't correspond to a single month but might run from January 1st to February 15th. So we had to just extract the information for each month in each category. But it was entered into a spreadsheet, and from the spreadsheet, the charts were automatically generated.
Q The technology was that an Excel spreadsheet was created --
A That's correct.
Q -- to document these hours and they were entered, and then this got beyond, I think, your and my capabilities.
Who was it that created the second part of it which broke down by category?
A Well, again, it was just someone who understood the technology from my office. His name was Alex Roberts.
Q Can we go down to the second half of that. And this is essentially color coded so that you have the total number of hours in the left-hand column at the top as to the number of

hours in this case Ms. Hunt is spending working on this case, which in January happened to be 102 hours, broken down by -- from A to J, which are the CJA-30 billing categories with the blue representing court hearings. What color -- whatever that is, I guess we'll call it magenta representing conferences with the client. Witness interviews represented by appears to be a lighter blue. Consulting with experts followed by the large orange category of reviewing records, followed by research and writing, followed by travel, followed by a catchall category of just other activities on the case.

And if we go back up to the top of that chart again, if we may look at it, I mean the chart in a sense speaks for itself.

Does it appear that there was a relatively fair amount of activity in January that steadily declined with an exception of July into August and then real work again resumed on the case in September when there were numerous court appearances, October when there were numerous court appearances and getting ready for trial, and November when the trial itself took place in this courtroom?

So that's a fair-and-accurate summary based on the input that was made into the creation of this chart, correct?

A Yes.

Q If we go down to the next page on this chart, Mr. Berrigan's hours.

Have you had a chance to review Mr. Berrigan's deposition?

A Yes.

Q Were you here yesterday when Mr. Berrigan --

MR. RUHNKE: Reset this chart. Thank you. If we could just blow up Mr. Berrigan's hours.

Q (BY MR. RUHNKE) Obviously Mr. Berrigan has no hours in January. In February he spends a period of time on the case when he first gets into it. In March, again, maybe a little under 50 hours. April he spends four hours in the case. It speaks for itself. Very little activity until September, maybe 20 hours a month.

Is it a fair reading of this chart that until September, Mr. Berrigan is spending the overwhelming amount of his time on other matters than the Nelson case?

A Yes.

Q Have you heard Mr. Berrigan state both in deposition -- not heard but read in his deposition and heard him state yesterday that the issue here was time, he felt he didn't have enough time to get ready?

A Yes. He had a very heavy caseload.

Q And in terms of what he is spending his time on, if we go to the, I guess, the bottom of that chart, bottom -- sorry, next page of that chart. Okay. Let's look at that.

One of the categories is witness interviews, and

it's represented -- I'll call it olive green if that's a fair observation, olive green, and through -- until we get to September on the eve of trial, how much time is Mr. Berrigan spending interviewing witnesses?

A Just a few hours.

Q And you've heard him testify that he was the person in charge of preparing the mitigation case; is that correct?

A Yes.

Q Okay. In terms of social --

MR. RUHNKE: We can take that down now. Thank you.

Q (BY MR. RUHNKE) Mr. Berrigan had a draft social history that he received from Ms. Francis, correct, in or about May I believe the date is that she provides that to him?

Is there any information at all about what Mr. Berrigan did with that social history?

A Well, I think his testimony is that he read it and, you know, I'm not recalling offhand whether it was the social history or the chronology that he annotated with his own notes of things to follow up. But I believe he testified that after taking those notes, he didn't disseminate them or use them himself for the follow-up that should have occurred.

Q Any evidence that these were communicated to Ms. Francis or anybody else on the team saying this is stuff we need to do?

A No. They certainly had some other discussions at a

later time about some follow-up, but that specific set of notes was not communicated.

Q And in terms of the mental health investigation in this case, in your opinion did that meet prevailing standards of professional norms for the period we're talking about, 1999 to 2001?

A No, it did not.

Q There's evidence in the case that these two psychologists interviewed Mr. Nelson at various times, Mark Cunningham, Ph.D. and Daniel Foster, who's Psy.D., doctor of psychology. Why wasn't that enough?

A Well, they were not provided with a thorough background. There was nobody in the trial team who observed the client over the life of the case or longitudinally who was observant of signs and symptoms of potential disorders and impairments, so nothing communicated to the experts that allowed them to have that kind of rich picture of who it was, and the -- you know, the assignments were really pretty vague. You know, Doc, tell me what we've got here as opposed to giving them specifically-framed referral questions based on the investigation.

Q By his own report, did Dr. Foster conduct a complete mental health evaluation of Mr. Nelson?

A No. As he indicated in his report, you know, he appropriately spent time trust building and getting history

from the client.

Q You mentioned the term longitudinal, lateral.

A No, not lateral. Longitudinal.

Q Okay.

A Up and down.

Q And why is a longitudinal period of observation important in assessing mental health? And by longitudinal, we mean different periods of time?

A Yeah. Over the length of the case is a simpler way, use a shorter adjective. You want observation over the -- that long period of time to see symptoms that may wax and wane. In other words, somebody may seem perfectly normal three weeks out of four but not in the fourth.

And your experts are probably not going to see the client numerous times. They're going to be very expensive, and so you need that kind of observation that will help inform the experts' understanding.

In addition, you want to see how the client is responding to stressors in the day-to-day environment, changes in his relationships in the outside world, conflicts in the custodial environment, how does he handle stress, how does he react and overreact. All of that helps inform what's going on.

Q Was Dr. Cunningham retained or employed or appointed to do mental health evaluations of Mr. Nelson?

A No.

Q What was his, if you recall, referral question? What was he asked to do?

A Well, he was asked to be a -- ultimately asked to be a teaching witness to provide a summary of the research, including the Department of Justice research on the developmental factors which put a developing child at risk or alternatively protect him and generally sociologically increase or decrease the risk of negative outcomes.

Q In terms of the continuity of counsel as the record reflects, did Mr. Nelson have different attorneys at different stages of the case with the exception of Ms. Hunt, who was involved in the case from start to finish?

A Yeah, that's correct.

MR. RUHNKE: Could we put up P79 and highlight the first maybe third of that.

Q (BY MR. RUHNKE) P79 is in evidence as basically a chronology of what the defense did in investigating mental health, and there's a typo here that I'm going to correct.

But did the team seem to recognize from the beginning that investigating Mr. Nelson's mental health issues was important?

A Yes. And that was in Mr. Ninemire's letter after the federal public defender left the case saying consulting a psychiatrist is going to be important in this case. Certainly

it's in the funding applications for Dr. Peterson.

Q And is it in the funding applications for Dr. Cowan?

A Of course.

Q And do you recall in that funding application that -- I think it was either prepared -- I think it was prepared by Ms. Hunt, and Mr. Shull's signature, but Ms. Hunt, I think, prepared the motion -- the issue of Mr. Nelson's premature birth, lack of oxygen during delivery was something that may have resulted in neurological damage and brain defects?

A Yes, absolutely.

Q So at least as of January of 2001, the team was recognizing the importance and the significance of those issues; is that correct?

A Yes.

Q And, again, we know that no neuropsychological examination ever took place, correct?

A No neuropsychological examination ever took place, correct.

Q And we think we've established that Dr. Foster obviously was not a neuropsychologist and did not even complete a complete mental health evaluation, correct?

A That's correct.

Q You're aware of the fact that Mr. Berrigan canceled the appointment with Dr. Cowan and that no new appointment or no new expert was ever selected, correct?

A That's correct.
Q All right. As it went on, we go into September.
MR. RUHNKE: Can we just take down the blowup and go down towards the September part of the case.
Q (BY MR. RUHNKE) As it proceeded, the defense went ahead and filed a notice that it was intending to present mental health mitigation, and it attaches Dr. Foster's CV.
To your knowledge, had Dr. Foster even seen Mr. Nelson as of September 4, 2001?
A No.
Q In fact, it's not until, as this chronology shows, it's not until a couple of weeks later that there's a motion to authorize him, and it's not until October that he actually interviews Mr. Nelson on consecutive days and, as stated on the chronology, describes the meeting as primarily history taking and trust building. And it's not until a few days later that his services are actually authorized all based on the documents you've reviewed and the records.
THE COURT: Mr. Ruhnke, let's not keep going over the same stuff over and over again. Let's get to the main points, okay?
MR. RUHNKE: Okay.
Q (BY MR. RUHNKE) Let me just finish the mental health.
As you know, ultimately the magistrate judge had ruled that if Mr. Nelson did not cooperate, he would not be

allowed to present mental health evidence and ultimately -- and Judge Gaitan affirmed that report of recommendation, and ultimately no mental health evidence was presented, correct?

A Yes, correct.

Q Were you here yesterday when Mr. Berrigan said in essence he didn't have a mental health case at that point?

A That's correct.

Q Okay.

THE COURT: He sat through all of Mr. Berrigan's testimony and all of Ms. Hunt's testimony.

MR. RUHNKE: Yes, sir. I'm trying to get to our expert on the issue, but I'll move on, I promise.

THE COURT: I know you know how to do this. I'm just asking you to not have me remind you all the time to do this.

MR. RUHNKE: Thank you.

Q (BY MR. RUHNKE) So the team -- the takeaway message for a lot of this is the team was aware of mental health issues from early on in the case. Is that a fair summary?

A Yes. I was hesitating about the word "team."

Q The attorneys?

A The lawyers individually and certainly Ms. Francis as well were aware and Mr. Ninemire were aware of the importance.

Q In terms of brain damage, was there information available to the team that Mr. Nelson may have suffered

traumatic brain injuries?

A Yes. And that included both in-utero exposure, domestic violence in his early childhood, beatings from other caretakers. His older brother Johnny was also reportedly beating him. So there were multiple things that put him at risk for traumatic injury.

Q And the circumstances of his birth included among them?

A Yeah. The anoxic birth certainly and the period of hospitalization that followed.

Q Didn't this team obtain a lot of records? Referring to Ms. Francis, didn't they obtain what they describe as thousands of pages of social history records?

A Yes. Some were obtained by Ms. Francis, some were obtained earlier, you know, either through the public defender's office or when Mr. Shull and Ms. Hunt were on the case. But, yes, collectively, they certainly did obtain thousands of pages of records.

Q And based on your review of the penalty phase, which was the only trial that we had since he entered a guilty plea, based on the review of the trial and with the trial, how many of these records were presented to the jury?

A None. And, you know, one thing that's interesting is that the birth records were actually on Mr. Berrigan's original exhibit list. But not only were they not presented to the jury, but in his opening, Mr. Berrigan referred to the

birth difficulties and then said Mr. Nelson was fine afterward.

Q And have you, as part of your preparation, reviewed the report of Dr. Carolyn Crawford, MD, a neonatologist, who has reviewed those birth records?

A Yes.

Q Is it her conclusion that Mr. Nelson was quote, unquote okay as a result of birth?

A No.

Q And have you reviewed the report prepared by Jill Miller, masters in social work, mitigation specialist, on her review of what was presented, what could have been presented, records that -- I want to -- three categories of records, three or four categories of records discussed by Ms. Miller?

One is records that were gathered but never utilized, records that were not gathered that cannot be gathered any longer because they've been destroyed, records that have been gathered since the time of the 2255 investigation that were available to the mitigation specialist and still are available. Again, I won't go through it because Ms. Miller is going to testify.

Were there records that they did not gather, did not explore, which presented significant mitigation evidence?

A Yes.

Q And was that failure to gather easily-available records

--

A Yes. And in fact there was also correspondence internally between Ms. Francis and her staff and between them and the lawyers about the need to get authorizations, the need to pursue certain records, but --

Q Let me give you one particular example.

A Sure.

Q Did the mitigation investigation that was conducted really in 2001, because that's when Ms. Francis began to work on the case, develop evidence or had the team already developed evidence -- not team.

Did the representatives of Mr. Nelson already develop evidence that he had been in special education classes in White Settlement?

A Yes.

Q And was the team -- were the representatives advised that regular school records were being disclosed, but if they wanted special ed records, they had to make a different and separate request because they're in a different location?

A Yes. That response from the schools was staring them in the face telling them here are some more records and, you know, since special education was certainly important in a case with cognitive limitations, they should have been pursued.

Q And did, to your knowledge, Ms. Francis or her

organization ever obtain Mr. Nelson's special ed records through their investigation?

A No.

Q Is there a tab on your report that has a letter to that effect? And if it's easy for you to identify it, please do so. If it's not that easy, just let me know.

A I believe it's tab 144.

MR. RUHNKE: Could we look at tab 144 of Mr. Stetler's report? If we could just make that a little larger by just highlighting a smaller portion of it or enlarging a smaller portion. Okay.

Q (BY MR. RUHNKE) And this is -- you see the headline -- you see the handwriting "More records, please request"?

A Yes.

Q You know whose handwriting that is?

A No. It could have been Ms. Francis, could have been Ms. Hunt. I'm not sure.

Q Okay. But if you read the --

MR. RUHNKE: Can you center that, please.

Q (BY MR. RUHNKE) It reads the above-named student has additional records located in, and it says the department of special education and that essentially you have to make a separate request in order to acquire special --

A Yeah. And that's not unusual.

Q And that's -- I think that's a requirement of the

privacy laws regarding special ed.

To your knowledge, did the team at that time ever present evidence of special education or acquire evidence of his special education records?

A No.

Q Are you aware that since the 2255 investigation began, some special education records were located in a school district -- I think at Miami School District here in Missouri just because some of them happened to have been sent to the Miami School District when they transferred?

A Yes.

Q Were those records complete?

A I don't believe so. There's a second page to this tab. It's essentially the same kind of information.

Q Okay. It's just basically discussion of -- if we could just enlarge the text on that page. All right.

So the team, the mitigation investigation team, is being advised that there are special education records available. This is from 2001. These records were probably gathered in 2001 or around that period of time.

And to your knowledge and review of the history of this case, special education records were never requested or acquired in advance of Mr. Nelson's trial in 2001?

A Yeah, that's correct.

Q Have you reviewed the verdict sheet in this case?

A Yes, I have.
Q And the verdict sheet lists mitigating factors; is that correct?
A Yes. Nonstatutory mitigating factors.
Q They're all nonstatutory mitigating factors, which means these are facts or circumstances which the defense suggests to the jury justifies a sentence of less than death.
And have courts discussed the skills of counsel required in drafting appropriate mitigating factors?
A Yes. Judge Bennett in the Northern District of Iowa in the Angela Johnson 2255 case has an extensive discussion of that issue even though it was not -- it was procedurally barred in the case. He found it so important that he talked about it anyway.
Q And that was the case where Mr. Berrigan and the rest of -- not just Mr. Berrigan -- the rest of the trial team, the trial attorneys in that case, were declared to be ineffective and the death penalty was set aside, correct?
A Yes. And remanded for a resentencing.
Q You discuss this in your report. I'm not going to belabor it, but did the drafting of mitigating factors in this case, were they drafted in a way that made it difficult or easy for jurors to get to the point of finding something mitigating?
A It made it difficult.

Q And I think we know that the jury in this case was -- deliberated for a little under two hours and only one juror found any mitigating factor established, correct?
A That's correct.
Q Overall whose responsibility is it to see the case in mitigation is properly investigated, properly put together, and properly presented to a jury at penalty?
A The learned counsel.
Q And overall, based on your review of this case, is it your opinion based on your knowledge and experience that prevailing professional norms as they existed in 1999, 2001 were or were not met in this case?
A They were not met.
MR. RUHNKE: I have nothing further, Your Honor.
CROSS-EXAMINATION BY MR. VALENTI:
Q Mr. Stetler, as I understand your testimony, you've indicated that though Mr. Nelson had a team, you don't believe that that team functioned correctly, correct?
A That's right.
Q And you indicate that one of the indicia of that team not functioning correctly is that Ms. Francis, Ms. Haddad, Ms. Murphy, and others didn't visit Mr. Nelson regularly enough while he was in CCA, correct?
A Correct.
Q You, of course, realize that that group was hired

because of their connections to the Dallas, Texas, area because a significant amount of the fact investigation to be done needed to be done in Texas, not here in Kansas City?

A That's correct.

Q All right. So they were more uniquely geographically situated to allow them to conduct investigation in and around the White Settlement area where he grew up in his youth?

A Yes.

Q All right. That would also make them geographically disadvantaged as it related to their ability to meet him and see him at CCA?

A Yeah. I think that's one of the reasons they discussed in those -- in that I think it's the Hereford House dinner meeting that Mr. Berrigan referred to yesterday. If you look in those notes, I believe, they talked about maybe it would be a good idea to get somebody from the defender office in Leavenworth to see Mr. Nelson on a regular basis.

Q Correct.

And so client contact was a concern that they talked about as early as February of 2001, when Mr. Berrigan first got in the case after Mr. Shull had been taken off of it?

A Exactly.

Q And because it is a team approach, regardless of who does the work, ultimately it is the attorneys' responsibility to make sure that those client contacts take place, correct?

A Correct.

Q And you saw the Plaintiff's Exhibit 80 in which the hours were broken down, and one of the categories for both Mr. Berrigan and Ms. Hunt were the hours that they spent in client contact?

A Yes.

Q So each of the attorneys spent time with Mr. Nelson from -- we only see a 2001 time, but Ms. Hunt on each month in 2001, correct?

A Yes.

Q And Mr. Berrigan to a lesser degree early on in the representation but to a much more significant degree later in the representation continued his client contacts as well?

A Yes. And he took extensive notes when he visited and did not discuss any observations of mental health issues.

Q Okay. And you indicated, though, that part of this team approach would be a longitudinal observation of the defendant's psychological or psychiatric condition over the time of representation, correct?

A Yes.

Q All right. You, of course, realize that as early as fall of 2000, Mr. Shull and Ms. Hunt had gone to Texas while hiring Ms. Francis, to then interview and ultimately hire Dr. Cunningham?

A Yes.

Q Who was a licensed professional in the field of psychology, correct?
A Yes.
Q He was hired, as you indicated on direct examination, as a teaching expert, correct?
A Well, he was hired initially as a mitigation specialist according to what was filed, but the role he ultimately played was as a teaching expert. So there may have been sort of a disconnect between what was in Mr. Shull's mind in November of 2000, and what was in Mr. Berrigan's mind in the summer of 2001.
Q Understood.
But he's within the case because he was ultimately authorized in December of 2000, by the courts as a licensed psychologist in a mitigation capacity, fair?
A That's fine.
Q Okay. And in his capacity, because he is a professional, were he to make observations, though not hired to do an evaluation, he could certainly make reports longitudinally about what he saw of Mr. Nelson's psychological or psychiatric condition, correct?
A Yes. If he had seen him, but he saw him for only 224 minutes according to his report.
Q Of course most of the defense experts in this case saw Mr. Nelson for very little more or not more time than that

when they made their opinions, didn't they?
A Yes. That's why the observations of somebody who sees him more often can be more important.
Q I understand that.
But even in the postconviction case currently before the court, some of the experts have offered opinions for the defense counsel, for the postconviction counsel having not seen Nelson for much more than three, six, or even eight hours themselves?
A That's true.
Q All right. I believe you testified during direct examination that because of the manner in which things progressed, no psychological information was presented to the jury, is that correct, from the defense side? Did I misunderstand you to say that, sir?
A What did you say again, please?
Q I believe you testified on direct examination that no psychological testimony was produced by the defense team during the mitigation phase of the hearing?
A Well, Dr. Cunningham testified but within the constraints of Judge Gaitan's order.
Q Correct. Because you know now, having reviewed the file, that Mr. Nelson, regardless of what Mr. Berrigan or Ms. Hunt did do, did refuse to cooperate with the government's mental health experts, correct?

A Yes.
Q And that he was advised certainly by Mr. Berrigan and strongly, Mr. Berrigan's words, to not cooperate, but ultimately that decision was Mr. Nelson's and Mr. Nelson's alone?
A Yes.
Q Mr. Nelson was brought before Magistrate Judge Hays and explained that that was his and his decision alone, correct?
A Yes.
Q And he, nonetheless, said, yes, that's what I want to do?
A Yes.
Q Later Judge Gaitan brought Mr. Nelson before him and again explained to him the ramifications of his noncooperation, correct?
A Yes.
Q And he, again, on the record said that he understood that he was potentially waiving the right to present mental health evidence during his mitigation case should he not cooperate?
A Yes.
Q Given your role as a mitigation or national mitigation coordinator, you certainly know who Pat Berrigan is, correct?
A Excuse me?
Q You know who Pat Berrigan is?

A Yes.
Q Because you've been in this field, as I recall, from -- since about 1980; is that right?
A Correct.
Q And I think Mr. Berrigan testified that he's been a practicing lawyer handling these cases since about 1986?
A Yes.
Q So two gentlemen who have had a distinguished, lengthy career, you both know who each other are?
A Yes, we do.
Q Likewise, certainly through this case, you know who Tena Francis is; is that right?
A Yes.
Q And in fact Tena Francis, though, at the time this case was tried in 2001 had her own business in Dallas, Texas, she now works for the same organization you do, correct?
A She works for the Federal Defender System, yes.
Q She works for the Federal Defender System in Las Vegas, Nevada?
A Correct.
Q Changing gears a little bit, sir.
To make sure I phrase this correctly, in the mitigation investigation, time is a necessity or maybe more appropriately is an ally, correct?
A Yes.

Q Okay. The more time you have, the more you can do, fair?
A You can't do an adequate job without adequate time.
Q Right. And the more time you're given, the more time you can get things done, fair?
A Generally, yes.
Q It assumes people are working on it?
A You have to use the time.
Q Correct.
A You get a continuance and don't work on it, it doesn't help you.
Q And sometimes the time that you as a mitigation specialist or mitigation investigator would want is in tension with court demands in order to move their dockets, correct?
A Yes.
Q Because the criminal justice system has the need to stately move things in a progressive manner through the courts, correct?
A That's correct.
Q So much so that there is a federal act known as the Speedy Trial Act that puts pressure on all litigants, including judges, to move their dockets?
A Yes.
Q Okay. And because of that, there's a tension then between courts trying to move cases and defense and defense

teams trying to take the time necessary to investigate, correct?

A Yes. I'm sometimes asked to provide declarations in precisely that area.

Q The offense for which Mr. Nelson was ultimately convicted and sentenced to death occurred on October 12th, 1999, correct?

A Yes, correct.

Q He ultimately pled guilty almost two years to the day later and then a mitigation trial began about two years later?

A Correct.

Q And though Mr. Berrigan had only been in the case because of changing counsel since February of 2001, Mr. Nelson had been represented by counsel since the time shortly after his arrest in October of 1999?

A Yes, that's correct.

Q You have been called upon to serve in the role of mitigation specialist on numerous occasions, correct?

A Yes.

Q Sometimes that would mean you're assigned from the time that a case occurs as the actual investigator in a matter?

A Yes.

Q Or sometimes supervising others?

A Yes.

Q You've also been called upon to assist cases as they

progress through the appeals system; is that correct?

A Yes.

Q And you've also been called upon to then provide your opinions or guidance on cases that are like this one in the postconviction setting?

A Yes.

Q Okay. You've been called upon and even testified, I believe, in this courthouse before similarly at the postconviction phase, correct?

A Yes.

Q I believe that was United States of America v. German Sinisterra?

A That's correct.

Q That was a capital case from also a -- it was '98 actually.

But it was before Judge Fenner, correct?

A That's correct.

Q And I believe in that case you were hired by postconviction counsel and you were critical of Trial Counsel Fred Duchardt's manner in which he conducted his mitigation investigation?

A Yes.

Q And though you testified and that matter was ripe for hearing, ultimately the hearing was not necessary because Mr. Sinisterra passed away --

A Yes.

Q -- of natural causes?

A Yes.

MR. RUHNKE: I'm sorry. Just if -- I believe there was a hearing, and after the hearing Mr. Sinisterra passed away.

MR. VALENTI: Right. It was ripe for ruling by the district court, but he passed away as that ruling was due.

Q (BY MR. VALENTI) Like the Sinisterra case -- well, bad question. Let me rephrase.

In Sinisterra you were critical of trial counsel's mitigation investigation and mitigation presentation, correct?

A Yes, I was.

Q As you are here of the mitigation investigation and mitigation presentation?

A Yes.

Q Okay. You indicated through your various reports that it's always important to look at independent corroborated information, correct?

A Yes.

Q That's information that expert witnesses can utilize and rely upon when forming their opinions, right?

A Yes.

Q The reason for that, I assume, is that time and history have shown that suspects in general or defendants in

particular are notoriously poor historians, correct?
A Yes.
Q And --
A And an expert will be subject to cross-examination if all their information comes only from someone who has potential secondary gain.
Q Correct. Bias?
A Yeah.
Q Yes. So that's one of the reasons these investigations in your opinion are so important.
One of the things you looked at when forming your initial declaration in 2012, however, was Tena Francis' mitigation investigation that was conducted by her, correct?
A Yes.
Q When you were talking about with Mr. Ruhnke during direct examination about the records at the White Plains Educational Elementary School, the school --
MR. RUHNKE: You said White Plains. That's my neighborhood.
MR. VALENTI: I apologize.
Q (BY MR. VALENTI) The school Mr. Nelson attended.
A White Settlement.
Q You indicated those records were not obtained. Is it fair to say those records would have been dated even in 2001 even?

A Dated in what sense?
Q They were older. They would have been from his youth?
A Oh, of course, yes.
Q And they're even more dated now?
A Yes, absolutely.
Q Those records are hard to obtain, correct?
A Harder to obtain now, yes.
Q The records can be more difficult to obtain as time goes on?
A Absolutely.
Q That's not an uncommon experience for you to find?
A Not at all.
Q Okay. Initially the declaration you issued in 2012, was approximately 23 pages. Does that sound about right?
A Yes.
Q And I believe that about the first 21 pages or so were essentially -- and these are my words so please don't take insult -- but kind of a position paper on the propriety of mitigation investigation? Is that fair to call it that?
A Yeah. It's a summary of the standards.
Q And then for the last page and a half, two pages you critique the investigation and presentation in this case, fair?
A Laid out the areas, yes.
Q And then last week that 23-page declaration became a

76-page declaration and was submitted to me -- I think you signed it maybe a week ago today on April 8th. Does that sound about right?

A That sounds correct.

Q When you're looking at that, one of the areas you critique is the presentation of evidence that Mr. Berrigan did during the Nelson case. Do you recall that?

A Yes.

Q And you justify your conclusion by referring to the verdict sheets regarding the number of mitigating factors that the jury found or didn't find to exist, correct?

A Yes.

Q Isn't it fair, sir, that when you're looking at a case as a postconviction mitigation specialist in an advisory capacity, as you are now, that you're always doing so after someone's been sentenced to death?

A Yes.

Q So it's axiomatic to say that it didn't go well for them at trial?

A That's correct.

Q Isn't it also fair or is it fair to say that the underlying facts and circumstances of the case, the guilt phase portion of the case, can be very important to why a jury reached a certain decision?

A It's always important, yes.

Q Okay. And you've concluded that because so few of the mitigating factors were found, the necessary conclusion is that Mr. Berrigan presented his case ineffectively or unartfully. But isn't it possible, sir, that because this jury that heard evidence that the defendant had abducted, raped, transported, and strangled a ten-year-old girl, that they just didn't want to hear anything else from Mr. Nelson or his attorneys?

A That's possible.

And it's also possible that had the investigation been done appropriately and been well presented, a single juror might have struck a different balance.

Q And you say "possible," but in your declaration from 2012, you say that because they didn't find him, he was ineffective in his presentation. But when you say possible, it's equally possible or unknowable at the very least if they were so put out by the nature of the crime, that they had heard all they needed to hear, correct?

A Yes.

MR. VALENTI: That's all I have.

REDIRECT EXAMINATION BY MR. RUHNKE:

Q Picking up from where Mr. Valenti just ended, obviously anything in life is possible or almost anything in life is possible. Maybe eternal life is not possible, but almost anything else is possible.

This was a highly-aggravated case. I think we can all agree with that; is that correct?

A Yes.

Q Have jurors in federal death penalty cases returned life verdicts in highly-aggravated cases?

A Yes, of course. And the five cases that the Supreme Court overturned for ineffective assistance were highly-aggravated cases.

Q And have juries returned life verdicts in cases of terrorist bombings where hundreds of people were murdered?

A Yes.

Q Have jurors returned life verdicts in cases where multiple murders took place by people convicted of murder?

A Yes.

THE COURT: I think this court and the Court of Appeals can take judicial notice of those events.

MR. RUHNKE: Thank you, Your Honor.

Q (BY MR. RUHNKE) And in your declaration, did you ever state that the reason the jury reached its verdict was that Mr. Berrigan hadn't done a good job?

A No, I don't believe so.

Q Was your opinion limited to essentially the presentation did not comply with prevailing professional norms?

A Exactly.

Q And --

A The ultimate conclusion is not mine.
Q You were asked about the declaration that you initially filed in 2012, which was P69, which was some 22 pages long, I think, and the expanded declaration was filed last week, 69A, which really has appended to it hundreds of documents and other supporting materials.
What was the intent of filing that expanded declaration in terms of streamlining your presentation before the court in terms of time consumption?
A Well, when we were advised that there would be a limited timeframe, it seemed appropriate to streamline the testimony by putting everything into an expanded report.
Q Now, does that seem to have been a good idea in retrospect?
A Yes.
Q Because if you had sat here and tried to introduce 144 different documents, we might have wound up having some difficulty --
A There would be no more witnesses.
Q Mr. Valenti asked you about the fact that Ms. Francis was located in the Dallas/Fort Worth area somehow impacted her ability to visit with Mr. Nelson.
Is it common or uncommon for mitigation specialists to take on cases in areas where they don't reside or where they don't have their offices?

A No. It happens all the time, particularly in federal court.

Q And does the fact that Ms. Francis resided or had her offices or her people located in Dallas/Fort Worth mean that the obligation of a mitigation specialist to spend a significant amount of time with a client was somehow no longer in play?

A No, not at all.

Q Prevailing standard norms, prevailing norms of professional responsibility would require the attorney to do what in terms of having the mitigation specialist visit the client, meet with the client?

A To set up some kind of regular schedule and find the funding to enable that.

Q And in this case from both directions did you see any efforts coming from Ms. Francis to ask Mr. Berrigan to do that or efforts on Mr. Berrigan's part on the other end to try to set up a regular visitation schedule with the mitigation specialist?

A No. And, as I pointed out, there was a discussion of possibly getting someone else in who could make observations of the kind that might have formed mental health testimony. In addition, when Ms. Haddad visited Kansas City, she didn't see him.

Q And Mr. Valenti asked you questions about the needs of

courts to move the docket, the obvious needs for cases not to languish for years and years and years.

A Of course.

Q And I think you mentioned something, that you have filed declarations or other documents in such situations. So are you referring to a situation where a defense team feels it's not ready to proceed, needs to seek a continuance from the court, and is -- and calls upon outside experts, outside people with great experience to provide declarations explaining why a continuance would be required in the case?

A Yes, absolutely.

Q And to your knowledge were you aware of anyone else asked to do a similar declaration in this case?

A No. And I would add, of course, I wasn't employed in the federal system at that time, but, you know, I testified at another federal case within a couple of weeks of the start of this trial on related issues of litigation standards.

Q And the related issues were involving the need for resources and time to prepare a case?

A Exactly.

Q Did Mr. Berrigan happen to be the lawyer in that case?

A Ultimately. He was not involved in the case at the time.

Q That was in Nashville?

A Yes, correct. Middle District of Tennessee.

Q When Mr. Valenti describes your views as critical of Mr. Berrigan, are you criticizing Mr. Berrigan, or are you assessing his compliance with prevailing professional --

THE COURT: I think that question has been asked and answered.

MR. RUHNKE: Okay. Just a moment, Your Honor.

Nothing further. Thank you.

THE COURT: Any follow-up?

MR. VALENTI: One quick question.

RECROSS-EXAMINATION BY MR. VALENTI:

Q Mr. Stetler, as it relates to the timing of cases, have you ever known courts on their own to continue death penalty cases, or do they wait and ask for -- rely upon the litigants to tell them they need more time?

A That's a good question. I think generally they'll rely on the litigants.

Q If the litigants don't ask for more time, then everybody can assume they're ready to go, right?

A Yes.

THE COURT: Okay.

MR. RUHNKE: Nothing further, Your Honor.

THE COURT: Thank you. Why don't we take about a 15-minute break.

(A recess was taken.)

MR. RUHNKE: We're ready, Your Honor. The -- we

call Jill Miller to the stand, please.

JILL MILLER, being duly sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MR. RUHNKE:

Q Ms. Miller, where do you reside?

A Madison, Wisconsin.

Q All right. And what is the nature of your profession or employment?

A I'm a forensic social worker in private practice.

Q And for how many years have you been a forensic social worker in private practice?

A In private practice since 1984.

Q And when -- what's the extent of your educational background?

A I have a bachelor's degree in social work from the University of Wisconsin from 1967, and a master's of science in social work from the University of Wisconsin in 1971.

Q Do you also have graduate credits towards a doctorate degree in social work?

A A few, yes.

Q And as a forensic social worker, where did you begin your career or your work?

A At the Legal Services Center of Dane County, which at that time was a private agency that contracted to provide indigent defense services in the criminal, juvenile, and

mental health fields.

Q And as part of your training and experience as a social worker, forensic social worker, are you experienced in the preparation of what's called a psychosocial history?

A Yes.

Q Are there standards and guidelines for preparing such a report?

A There aren't written standards as standards, per se. There's sort of educational programming on methods in social work in which you talk about how you investigate the background of a client and, you know, assess their treatment and rehabilitation needs.

Q And what is a psychosocial history?

A It's a life -- well, it's more than a life history study of the client because it involves an investigation of all of the factors and experiences that might have affected the development of the client, influenced behavior and personality. It's multigenerational, as Mr. Stetler explained, because you need to understand the influences and possible hereditary factors that might affect the client.

Q And when you prepare a psychosocial history, do you also engage in records gathering?

A Oh, yes. That's a very important part.

Q And why is that?

A The records document things with some detail. They

help -- actually use them to help witnesses who don't remember certain things. They document the medical, school, employment history, and I think, you know, they're important in making the testimony of lay witnesses more credible because the things they're talking about are actually documented in records.

Q And in your early stages of your career, did you often testify in family courts regarding the results of a psychosocial investigation?

A Yes. I started in juvenile court and then did some private practice doing adult sentencing, family court matters, juvenile court, mental commitments.

Q And did courts rely upon your testimony to determine issues such as child custody, termination of parental rights, other extremely important issues?

A Yeah, some of those. It was a lot more juvenile dispositions and sentencing in criminal cases.

Q At some point did you turn your career in the direction of capital cases, death penalty cases?

A Yes.

Q And approximately when was that?

A 1986.

Q And since 1986, can you estimate the number of capital cases roughly that you have been involved in?

A I would say over 150.

Q And we're going to put three documents on the screen.

MR. RUHNKE: If we can look at P37.

Q (BY MR. RUHNKE) Is that your CV, your resume?

A Yes, it is.

MR. RUHNKE: And P38.

Q (BY MR. RUHNKE) What is P38?

A That is the social history I prepared in this case.

MR. RUHNKE: And if we can look at P38A.

Q (BY MR. RUHNKE) And what is P38A?

A That's a brief supplemental report including information from some interviews with juvenile probation, juvenile parole workers in White Settlement.

Q And though the report is dated March 21, 2014, you had conducted those interviews at an earlier date?

A Yes, 2012.

Q Had you also included among the exhibits a summary of earnings of Mr. Nelson's mother, Nancy?

A Yes.

Q We can take those down now.

How long in your knowledge have mitigation specialists been part of the capital defense function?

A Well, I'm not sure when the first one was. I know that they were functioning several years before I began doing the work.

Q And to repeat, you began to work in this field in 1986?

A Yes.
Q By the time 1999 to 2001, the timeframe of this trial, were mitigation specialists a well-established aspect of capital defense?
A Oh, yes.
Q And you have a master's degree in social work.
Are there any particular degree qualifications to serve as a mitigation specialist, per se?
A No. There's not a requirement. There was discussion about doing certification and having some requirements, but it was felt that because the duty to conduct the case and present it is counsel's, that the way to go was to develop the supplementary guidelines for the mitigation function that would guide counsel in bringing mitigation people into the case and doing mitigation investigation.
Q Is there a general skill set, if I can use that word, that mitigation specialists should bring to the task, minimum skills?
A Yes. I'm not sure -- well, yes. I think that you certainly need to have a lot of knowledge about life history, the kinds of factors and influence that affect clients growing up. Interviewing techniques are important, method of doing social histories, the importance of records.
Q How about the ability to screen for medical --
A Right. I was coming to that.

In the 2003 guidelines, and I participated in that process, there was actually some discussion about requiring mitigation specialists to have master's degrees in social work, which I do and I actually think is the best training for it. But there are many qualified and competent mitigation specialists in the country who don't have that training and would be then prohibited by those guidelines from continuing to work and who are competent, have done a lot of training through seminars to pick up some of the skills. So the compromise was to add a requirement that there be someone on the team who is qualified to screen for mental and cognitive impairments.

Q Now, you, yourself, are you qualified or do you consider yourself qualified to diagnose mental impairments and mental disease or defect?

A I don't diagnose but I can screen. I'm aware of symptoms and then would make suggestions about appropriate experts.

Q And is it a function of a mitigation specialist to when he or she sees signs and is able to screen for evidence of mental impairments, a client showing symptoms of mental impairments, to bring that to the attention of the attorneys conducting the case and recommend experts or that expert analysis be undertaken?

A Yes. I think that's important for a number of reasons.

One is to help determine whether an expert evaluation is needed and what type of expert should be brought in, but I think it's also important for the members of the team to understand the functioning of the client so that they know how to communicate effectively with them.

Q And in terms of the ABA guidelines you mentioned before, you were here when Mr. Stetler discussed briefly the history of those guidelines, that they began with the National Legal Aid & Defenders Association developing a set of guidelines for performance of counsel in capital cases. Were you involved in that?

A Yes, I was. And they were called standards when we did them. I was on the defender council, and we had staff that did the actual research and writing and presented drafts to us at our meetings and which we then, you know, commented and revised.

Q And that eventually was transmitted to the ABA and resulted in the guidelines?

A Yes.

Q As a mitigation specialist and, again, referring to the timeframe of this case, 1999 to 2001, was it common or uncommon for a mitigation specialist to testify at the penalty phase of a capital case?

A It was common. It wasn't always done but it wasn't uncommon.

Q Where a mitigation specialist testified at a penalty phase of a capital case, was the usual presentation to present an overview of the client's life, the findings of the investigation, introduce appropriate documents, basically give one big picture of the client's life?
A Yes.
Q Would that be -- in the standards that should be applied, would that be the end of it in a typical case of a defense presentation?
A Oh, no.
Q What else would go into a standard meeting -- pro forma standards of a mitigation presentation at the --
THE COURT: Before you answer that question, I'd like to ask you were sitting here when Mr. Stetler testified; were you not?
THE WITNESS: Yes.
THE COURT: Is there anything he said about those standards that you disagree with?
THE WITNESS: Well, we're talking now about the presentation of the evidence and how the mitigation specialist's role fits in with the other witnesses and records.
THE COURT: I'm asking you do you disagree with anything that he said about that?
THE WITNESS: No.

MR. RUHNKE: I'll take that under advisement, Your Honor, and move into a different area.
Q (BY MR. RUHNKE) You, yourself, have you testified as a mitigation specialist before juries in death penalty cases?
A Yes.
Q Can you estimate approximately the number of times you've testified in front of juries?
A Yes. This is my 37th time.
Q You're not in front of a jury right now.
A No, I'm not, that's true. I'm not in front of a jury.
Oh, in front of juries, I think 20 -- I didn't come with that particular. I counted the federal juries.
Q So in federal juries, how many times have you testified in front of federal juries in federal capital cases in the role of a mitigation specialist?
A Nine.
Q And in the year 2001, the year that this penalty phase was tried, did you testify as a mitigation specialist in a federal capital case that happened to be tried in Southern District of New York?
A Yes.
Q And since 2001, have you testified in that role in federal capital cases in front of juries?
A Yes. Five times since 2001, four times prior to that.
Q Are you aware of other mitigation specialists to your

knowledge in the field who have also testified at such trials?

A Yes.

Q You've seen Ms. Francis' work that was done in this case.

Is there any reason that the lawyers on the case would at least have not discussed with her the idea that perhaps she could testify and present this social history? Did you see anything in the record that reflected that discussion, kind of discussion, ever taking place?

A No. She wasn't really involved heavily in the case after her initial meetings.

Q In your -- and did you undertake a social history of Keith Nelson's life?

A Yes.

Q And in the course of conducting that social history, how much time did you spend with Mr. Nelson in total?

A I would -- over 25 hours, probably 26, 27 hours. When I would go to Terre Haute, I would stay the entire time they let you stay, which is 8:30 to 3, 3:15.

Q Okay. And Mr. Nelson, as we know, is presently incarcerated at the -- what's called the Special Confinement Unit, death row, at the U.S. Penitentiary in Terre Haute, Indiana.

When you saw Mr. Nelson, what were the conditions of your interview? Was it through a phone, a window? How did

you meet with him?

A They were in-person interviews in a room across a table.

Q So you had full-contact visit with Mr. Nelson?

A Yes.

Q And did you, as you developed and investigated Mr. Nelson's social history, discover themes, patterns of familial behavior, information about his home life, general themes and patterns that you uncovered?

MR. RUHNKE: I'm not going to go into them in detail, Your Honor. They're described in her report, but I do want to set out just the general themes and patterns you were able to discover.

Q (BY MR. RUHNKE) So what were they?

A Well, on both sides of the family, there's a multigenerational history of mental illness. Some of it was explored a little bit on the Nelson side pretrial. The Morse side not as much. Alcoholism, substance abuse on both sides of the family. A lot of domestic abuse on both sides of the family, inappropriate sexual behavior, including criminal sexual misconduct.

Q So stay with that for just a moment.

Are there relatives on Mr. Nelson's -- the Morse side of the Nelson family in prison for inappropriate sexual conduct?

A Yes.

Q And in particular is there a particular individual?
A Oh, yes. His uncle Milas Morse is in prison --
Q Milas, M-i-l-a-s?
A M-i-l-a-s.
In prison in Illinois for aggravated sexual assault of his four-year-old great granddaughter.
Q And do you know what term of years he's serving?
A Eighteen.
Q We'll come to this later, but were you able to gather records about his criminal prosecution?
A Yes.
Q And, sorry, I interrupted you. Was there evidence that you developed of hyperthyroidism?
A Yes.
Q What is hyperthyroidism?
A It's an underproduction of the thyroid hormone. You can have hyper, which is overproduction, and hypo, and people who have hypothyroidism are not producing any so they have to take a synthetic thyroid hormone, which is generally Synthroid.
Q Are you saying hyper or hypo?
A Hypo.
Q Hypothyroidism. What are the implications of that?
A Well, the symptoms of hypothyroidism can include a number of physical symptoms but also what appears to be mental --

Q Slow down a little, if you would.
A Mental health symptoms. So dull facial expression, thinning hair, overweight, but also lethargy, depression, forgetfulness can be some of the symptoms. And in an untreated pregnant mother, it can cause problems for the developing fetus.
Q And in terms of first-degree relatives, who did you identify with hypothyroidism in Mr. Nelson's family?
A Well, Nancy Nelson has hypothyroidism. All of her sisters have it. Her mother, Wilma, so that would be Keith's grandmother, has it, and a son of Kathy Henry's.
Q And you've seen the report of Dr. Carolyn Crawford, the neonatologist, in this case?
A Yes.
Q Does she discuss that issue in her analysis of Mr. Nelson's birth records and the effects of his birth?
A Yes. I should say that it was important to know that Nancy was diagnosed at age 11 and did get medication for a period of time but stopped taking it at age 16 for 20 years. So she was not on the Synthroid during her pregnancy with Keith.
Q And what about poverty in both sides of the family, the Nelson side and the Morse side?
A There was poverty on both sides. It was more extreme on the Morse side where there were, you know, 14 children who

lived for a period of time in just a two-room shack, which they then built a house on. They had no electricity or running water. The boys had to hunt and fish for them in order to eat. So it was pretty severe on the Morse side.

Nancy's family too was large, and the father worked in a cemetery and then was alcoholic. So some of the money he earned went to alcohol.

Q And just to get an overarcing kind of question, the report that you produced, the psychosocial history report that you produced, would you have been comfortable testifying at a penalty phase of Mr. Nelson as to the results of your psychosocial investigation?

A Yes.

Q And would you have supported your testimony with documents and other information?

A Yes.

Q I'm not -- the report is here. I'm not going to try and take you through what your testimony would have been.

Did you identify themes of emotional distance on the part of parents?

A Yes. On Nancy's side I think it was somewhat due to depression, and the Morse side it's hard to tell about Pearl, whether she had any depression. But both --

Q Pearl is --

A Pearl is Keith's grandmother. So both parents, and I

think, you know, we know that parents have the most influence in the lives of a child, so the way that they parent is often a function of how they were parented themselves. So they both grew up in homes that were not only poor but very chaotic, where there was alcohol abuse, domestic abuse. The maternal grandmother is described as depressed.

Pearl is -- on the Morse side is described as very distant and stern. They weren't, either one of them, loving or nurturing parents, so neither Nancy nor Kenneth had any modeling for that kind of behavior.

Q And would that be information you would have been able to present to the jury if you were called to testify?

A Yes.

Q And is it part of a valid psychosocial history when you're talking about a lot of things that you've learned during interviews, a lot of things you've learned during records review, is there a discussion of a concept known as triangulation?

A Well, it's a -- as you're gathering information, you're learning new things, and so you're identifying new things you need to explore, new witnesses, new things you need to go back to the client and talk about. So you're constantly doing that and going back then and going through the new information with the client.

Q Alcoholism, substance abuse?

A Yes.

Q Through?

A On both sides of the family. Well, you know, grandparents as well as parents. Both of his parents have abused alcohol, and Kenneth Morse has abused drugs.

Q Kenneth Morse being Keith Nelson's father?

A His biological father, right. And both grandfathers were alcoholic.

Q And did you review records that had been collected as part of the Tena Francis investigation?

A Yes.

Q And I don't know if I've actually asked this. How much time to your review of the records did Ms. Francis' group spend with Mr. Nelson?

A Well, Tena Francis saw him in February of '01, one day for a couple hours with the attorneys where it appears a lot of legal issues and issues around conditions of confinement were discussed, and then she went back the next day and spent several hours with him. And after that no one saw him.

Q From Ms. Francis' organization?

A Yeah, any mitigation person.

Q I believe it's your testimony it's important to spend time with a client?

A Yes.

Q Why is that?

A Well, for a number of reasons and not just for visits. A client, particularly one with some of the problems Keith had, does need contact with people and with members of the defense team, but you don't see them just for visits. You're continually gathering information and coming back with the new things you've learned to discuss those things with the client.

You also need to develop the kind of relationship over time that enables people to talk about their private and shameful matters, and that comes with building trust. And then the kind of observational things that Mr. Stetler talked about, observing their behavior over time.

Q For example, were you able to see anything in Ms. Francis' interviews with Mr. Nelson where he discussed being sexually abused?

A He, I believe, told her something about the popsicle -- a babysitter that had him stick popsicle sticks -- and then she sort of noted that this was not a subject she was going to address that day because it was their first meeting and she would talk about it later. But no one did.

Q In your meetings in the approximately 25 hours you spent with Mr. Nelson, did he discuss with you sexual abuse?

A Yes.

Q How would you describe his willingness to discuss that topic?

A It was extraordinarily difficult for him and

extraordinarily emotional, and people who have spent time with Keith know that he doesn't like to show emotion. So that was very hard for him. In fact, it was so difficult I sort of turned away so that he didn't need to look at me, and that made it a little easier to talk about it. But he couldn't even finish sentences talking about it.

Q And did he discuss when he was a juvenile in the custody of Texas Youth Corrections, that an older inmate, couldn't have been much older, he was 15, had sexually abused him for a period of six or eight months on a regular basis?

A Well, he was there four and a half months the first time, and that's when it occurred during his first stay there. He was 15 shortly after he came, but he was quite small for his age, and I believe this youth was 17.

Q And was he able to discuss any details about his sexual abuse with you?

A He talked about oral and then started to say and imply that he had been sodomized but just couldn't talk about it anymore.

THE COURT: These are details that are in the report?

MR. RUHNKE: Pardon?

THE COURT: These are details that are in the report, her report?

MR. RUHNKE: The discussions of that interview are

in the report.

THE COURT: Yeah. We're going to move past that I thought.

MR. RUHNKE: Right.

Q (BY MR. RUHNKE) So that's an example of spending time with a client, producing information that may be difficult for any person to talk about, correct?

A Correct.

Q Okay. In terms of records that you were able to collect that the Tena Francis group did not collect, I'm going to direct your attention to the circumstances of Nancy Nelson's pregnancy with Keith and his twin brother, Kenneth.

Were you able to locate the physician who actually delivered Keith and Kenneth or at least handled Nancy during the pregnancy?

A She didn't really get a lot of prenatal care. Any really. This was a family physician. So she had seen him when she was pregnant with Johnny and really through all of her deliveries. This was Dr. James Pretz, who was retired when I found him, didn't specifically remember them, but told me where his records could be found. And I located his records.

Q And when did you interview Dr. Pretz roughly?

A Probably 2011.

Q Okay. Within the last few years?

A Oh, yeah.

Q So he would have been obviously available to be interviewed in 2001.

MR. RUHNKE: So if we could look at P47, and just blow up the top one-third of that, if you will.

Q (BY MR. RUHNKE) What is P47?

A These are Dr. Pretz' records.

Q And it appears to be his patient card for Nancy Nelson?

A Yes.

Q And is this an example of a record telling something of a story?

A Yes.

Q For example, in the upper left-hand corner, what does it say?

A Welfare.

Q Indicates obviously that the family is on public assistance at the time?

A Yes.

Q And in terms of the Tena Francis organization, was there evidence that the Nelson family was on public assistance virtually the entire time that the boys were growing up?

A No. I mean, there were periods where Nancy was working and they weren't on welfare in Texas.

Q But there were periods of time when the family was clearly on public assistance?

A Yes. During the whole time they were in Kansas, before she went to California, during the time in California, and the initial period of time in Texas, they were on welfare.
Q Did you see any efforts to gather records of welfare on the family?
A No.
Q Were they at times in Section 8 or HUD housing?
A Yes.
Q Did you see any efforts on the part of the Francis group to gather those records?
A No.
Q Ultimately who was in charge, though, of what the mitigation specialist does and does not do?
A It's counsels' duty to direct and monitor the mitigation investigation.
Q So you can urge, you can cajole, but it's ultimately the lawyers' call; is that right?
A They should be urging you, telling you you need to be doing this.
Q But it's up to the attorneys, they bear the ultimate responsibility?
A Yes.
Q There's no such thing as ineffective assistance of an expert; it's the lawyers who bear the responsibility?
A Right.

Q Now, looking at what is P47, the first entry reads LMP, April 15, 1973, and I'm reading that to be last menstrual period?

A Yes. That's her pregnancy with Johnny.

Q And does -- do we show Nancy Nelson's weight at the time?

A Yes.

Q She weighed 191 pounds, blood pressure 100 over 64.

Had Nancy Nelson delivered a child within several months actually, eight or nine months of this office visit?

A Yes. I think it's just below where it is on the screen she delivers Johnny in February.

Q But there was a first child, Johnny, who had been delivered really less than a year earlier, correct?

A This -- '73 is her pregnancy with Johnny.

Q Oh, I'm sorry.

A She had him on the same year she had the twins. She had him in February.

Q Okay. So let's go further down the document. I was misreading that as Keith's.

A No.

Q So as we get into the spring of 1974, Keith was born what date?

A November 23rd.

Q 1974, correct?

A Correct.
Q And do we see that there's a record for the birth of John Ray Nelson, and the date of that is February 20, 1974?
A Correct.
Q So that Keith and his twin brother, Kenneth, are actually born fewer than nine months after the birth of Johnny Ray, correct?
A Nine months, yes.
Q And there's a discussion of, you know, John getting obviously office visits, looked like there's some inoculations that he's getting. He's getting DPT shots, second one. If we go to the bottom third of that.
There's -- as the records continue, do you see an entry on July 11, 1974?
A Yes.
Q And what's that a reference to?
A She was seen in --
Q She being Nancy Nelson?
A Nancy Nelson, I'm sorry. Was seen in the Providence Hospital Emergency Room with probable premature separation of the placenta. She is not -- she thinks it's either a time she fell walking across a bridge or fell off of a bus. She can't remember the specific incident. But that's the only time during the pregnancy she was seen, and that was an emergency room visit.

Q And you see the very next entry after that is November 23, 1974, and a reference to Kenneth who's quote, unquote Kenneth Dwayne, is that Kenneth -- what's the middle name? Dwayne, is that what it is? I can't read it.

That -- essentially --

A I think it's Kenneth Wayne.

Q Kenneth Wayne?

A And Keith Dwayne.

Q So Kenneth is the firstborn twin. He's quoted as still in at a given time, and then on November 24, 1974, I can't really read the doctor's handwriting. Let's go on to the next page, but obviously -- that's November 27th, I'm sorry.

But on November 24 Keith was born second to his cousin -- to his twin brother, correct?

A No. They were born the same day. They were born within ten minutes of each other.

Q November 24th?

A 23rd. She was seen by the doctor on the 27th.

Q And during her pregnancy and based on your interviews with Nancy Nelson, how many times did you speak with Nancy Nelson?

A I had three lengthy in-person interviews with her, and by then we had a sufficient relationship that I could do some follow-up things by phone.

Q And what's the significance of in-person versus

telephone interviews or preference?
A Well, two things. The first is just establishing the kind of relationship of trust and confidence that a person feels they can disclose things to you, and the other is to be able to observe them behaviorally.
Q Did Nancy discuss the circumstances of her pregnancy, including whether she even knew she was going to be delivering twins?
A Oh, she didn't know she was having twins. She had no -- really no prenatal care. She had a visit where it says last menstrual period, but it doesn't even show a pregnancy test. It shows she was having some sort of infection.
Q And what about gaining weight or losing weight during her pregnancy?
A She has said, and not only to me but other sources, that she lost weight, that she was very depressed through the pregnancy, she was continuing to be abused, she lost a significant amount of weight. We can't confirm that with the records, but --
THE COURT: I think you've made your point on this testimony, Mr. Ruhnke. Let's move on to another topic.
Q (BY MR. RUHNKE) On the record itself, is there a discussion of a splenectomy on the record itself?
A Yes.
Q Is it on that page?

A The page that you're displaying?

Yes. It says Indianapolis, October 1975.

MR. RUHNKE: Would you bring that up, please.

Q (BY MR. RUHNKE) And in terms of a record, why is this reference to a splenectomy in Indianapolis relevant? What does it relate to based on her history and the history of the circumstances under which Keith Nelson's household operated?

A Well, there are a couple of, I think, important things about this. One was that the surgery was the result of a very severe beating by Kenneth Morse, and she --

Q How do we know that that occurred? As reported by Nancy Nelson?

A It's reported by Nancy.

Q And corroborated by?

A Siblings know about it. Then she was pregnant with Paul at the time. So that's the other significant part about it, and she reported that the doctors advised her to abort the fetus, but she did not do that.

Q And was there a story told at the penalty phase about this beating and the splenectomy to your knowledge?

A There may have been where she was taken to the hospital by Kenny Morse, who used a different name, a name of his sister. It's not clear. We were never able to be clear about what hospital it was or what name he used.

Q Would this record have served to corroborate that event?

A Yes.
Q Looking at -- I want to bring up now P73.
At the trial, at the penalty phase, was there any documentation or corroboration offered on the issue that Keith had two brothers, Paul and his brother Johnny, who were diagnosed as schizophrenics?
A There was no documentation. That was a brief reference and that was it.
Q And was this a record that was gathered by the 2255 investigation following the trial?
A Yes. They had records at the time on Johnny and didn't present them regarding his diagnosis, but they did not collect records on Paul. And there's a note in somebody -- maybe Tena's that Susan was going to get Paul's records, but there's no indication they ever did.
Q And this particular document was gathered, and does it, again, not going through it, does it contain a collection of Paul's medical records indicating multiple hospitalizations and diagnoses and discussing symptoms and behaviors all coinciding on a diagnosis of schizophrenia?
A Yes.
Q And this was a record that was gathered by the trial team?
A Correct.
Q Did you also gather -- did the trial team also gather,

meaning the postconviction trial team, also gather medical records for Nancy Nelson?

A Yes.

Q Had those been gathered by the Tena Francis organization?

A No.

MR. RUHNKE: Could we bring up P74.

Q (BY MR. RUHNKE) And is that a compilation of -- it begins with the affidavit of the custodian of the records to qualify the medical records.

Are those the medical records of Nancy Nelson, the documents which follow the --

A These are medical records from the University of Kansas Hospital where she has received treatment in recent years but also was treated in the '70s there.

Q And, again, just in general terms, what is in those records? If you were here testifying in a penalty phase, I would try to take you through those records in a pretty detailed way, but could you just give us a summary of what these records tell us about Nancy Nelson's life and inferentially Keith Nelson's life?

A First of all, they confirm the diagnosis of hypothyroidism, but it's the earlier records that I think are more significant.

Q What do they show us?

A They show that when she -- that first she went into the hospital asking for -- she wanted birth control, and she asked for an IU --

Q Can we get roughly a year on that?

A It was between the twins and Paul so '75. Paul was born in '76. So I'm not remembering exactly.

Q Just so we're clear about this family, at some point was Nancy Nelson in her early 20s with five boys under age five years old, five years of age?

A Yes.

Q Isn't that a handful?

A Yes.

Q Was she being supported by her husband, assisted by her husband?

A Well, she never married him, but she was not being supported by him.

Q By the father. In fact, she was being abused by him on a regular basis?

A Yes, until she fled.

Q Okay. So what is in these records that is significant?

A First there's her request for birth control, and she wanted an IUD and not the pill. When I asked her about that, it was because she didn't want Kenny Morse to know. Then when she became pregnant --

Q She didn't want him to know that she was using birth

control?

A Correct. When she became pregnant with Steven, she was advised to have a therapeutic abortion. The doctor signed a form stating he recommended it because continuing the pregnancy would not benefit the mental health of the mother. Her mental health would be impaired.

So it was signed and she was advised to get it. She says she doesn't know why she didn't get it, but she thinks maybe Kenny Morse found out and wouldn't let her have the abortion.

Q And these records were available and could have been gathered obviously by the trial team because they were available to the 2255 team subsequently, correct?

A Yes.

Q I'm going to look at -- I want to look at school records, so I want to start with 13A.

What is in 13A?

A That's Keith's withdrawal record. That's from White Settlement, I believe, in the fall of '89 when he went to Gainesville.

Q All right. And I want to be clear that the -- you understand that these were records that actually were gathered by the trial team at the time of Mr. Nelson's capital case trial, correct?

A They had them. I'm not sure who gathered them, but they

had them, yes.

Q Okay. So they were available, they could have been used, and to your knowledge -- well, there were no records introduced at all. So they were not used, correct?

A Correct.

Q Speaks for itself.

And if we look at 13B, please, what is 13B?

A This is what's called the admission review and dismissal committee meeting. These are the committees that review special ed findings and then develop what are called the individualized education plans for students who are placed in special education. This is a White Settlement record, but it was found in the Miami R-1 School records here in Missouri, that were found by the 2255 team.

Q Okay. So let's back up on that a little bit. We saw earlier when Mr. Stetler testified, a notification from White Settlement that there are special education records, they do exist, but they have to be requested separately, correct?

A Yes.

Q Is that common or uncommon?

A That's very common.

Q And as part of the investigation, did the 2255 team seek to track down school records for when Mr. Nelson came to Missouri?

A Yes.

Q And you remember approximately how old he was when the family moved from White Settlement to Missouri?

A Well, he was in school in Missouri twice, so these records include the Oak Grove, Kansas or Turner Unified School District when he first went to his Uncle George Nelson's home in 1988. So there were records there.

And those records were then sent to the Miami R-1 School when George and his family, who were then caring for the four younger Nelson boys, moved there. So they had those sets of records.

He returned -- when the family finally moved to Missouri, he came back and reenrolled. Didn't really attend. If he did, it wasn't for any length of time, but the school district then requested this last set of education records from White Settlement. So these are the last ones.

Q So this is the way mitigation investigations sometimes occur. You go looking for special ed records in White Settlement, and what happened when you tried to gather the ones from White Settlement?

A I tried every place that I could think, every school he went to, the special education department, the board of education. They were just gone. They didn't exist anymore and the notifications they received would have indicated they did exist at the time of trial.

Q And as a matter of serendipity, you go to Missouri

looking for his Missouri records and it so happens that White Settlement had transmitted some of the special ed records to the Miami School District?

A Correct. And those -- the other thing that was indicated in those records because special education evaluations are required by federal law to occur every three years or if there's an initial evaluation, and then the student has to be re-evaluated every three years. And that includes psychological and psychometric testing, so that would have been incredibly valuable information to have in this case had it been obtained at the time. It no longer exists.

The other thing here, he would have been due for a re-eval in 1990. There's an indication that that was done at the Texas Youth Commissions facility in Gainesville, but the records from the Texas Youth Commission did not include the educational subfile. They included a very few pages of educational records.

When we tried to get the subfile that would have had that evaluation, it no longer existed.

THE COURT: Mr. Ruhnke, can we please --

MR. RUHNKE: I'm moving on, Your Honor. I got it.

Q (BY MR. RUHNKE) And so there are records that were available at the time that have since been destroyed which nobody can gather any longer, correct?

A Correct.

Q And there are records that were available that could have been used but were not used, correct?
A Correct.
Q And there are records that have been gathered since then that were available but were not gathered at the time, correct?
A Correct.
Q Was there any documentary evidence offered that Johnny Nelson is schizophrenic at the trial?
A No.
Q Did there exist documentary evidence of Johnny Nelson's schizophrenia?
A Yes. They have that.
Q And that was contained often in the correction records because Johnny Nelson committed a murder?
A Right. There were a lot of issues about his competency, so he had a number of evaluations around that.
Q And he was diagnosed as a schizophrenic?
A Yes.
Q For a while he was declared incompetent to stand trial because of his schizophrenia, do you recall that?
A I believe so. He was in the hospital for a period of time and then ended up resolving the case.
Q Your review of the record is that the Tena Francis organization had those records, the defense team had those

records in 2001, just simply didn't use them; is that correct?
A Right. The defense team had them. Whether Tena Francis saw them, I'm not certain.
Q Somebody gathered them?
A Correct.
Q Was there evidence that you observed about Mr. Nelson's, I'll call it, suicidality, self-abusive behavior that was in the records that were actually available to the trial team in 2001?
A Yes.
Q What kind of activities, self-abusive, self-injuring activities, were documented in those records?
A Documented, okay. You know, the behaviors began before he started going into juvenile detention at home.
Q As a young kid?
A Well, in about 1987 is when I -- he would engage in head banging and banging his head on the floor and the walls, cutting himself.
Q Stop with cutting himself.
What do you mean by "cutting himself"?
A Well, using, you know, a knife or an implement to cut into his arms or wrist. He used a pencil one time, I think that was in detention, the tip of a pencil to jab his arm. He burned himself with cigarettes.
Q Based on your experience, when somebody is cutting, is

cutting behavior usually associated with suicidal behavior of that nature?

A Not necessarily. It's more of a self-abuse rather than suicidal. He had suicidal behavior in addition. It's a very significant indicator of underlying trauma and abuse, particularly sexual abuse.

Q So people who have been sexually abused often engage in these kind of behaviors, self-induced, self-cutting, and these records were available in --

A Yes. Then the behaviors continued in detention, where he was writing on the walls and the floor in his own blood. He reported -- at one time when he was out before he was in detention after the first time, Nancy -- he had had a referral so there was an intake worker assigned, and Nancy contacted them because he was suicidal.

And they just told her, oh, take him to mental health, which of course, she didn't do. He reported to people that he had --

THE COURT: We're getting into more detail of the report. The report will speak for itself.

Q (BY MR. RUHNKE) If you had been involved in this case based on your training and experience back at that time and were aware of the traumatic head injuries that he suffered, the premature birth, the prenatal trauma inflicted on Nancy, including the beating that sent her into early labor, would

you have considered recommending to the team that certain experts be employed to further explore these issues?

A Yes.

Q What kind of experts would you have recommended?

A I would have certainly wanted to get those special ed records, but would have recommended neuropsychological testing very strongly. There are a number of potential causes of brain damage in his history. The birth records would have led me to recommend a neonatologist become involved and look at those, and then probably later when we collected and documented more things, I would want a psychologist or someone with expertise in trauma to become involved.

Q Based on the investigation that was conducted, based on what you've seen afterwards, what you collected, the interviews you've conducted -- I want to go to just one more, sorry, before I finish up.

MR. RUHNKE: I want to display P70.

Q (BY MR. RUHNKE) Again, without going into the details of P70, I think it's maybe over a hundred pages long, what does P70 represent?

A These are voluminous records on the Morse family side. There's the marriage of John and Pearl Morse, the grand -- Keith's grandparents, and in fact prior to their marriage, he impregnated her when she was 13 and he was 16 years older. So that --

Q These are records all the way through --
A Right. Showing criminal conduct, orders of protection because of domestic abuse incidents, the traffic accident that killed Kenneth Morse' father.
Q Included in this is the criminal record involving Milas Morse that you referred to --
A Correct.
Q -- earlier in your testimony?
A And some related to his son's sexual conduct as well.
Q Based on your review of the investigation that was covered, did the Tena Francis investigation uncover or gather any records at all related to the Morse side of the family?
A No.
Q Did you actually interview Kenneth Morse?
A Yes.
Q In a manner of speaking.
Where did take place?
A That took place in the prison in Ellsworth in Kansas, not far from here actually.
Q When did that occur?
A 2011, I believe.
Q And how did that interview go?
A Well, Kenneth is an exhibit. He is extremely volatile, erratic, angry.
THE COURT: Just a moment. Do you have some

specific questions for her rather than how did that go?

MR. RUHNKE: Sorry. That was a little bit too colloquially.

Q (BY MR. RUHNKE) Was he cooperative with you during the interview?

A No.

Q Did he stay with you for the length of the interview that you had intended to conduct?

A No.

Q How long did he stay in the room?

A Probably 20 minutes or so and then he stomped out.

Q He just left without completing the interview?

A Correct. He was very angry throughout.

Q Based on what you've seen, based on your own investigation, based on the possibility of a mitigation specialist presenting a life history, do you think a richer, corroborated, humanizing case could have been presented on Mr. Nelson's behalf?

A Yes.

Q And, again, whose responsibility is it ultimately for how the case is presented?

A Counsel's.

MR. RUHNKE: Thank you, sir. I have no more questions, Judge.

Thank you, ma'am.

MR. VALENTI: May it please the court.

CROSS-EXAMINATION BY MR. VALENTI:

Q Ms. Miller, you indicated that during your interviews with Mr. Nelson, it took some trust building, I think was your words, to get him to discuss some of the sexual abuse that he alleged to have been victimized of, correct?

A Yes.

Q And you, of course, recognize from your review of the records that Tena Francis met with Mr. Nelson at CCA in February of 2001, correct?

A Yes.

Q And on the second day of her meeting with him, he divulged a sexual situation with the former babysitter involving popsicle sticks and her vagina, correct?

A Yes.

Q All right. So whatever trust building was done on her part, she was able in her second interview to begin to have Mr. Nelson disclose areas of at the very least sexual malfunction that he was exposed to, correct?

A Yes.

Q You also indicate that some of the records that you have been able to obtain since you were placed on the case would have been available in 2001.

First, when did you get assigned to this case?

A 2005.

Q So you've been on this case almost nine years now?
A Well, there was a period of four years where matters were being litigated and I was not actively involved.
Q Okay. You've been on the case for nine years. Of that, four years were inactive, so you've been actively involved for five --
A Yes.
Q -- fair?
And you heard my questions to Mr. Stetler because you were in the courtroom. You know that time can be an ally to a mitigation investigator, can also be an opponent if the records are destroyed. But the more time you have, the more you can do, correct?
A Correct.
Q And you had a substantial amount of time, at least five years, to actively investigate this matter as recently as working on it in 2014, correct?
A Yes. It was primarily done by the time this report was written in 2012, and then, as you know, there have been a number of delays.
Q Sure. And there have been some supplemental materials recently put out by you in that report that was -- I don't know if it matters --
A Yes.
Q -- Plaintiff's 38A?

A Right. But that work was done in 2012.

Q Now, the records that we're talking about that you say would have been available at the time of trial but are no longer available, how do you know they would have been available then?

A Well, because the schools indicated that those special ed records needed to be requested separately. The hospital records were available at the time of trial for Keith, but no one requested Kenneth's or any other records on the family.

Q So the records that are no longer available but would have been, do you have like an order of destruction from a court or the hospital or some certification from someone that those records were destroyed on a date certain?

A No. We have some records destructions policies. I think that's primarily for California.

Q Okay. And because we're dealing with the transition from kind of an analog to a digital age, many of these records are now available in a more easy format to find than electronically, correct?

A Records that are created more recently are electronic. Old records that have been destroyed -- I mean, now I think they'll keep records more because they have the capability to store them electronically. Hopefully they will.

Q So when you say these records are destroyed, they were available -- you're assuming that they were available because

at least there's one report from White Settlement says that you need to get these separately. But that doesn't mean the records are there; it just means you have to go over here to get them, right?
A Yes. I don't know that they would tell you to request them separately if they no longer existed.
Q Well, it's certainly two different entities --
A I did actually talk to people in White Settlement that didn't get a letter from them. There was an effort to get the Providence records, and they actually had some of Nancy -- well, no, Kansas had relevant records.
Q But the White Settlement letter you're talking about from the school, when they're referring you to the special education section, those are clearly two different entities that they're requiring you to make a request somewhere else?
A Correct. Special education records are commonly kept separate from the general academic files.
Q Because we're talking about two different entities, the one entity can't provide you with the special education records, can they?
A No. But they're both part of the same school system. They're just a different office in the same school system.
Q Do they have different retention policies because --
A I don't know that.
Q So you don't know.

You indicated during your testimony that it was common for mitigation specialists to testify in cases back when this case was tried in 2001, correct?

A Yes.

Q And, likewise, you indicated I think fairly that on some occasions that does not occur?

A Correct.

Q And that's really a matter of choice or trial strategy by the person tasked with presenting that evidence to the jury, isn't it?

A Yes.

Q And in your experience in over 150 cases over the last couple decades plus, you come across all different types of attorneys, don't you?

A Yes.

Q Different types of trial strategies and tactics, correct?

A Yes.

Q And different preferences for how they choose to present their case?

A Yes.

Q And so when a mitigation specialist doesn't testify, in those cases you're going to find defense counsel who have chosen that they'd rather have the underlying testimonial witness sit in this chair and try to bond with the jury,

correct?

A In some cases, yes.

Q Because when you're testifying as a mitigation specialist, you are necessarily testifying as a summary witness, correct?

A Generally, yes.

Q And doing so in what would be referred to legally speaking in a narrative fashion?

A Yes.

Q And because some attorneys find that distasteful or not particularly -- I don't want to say compelling. I don't mean it that way. I don't mean it disrespectful. But you don't bond on individual topics with the jury. They choose the witnesses that could give voice to the facts that you're testifying to, correct?

A Yes.

Q Okay. Now, the report that you authored from 2012, if I recall correctly, it's Plaintiff's Exhibit 39, is approximately 88 pages; is that right?

A Yes.

Q And it is what you call a psychosocial history of Mr. Nelson dealing with the multigenerational aspects of his family life?

A It's -- yes, it's as comprehensive a social history as I could do, and I will say I incorporated the work of earlier

people involved in the case so that it would be complete.

Q Correct. And that's where I was going next, ma'am, is when you start on page 83 of that, you start essentially sourcing the material that you have relied upon while gathering this report; is that fair?

A Yes.

Q And I believe on top of page 83 of the Plaintiff's Exhibit 38, you go through the people that you interviewed and the dates that you interviewed them, and that takes up, I'll say, the top 60 percent or so of the page; is that fair?

A Correct.

Q Then as you get to the bottom of the page, there's memos of interviews by Tena Francis that she conducted with both Keith and Nancy Nelson in person and then later with Nancy Nelson on the phone?

A Correct.

Q So you read those materials that Tena Francis has prepared and fold that material into your overall report; is that fair?

A Yes.

Q Going down on that page what I would call maybe the bottom third of page 83, there are memos of interviews done by Deborah Haddad with a litany of witnesses, including Kenneth Morse, the man you had talked about interviewing earlier, correct?

A Correct. She had a brief phone conversation with him in which he was as uncooperative as he was with me.
Q Sure. But he had been interviewed by the mitigation team in 2001, correct?
A Briefly by phone, yes.
Q And those interviews, 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12 different people, around 13 or 14 interviews were interviews that you looked at when forming this report, correct?
A Yes.
Q And then as you go on to page 84, there are -- is an entire page of sourced materials that you looked at again, interviews by Deborah Haddad, memos written by Dan Grothaus, memos written by Ron Ninemire, handwritten interview notes of Ron Ninemire, and memos of interviews by Lisa Murphy?
A Correct.
Q Okay. All materials that the trial team had in their possession in 2001, as part of their investigation materials that you relied upon and folded into your investigation in this report here?
A Right. I used it so that this would be a complete compilation of information collected then and information collected since.
Q And then, finally, as we get to page 85, the top half of that page are more memos of interviews that Lisa Murphy

conducted on Tena Francis' behalf that you reviewed in conjunction with your report?

A Correct.

Q Okay. And if you go down past that, those are more materials that were done by you and I guess someone who worked for you?

A That worked for the Capital Habeas Unit in Arizona, were part of the team now.

Q That's Sandra -- I might get that wrong -- Zahirieh?

A Zahirieh.

Do you want me to spell it?

Q No. I'll spell it. Z-a-h-i-r-i-e-h.

When you began your work in this case some nine years ago or the five years that were most important, you used as a foundation of your investigation the materials that had previously been gathered?

A I used as a beginning point, yes.

Q And we can argue over that, but you started with that material, the materials that they themselves would have had in 2001, and then you've taken the additional time that you had the liberty of having given the delays in this case to conduct the interviews and expand the investigation to the point it's at now?

A Yes.

MR. VALENTI: That's all I have, Your Honor.

REDIRECT EXAMINATION BY MR. RUHNKE:

Q Ms. Miller, in conducting your investigation, you said you drew on every source of information that was made available to you or reasonably related to his life history, correct?

A Yes.

Q Mr. Valenti asked you some questions about whether the special ed records would have been available to the trial team in 2001 or 2000, when they went looking for it. When did Mr. Nelson transfer to Missouri?

A He initially transferred to Missouri in 1988, when he went to his aunt and uncle's and then again later at the end of 1991.

Q All right. And certainly at that time we know the special ed records were in existence because they were transferred along with him or copies were sent to the Missouri School District, correct?

A Correct. Some of them.

Q And the other school records -- I'll call the regular records, not special ed. The regular records were all available to the trial team in 2001, and we just don't know for sure whether the special ed records but certainly the other records have not been destroyed; is that correct?

A Correct.

Q Have you seen anything in the -- your review of the case

that showed there was ever any discussion at all of Tena Francis or anyone else testifying as an overview witness to the social history?

A No.

Q And when you testify and other mitigation specialists testify to an overview, are also lay witnesses utilized, expert witnesses, and records to --

A Yes.

Q -- present a comprehensive --

A A complete-and-persuasive case, yes.

MR. RUHNKE: I have nothing further, Your Honor.

MR. VALENTI: Nothing further, Your Honor.

THE COURT: Thank you.

MR. RUHNKE: We have a witness literally on the way from the airport.

THE COURT: Why don't we take a 30-plus minute break, call it lunch, and resume thereafter.

MR. RUHNKE: Okay. Thank you, Your Honor. He should be here.

(A recess was taken.)

MR. RUHNKE: Your Honor, the witness has arrived. He just went to the restroom and will be right back.

Your Honor, we call Michael Gelbort.

MICHAEL GELBORT, Ph.D., being duly sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MR. RUHNKE:
Q Dr. Gelbort, good afternoon.
A Good afternoon.
Q I want to thank you for adjusting your travel schedule to get here sooner than you had been scheduled. I appreciate that.
What is the nature of your occupation?
A I'm a clinical neuropsychologist in private practice.
Q And where are you located?
A My office is in Joliet, Illinois. I practice in the Chicago area.
Q And in terms of education, where did you earn your Ph.D. in clinical psychology?
A Texas Tech University.
Q And you have a BA degree?
A I'm sorry?
Q Do you have a BA degree, bachelor's degree?
A Yes.
Q And where did that come from?
A Grinnell College, Grinnell, Iowa.
Q And for how many years have you been practicing clinical neuropsychology?
A Like since 1985.
Q Okay. Approximately 31 years I translate that into?
A Almost.

Q And I'm going to display on the screen, which will come up in front of you, a document marked P52.

MR. RUHNKE: Would you bring that up, please?

Q (BY MR. RUHNKE) And looking at that, is that your current resume, CV?

A Appears to be the first page, yes.

Q All right. And does that contain an overall summary of your experiences and things you've done as a clinical neuropsychologist?

A Generally so, yes.

Q Are you certified in the specialty of neuropsychology?

A I am.

Q Forensic neuropsychology?

A Correct.

MR. RUHNKE: Could I also take that down and put on the screen a document marked P53.

Q (BY MR. RUHNKE) What does that appear to be?

A It looks like the first page from the neuropsychological evaluation report regarding Keith Nelson.

Q You prepared that report?

A I did.

MR. RUHNKE: We can take that one down.

Q (BY MR. RUHNKE) Doctor, just for your information, your CV, your report are in evidence so that the court will have the benefit of both documents, and I'll try not to go too

deeply into either document in presenting your testimony.

But, first of all, what is neuropsychology and how is it distinguished from, for example, clinical psychology?

A Neuropsychology is most often, I think, described as the study of the relationship between the brain and behavior. It's a subset or a subspeciality within clinical psychology for the most part. Clinical psychology looks at personality, psychopathology, and general intellect, assessing those functions as well as treating aberrations, understanding normal versus abnormal.

And then neuropsychology takes the next step and recognizes that when there is change in the way the brain functions, you will quite often see changes in the way people behave both in terms of their intellect, learning, memory, their personality, and the like.

Q And in general terms how does one go about -- how does a neuropsychologist go about conducting a neuropsychological evaluation? Is there a standard protocol, set of procedures, things that you normally do in that practice?

A There's a wide variety of approaches, but essentially a neuropsychological evaluation should be, I would say, designed to figure out who this person is and why they are as they are. There are different ways to approach this.

You can do it in a clinical or qualitative fashion. You can do it in a more quantitative fashion or using

standardized tests, asking questions which have been asked of literally thousands of other people and then normed, comparing people with known different types of neuropsychopathology versus people who are known to be normal and seeing if they perform differently on certain tests.

If they do, the tests may be able to distinguish the normal from the abnormal person. So the use of those tests or techniques is the way we first off ascribe is someone taking the test as we request. Secondly, are they acting more like a normal individual or someone who has some type of abnormality. And then, finally, if there is abnormality, what type is it, why is it there, how significant is it and how does it affect someone.

Q In your specialty of neuropsychology, were you asked at some point, I believe in 2005, to conduct a neuropsychological examination of Keith Nelson?

A I was. Actually I think the question before being asked to do the evaluation was is this background information significant and might there be something wrong with someone with this type of a history, and if so, would neuropsychology be reasonable to pursue with this case.

Q And some of that background information, again it's included in the report, were history of dyslexia, history of special education, birth complications, including the possibility of hypoxia and anoxia were present. And with that

information, did you believe that a neuropsychological examination might be fruitful in determining whether there were neurological impairments?

A Yes.

Q As you went --

MR. RUHNKE: I'm sorry. I forgot to offer Dr. Gelbort as an expert in the field of neuropsychology.

MR. VALENTI: No objection.

THE COURT: He will be received as such.

MR. RUHNKE: Thank you.

Q (BY MR. RUHNKE) Do you recall where this evaluation took place? And feel free to refer to your report.

A Sure. I believe it was in Terre Haute. Yes. At the federal penitentiary in Terre Haute, Indiana.

Q And what were the circumstances of the examination, evaluation in terms of contact visit, noncontact visit, through a window, through a glass? What were the circumstances?

A Mr. Nelson and I worked in a contact visitation room. It was just the two of us. Pretty much a table, two chairs. There was a spot for me to put my equipment, reasonable quiet.

Q As part of the process of the neuropsychological assessment, as you conducted in Mr. Nelson's case, is it necessary for the subject of the assessment to be able to write, to be able to fill in blanks, complete certain

paper-and-pencil tests?

A As it pertains to this particular evaluation, yes, it was.

Q And did you administer to Mr. Nelson a set of standard neuropsychological assessments, instruments?

A Test instruments, yes.

Q And what were the particular instruments that you administered to Mr. Nelson in 2005?

Just for the record, according to your report, the date of your evaluation was October 5, 2005.

A Okay.

Q Approximately nine years ago.

And what instruments did you select to assess and test Mr. Nelson with? If you'll refer to the second paragraph on page 2 of your report.

A He was administered -- I'm looking at my data sheet actually.

Q Okay.

A -- the Wechsler Adult Intelligence Scale, Third Edition. He was administered the Category Test from the Halstead-Reitan Battery, the Trail-making test also from that battery, grip strength, lateral dominance testing, the Wide-Range Achievement Test, Third Edition. There were some mental status items which were administered. Some items from the Luria Nebraska were given, aphasia screening. He was given a

sensory examination. Let's see if there's anything I missed. I think that covers it. It is listed in the report though.

Q In the course of administering this kind of testing, do you observe the test subject to determine whether he or she appears to you to be putting forth good effort?

A Observation is one measure. There's also a review of consistency of responses and comparing and contrasting various responses to see if they make sense.

Q In the case of Keith Nelson, did you have any concerns about him not putting forth a good effort or not trying to do his best on the testing?

A Every indication I looked at suggested that he was working hard, trying to produce good data for me.

Q In terms of an IQ score, this was during the time of the WAIS, W-A-I-S, III, what was his verbal, and what was his performance scale -- score on that issue?

A He achieved a verbal IQ score of 93, a performance IQ score of 107.

Q And a full scale IQ score of?

A 99.

Q Almost exactly on the average, correct?

A Right in the center of the average range, yes.

Q Now, the 93 score on the verbal and the 107 on performance, there's a difference of 14 points between the two scores. Is the difference between verbal and performance

scores on an instrument like the WAIS-III significant?

A It's relevant to look at it and consider, and if there's a significant differential, then that's deemed or viewed as statistically unusual, and it's reasonable to look at why that might be occurring.

Q And did this range of 14 points approach clinical significance?

A It did. The standard deviation is 15, so it's essentially one standard deviation apart. That's somewhat atypical.

Q Okay. In terms of standard deviation, the way tests are normed, you tell me if I'm wrong, is that an average of -- a median score is established and then you move a certain percentage either direction from the mean, that's one standard deviation. Second one is two standard deviations, and you ultimately determine whether that is significant. I'm not saying that very well, am I?

How does a standard deviation work on this kind of test?

A I think, you know, if you were taking a statistics class, you talk about the standard deviation being a measure of central tendency. So if the test is one where the scores tend to cluster, where most people are in the middle, and then the further from the middle you get, the fewer people will score at any particular point, the standard deviation tells

you how many points on that particular test, a certain percentage.

So, for example, 68 percent of the individual scores should occur between minus one standard deviation. Standard deviation on an IQ test like this is 15. So from 85, one standard deviation below the mean, to 115, one standard deviation above the mean, you'll get essentially 70 percent of the population.

From minus two standard deviations, a score 70, up to a score of 130 plus two standard deviations, you should get about 98 percent of the population -- excuse me, about 96 percent.

Q And in terms of an IQ score, we're not -- there's no allegation here that Mr. Nelson is at all intellectually disabled in the sense of mental retardation.

If you get two standard deviations away to you're in the level of an IQ of 70, that places you in the range of mild mental retardation; am I correct?

A At 69 and below or 69 out of 60 anyway or even 55, you're deemed, based on the IQ testing, in the mildly mentally retarded range. That doesn't necessarily give you a diagnosis of retardation. There's other factors that have to be considered as well.

Q Understood. But it's the category of mild mental retardation, and if other things, all else being equal, had

you been in that range, even though it's called mild, you're not even exposed to the death penalty. Not an issue we have in this case. But it's a use of the term "mild" I think that I'm focusing on. Let me continue with this.

Essentially what were your findings with regard to Mr. Nelson? Again, your report's in evidence, but what were your findings?

A His scores proved to be interesting to me, and I think they would be interesting to most neuropsychologists. As I said, if the point of the evaluation is trying to understand who this person is and how they behave and where their strengths and limitations would be, his scores are not typical scores. They're not far from typical scores in many ways, and many of his absolute scores, and the word "absolute" I think is to be highlighted, are in the average range or even above average.

But the pattern, which is really what a neuropsychologist or even a physician, a medical diagnostician, looks at, we look at patterns, we do pattern analysis, he presents with an interesting pattern in that, as you've already highlighted, there's a difference between the verbal and in this case the performance or nonverbal, and that carries through in various points of his testing. And when you go and look and correlate that with his history, you see an overall pattern of strengths and weaknesses.

Q And as you evaluated and assessed his essential strengths and his essential weaknesses, did you reach conclusion about any indication of frontal lobe disturbance slash dysfunction in Mr. Nelson?
A There -- I did.
Q What conclusion did you reach?
A That the frontal lobes were contributing to the areas of weakness shown in his test data.
Q And did that mean in essence that he had areas of dysfunction in the frontal lobe area of his brain?
A This data supports a diagnosis of frontal lobe disturbance or dysfunction.
Q And what role does the frontal lobe play in human behavior, in brain functioning?
A I think the most graphic way to think about it is when people see pictures of the homunculus, when people try to understand the way the brain is working early on and even now in kind of a simplistic way, we think of a little man pulling all the levers. And the little man who's pulling the levers, directing the rest of the brain to do the things that it does, that's the frontal lobe.

Other ways to think about the frontal lobe, it's the part of the brain that starts and stops behavior. The frontal lobes are as such the gas pedal and brake pedal of our behaviors. They allow us to initiate as well as to inhibit.

The frontal lobes are what are different from humans versus all other animals. Our frontal lobes are much more developed. They allow us to have complex language, to anticipate consequences, to appreciate the implications of our behavior, and to change our behavior such that we go in one direction and avoid another. So it's really the part that synthesizes and pulls together all of our thinking and our overactive behavior.

Q And as stated in your report, was it your conclusion that he, because of these dysfunctions and impairments, will demonstrate episodes of impaired reasoning and learning slash memory abilities and is found to have other than normal brain functioning, and, quote, his performance is consistent with and indicative of brain dysfunction?

A Yes.

Q And that was a conclusion you reached in the year 2005, correct?

A Yes.

Q Were you able to determine in any scientific way or to any degree of psychological certainty what the etiology was of this brain dysfunction, where it came from?

A We're not able to, using these types of methods, establish categorically or with 100-percent certainty what the etiology might be, but what we do do and what we can do is compare the data and the person's presentation, two different

types of data, with the known history and we can correlate.

So if you have someone who has suffered in a very concrete example an open, penetrating injury to the left frontal portion of the brain, which through over a hundred years of research has been shown to be almost always where language, expressive language lives, and then you see that a person has had a change from before the time of that injury to after in their expressive language abilities, well, you cannot conclude in a predictive sense that that's what caused the change.

You can say the correlation is exceedingly high, and for all intents and purposes you can say that's what caused it.

Q And various hypotheses can be explored to conclude etiology and to determine etiology. For example, someone who has suffered loss of oxygen significantly during the birth process, is that person -- is that a hypothesis that could explain later brain dysfunction?

A Definitely.

Q Someone who while in utero, the mother was viciously assaulted in the late stages of pregnancy forcing her into a premature labor, is that something within the literature that could account for a brain dysfunction?

A Depends on the nature of assault, what part of the body was injured, but in certain cases, absolutely.

Q Traumatic brain injuries as a child and young adult?

A That can definitely lead to changes in cognitive functioning.

Q An individual who while in prison was choked to the point of losing consciousness, would that be the kind of insult that could impact a brain -- cause brain dysfunction?

A It can.

Q Do you recall back in 2005, whether, as a result of this analysis, you recommended to the defense team that imaging might be explored to further develop information about Mr. Nelson?

A I do. And I believe I made that suggestion.

Q And what sorts -- what can imaging add to the analysis of brain dysfunction in general terms?

A There's different ways to, if you will, look at a brain, and I don't mean physically look at it, but I am talking about the brain is an organ that has a variety of different components in terms of how it functions. So there's mass or structure to it. There are different ways that it behaves. It's a chemical organ. It's an electrical organ and it gives rise to behavior.

So if you're concerned about mass-occupying lesions like a tumor or ablation, destruction to the tissue, then a very appropriate way to look at the brain or to try to gain insight into what's going on with it would be to look at the

structures, things like CT, computerized tomography, or MRI scan.

If you're concerned about electrical disturbance such as a seizure disorder, then the proper way or the most useful way to look at it is through EEG, electroencephalogram.

If you're trying to understand how it functions, then a behavioral sort of approach such as neuropsychological testing and now a mix between the more organic neurological assessment and behavioral testing, which would be things like PET scan, are ways to look at, view the brain, or test the brain and see how it functions.

Q Generally speaking, were PET scans, MRIs, CAT scans, CT scans, all those kinds of scanning available within the arsenal of those investigating brain dysfunction early 2000, late 1990s? Is this new technology or has this technology been around for a long time?

A The MRI -- Chicago's first MRI came online in either 1984 or 1985. That was one of the first subjects at Northwestern, so I know specifically the years that started. PET scanning is more recent than that. CT scanning is before the mid '80s, so these are newer technologies but they -- because they're so powerful and so useful for a variety -- not just for looking at the brain but looking at different parts of the body, they have proliferated very quickly. They've been around certainly since 2000.

Q In assessing impairments, do neuropsychologists employ gradations such as mild impairment, moderate impairment, severe impairment?
A We do.
Q Does a person who suffers from a mild brain dysfunction have an insignificant condition?
A I would say no.
Q If somebody is suffering from moderate or severe, for example, somebody suffering from severe brain dysfunction, what kind of person would you expect to see suffering from severe brain dysfunction?
A Well, using the word "see," most people wouldn't see that person at all because they'd be likely asleep or in a coma in some sort of a facility. That's severe brain dysfunction normally. If it's not equal to coma, it's pretty close to that. These are people who don't get out.

Moderately-impaired people are oftentimes visibly impaired where if you were to sit and talk with them, you would know pretty quickly for most of us folks that something's quite wrong with their thinking abilities.

The mild group, at least in our nomenclature, are sometimes referred to as the walking wounded. They're people who may be out and about in the community. They may have jobs. They may present in a way that's a little odd or eccentric to most laypersons' eyes, but people wouldn't

necessarily know they've had a brain injury of sorts.

And many of them can do well in the community, but they also have behavioral eccentricities or abnormalities, aberrations which cause them to be different, and it depends on where or what type of aberrations. You know, we spoke of the frontal lobes. If you're injured in a way where you have defective initiation, you may sit at home and watch a lot of TV and eat a lot. But if you have defective inhibition, you may act out, and those are people who become seen by society. They get in trouble.

Q The people who wind up getting arrested and into our prisons and committing violent crimes, those kind of people?

A Quite often.

Q Okay. In addition to the examination that you carried out in 2005, have you been supplied over the past several months with other expert reports that took place or occurred or were produced much more recently?

A Yes.

Q Have you seen, for example, reports of imaging that was done on Mr. Nelson?

A Yes.

Q Have you seen the report of Dr. Ruben Gur --

A Yes.

Q -- regarding brain dysfunction and areas of brain dysfunction?

Have you seen the report of Carolyn Crawford, MD, a neonatologist, who analyzed Mr. Nelson's birth records for a source of brain dysfunction?

A Yes.

Q Have you seen the clinical reports of Xavier Amador, who observed evidence of frontal lobe syndrome in his clinical assessments of Mr. Nelson?

A Yes.

Q Have you reviewed the report of Dr. Daniel Martell, who said in sum and substance he agreed with your findings that Mr. Nelson does suffer from frontal lobe disturbance?

A Yes.

Q Do any of these reports undercut in any way the conclusions you reached in 2005?

A They don't undercut the area that I looked at, the cognitive function and dysfunction. They certainly branch out and go much more broadly and into other areas, areas I didn't investigate. So I don't have an opinion to speak of about what they said in those areas, but with regard to what I looked at, I don't see anything that's discrepant from what I saw or said.

Q They broadly all at least at some core level describe brain dysfunction, the frontal lobe syndrome; is that correct?

A Yes.

MR. RUHNKE: Nothing further on direct, Your Honor.

Thank you. Let me just get this stuff out of here.

MR. VALENTI: May it please the court.

CROSS-EXAMINATION BY MR. VALENTI:

Q Dr. Gelbort, when you initially conducted your neuropsychological evaluation in 2005, you indicate that when speaking with the patient in this case, Mr. Nelson, he reported possibility of hypoxia and anoxia and that it might exist; is that correct?

A Yes.

Q And, of course, I'm sure he didn't use those words, but for edification of the court, can you tell us what that means?

A Hypoxia and anoxia?

Q Yes, please.

A Hypoxia is a low level of oxygenation. Anoxia is being without oxygen. So when someone is getting only an insufficient amount of oxygen to support them, that would be hypoxia. If you're completely cut off from oxygen, that would be anoxia.

Q You indicate in your report that the possibility of those two conditions exists. How did you come to that conclusion, sir?

A It's based on the description from the patient.

Q So what I was getting at, and I appreciate the way you answered, is this was information reported to you by Mr. Nelson?

A That's correct.
Q At the time that you were doing your evaluation, were you provided with his previous medical records to help you with the history?
A Not at that point, no.
Q Okay. So how long a time did you spend with Mr. Nelson during your evaluation?
A I don't have it written down specifically, but the evaluation was probably on the order of five or six hours.
Q Okay. And -- over the course of one day and one visit?
A That's correct.
Q You indicated that when you met him at Terre Haute in the federal correctional institute there that you had a room in which you had your equipment, correct?
A Absolutely.
Q What equipment did you bring with you?
A The test equipment. So there are certain props or items that you need to administer these tests. There are plastic blocks that you use. There are different pictures that are shown to the individual. There's paper and pencil to record things. There's paper and pencil for the patient to write or draw things.
Q Did you video record your testing of Mr. Nelson?
A I'm sorry?
Q Did you video or audio record your testing of

Mr. Nelson?
A I did not.
Q Later in the introductory paragraphs you talk about Mr. Nelson suffering from nighttime enuresis. Is that how you say it?
A Enuresis.
Q Thank you.
And that's essentially bedwetting?
A Correct.
Q Okay. And there's other descriptions of Mr. Nelson in his youth, but is it fair for me to say that the other descriptions you have in there were all self-reported by Mr. Nelson?
A The history reported in my report, which was offered shortly after I saw him, were based on the materials that he provided to me, the information he provided.
Q Were you provided any other kind of records beyond his report?
A Not at that time.
Q To the extent that you could have those, you would prefer to have them, wouldn't you?
A Well, it depends. You know, there's something to be said and you can certainly make an argument for what would be called a blind evaluation.
Q Okay.

A And then to reconcile that at some point with additional historical information.

Q Okay. As I understand, if I have it correct, Doctor, when you refer to neuropsychology in layman terms, we're basically talking about linking behavior to brain function. Is that fair?

A Generally so.

Q And because we're looking at a brain or an internal organ that is not as easily dissected -- well, that's a bad word. Is not easily understood by lay people in the evaluations, you're having to draw conclusions not based on fact but maybe correlations with datasets; is that correct?

A Run that by me again, please.

Q Well, you say that to determine etiology or causation, you -- to conclude, you correlate data; is that correct?

A I think you have to be careful when you say to determine the etiology. You know, the history is as the history is, so some of it can be gleaned from the individual. Some of it can be gleaned from additional sources of information, family. Some of it can be taken from medical records.

So we have some description, and it's, I would say, objective and subjective both of where the person's brain has been. That's kind of the way a neuropsychologist thinks about it.

And then you've got the data, and the data comes

generally in two forms; the evaluation results, as well as what you see when you look at the person based on your training. And those things do get pulled together to tell a story, and the story sometimes makes great sense and it's very clear and convincing and sometimes it's confusing.

Q With brain dysfunction or injury to the brain, isn't it important to the extent you're able to describe it, to be able to describe the degree of that injury?

A Well, it --

Q Or that degree of dysfunction?

A It depends. You know, an evaluation -- I can think of virtually no cases where an evaluation is done out of the blue for no reason. Evaluations are done to answer a question and to try to understand the whole person, as I've said a couple times now.

It's useful to look at the data and assess the quality of the data and collect data that's relevant, and then correlate that, compare and contrast it with what else you see as well as the history.

Q In this case you ultimately concluded that there was some brain dysfunction, correct?

A The evidence definitely supports that.

Q There was discussed on direct examination with Mr. Ruhnke about mild -- I've forgotten the middle one.

MR. RUHNKE: Moderate.

Q (BY MR. VALENTI) Thank you. And severe brain dysfunction. Do you have a conclusion as to what level those -- are we're talking about mild?

A This would be categorized as mild.

Q During the testing you have, at least as it relates to intellectual quotient or IQ, you determined that he was in the average range but with some statistical differences based on verbal and full score, correct?

A The overall or the summary scores come out in the average range.

Q The injury you described is it was your opinion, sir, that that brain dysfunction lodged in the frontal lobe of Mr. Nelson's brain, correct?

A I think there's frontal lobe disturbance showing up in the data. I think there's also some left hemisphere disturbance. We haven't spoken of it yet but that's also showing up.

Q When we talk about frontal lobe, I think you described it as the -- what I would call the executive function of a person?

A That's another word that's applied to frontal lobe functioning.

Q I think you described it as the ability to stop and start certain behaviors?

A Those are types of functions that live within the

frontal lobe more or less.
Q Is impulse control one of those type of functions that would be housed in the frontal lobe?
A Largely so, yes.
Q Were you provided any information relative to the underlying offense that Mr. Nelson was convicted -- not convicted, which he pled guilty and was ultimately sentenced to death for regarding whether or not he could exercise impulse control?
A I've been supplied -- I think that was a two-part question. I have been supplied information relevant to the offense, and I don't believe that there was a witness to the offense who could provide information where impulse control could be carefully considered.
Q There was, however, testimony at, what, the penalty phase of the trial about him talking about the abduction of someone to anally rape before he did it, correct?
A That's my understanding, yes.
Q And that there was talk of it a month or so prior to what was an initial attack on a woman named Michanne Mattson on October 2nd, 1999. Do you recall that?
A I do.
Q And that there were coworkers and family members who heard him talking about that attack after October 2nd, 1999, for days leading up to what was then the abduction of Pamela

Butler on October 12th, 1999, where he was talking about abducting someone who was young and doing some unspeakable things to them. Do you recall that testimony?

A I do.

Q And do you recall also that there was testimony regarding people who had seen him in the area where Pamela Butler was abducted days previously driving back and forth they thought in a truck?

A I recall.

Q Okay. Does that sound like information that could inform an analysis of whether or not Mr. Nelson had impaired impulse control?

A It weighs in on some types of impulse control, not on others.

Q What types does it weigh in on?

A It certainly suggests that he had thought about things or he had reflected on this. Obviously judgment and reason wasn't being exercised or not good judgment, not good reason.

Q Well, wouldn't that be true in almost all criminal activity, I mean, that -- when people commit crimes, they're in one way or another exercising poor judgment as you look at it from a clinician's point of view, correct?

A I think self-defense would be an indication of a crime that's committed that may not necessarily conform to what you're talking about.

Q Well, but self-defense is a defense to crime. If someone defends themselves, that is a reason to have not committed a crime. It's an absolute or an affirmative defense.

I'm talking about someone steals from someone else, someone harms, someone rapes, someone sells drugs, that's people exercising poor judgment and impulse control relative to societal standards, isn't it?

A Well, first off, to go back, the self-defense I was talking about wasn't a legal term of putting something on in court but rather if someone attacks you and you aggress back, that that's self-defense --

Q Absolutely.

A -- in a more lay sense. And that's a crime or, you know, people can be charged for that, as I understand, but it's one of those things that is -- probably reflects some type of positive impulse.

Q Okay. Let's not talk about self-defense or defense of others. Let's talk about a defendant that acts and commits a robbery at the local QuikTrip. That person has exercised poor impulse control, correct?

A They certainly may have.

Q Okay. Or they've at least done -- created a selfish act or a criminal act where they put their own needs and priorities above that of others or society's?

A I don't think there's any disagreement there.
Q Okay. And so when you say that there is some impulse control that can be analyzed by looking at the evidence of the underlying crime, is that what you're referring to?
A As I said, I don't think anyone was there to see what happened in the moment, to know how well he controlled his own behavior. What you've referred to, though, is that there was some discussion ahead of time in a more controlled setting that, you know, there's still some impulsivity there, and there's not evidently or it sounds like there's not been proper thinking or adaptive thinking to say, okay, you know, people have different impulses, I need to inhibit these.
Q Or an unwillingness to inhibit them?
A Possibility.
MR. VALENTI: That's all I have, Your Honor.
REDIRECT EXAMINATION BY MR. RUHNKE:
Q Dr. Gelbort, you conducted, as the term you used was, essentially a blind analysis of Mr. Nelson when he first saw you, correct?
A Yes.
Q You had no information was he brain damaged, wasn't he brain damaged. You were requested to do it. There was some information saying this is in his background, but you simply conducted your testing, took five or six hours with him, administered standard testing instruments, and reached the

conclusion justified by the data, correct?

A Yes.

Q And if somebody who robbed a local convenience store, Mr. Valenti's example, is everybody who commits a crime going to also show up with brain dysfunction?

A No.

Q And when you talk about frontal lobe, is that the part of us and the piece of us that, you know, we think about doing something, we know we shouldn't be doing it, if our frontal lobe is paying attention, they're saying, hey, don't do that and we listen? Is that a good analogy?

A That's actually a very good analogy, and I think one has to be careful when talking about impulse control and impulsivity to recognize the knee jerk or delayed reaction to those words is that it happens in a moment like a knee jerk, that it's a reflexive sort of thing, and the way behavior unfolds is that you can have impulsive behavior that takes time and develops slowly where there's plenty of time to say, no, I shouldn't do this, but it's still an impulsive behavior even though it happens over time slowly.

Q So if you're planning to do something to hurt somebody a few days down in time and if your frontal lobe is not telling you, hey, don't do that, it may take a couple days to do it, but your frontal lobe doesn't engage and you're not able to access those assets of, I think, executive function that says

bad things will happen if you do this and you don't?

A There's two ways to respond. Either the frontal lobes don't do what they're supposed to or they weren't able to do what they were supposed to because they're defective. You know, when you have people with defective frontal lobe functioning, there's a much higher likelihood that they will engage or display aberrant, poorly socialized behavior, and the research over the years has shown that when you look at people who are incarcerated for violent crimes, there's a much higher preponderance of frontal lobe disturbance or dysfunction in that group than there are in the normal population.

MR. RUHNKE: Thank you, sir.

I have no more questions.

MR. VALENTI: Very briefly.

RECROSS-EXAMINATION BY MR. VALENTI:

Q Dr. Gelbort, during your normal psychological testing, did you see any indicia of alogia if I said that correctly?

A There was some anomalies in terms of language function but nothing that rose at least in my interview to that diagnosis.

Q Nothing to the point that you noted it in your report, correct?

A Correct.

Q Similarly, during your neuropsychological testing, did

you see any indication of post-traumatic stress disorder or PTSD?

A My evaluation was not designed to look at that, and I didn't see anything that was so compelling or gross as to suggest PTSD.

Q You didn't report on that topic either, correct?

A Correct.

MR. VALENTI: Thank you, sir.

MR. RUHNKE: Nothing further, Your Honor.

Thank you.

THE COURT: Thank you.

(Witness excused.)

MR. RUHNKE: Your Honor, call as our next witness Xavier Amador.

XAVIER AMADOR, Ph.D., being duly sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MR. RUHNKE:

Q Dr. Amador, just for your own information, the lights may come on and off in the courtroom. It's a bit dark here, but we're working on it apparently.

Would you state the nature of your profession?

A I'm a clinical psychologist.

Q And are you self-employed?

A Currently, yes.

Q All right. And where are you based?

A I'm based in New York.
Q And where in New York?
A Peconic.
Q Peconic is a small town out -- at the end of Long Island?
A Yes.
Q And I'm going to put some documents on the screen and just ask you briefly to identify those documents. First document I call for is P60.
Is P60 a current CV, resume of yours?
A Yes.
Q And I can see from the top it's revised as recently as January 2014?
A That's correct.
Q For your information, your CV is part of the record of this case and admitted into evidence. Your various reports have also been admitted into evidence, and the judge will have access to all that information.
MR. RUHNKE: Could I see P61, please. If we could just highlight the date of that report, the upper portion of that report.
Q (BY MR. RUHNKE) Do you see the date on that report?
A Yes.
Q March 30, 2010, addressed to me regarding Keith Nelson.
And was P61 a report regarding your first interview

with Mr. Nelson?

A Yes.

MR. RUHNKE: Would you please, Ms. Taylor, put up P62. Again, if we could highlight the date in the upper portion of that report.

Q (BY MR. RUHNKE) Again, is this a report obviously dated July 12, 2010, addressed to myself regarding a second interview of Keith Nelson, this one taking place on April 6th, 2010?

A Yes.

MR. RUHNKE: Finally, if we could put up P63, and, again, if we could highlight just the upper portion of the report.

Q (BY MR. RUHNKE) You see the date of that report being April 20, 2012. I don't think that one is addressed to anyone in particular. Does this report represent a summary of your several individual meetings with Mr. Nelson?

A Yes.

Q And is that the last report that you wrote in this case?

A Yes. That includes an additional face-to-face interview and a telephonic interview.

Q But that's included and subsumed within that final report, correct?

A Correct.

Q By terms of your own background and education, where did

you earn an undergraduate degree?

A Undergraduate degree was from the State University of New York.

Q In what year?

A 1982. Graduated with a degree in psychology with honors.

Q And did you earn a graduate degree?

A My MA was from New York University --

MR. VALENTI: Your Honor, the government has no objection to Mr. Amador -- or Dr. Amador's credentials given his CV that's been provided if we could shorten this up.

MR. RUHNKE: I'll skip the educational requirements. I do want to focus a bit on research interests and specializations.

THE COURT: That would be appreciated.

MR. RUHNKE: Okay. Thank you, Your Honor.

Q (BY MR. RUHNKE) So have you served as a clinical psychologist in essence since earning your Ph.D.?

A Yes, since 1989.

Q And as part of your career, have you directed psychological services, for example, for major psychiatric institutions?

A Yes. I was director of an NIH grant, a center for evaluation of psychotic disorders, which includes not only psychotic disorders but all the comorbid disorders that come

with it, depression, PTSD, anxiety disorders, and evaluating normal people. For every study in our center, which there were thousands of subjects, we would also have to have normal controls. I ran other services. There was a second opinion clinic called the center for I think -- I forget. It's in my CV. But the center for evaluation of psychotic disorders, which was a nonprofit charitable second clinic -- second opinion clinic. And I worked on the DSM-IV.

Q If you had to describe the special focus of your research activities, outside clinical activities, your research activities, writing activities, is there a particular area of mental disease or defects that you have focused on?

A The area that I've focused most on has been schizophrenia spectrum disorders and the neurocognitive deficits that accompany them.

Q We'll return to schizophrenia spectrum when we discuss Mr. Nelson.

Have you had academic appointments over the years?

A Yes.

Q Do you currently have an academic appointment?

A Yes.

Q What is that?

A Visiting professor at the State University of New York.

Q Have you published articles in peer-reviewed journals, and are those contained in your CV?

A Yes.
Q Do you serve as a peer reviewer for numerous prestigious journals in the field of mental health and psychology?
A Yes. Prestigious in that they have high-impact scores, which is how you would define whether or not a journal has impact on the field. So the American Journal of Psychiatry, the Archives of Psychiatry, and many others.
Q So what you're describing is a system where if someone publishes a research article, there's a -- some research done as to how often it's cited, how often other people are looking at it, citing it, discussing it, and the more it's discussed, the more impact it seems to have?
A Correct.
Q Okay. What is your current concentration? For example, do you have a clinical practice?
A I do.
Q So you treat patients as part of your day-to-day activities?
A My clinical practice at this point is down to about eight hours of direct clinical care a week, but in addition, I'm the director of an institute called the LEAP Institute, so we also -- I supervise consultations that come through our faculty and clinicians that work with us.
Q And what percentage of your time is spent in forensic work and I mean currently in the last few years? In other

words, how often do you testify in a court such as we're doing today?

A Since -- I think the first time I testified was 1999, I believe. At the very most I would say on average once a year.

Q One time a year. You're not one of these doctors who's in court every other day?

A I haven't testified in at least two years in depositions or trial. Two, maybe three years. You would know. It was a case I worked on with you.

Q You described the LEAP Institute. Just, again, in broad terms and without dwelling on the details, what is LEAP?

A It's essentially an evidence based -- means there's been research on this practice. We train law enforcement, corrections, healthcare professionals, family caregivers of people with mental illness, and other disorders how to engage with the person, their communication strategies to increase trust that the person will work with you, reveal what's really going on with them. In short that's the main focus of that institute.

Q Were you asked as part of your forensic practice, as part of your forensic responsibilities, to conduct an assessment of Keith Nelson?

A Yes.

Q And in carrying out that function and as you continued to assess Mr. Nelson as a clinical psychologist -- and let me

pause for a moment.

How does clinical psychology differ from -- you saw Dr. Gelbort here a couple of moments ago. How does it differ from neuropsychology?

A Well, most neuropsychologists are clinical psychologists who go on and get specialty training. I actually did get specialty training for a year. I was working in a neurology service. I learned how to administer all the tests I've seen in this case. I didn't go on to get a board certification in neuropsychology, although I was licensed to conduct neuropsychological evaluations. I did that for maybe the first five years of my practice. I ended that practice in '94. So it has to do with really getting advanced experience and training and certification.

Q And in your case, in the case involving Mr. Nelson, have you reviewed extensive materials about the case, about the background of the case, and about Mr. Nelson's history and background?

A Yes. Tens of thousands of pages.

Q And among the things you've reviewed, did you review a complete penalty phase transcript, which was the only transcript in this case because of the guilty plea, but did you review the transcript of the proceedings that led to Mr. Nelson being sentenced to death?

A Yes, I did.

Q Did you review several thousand pages of documents that had been originally provided to Drs. Dietz and Martell in September of 2001, in anticipation of their assessment of Mr. Nelson, which actually never took place? Did you review that CD and those three binders of materials?
A Yes. I reviewed all the same materials.
Q And do those include hundreds of FBI 302 reports, local law enforcement reports, and other documents relating to not only the kidnapping, murder of Pamela Butler but the earlier attempted abduction of Michelle Mattson -- Michanne Mattson?
A Yes.
Q Did you review raw data that other experts had compiled?
A Yes.
Q Including Dr. Martell's raw data?
A Yes. I requested it and reviewed it.
Q Did you review reports of neuroimaging meaning PET and MRI that had been conducted in the fall of 2010, at a facility, private facility, imaging facility near the Terre Haute prison?
A Yes.
Q And did you review expert reports of Daniel Foster, Michael Gelbort, Natalie Novick Brown, Daniel Martell, Jill Miller, Ruben Gur, Carolyn Crawford, and Leslie Lebowitz, Ph.D.?
A Yes. And --

Q Yes. And many of those reports I understand were prepared after you had seen Mr. Nelson and the last time you saw him, but did you consider and review those reports in preparation for your testimony at this hearing?
A Yes.
Q When was the first time that you met with Mr. Nelson? You can feel free to refer to your report.
A The first time I met with Mr. Nelson was at the U.S. Penitentiary -- all of my meetings were there in Terre Haute, Indiana. On February 8th, 2010, we met for 3 hours, 30 minutes. The second --
Q In your report, the one that's marked P61, it actually says February 8 of 2009. Is that just a typo in the report?
A Yes. That was 2010.
Q And what was the physical setting in terms of contact visit? Not contact visit, face-to face, over the phone? How did it -- how did it take place?
A It was a contact visit face to face. There was a stainless steel table between us and a barrier underneath.
Q Were you able to, for example, shake hands with Mr. Nelson when he first came in and have unfettered physical contact with him face to face?
A Yes.
Q And was it a private setting and a quiet setting?
A Yes.

Q And approximately how long did that first interview of Mr. Nelson take place?
A Three hours and 30 minutes.
Q And I'm just going to summarize the visits, and then we'll come back to each one of them.
Referring to P62, when did the second visit take place?
A April 6th, 2010.
Q So just -- you had seen him on February 8 and you saw him again approximately two months later?
A That's correct.
Q And for how long did that session last?
A Three hours and 15 minutes.
Q And the third time you met with Mr. Nelson was when?
A That was February 17th, 2011, for 3 hours and 15 minutes, and all three meetings were in the same room.
Q So you've seen -- you've been face to face with Mr. Nelson for in excess of 10 or 11 hours, I'm just doing the rough math, and in every instance it was face-to-face full contact, and those visits were spaced out over the course of about a 12-month period; am I correct?
A Yes. And if my math is correct, ten hours face to face.
Q Okay. You also had at one point a relatively brief telephone conversation, telephone conference with Mr. Nelson with myself on the line to address a specific issue, correct?

A Correct.
Q And do you remember when that was?
A That was on February 2nd, 2012, and we spoke for 20 minutes.
Q And so starting with your first visit with Mr. Nelson on -- let me back up a little with another question.
What does the term "longitudinal" mean in the context of this kind of evaluation?
A In the context of a psychological/psychiatric evaluation for forensic purposes, a longitudinal evaluation has among its goals is to determine whether symptoms are waxing and waning, whether they -- also to gain trust in the individual. Sometimes more than one meeting is required. I've been in an evaluation where somebody wouldn't speak to me for the first meeting, and I had to come back, was mute for the whole time.
But the main purpose is to increase the reliability and validity of your assessment. Any psychological paper-and-pencil tests, of which there have been many administered to Mr. Nelson, have many items for the exact same reason, that you want to have several or even many, if you can, interviews over time to separate out aberrant momentary phenomenon from trait-related symptomatology.
Q Do symptoms of mental illness, psychotic disorders wax and wane, meaning sometimes they're front and center and sometimes they're not so obvious?

A They -- you're really asking two questions, I think. They wax and wane like any medical symptom. Arthritis can have a bad day, good day. Alzheimer's, you can have a little bit clearer mental status and memory on a particular day, and then it's terrible the next or even that evening. Same thing with psychotic symptoms. These are symptoms of brain disorder.

In addition, you have -- you reference is it -- I'm paraphrasing your question -- really about the issue of detecting the symptoms. And so on some days the person may be more trusting, more forthcoming. On other days they're more guarded or distracted in some other way.

Q And in the course of your assessment of Mr. Nelson, did you also conduct what's called a collateral interview?

A Yes.

Q And what is a collateral interview?

A Trying to speak with somebody who knows -- either knows him well, has had opportunity to observe him, has intimate or casual knowledge of him but can corroborate at least some of the signs or symptoms of mental disorder or lack of them that I'm finding.

Q And who did you interview as a collateral source of information in this case?

A His mother, Nancy Nelson, in Kansas City on September 13th, 2010.

Q And about how long did that interview last?
A For three hours.
Q And did that factor into your analysis of Mr. Nelson?
A Yes.
Q Is it good practice to interview a collateral source when doing a mental health assessment?
A Yes.
Q And why is that?
A It increases the reliability of your assessment for the same general reason I gave before. With multiple assessments, you can then look to see where you have corroboration and where you don't. The other reason is that you -- the informant in this case, Keith Nelson, may have, in his case he does have I've opined, certain behavioral patterns of adapting to his life history that lead him to minimize certain symptoms and also may have deficits that also the individual, generally speaking now, do not reveal signs and symptoms, might be paranoid and afraid to tell me things.

There's all sorts of reasons to speak usually with family members but not always in clinical practice and in practice of a forensic assessment. I've interviewed guards as well. Not in this case. I didn't have that opportunity.
Q In terms of, again, an overall broader point, is one of the things you're assessing for when you're doing a clinical interview whether, one, the subject is doing their best to

answer your questions honestly versus either deflecting your questions, refusing to answer your questions, or in fact faking or malingering symptoms of illness?  Is that a concern?
A    The veracity and credibility of the report that I'm getting is always on the top of the list along with assessment of any possible mental disorders or other disorders.
Q    And in Mr. Nelson's case, did you have the sense that he was doing his best to be cooperative with you and that he was not trying to fool you, pull the wool over your eyes or otherwise fake symptoms of mental illness?
A    For the overwhelming majority of the questions I asked, yes; for some, no.
Q    And what was Mr. Nelson's style of response when it came to overstating or understating mental illness?
A    He really had a pattern of what I typically call faking normal.  When he talked about -- when I asked him about various forms of abuse as a child, as a teenager, physical, sexual, emotional, and psychological abuse, he minimized it. I think I quote what he said in one of my reports as if it was nothing, it was no big deal.
Q    And let's go to your first visit with Mr. Nelson and the impressions that you reached at the end of the first meeting with him, which, again, occurred on February 8th, 2010.

You note in your report that you had concluded that Mr. Nelson meets diagnostic criteria for cognitive disorder

not otherwise specified, post-traumatic stress disorder, and a psychotic disorder not otherwise specified; is that correct?

A Yes.

Q You spoke earlier about the schizophrenia spectrum.

What does that mean?

A In our field we are certain that there is no single disorder called schizophrenia that we're really talking about, the schizophrenias, so using our current classification system, the DSM or the ICD, the International --

Q What was the latter one?

A The International Classification of Diseases.

Those of us who do research in this field recognize that there is really a spectrum of psychotic disorders from schizophrenia to schizo-pathic disorder, mood disorders with psychosis, even more recently PTSD with psychotic symptoms. That's not typically in the schizophrenia spectrum. There's some newer research indicating that. Through psychotic disorder not otherwise specified.

And I'm limiting my comments now -- I shouldn't have talked about current because there's even more current thinking to be even more inclusive based on genetic studies, based on other kinds of studies, but these are a spectrum of disorders involving some core symptoms.

Q What you meant by the latter comment is that the DSM-IV, which had been the Bible of psychology since the '90s, was

very recently replaced by a new edition, DSM-V, which rewrote some of the criteria and diagnostic criteria --

A The DSM-V was not at play during the course of Mr. Nelson's trial, so that's the comment I was making.

Q During your interview, you noted that together with the -- what you saw on your interview and for the neuropsychological testing, among the materials you had were Dr. Gelbort's initial neuropsychology testing, correct?

A Yes.

Q That you saw an individual who is likely to be impulsive, have difficulty with memory, and limited in their ability to control angry feelings.

Is that still your impression of Mr. Nelson as you continued your two or three additional sessions with him?

A Yes.

Q And you also had looked at an affidavit prepared by a fetal alcohol spectrum specialist by the name of Natalie Novick Brown, who concluded that he may or may not be fetal alcohol but certainly had signs of neurological impairment that may be related to fetal alcohol syndrome. That was another source that you had to rely on?

A Yes.

Q And so let's talk about cognitive disorder not otherwise specified.

In simple terms, what are we talking about? What is

cognitive disorder that you observed in Mr. Nelson?
A There's ample evidence, both from behavioral assessment from interview as well as from neuropsychological testing, that the person suffers from cognitive deficits that impair their functioning and/or cause distress in their life.
Q And in Mr. Nelson's case, is that what you observed?
A Yes.
Q Did you observe, again, in your clinical interviews evidence of brain dysfunction, if I can just put it that way? And you tell me what sorts of things you did observe.
A Yes, I did.
First, probably one of the first things I noted was his difficulties with memory. He couldn't tell me how old he was. He could tell me his birth date, so the long-term memory in that instance worked well. He wasn't sure if he was -- I think, if I recall correctly, 34, 35 years old. Other kinds of what are called working memory problems, really paying attention, as I have to now with your questions and trying to stay focused and on track. I noticed also -- it's not in the realm of cognitive dysfunction.
Q What about areas of a psychotic disorder?
A I noticed, first, one of the things that you see in some psychotic disorders and schizophrenia is poverty of speech, alogia. That is a sort of a slow assessment. You want to make sure over time that what you're seeing is a pattern, is a

trait, not just a bad day or the person's depressed and is a man of few words.

I had the opportunity to see him over the course of more than a year, I believe it was, or about a year three different times, ten hours, and there was a consistent poverty of both content of speech. He spoke in very short responses typically, not always. But also a real -- a loss of the ability to abstract so that his answers were not elaborated, did not include abstractions, which is typically a sign of executive dysfunction, which we see in a wide range of disorders, including psychosis.

Q Did you see symptoms of disassociation?

A Yes, absolutely.

Q And what is disassociation?

A Well, there's depersonalization; there's derealization. Depersonalization is the feeling that you are not there, you're watching. Derealization is it doesn't feel like this is real.

He has a great deal of the former experience of depersonalization, that he's not there. It happened during our interviews. There were pauses. When I would ask him what he was thinking, his answers typically were nothing, and then I would ask him because of his history of trauma, are you feeling like you're here with me right now? I'd ask him about three or four different questions you ask to assess this and

he'd say no. And I'd ask him to elaborate. I'd have to probe.

I'd say, Do you feel like you're watching this happen, or do you feel like you're a part of this? And his answers frequently, not always, were that he felt he was watching us, it was as if he was watching a movie, as if he was outside himself. That's depersonalization.

Q And at the time you assessed Mr. Nelson initially and over the course of that one year, did you have information that he had been born prematurely?

A Yes.

Q Did you have information that he had been physically abused by a variety of people, including his father?

A Yes.

Q And did that factor into your analysis?

A Yes. His birth records in contrast to his twin brother, he suffered and was described as suffering several episodes of, what was just testified to, hypoxia and anoxia. He was certainly not thriving to the extent that his twin brother was and was observed to stop breathing on at least two occasions during transport from one hospital to another, had other behavioral indices of very low oxygenation to the blood; therefore, to his brain.

So those kinds of complications are things that you do see in histories of people with documented brain

dysfunction. And also psychosis in the schizophrenia spectrum, you see birth complications like that. Not always but frequently at a much higher level than in a normal population.

Q Did you observe during this first three and a half hours symptoms of post-traumatic stress disorder?

A Yes. The first being the derealization -- depersonalization. There wasn't a lot of derealization. But that feeling that he was outside of himself. Also avoidance. He really could not -- I don't think this was a choice on his part -- could not go into what happened to him as a child. This was a very sealed-over area, and it's very similar to what you see in somebody with PTSD. It's avoidance.

Q Do people who are undergoing extremely traumatic experiences, being a victim of sexual assault, being the victim of serious physical abuse as a child, war time, disassociate that way as a way of dealing with the trauma?

A The theory is that's the way, you know -- we're going from description to explanation. The theory is that's why disassociation happens. In terms of description, it is a typical description of somebody with PTSD. The person has frequent episodes of disassociation, feeling outside themselves as if they're observing themselves. The third symptom I saw, which I didn't mention, was also paranoia, which may have multiple causes, multiple etiologies. The

schizophrenia spectrum illness may be one. The trauma history, being part of the PTSD, the hypervigilance and paranoia, this is somebody who is while in prison very afraid.

Now, it's normal to be afraid in prison in my experience from the evaluations I've done and the literature I've read. It's normal to be on guard. I find his level of being on guard and his level of fear and frank paranoia to be far and above the baseline normal paranoia and vigilance that I see in other inmates, including inmates on death row.

Q Even given his circumstances, being a prisoner in a secure penitentiary on death row where a level of vigilance and concern for your safety would obviously be present, his was beyond what one would expect?

A Far beyond. And both in severity but also in terms of persistence.

Q During this interview did he disclose to you that he has absolutely no sense of taste, no sense of smell?

A No, he didn't disclose it. I had to elicit that.

Q Did you elicit that?

A Yes.

Q What is it -- is there a name for that condition?

A Well, a loss of olfaction and a loss of the ability to taste is associated with a number of different kinds of deficits in brain function.

Q So is it a symptom then of brain dysfunction?

A Yes.

Q Did he disclose to you or did you elicit from him symptoms of hallucinations, tactile in this case hallucinations?

A Yes.

Q Tell us about that, please.

A Again, as part of the interview process, in addition to trying to gain his trust and elicit symptoms, are they there, are they not there, I asked about the full range of possible hallucinations. He consistently denied auditory hallucinations of any kind. Command hallucinations, I was particularly interested in because of the nature of his report of the crime.

When I got to bodily sensations, he immediately talked about poking in his back. It wasn't until the third interview that I also discovered that he had the experience of burning sensations as if somebody was holding a flame very close to his back or putting a cigarette out in his back. On a scale of 1 to 10, 10 being what it felt like to have a cigarette extinguished on your arm, I could ask him that because he had numerous scars on his left arm where cigarettes had been put out on his arm, he said --

Q Self-injury?

A Self-injurious, yes. Self-injury.

But I used that as an anchor for my rating of

severity of the false perception, the hallucination. He said it was a 10. It was very much like -- only worse because with a cigarette, the pain goes away quickly. With these hallucinations -- now he's not calling them hallucinations. I am -- they would go on for five minutes, a feeling that there was a flame very close to his back or a cigarette was being extinguished on his back.

Q Did he report those sensations to you during each of the three times you met with him in person and indeed over the telephone conversation we had?

A The first two interviews he described it as poking. By the third when I would revisit it, ask for elaboration, he offered that it's a burning sensation also. They don't happen simultaneously. So actually it's a second -- he may have a third, I don't know, but I can say with certainty, with a reasonable degree of professional certainty now, he has at least two distinct tactile hallucinations, a poking sensation and a burning sensation.

Q And are those the kinds of symptoms that you would expect someone to volunteer who was trying to fake mental illness?

A No.

Q If someone were trying to fake mental illness, what sorts of things would you expect them to put forward and have you seen them put forward?

A I have seen it both in my experience and if you look at the literature, the -- among the most common symptoms are hallucinations in particular, command hallucinations, the voices told me to do it. I evaluated that on each of the three face-to-face interviews. At various times in various ways linked to behaviors he was engaged in, were you hearing voices at that time, he emphatically said, no, I've never, and he added on his own, I have never heard voices.

Q In a sense that's a bit of a test on your part that you're seeing whether he's now going to start endorsing symptoms that he never endorsed before?

A Yes. Hence the longitudinal assessment. If suddenly he's asking -- adding a whole slew of new symptoms and saying, oh, yeah, I did hear a voice telling me to do this, it would raise a red flag in terms of malingering.

Q But that did not happen; am I correct?

A No, it didn't happen.

Q At the conclusion of your first report, you did discuss his state of mind at the time of the offense. One of the things we asked you to do was look at whether he met criteria for McNaughton. At the conclusion of your first interview, you weren't prepared to express an opinion on McNaughton, but you did tell us and I'll just quote it.

MR. RUHNKE: In fact, would you bring that up. This is P61 at Bates 7. Would you blow up the final paragraph?

Q (BY MR. RUHNKE) You did reach the conclusion that at the time of the offense, his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired regardless of whether the capacity was so impaired to constitute a defense to the charges.

You also concluded that he committed the offenses under the influence of severe mental disturbances that affected his perceptions, judgment, impulses, and ability to conform his conduct.

And, finally, it was your view that he committed the offenses under severe mental, not an emotional disturbance. So that was your first visit with Mr. Nelson, and those were the conclusions you reached after that first visit?

A Yes. There's a little bit of a misquote. He committed the offenses under the influences of severe mental disturbances.

Q If I read that wrong, I apologize.

Would you have a look at the next exhibit, which is P62, which is a very brief report, two pages of your second encounter with Mr. Nelson, and that's reflective of your second visit which occurred on April 6th, 2010, for three hours.

Without summarizing the report or reading it into the record, the report, essentially you're saying I saw the

same things this visit that I had seen earlier. Is that a fair summary of the second visit?

A It's fair with one caveat, which is I did see a worsening of his paranoia to the point of uncovering one frank delusion, a paranoid delusion.

Q Did you also see evidence of frontal lobe disturbance?

A Yes.

Q And at the time you were conducting this evaluation, no imaging had been done of Mr. Nelson's brain, no other neuropsychological evaluation had been done of Mr. Nelson, no neonatologist report had been written about the effects on his brain. These are symptoms that you were observing, a frontal lobe disturbance based on your experience and training as a clinical psychologist; is that correct?

A That's correct.

Q Okay. And if we go on then to the long report, which is dated April 20, 2012, which is the final report that you prepared in this case, it again notes that you had interviewed him and on the first page summarizes the interview of February 8, April 6, February 17, and on February 2 when we talked for 20 minutes on the phone, and your interview of Mrs. Nelson, Nancy Nelson, and that you have reviewed certain materials. Those materials are not attached to this version of the report but have been otherwise provided to the government and are the materials we reviewed earlier.

What conclusions did you reach following these three evaluations of Mr. Nelson?

First of all, did you conclude that he still presented with diagnostic criteria for cognitive disorder not otherwise specified?

A Yes.

Q Post-traumatic stress disorder?

A Yes.

Q Psychotic disorder not otherwise specified?

A Yes.

Q Now, on Axis II which is the -- under the DSM, as we probably all understand the DSM system, has to do with personality disorders; am I correct?

A Yes.

Q Okay. One frequent personality disorder diagnosis seen in individuals who are in prison is antisocial personality disorder. I think the statistics are something like 70 percent of the people in prison meet criteria for antisocial personality disorder.

You ruled out antisocial personality disorder, and incidentally so did Dr. Martell later on. Why? Why did you rule that out?

A It's impossible to make that diagnosis given the diagnostic criteria that we use and common sense because of the history of brain damage at birth, the head injuries that

he suffered throughout his life, and all of which were corroborated by the testing, the structural imaging, the functional imaging, the neuropsychological testing that was conducted by three different experts and onset of these conditions in childhood.

So that when you have an impulsive child with a history of head trauma, with a history of very severe birth complications that almost certainly caused the damage to his brain or some of the damage to his brain that we see today clearly, you cannot give a --

THE COURT: I think we've covered enough of this. This would be more appropriate for a full-blown hearing if the court wanted to reverse its position.

MR. RUHNKE: The court has the report.

THE COURT: Certainly.

MR. RUHNKE: If there were a jury here, Dr. Amador, we'd be spending a lot more time on the individual findings. There's no jury here and Judge Gaitan is certainly going to have all these materials at his disposal.

Q (BY MR. RUHNKE) When it comes to the final conclusion, you did conclude at the end of this report that based on your analysis, Mr. Nelson had a defense of McNaughton insanity, and I'm using McNaughton as shorthand for the Statute 18, United States Code, Section 17, which you quote in your report correctly as, quote, that he's not responsible, quote, as a

result of severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts, closed quote.

MR. RUHNKE: I won't spend any other time on the other diagnostic criteria, but I'd like to spend a few moments on the determination that he met McNaughton insanity, Your Honor, if I may.

THE COURT: As long as it's not repeating what you've already gone over.

MR. RUHNKE: It will not repeat what we've been over.

Q (BY MR. RUHNKE) What led you to conclude -- you have read a great deal about the circumstances of the crime. You had read police reports and other documents that had been provided related to Drs. Dietz and Martell in 2001, really thousands of pages, although probably when you sort through, probably two-thirds of those were prison records that had to do with -- nothing to do with the crime, but probably at least a thousand pages of those materials were police reports having to -- and autopsy report having to do with the Pamela Butler abduction and murder.

Having reviewed all those materials, having spoken with Mr. Nelson, what led you to conclude to a reasonable degree of psychological certainty that he met McNaughton, that he had a defense that he was not responsible for the crime as

a result of mental disease or defect?

A By the time I had spent ten hours assessing over the course of the year the dissociative state and the quality, nature, and severity of the dissociative states that he experiences and experienced at the time of the crimes, I had sufficient professional certainty that this impaired his ability to appreciate the nature and quality of his acts. That's why I didn't opine earlier. I wanted more assessment longitudinally over time before I could have confidence.

All of the records that you mentioned when I reviewed them again, a second time in light of that opinion, did not contradict my ultimate opinion, and some, if not many, cases actually were consistent with that opinion.

MR. RUHNKE: Your Honor will have all those reports. Unless the court has further questions of the witness, I'll sit down and let the prosecution do their examination.

Thank you very much.

THE WITNESS: Would it be possible to have some more water?

THE COURT: Sure.

CROSS-EXAMINATION BY MR. VALENTI:

Q Dr. Amador, you first saw Mr. Nelson in 2010, in Terre Haute. You indicated during your first interview you did not conduct neuropsychological testing, correct?

A Correct.

Q You are aware that before you, Dr. Gelbort previously had conducted neuropsychological testing in 2005, correct?

A Correct.

Q And later in 2010, Dr. Dan Martell had also conducted neuropsychological testing?

A Yes.

Q Neither of those two doctors, one employed by the postconviction counsel, one employed by the government, found indications during the neuropsychological testing of indications of PTSD, did they?

A Correct.

Q But, nonetheless, you, who didn't do any testing, do believe he suffers from post-traumatic stress disorder despite the testing to the contrary?

A That's not true. There was no testing to the contrary. None of the tests employed by the doctors you just mentioned were tests of PTSD. In addition, because the doctors were conducting neuropsychological evaluations, they spent at best 10 percent of the time interviewing Mr. Nelson that I did, and it's through clinical evaluation and interview that you detect PTSD.

Q But there's no evidence in the neuropsychological testing, none of the empirical data that they were able to employ are indicative of the diagnosis you later came up with or -- that you came up with?

A No, of course not because there's no items in their test that are designed to evaluate PTSD. It would be -- I'm sorry. Do you want me to --

Q I was going to change topics. If you've got something else to say, feel free to say it.

A It would be like assessing my son's ability to spell by giving him a math test. It's not relevant.

Q Well, one thing you did consider relevant is alogia, if I've pronounced that correctly. You mention it in your first report, again your second report, and finally your third report. You heard Dr. Gelbort's testimony, at least the end of it, that he didn't see anything significant to suggest alogia, correct?

A I don't recall exactly what he said.

Q His report doesn't mention alogia or having found alogia during his diagnostic -- or during his evaluation, correct?

A That's correct.

Q Dr. Martell interviewed Mr. Nelson after you did and did not find or did not agree with your conclusion that alogia was present; is that correct?

A That's correct.

Q You go to some length, as I understand it, in your third report --

A Actually I need to revise that answer.

Q Okay.

A In my reading of his report, I don't know that he specifically said he disagreed with my assessment that he had alogia, and, furthermore, I know that he did not question or use -- he used quite a few tests, tests like the PANSS, the Positive and Negative Syndrome Scale; the SANS, the Scale to Assess Negative Symptoms. I didn't bring the paper-and-pencil test in with me because I have them memorized.

I went through, as I said earlier when I went through all the symptoms of delusions and hallucinations, I went through all the negative symptoms of schizophrenia spectrum disorders. So my clinical interview did focus on -- this is one part of my clinical interview that I did focus on. I didn't see that in any of the doctors that you mentioned, and certainly none of them that I recall refuted or disagreed specifically. I may be wrong about that.

Q Okay. Dr. Martell will be here. He can testify to what his opinion is regarding the alogia.

You went through some significant time during your third report in a footnote describing how you were specially trained with the ability to diagnose or identify people who suffer from alogia, correct?

A That I have special expertise in that area, yes.

Q And you put that in your report, Plaintiff's Exhibit 63, Page 8, Footnote 1, which takes up 35 percent of the page, to describe what alogia is and how it's a complex area that

you've been specially trained in, correct?
A No.
Q Huh?
A It's not a complex area. It's simply an area -- there's a huge literature on the assessment of negative symptoms. For everyday clinicians, for people without special training in the assessment of negative symptoms, it's often overlooked. The reliability study that was conducted when the DSM-IV was developed, MacArthur Reliability Study, I was one of the people who participated in it, was specifically designed to increase our ability to assess negative symptoms reliably because negative symptoms are in the diagnostic criteria.
Q As is true with anything, proving something in the negative is very difficult to do; is that fair?
A I'm sorry, I --
Q Proving a negative is hard, proving a negative is hard in general?
A You interrupted me so I really am totally lost. Can you start over?
Q In general, proving something that is a negative is difficult to do?
A No, not at all.
Q Well, you just said that proving these negative symptoms was problematic. I'll use your words.
Alogia is a very difficult symptom to assess

reliably by forensic psychiatrists and psychologists who rarely receive specialized training in this assessment. Your words, correct, in your report?
A Yes.
Q That's what I'm trying to suggest. You put a footnote in talking about how alogia is a difficult symptom to assess reliably, correct?
A By the average clinician, yes.
Q And you put it in your report because you thought it was significant, yes? Can you answer affirmatively or verbally?
A I'm not sure what you mean by "significant."
Q You put it in your report, correct?
A Yes.
Q Are you reporting on significant items?
A Not always.
Q Okay. You're reporting on a man's mental health evaluation you've been tasked to do so the court can have information before it to determine whether or not he's entitled to relief, right?
A That's correct.
Q So you're not putting in your grocery list from 2010 in there, are you, because that's not relevant, but you're putting things that you think are relevant in your report, right? It's not a hard question, Doctor.
Did you think alogia important when you wrote your

report in 2012?

A Clearly.

Q Did you think it important when you wrote your first two reports in 2010?

A Yes.

Q You indicate in your ultimate conclusion in your third report, that any competent neuropsychological evaluation would have found the same mental diseases and defects that you found, correct?

A Could you quote the section you're referring to, please, to refresh my memory?

Q Page 24 of Plaintiff's Exhibit 63, your report, last line. "Finally, it is my opinion that a properly-conducted mental health assessment, which would include a thorough psychosocial history that utilized a review of all relevant and available documents and collateral interviews, could have uncovered the mental disease and defects I diagnose."

A I'm just turning to page 24. What line?

Q Last line, last line. It says "finally." Please read it to yourself.

A Yes.

Q So it was your opinion when authoring this report that a competent professional could diagnose the same things that you found?

A In the context of a, quote, properly-conducted mental

health assessment, which would include a thorough psychosocial history that utilized review of all relevant, available documents and collateral interviews, yes.

Q Since Dr. Gelbort did not diagnose the defect of alogia, does that mean then that you consider him incompetent?

A No.

Q All right. But he didn't find one of the defects that you found?

A It wasn't the focus of his evaluation, nor did he conduct collateral interviews as I did.

Q But I asked him whether or not he saw indicia or indication of alogia or problems with speech, and he said he had some issues verbally as related to his IQ but not issues he thought significant enough to be alogia.

So do you think he's incompetent?

A I'll answer the question a second time.

Absolutely not. I don't think he's incompetent.

Q One of the supports you have for your finding of post-traumatic stress syndrome -- or disorder, excuse me, is depersonalization or disassociation, correct?

A Correct.

Q And by dispersonalization, you indicated someone who essentially is describing a series of events like they're witnessing it from outside their body. Is that a fair way to say that?

A Yes.
Q Isn't it true that as you pulled at that thread, Doctor, you fed him the answers?
A No.
Q You just went through the questioning on direct examination, and you said, Are you feeling like you're outside yourself? You don't feel that's giving someone the idea that the answer is yes or no? It's not particularly complicated to figure out the answer you're looking for, is it?
A My answer is no. I've been asked many different questions today. Nobody's feeding me answers, including yourself.
Q No, not you. I'm talking -- me feeding you or your attorney.
I'm talking about you feeding Mr. Nelson the answer that would help you come to a diagnosis supportive of PTSD. You fed him the answers on depersonalization, didn't you?
A Absolutely not.
Q You didn't walk him down the primrose path on what answers would be appropriate to help him come to that conclusion?
A That would be unprofessional, unethical, and not consistent with my reputation or practice. I did not do that.
Q Mr. Nelson knew who you were when you interviewed him on all three separate occasions and also on the phone interview,

correct?

A I'm not sure what you mean by he knew.

Q He knew you were a psychologist there to evaluate his mental status on behalf of his attorney team looking to get relief in federal court on a sentence of death he previously received?

A Yes.

Q You identified yourself to him, correct?

A Yes.

Q Because Mr. Nelson's conviction had been final by appeal, the only means of relief he would have, other than clemency by the President, would be to get relief in a district court or an appellate court setting with an allegation of ineffective assistance of counsel. Did you know that?

A Yes, I did know that.

Q Okay. So he knew that his mental health was one of the primary foundations upon which allegations were being brought in court that he was entitled to a new sentencing hearing?

A I don't know that that was the focus of what he knew. He talked about ineffective assistance.

Q He knew that you were employed by his attorneys, though, right?

A Yes.

Q He knew you weren't employed by the government?

A Yes.

Q You've known enough about this case, I'm assuming, based on the records you've been given, that Mr. Nelson has been noncooperative at least at the time of trial and plea with government counsel that were there to assess his mental health, correct?

MR. RUHNKE: I object to the -- that characterization. I don't know if it fairly describes his behavior. Acquiesce to his lawyer's advice.

THE COURT: The record will speak to that issue.

Q (BY MR. VALENTI) He did not cooperate, he did not make himself available to be interviewed by Dr. Park Dietz or Dr. Dan Martell back in 2001?

A That's correct.

Q You were aware of that?

A Yes.

Q So much so you note in your report paranoia to the point in your second report you refer to it as a paranoid delusion about the government's experts looking to do him ill, correct?

A No, not correct.

Q You report in your second report, Plaintiff's Exhibit 62, a paranoid delusion, correct?

A Yes.

Q Specifically, you report, however, this time his paranoia was especially focused on the upcoming evaluation of

the government's experts who he believes only want to kill him and will be dishonest?

A That's correct. That's not the same as do him ill. Most --

Q I'm sorry. That was my error.

Go ahead and say it. Do him ill was just the way I speak. I apologize.

He had a paranoid delusion. Please explain that.

A Thank you.

As I said before, I don't -- I didn't make the assessment in a vacuum. I looked at his response to those questions about the government experts against my experience with other inmates on death row and other inmates facing death penalty. There is certainly paranoia about the government experts. There is definitely suspicion. There's doubt. There's bias. This was far and above that level. This was delusional conviction that what you just said, I don't want to be cumulative, but the part you left out was that -- I had it here a moment ago. I apologize.

It's the second full paragraph three lines down. This anger and the bravado -- quote, this anger and the bravado stem from his certainty that they, and he's referring to Drs. Martell --

Q If you can help me, what page are you on, sir?

A The same page you were quoting from. Last page of --

Q Sorry. I was on the first page of the report.
A Go to page 2 of the July 12th, 2010 report.
Q Thank you.
A Second full paragraph, three lines down.
"This anger and bravado stem from his certainty that they will lie, manipulate him and the truth and have no goal other than to kill him." That's delusional.
Q Okay. Have you ever had --
A I know Dr. Martell. I presented with him at an ABA conference. I don't think that Dr. Martell is a paid killer, and that's how Mr. Nelson truly believed, and we discussed it at length.
Q Had you had any other clients that you interviewed on death row that had previously not subjected themselves to examination during the guilt or innocence phase or the penalty phase of the case?
A Absolutely.
Q Had you had other clients like Mr. Nelson who had been instructed by their previous counsel not to cooperate because the counsel's experience with medical staff in death penalty cases was not very good?
A I don't believe I ever have heard that before, no.
Q So Mr. Nelson's own concern about this area coupled with the advice he had previously gotten by counsel, could that inform his opinion on why he was concerned about defense

counsel -- or, excuse me, about government mental health counsel?

A I'm sorry. Could you pass that question again?

Q Yes. Could the fact that -- could Mr. Nelson's views and suspicions, in your words, paranoid delusions, be informed by his own personal views coupled with legal advice he previously received about cooperating with government mental health experts?

A All delusions are informed by personal experience and what one is exposed to, so somebody with religious delusions frequently comes from a -- either a highly religious background or is very involved in religion before they became psychotic. So yes. All delusions have a kernel of truth, but they become delusional when they're fixed, false beliefs.

Q Isn't Mr. Nelson's concerns and fears, though, an honest appraisal of the reality he found himself in when being interviewed by first you and then Dr. Martell?

A I do not believe Dr. Martell's sole purpose is to lie, quote, manipulate, and try and kill Mr. Nelson. Absolutely not.

Q Okay. And I would agree with you on that, but a defendant --

A I would hope so.

Q A defendant might very well think that's their real goal and that makes them delusional simply because they don't trust

the government?

A I believe I've answered this question. I can answer it again, but it's going to be a repetition.

The answer is that given the baseline of experience that I have evaluating inmates on death row, prisoners being held over facing capital charges have a great deal of paranoia, suspicion, cynicism about government experts coming in to evaluate them. I've seen attorneys work very hard to get them to agree, as I saw in this case, to meet with those experts.

That's different than a fixed false belief. It's apples and oranges, night and day different from somebody who is absolutely certain with no doubt that this person's only goal is to lie, manipulate, and to cause his death.

Q Of course, the only report we have of that is through you?

A That's correct.

Q Because that's not reported by others, right?

A Not to my knowledge.

Q Okay. You've then described tactile hallucinations on at least two different varieties, one a poking in the back, another a burning in the back, correct?

A Yes.

Q You've used those tactile hallucinations as a basis to support your psychosis not otherwise specified diagnosis; is

that correct?
A Yes.
Q Okay. Could be a medical condition causing that, correct?
A Absolutely.
Q Could be twitchy muscle or a fiery nerve or any number of causes, is that right, other than hallucinatory?
A No.
Q Could not be?
A A twitchy muscle or a fiery nerve, if you're talking about muscle spasms, you're talking about nerve compression, given the area of the back that he was talking about, it didn't -- you know --
Q You're not a medical doctor, though, are you?
A No.
Q And you're not someone that can diagnose whether or not it could be a pinched nerve or some other medical condition, right?
A Correct.
Q So if it were a medical condition, wouldn't that be just as likely as your tactile hallucination described to you by a self-motivated person facing a sentence of death?
A I'm sorry. Could you ask the question again?
Q Your trusting Mr. Nelson's reports to you, correct?
A No. I'm always looking for corroboration. I'm also

looking at demeanor. I'm looking at opportunities he takes or passes to malinger symptoms that would give him an end result that he presumably would be seeking, which is to avoid the death penalty.

Q What kind of corroboration do you have that he experienced tactile hallucinations?

A The dermatology consult that was conducted that showed that there was no medical condition to explain the experience he was having, my interview following that in which he described ongoing tactile hallucinations, including during the day that he was evaluated by the dermatologist.

Q And it doesn't seem like it might be reasonable to you that someone who was self-motivated to try to avoid a sentence of death might make up a condition that there really was no way to corroborate one way or the other?

A It would be extremely farfetched and completely outside my experience for somebody to malinger a tactile hallucination. It stretches my imagination how that could be helpful to somebody in a case like this.

Q Well, it's helpful because you've used it as a basis for a diagnosis. So why would that be such a farfetched stretch?

A I was about to answer. Auditory hallucinations are far more common, are far more commonly malingered, and are a far stronger defense than a tactile hallucination. In fact, its rarity increases its credibility. It's very unusual in

psychotic disorders. It's something you typically see in patients with brain damage, primary brain damage not associated with psychosis.

THE COURT: Mr. Valenti, I think we've covered this area plenty. Let's move on to something else.

MR. VALENTI: Okay.

Q (BY MR. VALENTI) Finally, as we're looking through some of these issues --

THE WITNESS: Excuse me. May I stand up for a minute because I have sciatica? I'm not a medical doctor, but my medical doctor told me.

THE COURT: Some malingering going on?

If you feel comfortable talking there, you can do that too.

MR. VALENTI: I'll pick that up to the extent we make sure everybody can hear you. Feel free to stand up.

THE WITNESS. Yes. Thank you very much.

Q (BY MR. VALENTI) During your review of records, I assume that you've seen previous mental health evaluations conducted of Mr. Nelson, correct?

A Yes.

Q And you are aware that in 1995, Dr. B.U. -- and I will not pronounce his name -- it's S-r-e-e-n-a-r-a-s-i-m-h-a-i-a-h, I'll call him Dr. S., a medical doctor diagnosed Mr. Nelson with an antisocial

personality disorder and excluded psychosis during his diagnostic evaluation?

A Yes, I recall that.

Q Okay. Later in 1999, Dr. Samuel Fadore, F-a-d-o-r-e, had the diagnostic impression on Axis II that Mr. Nelson suffered from antisocial personality disorder. Do you recall that?

A Yes.

Q Do you recall that in 2001, Dr. Foster in relation to the ongoing litigation in this case found antisocial personality disorder to exist with Mr. Nelson and also believed that sexual sadism was strongly suggested but that would need further evaluation?

A In Dr. Foster's preliminary report you're talking about?

Q Yes.

A Yes. I'm aware and considered all three opinions.

Q Okay. And despite that, you determined in your diagnosis that he does not in fact suffer from antisocial personality disorder but instead suffers from post-traumatic stress disorder?

A I included all three of those opinions in the context in which they were given, for example, a lack of knowledge of his long history of neurocognitive deficit as part of my opinion, yes.

MR. VALENTI: Nothing further, Your Honor.

REDIRECT EXAMINATION BY MR. RUHNKE:

Q Few more questions, Dr. Amador.

MR. RUHNKE: Could we display P64, please, and could we take a quick look at this. Could we just display the top half of P64. Just try to pick up the date on this consult. Okay.

Q (BY MR. RUHNKE) You see a Bureau of Prisons health services clinical encounter dated May 6th, 2011? Do you see that date?

A Yes, I do.

Q When you received Dr. Martell's report on Mr. Nelson, did he suggest that the medical condition might be the result of a particular -- I'm sorry, the burning sensation, a skin condition, a sense of poking and burning might be the result of a particular medical condition that he mentioned in his report?

A Yes.

Q And as a result of that, do you know that we asked the Bureau of Prisons to evaluate Mr. Nelson for any existing dermatological condition?

A Yes.

Q And without reading through the report, was the Bureau of Prisons' clinical encounter negative for any dermatological conditions?

A That's correct.

Q And was there also an outside provider or I believe NaphCare?

MR. RUHNKE: If we can look at P65. If we could highlight the administrative note section of that.

Q (BY MR. RUHNKE) This is an outside provider named Roger Jones, MD, and the date of this report is January 10, 2012. And January 10, 2012, at 11:40, that the -- we were -- we asked that Mr. Nelson be assessed just because Dr. Martell had put in his report that he thought it might be a medical condition, and the physician says, "Whatever skin condition the inmate has is no longer present. When I last saw the inmate, he did not have a single abnormal area of skin on his back to biopsy and denied any skin complaints to his back, and I decided not to perform a biopsy as the skin was normal and no court order was seen and the inmate was complaint free. The act of biopsy would be likely to cause scarring and pain and in my opinion would be against the Hippocratic oath in regards to doing no harm."

The takeaway message of this, Doctor, is there was no dermatological condition that could account for the pain and the burning; am I correct?

A Not according to Dr. Jones.

Q Or the earlier Bureau of Prisons' encounter.

Mr. Valenti seems to suggest in his questions that you had, I think the word was, led Mr. Nelson down a primrose

path to endorsing symptoms of mental illness.

Did you do that?

A No.

Q Are you familiar with the assessments of Drs. Amador -- I'm sorry, you are familiar with the efforts of Dr. Amador. The efforts of Dr. Martell -- sorry -- the reports of Drs. Martell and Gelbort that in their assessment, Mr. Nelson was putting forth honest effort?

A Yes.

Q And in fact Dr. Martell will be here to testify, but that Dr. Martell administered what I call malingering instruments which are designed to see if somebody is trying to fake mental illness or just fake generally and that he was found to have been -- passed those instruments with flying colors?

A Fake mental illness, fake generally, and fake memory impairment, those are the tests that Dr. Martell administered, and Mr. Nelson did not show a pattern of faking even memory impairment.

Q The 1995 evaluation that Mr. Valenti referred to was a very brief clinical encounter in a correctional setting; am I correct?

A Yes.

Q The same with the 1999 evaluation, correct?

A Yes.

Q And Dr. Foster, did he have to your knowledge a comprehensive social history of Mr. Nelson when he interviewed him in the fall of 2001?
A No.
MR. RUHNKE: I have nothing further, Your Honor.
MR. VALENTI: Nothing further, Your Honor.
THE COURT: Thank you.
MR. RUHNKE: Your Honor, unfortunately we have no one else available today, but we will complete our case tomorrow.
THE COURT: Okay. Then we'll break for the day.
Thank you.
MR. RUHNKE: Thank you. 8:30, Your Honor, tomorrow?
THE COURT: Yes.
(Court adjourned at 2:09 p.m.)