IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

KEITH D. NELSON, )
Movant, )Case No.
vs. )04-8005-CV-W-FJG
UNITED STATES OF AMERICA, )Pages 468-628
Respondent. )

TRIAL TRANSCRIPT - VOLUME III OF IV

On April, 14, 15, 16, and 17, 2014, the above-entitled cause came on before the Honorable Fernando J. Gaitan, Jr., United States District Judge, sitting in Kansas City, Missouri.

APPEARANCES

For the Movant:
MR. DAVID A. RUHNKE
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042

MS. PAULA K. HARMS
Federal Public Defender
850 West Adams, Suite 201
Phoenix, Arizona 85007

MR. GARY E. BROTHERTON
Legal Writes, LLC
503 E. Nifong Blvd., #377
Columbia, Missouri 64201

For the Respondent:
MR. DAVID M. KETCHMARK
MR. JEFFREY E. VALENTI
United States Attorney's Office
400 East 9th Street, Ste. 5510
Kansas City, Missouri 64106

## I N D E X

WEDNESDAY, APRIL 16, 2014
VOLUME III OF IV


| | Page |
|---|---|
| TENA FRANCIS | |
| Direct Examination by Mr. Ruhnke | 471 |
| Cross-examination by Mr. Ketchmark | 495 |
| Redirect Examination by Mr. Ruhnke | 510 |
| CAROLYN S. CRAWFORD, MD | |
| Direct Examination by Ms. Harms | 514 |
| Cross-examination by Mr. Valenti | 526 |
| LESLIE LEBOWITZ, Ph.D. | |
| Direct Examination by Ms. Harms | 527 |
| RUBEN GUR, Ph.D. | |
| Direct Examination by Ms. Harms | 551 |
| Cross-examination by Mr. Valenti | 588 |
| Redirect Examination by Ms. Harms | 601 |
| LARRY PACE | |
| Direct Examination by Mr. Ketchmark | 603 |
| Cross-examination by Mr. Ruhnke | 618 |
| Redirect Examination by Mr. Ketchmark | 627 |

WEDNESDAY, APRIL 15, 2014

THE COURT: Good morning.

MR. RUHNKE: Good morning, Your Honor.

MR. VALENTI: Good morning.

THE COURT: Mr. Ruhnke.

MR. RUHNKE: Your Honor, before we begin this morning, Mr. Valenti had raised an issue with me yesterday after court. We've reached a resolution of any dispute we had. I just want to put it on the record.

Mr. Valenti called me after court to say that he had understood Dr. Amador to have testified that Mr. Nelson satisfied criteria for McNaughton insanity at the time of the offense, which he did, and that had also been in the report. Mr. Valenti thought, well, maybe he might have to reopen cross of Dr. Amador on the issue, and he recalled a conversation we had had sometime back where I'd represented to him that the -- although there was the opinion on McNaughton insanity, the remand in this case went only to the penalty phase and, therefore, that testimony would be relevant only to mitigation.

I recall that conversation. I recall the representation. I stand by that representation and, therefore, that testimony was offered only on the issue of penalty and mitigation and not in any effort to argue that the guilty verdict would somehow be set aside.

THE COURT: Yeah. Because that's not a subject for this court's consideration anyway.

MR. RUHNKE: That's correct. This case came back solely on the issue of penalty, Your Honor.

THE COURT: And limited issues at that.

MR. RUHNKE: To six questions on that, that's correct.

May we proceed?

THE COURT: Absolutely.

MR. RUHNKE: We begin by calling Tena Francis.

THE COURT: Okay.

TENA FRANCIS, being duly sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MR. RUHNKE:

Q Ms. Francis, good morning. Where are you currently employed?

A At the Federal Public Defender's Office in Las Vegas.

Q Any particular section of that office?

A The Capital Habeas Unit.

Q And just broadly speaking what does the Capital Habeas Unit do?

A We do the federal postconviction proceedings for inmates on Nevada's death row.

Q Do you represent state prisoners and federal prisoners who have been sentenced to death?

A We don't have any federal prisoners at this point, but, yes, we would.
Q And when did you begin your employment there?
A In the autumn of 2005.
Q Taking your attention back to the late 1990s into the early years of the 2000s, did you have your own business during that period of time?
A Yes.
Q And what was it called?
A It went through a couple of names. It was T. S. Francis & Associates. Then I took a partner, Francis & Leonard Investigations, and Capital Punishment Investigation & Educational Services was the last one.
Q And what largely did the organization under its various names do?
A We only did capital case work, pretrial, and postconviction.
Q And you were the principal in that firm?
A Yes.
Q And you were the owner of that business?
A Yes.
Q I'm going to direct your attention to the case of Keith Nelson.
A Uh-huh.
Q And was there a time that you got involved in doing

mitigation investigation for Keith Nelson?

A Yes.

Q And before we go much further, do you distinguish your role in a case between mitigation specialist and mitigation investigator?

A I do.

Q And what do you describe yourself as?

A An investigator. I collect facts. I pull facts together. I organize them and I assist with expert witnesses.

Q Okay. And, for example, you have a master's degree; is that correct?

A Yes.

Q It's in criminal justice?

A Yes.

Q You do not have a master's degree in social work; is that correct?

A No.

Q So do you -- by calling yourself an investigator, do you mean to distinguish yourselves from mitigation specialists who do have those social work and master's level credentials?

A And expertise, yes.

Q For example, in your own skill set do you consider yourself trained and competent to identify symptoms of many kinds of mental illness?

A No.

Q I'm going to just to start, show you a file folder marked P9A.

MR. RUHNKE: And there's no objection to the admission of this document.

Q (BY MR. RUHNKE) And just have you identify P9A. We're getting a little ahead of ourselves here, but I just want you to identify what P9A is.

A This would be the contents of a binder without the binder that held everything from research to witness interviews to summary reports.

Q Okay. You should understand that there's -- the court has heard a lot of testimony about your involvement in the case. Mr. Shull has testified. Ms. Hunt has testified. Mr. Berrigan has testified. So a lot of this ground has already been gone over, and I'm not going to go all over it again.

I want to start off by charting your involvement in the case. Did it begin with a phone conversation with Mr. Shull on approximately November 15, 2000?

A That sounds right.

MR. RUHNKE: Could you just put P9, page 7 on the screen, please.

Q (BY MR. RUHNKE) I'm not going to take you through this, but does that appear to be your handwriting?

A Yes.

Q And does that appear to be notes you made during the meeting of a telephone conversation of November 15, 2000?
A Yes.
Q Did there come a time a couple of days later that you met in person in Dallas with Mr. Shull and Ms. Hunt?
A Yes.
MR. RUHNKE: And I'm going to ask we display P10, page 8.
Q (BY MR. RUHNKE) Again, do these appear to be your notes of the meeting that occurred in Dallas on November 17, 2000?
A Yes.
Q And you made notes of discussions that were ongoing during that meeting; is that correct?
A That's correct.
MR. RUHNKE: If you could just go to page 4 of that document. I'm sorry. Page 4 of the document. I meant let's go to page 8 and go four more pages. Okay. That page. Would you highlight just the top.
Q (BY MR. RUHNKE) In the course of that meeting you made a note, "has neuropsych hired," double exclamation point. I gather from that that you were told that the neuropsychologist had been hired and the double exclamation point means that's a good thing?
A Absolutely.
Q Okay. Why in your experience as a mitigation

investigator is having a neuropsych involved in a capital case a good thing?

A Well, especially in a case where you suspect your client may have brain impairment, brain damage.

Q And in Keith Nelson's case based on records, based on history, did you suspect that he may have brain damage?

A Yes.

Q Going now -- let me take that down.

Subsequently, a motion was filed to have your organization appointed and you were appointed to serve as a mitigation -- your firm was appointed to provide mitigation services in Keith Nelson's case; is that correct?

A That's correct.

Q Do you recall when it was that you first met Pat Berrigan roughly?

A Oh, I don't know. Sorry.

MR. RUHNKE: Could we display P18 at page 1 and highlight the top portion of that with the date and the reference.

Q (BY MR. RUHNKE) You see a reference to February 21, 2001, confer with Susan and Tena Francis at Hereford House?

A Yes.

Q Does that refresh your recollection that in, you know, the second or third week of February of 2001, you traveled to Kansas City from Dallas to meet with the defense team in the

Nelson case?
A Yes.
Q Was that the first time you had met Mr. Berrigan?
A Yes.
Q During that trip, did you also have occasion to sit with Mr. Nelson?
A Yes.
Q To interview him at the Leavenworth Correctional -- CCA, Corporation -- Correction Corporation of America facility, private facility in Leavenworth, Kansas?
A Yes.
Q Did you meet with him twice during that trip to Kansas City?
A I did.
Q Now, during those meetings with Mr. Nelson, those two meetings, did the subject of sexual abuse come up?
A It did, though I didn't raise it.
Q Okay. And stop there for a second.
Can you explain -- the fact that you didn't raise it, was it because it's not something that had occurred to you, or was there something else about the topic?
A It's a very sensitive topic that I generally don't raise the first time I sit down with a client.
Q In other words, you don't sit down with someone, say, Hi, I'm Tena Francis, have you ever been sexually abused?

A Right.

Q For obvious reasons.

And was the topic of sexual abuse -- and I believe what Mr. Nelson may have disclosed to you, you tell me, did he discuss an incident with maybe a teenage babysitter who had involved him in some sexual activity when he was maybe ten years old?

A Yes.

Q Did you ever revisit the topic of sexual abuse with Mr. Nelson?

A I did not.

Q Did you ever see Mr. Nelson again after that trip in February of 2001?

A I did not.

Q Did any member of your organization ever see Mr. Nelson again after that visit in February of 2001?

A No.

Q Is that a practice that you follow in every case, not seeing the client?

A No.

Q What is your practice in every case?

A To see the client as often as possible.

Q And you were located in Dallas. Mr. Nelson was located in Leavenworth, Kansas, Kansas City area.

Was the fact that you were in Dallas and he was, you

know, a state or two away a major impediment to seeing him if you had wanted to or been able to?

A No. Distance wasn't the issue.

Q Do you have other cases where, oh, you're based in Texas, your client's in different states, different locations in the United States?

A Yes.

Q Under those circumstances, do you often apply for funding to visit the client or the attorneys apply for funding to visit the client?

A Yes.

Q And ideally how often would you like to visit a client? I know every client is different, but all things being equal, how much contact would you like to have with a client?

A Face-to-face contact at least twice a month.

Q And you do that in other cases?

A Yes.

Q Do you do that in other cases where the client may be located in a distant state from Texas?

A I have, yes.

Q After February of 2001, did you ever make another trip to Kansas City?

A I did not personally.

Q At that point did you essentially turn the investigation over to an associate by the name of Deborah Haddad?

A Yes.
Q Why did you turn over the investigation?
A That was the plan from the beginning. Deborah had an MSW and had worked with kids before. Mr. Nelson, being as young as he was, I thought she was right for it.
Q And did you discuss that plan with Mr. Berrigan and Ms. Hunt?
A Yes. But Deborah was never present for the meeting I had with them.
Q Did they ever meet Deborah Haddad before she came to Kansas City and began working on the case?
A No.
Q But your recollection is you informed both Mr. Berrigan and Ms. Hunt that you would be -- Deborah Haddad would be the principal investigator on the case?
A I believe so, yes.
Q Were you engaged in other cases in other activity throughout this period of time?
A Yes.
Q Now, we've heard some testimony, and I'm not going to dwell on it, in the case that a dispute arose between one of the attorneys, Susan Hunt, and Deborah Haddad over a visit she had made to Kansas City to interview witnesses. You know what I'm talking about?
A Yes.

Q All right. And long story short, Ms. Hunt basically was upset that Ms. Haddad had come to Kansas City, her travel had been funded, and she'd spent a weekend with her parents in St. Louis instead of working on the case. That was the controversy, correct?
A It wasn't her parents. I think it was an uncle.
Q Okay. Relatives?
A And she went to St. Louis not just to see them. She had some records collection to do in St. Louis for the case, but, yes, Susan --
Q In any event whoever is right, whoever is wrong, a dispute arose and Ms. Hunt was quite angry about what had taken place, rightfully or wrongfully, quite angry about what had taken place?
A Yes.
Q And thereafter did Ms. Haddad basically say I will not work on this case any longer?
A Yes.
Q And so she was removed from the case at that point?
A She did some work in Texas after that on the case, but she was not involved with Susan Hunt after that. And there was -- it was more than the travel. There was a controversy involving Mr. Nelson's mom. Susan had accused her of just being really unprofessional.
Q There was a dispute also between Ms. Haddad and Ms. Hunt

that Ms. Hunt seemed to be acting as a gatekeeper to Nancy Nelson, would not let Ms. Haddad have access to her. Is that a fair summary of that disagreement?

A Yes, yes.

Q Hardly matters whose record is wrong in this situation. The reality is there was a disagreement. As a result of that disagreement, Ms. Haddad said basically I won't deal with Susan any longer, I need to be removed from this case; is that correct?

A Yes.

Q At that point who was working on the case?

A No one.

Q And could you then have stepped back into the case as the principal in the mitigation investigation firm and the firm responsible for the mitigation investigation, you yourself?

A Not with the caseload I had and the deadlines I had.

Q Tell us a little more about that if you don't mind.

A About the cases?

Q About the caseload you had and what other -- I don't need you to describe the cases. Maybe I can make it easier this way.

Were you burdened with a lot of other capital cases in a lot of other jurisdictions during this period?

A Yes.

Q Were you working on a federal murder case where the death penalty had been withdrawn but still going to trial in Kentucky?
A Yes.
Q And were you working on that case throughout the spring and summer of 2001?
A Yes.
Q Working on other cases that summer?
A Yes.
Q So is it a fair summary that you simply didn't have the time to work on the case during that period of time?
A Not if it -- no. That's correct.
Q And the next item I want to show you is P9 at page 108.
If we look at just the top half of that --
A Uh-huh.
Q -- letter, top half. Okay.
You see this letter dated May 21, 2001, and if we go down a little further and highlight the body of the letter, is this the letter where you enclosed a binder to Ms. Hunt and Mr. Berrigan containing the materials that are in the folder that's sitting in front of you, P9A?
MR. RUHNKE: I believe it's in evidence without objection.
A Yes.
Q (BY MR. RUHNKE) Those are the materials you transmitted

to them on May 21, 2001?

A Yes.

Q And had you been working on the case since your meeting with Mr. Berrigan in February in the sense of you, yourself, doing any work on the case or investigation?

A No.

Q The next item I want to show you is P9 at page 114.

MR. RUHNKE: If you just highlight the top with the date on it, et cetera.

Q (BY MR. RUHNKE) Do you recall having a phone conference with members of the Nelson defense team on June 13 or about June 13, 2001?

A It was scheduled for Susan Hunt, Pat Berrigan, and I, but I think that Susan Hunt was not present for it.

Q And so what's represented in P9 at 114 are your notes, your handwriting reflecting things that were discussed during that call; is that correct?

A Yes.

MR. RUHNKE: Just highlight what the first item was.

Q (BY MR. RUHNKE) Mr. Berrigan, it appears, was going to ask for more money. You were -- your budget had basically been expended by that point; is that correct?

A Yes, I believe so.

Q You had a discussion about neuropsych testing and that Mr. Berrigan was going to explore the issue of hiring a

neurologist instead of a neuropsych, and that was a topic that you discussed, correct?

A Yes.

Q Did you ever advise Mr. Berrigan that he should not hire a neuropsych or he should not hire someone to investigate Mr. Nelson's brain impairments, brain damage, neurological impairments, issues like that?

A No.

Q Did you think it was important that such an expert look at Mr. Nelson's history?

A Absolutely.

MR. RUHNKE: Can we take that down. Can we bring up P10 at page 1 and highlight the first third of that page if you can.

Q (BY MR. RUHNKE) All right. We certainly see that at this point your organization is going by the name of Capital Punishment Investigation & Educational Services. It's sort of morphed into that name, correct?

A Yes.

Q And this reflects a conversation you had with Mr. Berrigan on June 28 and that you're sending him an affidavit that he had requested and, you know, just nice talking to him, et cetera, it was helpful.

And in the body of this letter do you raise a dispute and the issue that you're having with Susan Hunt?

A Yes.
Q And ask Mr. Berrigan to intervene or for advice or explain what's going on or just unburden yourself saying I can't deal with Susan and she doubts everything I say. I'm not going to quote the whole letter. The letter is in evidence.
But you're bringing it to Mr. Berrigan's attention the ongoing dispute you're having, the issue over Deborah's visit so that Mr. Berrigan is aware of it, correct?
A Right.
Q Did you ever have a conversation with him about that later on that you recall?
A Oh, boy. I'm honestly not sure. I have notations of a couple of phone calls with him, but I'm not sure that he was very responsive to the whole thing.
Q Not very responsive?
A Huh-uh. Correct.
Q Just pulling back a bit, from the period of February 2001, when you first met Mr. Berrigan and the second time you had met Ms. Hunt through -- really through the end of August of 2001, how much contact did you have with Mr. Berrigan?
A I think I had three phone calls with him.
Q And how much contact did you have with Ms. Hunt?
A Significantly more at least in the beginning but about ten calls, and about half of those were related to an invoice.

Q You had about maybe ten phone calls with her?
A Maybe, yeah.
Q And half of those calls were about a CJA voucher perhaps that you had filed?
A Yes.
Q Okay.
MR. RUHNKE: And I want to bring up P10 at page 4. Go to page 4 of P10.
Q (BY MR. RUHNKE) Is this the affidavit that was --
MR. RUHNKE: Bring up the first part so we can get a better look at it.
Q (BY MR. RUHNKE) Is this the affidavit you referred to enclosed in the letter to Mr. Berrigan? Actually you couldn't tell by what we're looking at.
MR. RUHNKE: Let's go to the last page of that. Just bring up the end of it.
Q (BY MR. RUHNKE) Okay. Do you see your signature and the date of June 30, 2001? Is that the affidavit that you filed?
A Yes.
Q Okay. And I'm not going to belabor the point, but in paragraph 7 of that affidavit, if we go back up to that paragraph 7 and highlight that, in the affidavit did you mention that a good deal of documents that document Keith's life had been collected but many important documents had not yet been collected? You're telling Mr. Berrigan indirectly,

and he's theoretically going to file this with the court, but this is the status of the investigation at that point, correct?

A Yes.

Q So all available records that document Keith's life -- were there other records involving other family members that still had not been collected?

A All of the records involving other family members had yet to be collected.

Q And do you know if they ultimately ever were collected?

A I don't know. I know that we didn't collect many more records.

Q Okay. After this point you didn't collect many more records; is that correct?

A Correct.

MR. RUHNKE: If we could go quickly to paragraph 8 of the affidavit.

Q (BY MR. RUHNKE) Does that reflect a listing of witnesses who ought to be interviewed and have not yet been interviewed?

A Yes.

Q Going to paragraph 10 of the affidavit, this is the last one I'm going to show to her, you're telling Mr. Berrigan and inferentially the court, who is going to be reading the affidavit, that the social history is not complete, and in the final two sentences of that page, you discuss the significant

amount of mental illness on both sides of Keith's family and that there is reason to suspect Keith might suffer neurological impairment caused by hereditary factors, prenatal damage, birthing problems, head injuries suffered as -- I think we'll go to the next page.

MR. RUHNKE: Blow up the remainder of that.

Q (BY MR. RUHNKE) Head injuries suffered as a child, possible exposure to neurotoxins. Whatever the source is, you are advising Mr. Berrigan at that point that, look, we need to look into this issue of neurological impairments?

A Yes.

MR. RUHNKE: All right. We can take that down.

Q (BY MR. RUHNKE) Throughout the summer of 2001, this affidavit is filed approximately the end of June 2001, did you personally have much contact with Mr. Berrigan or Ms. Hunt during the course of that summer?

A No.

Q Are you aware if anybody in your office had any significant contact with them during the course of the summer?

A I don't believe anyone had any contact with them during the course of the summer.

Q And do you recall that at that point the case was scheduled for trial in October of 2001?

A Yes.

Q You only saw Mr. Nelson on that one occasion, and

obviously that's not your practice. Am I correct that that's not considered good practice for a mitigation investigation, to see the client once?

A You're correct.

Q Okay. Were you being pressed by the attorneys or contacted by the attorneys to say we'd like you to start seeing Keith more often, please start coming to Kansas City on a regular basis, any contact or any urging on the part of the attorneys to have you see Mr. Nelson more frequently?

A No.

Q On the other side of the coin, were you reaching out to Mr. Berrigan and Ms. Hunt saying, look, I've seen this client only one time, we need to see him on a regular basis, he is a primary source of information in our investigation, and simply we need to start seeing him on a regular basis? Were you reaching out the other direction?

A No.

Q And may I ask why not? I mean you're responsible for this mitigation investigation, your firm. It's standard, absolute mandatory practice to spend significant time with the client. It is not happening.

The attorneys are -- and the attorneys I want to emphasize are the ones ultimately responsible for this, but I'm curious as to why you are, yourself, not contacting the attorney saying I need to do my job, I can't do it if I can't

see my client, if we can't see the client?

A I dropped the ball. I mean I was traveling a lot on other cases, but I didn't -- I didn't get back with him.

Q So you really just saw him that one time?

A Right. During that one trip.

Q And in that -- I won't go back to it, but in that affidavit you filed at the end of June, is one of the things that you urged the attorneys to do was we start -- we need to have more contact with Mr. Nelson?

A I believe so, yes.

Q Okay. The affidavit speaks for itself. I'll represent that there is a paragraph in there that talks about we need to have more frequent contact with Mr. Nelson. It just never happened; is that correct?

A That's correct.

Q The next event that occurred in the case is in late August, early September another person in your office, Lisa Murphy, did some interviews and facilitated some interviews in White Settlement, Texas, where Mr. Berrigan and Ms. Hunt traveled to White Settlement on two separate occasions in September to interview witnesses. I'm leading through this because this has been all over the record already.

Do you recall that happening?

A Yes, after I looked at my file.

Q And who was Lisa White?

A Lisa Murphy?
Q I'm sorry, Lisa Murphy.
A She was an investigator in my office. She had been there several years by that time.
Q Her qualifications?
A Experience.
Q Did she have a --
A She didn't have a degree in law enforcement. She had a degree in --
Q No training in social work?
A No, no. Other than attending a few seminars.
Q Would you call her a mitigation specialist?
A No.
Q Mitigation investigator or simply an investigator?
A An investigator.
Q And so she facilitated -- did some interviews and facilitated and I think went around with Mr. Berrigan and Ms. Hunt when they interviewed witnesses in White Settlement; is that correct?
A Yes.
Q Now, in the fall of 2001, what was the status of your personal caseload?
A I had a trial scheduled for early September in western Kentucky, a federal trial. I had a trial that was scheduled in Las Vegas for sometime in October. It pled out but we were

still working it as if it was going to trial. I had a postconviction writ due on a case from Houston that was due around the same time.

Q Okay.

A I was traveling nonstop.

Q Now, my generation remembers where we were when John Kennedy was assassinated, but we all remember where we were on September 11th, 2001. Do you recall where you were on September 11, 2001?

A I was in Alabama.

Q And what was -- what were you doing in Alabama?

A I was still working on the case that was scheduled for trial in early September in Kentucky.

Q And did the events of September 11 and the shutdown of air travel all over the United States have an impact on what you were doing at that time?

A Absolutely.

Q Why is that?

A We had out-of-state witnesses that no longer could fly to the trial. I think in a four-day time I drove from Alabama to Tennessee. Then I was in Kentucky and then I was in Texas.

Q And ultimately the flying ban was lifted and things never got back to normal but things got back to business as best we could?

A Right, yes.

Q And did your trial in Texas end at some point in September, early October?
A In Kentucky?
Q Yes.
A Yes, yes.
Q Were you available to assist at the penalty phase of Mr. Nelson's trial had you been asked to do so?
A Yes.
Q Did anybody ask you to do so?
A No.
Q Did you volunteer to Mr. Berrigan and Ms. Hunt saying, look, the penalty phase is coming up, I'm available to assist you with the witnesses and anything else you need at trial?
A I don't remember having any contact with them around that time.
Q Once Ms. Haddad essentially stopped working on the case, looking back on it, what should you have done?
A I should have informed the attorneys that I needed to be removed from the case and they needed to hire someone else to do it.
Q And that -- you never did that?
A I did not do that.

MR. RUHNKE: Thank you. I have nothing further on direct.

Thank you.

CROSS-EXAMINATION BY MR. KETCHMARK:

Q Let me get this right, Ms. Francis.

You in hindsight should have informed the attorneys that your firm should have been removed from the case and you didn't do that, that's your testimony?

A Absolutely.

Q So using a phrase that you used earlier, would you agree with me that you dropped the ball on that one as well?

A Yes.

Q And in fact you not only dropped the ball but you went one step in the opposite direction and you file an affidavit that's a notarized sworn-to statement, sworn to you on June 30th of 2001, that you send to Mr. Berrigan with a letter saying that the disagreement between Ms. Hunt and Ms. Haddad was a misunderstanding, correct?

A That's one way of putting it, yes.

Q And that Deborah was actually working and that Susan just didn't understand that that work was being accomplished, correct?

A Yes.

Q And in fact you go so far in this affidavit in parts that Mr. Ruhnke doesn't talk to you about to say during the last six months as of May 18th of 2001, I and my associates have devoted a total of 267 hours to the investigation of Keith Nelson's pretrial defense, correct?

A Yes.

Q This includes 11 hours spent identifying and collecting life history records, correct?

A I don't have it in front of me but that sounds right.

Q Would you dispute that that's what you put in your sworn affidavit at the time?

A No.

Q 117 hours identifying, locating, and interviewing witnesses. No dispute there, correct?

A Uh-huh, yes.

Q 105 hours reviewing life history records and report writing?

A Yes.

Q And 34 hours of travel time?

A If that's what it says, yes.

Q But your testimony on direct examination is nobody was working on this, correct? I mean you said that as much. You said you at least weren't working on it from the time you got with Mr. Berrigan, correct?

A For those summer months after that affidavit was filed, that's correct.

Q My recollection, ma'am, and maybe I'm wrong, is that from the time you met with Mr. Berrigan you said in February of 2001, up here in Kansas City, that you, yourself, were not working on this and that work was being done by other people

in your office?

A That's correct.

Q So when you pled in the affidavit that you and others in your office are working, that's really not accurate. Your testimony today is that you weren't working on it; it was other people in your office, correct?

A Can I have the letter back in front of me so I understand what we're talking about?

Q You may.

MR. KETCHMARK: Can you pull it up, or do you want me to give her a copy?

THE WITNESS: I believe what it says is that we put in those hours.

MR. RUHNKE: We'll pull it up in a second.

MR. KETCHMARK: Paragraph 5, please.

Q (BY MR. KETCHMARK) I want to direct your attention to her affidavit, paragraph 5, please. Bottom of that right there.

And the language there, ma'am, says, "I and my associates have devoted a total of 267 hours." You see where I'm referring to?

A Yes. That's not what you said a minute ago, but, yes, we had devoted up to that time. And my involvement had been mostly up to that point in Kansas City when I made the trip.

Q So --

A And after that my involvement was more, you know, supervising Deborah as needed and that was it.

Q So your involvement was supervising and submitting bills. Is that what your testimony is?

A Sure. My bookkeeper did the billing but --

Q But you sent up the CJA vouchers. You signed off and certified that the work that was in the vouchers was being done and that you guys should be paid for it, correct?

A Correct.

Q You also indicated that once your trial was done, you were available to do work in the penalty phase but they didn't ask and you forgot to tell them?

A I forgot to tell them what?

Q You didn't get on the phone and say, hey, I'm available, I know this Nelson case is going to trial, my schedule allows me to?

A Actually I didn't know it was going to trial. The purpose of this affidavit was to request additional funding and get a continuance.

Q I'm not talking about this affidavit. What I'm talking about is when your trial that was in Kentucky wrapped up and was done in September of 2001, that's the timeframe. Do you understand that?

A Yes.

Q When that was done, Mr. Ruhnke asked you whether you

picked up the phone and let them know that you were available to participate in the Nelson penalty phase and your answer was no?

A That's correct.

Q And your answer was that you had no contact with Mr. Berrigan or anybody else from the defense team, correct?

A That's correct. That's my recollection.

Q And so my point in asking you that is, is that another example of you dropping the ball, so to speak?

A Yes.

Q You also indicated that your status in the fall of 2001, is you were traveling because your caseload -- traveling to Kentucky, traveling to Las Vegas, doing a postconviction habeas writ, all of that work, you were very busy, correct?

A Yes.

Q And you were very busy in every place except for Kansas City, fair statement?

A I wasn't in Kansas City, that's correct.

Q You were busy on all other matters but Mr. Nelson's case is what your testimony is?

A Not all other matters, but, yes, I was very busy, and I was not working on Mr. Nelson's case.

Q You only saw Mr. Nelson on one occasion -- well, on one trip, correct, two occasions?

A Correct.

Q Do you need some water?
A No. It's sinuses.
Q Okay. And that's not your normal practice is what your testimony is?
A Correct.
Q In fact, your testimony is that you should see the client on multiple occasions, I think, a couple times a month to establish the rapport and get the information that you need to develop the social history and life history, correct?
A Well put, yes.
Q But you never asked Mr. Berrigan or anybody from the defense team to do that, correct?
A Correct.
Q Dropped the ball on that one as well?
A I think that was the original statement where I said I dropped the ball.
Q I believe that's correct per my notes.
You also talk in your affidavit about significant mental health -- or when you talked to Mr. Ruhnke, about significant mental health and mental health issues and that was also a theme of your conference call with Mr. Berrigan that happened on June 13th of 2001. Would you agree with that?
A I'm not sure if I'd call it a theme, but I'm sure we discussed it, yes.

Q Well, do you remember the discussion about a neuropsych and that they needed to pursue that?
A That was my suggestion, yes.
Q And do you recall in that conversation or at least the notes reflect that you had indicated that Mr. Berrigan had some hesitation or you described it as fear of neuropsych because he didn't want the defendant exposed to government experts? Do you remember that as being reflected in your notes as part of that conversation?
A Yes. I remember it -- seeing it in my notes, but, yes.
Q Are you aware of the litigation that was going on between Mr. Berrigan and the government surrounding the mental health issues throughout the theme of -- throughout the duration of his involvement in this case?
A You mean with regard to if he -- if the client is evaluated by a defense expert, the government has the obligation or had the authority to do an evaluation as well?
Q Yes. And what the scope of the evaluation would be, how the doctors would be selected, all of those factors. Are you aware of all that ongoing litigation that was happening during this timeframe?
A I'm not aware of the details, but that was the same issue that was litigated in every federal capital trial I was involved with.
Q Along that line, the mental health issues in here

weren't hidden underneath the rocks, they weren't in the dark corners that you had to pull out through discussions with the client and family members, these were big red flags that were present. Is that a fair statement?

A There were red flags that mental illness was an issue, but it's not like you just take one line from somebody and that's your case. So, no, I disagree.

Q I understand. There were multiple people and multiple records that suggested that mental illness was something that was a history of both the Nelson and the Morse family and it needed to be explored, correct?

A Yes.

Q So this isn't a situation where you're having an interview with somebody that you've interviewed on five occasions and it finally comes out that there's mental health issues? This wasn't something that was secreted in the records as a little footnote. There was ample evidence of mental health issues, correct?

A Correct.

Q You indicated in your affidavit that was filed on June 28th of 2001, that that was for, I think, two purposes. You said it was to get a continuance. And what was the other purpose?

A More funding.

Q More money?

A More funding, yes.
Q Because you, as you stated in your affidavit, your office had done 267 hours up to that point and had exhausted what the court had authorized, fair statement?
A I'm not sure if we had exhausted it or not, but, yes, the number is what was in the affidavit, yes.
Q Well, when you were initially being retained and you filed an affidavit for -- yeah, it was an affidavit in connection -- do you remember having contact with Ms. Hunt and Mr. Shull down in Texas --
A Yes.
Q -- back in the fall of 2000?
A Yes.
Q And you recall giving them an affidavit at that point basically setting out who you are, what you do, and your experience to that point, correct?
A Yes.
Q And would you agree with me in that affidavit that you set forth, you indicated that at that point since 1987, you had had more -- investigative services had provided more than 100 capital murder cases in both the pretrial and the postconviction stages of prosecution? So substantial experience?
A Correct.
Q And you also set forth what needs to be done in order to

effectively investigate the mitigation, social history, life history, mental health of a client, correct?

A In general, yes.

Q And you also indicated that it was your professional opinion that adequate investigation of a capital case requires between 200 to 400 hours of work or approximately 5 to 10 weeks of uninterrupted investigation?

A That's correct.

Q You still stand by that in terms of the standard or the norm?

A I'm not sure. As a federal investigator, I haven't had to even consider those things.

Q Well, let me ask you --

A I put significantly more time than that into my cases as a federal investigator.

Q Let me ask you this: When you put that in the affidavit that was provided to Ms. Hunt and Mr. Shull back in 2000, you put that in there because at that time that was your belief, fair statement?

A Correct.

Q With respect to Ms. Haddad, I think you indicated that she did have a master's of social work and it was always your plan to have this turned over to her. Is that what your testimony was?

A Not the client interviews because I had started with the

client. I felt like I should be the one that continued those, but, yes, she would be interviewing a significant number of witnesses.

Q And it's your testimony that you recall having conversations both with Mr. Berrigan and Ms. Hunt and that they were okay with that?

A Yes. I can't imagine not telling them.

Q When you first met with Mr. Nelson at CCA in February of 2001, I think your testimony on direct, correct me if I am wrong or mischaracterize this, but that he unsolicitedly made the comment about a sexual assault or sexual activity involving a babysitter. Am I paraphrasing that correctly?

A Correct.

Q Fully unsolicited, this is just him vomiting out something to you in the course of a conversation?

A It was -- yes, it was an unsolicited subject, yes.

Q Was that unusual in your experience?

A Every client is different, okay. I've had clients who were molested as kids that didn't consider it molestation. It was just something that was normal in their house, and it was easier for them to talk about than others.

Q But by unsolicited, you weren't in any way prompting him, any way having any suggestion, this wasn't even a topic of conversation that you were having with him when this information was proffered?

A That's correct.
Q And I think it's your testimony that you never revisited this and you never followed up on it, correct?
A Because I never went back to see him, correct.
Q Did you tell Mr. Berrigan and Ms. Hunt about this when you -- after this information had come to light?
A I don't recall. I know I wrote a report. I believe I wrote a report, but I'm not sure if I told them personally.
Q If you wrote a report, it's going to be part of the record because all these exhibits have been admitted.
At any point did you do anything to follow up to say, hey, even though I'm not working on this case, this needs to be done?
A No.
Q At any point in time did you say, hey, Deborah and Lisa, I'm too busy in these other matters, you need to make certain that this is followed up?
A I'm sure Deborah was aware of it, but, no, she wasn't having contact with Keith.
Q It's your testimony that nobody was?
A Correct.
Q Another example of you, quote, unquote dropping the ball?
A Uh-huh.
Q Is that a yes?

A It's the same issue that I said I dropped the ball on to begin with, yes. I did not have any further contact with Mr. Nelson.
Q Okay. As a result of this affidavit that you provided Mr. Berrigan at the end of June 2001, more funding was in fact authorized for your firm. Is that a fair statement?
A I don't recall but I -- it had to have been for Lisa and Deborah to have been working on it.
Q Well, do you know how much time your firm, whether it's you and Lisa or Deborah, billed following --
A I don't.
Q Would you be shocked if I were to represent to you that the plaintiff's billing records, CJA billing records, for -- that were submitted under your signature, Plaintiff's Exhibits 33, 35, and 36, have a billing of 161.89 hours?
A That wouldn't surprise me, no.
Q And that's just from July 1st going forward?
A If that's what you say -- I haven't seen it. I don't know, but if you represent that, then yes.
Q And is 162 hours on top of 267 hours, is that insubstantial?
A It depends on how the hours are spent. For example, the --
Q My point, ma'am --
A -- efforts with Lisa Murphy, taking the lawyers to meet

witnesses she had already met with, I can't see that as being -- you know, advancing the investigation with those hours.

Q You had no problem submitting a bill and staying on the case and billing the government for another hundred and almost sixty-two hours of work being done by your firm. Is that a fair statement?

A That's a fair statement.

Q Is it a fair statement that your testimony today and your testimony in your deposition is we dropped the ball and we provided shoddy mitigation work under the circumstances that this defense team was comprised?

A True. That was also mentioned in the affidavit in terms of how much was left to be done on the case.

Q You're currently working for the Federal Public Defender System at the capital unit in Las Vegas, as you indicated, correct?

A Yes.

Q In fact, you come into courtrooms and you testify for postconviction counsel on these type of hearings and criticize mitigation work done by trial teams, fair statement?

A This is the second time I've testified in almost 30 years, so, no that's not a fair statement.

Q Well, regardless of testifying, you look at and do -- do you do mitigation investigation in postconviction cases?

A Yes, sometimes.
Q And is that purpose to be critical or to determine whether or not there was good mitigation work done by the underlying mitigation team?
A Correct.
Q And, ma'am, this might be an obvious question, but you're opposed to the death penalty, correct?
A Yes.
Q And you understand that the purpose of this hearing today is to make a determination by Judge Gaitan and the Eighth Circuit whether or not the representation that Mr. Nelson received was effective? You understand that's the purpose?
A Correct, yes.
Q And you also understand, ma'am, that if Judge Gaitan and/or the Eighth Circuit were to find that it was ineffective, that Mr. Nelson's death sentence would be vacated?
A Yes.
Q And that he would have it remanded for a new penalty phase to determine, starting over with somebody who didn't drop the ball, according to you, whether or not a death sentence should be imposed?
A Correct.
Q Reset the clock back to 2001 in essence?

A Correct.

MR. KETCHMARK: One moment, Your Honor.

That's it, Judge.

MR. RUHNKE: Some redirect, Your Honor.

THE COURT: Yeah. I hope you don't go back through what we've already gone through.

MR. RUHNKE: I would never do that. I will not do it right now.

REDIRECT EXAMINATION BY MR. RUHNKE:

Q The thrust of Mr. Ketchmark's last few questions and about your opposition to the death penalty and your understanding of the implications are that you're distorting the truth as a witness in order to assist Mr. Nelson.

Is that true?

A That seemed to be what he was saying but that's not true.

Q Is it easy for you to come to court and discuss what happened in the Keith Nelson case?

A No.

Q Mr. Ketchmark asked you about gathering records and records that had been gathered. I'll give you an example.

Were you aware that Keith Nelson's brother Paul was diagnosed schizophrenic, living on Social Security, SSA, Social Security Assistance, SSI, I'm sorry, and had been hospitalized on numerous occasions for schizophrenia?

A I don't remember knowing anything about hospitalizations. I don't recall that but I do recall that he had a diagnosis.
Q He had two brothers who were schizophrenic; is that correct?
A Yes.
Q One was in Texas for a certain time for murder. The brother Paul, did you ever gather the records of Paul's hospitalizations?
A No.
Q Mr. Nelson was born prematurely and his twin brother, Kenneth, and he were both born as fraternal twins.
Although the records, Mr. Nelson's -- Keith Nelson's birth were gathered, was there any efforts that you recall to gather the birth records of his brother Kenneth?
A There was not.
THE COURT: All right. We know about these things. We know she didn't gather substantial records. We don't need to go back through this again.
MR. RUHNKE: Okay. I was following up on the suggestion that records had been gathered.
Q (BY MR. RUHNKE) I want to put up on the screen what is tabbed 144 of Mr. Stetler's declaration.
Do you recall trying to get a hold of Mr. Nelson's school records from White Settlement?

A I know I did not do that personally.
Q But your office did?
A Yes, I believe so.
Q Were you aware that Mr. Nelson had been in special education?
A I don't recall that, no.
Q Do you -- and if you don't recall, the document will simply speak for itself, that when the school transmitted the records, they noted that he had special education records but they had to be requested separately, do you recall whether your office or you or anybody ever went after those special ed records?
A I don't recall. I'm sorry.
THE COURT: Again, Mr. Ruhnke, I think you've established this issue already.
MR. RUHNKE: Okay. Let me just take a quick look.
Q (BY MR. RUHNKE) You said in response to a question by Mr. Ketchmark that you weren't aware that the Nelson case was actually coming to trial at the time it went to trial; is that correct?
A That's correct.
Q Were you assuming that a continuance had been granted, or why weren't you aware that the case was actually coming to trial?
A I assumed that the attorney was seeking a continuance.

I didn't hear anything from either of the attorneys, and I guess I did make the assumption that it would be postponed.

MR. RUHNKE: I don't have anything further.

Thank you.

THE COURT: I've got a question.

Why would you make any assumption if you had pretty much said you were not involved in the case anymore?

THE WITNESS: If we had been given more time to work on the case, I would have been involved with it. It was an unfortunate situation that autumn that happens sometimes to expert witnesses or investigators. The cases that had been put off and put off and put off all end up having deadlines at the same time.

THE COURT: Yeah, but I think your testimony was that you were so busy doing other things, that you just dropped the ball, you were disconnected from the case?

THE WITNESS: I was.

THE COURT: Did I misunderstand you?

THE WITNESS: No. I was personally disconnected from the case after that affidavit was filed, yes.

THE COURT: You say you personally, you mean your firm?

THE WITNESS: I mean me personally. Deborah Haddad did a little more work in Texas. I'm not sure how much that summer.

THE COURT: Sorry, Mr. Ketchmark.

MR. KETCHMARK: No, Your Honor. I don't have any follow-up questions.

MR. RUHNKE: Thank you. Nothing further.

THE WITNESS: Should I leave this here?

THE COURT: Yes. Leave it there. They'll sort it out as they need it.

MR. RUHNKE: I'll grab the binder and take custody of the binder when we sign off on the exhibits.

MS. HARMS: Movant calls Dr. Carolyn Crawford.

CAROLYN S. CRAWFORD, MD, being duly sworn by the courtroom deputy, testified:

MR. RUHNKE: Your Honor, Dr. Crawford said she would like some water at the witness stand. I'll walk over and get some for her.

DIRECT EXAMINATION BY MS. HARMS:

Q Good morning.

A Good morning.

Q Could you introduce yourself to the court?

A Yes. Good morning. My name is Dr. Carolyn S. Crawford, MD.

Q And do you have a specialty, Doctor?

A Yes.

Q Could you explain what that is?

A I'm primarily -- I'm, first of all, a pediatrician, and

then subspecialized in an area called neonatal-perinatal medicine, which is care of the sick and premature infant and the study and understanding of problems during pregnancy, labor, and delivery that can impact on that patient.

Q And how long have you been a practicing physician?

A Okay. Graduated medical school in 1971, and passed the third part of the national boards in '72. So I was licensed to practice medicine then, but I was also in training to be a pediatrician and then subsequently neonatal-perinatal medicine. So I've been treating patients since, really since 1971, but in a teaching -- in a learning capacity as a student until 1975, when I finished my fellowship in neonatal-perinatal medicine the first year.

Q Could you tell us some about your education?

A Undergraduate was at Dickinson College in Carlisle, Pennsylvania, and got a graduate degree from St. Joseph's University in Philadelphia. Medical school was Jefferson Medical College in Philadelphia, graduated there in 1971. I took two years of pediatric residency at St. Christopher's Hospital for Children in Philadelphia, and then took an elective year in subspecialities, took two years of neonatal-perinatal medicine fellowship at the University of Pennsylvania, first year at Pennsylvania Hospital, and the second year at the Hospital of the University of Pennsylvania.

Subsequently I have 22 hours towards a Ph.D. in

fetal pharmacology, kind of a narrow area, and that's pretty much my educational profile.

Q And what is your current practice?

A I'm a staff neonatologist at Our Lady of Lords Medical Center in Camden, New Jersey.

Q Have you -- sorry, go ahead.

A Our Lady of Lords is a level three regional center for high-risk pregnancies and high-risk newborns.

MR. VALENTI: Your Honor, the government is willing to stipulate that Dr. Crawford is an expert in the field of medical -- a medical doctor in pediatrics, neonatology, and perinatology.

MS. HARMS: We offer her as an expert in neonatology and I'll move on.

Q (BY MS. HARMS) What were you asked to do in this case?

A I was asked to review the records, especially the records relating to the pregnancy that Nancy Nelson had with Keith and Kenneth and to relate -- review the records of Keith's newborn period, the neonatal period, both at Providence Hospital and at Children's Mercy Hospital.

Q And did you review any other records in this case?

A Yes. I reviewed a plethora of other records, reports, social reports of his social background, reports of neuropsychological evaluations of Keith Nelson, reviews of MRIs, PET scans.

Q And Dr. Gur's report also?
A Dr. Gur's report, yes, Dr. Gelbort's report. I reviewed records relating to his school performance and activities and then many records relating to his incarceration and testing and evaluations done at that time.
Q Before we go into specifics, could you just broadly summarize your findings in this case?
A My findings are that Keith Nelson was born prematurely, probably four to six weeks prematurely. He was the second born of twins. So he was premature. He was also low birth weight. He was born to a teenage mother who had just -- who became pregnant again within four to six weeks after delivering her first child. That's a high-risk situation for impaired maternal nutrition and impaired nutrition for the subsequent fetus, so it's also a twin pregnancy, which is more demanding in terms of the nutritional demands of two fetuses rather than one.

His mother was subjected to several episodes of physical abuse, including one two to three days before the twins were born prematurely in which the father of the babies stomped her on the abdomen. She had very limited, essentially no prenatal care, eventually acknowledged that she did not take vitamins and iron during pregnancy.

She had documented hypothyroidism, which is a condition that can impact and frequently does impact on not

just the mother but the developing fetus in terms of predisposing the fetus to premature birth, to impaired mental development, to low birth weight.

Q You said quite a bit there, so let's go over some of that.

A Okay. In addition, he was the second born of twins. The second born of twins is usually less -- let me see, what's the word I want to use? They don't adapt as well to extrauterine life because they're subjected to more hypoxia after the first one is born. And he was born by total breech extraction, meaning his buttocks delivered first, and then the last thing to develop was -- to deliver was his head.

Breech babies, especially premature breech babies, have as high as a 25-percent risk of developmental delay and mental retardation because of the breech presentation and are frequently delivered by cesarean section, not an option because his mother didn't get to the hospital until she was fully dilated and delivered very shortly thereafter. So there wasn't an option to optimally deliver the twins.

Q In terms of the twins, do you have any knowledge of the differences in treatment after their birth between Mr. Nelson and Kenneth?

A Yes. That was quite different. Kenneth, who was the first born, did quite well for a premature baby, went home much earlier than Keith. He did not develop complications.

He did not have to be transferred to the children's hospital whereas Keith immediately developed breathing problems, lack of oxygen, had blueness or cyanosis. He required oxygen, 100-percent oxygen to be given to him. He had borderline low sugars.

He had a positive urine test for E. coli, which was an infection, was also present in his throat, so he probably acquired that during the delivery process. He had to be transferred to the children's hospital. He had to be given breathing support with tubes in his nose, oxygen under pressure. So he had respiratory distress syndrome, which is common in premature babies, especially male infants whose lungs develop more slowly than girls. They're about two weeks behind in terms of the stage of development.

Q Was there also a notation of blood in his spinal fluid?

A Yes. He had -- at several weeks of age he became lethargic, poor feeding. He had what's called clinical sepsis. He had cultures or samples taken of his urine, his blood, and his spinal fluid, and when the spinal fluid was examined, there were over 2,000 red blood cells and no white blood cells. So this is typical of the spinal fluid in an infant who has had a small brain bleed, which is common in premature babies and more common in second born twins and even more common when they've had respiratory distress syndrome.

Q All of these complications at birth that you just talked

about, would they have implications for the central nervous system?

A Yes, they do. In terms of Keith, you know, when you compare him to his brother, his brother did not have the complications. He was the first born. I believe he was also somewhat bigger in size than Keith. So the implications they have is for an impact on certain areas of the brain.

The white matter -- the brain has basically gray matter and white matter. The white matter is especially sensitive to lack of oxygen, and one of the most sensitive areas in the brain is the hippocampus in terms of the impact of lack of oxygen, low oxygen can have on it. And borderline low sugar combined with low oxygen has a synergistic effect on the impact on brain tissue.

When the brain is compromised or threatened by inadequate oxygen, glucose, et cetera, there's a tendency to shift blood away from the anterior, the frontal part of the brain circulation to the posterior part of the brain's circulation. That would make your frontal part, your frontal lobes more vulnerable.

Low blood sugar in combination with low oxygen has an increased susceptibility in the occipital part of the brain. I believe his studies have shown subsequently that there's impaired function of the brain in the frontal area and in the occipital area.

Q I want to return now to your comment about the lack of prenatal care in this case.

MS. HARMS: If you could bring up Exhibit 44 at Bates No. 9018 for me.

Q (BY MS. HARMS) This is a record from Providence Hospital before Keith was transferred.

MS. HARMS: That's okay.

Q (BY MS. HARMS) Did you notice any prenatal visits at all?

A There was a visit to the hospital, I believe, around three to four months of the pregnancy because of bleeding, and there was suspected abruption, which is a pulling away of the placenta from its attachment to the uterus, and she had vaginal bleeding at that time. And I believe there was one notation in Dr. Pretz' records that she was seen at some point in the pregnancy, but it's not clear what she was seen for or any indications.

Q What are the implications of a possible premature separation of the placenta?

A Well, the role of the placenta is to deliver -- to bring oxygen from the mother's circulation through the placenta into the umbilical cord into the fetus. So the placenta acts actually as the fetus' lungs. The lungs in the fetus are filled with fluid and don't serve the usual function that our lungs as a newborns or adults.

So if the placenta separates, there's a decreased surface area, decreased area for oxygen to come into the placenta and for carbon dioxide, the waste gas, to be transferred out of the placenta.

Q You mentioned earlier that Ms. Nelson went into premature labor following a beating from the father. Have you done any -- looked at any studies about the effects on the fetus due to maternal stress from physical abuse?

A Yes. There is an increased risk of premature delivery. There's an increased risk of, well, premature labor, premature delivery.

Q Did Ms. Nelson -- was she aware that she was pregnant with twins?

A No. Wasn't known until the time of delivery. This was 1974, and the use of ultrasound and techniques like that were not as well utilized as they are today.

Q You mentioned earlier and I think the birth records show very marked peripheral cyanosis?

A Yes.

Q Could you explain again in more detail what cyanotic means and the significance of it?

A Cyanotic is blue. It's the presence of decreased oxygen in the blood, decreased blood flow. Especially in the periphery, that's something called acrocyanosis. It means that the arms and the legs are quite blue. He also developed

what's called central cyanosis, which is blueness throughout the body, which required oxygen up to 100 percent.

Q If Mr. Nelson had been born with RDS now, would he have been treated differently?

A Well, yes. He probably would have been given something called surfactant, which is a substance that's put into the lungs to help the lungs act as if they're more mature and to decrease the amount of oxygen that's needed to decrease the severity of the respiratory distress, and it overall improves outcome.

Q Were there any periods of apnea noted during the transport to Children's Mercy?

A Yes. He had several episodes, I believe, at least two during the transport. Apnea is a condition where you stop breathing. It can be a form of seizure or it can just be because the baby's premature. Apneic episodes are increased in premature babies.

Q Was the respiratory distress syndrome, do the records note the severity of it?

A The transport team that came from children's hospital assessed Keith to have severe respiratory distress syndrome.

Q Did you note anything in the records about social services?

A Yes. Social services were contacted and involved because the mother, I believe, only visited one time and was

unavailable -- was sort of unavailable, partially explained, perhaps, by a letter being sent to a wrong address. But in any case, there was some difficulty getting a hold of Nancy Nelson, even when Keith was ready to be discharged home. And he was supposed to be followed by protective services but that was pretty spotty.

Q If there had been neurological problems in Keith when he was ready to be discharged back in 1974, may they not have noted them in the records or not been aware?

A Certainly. The testing that we would have available to us today is vastly different than what was available in '74. In 1974 we were not doing head ultrasounds. Those came in around '79, '80. And same with CAT scans of the brain, maybe '76, '78, those were starting to be used, and MRIs weren't even available at that time.

Q So that executive dysfunction noted in the other reports, is that a known complication sometimes of premature birth?

A Yes. Of course, there's no way to test that in a newborn or even an infant. It's just those functions aren't developed. You can say, you know, if you see evidence of -- structural evidence of frontal lobe abnormalities, you can prospectively look for evidence of executive function or dysfunction, but there's no way to test a newborn for it.

Q Would it be somewhat misleading to say that Keith had

some problems when he was born but recovered well?

A Well, on surface, you know -- on the surface that may have appeared that he did recover. Our ability to identify the lingering effects of intra -- of prenatal and neonatal insults in 1974 was quite limited. So he may have the appearance of normal, but subsequently you can flesh out or define the abnormalities that at least in part have a relationship to the pregnancy, the labor, and the delivery in the newborn period.

So it's like the substrate, the vulnerable substrate upon which genetic factors of the high risk of -- or the high incidence of mental illness in the family, subsequent head injury, et cetera, so that the substrate is there. And then other factors can heap upon that to eventually have an individual that demonstrates executive dysfunction, frontal lobe syndrome.

Q Could you have offered this same testimony based upon your review of the records back in 2001?

A Not -- well, I could offer the -- some of the same testimony in terms of the risk factors, in terms of what happened to him as a newborn, what was going on as a fetus. I think subsequently there have been studies done that I think are very helpful to define his areas of brain injury and brain damage. I didn't have that information in 2001.

MS. HARMS: No further questions.

THE COURT: Before you begin, Mr. Valenti, let's take a short break, about ten minutes.

MR. VALENTI: I only have one question if we can get her out of here.

THE COURT: Okay.

CROSS-EXAMINATION BY MR. VALENTI:

Q Doctor, you indicated that Mr. Nelson was subject of a premature birth. As a twin, is that more likely to be the case in general? In other words, a twin birth is more likely to be premature than a single birth?

A In general that often happens, especially when there's lack of prenatal care and you don't know what's going on with the pregnancy. You don't know to tell the woman to, look, you're carrying twins, you know, you need to take some extra care, you're more at risk for delivering early, you know, get more rest, you know, more -- better nutrition. Of course, that was not known.

Q Nutrition and vitamin issues could also exacerbate that heightened risk or lack of --

A Well, the nutrition is a factor -- you know, vitamins -- this was a woman who had just delivered, who had just birthed a child, and within four to six weeks she's pregnant again and with twins. So her nutritional status was kind of compromised.

MR. VALENTI: Thank you. That's all I have, Your

Honor.

MS. HARMS: Nothing further, Your Honor.

THE COURT: All right. Thank you, Dr. Crawford.

Let's take a break.

(A recess was taken.)

MS. HARMS: Movant calls Dr. Leslie Lebowitz.

LESLIE LEBOWITZ, Ph.D., being duly sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MS. HARMS:

Q Good morning.

A Hi.

Q Could you introduce yourself to the court, please?

A My name is Leslie Lebowitz.

Q And what is your profession?

A I'm a clinical psychologist.

Q And how long have you been practicing?

A Since about 1990.

Q And within clinical psychology, do you have an area of specialty?

A I have some expertise in psychological trauma.

Q And what is your educational background?

A I have a BA from Oberlin College and a Ph.D. from Duke University.

Q And do you provide treatment to survivors of trauma?

A I do. I have a broad private practice, but within that

private practice, I also see a lot of trauma survivors.

Q Have you done any other work involving the treatment of trauma?

A Yeah. I teach. I co -- I wrote the psychological portion of the curriculum that the Air Force uses to treat their -- to teach the people who treat the victims of sexual assault within the military, and I do trainings two or three times a year for the military on that.

Q Do you also do any work with vets and PTSD?

A I do. I work for a couple of -- several years actually at the National Center for Posttraumatic Stress Disorders treating combat veterans, and more recently I've been involved in a collaboration to develop, and now we're in the clinical testing stage, a treatment protocol for traumatized, redeploying Iraqi and Afghani Marines.

Q And have you published in peer-reviewed journals on the topic of trauma?

A I have.

MR. VALENTI: Your Honor, the government is willing to stipulate to Dr. Lebowitz's credentials as a clinical psychologist.

MS. HARMS: I'll offer her then as an expert in psychology and psychological trauma.

THE COURT: Okay.

Q (BY MS. HARMS) What were you asked to do in this case?

A I was asked to review background material and to assess the severity of Keith Nelson's history of childhood maltreatment and to talk a little bit about some of the effects that that might have had.
Q Were you provided with documents to review regarding Keith Nelson?
A I was.
Q And what kind of documents were those?
A I reviewed a detailed social history and some of the supporting materials for that social history. I read expert reports from both the government and the defense and also looked at medical, educational, and some criminal records.
Q Are these the type of documents that are generally accepted as relevant and appropriate to look at in a clinical setting?
A They are. Well, yeah, they're a little bit unusual in a clinical setting, although they would still be helpful, but they are typical in a forensic setting.
Q Did you also review information related to Keith Nelson's parents, his brothers, and extended family?
A Yes, I did. There was a fair amount of information about that within the social history.
Q And is it important to review information about family members when looking at trauma?
A It is. It's important just when looking at people in

general to try to understand them within their social and familial context to the best of our ability.

Q Did you see any patterns among the Nelson and Morse family that are relevant to his trauma history?

A Very much so actually. His family tree is remarkable for the degree to which it is absolutely riddled with major psychopathology, substance abuse, and patterns of interpersonal violence and neglect. It's a very, very robust and pervasive pattern, and these patterns tell us a lot about the kind of resources and vulnerabilities and socialization experiences that individuals have. Very informative.

Q For the purposes of your testimony here, what do you mean by the term "childhood maltreatment"?

A Childhood maltreatment is a broad term that encompasses, you know, a wide array of experiences that are harmful to children. So it includes neglect, it includes trauma, and it also includes other kinds of adverse experiences such as corruption, isolation, which are relevant here as well.

Q And what do you mean by the term "trauma"?

A Trauma is a term we use to describe any experience that is so overwhelming, so emotionally overwhelming that it exceeds our ability to cope and because of that brings with it the risk of harm.

Q And the term "neglect" as it relates to trauma?

A Well, neglect is actually its own category that

describes some kind of deprivation. It could be medical, educational, emotional, or physical, and really neglect is used to describe the absence of certain kinds of resources or experiences that a child requires in order to develop normally or healthfully. And so while neglect can be traumatic and often is traumatic, it's not necessarily traumatic, and trauma can include and often does include elements of neglect but not always, which is why people sometimes just use the term trauma maltreatment -- I mean child maltreatment. But basically trauma refers to the presence of something that is really toxic, and neglect refers to the absence of something that is essential.

Q Is all childhood maltreatment by definition traumatic?

A No. Children can absolutely have experiences that are not traumatic at the time but which nonetheless are harmful. So, for example, if a child is taught to steal, as they were in this case, or if a child is exposed to certain kinds of really inappropriate sexual contact, it may be confusing, but it may not be traumatic at the time. Nonetheless, it may still be injurious to the child. It may still leave them more vulnerable to not making a good adjustment to society.

Q Without going into great detail, could you just give us an overview of what evidence of childhood maltreatment you found in the life of Mr. Nelson?

A Okay. Well, he was born, you know, vulnerable and born

to a mother who was already battered, damaged, and really utterly unprepared to parent. He was neglected -- severely neglected by her. He was not protected from abuse by her, and later on he was also beaten and emotionally abused by her.

At the same time, starting right at the beginning, he was living inside a family that was punctuated by extraordinary levels of violence, and this violence continued throughout his entire development extending to include other people and other kinds of abuse as well.

Q So I want to talk a little bit about how childhood maltreatment causes trauma.

How does that trauma harm the child?

A Trauma harms by so overwhelming -- so exceeding our capacity to cope that it has the possibility of really damaging the fundamental systems of the self.

Q Why aren't normal coping mechanisms sufficient to manage the traumatic experience?

A Because it's too much. It's literally too much of a load. If you think about it this way, if you think about a person kind of like a city where there are, you know, sewers and power grades and aqueducts and dams and all kinds of elaborate mechanisms to deal with things like weather changes or power surges, and those sort of mechanisms work very well. If there's a big storm, they might even work well. If there's the occasional tornado because while some parts of the system

may get damaged, the other parts can jump in to repair.

But if you think about what happens when a tsunami hits a city and suddenly the mechanisms for diverting water, for managing this kind of environmental stress are so completely overwhelmed that everything breaks down, and the possibility of for one system to then repair another system is damaged because all the systems are overwhelmed.

The problem with really severe trauma as compared to, you know, single acute trauma or normal stress is that it touches on these fundamental systems of self, and if the trauma is severe enough, chronic enough and overwhelming enough, it has the ability to really overwhelm them and knock them out of commission in a way that can cause enduring harm.

Q Could you explain what you mean by the term "maladaptive responses"?

A Sure. Maladaptive responses is a broad term that's used to describe some of the really harmful ways that people cope with the effect of trauma, and also it's a term that's used to describe just some of the way that the body and the mind and the psyche adapt. So, for example, substance abuse, disregulated behavior that can find expression in self-harm or violence, mood disorders, depression and anxiety, patterns of interpersonal dysfunction, these would all be considered to be maladaptive responses to traumatic stress.

Q Does trauma affect our ability to regulate our emotions?

A Yeah. Probably one of the fundamental ways that trauma negatively affects individuals is through its effect on the emotional system. You know, human beings are born with a capacity to have a wide range of emotions, and basically not only do we need all of our emotions, but we need them in the right amounts. We need them in a kind of regulated way.

And one of the things that happens when human beings are hit with the kind of tsunami emotion that is what characterizes trauma, is that those regulatory systems, the capacity to bring nuance and control, to channel, to divert, to modulate our feelings, it can be irreparably damaged by enough trauma. And so the person is left with a system that is not under control, that is not well regulated.

So rather than, you know, being able to feel normal frustration and kind of work with that, they may go from either none to 100 or rather than being able to have impulses and feelings come up but yet be able to divert them and channel them appropriately, they may be faced with a kind of all-or-nothing response where they either don't feel anything appropriate or they feel way too much and they can't manage it. And emotional disregulation is because it's such a fundamental capacity, it underlies a wide swathe of disorders.

Q How about the cognitive system, does trauma affect that at all?

THE COURT: Can we start focusing on Mr. Nelson and

not the general -- the report is in the record. Let's go with Mr. Nelson.

MS. HARMS: Sure.

Q (BY MS. HARMS) I think you talked a little bit earlier about the differences between chronic and acute trauma.

What kind of trauma did Mr. Nelson experience?

A Mr. Nelson experienced the most severe kind of trauma, which is chronic, severe developmental trauma. Perhaps it's worth noting that it is so different to have that kind of traumatic experience, that, you know, when people are talking about trauma, they are often talking about acute trauma or adult trauma, and it's qualitatively very, very different than what happens in the face of chronic developmental trauma.

Q You were talking some about the patterns and themes in the Nelson family that you saw.

A Uh-huh.

Q Were there any patterns involving sexual behavior that you saw?

A Yes, there was. There was a history of sexual violence that I think begins in the generation of the great grandparents and comes down all through the family tree, and, you know, the -- you know, one of the ways in which those patterns are relevant is that they create -- they create a kind of familial cultural norm so that things that should be seen as great problems are not necessarily seen as great

problems. They create a likelihood that people are being parented by people who have been harmed traumatically.

Q What did you learn about Keith's parents in terms of their background and its impact on him?

A Well, both his parents were extremely ill. His mother was, you know -- it sounds like his mother was raised in a home, while not quite as severe, that was similar in many, many ways to the home she subsequently created for her son. Her mother is described as being disengaged, unable to attach, depressed. Her father was very violent. She was frightened in school. It sounded like she was bullied and an insecure child, who dropped out of school very early to take care of her sick mother.

The home sounds like it was adversive enough that three of her sisters were married and I think out of the house at 15, which is -- or at least they were out of the house by 15. So she started out a pretty fragile, depleted person without, you know, adequate developmental experiences or adequate modeling, and then she met Keith Nelson's father early on.

And he also comes from a very violent, poor, disordered household and is described by almost everybody that I looked at in his family as being, you know, flamboyantly sick from very early on. He was always prone to violence. That could be directed at himself or other people. He ate

copious amounts of feces and sugar and is described as being bizarre and paranoid and delusional, and they got together when -- I think they were both teenagers actually and had their first child.

Q Can you tell me a little bit about the early environment in which Mr. Nelson was raised?

A Yeah. You know, he's raised by a mom who is being battered from the get-go so she's terrorized, she's overwhelmed. In her description she sounds dissociative, unable to attach or to nurture, and so there's not any of the positive critical nutrients of early development happening. At the same time he's being exposed to a chronic reign of terror. I mean, she's being beaten and battered. There are not a lot -- but the examples that do exist in the record of when that violence was directed towards the children are so -- they're remarkably --

THE COURT: Let me interrupt. We don't need to go through all these details. We have them in the record. We have the report in the record. Let's get to the consequences if she's going to testify to that.

MS. HARMS: Okay.

Q (BY MS. HARMS) How is Nancy's ability to care for her children impacted?

A Well, you'll have to tell me if I'm -- I don't think this is -- I mean --

THE COURT: I think she's already testified to that.

MS. HARMS: Okay.

THE WITNESS: I mean --

THE COURT: Wait. Let's wait for a question.

Q (BY MS. HARMS) What would be the impact of a young child like Mr. Nelson being exposed to this level of violence in the household?

A Okay. Well, there's two things he's being exposed to. One is neglect and the other is violence. So in terms of the violence, what is happening is that every single developing system in his self, his emotional system, his cognitive system, his biological system, his capacity to attach, all of those fundamental systems are under continuous and relentless assault from the violence. So if you just think about it for a moment from any one of the systems, you think about it biologically, for example, you know, this is happening during the period of life in which his brain is under the most rapid period of development in which we are growing more neuro connections than we're losing.

And the brain is shaped by the environment. The brain both reflects what's happening environmentally, and it creates neuro pathways that facilitate you doing more of what the environment is demanding of you.

So if what your brain is doing most of the time is -- what you're doing is cowering in terror and what your brain

is doing is responding to this onslaught of horrifying life experiences, then that's what your brain learns to do. And that's how -- that's what you bring to the enterprise of interpreting experience and responding to experience, and it also means that while you're doing that, you're not doing other things.

You know, you're not exploring, you're not developing a sense of safety, you're not learning how to regulate your impulses, you're not doing the things that down the road could give you experiences of mastery or positive social interactions or positive experiences with empathy or self-control or any of the things that are actually going to be necessary.

So the important thing to understand about, you know, a child in that kind of environment is that that environment is being woven into the fabric of the developing self, and there's a term called "developmental cascading," which means that it will cascade forward and construct his experience of the present even when those actual experiences are no longer going on.

Q Now, Keith's father was out of his life primarily by the time he reached four. Does this lessen the impact of the early instances of abuse?

A No. It doesn't make any difference. I mean it would have made a difference if at four his life changed radically

and there was a sudden, you know, environment of safety and nurturance, but, you know, if you -- if you light a fire with a match and you take the match away, the fire still burns unless something puts it out.

And not only did this fire keep burning but there was -- the fuel, you know, that was feeding it never stopped. You know, in fact his father didn't just vanish at four. He actually circled back and terrorized the family again, but even separate from that, there is a long string of extraordinarily abusive caretakers that then keep this terror going.

Q Can you comment on the significance of Mr. Nelson wetting his bed until the age of twenties -- in his twenties?

A Yeah. You know, without more information, it's hard to know exactly what that bedwetting was about, but, you know, wetting your bed into your twenties is unusual and certainly something that requires and kind of demands intervention, which didn't happen.

In the context of the life he was having, though, it was, I think, a pretty important risk factor in the sense that it made him a target. It made him both have to walk around the world smelling horribly and had to have contributed to him feeling like he was the person who smelled like this. But it also made him a social pariah and an outcast, so it contributed to depriving him of subsequent social experiences

that might have been reparative. And there's also evidence in the record that it made him a target for being singled out for extra abuse and beatings and condemnation.

Q Can you talk about mom's functioning once they finally moved to Texas and how it impacted the children?

A Her functioning, as best I can tell from the record, her functioning continued to deteriorate, that at some point in Texas she discovers that alcohol will soothe some of her own post-traumatic symptoms, and the description is that she is either drunk, you know, screaming and hitting them or just absent. So there was absolutely no care, affection, guidance, structure, nurturance, attunement, or protection.

Q Can you talk some more about the impact of the physical abuse that Keith suffered from the babysitters?

A Yeah. I mean, the -- part of what you have in this story is you have the constant compounding of abuse, so it just doesn't ever stop. And what that means is that, you know, as you're building your understanding of people in the world, you know, at every point in time where, you know, there might have been a significant opportunity to have a different experience, in fact the experience is the same.

So, you know, from a child's perspective, this is what the interpersonal world is made of. It's made of victims and perpetrators, and violence is an absolutely normal, everyday, acceptable tool and that you don't deserve to be

protected from it, and there is no way to escape it.

And, you know, one of the things that also happens is as a child is growing up in a world that's saturated with violence, not only do they not get used to it, but they become more sensitized to it. There's a kind of process that happens where you become less and less able to calm yourself, to restore any kind of equilibrium and more and more reactive to stress. So it's a kindling effect. One doesn't get used to it.

Q Your report also talks about corrupted influences in Keith's life. Can you explain that?

A Yeah. Corruption is what -- you know, is a term we use to describe, you know, influences that are harmful but may not be traumatic. So one of the more glaring ones within the record is I think his name was Fred Crabtree, who was one of the many caretakers he had, but who taught the children how to steal and encouraged them to do that. So that's an example of something, while it may not have been traumatic, was not positive or helpful and did not help them make a better adjustment to society.

Q Did Nancy ever attempt to get help in caring for the boys?

A Not in any significant or sustained way. There were a couple very weak efforts. I think about the closest she ever got to actually doing anything was giving them up altogether,

which she didn't do, but which they did find out about. So rather than it being helpful, in all likelihood it was just another frightening and rejecting event. She sounds too overwhelmed to follow through with any kind of resources.

Q At some point the boys went and stayed with George and Aunt Sally. Can you talk about how that experience impacted Keith or how it changed --

A You know, I can't really speak to it at that level of detail. It sounds -- well, there's a couple of things.

First of all, the home, while better than Nancy's, was far from ideal. The -- you know, the boys were whipped, and it sounds like, you know, by the time they got there, it was essentially too little, too late, certainly for Keith. He was already, I think, too damaged, and although it was better in that there was some structure, there was food, you know, there was an effort, I think for him, it was too little, too late.

Q I'd now like to talk a little bit about sexual abuse.

Can you speak generally about the issue of documentation of sexual abuse?

A Yeah. I mean, you know, of all the kinds of terrible things that happen to children, sexual abuse and particularly the sexual abuse of males, but sexual abuse in general is something that tends to happen more in private. And certainly when we're talking about the sexual abuse of males, is so

shameful that people are less likely to talk about it, and it tends to be something that happens in private. So you don't have witnesses easily available.

Q What did you learn in regard to Mr. Nelson and sexual abuse?

A Well, there's evidence in the record that like all these other traumas, sexual abuse was a repeated event that punctuated his life. He discloses pretty early on that he was raped as a child. He later retracts that, which is not unusual for survivors of sexual abuse to sort of say something happened and say it didn't happen and go back and forth. That's actually a pretty common pattern.

But he describes that. He -- there's at least -- there's an incident -- there's two incidents with female babysitters that are talked about. There is an incident that his brother talks about with a male caretaker, and then there's the likelihood that he was repeatedly raped in juvenile detention.

Q What would be the impact of sexual abuse upon a child?

A You know, on the one hand it's very similar to the way any trauma affects a child in the sense that it's overwhelming. It disregulates their emotional system. It alters the ways in which they think about themselves and other people, and it harms them at the biological level.

At another level, you know, any time you have things

that should be separated stuck together, you're talking about something that has its own kind of potential trajectory of harm, so when you are, for example, being abused by people who you should love and trust, you have a kind of conflation of attachment and terror. In sexual abuse you have something that, you know, should be a way that people are brought together and something that has some tenderness and some affection present except in this case you have it, you know, in ways that are confusing, inappropriate, or violent and terrifying. And so you have the putting together of things that should be separated, and because of that, it has the capacity to really disorder how we understand relationships, how we understand sexuality, and how we think about ourselves.

Q How does childhood maltreatment continue to impact someone like Mr. Nelson as an adult?

A Well, you know, there's a couple of ways. You know, insofar as the fundamental systems of the self are shaped by those experiences, that effect continues to drive and organize your relationship to the world. So, you know, the parts of, for example, the brain that are harmed by this kind of a relentless assault affect how we interpret the things that happen to us.

They affect our ability to inhibit our impulses. They affect our expectations of other people. They shape our beliefs about ourselves and how we will be treated by other

people, and all of those things organize our behavior in the world, which is why people who are chronically terrified have very different experiences interacting with the world than people who have developmental experiences that allow them to go forth into the world with some faith and positive expectations.

There's a kind of feedback loop that happens, and also, you know, one of the qualities of trauma is that unless something significant happens to remediate it or to help in some way, these memories are indelible. They don't fade with the passage of time. That's one of the differences between traumatic and normal memories, you know, and so, you know, at every level they continue to drive our experience of the present.

So while the actual traumatic experience may be physically or literally in the past, it is not psychologically or biologically in the past. It continues to be present and to shape our present experience of reality.

Q Is there any event in Mr. Nelson's life that you would single out as the most traumatic?

A No. The problem with Mr. Nelson's life is that it was a continuous, relentless barrage of trauma and neglect, and the ubiquity of what happened, the variety of what happened, the utter lack of rescue or protection and the amount of time, the slough of development over which these experiences happened

create a kind of toxic load that is qualitatively unlike other things. The problem here is really everything put together.

Q How would you compare the brothers in terms of the trauma and its impact on them?

A Well, you know, even children being raised in the same home are having different experiences within it. And some of that is a function of who the children are and the resources that they bring, and some of it's a function of, you know, birth order, and some of it's just about opportunity.

So, for example, if I was to think about Keith in relationship to his brother Kenny, they started the world -- even though they started the world in the same family, as best as can be told, they started the world in very different places.

Keith was fragile and cognitively impaired to begin with and a bed wetter, so he is going to both have a different experience of the kinds of traumas that are befalling him. He's going to be less able to cope with them, and he's also going to be more harmed by them.

It sounds like his twin brother, because he was more cognitively intact, had the opportunity to create some alternative kinds of experiences for himself. And then just thinking about the sibling group as a whole, there's a remarkable amount of pathology. I mean, you have two out of the five brothers are schizophrenic. Keith is -- there's some

argument about the diagnosis, but it seems like he's certainly ill.

So you have two people in jail for murder. You have three that are egregiously mentally ill. You're talking -- whatever the balance between genetic loading and environmental toxins, you're talking about something which was clearly very, very toxic.

Q Now, you did not diagnose Keith with PTSD, correct?

A That's right.

Q And you did not personally meet Mr. Nelson?

A That is also correct.

Q Can you talk about the relationship between PTSD and childhood trauma?

A Sure. PTSD is one of many possible sequelae that can, you know, emerge as a result of trauma. It tends to be a more useful diagnosis when talking about adult trauma and acute trauma. It is -- in general tends to be less useful when talking about this kind of broad developmental assault simply because so -- well, for a variety of reasons. One is which so many things, so many negative outcomes emerge from childhood trauma, and because childhood trauma affects these fundamental systems of the self, the reach is broad and diverse, and PTSD is simply one of many possible outcomes.

Q Is there anything else in Keith Nelson's behavior that suggests traumatic impact to you?

A Well, there's a lot. You know, he was hyperactive, impulsive, extraordinarily self-destructive. He is both victim of and the perpetrator of a crime. He -- there's descriptions in the record where he sounds dissociative. All of those are highly associated with childhood trauma, every single one of them.
Q Is there a history of self-harm?
A Yes, very severe one.
Q Suicidal behavior?
A That too, yes, all of which are common in the aftermath of severe trauma.
Q Do you have any criticisms of Dr. Martell's report?
A Well, you know, without knowing exactly what information Dr. Martell had access to, it's a little hard to criticize it from that perspective, but, you know, his -- Mr. Nelson's childhood is dispensed with and minimized so starkly as to constitute, I think, a real distortion. But whether that's a fault of information flow or, you know, that I don't know.
But it is -- you know, psychology is an interpretative science, and part of what allows us to make accurate interpretations is taking into account not only the individual but as much contextual information as possible. And a history such as this can't be sidelined. It's too significant as a determinant of behavior.
Q What about the DAPS test that he gave Keith to determine

PTSD?

A Yeah. DAPS is actually, for a paper-and-pencil measure, is a pretty good measure. In general one doesn't use a paper-and-pencil measure to determine either the presence or the absence of a diagnosis. If you're really trying to diagnose something, you typically want to try to do a structured clinical interview, and the paper-and-pencil measures are usually used as sort of guidance as to what to explore next.

But that's not the real issue. The real problem with the DAPS, which would also be the problem with the clinician-administered PTSD scale or really any PTSD scale, is that the way those scales work is you have to be able to talk about a particular event and the thoughts and feelings and physiological experiences you had connected to that event, and then you have to be able to trace it and talk about how it affected you going forward.

And it's a little bit like saying to somebody, you know, in a dark landscape, can you tell me what something looks at? Unless you have some light, you can't see the darkness. In a life history, which is all bleak and all horrific, there's no way to pop out particular experiences and anchor one's, you know, symptoms to them. And many of these experiences are what he's -- maybe they start when he's not even verbal, so --

THE COURT: What was the question?

MS. HARMS: It was about the DAPS test that Dr. Martell gave Mr. Nelson.

THE COURT: With all due respect, Dr. Lebowitz, you're going into such a narrative, it's kind of hard to keep up with these things. I think you got an answer. Let's get another question and move on.

MS. HARMS: Okay. I'm actually done, Your Honor.

THE COURT: Okay.

MR. VALENTI: No questions, Your Honor.

THE COURT: Thank you.

(Witness excused.)

MS. HARMS: Movant calls Dr. Ruben Gur.

RUBEN GUR, Ph.D., being duly sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MS. HARMS:

Q Good morning.

A Good morning.

Q Would you introduce yourself to the court, please?

A My name is Ruben Gur.

Q And what is your profession?

A I am a neuropsychologist. I teach at the University of Pennsylvania.

Q And do you have a specialty?

A Brain imaging and behavior.

Q And do you do clinical work?
A Yes.
Q And do you also do some research?
A Yes.
Q What kind of patients are you normally treating?
A The patients that I normally -- that I'm normally involved with are individuals that have complex behavior abnormalities that could reflect brain damage and there's need to decide whether the brain is damaged and how much brain damage affects the behavior.
Q Could you describe your education for me?
A I received my bachelor's degree in psychology and philosophy from the Hebrew University of Jerusalem in 1970, a master's degree in clinical psychology at Michigan State University in 1971, and a Ph.D. in clinical psychology from Michigan State University in 1973, and I did postdoctoral fellowships at Stanford University and at the University of Pennsylvania.
Q Have you received any honors in your profession?
A Yes.
Q Could you describe some of those?
A Well, I was elected to fellow status in the American Psychological Association, the Association of Psychological Science, the American College of Neuropsychopharmacology, and the American Board of Professional Psychology in the field of

clinical neuropsychology. I received awards from the National Alliance for the Mentally Ill, NAMI, and from the Brain & Behavior Research Society. Most recently the Lieber Prize for contribution to the neuroscience of behavior which I shared with my wife, Raquel.

Q And have you been published in peer-reviewed publications?

A Yes.

Q About how many would you estimate?

A I have over 400 publications in refereed journals.

Q And what percentage of this -- of these publications would you say dealt with brain imaging?

A Almost all of them. I would say about 80 percent.

Q Could you talk a little bit about some work that you're doing right now with NASA?

A Well, right now we have a couple of projects with NASA, mostly surrounding the planned mission to Mars that will require astronauts to stay out in space for a very lengthy period of time, and that never happened before. And there is concern about what will happen to the brain of the astronauts. So there's going to be a mission next April where they will send an astronaut for a whole year, an astronaut and a cosmonaut for a whole year, and we are involved in putting together the battery that will evaluate the brain before the travel and then after he returns.

In this case the astronaut has an identical twin, who will take all those measures without flying, and that gives us an amazing opportunity to really look very closely at all the changes that may occur during space flight that can happen to the genetic system, to the immune system, to the guts, bacteria, to -- importantly to brain function.

Q But basically they're using the methodology that you have developed?

A Yes.

Q And you've testified before as an expert in brain imaging?

A Yes.

Q And you've testified for both the prosecution and the defense?

A Yes.

MS. HARMS: I would like to offer Dr. Gur as an expert in neurobehavioral imaging and neuropsychology.

MR. VALENTI: I don't have an objection about the neuropsychology aspect of it. I do have some questions when I get to my cross-examination about the neurobehavioral imaging. I'm prepared to let them ask the questions. It would just be during cross.

THE COURT: I would say he met that qualification.

Q (BY MS. HARMS) I would like to bring up the PowerPoint that you prepared in this case, Exhibit 81. If you can press

play on the clicker there.

What were you asked to do in this case?

A I'm sorry?

Q What were you asked to do in this case?

A In this case I was asked to evaluate the neuropsychological testing and the brain imaging studies that included structural and functional imaging, and reach a conclusion about whether they indicate normal or abnormal brain.

Q And what would be a broad summary of your findings in regard to Mr. Nelson?

A I found evidence for brain damage.

Q So before we get into specifics, do you want to explain some basics about brain structure from the PowerPoint?

A Yes. I think it will be helpful if I could explain really the basic concepts that are needed to understand neuropsychological testing and the brain imaging methods.

Q So can we go to the first slide, I think, if you could maybe press play and then --

A So what I would like to briefly describe are some basic brain science principles, then the technologies that were used in the case of Keith Nelson, the behavioral imaging method, the magnetic resonance imaging, and the positron emission tomography, and I'll then summarize the findings.

Q So first we can talk about the general anatomy of the

brain as represented in this slide or the neuron, I guess.

A Yes. This is a cartoon of a cell of the brain. The brain cells are called neurons, and they are distinguishable from all other cells in the body by two features. The first is that they are surrounded by those protrusions that look like hair that surround the cell body. And these protrusions are called dendrites, and they swim in a sea of chemicals. And those chemicals get attached to the membrane or the skin of the cell.

When the electrical polarity outside the skin becomes different from that inside the cell, then there is a short. There's an electrical pulse and the electrical pulse travels along the skin of the cell and then shoots down the second unique feature of a brain cell. And that's a long fiber that comes out of the cell, and that fiber is called axon. That fiber can be anywhere from barely visible to several feet long.

So it's a long fiber, and the electrical pulse travels down that fiber until it reaches the axon terminals. When it reaches the axon terminals, it releases chemicals, and those chemicals will become attached to the next cell. If the next cell is another neuron, that will trigger another pulse, and this is how brain cells communicate with each other through electrical pulses that go from one neuron to the next. If on the other hand at the edge of those axon terminals there

is a muscle, the muscle will contract.

Now, you note that around -- surrounding the axon are those nodes that are painted in red here in this cartoon. In reality they are white because they are made of fat, and the role of these nodes that surrounds the fiber is to insulate the electrical signal so it doesn't dissipate.

The same way that the electrical company uses rubber around conductors and the rubber is thicker if you need to send electricity to a longer distance, the same way axons are -- the brain doesn't have rubber, it uses fat. And so those axons are surrounded by fat, and the longer the axons, the thicker the fat insulation. Notably we are born without almost any of that fat. This fat in the brain gets a more respectable name. It's called myelin, m-y-e-l-i-n. We are born without almost any myelin in the brain, and that's why if a baby is tickled in the right foot, they will move both arms. They can't direct the signal to where they want it to go. It dissipates in the whole brain.

During the first year of life, the areas that control movement become myelinated, and that's when the kid can get more directed movement. And during the second year, the areas that relate to speech become myelinated, and so on. And it's important that -- to note that not all areas get myelinated at the same time.

The areas related to movement and speech are among

the first to get myelinated, but the frontal lobe, the part of the brain that relates to executive control, for example, that doesn't get fully myelinated until early twenties. So the brain continues to develop until around age 22 or 23 through the process of myelination.

Q I think the next slide is the lobes of the cerebral hemisphere.

A Yes. This is a cartoon of the brain that shows how the brain looks like. On the left it shows how the brain would look like if you took a picture from the top, and on the right if you took a picture from the left side.

What is important to note here is that the brain is divided into lobes, and you can see the lobes from the top picture. The frontal lobe here in sort of violet color, the parietal lobe in blue, and the occipital lobe in red.

And from the side view, you can see how the brain sits on top of what is called a brain stem. That stem that you can see at the bottom comes from the spinal cord, and, as you know, evolution doesn't throw anything away. It takes the brain of a worm and puts on top of it the brain of a reptile, on top of that the brain of a mammal, on top of that the brain of a primate, and on top of that comes the human brain, but none of the older brains are thrown away. They are all still existing inside our brain and functioning pretty much the way they functioned in animals where we find it already.

So the brain stem that you can see here looks like the brain of a snake, and it can do everything a snake can do. It gets the information from the spinal cord, and that information includes whether we are warm or cold, whether we are hungry or thirsty, whether we have an urge to have sex. All those sensations come through the spinal cord to the brain stem, and from there they go inside the brain and the brain gets that information and processes it.

Now, from the side you can see the three lobes that I mentioned, the frontal, parietal, and occipital, and you also see the temporal lobe. And an important principle in brain function is that the information is processed in the back of the brain and acted upon in the front of the brain.

So what -- if we look at the world, the visual information first comes to the occipital lobe, to the back of the brain, and the job of the occipital lobe is, first of all, to flip the image because our eyes -- our eye lenses send the picture upside down. So it's the occipital lobe that flips them, and then it analyzes the visual information in very primitive, rudimentary fashion, so it can identify horizontal lines, vertical lines. It can identify light, darkness, movement, but in a very -- just the contours of what happens, and that information moves forward in two streams.

One is called the dorsal stream, and that's the stream that goes on the top of the brain, and one that's

called the orbital stream at the bottom of the brain. The top stream generally relates to what we think about, what we see, and the bottom stream relates to what we feel about it.

Q I think you mentioned earlier executive functioning, and I think that's important in this case. I think your next slide addresses that.

A Yeah, if I may just one more because I just mentioned the visual. The auditory information similarly comes to the back of the temporal lobe. The temporal lobe is right behind our ears, and again initially it is a very primitive processing. Is this a human voice or a voice of an engine? And then all that information from the visual, from the auditory, and from inside the body meets exactly where the frontal, temporal, and parietal areas meet, and there that's where it gets integrated. And everything gets forwarded to the front of the brain. And that's where the frontal lobe sits, and the frontal lobe, as I mentioned, is important for executive function. The frontal lobe decides what to do about all this information.

Q And you found frontal lobe damage in this case, correct?

A Yes.

Q And how does that affect behavior then?

A I have a list of symptoms.

I mean, there's -- this one picture in the middle, it shows another very important structure that I didn't

mention and that is very important in this case, if I may.

Q Sure.

A What you see here is the brain opened up and you look at it inside, and you can -- that way you can expose several important structures. One important structure is the amygdala. That is indicated with a red arrow. It has the shape of an almond, and hence its name, amygdala. Amygdala is almond in Greek.

And right next to it you see a structure that is literally wrapping the amygdala, and it looks a little like a seahorse, upside down seahorse. And so the Greeks called it hippocampus, h-i-p-p-o-c-a-m-p-u-s, and these are very primitive structures that are fully developed. And they look exactly like they look here in a crocodile.

And they ask very simple questions. The hippocampus asks the question have I experienced this before, is this -- or is this a new experience? But in order to answer that question, it has to have access to all your memories. And indeed the -- much about the role of the hippocampus was discovered from patients with epilepsy that had the seizure -- a lot of times the seizure focuses either in the hippocampus or in the amygdala or in those medial temporal structure.

So a famous patient by the name of -- by the initial of H. M. had both hippocampi removed, and what happened to him is that he remembered everything that happened to him until

that surgery and nothing that happened to him after that surgery. So even though his wife would visit him daily, after 20 years every time she would walk in, he was shocked at how old she got. He always remembered her the way she looked 20 years ago. So the hippocampus is essentially in order to learn new things, to find out what is new and what you already know.

The amygdala asks a different question but also seemingly simple. Am I in danger? Is this experience a threat? And if the amygdala perceives threat, it will send an alarm signal, and the alarm signal goes to the frontal lobe, and the frontal lobe decides what to do about it.

Now, importantly, the amygdala is very primitive. It does not speak. It does not understand language. It really grasps situations, and it has no feel of the context of the events. So if you are in a movie and you see a tiger jumping at you, the amygdala thinks it's a real tiger, and it will be scared and will issue an alarm, run away.

That goes to the frontal lobe and, most importantly, to the orbital frontal area that is tightly linked to the amygdala. And it's the orbital frontal lobe that will tell you, no, this is just a movie, it's not a real tiger, you paid for your seat, you are safe, no reason to do anything, calm down. So this is an important interplay between the amygdala, the emotional brain, and the orbital frontal part that is like

the brakes.

And, finally, an important structure that you see here in yellow is called the corpus callosum, and it's a body of fibers. There is no cells in the corpus callosum. These are only fibers that connect the two hemispheres to each other.

As you may note, as you notice, we don't have one brain. We have two brains. And the only thing that connects them are these fibers, and, of course, there are different functions to the two hemispheres of the brain. The left hemisphere is -- deals more with the world through words, through logical analysis, whereas the right hemisphere is more intuitive. It thinks in pictures and shapes, and when we speak, it's the left hemisphere that talks. It's the right hemisphere that puts the intonation on our speech.

So people who have a lesion, say, the front -- in the front of the left hemisphere, they will have what is called aphasia. They will speak very little. They will have limited vocabulary. They will lose the ability to speak grammatically.

People with the same lesions on the right side, they will speak fine, but they will speak in a flat tone. They will not be able to put the emotional emphasis and, therefore, they can be very often misunderstood. The first case that came to the attention of science was a teacher whose complaint

was that she lost control of her class, and it turned out that that was a stroke that she had in that area and caused her to speak in a monotone voice and she lost control.

So these are the main structures of the brain, and I think I explained the main principles of the brain, which is that the brain perceives in the back, acts in the front. It's more -- deals with information more intellectually at the top and more emotionally at the bottom and is more verbal, analytical on the left and more spatial, pictorialistic on the right side.

Q Just to clarify, you were talking about the hippocampus and the amygdala, and those are parts of the brain that you found to be damaged in Mr. Nelson, correct?

A Yes.

Q And now I'd like to move on to talk about executive functioning.

A Yes. So we discussed the role of the frontal lobe being responsible for executive function, and we know about the role of the frontal lobe both from cases of brain damage and from more recently, which is most of what I -- my work has been on, taking people and placing them in a scanner and finding out which parts of the brain become active when they're faced with different kinds of tasks.

So the frontal lobe is responsible for monitoring and directing behavior. It's the part of you that keeps tab

on what you are doing and what you are about to do, and in general the back of the frontal lobe deals with the here and now. And the further front you go, the more it deals with the more distant future.

So the same for planning. There is a -- there is a -- the back of the frontal lobe is called dorsal lateral prefrontal cortex, and that's the part that keeps tab on what you are doing -- what you just did, what you are doing now, and what you are going to do next. So it's literally the part that lights up remembering what was the last word I said and what is the word I'm saying now and what is the word I will be saying next. So that's the back of the brain.

As you move forward, it becomes more of a distance. What have I done last year, what am I about to do next year. Mental flexibility, you need the frontal lobe in order to gauge --

THE COURT: While this is very interesting, and I'm enjoying it, quite frankly, I'd like to get to Mr. Nelson.

MS. HARMS: Okay.

Q (BY MS. HARMS) I think the next slide discusses frontal lobe damage which you found in Mr. Nelson. Can you talk about what are the implications of frontal lobe damage?

A So the symptoms that you see with people who have frontal lobe damage, you see disinhibition. They want something, they'll take it. It's hard to stop them. They are

irritable. They can go into a rage attack for no reason. They're emotionally labile. They can go from one emotion to another fairly easily.

They are tactless. The role of the frontal lobe is put your behavior in context. That's one thing that frontal lobe patients have difficulty doing. If an off-color joke worked in the bar, they will use it in good company as well. They can't distinguish.

They are characterized by poor planning. They can plan but their plans are poor. They tend to be manic. Some of the symptoms resemble mania, and that's why psychiatrists sometimes have a hard time making the diagnosis because the brain doesn't behave by DSM criteria.

They tend to be risk taking. Even people who all their lives were living straight and narrow, they get Parkinson's disease, Parkinson's disease affects the frontal lobe, and you find those old people sneaking out of the house and traveling to the nearest casino and gambling the family fortune away. So they are engaged in risk taking. The executive part is -- can't control their impulses.

Perseveration. If they start doing something, they can't stop, so those patients, for example, if you come to a movement disorder clinic, they will stand in front of the elevator. The elevator door opens and they can't initiate a movement. So you have to push them a little bit and then they

will walk. But once they start walking, they can't stop. They will walk until they hit the wall of the elevator on the other side. So the frontal lobe is important to make a plan but also to change a plan if things don't work.

They tend to develop obsessive compulsive behaviors. Again, part of the symptom is that they can't stop doing something. If they start washing their hands, they can stand there for an hour just washing their hands.

They have some motor dysfunction, and they are very characterized by antisocial behavior. The famous case of Phineas Gage from Iowa, who was a railroad worker and was hit with a spoke, it went through his right eye and through his frontal lobe. He was miraculously saved but he became deteriorating. He was a good family man, and then he started getting involved in barroom brawls and ended up philandering, leaving his family, and ended up in skid row.

THE COURT: Ms. Harms, I'm going to ask you to take Mr. -- Dr. Gur and get him on point here.

MS. HARMS: Okay.

Q (BY MS. HARMS) How did you go about determining the neurobehavioral deficits in this case?

A So, I mean, there's one more concept that's important to know, and that's the concept of standard deviation, and that's the last one, I swear.

You need to know that because that's how we

determine what is abnormal. So if I take measures of anything, it turns out that most measures will distribute in the shape of this bell curve that you see here.

So, for example, if I measured the height of everybody in the courtroom, if I can calculate the average height, suppose it will be five-ten, I also want to be able to know how many people are at what range of heights, and it turns out that if I take every observation and subtract it from the average and take essentially the average of those differences, it turns out that about two-thirds of the people will be within that value.

So if I do that and find out that the average difference from the average height of people in this courtroom is 2 inches, then I know that two-thirds of the people will be between five-eight and 6 feet.

If I now go another standard deviation, I'll cover 95 percent of the people in this room, and this is how across all the studies I'll describe, this is how we determine what is normal. We have data on the normal, on the sample of healthy people, and we have data on Mr. Nelson, and we can determine for each value how far it deviates from the average.

Now, in general if any of your values deviates by more than one standard deviation from the average, this has clinical significance in the sense that, for example, if you go to a general health checkup and they run a bunch of

laboratory tests on you, if any of the -- if everything is within normal but one of your values is more than standard deviations away from normal, the clinician will have to take a look at it.

If you came to your concern that you may have Alzheimer's disease, you notice you are older and your memory's not as it used to be, you will come to a neuropsychologist. They will give you a battery of tests. If any of the tests is more than one standard deviation worse than your average, you will get the diagnosis of mild cognitive impairment, and it turns out that 20 percent of people who get that diagnosis today will have Alzheimer's within a year from now.

So this is the concept of standard deviation, which is roughly the average difference from the average of a sample.

Q Okay. So specifically in this case, how did you go about determining Mr. Nelson's neurobehavioral deficits?

A Okay. So the first thing we did is the behavioral image, which is based entirely on the neuropsychological testing.

Q And did you use the testing of both Dr. Gelbort and Dr. Martell, correct?

A Yes, used both Gelbort and Martell. And the behavioral image is an algorithm we've developed with funding from the

National Institutes of Health back in the 1980s, and what happens is that when you give a neuropsychological battery, a neuropsychologist will attempt to link performance on each test with a particular brain system. So if there is -- if they measure verbal fluency and there is a reduction in verbal fluency, the neuropsychologist will say, well, maybe there's damage in the left frontal temporal area that controls language fluency.

If there is deficit, for example, in recognizing faces, then the neuropsychologist will say there may be a problem in the right parietal area, and so on. And the ability of the neuropsychologist to interpret the results depends a lot on the training and their experience.

So we try to make it more uniform and brought the four top neuropsychologists in the country at the time and sequestered them for a couple of days and had them go over all the neuropsychological tests that were available and essentially give weights for each brain region indicating the probability that the damage in that area will produce a deficit on that particular test. So that gave us the weights of those experts.

We established the reliability of the experts and then waited a year and brought those experts again to do the same exercise. And that way we had their -- within expert reliability and between expert reliability, and these are the

weights that are at the guts of this algorithm. And the algorithm allows you to put in any neuropsychological test of anybody who received a reasonable neuropsychological battery, and it will translate those tests into an image that indicates what parts of your brain are possibly damaged.

Q So to sum up, it helps establish the localization of the brain damage based upon the neuropsychological test scores?

A Exactly.

Q Okay. And what are we seeing in this slide here?

A What we're seeing here from Gelbort's testing is that there is -- the damage is mostly in the front of the brain. The yellow colors indicate the relative sparing. Blue color indicate damage. So you can see that the left side is darker than the right, and most of the damage is in the orbital frontal area that's the part of the frontal lobe that sits right above our eyes.

Q And in terms of functioning, that part of the brain again controls?

A That's the part that essentially will tell you in a movie this is not a real tiger and you paid for your ticket, nothing to worry about. It's the verbal part that controls impulses coming from the amygdala.

Q The next slide I believe shows the results from Dr. Martell's testing?

A Yes. And in terms of -- they point to the same effect.

Martell's testing suggests some damage also, more in the back of the brain.

Q And I guess the next slide is a comparison of the two.

A Yes. It shows them one next to the other so you can see that he looks a bit worse from Martell's testing than Gelbort's testing. But both of them localize to very similar regions.

Q In addition to utilizing the neuropsychological test results, did you also employ an MRI that was done at Terre Haute?

A Yes.

Q And you also used an algorithm that you've developed?

A Well, for the -- the behavioral imaging algorithm I developed together with computer scientists. The MRI algorithm was mostly developed by computer scientists. I was part of the team, but I mostly told them what's important to do, you know. But I didn't develop that.

Q Has that algorithm been tested for reliability in this context?

A Yes. I mean, the MRI algorithm, analysis for algorithm was developed by Professor Christos Davatzikos, who is a world-renowned image analysis expert, and his team.

Q I think you can go ahead and advance to the next slide.

So what is the algorithm designed to do?

A Well, the MRI gives us information about the molecular

composition of the brain. You put the brain in a strong field, and then you send a current that is at an angle to it so the molecules will try to align themselves with the new field. But that's there only very briefly, for 20 milliseconds, less than what it takes you to blink.

And so the molecules will rattle back into the original position, and that's -- we call it resonance. That's the resonate. They resonate back. It's the same way if I take a -- if I take a pen and bend it and I stand it back up. It won't just sit there. It will vibrate. That's the resonance.

And that's what we can measure using radio antenna that surround the head. So it's very similar to listening to different radio frequencies.

Now, there's a big principle in biology that big bodies move slowly and small bodies move fast. The smallest and most abundant molecule in the brain is water, and so when we first listen, we hear all the water molecules rattle back. Then we hear the proteins, which are the material that build the cell bodies, and last come the big, fat molecules, which we know by now are the myelin, are the white matter in the brain.

And so by listening to those frequencies, the computer paints the MRI picture literally dot by dot. So it's not like if you take a photograph of the room with a regular

camera, all the information comes in and burns the photographic plate in proportion to the amount of light. Here it's the reverse. The computer has the number of resonances from each region, and he -- it, the computer, makes a dot. And the higher the number, the brighter the dot.

Q And I think the next line talks --

A That's how the MRI is created.

Q The next slide talks about regions of interest, which is how you interpret --

A Yes. So on the left on the next slide you can see what comes out of the MR procedure, and all these bright dots, they are white matter, and the grayer dots are gray matter, and the black dots in the middle are cerebral spinal fluid. The brain doesn't -- the brain actually floats inside our cranium, surrounded by fluid, and the fluid surrounds all around it and is inside it in what we call the ventricles and that fluid is important. It provides some nourishment, but, most importantly, it protects the brain from injury. Otherwise, we will have a head injury every time you sneeze.

So the MR can decompose those parts, the gray matter, which is proteins, the white matter, which is fat, and the fluid, which is fluid, and then what we do is we have an atlas, which is a regular MRI of a regular healthy person. What is distinguished about it is that expert neuroanatomists went over each of those dots. These dots are called, by the

way, voxels. A voxel is a three-dimensional pixel. If you take a regular digital photograph and you blow it up and blow it up, you will see the dots that make that photograph.

These are pixels, two dimensional. The computer -- the MR computer paints the picture in three dimensions, so each -- it gives you slices, and each slice -- each dot on that slice has a known length, a known width, and a known depth, which is the slice thickness. And in this case the MRI was obtained with excellent resolution of 1 by 1 by 1 millimeter voxel size.

So it -- in the atlas each of these voxels is labeled by an expert -- by expert neuroanatomists with agreement among them regarding the region from -- to which it belongs.

Q Okay.

A So what you do with it when you get it --

THE COURT: All right. Let's stop, Doctor. Let's get to the point.

MS. HARMS: Let's go to the next slide, which is the MRI results for Mr. Nelson.

THE COURT: It's fascinating but we could be here all day talking.

THE WITNESS: What I'm saying is we take --

THE COURT: Let her direct the testimony.

Q (BY MS. HARMS) So the next slide then would be

Mr. Nelson's MRI results, and could you talk about the abnormalities that his MRI results showed? There's two more slides.

A So we compared Mr. Nelson's brain to a group of healthy people, and what you see here is the results in standard deviation unit. So these are called Z scores. A Z score of zero means exactly on average. A Z score of minus one means that you are one standard deviation below average. Plus one if you are one standard deviation above average, and so forth.

What we see on the first segment of this graph is the volume of the big lobes, the frontal, parietal, temporal, and occipital. And you can see that overall Mr. Nelson has average to above average brain volume, but you can also see that the left frontal and the left occipital are relatively reduced.

So now we are asking how are the different parts of his brain, how do they look in terms of their deviation from normal? So here we use relative Z scores because simply it is normal, for example, to be 6 foot 2. It is normal to have a size 7 shoe. It's not normal to be 6 foot 2 and have a size 7 shoe. So the different parts of the brain need to be proportionate to each other, and that's calculated using the relative Z scores.

And what is very clear here is that the white matter, both in the frontal and in the occipital lobes, are

drastically abnormal, reduced by two to three standard deviations below normal.

Q And what would that mean in terms of functioning?

A Well, the white matter is important for transmissions, transmitting information from one brain region to another, and when the white matter is damaged, you get disruption of that communication. So people with frontal lobe white matter damage will have a difficult time collecting the information that they need in order to make a reasonable decision.

MR. RUHNKE: May I just have a moment with Ms. --

Q (BY MS. HARMS) I'd like to actually move on to the PET analysis. Could you go to the next slide?

A Yeah.

THE COURT: If he touches the screen, it will show up on our screens too.

MS. HARMS: I think I'm ready to move on to the PET. If you could advance the PowerPoint.

THE COURT: I meant for that too. Anything.

Q (BY MS. HARMS) Was a PET scan done in Terre Haute in September 2010?

A Yes.

Q And I would like you to bring up Exhibit 56, please, the second page.

A This?

MS. HARMS: Exhibit 56, the PET scan from Terre

Haute.

Q (BY MS. HARMS) So the PET was read independently by a doctor at Terre Haute, correct?

A Yes.

Q Just bear with me for a minute while she brings it up.

Did the doctor who interpreted the PET scan at Terre Haute notice anything?

A The PET scan, unlike the MRI that tells us about the brain structure or anatomy, the PET scan tells us about brain activity or more specifically the rate at which the brain consumes sugar or glucose, and that's proportionate to activity because every time a nerve cell fires, it needs energy in order to fire again. And it gets its energy by burning sugar with using oxygen.

So every time the brain cell fires, it needs more oxygen and needs more glucose, and that gets there through the blood stream. And that's what we are measuring with PET. We measure how much glucose was metabolized in each region.

Q So what are the findings of the doctor at Terre Haute in reading this PET scan?

A So the doctor in Terre Haute who read it described a relative decreased posteriorly compared to anteriorly, somewhat more prominent on the right than the left. It appears to be focal areas of thinning bilaterally at the posterior-inferior portion of the frontal lobe just above the

sylvian fissures bilaterally. These appear to be thinning at the bilateral medial temporal lobes as well. Multiple patchy areas of decrease are seen throughout the cerebral cortex. Deep nuclei are seen, although there appear to be relative decrease in the right-sided caudate and putamen and left-sided thalamus.

Q So translating that for us, does this -- is this consistent with your results, what the doctor at Terre Haute found in the PET scan?

A Yes, highly consistent. I was actually quite amazed because it's not easy to read a PET scan visually. We usually rely also on the quantitative analysis, and as far as I know, she didn't do a quantitative analysis.

Q And so, again, this is referring to activity in the limbic stretches of the brain, the amygdala and hippocampus, that we talked about earlier?

A Yes.

Q Can you give me examples of cases of what happens when someone has a damaged amygdala?

A Well, in general people with amygdala damage have been described in the literature, and it's called the Kluver-Bucy, K-l-u-v-e-r, hyphen, B-u-c-y, syndrome. And, of course, not all of them show all the features of it, and some of them show only some of it.

But in general these people are characterized by

being out -- normally are very placid. They look like they are not interested in much. They are -- they look calm, cool, and collected, and then something unexpected will happen and they will go ballistic. They will attack anything in sight.

So if you stimulate the amygdala in a monkey, the monkey will attack the cellmates without discrimination. So the Kluver-Bucy syndrome includes damage in the amygdala and in some cases frontal lobe. The main feature of it will be very flat affect. If you just talk to them, they seem to be very calm, but they can -- they can go into a rage with very little provocation.

Q And, again, you took the PET results and you expanded upon them. Can you explain to us how you did that?

A So with the PET results, we followed the similar procedure to what we use with the MRI except that the resolution of the PET is not nearly as good as that of the MRI. So the resolution of PET is not 1 by 1 by 1 millimeters but somewhere between 4 and 6 millimeters in each direction.

So we don't really outline the exact features, but we use a system of what we call regions of interest. It's a standard set of regions of interest that you can fit into an individual brain, and you just make sure that each region is in the area that it's supposed to be in and in the middle of it. So it's more like a punch biopsy than like a complete -- a complete characterization.

And we have standard sets of regions of interest that we measure in every subject, and we compared Mr. Nelson to the group of healthy volunteers.

Q And what were your findings?

A So there are several striking findings. The most striking really is the reduced metabolism in both amygdala and hippocampus as well as the parahippocampal gyrus. And we also see reduced metabolism in the corpus callosum and especially the front of the corpus callosum and the cingulate gyrus, and we see also reduced metabolism in the basal ganglia.

So by contrast to that, we see abnormally high metabolism in the cortex, almost out of the cortical area, frontal and parietal. So these are two types of abnormalities. Unlike in MRI where it's always the more the merrier, the larger the volume, the better, with PET you have to pay attention both to hypermetabolism and hypometabolism. Hypometabolism, especially in amygdala and hippocampus, is seen, for example, in seizure disorders, and this is very similar to -- the magnitude of this abnormality in Mr. Nelson's case is close to what we see in seizure disorder patients.

Amygdala that -- and we also know -- I didn't have the chance to comment, but you can see in the exhibit that the amygdala also has lower volume in Mr. Nelson's case. So when there's low volume and low activity, what happens is that

amygdala has very large cells, and if one of them begins to fire, the other cells will also begin to fire. And when there is tissue loss, this whole thing will happen very quickly.

It will lead to -- within normal limits, it will lead to intense feeling of fear or anger, which is what the amygdala generates. In extreme cases it can lead to a seizure.

Q Can you tell anything from analyzing the results of these three different sets of tests as a whole, the MRI, the PET, and the neuropsych testing?

A Yes. They all seem to converge in showing that the frontal system in Mr. Nelson is corrupt, is damaged. You can see that from the results of the neuropsychological testing both of Dr. Martell and Dr. Gelbort, and you also see from the structural imaging that there is damage in the frontal lobe that is structural damage.

There is -- the volume is lower than it should be as well as the volume of the amygdala, and when you look at the PET images, the metabolic activity of the amygdala is abnormally low whereas of the frontal and the rest of the thinking brain is abnormally high.

This PET study was done in what we call the default mode state, which is he was just sitting there, eyes open, and no task, was not given any tasks. And what was found over the past couple decades is that those regions that are abnormally

high in metabolism during the default mode state are those that will go down when the subject is facing a challenge or a task and vice versa. Those regions where the metabolism is abnormally low, those regions will go -- will shoot up during -- when the person is faced with a challenge.

So someone with a brain like that, if faced with a challenge or a task or a situation that's perceived as dangerous, his emotional brain will become hyperactive, and his thinking brain will become hypoactive.

Q Is it fair to say then that Mr. Nelson has abnormalities in regions that are important for regulating behavior?

A Yes. These are very important regions for regulating behavior.

Q Is there any implication for the ability to regulate your impulses, including sexual impulses, based upon these results?

A Yes. The sexual impulses as well as the impulse to have food or drink are -- relate to the functioning of the reward system, which is the basal ganglia. And he has abnormally -- abnormalities as well in the basal ganglia. So these are the -- these are the parts of the brain that are supposed to tell you what is enjoyable and what is not enjoyable.

If you taste something and it tastes good, the basal ganglia will shoot out some dopamine that will go to your frontal lobe and give you a good feeling. So damage in the

basal ganglia can lead to distortions in what experiences is good and what does -- not experience is good. A damaged basal ganglia will issue corrupt messages in those areas, and these include food and sex.

Q You also reviewed a social history report, correct?

A Yes.

Q Did you find anything significant in the family history in terms of Mr. Nelson?

A Well, there is a very high incidence of schizophrenia. In fact, his family would qualify for the definition of a multiplex family, which is defined as two people or more who have schizophrenia. The significance of that is that even if -- even members of the family who do not have schizophrenia, they have -- they show deficits that are not quite as severe as the ill members but are definitely not in the normal range.

If in general the probability of him suffering from schizophrenia is 1 percent in the population, and that's through -- throughout the world. But if you have one sibling with schizophrenia, that probability jumps 20 folds. So you now have 20-percent chance.

If you have two siblings with schizophrenia, that's even higher, and even if you don't have schizophrenia yourself, you likely will have some brain abnormalities or vulnerabilities in the brain that characterize those families.

Q Is there any relationship between prolonged childhood

bedwetting and schizophrenia?

A Yes. Prolonged child bedwetting is a -- is known to be a predictor of eventual schizophrenia. It doesn't happen to all -- everybody who is -- who has prolonged bedwetting, but a lot of people who have prolonged bedwetting, when they grow up, they have some sort of psychosis.

Q How about suicidal behaviors?

A Suicide is an even greater risk in schizophrenia than in depression. More people with schizophrenia commit suicide than people with depression proportionately.

So when you have schizophrenia, when you are in the -- when you have an exacerbation of symptoms, that's not when you are a suicide risk. But when there is some abatement of symptoms and you begin to realize what you are into, then there is a very high risk for suicide.

Q Is there anything about the birth of Mr. Nelson that has consequences for his brain?

A The what?

Q The birth of Mr. Nelson that has consequences for his brain?

A Just being born a twin is a risk factor, and any birth complication adds to the risk. If the mother was drinking during pregnancy, that adds to the risk or if the -- if the prenatal conditions were adverse, that also adds to the risk.

Q Did you review information that indicated Mr. Nelson was

physically abused as an infant?

A Yes.

Q How could that impact the developing brain?

A There are two ways in which physical abuse can impact the brain. One is directly, if the abuse reaches the head, so there was an incident where he was -- he grabbed him and circled him around, and his head hit some hard surfaces. Each one of those can be directly injurious to the brain, and, as you may know, every concussion is worse than the first one.

So if you have a concussion, chances are you'll be okay. If you have another concussion, your chances are much worse than starting, and if you have another concussion, every additional one makes things worse. So multiple small concussions like that could produce brain damage, and almost regardless of where you are hit in the brain, it will affect the frontal lobe because the orbital frontal area sits right on top of those nasty bones that we have, the orbital bones right above our eyes. So if the frontal lobe rubs against those bones, it will be damaged.

The second way which abuse can lead to brain damage is that it prevents the brain from developing normally, and the structure that seems to be most affected is the hippocampus. So if -- in animal studies if you take a mouse growing up and you hang them by the tail for ten minutes every day, which is how we are trying to mimic abuse, those mice

that were raised that way, will have smaller hippocampi than mice that were not treated that way.

THE COURT: Ms. Harms, I think for the purposes of this hearing, we have more than enough information from this witness.

MS. HARMS: Okay. Just one last question.

THE COURT: I've given you considerable latitude. You have one last question.

Q (BY MS. HARMS) Do people with brain damage, do they behave abnormally all of the time?

A No, not at all. They behave normally most of the time, and some people who have frontal lobe damage, we never find out about it. I mean, we all know people who are a little too aggressive, irritated, lack tact. Until it reaches a proportion, proportion that will show up as symptoms, we won't know, and even people who have brain -- bad frontal lobe damage, don't behave all that -- don't walk around drooling. It has to be a combination of events that will produce -- that will show that vulnerability.

The same way we have -- a few years ago there was those Toyotas that would start racing. It didn't happen to all the Toyotas, but under certain circumstances, that defect would show up, and that's -- the same is true for frontal lobe damage or any kind of brain damage. The brain has a remarkable ability to organize, reorganize itself, and act in

a way that is normal.

But when there are -- there is a certain set of conditions, that's when the vulnerability will be exposed.

MS. HARMS: Thank you. That's all I have.

THE COURT: Why don't we take a break, about 35 or so minutes, okay, and then we'll resume.

Thank you.

(A recess was taken.)

RUBEN GUR, Ph.D., previously being sworn, resumed the stand:

MR. VALENTI: May it please the court.

THE COURT: Absolutely.

CROSS-EXAMINATION BY MR. VALENTI:

Q Dr. Gur, as I understand it, you did not perform a neuropsychological evaluation of Mr. Nelson, did you?

A That's correct. I did not.

Q You didn't see him in person?

A That's correct.

Q Instead you have taken data provided to you by other doctors, specifically, Neuropsychologists Gelbort and Martell, and quantitated that data to create the behavioral image picture that you showed earlier of Mr. Nelson's brain, correct?

A Yes.

Q Let's talk a little bit about that. The quantitation approach that you use requires the use of an algorithm that

you developed, correct?
A Yes.
Q And it's an algorithm that you developed in the mid 1980s?
A Yes.
Q I believe that that algorithm was then ultimately patented by you and the rights to it were assigned by your university to a company known as Biologic?
A Yes.
Q Secondarily -- and you've written about the algorithm over the years, haven't you?
A Yes.
Q How many times would you estimate you've written about that algorithm?
A Four papers.
Q Okay. Since the 1980s?
A Yes.
Q When was the last paper you wrote about the use of the algorithm since then? What's the most recent article? Let me rephrase.
A I believe it was '92, '93.
Q So some 22 years ago was the last time you wrote an article about the use of this algorithm?
A Yes.
Q You've written hundreds of articles, as I recall, from

your curriculum vitae, however, correct?
A Yes.
Q And of those hundreds, only four deal with the algorithm that we are using as the basis for your testimony today?
A You're talking about the behavioral imaging?
Q Yes.
A That's just one of the algorithms.
Q Yes. That particular algorithm.
A So, yeah, that's all the papers I wrote about it.
Q So to be fair, the behavioral image that we're talking about today really hasn't been updated much in the last 20 or so years?
A Has not been updated, no.
Q Okay. Medical science, however, has advanced greatly over the last 20 years?
A Yes.
Q And the basis upon which you're trying to do your work is as a neuropsychologist because you are one, right?
A Yes.
Q And a neuropsychologist's goal is to try to link behavior to brain function?
A Yes.
Q And in order to do that for purposes of use of this algorithm, you convened a commission of peers in the 1980s?
A Well, there were -- back then they were more than peers.

They were more like mentors.
Q Okay. But experts in the field?
A Yes.
Q Okay. And this commission essentially got together in the 1980s to describe and provide what the papers describe as expert judgments about the weight particular neuropsychological testing should be given relative to brain function?
A Yes.
Q So the foundation upon this is based upon the judgments of experts in the field from over 20 years ago?
A Yes.
Q Not on empirical data since then that could have been added to -- strike. Bad question.
Not empirical data but instead judgments of men in a panel?
A So the algorithm itself, the guts of the algorithm include those weightings, and those weightings reflect the judgment of these experts based on their knowledge, experience, all the data they collected their whole life, but --
Q Ceasing, however, in the 1980s since it's not been updated since then?
A It has not been updated, no.
Q Okay. Some of the tools that are necessary to use are

either a PET scan or an MRI, correct?
A Yes.
Q And those are two of the scans we saw today. Are you qualified to read an MRI?
A I don't read MRIs, no.
Q Nor are you qualified to read a PET scan?
A That's correct.
Q Because in order to read that under the industry standards, it requires someone that is either a neuroradiologist or a nuclear medicine doctor, correct?
A Yes. It's a neuroradiologist for MRI and a nuclear medicine doctor for PET.
Q You're neither of those?
A I'm not, no.
Q And much like the previous neuropsychological testing provided to you by Dr. Gelbort and Dr. Martell, you took the readings of either the MRI or the PET scan and used those men's or women's interpretations in your imaging?
A No, no. I don't -- maybe I misunderstood your question.
Q Okay.
A By reading, what I thought you meant was when the MRI is done and you have the printed pictures of the brain, then typically a neuroradiologist will look at those pictures and see if there is a tumor or stroke or multiple sclerosis or anything that can be visualized, and that is fortunately the

case for a lot of illnesses that can kill you. And the purpose of the clinical reading is to make sure that none of those conditions exist.

Q Okay. But you're not licensed to do that?

A No, no, I don't do that.

Q Okay. All right. There's been some writings over the years in the literature about what it takes to quantitate data such as the data you're quantitating, correct? In other words -- let me rephrase.

When you're quantitating the data, you're taking the information about Mr. Nelson's brain scan, whether it be PET or MRI, correct?

A Yes.

Q And you're comparing it then to what is provided to you known as norms, correct?

A Yes.

Q Norms are what?

A Norms are the same kind of data collected from healthy people.

Q Okay. So other people's brain scans?

A Yes.

Q A control group, so to speak?

A Yes.

Q All right. The control group, when you did Mr. Nelson's quantification -- or did your quantitation, excuse me,

originally you did that against how many brains?
A I believe it was eight control subjects.
Q Were the eight control subjects tested by the same machine that did a brain scan of Mr. Nelson?
A Tested by the same generation machine, same type of machine. Of course, he didn't -- he wasn't brought to Philadelphia. He was scanned in Indiana.
Q So your control group of brains, the initial eight, came from Philadelphia?
A Yes.
Q Whereas Mr. Nelson when he was scanned, was scanned in around the Terre Haute area, correct?
A That's correct, yes.
Q So though the machines in your testimony might have been of the same type or generation, the actual -- the machine itself was a different machine, correct?
A That's correct, yes.
Q When you had his brain compared against other normal control group a second time, how many brains were used?
A I believe there were 69.
Q I think 84.
A Eighty-four?
Q And it doesn't matter. Sixty to 80 we'll say; is that fair?
A Yes.

Q Were those brains from scans that occurred in the Philadelphia area as well?
A Yes.
Q Again, by a machine, not the same machine Mr. Nelson was scanned by?
A Yeah. It was an older generation machine.
Q Why did you do the second set of brain scans or brain comparisons?
A Counsel asked me to do that because they were concerned that since I'm coming to Kansas City, that issue will be brought up, and they wanted to make sure that if I see -- that I see the abnormalities also on that larger sample.
Q When you did the larger sample, were you able to pick a control group that would have been from the same geographic area that Mr. Nelson grew up in?
A The larger sample is from the Philadelphia area as well.
Q Not Kansas City?
A No.
Q Not White Settlement, Texas?
A No, no. Philadelphia.
Q Okay. Wouldn't you agree that The Society of Nuclear Medicine has indicated that if quantitation is to be attempted, there certainly needs to be more study involved in whether or not that should be done, the control brains and the comparison brains being used -- done on the same machinery?

A No.

Q You don't agree with that?

A No. That's not how things are done.

Q Huh? Are you familiar with the nuclear -- The Society of Nuclear Medicine?

A Yes.

Q Do you recall testifying in November of 2011, in the Commonwealth of Pennsylvania in a case of Commonwealth v. Eichinger? I'm not sure I pronounced that right, E-i-n-c-h-i-n-g-e-r.

A There is no N. E-i-c-h-i-n-g-e-r.

Q Do you recall testifying in that hearing?

A Yes.

Q Do you recall being asked questions about whether The Society of Nuclear Medicine thought that it needed to be studied whether or not the comparison or quantitation could properly occur using two different machines?

A I vaguely recall something like that.

Q If I showed you your previous testimony, would you have any reason to disagree that you acknowledged that the society had recommended that?

A I can believe they recommended that. Which year was that?

Q It was a paper issued by them in 2009.

A So -- well, yeah, I mean, it's a nice recommendation and

has been done, and there is no -- much variability among machines, so nobody -- if I were contemplating a study -- well, we are doing -- right now is sitting here, we are doing multiple studies with multiple machines, and they're putting the data together. And, of course, you want to see if there is any variability among machines, and you include that in your data analysis. And I've not heard a study that shows a substantial machine variability. You get some variability because of the machines, and so -- but I'm not aware of a single study that had to be canceled or questioned or in any way rendered invalid because of those small variabilities that exist.

I mean it used to be at the beginning the first phase of the PET, each machine was literally home brewed. In the first PET that was built at Penn, you know, was put together literally by hand, so each machine had different characteristics. But the machines today are highly standardized across manufacturer and across --

Q I think what you're saying, Doctor, is the technology has changed and gotten better over time, correct?

A Yes, yes.

Q Unlike your algorithm that hasn't changed since the 1980s?

A Yes. Because what happens in -- after the '80s, was a whole new generation of studies that used functional imaging,

and the field of looking at brain lesions hasn't really changed much itself. And we are now more interested in doing the behavioral image of the future that will be based on actual data on activation, but that project is still literally in its infancy.

Q In the first control group of brains that you used for a comparative analysis, how many of those brains were left handed?

A I don't know. I don't think any of them.

Q Did you know that Keith Nelson was left handed?

A Sure.

Q You know as a neuropsychologist that left handedness can have an impact on brain function, can't it?

A Yes. I mean, I've been one of those who studied it quite extensively but not in brain structure. I don't know of any study that shows it affects PET or MRI.

Q How many of the original eight had diagnosed personality disorders?

A Probably none. Hopefully none.

Q How many of the original eight had diagnosed or were suffering from, to your knowledge, depression?

A None.

Q In the second group of comparative brains, any idea how many of those were left handed?

A None was left handed.

Q None?
A None.
Q In the second group any idea how many of them were suffering from or diagnosed with personality disorders?
A None.
Q Any idea in the second group how many of them were diagnosed or suffering from depression?
A None.
Q Of course, depression can have an impact on metabolic activity, can't it?
A Yes.
Q And some of the behavioral imaging that you're showing is depicting or claiming to depict metabolic activity in the brain?
A Not a behavioral image.
Q You're trying to track metabolism in the brain to that image, correct?
A Not the behavioral image. The PET image.
Q Okay. I misspoke. I apologize.
In the PET image you are, however, trying to track metabolic activity, correct?
A Yes.
Q And Mr. Nelson has been diagnosed at various times, not surprisingly on death row, as suffering from depression. So could that have an impact upon the metabolic rates you're

finding in the PET scans?
A It could have a small impact but nothing like what we see in his brain.
Q When it comes down to what we've got here, Doctor, if I understand it, is you've taken the data provided by other people and put it together and created a pretty picture; is that right?
A Well, I analyzed his data as well, but with that addition, you're right.
Q Not only that but the most important part of neuropsychology in order to link a deficit to a behavior is to have an idea about the degree of a deficit, correct; in other words, how bad a lesion is or an impact or injury?
A It's good to know. There isn't unfortunately a one-to-one correspondence between the size of the lesion and the effect on behavior. It's not simple.
Q But in a general sense, the more impactful the lesion, the larger the lesion, the more impactful you can assume it would be on the behavior?
A Absolutely.
Q Okay. And as you look at your behavioral image, I've heard you or read that you've described it as a unitless scale, that color scale is unitless, correct?
A Correct.
Q And by unitless, explain to the court what that means.

A It means at least in science, what it means is that you cannot assign to it a physical or biological value, so you cannot say that -- like glucose metabolism is measured as how much -- how many milligrams -- milliliter of glucose were taken by each gram of -- by 100 grams of tissue per minute. That's a unit. Unitless means that it's not assignable to a particular level.

Q And units are important because it's easy to say that two units is twice as much as one unit, correct?

A Exactly, yes.

Q Units create comparative value?

A Correct.

Q And as I look at Plaintiff's Exhibit 81, page 11, the behavioral image created based on Dr. Gelbort's neuropsychological testing, that is a unitless diagram, correct?

A Correct.

Q So there's not relative comparative value by looking at this?

A Correct.

MR. VALENTI: That's all I have, Your Honor.

REDIRECT EXAMINATION BY MS. HARMS:

Q Dr. Gur, although you did not conduct an MRI or PET on Mr. Nelson personally, they were conducted by qualified individuals, correct?

A Oh, yes.
Q Is there any reason to believe that the algorithms that you created are no longer valid?
A No.
Q And you took into account handedness. Does it affect your conclusions at all?
A Which --
Q Keith Nelson's handedness, it does not affect your conclusions?
A No, no.
Q And whether or not the normative group were people in Philadelphia or Kansas City, does that matter in terms of the volume of the brain?
A No. There is no evidence that brains are different in Kansas City than in Philadelphia.
MS. HARMS: Thank you. That's all I have.
MR. VALENTI: Nothing further, Your Honor.
THE COURT: That's good to know, Doc.
Thank you very much.
Other witnesses?
MS. HARMS: We have no further witnesses.
MR. RUHNKE: That completes our presentation. I understand the government has a rebuttal witness this afternoon and its expert neuropsychologist tomorrow morning.
THE COURT: Thank you.

MR. KETCHMARK: That is correct, Your Honor. We're ready to proceed with the one witness we have this afternoon, Larry Pace.

LARRY PACE, being duly sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MR. KETCHMARK:

Q Sir, could you state your name for the record.
A Larry Pace.
Q And, Mr. Pace, how are you employed?
A I'm an Assistant Federal Public Defender working in the Western District of Missouri here.
Q How long have you been employed in that capacity?
A Little over 18 years now.
Q And you understand you're here because this is an evidentiary hearing regarding the case of the United States v. Keith Nelson, which was a death penalty case that you had some level of representation early on; is that correct?
A That's correct.
Q Before we jump into your involvement with Mr. Nelson, can you tell the court or the -- for the record, had you had prior capital experience before this case?
A Yes.
Q And can you explain that experience, please?
A Well, I was recruited by the Federal Public Defender's Office because I had capital experience in the state system.

I had represented individuals in postconviction cases, some successfully, and it was my understanding that the federal government was doing more capital litigation. So they asked me to come on board and do the capital cases for the federal government.

I think I'd handled three cases, three postconviction cases in the state system, and then I came to the federal system. And I think the first was Tug Emery. I think that was the first one.

Q Okay.

A We got that obviously successful. The government declined death after we did our mitigation work. Then I represented, I think, one or two other individuals very briefly before we got conflicted out.

Q Okay.

A Which is very common unfortunately because we represent so many people. But I think I represented a couple more in a very short manner before. Then I was representing Arboleda Ortiz prior to Keith, and that was an ongoing case when I got appointed to do Keith's case.

Q And in any of the cases that you had prior representation, did you take any of those to verdict?

A The Ortiz case went to verdict. The rest of the cases were all resolved either by way of a plea, or in the postconviction cases, of course, we, you know, we won a couple

in the Court of Appeals. So, I mean, we -- those obviously weren't trials.

Q And with respect to the Ortiz, what was the verdict that was reached in that case?

A That was a death verdict. There were three defendants. Two of the defendants got death. One got life.

Q And was one of your clients the individual sentenced to death?

A Yes.

Q Was there a postconviction challenge to your representation -- in connection with your representation in the Ortiz matter?

A Yes, there was.

Q And has that been resolved?

A The resolution of the ineffective assistance claims have all been resolved, yes, favorably for us obviously. Unfortunately for Mr. Ortiz, it's not. My understanding that there are -- the case is still back on review on other issues, but not on ineffective assistance claims. The ineffective assistance claims have all been finalized.

Q So just so I'm clear and the record is clear, you were not found to be ineffective in your representation of Mr. Ortiz?

A That's correct.

Q If I could, sir, I'd like to turn your attention to

Mr. Nelson's matter, and it appears to me that the federal public defenders were appointed early on in this, in the fall of 1999. Is that consistent with your recollection?
A Yes. It was sometime in late '99.
Q Other than yourself, do you remember the other attorneys that were involved early on?
A Well, we brought on two additional people. Bill Shull was brought on early. If I recall correctly, Bill had a lot of other activities going on, and trying to think, we brought on Susan. Susan Hunt was also brought on. So there was the three of us working on the case for a short period of time anyway until we were off of it.
Q And are you familiar with an attorney by the name of Dan Franco?
A Oh, yes.
Q Was Mr. Franco at some point involved in the case?
A Dan Franco was an attorney who had befriended Keith Nelson. Dan had absolutely no capital litigation experience, but he was a friend and apparently a confidante. He was in the case for a little while but really was not of any consequence.
Q With respect to then yourself, Ms. Hunt, and Mr. Shull, was there any division in terms of who was taking lead responsibility for the case at that time?
A Yes. I was lead counsel. Myself and our office, we

were handling the bulk of the expenses and travel and background investigation. Bill Shull and Susan were handling a lot of the motion practice locally. Susan is extremely well versed on the mental health issues, scientific issues, so we tried to divide the labor that away, do what we were most experienced with.

So she and Bill were handling primarily the motion practice. I was doing the background work, gathering records, and getting ready for any penalty issues.

Q With respect to Ms. Hunt, is it an accurate statement, Mr. Pace, that when she was brought into the case, she had no prior capital experience? Is that consistent with your recollection?

A No. I think she did have -- I think she did some postconviction work. I'm not so sure that she had done direct representation, and, frankly, I don't remember that off the top of my head, but I believe she did have some postconviction representation.

Q But no representation as it related to an individual who was facing a trial --

A That may be correct. I don't recall that independently, but that may be correct.

Q In terms of your office taking lead responsibility, are you familiar with an individual by the name of Ron Ninemire?

A Yes.

Q And who is Mr. Ninemire for the record?
A Ron Ninemire is now retired, but at the time I came on board with the federal defender's office, he was the chief investigator and was that up until about a year ago when he retired. He was the individual that was assigned in our case to do the background investigation and a lot of mitigation work on Keith's case.
Q And when you talk about background investigation and mitigation work, what -- what do you mean by that?
A Well, one of the first things, the most critical things in any death penalty case is getting as much information about the individual as possible, which would include everything from birth, all of his records, the school records, his medical records, his work history, family history, anything that had to do with that individual. We would look at his family and gather records about his family, any military use, criminal history, anything and everything that has to do with an individual, I mean, regardless. That's -- and that's kind of where we would start.
Q Okay.
A I had serious, long, detailed items that Ron Ninemire and I would go over as a checklist of things that needed to be done, and it was a thing always in progress.
Q And in that regard, Mr. Pace, is that something that you would have started with Mr. Ninemire early on because you

realized that this was most likely going to be a death penalty case?
A Well, yes, and it's -- I would have to give more of the credit to Ron Ninemire in that because Ron came from a different viewpoint. I mean, he had been a federal probation officer for years. He's got the training and experience that was -- it was amazing.
And he would come in with the fact that all of the things that needed to be done, he was extremely detail oriented, and he and I would sit for hours and go over the material that needed to be done. He would just keep it up, and as things came about, the list would grow of things that needed to be done. We did the same thing with individuals, and this was just something that I had built from my private practice on a complex case was names list.
I had a list of names of everyone involved in the case, whether it was from discovery, whether it was people that we had talked to, people that we thought we needed to talk to, and all alphabetical and that would grow too. And Ron was instrumental in maintaining all of that material. As our chief investigator, he maintained all that.
Q Did Mr. Ninemire have any involvement in assisting you in the Ortiz matter?
A He did a little bit in the Ortiz matter. I mean, we traveled together extensively, and I would have to say that

the bulk of the mitigation and investigation work was Ron Ninemire, yeah.

Q And is that in Nelson or Ortiz?

A That was in Ortiz, right. That's in Ortiz.

Q Similarly, in -- focusing back on the Nelson matter, did you and Mr. Ninemire travel and spend time outside the Kansas City area in an attempt to develop or research the mitigation aspect of the case?

A On Mr. Nelson's case?

Q Yes.

A Oh, yes. Keith Nelson was from a small town, I believe it was outside of Dallas, called White Settlement.

Q Okay.

A And I don't remember how many times Ron actually went down. I went down initially with him, and I think that we may have gone with Susan at one point too.

Q Okay.

A But, yeah, we were down in an initial gathering process to find individuals that knew him, teachers, police officers, family members, all -- anybody and everybody that might have some contact with him so that we could -- this could grow. It was a very, very early stage that I went down.

I think I went down either once or twice, and understand that I was doing Nelson and Ortiz at the same time, and Ortiz was also in Texas. So I was in Texas extensively

during that '99 and early 2000. But Ron was down there a lot more than I was.

Q And in terms of working on two capital cases at the same time, were you able to juggle those balls and keep them all in the air at the same time?

A Yes. That was the -- that was one of the things that Ray Conrad, who was our federal defender at the time, when I had one capital case, I did have a small caseload in addition. When I got the second capital case, I had nothing else to do. He made sure that we had the time and the resources to do what needed to be done.

And so, yeah, when -- and many times we would combine things. If we were going to Texas, if somebody needed to go to Dallas, somebody needed to go to Houston, we would do that. But, yeah, we made sure that we had the resources necessary to do it.

Q Are you familiar with an individual by the name of Dan Grothaus?

A Yes.

Q And who is Mr. Grothaus?

A Dan Grothaus is an investigator; I think, still an investigator today. He had been a newspaper reporter. I believe he may have been an investigative reporter, but he was very, very good at ferreting out information. And we used him -- I didn't hire him because I had Ron Ninemire. I had

in-house investigation.

I believe either Susan or Bill Shull, one or the other, I don't remember, wanted to bring him on board as their investigator so that we would have additional eyes and ears. And I think Dan did a lot of the work locally while Ron was out of town and gathering records where Keith grew up.

And I think he did a lot in Bates County, if I remember right. He had some family and stuff in Bates County. Dan was working more the local Kansas City area, Wyandotte County, the victim, the victim's family, those types of things.

Q And when you talk about you had your own investigator and that you think it was Susan or Bill Shull who hired Mr. Grothaus, even though there were Mr. Ninemire and Mr. Grothaus, was there information sharing that was going back and forth amongst the team?

A We would meet regularly, yes. Virtually everybody shared all of the information. The team would get together and meet. It wasn't like we have today where the computers were networked in like we have today, but we would get together and put the material together and make sure that anything that we had done Dan would see. And the same thing with Dan, anything that he had he would make sure that we had it so that everybody had all of the information and we weren't, you know, stepping on each other's toes and we

wouldn't be duplicating efforts.

Q Trying to work together?

A Yes. And actually we worked together very well. I thought Dan did a very, very good job with what -- the area that he was doing, and, of course, Ron, I mean I can't say enough good things about Ninemire. He was extremely meticulous and detail oriented and did what we needed him to do.

Q And, Mr. Pace, just for purposes of the record, when we met very briefly before you came in, did I inform you Mr. Ninemire was going to be here as a witness but unfortunately was diagnosed with pneumonia yesterday and we've graciously had a stipulation from the other side that we could get in some of what he did through you?

A Certainly. I learned that just today, yes. Ron and I were supposed to have lunch here recently, and I didn't hear back from him. That may be why. He may not be feeling well.

Q So focusing on the work that you and Mr. Ninemire were doing in terms of the record gathering and the name gathering for interviews, would you say that you were having success in gathering that type of information early on in this investigation?

A Yes. We had a great deal of success. We didn't have any road blocks anywhere, and that's one of the nice things about dealing with Mr. Ninemire is he had so much experience

first as a federal probation officer years before in interviewing people and getting records, and then as a federal investigator, the same holds true.

He could walk into an office and they would provide the material, and, like I say, he was so detail oriented. He always had several balls in the air at the same time. Records were constantly coming in, and he would organize them, make notations, and let me know what was going on.

So, yeah, he was -- I couldn't say enough good things about Ron and the way he was handling the work.

Q Now, with respect to the information that was coming in, I assume you're looking at it as the attorney to make an assessment and give direction to Mr. Ninemire to the extent that he wants your input in terms of which direction to go. Is that a fair statement?

A Yes, yes, that's true.

Q As you sit here today, do you have a recollection of some of those records? Were there mental health issues that were apparent in the records, both with respect to Mr. Nelson and with respect to his family?

A Yes. We were able to identify significant mental health issues with Keith, but we were so early in the stage that we hadn't even come close to deciding who we would be getting as far as a mental health expert. That was down the road a ways.

But I know that Ron had gotten school records, some

medical records. I believe there was some medical records on his mother, which created some issues for us, and some of the criminal records clearly showed that there was probably some mental health issues there. And not being medical doctors, obviously all we could do was identify it and then make a decision down the road how we were going to handle that.

Q Have you heard the term a "mitigation investigator" or "mitigation specialist," those two terms?

A Yes.

Q And did you consider Mr. Ninemire to be filling either or both of those roles in your trial team?

A Initially I would say that he was a mitigation investigator, although over the years I have met and interviewed and had CVs from a number of mitigation -- what they call mitigation experts, people that hold themselves out to be mitigation experts, and, frankly, their training many times was the same as what I found Ron Ninemire had. Ninemire, he had a significant background and good formal education in that field.

And then usually the mitigation experts that I have met and have interviewed simply don't have the experience, you know, and Ron came with 20-plus years of experience interviewing people and documenting issues. So I used him as a mitigation investigator.

Whether or not I would have used him as a mitigation

specialist, that decision hadn't been made yet. We weren't nearly to that point. There was just so much material to gather. I don't like to hire people until we actually know that, first, we're going to need them, and then we need to identify what we need first before we go out and just hire someone.

Q And you mentioned Mr. Ninemire's background and education. Are you aware did he have any degrees that --

A I believe he had a master's in sociology or social work, I believe. It's been a long time since I've seen a CV on him. I don't remember. But he's -- you know what, at one time, I mean, I just did that. I mean, I looked at his qualifications versus people that had sent their resumes, you know, wanting to work as a mitigation specialist in a particular case, and Ron had the same, if not better, qualifications of the education. And then, of course, the experience just blew him away.

Q Now, at some point, Mr. Pace, am I correct that a conflict came up that resulted in the federal public defenders, both you and Mr. Ninemire, being conflicted out of representing Mr. Nelson?

A That's my understanding, yes.

Q Would you agree with me, without looking at specific dates, that that conflict would have arose sometime in the summer of 2000, and ultimately, I believe, your -- the federal

PDs were removed from the case late summer, early -- the fall of 2000?

A I don't remember the date, but I do remember we were in the case about nine months. So it would have been around the summer of 2000, when we were notified. I mean, I didn't find out about -- we were notified that there was in fact a conflict, and I think Judge Hays called us, and she received some information. And so, yeah, it became apparent that we were going to have to get out of the case.

Q The records, the interview notes, the names, all that information that Mr. Ninemire and yourself had amassed, what would happen with those documents at the time that the federal public defenders got off the case?

A Well, we would have provided a copy. I don't think we ever got rid of the complete file, but a copy of everything that we had would have gone to the new counsel.

Q And was Susan Hunt obviously still involved in the representation?

A Yes. I'm not so sure that Bill Shull stayed in it, but I believe Susan stayed in it for quite awhile.

Q I'm going to show you what's been previously marked and admitted as Government's Exhibit No. 9. I will represent to you that this is a letter drafted by Mr. Ninemire to Ms. Hunt, and the date is actually reflective on the second page of having been drafted September 12th of 2000, and this is a

four-page document. You've seen that before?
A Yes.
Q For the record can you describe what is contained in Government's Exhibit No. 9?
A This is one of those -- again, as I described earlier, Ron Ninemire had a -- the ability to just detail orient everything that needed to be done, and this is a listing of some of the things that were done and some of the things that still needed, looks like, to be done. It was part on the mitigation investigation, so, yeah, he's providing to Susan information that he had done and what still needed to be done.
Q And would you agree with my characterization of the records that had been amassed at that point were fairly substantial?
A Thousands of pages of documents were amassed I know in that case as well as the other case, but I mean we were dealing with two major cases at the time. But with Keith's case I think we had several thousand pages of documents, yeah.
Q So you got the ball rolling, and then you passed on the information once you guys got off?
A That's what we were told to do, yes.
MR. KETCHMARK: That's all I have, Judge.
CROSS-EXAMINATION BY MR. RUHNKE:
Q Mr. Pace, good afternoon.
A Good afternoon, sir.

Q We've talked a few times along the years about the Nelson case, haven't we?
A Yes, we have.
Q And I wanted to be clear on one thing. I wasn't clear when the Ortiz case was tried in relation to your involvement in the Nelson case.
A The Ortiz case was tried in the year 2000.
Q All right. So the year prior to your -- well, let's stay with that for a moment.
A Okay.
Q Assuming that you were appointed to represent Mr. Nelson in the fall of 1999 --
A Yes.
Q -- and were involved in his case through the exact date would be August 21, 2000.
MR. RUHNKE: Your Honor, you would take judicial notice of the docket entry. It's been referred to before.
THE COURT: Absolutely.
Q (BY MR. RUHNKE) Were you involved in both the Ortiz case and Mr. Nelson's case from -- at the same time?
A I was involved with Keith Nelson's case. For the entire time that I was representing Keith, I was also representing Mr. Ortiz.
Q And when did the Ortiz case come to trial?
A I don't remember off the top of my head. It was

sometime in the year 2000.

Q Was it before or after you withdrew from the Nelson case?

A I think it was after. I believe we were still working on that case, and I think the case went to trial shortly after we -- either -- just shortly before or shortly after. I can't remember. Again, it's been 15 years, but --

THE COURT: You can probably stipulate to that, can't you?

MR. RUHNKE: We can probably find out.

MR. VALENTI: April 11th, 2000, before Judge Fenner.

MR. RUHNKE: It started April 11th, 2000?

MR. VALENTI: April 11th.

A So right before then we got off of Keith Nelson's case then.

Q (BY MR. RUHNKE) So I understand this correctly, you were going to trial in a federal capital case in April of 2000 --

A Okay, yes.

Q Based on the stipulation.

So you must have been pretty heavily involved in getting ready to go to trial in the case; am I correct?

A Certainly.

Q And so that by the time -- when you were first appointed in Keith Nelson's case then, you had never tried a federal capital case or state capital case before a jury. Am I taking

that correctly?

A Right. We never needed to. We resolved all of those short of a jury trial.

Q And you mentioned that you thought Susan Hunt had special skills or qualifications in the area of mental health. Do you know what you base that on?

A Well, she was -- she had a degree in -- I think she was a scientist.

Q Biology?

A Okay. And we had -- I had -- I mean, I've known -- I had known Susan for a number of years, and my understanding and having dealt with her, I believed, yes, that she did have much more information on the mental health issues and the science issues of mental health than I did. And that's why, you know, I let people that know a lot more about it than I do deal in those areas.

Q Do you recall that she actually worked as a forensic chemist for a law enforcement agency for a time?

A I believe she did, yes. That -- I'd forgotten that, but that's true.

Q Do you know if she ever worked in a mental health capacity?

A I really -- I don't know, Counselor. I don't.

Q It's been a long time?

A Yes.

Q Mr. Franco kind of appeared and disappeared in the case. Is that your recollection?

A Mr. Franco was a nuisance, yes, but he did appear and disappear at times.

Q You learned that he was eventually disbarred?

A Yes. He created more problems and we had significant problems, but fortunately he was ultimately out of the case. Then I think he was disbarred for other reasons, yes.

Q And you described him as a friend and confidante of Mr. Nelson. Do you know that he had never met Mr. Nelson until after his arrest? Do you know that from your experience from the case? Do you remember that?

A I don't remember that specifically. I just knew when I say friend and confidante, Mr. Nelson would not initially have any communications with us unless Dan Franco was there and then would ask us to leave at times so he could continue to talk confidentially with his lawyer, Dan Franco. So there were times that, yeah, when I talk about friend and confidante, he was much more of the friend and confidante than he was a lawyer.

Q And in reality an impediment to what the defense team was trying to accomplish?

A Absolutely, absolutely.

Q And you mentioned that the team met regularly. Would that be the attorneys and the investigators would sit down on

a regular basis to review the status of the case, plan out future steps, that sort of thing?

A Yes. I mean, as far as number of times in trying to get everybody together, that's, as you know, I'm sure, is extremely difficult with busy practices, and, of course, Susan had a private practice and Bill did too. But that's what we tried to do is get together, and if somebody had to be on the phone, they'd be on the phone. But we did try to meet regularly in order to make sure everybody was on the same page, everybody knew what they were doing and assignments because primarily we were not doing motion practice at all. That was Bill and Susan. She was doing the lion's share of that.

Q And you've taken training in capital representation, I assume?

A Oh, yes.

Q And is it stressed that it's important for capital defense teams to meet on a regular basis to update one another on what is going on in cases? Is that part of the standard of care that comes along with handling capital cases?

A Yes, that's true.

Q You also mentioned that you had a small regular Federal PD caseload along with your capital caseloads; is that correct?

A I had a regular -- a reduced caseload when I got the

Ortiz case, and when I got the Nelson case assigned, then those cases were sent to other attorneys, and the decks were cleared and I did nothing but Mr. Ortiz and Mr. Nelson.

Q Those capital cases are extraordinarily time consuming and labor intensive; is that correct?

A That's correct.

Q Handling more than two at a single time would be difficult?

A Well, I don't know that I would ever have handled more than two at a time. I think two is manageable as long as you've got a good support staff, but that's -- yeah. It's extremely time consuming.

Q So assuming that you're working a 40-hour week and none of us work 40 hours a week, we all work more than 40 hours.

A Yes.

Q You're devoting 80 hours a month to one case, 80 hours a month to another case, but certainly your time is focused on those cases; is that correct?

A Yes.

Q You discussed the identification of mental health experts. Do you recall that in the spring of 2000, seems to coincide roughly with your involvement in the Ortiz trial, that Mr. Shull filed a motion and the court ultimately approved the appointment of Stephen Peterson, Dr. Stephen Peterson, a psychiatrist, to serve as a mental health expert

in the case? Just I'm asking do you recall that?

A I don't independently recall that. I mean that's probably true. Again, it's not something I had direct involvement in.

Q Okay. I'm just testing your recollection just to see if you do remember. It's obviously a part of the record in this case. It is what it is.

And the last document that was shown to you by Mr. Ketchmark was Mr. Ninemire's letter to Susan Hunt basically listing steps that had to be taken. Do you recall that?

A Yes.

Q You said you gathered thousands of pages of documents. Do you recall that a lot of that was simply corrections records and Texas Youth Commission records, which in and of themselves amounted to thousands of pages?

A I don't remember the specific items. I know that Ron was gathering, putting together the records, and then everyone would discuss what we had and what we still had to obtain.

Q And do you recall that virtually the last of Mr. Ninemire's recommendations in that closeout letter was that it was essential that Keith Nelson receive a psychiatric or mental health evaluation?

A I know that we had discussed that. I thought it was imperative that he do that, yes.

Q And why would a mental health evaluation be imperative in a case like Keith Nelson's?
A Well, because I think that, first off, you have to decide whether or not they're competent to proceed. You have to decide if it's going to be a death penalty case. I mean, the standard is you can't execute someone that isn't competent, and you want to be able to make sure that they can work with you, you know, effectively. There's all these --
Q What about in the area of mitigation?
A Well, mitigation, yes, but, again, mitigation to me goes down the road just a little bit. First off, you've got to get the case together, you know, the primary guilt phase case together. And, again, if you can, I guess I would say, cut the legs off of the case early on, knowing that if you have enough mental health problems with the client that he couldn't be executed anyway, then you want to -- you want that up front. So those are -- yeah, there's a lot of factors that go into it.
Q Once you're past the issue of competency -- for example, do you recall whether you ever raised the issue of Mr. Nelson's competency?
A I didn't file any of the motions, no. We were -- again, we were in the information. This is way too early, Counselor. I mean, by the time I got out of it, it was probably time that some of those motions would be filed, and that may be where

you come up with Bill Shull asking for an expert in that field. It takes months to get to that point to determine who you need to hire.

I just don't go out and hire somebody. I want to know a lot of background about an individual before I'm going to spend the money to hire the right individual.

Q You agree, however, that evidence of brain damage, brain dysfunction, neurological impairments, levels of mental health difficulties can be important mitigation themes if the case actually does go to a penalty phase?

A Absolutely, yes.

MR. RUHNKE: I have nothing further, Your Honor.

MR. KETCHMARK: Just briefly.

REDIRECT EXAMINATION BY MR. KETCHMARK:

Q Mr. Pace, if you're working on a case, whether it's two capital cases or whether it's a regular public defender's docket and you realize that you're not ready to go to trial, what do you do?

A File a motion to continue it, and we would continue to investigate and provide enough information to the court to show why we're not ready to go.

MR. KETCHMARK: That's it, Judge.

MR. RUHNKE: And nothing additional, Your Honor.

THE COURT: Thank you, Mr. Pace.

THE WITNESS: Thank you, Your Honor.

(Witness excused.)

MR. KETCHMARK: I believe that's all we have until Dr. Martell in the morning, Your Honor.

THE COURT: Okay. Enjoy your afternoon.

MR. RUHNKE: Thank you. You too, Your Honor.

THE COURT: 8:30.

(Court adjourned at 1:40 p.m.)