IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

KEITH D. NELSON, )
Movant, )Case No.
vs. )04-8005-CV-W-FJG
UNITED STATES OF AMERICA, )Pages 629-686
Respondent. )

TRIAL TRANSCRIPT - VOLUME IV OF IV

On April, 14, 15, 16, and 17, 2014, the above-entitled cause came on before the Honorable Fernando J. Gaitan, Jr., United States District Judge, sitting in Kansas City, Missouri.

APPEARANCES

For the Movant: MR. DAVID A. RUHNKE
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042

MS. PAULA K. HARMS
Federal Public Defender
850 West Adams, Suite 201
Phoenix, Arizona 85007

MR. GARY E. BROTHERTON
Legal Writes, LLC
503 E. Nifong Blvd., #377
Columbia, Missouri 64201

For the Respondent: MR. DAVID M. KETCHMARK
MR. JEFFREY E. VALENTI
United States Attorney's Office
400 East 9th Street, Ste. 5510
Kansas City, Missouri 64106

# I N D E X

THURSDAY, APRIL 17, 2014
VOLUME IV OF IV


| | Page |
|---|---|
| DAN MARTELL, Ph.D. | |
| Direct Examination by Mr. Valenti | 631 |
| Cross-examination by Mr. Ruhnke | 651 |
| Reporter's Certificate | 686 |






Case 4:04-cv-08005-FJG Document 263 Filed 05/21/14 Page 2 of 58

THURSDAY, APRIL 17, 2014

THE COURT: Dr. Martell.

MR. VALENTI: Morning.

May it please the court, United States calls Dr. Dan Martell.

DAN MARTELL, Ph.D., being duly sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MR. VALENTI:

Q Sir, can you introduce yourself to the court?

A Good morning.

My name is Dan Martell.

Q How do you spell your last name?

A M-a-r-t-e-l-l.

Q How are you employed, sir?

A I'm a forensic neuropsychologist. I'm self-employed.

Q Please tell the court what it means to be a forensic neuropsychologist.

A It's a big mouthful. Neuropsychology is the study of brain and behavior and particularly the effects of brain damage on human behavior. Forensic neuropsychology brings those issues of brain and behavior into the courtroom for issues that are relevant in a particular case, whether criminal or civil.

Q You're a doctor; is that correct?

A I am.

Q What kind of training do you have and education that would support your ability to perform these jobs?
A I have a bachelor's degree with honors in psychology from Washington & Jefferson College in Washington, Pennsylvania. I got my master's and my Ph.D. at the University of Virginia in Charlottesville, where I also did a minor in law at the Institute of Law, Psychiatry, & Public Policy.

From there I went to New York University and Bellevue Hospital in New York City where I did my internship. I spent half of my time in a maximum security hospital for mentally disordered offenders called Kirby, K-i-r-b-y, Forensic Psychiatric Center, and then I did a postdoctoral fellowship where I specialized in forensic neuropsychology also at NYU, Bellevue Hospital, and Kirby Forensic.
Q When did you do that?
A When did I do that?
Q Yes. The fellowship.
A I believe that was in 1987.
Q How long have you held your Ph.D.?
A Since 1989.
Q Since that time, have you been working in this field?
A Yes, I have.
Q Almost exclusively?
A Yes.

Q Are you board certified in any particular area?
A Yes. I'm board certified in forensic psychology.
Q Okay. Have you been published in the field of psychology and neuropsychology?
A Yes, I have.
Q Do you recall approximately the number of times you've been so published?
A It's between 25 and 30 publications in peer-reviewed journals.
Q Have you ever been called to testify or evaluate someone for courts?
A Hundreds of times.
Q State and federal?
A Yes.
Q How many times would you estimate state cases?
A I don't know, maybe 150 times.
Q Federal, do you have an estimate on the number of cases you've worked in that regard?
A Maybe 75 times.
Q In any of those occasions that you've been called upon to make an evaluation, have you also had to testify?
A At least half, maybe more.
Q At my request did you provide the United States Attorney's Office with a copy of your current curriculum vitae?

A I did.
Q I'm going to show you what's been marked as Government's Exhibit 118A.
MR. VALENTI: Your Honor, may I have permission to approach the witness?
THE COURT: You may.
MR. RUHNKE: Your Honor, I'm not going to have any objections to the CV or the report of Dr. Martell.
MR. VALENTI: Thank you.
Q (BY MR. VALENTI) Dr. Martell, briefly does Government's Exhibit 118A, your curriculum vitae, kind of outline your training, background, and experience?
A Yes, it does.
Q Similarly, before we get talking about this case specifically, is it fair to say that you did, however, write a report?
A I did write a report.
Q And I've marked that as Government's Exhibit 118, and I believe you have a copy of it with you; is that correct?
A I do have a copy.
Q Should you during the course of your testimony need to refer to your report, please feel free to do so.
A Thank you.
Q Can you agree with me, Doctor, that if I ask any questions today regarding psychology, neuropsychology, that

any opinion you give will be to a reasonable degree of scientific certainty?

A Yes. Or I'll qualify if it's not.

Q Thank you.

Were you hired by the United States Attorney's Office to evaluate Keith Nelson as it relates to his court proceedings that we're in court now on?

A Yes, I was.

Q Did you evaluate him?

A I did.

Q When did you evaluate Mr. Nelson?

A I saw him on September 9th and 10th of 2010, for a total of about nine and a half hours.

Q Where did you see him at?

A I saw him in Terre Haute at the United States Penitentiary.

Q So he was in lockup at that time?

A Yes, he was.

Q And the institution you saw him in is commonly where the federal death row inmates are housed; is that correct?

A Yes.

Q What type of facilities did you have to conduct your evaluation of Mr. Nelson?

A We had a private, quiet room. There's a steel table that separates my side from his side, but there's no glass

partition. It's open. It's a very large room, echoes a bit, but it was more than adequate for the task.

Q Before we talk about that specific evaluation, had you attempted to evaluate Mr. Nelson years earlier?

A Yes, I did.

Q Do you recall when that was?

A Not specifically.

Q If I submit to you kind of the fall of 2001, would that sound about right?

A Yes.

MR. RUHNKE: Your Honor, we'll stipulate that's when it was.

Q (BY MR. VALENTI) Mr. Nelson had a trial approaching in October, November of 2001, and shortly before you and your colleague, Dr. Dietz, were tasked with trying to evaluate him on the government's behalf, correct?

A That's correct.

Q Were you ultimately able to evaluate Mr. Nelson during that time?

A No, I was not.

Q Can you explain to the court what happened?

A I came here to Kansas City. I went to the facility where he was being held at that time, and he refused to come out for the evaluation.

Q When you say you came to Kansas City, you're not from

this area?

A No.

Q Where are you from or where were you residing back then?

A In Newport Beach, California.

Q You had flown from California to Missouri to conduct -- or to Missouri to conduct the evaluation -- or where was the evaluation to be conducted then?

A It's at --

Q CCA?

A Yeah, CCA. It's a private -- I think it's in Leavenworth.

Q Kind of in Lansing, Kansas?

A There you go, yeah.

Q But you were unable to evaluate him then, correct?

A That's correct. He refused it.

Q In addition to you, was your colleague, Dr. Dietz, scheduled to evaluate Mr. Nelson as well?

A He was going to come after I was finished so he'd have the benefit of my test results.

Q What relationship do you and Dr. Dietz have with one another?

A Collegial. Dr. Dietz was a professor of mine at the University of Virginia. He's been a mentor to me. I joined his practice in 1994 in California, and I've worked with him for the past 20 years.

Q What is Dr. Dietz' specialty?
A Forensic psychiatry.
Q So you and he look at some things a little bit differently, correct?
A Correct.
Q You were going to work in tandem. He was going to use your results to inform his later evaluation?
A That's exactly right.
Q Was he able to perform his evaluation?
A No, he was not.
Q Before we again talk about Mr. Nelson's evaluation here, in general in the 2001 timeframe, was people like yourself, neuropsychologists' or mental health professionals' ability to conduct evaluations on defendants facing criminal charges a highly-litigated endeavor?
A At that time I think it was becoming more and more so. There would be challenges to the testing, and there would have to be a hearing to determine what was permitted and what would not be.
Q Generally when you get to interview someone or evaluate someone for a court proceeding, what was the timing? In other words, did it occur early in the proceeding or very late?
A Oh, it varies. Sometimes it would be very late; sometimes it would be fairly early on.
Q Okay. When you evaluated Mr. Nelson in 2010, were you

able to evaluate him in the manner that you preferred?
A Not entirely.
Q Please explain.
A One practice that my office has adopted is to videotape our examinations. We feel this preserves a perfect record of what occurred but then can be shared with the court, with the defense team, or the prosecution team depending what side we're on, with the other experts in the case. It documents exactly what was said and how things happened in a way that I think is good practice.
Q And you wanted to do that here, but that was ultimately challenged by Mr. Nelson and you were not allowed to do that, correct?
A That's correct.
MR. RUHNKE: Just to clarify, the court directed it not be videotaped. I don't know if Your Honor remembers that.
MR. VALENTI: That's correct.
Q (BY MR. VALENTI) There was litigation advanced by Mr. Nelson's group and ultimately a court order and you were not allowed to videotape that interview?
A That's my understanding, yes.
Q So we don't have that tape recording of your interview or evaluation of Mr. Nelson available today because of that?
A That's correct. There was a live video feed. Mr. Ruhnke was in the warden's office and was able to watch

the entire evaluation in realtime over the TV, but my understanding it was not recorded.

Q Correct. Similarly, you wanted to perform a test known as the MMPI; is that correct?

A That's correct.

Q What is the MMPI?

A It's the Minnesota Multiphasic Personality Inventory currently in its second version. It is a or an objective test of psychopathology, in other words, mental disorders.

Q Were you able to ultimately use that diagnostic tool in your evaluation of Mr. Nelson?

A I was not.

Q And, similarly, that was the product of litigation that ultimately the court ruled on so you didn't -- were not able to use that tool?

A Correct.

Q Okay. Talking about the evaluation you did perform, without going through every test, what generally did you do with Mr. Nelson?

A I spent a lot of time doing neuropsychological testing. There were several things I was interested in. One was his level of effort, whether he was trying hard, whether he would be exaggerating problems or minimizing problems, so I gave special tests to look at his effort and to rule out malingering.

Because I viewed my role here as to provide the court with a second opinion, I had looked at the work of Dr. Gelbort, of Dr. Amador, of Dr. Foster at that time, and based on what they had seen and the deficits they had identified, I tried to tailor a battery that would look to see if his impairments were replicable, if I would get the same problems that they had gotten using similar or in some cases the same tests.

So I tested his memory in particular, his frontal lobe functioning in particular, and his personality, and actually as I'm looking at this, it looks like I did administer an MMPI.

Q Correct. I want to get to that. It was in litigation but you ultimately were given the authority to give the MMPI, correct?

A Yes, I was. So my earlier statement was incorrect.

Q Okay. When you were testing him for effort, what did you find?

A Very good effort. There was no attempt to malinger, to exaggerate problems. He was a straight shooter. He was honest and forthcoming certainly on the neuropsych testing.

On the psychodiagnostic testing where I'm looking for evidence of mental disorders, out of three tests that I gave, two were perfectly valid with no effort to either exaggerate problems or minimize or hide problems. The other

one had a mild tendency to exaggerate, not for malingering purposes but what we call a cry for help, saying I'm really suffering and I want you to know that I'm suffering. So he turns up the volume a little bit but not to the extent that he's faking. You know, I found him to be depressed, and he wanted clearly on that test wanted me to know that.

Q So you -- one of the things that you did find during your evaluation was that he was suffering from depression?

A Yes.

Q What about PTSD or post-traumatic stress disorder, did you do any testing to see if that condition existed?

A Well, I did multiple things. One was clinical interview looking for signs and symptoms of post-traumatic stress disorder, as well as objective testing. One of the tests I use is called the Detailed Assessment of Post-traumatic Stress Disorder or DAPS. Also the personality assessment inventory has scales built in that capture post-traumatic stress symptoms.

So I looked at all of those things trying to see if there was evidence that he suffered from post-traumatic stress. I did not see evidence that he's currently suffering from post-traumatic stress. He did endorse a high level of stress in his past and some degree of discomfort at the time of that stress. But at the current time, no signs or symptoms of post-traumatic stress disorder.

Q You, of course, were familiar with Dr. Amador's report, having indicated you reviewed it, and that's a different opinion than Dr. Amador, correct?

A Yes.

Q Dr. Amador also diagnosed Mr. Nelson with a condition known as psychosis not otherwise specified; is that correct?

A Yes.

Q Can you tell the court what that is in general and whether you found it to exist?

A Psychosis not otherwise specified is a diagnosis where you have symptoms of a loss of contact with reality such as hearing voices, seeing visions, having hallucinations, having disordered thinking that doesn't fit one of the classic patterns like schizophrenia or schizoaffective disorder. I did not see symptoms. I think Dr. Amador and I were both looking at the same symptoms but interpreting them differently.

One prominent feature that Dr. Amador, I think, referred to as paranoia and delusions was Mr. Nelson's belief that the government experts were against him and would say whatever the government wanted. He has very cynical views about the evidence that was put on in his case and was very cynical from the outset about my participation with the belief that I would not be fair to him, that I would be biased against him.

This seemed to be rooted in reality in his perceptions of how the evidence went in at trial rather than some psychotic process. So I didn't see that as evidence of delusions or of paranoia.

On the other hand, you know, on some of the psych testing, it is true the government is trying to execute him, which puts him in a difficult bind. The tests are not set up for someone in his situation, so there was some questions that he felt he couldn't answer because of that. And, you know, some of his paranoia is based on the reality of his situation.

Another symptom that Dr. Amador pointed to was a sensation of poking or burning in his back in between his shoulders. There's also a medical condition called -- I've got to look it up. Give me just a second. I don't want to say it wrong. I think it's notalgia paresthetica, n-o-t-a-l-g-i-a, paresthetica, p-a-r-a-e-s-t-h-i-c-a [as spoken], I believe, which is an unusual dermatological condition where you get that -- a sensation of burning between your shoulder blades that happens intermittently throughout your life, and that's pretty much what he described. If he had that dermatological condition, that would not be a tactile hallucination. It would be a skin condition.

If he did not have a skin condition, then perhaps it would be a tactile hallucination. At the end of the day I don't think we have a final answer to that. I know a

dermatologist saw him at the prison. In reviewing the dermatologist's note he never mentions paresthetica in any way, like, he was never told to look for that.

He examined his back. He saw no redness. He saw no patches. He determined he wasn't going to take a biopsy because he didn't see anything wrong, but I don't think -- I don't know if he was properly informed for what to look for. So at the end of the day I think that remains an open question, but his symptoms certainly follow a known medical condition.

And I guess the last thing that Dr. Amador pointed to was a symptom called alogia or empty speech. I did not observe that. I did observe some, I would use the term, paraphasia, which was a trouble pronouncing words. For example, instead of saying giraffe, he would say diraffe with a D. Instead of accident, he would say ack-iz-dents. I don't know how you're going -- I put it in my report as a-c-k, dash, i-z, dash, d-e-n-t-s.

So there is some abnormality about his speech. He also told me that it happens all the time. It makes it difficult for people to understand him and that people in his environment in the prison give him a hard time about it. So he does have abnormalities in his speech but not alogia, not empty speech, not an inability to express his thoughts or to say things that are not complete.

Q Dr. Martell, did you do any intellectual quotient or IQ testing as part of your battery during the evaluation?
A I don't believe I did. Let me just take a look. No, I did not.
Q Were you aware that previous to your evaluation, Dr. Gelbort had?
A Yes.
Q And that he came up with results generally in the average IQ area?
A Yes.
Q You indicated disagreements with Dr. Amador on a few things, but on a larger issue you did agree with him. That was regarding cognitive disorder, correct?
A Yes.
Q Or brain damage?
A Correct.
Q Please explain that to the court.
A Based on my battery of testing, I found essentially the same things that Dr. Gelbort had found, perhaps some things of greater severity than Dr. Gelbort described, primarily involving Mr. Nelson's memory and his frontal lobe functioning.

What do the frontal lobes do? They're the executive command and control center of the brain. They're the place where you learn from mistakes, where you organize and control

and direct your behavior, and there he had impairments -- well, in memory -- let's take them one at a time.

In memory he had moderate to severe impairments. For example, I gave him a test where he had to memorize a list of words, and some of the words would be related. They'd be different kinds of fruit or different kinds of furniture or different means of transportation, and people with a functioning frontal lobe are able to use that executive command and control to sort and organize and say, oh, these are fruits and these are ways of getting around, and that facilitates their recall by clumping those things together.

Mr. Nelson was very poor at doing that, and as a result, despite being read the list multiple times, he had trouble remembering a normal amount of information. And then when later asked to recall it, he was very impaired in his ability to remember it. So he had problems with memory.

He had a variety of problems in frontal lobe functioning that were in general mild, although he did have one specific thing called anosmia, a-n-o-s-m-i-a, which is inability to smell. I gave him a test called the University of Pennsylvania Smell Test, smell identification test. It's essentially a scratch and sniff, smell this, and then you circle in the dot for what you think it smells like; bubble gum or blueberries or what have you. He has total anosmia, meaning an inability to smell, which is interesting because he

told me he likes to wear cologne in the prison and people give him a hard time because he wears too much. I think that might be reflected in the fact that he can't smell how much he's putting on.

He also had mild problems with inhibiting a familiar response in favor of an unfamiliar one. This is a tricky test where you're shown words printed in different color ink, and one time you just read the words. The next time you name the color of the ink, and the last time you have to name the color of the ink and ignore the word that's written. So the word "green" will be in blue ink, and you have to override your impulse to say green and say blue because of the color of the ink. And it's surprisingly challenging. He had mild difficulty with that.

He had difficulty shifting attention. He had reduced verbal fluency. He had difficulty clustering items together to enhance his recall, and he also had mild difficulty in terms of his everyday behavior, including apathy, a loss of interest, disinhibition, and executive dysfunction in general.

Q The majority of the brain damage you're describing is in the frontal lobe area; is that correct?

A Correct.

Q Now, with that brain damage being in place, do you have an opinion whether or not that brain damage was responsible

for the defendant's actions in the underlying criminal case?

A I do have an opinion.

Q What is it, sir?

A Well, I would say that, despite the level of brain impairment that's apparent on the testing and examination, when one looks at his behavior during the course of committing the crime, what you would anticipate from these findings is impulsivity, is an inability to control impulses to do things.

But looking at his behavior before, during, and after, we see a different pattern where he fantasized about what he wanted to do. He tried to carry out his fantasy with one victim, and when that didn't work, selected another victim. He laid in wait. He hid himself. He brought electrical cords to bind his victim. He kidnapped her and took off at a high rate of speed in such a way that people wouldn't be able to see him, wouldn't be able to identify him.

He took her to a secluded area. He bound her up he told me so she couldn't get away. These are all things that show planning as opposed to impulsive acting out.

So for those reasons, I don't think that the brain damage played a significant role in causing this crime.

Q Similarly, at the end of Dr. Amador's report he briefly mentions insanity as it relates to McNaughton. Were you aware of that evaluation?

A I was.

Q Do you have an opinion in regards to that?
A Well, again, I do have an opinion. I don't think he meets McNaughton standards with regard to knowing the wrongfulness of his behavior. The fact that he laid down on his seat prior to the kidnapping reduces his risk of people seeing his face and being able to identify him. That's knowledge that what he's planning to do is wrong and he doesn't want to get caught. Grabbing her and holding her down and driving away quickly, again, is knowledge that he's doing something wrong and doesn't want to be seen or be caught.
Getting rid of evidence, he talked to me about his awareness that her clothing could have trace fiber evidence that could link him to the crime, so he threw the clothing into the lake in order to get rid of that forensic evidence. He was seen wiping down the car and scrubbing his fingerprints off, again, trying to reduce his risk of getting caught for something that he knew was wrong. If you didn't know it was wrong, there's no reason to get rid of the truck, to wipe it down for evidence, to try and remove fibers from the crime scene that could identify him.
Q Finally, Dr. Martell, subsequent to your evaluation of Mr. Nelson in 2010, Mr. Nelson has himself employed other experts in the field to further evaluate him or to comment on your evaluation. Have you had the opportunity to review those reports?

A I have.

Q Has any of the reports that have been tendered to you changed your opinions that you offer the court today?

A No.

MR. VALENTI: Your Honor, that's all I have.

MR. RUHNKE: Just need a minute to get organized. This went a little bit quicker than I thought it was going to go, as did the whole hearing.

Could we display on the screen -- we have marked a few additional exhibits, which we will get electronically to your clerk by the end of today. I'm not sure we're going to move many of them into evidence, but there's a few additional.

THE COURT: The government is not challenging those exhibits?

MR. RUHNKE: I'm sorry?

THE COURT: There will be no objection?

MR. VALENTI: No.

THE COURT: Okay. Very good.

MR. RUHNKE: Could we see P86 on the screen.

CROSS-EXAMINATION BY MR. RUHNKE:

Q Dr. Martell, can you see that on the screen in front of you?

A Yes, I can.

Q We've been somewhat struggling with the issue of what standard deviations mean, somewhat struggling with how they

translate into population percentages. Can you tell me what you're looking at as P86?

MR. RUHNKE: In fact, let's enlarge the whole thing, get rid of the margin, the white stuff, just highlight the graph part, blow it up.

Q (BY MR. RUHNKE) That's a little larger. Can you tell what we're looking at?

A This is what's commonly called the bell curve that shows the distribution of test scores over the population.

Q And if I'm correct, the zero represents the absolute mean, the average with the mean, the middle of the group. There's -- half the group's on one side, and half the population's on the other side, correct?

A Precisely.

Q And within that range, you find 34 percent of the population on one side, 34 on the other. So 68 percent of the population falls within that average range. Is that a correct interpretation?

A Yes, it is.

Q All right. And when you move one standard deviation away, there's 13.59 percent as it turns out, but a little over 13 1/2 percent of the population are one standard deviation away either direction, correct?

A Correct.

Q When you get to two standard deviations away, it's down

to 2 percent of the population in either direction, correct?
A Yes.
Q And when you get to three standard deviations, you're down to almost a tenth of 1 percent, .13 percent; is that correct?
A Yes.
Q So when you're getting to three standard deviations, you know, 99.8 percent of the population will perform better or worse, depending on which end of the scale they are than the average; is that correct?
A Correct.
Q Okay. So you have a forensic practice exclusively?
A Yes.
Q When was the last time you had a clinical practice? When was the last time you actually treated a patient?
A Well, I consider forensic work to be clinical work, but it's different from treatment. And the last time I treated a patient was 2 -- no, 1992 probably.
Q All right. So it's been two decades plus?
A Yes.
Q And you certainly are not providing therapy when you do a forensic analysis, are you?
A No. But clinical encompasses more than just therapy.
Q And how many times a year do you testify at hearings in front of juries, roughly speaking?

A It varies, but I'd say between five and eight times a year.
Q You earn your living primarily as a forensic or exclusively as a forensic psychologist?
A Yes.
Q Do you have any other salaried positions anywhere?
A No.
Q You list yourself as a faculty member at UCLA Medical School. You're not paid for that position; is that correct?
A That's correct.
Q What hourly -- are you here as part of Dietz & Associates, or are you here on your own, Dan Martell, own neuropsychological practice?
A I'm here through Park Dietz & Associates.
Q And if I understand correctly, Park Dietz & Associates bills the government a certain hourly rate for your services and you get a lesser rate from Park Dietz and they keep part of the money. Is that roughly how it works?
A That's correct.
Q And what hourly rate is the government being charged right now for your services?
A $450 per hour.
Q When you testified in the Angela Johnson case, I believe the rate was $400 an hour, so it's gone up $50 since then?
A I don't recall. I haven't raised the rate for quite

sometime.

Q And of that $450 per hour -- and one of the reasons I ask is we often have to hire experts, and it's good to know what the government is paying experts.

A Sure.

Q So how much of that money goes to Park Dietz & Associates, and how much goes to you?

A Park Dietz & Associates retains approximately one-third for overhead.

Q Their overhead runs $150 an hour?

A You'd have to ask Dr. Dietz.

Q Okay. Well, what does Dr. Dietz charge in government cases currently?

A I'm not sure. I think it might be $600 an hour.

Q Now, you have a three-ring binder with you on the witness stand. Could you just tell me generally what is in there?

A Sure. I have a copy of my CV and my report, and then I have the reports of several of the other doctors in this case.

Q Do you also have your raw test data with you?

A I have three pages from it. I have the rest in the courtroom.

Q Okay. In fact, you did administer an MMPI-2 to Mr. Nelson; is that correct?

A Yes.

Q You also administered a personality assessment inventory; is that correct?
A Yes.
Q So those are both personality testing. There was some litigation about it, correct, but ultimately the court's ruling was go ahead and admit it -- go ahead administer the testing, and if it's a problem, we'll deal with it later. It hasn't been a problem, so we haven't brought it back to the court's attention.
So you were able to do that?
A Yes. Thanks for the clarification.
Q And the first part of your report, among other things, summarizes the underlying criminal conduct in this case, and I'll be more specific. If you look at your report from -- the first seven pages of your report list documents that you've reviewed, and if you look at page 7 of your report, sir, if you will.
A I have it.
Q Okay. Do you see that the first 59 items that you reviewed came from the government essentially in 2001, their FBI 302s, their police reports, their interviews, all manner -- photographs, all manner of things dealing with the underlying kidnap and murder of Pamela Butler, correct?
A Yes.
Q And then you note that you reviewed a report of

Dr. Daniel Foster, a report of Michael Gelbort, affidavit of Natalie Novick Brown, and a report of Xavier Amador dated March 30, 2010. I gather that since writing this report, you've reviewed the additional reports of Dr. Amador?

A I have.

Q Have you reviewed a social history that was prepared in this case by Jill Miller?

A I have.

Q Have you reviewed -- let me just back up a moment.

At the time you conducted -- at the time you conducted your exam in 2010, did you have available a draft social history report that had been prepared by Tena Francis Associates? Do you recall that?

A I don't recall. If I had it, it would be in the list.

Q And I'll represent to you that it's not on the list.

But you reviewed the neonatology report prepared by Dr. Carolyn Crawford?

A I did.

Q And to just step back from this a minute, you've identified brain damage, brain dysfunction, neurological impairments in Mr. Nelson. In response to Mr. Valenti's questions, you did not see a connection to the underlying offense between the brain dysfunction that you identified, correct?

A Correct.

Q In terms of mitigation evidence, evidence that may be presented to a jury, is such evidence evidence of mitigation in your experience?
A Yes.
Q You also reviewed the trauma report, I call it that, of Dr. Leslie Lebowitz?
A I did.
Q Do you know Dr. Lebowitz or of her?
A I do. We have -- we're actually working on a case together at the moment.
Q Did you also review the MRI and PET results?
A I did.
Q Are the report -- the bioimaging report, neuroimaging report of Ruben Gur, Dr. Ruben Gur?
A I did.
Q Finally, you also mentioned the dermatological reports from Terre Haute, correct?
A I only had one. That would be from Dr. Jones.
Q Okay. Let me put on the screen, I'm jumping ahead here, let me put on the screen first P64, please.
MR. RUHNKE: If we can just blow up the top third of that.
Q (BY MR. RUHNKE) Do you remember looking at this report, and it is by Dr. Jones, Roger Jones, MD?
A No.

Q All right. So you saw a different report.

And you notice the date of this report is -- an encounter date May 6th, 2011?

A Yes.

Q So you've never seen that report?

A I don't believe so.

Q Okay. And in that report the inmate is noting a vague history, uncertain condition in his back, no specific issues -- lesions reported, no skin complaints, reports a skin biopsy was requested for medical/legal reasons, and it just basically -- this is just a negative report, correct?

A Yes.

MR. RUHNKE: Can we see the second page of that, please.

Q (BY MR. RUHNKE) And in the top left-hand -- if we just highlight the exam portion of that, the dermatologist, who made this examination, and I'll represent to you this is an outside provider, this is not somebody that's on staff at Terre Haute, sees no skin lesions, some eczema to his hands, freckles, but no suspicious pigmentation, no signs of trauma, skin biopsy not indicated.

So that's one you had not seen; am I correct?

A That's right.

MR. RUHNKE: Could we see the next one, which is P60 -- whatever the next number is. It's not that. Okay. If we

could just highlight the text section of that, including the date and everything, everything but the Bureau of Prisons header.

Q (BY MR. RUHNKE) Now, is this the report that you did see?

A Yes.

Q Okay. And, again, this is a dermatological consult. The date of the consult is January 10, 2012, and the doctor, again, makes an examination. He decides that the skin is normal and there's no complaints, so he's not going to do a biopsy because he feels that he'd violate the Hippocratic oath because he would be cutting into the skin, he'd be leaving a scar, and there was no medical reason for that.

MR. RUHNKE: Now, take that down, if you will.

Q (BY MR. RUHNKE) In your review of Dr. Amador's materials, do you recall that Dr. Amador had a three-way conversation with myself on the phone with Mr. Nelson shortly after this examination? Do you recall that part of it, about a 20-minute phone call?

A Yes.

Q And that Mr. Nelson reported to Dr. Amador, as reflected in his report, that he continued to suffer from those burning sensations, poking sensations, and had those burning and poking sensations even during the period of time when the dermatologist looked at his back and found nothing wrong with

him? Do you recall that?

A Yes.

Q In your direct exam you had mentioned that your neurological testing of Mr. Nelson produced results that were actually somewhat more grave or more severe than those uncovered by Dr. Gelbort, correct?

A Correct.

Q And you weren't here yesterday for Dr. Gur's testimony, were you?

A No, I wasn't here.

Q I'll represent to you with the government's consent that Dr. Gur in fact in his bioimaging or neuroimaging, I forget what he calls it, compared the two raw data, took your raw data, and took Dr. Gelbort's, and his conclusion was, yes, your findings represented more severe brain damage than Dr. Gelbort had identified.

You weren't aware of that, were you?

A No.

Q Can we just talk about some basic principles that informs the kind of examination that you do.

Now, you have written reports for defense counsel, you have testified for the defense, you've testified for the government -- written reports for the government as well, correct?

A Correct.

Q The overwhelming majority of cases you've testified in have been for the government though, correct?
A Certainly the majority.
Q So some basic principles. You knew from your examination that Keith Nelson has two first-degree relatives, brothers, who are diagnosed schizophrenics, correct?
A Yes.
Q Is it true that when somebody has first-degree relatives with that kind of mental condition, disorder, that there's an elevated risk for the development of brain disease and other psychiatric disorders?
A Yes.
Q You know from your review of the records and your conversations with Mr. Nelson that as a child he suffered from, if I say it right, enuresis, bedwetting?
A Correct.
Q In fact, that carried into his adulthood, but certainly throughout his childhood, he -- when he went to bed at night, he would wet his bed?
A I think it continued until he was 20 years old.
Q Right. But certainly throughout his childhood, correct?
A Yes.
Q And would you agree that bedwetting is often reflective of neurodevelopmental delays as well as situational psychological stress on children?

A Either or both.
Q Okay. So that it is a significant symptom in the sense that it may suggest neurodevelopmental delays, and it also may suggest that this is a child who is living in a very stressful environment, correct?
A Yes.
Q You know from reviewing your history of Mr. Nelson, that he has a history of head injuries, closed head injuries, correct?
A Yes.
Q And is it true that even without a loss of consciousness, closed head injuries can be associated with significant neurobehavioral deficits?
A Yes.
Q Is there also substantial scientific literature that abuse and violence during childhood creates a significant risk for the development of psychiatric disorders?
A Yes.
Q Is it also true that there is a clear link in the literature between childhood abuse and an elevated risk of criminal behavior as an adult?
A Yes.
Q There is also, is there not, a substantial literature of the harmful effect on children simply witnessing violence, correct?

A Yes.
Q And in this case it certainly increases subsequent risk of psychopathology, correct?
A Witnessing?
Q Witnessing violence.
A Yes.
Q And in this case do you know from the history, that Keith Nelson witnessed significant violence often by his father against his mother?
A And his grandmother.
Q And his grandmother?
A Yes.
Q And does witnessing that kind of violence even further increase the risk of psychopathology later on because it's in the family?
A I think the majority of the literature is that -- of that kind where it's abuse in the family, although there's also witnessing of violence in the community that also contributes.
Q Okay. Yes. I think you wrote a report in the Billy Allen case; did you not?
A I did.
Q Okay. And in that case Mr. Allen had witnessed a lot of street violence and a lot of, like, shootings on the street in his neighborhood, and in your assessment that was significant,

correct?

A Yes.

Q What role does a social history play in a mental health evaluation of the type that you conducted? I'll qualify it that way.

A Sure. I mean, history is critical to understanding the person, their developmental milestones, the problems and successes that they have encountered in their lifetime. So it puts the person in context.

Q And are you familiar with a standard psychiatric test, actually leading psychiatric test formally Kaplan and Sadock, it's now Sadock and Sadock?

A Yes.

Q Are you familiar with a statement in that treatise that an accurate social history can be, quote, the single most valuable element to help the clinician reach an accurate diagnosis?

A I don't know that quote specifically, but I'm sure it's in there.

Q And do you accept that?

A I do.

Q In the social histories section of your report, and you have your report, you can look at it, at page 7.

A I have it.

Q You report under the family history in the very first

paragraph that Keith Morse and Nancy Nelson had only met four times -- on four occasions during their lives, and each time they met, she became pregnant?

A That was the belief of Mr. Nelson's brother, yes.

Q And this section is all background information, and the section that was prepared on the crime itself, did you prepare that or did another employee of Park Dietz & Associates prepare it?

A Another employee prepared the summary.

Q And that was a former FBI agent and I forget his name?

A I think it's Ron Walker.

Q I think you're right. I think it's mentioned in the report.

A Yes.

Q So one of the ways you work is if you get a large volume of, for example, FBI 302s, investigative reports, within Park Dietz & Associates, there are retired FBI agents who work there who will take that and literally thousands of pages of documents, and try to summarize them and break them down into a manner that will -- that's of information, correct?

A Correct. In this case it's about a banker's box that's in my garage at the moment.

Q Although most of it, to be fair, consists of like correction records and things that really have very little significance?

A That's true. Out of the banker's box, I ended up with about, I don't know, ten pages of critical history.

Q Okay. And was it significant to you that the parents -- to your analysis, that the parents met only four times?

A Personally I find that a little hard to believe unless she's abnormally fertile.

Q It occurred to me as well.

And are you aware that every social history since then has confirmed that they lived together four or five years, a very troubled relationship but they lived together four or five years?

A I believe that's true based on the other reports I've read.

Q At page 8 of your report you say that -- you note that Keith Nelson lived with his aunt and uncle, George and Sally, out of the home for three and a half years, and, again, based on other reports you've read since then, are you aware that they were actually there only a few months? Page 8.

A I don't recall specifically.

Q Okay. At page 29 of your report you are discussing the report of another psychologist, Dr. Daniel Foster, and note that his report says that Mr. Nelson was repeatedly removed from his home and placed in group homes during his childhood.

Are you aware that that just is a mistake and that never actually happened? Are you now aware that that did not

occur?

A Yes. Some of the continuation of that sentence I think is true, that he was placed in correctional -- juvenile correctional settings.

Q And, as you've said in terms of the testing that you accomplished, you administered to him at least two standard, what I'll call, malingering instruments, correct?

A Yes.

Q One was the VIP, Validity Indicator Profile?

A Correct.

Q The other one was the TOMM, Test of Memory Malingering systems I think is the title of that. Is that close?

A Yeah.

Q It's T-O-M-M, correct?

A Yes.

Q And he did well on both of those, correct?

A Absolutely.

Q And those are -- I don't want to say they're a trap, but for someone who is trying to fake mental illness, it's essentially almost a 50/50 guess as to what the right answer is on most of those tests, correct?

A Well, that's not entirely true. Those tests are specifically looking for people trying to fake neuropsychological or brain damage as opposed to psychiatric problems, and, you know, a lot of the tests have two, you

know, two answer options so the -- essentially there's a 50/50 chance.

Q And when you get somebody who gets one out of ten when, you know, just flat-out guessing would get you 50 percent, you realize you have a problem; is that correct?

A Correct.

Q Wasn't the case here, right?

A Not at all.

Q And many of the other instruments that you administered have malingering validity type subscales and subtests within them, correct?

A Yes.

Q And in Mr. Nelson's case he did fine on all of them with the possible exception of the MMPI-2, correct?

A Correct.

Q But you saw this more as a classic, quote, unquote, cry for help than as an effort to deceive you, correct?

A I believe so, yes.

Q I mean, some of the questions on the MMPI-2, for example, are questions like I believe people are out to kill me, and, you know, it's very difficult to translate those kinds of questions into a death sentence inmate's situation, right?

A Absolutely.

Q You did not administer an IQ test but Dr. Gelbort did.

Does an IQ test such as the WAIS-III, which was administered in 2005, adequately or at all assess frontal lobe function?

A It has some frontal lobe significance.

Q And let me direct your attention to your testimony in United States v. Angela Johnson.

MR. RUHNKE: Did I give you guys the copy of the exhibit? I'll give you one now.

Q (BY MR. RUHNKE) You testified in a case in Pennsylvania, maybe 2011, United States v. -- United States v. Robinson. You recall that?

A Yes.

MR. RUHNKE: That's P89. Let me give you the exhibit, P89. You know what, I can use the -- I thought we had it in -- I can use the Elmo just to run through this.

Q (BY MR. RUHNKE) And in the Robinson case, you were testifying for defense counsel in that case -- for the defense in that case, correct?

A Why do you sound surprised?

Yes, I was.

Q I know the folks in Philly CHU have utilized you. We've met any number of occasions over the years, and so I'm going to show you page 37 of that transcript by using the document header. I'm directing my attention to, first, the bottom of the transcript.

You were asked this question: Now, an IQ test, would that be the type of test you would use to assess the functioning of the frontal lobe?

And at the top of the next page of the transcript you answer: No. I mean, if you do all of that with IQ testing, you wouldn't need neuropsychology.

Question: So when you see this kind of drop, then it's a red flag for neuropsychological testing?

Answer: It certainly would be, because, you know, particularly frontal lobe functioning is -- you could have a massive injury to your frontal lobes and still have the normal IQ. IQ tests are relatively insensitive to frontal lobe damage, which is one of the reasons we have neuropsychological testing to try and capture that frontal lobe function.

Was that accurate testimony when you delivered it?

A It was.

Q Still stand by that as an accurate assessment of what IQ relates to frontal lobe functions -- in assessing frontal lobe?

A I do. Although as the IQ test has evolved, some of the subtests have become more sensitive to frontal lobe than they were at that time.

Q Well, this -- when did that testimony take place?

A I want to say maybe three years ago, maybe four years ago.

Q I'm looking at the front page of the transcript, and I'll just display it. Tuesday, December 21, 2011, little less than three years ago.
A Correct.
Q In fact two and a half years ago.
What new IQ tests have come out in the last two and a half years?
A Well, the WAIS-IV is the one I'm thinking of, the latest iteration. I'm not sure that it was being used in that case. I'm not disputing your question.
Q As long as you're not disputing it.
A I'm not.
Q The WAIS-IV has been around now for ten years?
A Not quite.
Q If you look at it through Unified, it's been about ten years.
A Okay.
Q So the fact that Mr. Nelson has an average IQ, does not mean that he could not have frontal lobe damage, that was the point?
A Yes. And you're absolutely right.
Q And in the Robinson case I think one of the issues was the defendant in that case had an extraordinarily high IQ, in the 120s or so; is that correct?
A He did, yes.

Q Is there a term -- let me back up to the next question.
You've talked about mild impairment, mild cognitive or mild deficits showing up on the testing.
A mild case of brain damage is not insignificant, is it?
A No.
Q It's quite significant, correct?
A Yes.
Q And there's also a term in neuropsychology that's called convergent validity. You know what I'm talking about?
A I sure do.
Q And what convergent validity means, if I'm correct, is that if you have several independent sources testing evaluations and they all point in exactly the same direction, you have much more confidence in your particular assessment. Is that a fair summary?
A Yes.
Q Okay. In this case in terms of neurological impairment in memory and frontal lobe functioning, Dr. Gelbort's testing supports that, correct?
A Supports what?
Q Neurological impairments in memory and frontal lobe functioning?
A Yes.
Q Dr. Amador's clinical observations support that

conclusion?

A Yes.

Q Your findings support that conclusion, correct?

A Yes, they do.

Q The PET and the MRI testing that was performed also support that conclusion, correct?

A Correct.

Q Is it fair to say that this is a case of convergent validity where you've got multiple sources all reaching the same conclusion?

A Absolutely.

Q And even Dr. Gur's imaging, which was somewhat disputed in court the other day, captured the fact that your raw data showed signs of slightly more severe brain dysfunction than Dr. Gelbort's, correct? You don't know that?

A I don't know that. But it's true it -- I did.

Q So some of the particular tests that you performed on Mr. Nelson, one of them was the Stroop, S-t-r-o-o-p, and the Stroop test is the one you described with the color and the fact that, you know, you have to inhibit a response, and the way the Stroop works, if I'm correct, I'm asking you, the way the Stroop works is that there is a -- first of all, a list of words that the person is asked to read, correct?

A Yes.

Q And then there's a page that consists of colors, just to

identify colors, correct?
A Correct.
Q Then there's a list of -- not a list but a list of words and colors where the colors themselves correspond with the words? I've actually got an example of it if I can put my hands on it in a second.
Although these tests are copyrighted and protected, it's a reality that they're often quite easily available even on the internet, true?
A Some more than others, but, yes, sometimes they are out there.
Q Let me see if I can just pick up another copy of that test. I had it at my command seconds ago.
In any event when it comes to the Stroop, the hard part of the test is that the defendant looks at a word and the word says "red" but the color is blue?
A Right.
Q And the hard part is that our minds are trained and acquire the word before we acquire the color, correct?
A Yes.
Q And it's a measure of inhibition on some levels, correct?
A Well, the ability to inhibit the impulse to read the word and instead name the color.
Q So that, you know, you look at it and you say red and

say, oh, no, no, no, I take that back, it's blue, and it's that inhibition ability that that document -- that that testing measures, correct?

A Yes.

Q Mr. Nelson did not do well on that part of the test, did he?

A No, he did not.

Q He was close to two standard deviations away from the norm on that part of the test, correct?

A I think that's true.

Q All right. So that puts him close to that bottom 2 percent of the population, right?

A Correct.

Q You also administered a test called Trails A and Trails B; is that correct?

A Yes.

Q And Trails A and B, again, test executive functioning in the sense of the ability to get a pattern into your head, organize it, and go ahead and reproduce the pattern, correct?

A Well, it's a little more complicated.

Q Explain what it involves.

A Trails B is more sensitive to executive functioning because you have to be able to divide your attention. You're shown like a connect-the-dots problem, but you have both numbers and letters and you need to switch back and forth,

number, letter, number, letter. And so it requires the ability to keep two things in mind at once and alternate between them effectively and efficiently.

Q And I am going to pick up --

MR. RUHNKE: Can we have P86. I'll give you the page number in a moment. At page 13, P86, page 13.

Q (BY MR. RUHNKE) So you see what's on P86 at page 13? Do you see what that is?

A I do.

Q And that's your raw data -- this is -- you can see from the top you've written K. Nelson. You've written the date, September 9, 2010, and this is his scoring on Trail Making Part A, correct?

A Yes.

Q And Trail Making Part A is a relatively simple test, correct?

A It's just connect the dots.

Q And his T score on that case was 50, which is exactly average, right?

A Yes.

Q Can we just show what Trail Making looks like, the rest of the document, the sample.

So it's -- it couldn't be easier if you're, you know, functioning correctly. You could have 1 to 2 to 3 to 4 to 5 to 6 to 7 to 8 and a picture of a polar bear appears when

we were kids.

And in this case he did average, he did not do above average, he did not do below average, correct?

A He did as expected based on his IQ.

Q Is this a timed test?

A It is timed.

Q And it's the amount of time that it takes you to complete this that controls how well you do -- how well you score, correct?

A That's correct.

Q If somebody is staring at this test and can't figure out to get from 1 to 2, you're looking at -- assuming someone's making good efforts, you're looking at somebody who's got some neurological impairments that are quite serious, correct?

A Yes.

MR. RUHNKE: Can we go two pages down on the exhibit.

Q (BY MR. RUHNKE) Part B is Trail Making B, and this is a harder test because it requires you to keep in mind two different principles. I think if we can look at the page before or look at the sample, please, if we may.

And in this one you begin with one, but then you've got to go to the first letter in the alphabet, then you've got to go to the next letter, then the next number, the next letter, next number, next letter, et cetera, and if we could

-- I think the page before it -- pull up the page before.

This is Mr. Nelson's completed Trails B, correct?

A This is Trails A.

Q Right you are. Let's go back to the next page -- next page down.

This is Mr. Nelson's completed Trails B, correct?

A Yes, it is.

Q And, again, it's a timed test, correct?

A Correct.

Q And if we go back to the page before, it reflects your scores on Trails B. If we highlight the upper part of the score, this is his -- he reaches a T score of 32?

A Yes.

Q That's nearly two standard deviations below the mean, correct?

A Correct.

Q So he's down in that -- you know, 98 percent of the country's going to do -- 98 percent of the population, thereabouts, plus or minus, is going to do better on this than he did?

A Maybe 95 percent.

Q Okay. Accept that.

You also administered a test called -- it's usually referred to as the FrSBe. Explain what FrSBe means?

A It's the frontal systems behavior examination, I think.

Q If we can display P86 at page 7 and highlight the top.

Okay. This is the form and this is designed really to testify -- to test and assess, again, executive functioning, right?

A Yes. What it's trying to capture is a little more of everyday functioning. A lot of the tests in the lab, connecting the dots, reading the colors, don't map onto everyday behavior very well, where this test tries to capture things that people do in their everyday life.

Q Okay. If we could go to the score portion of page --

MR. RUHNKE: I'll give you a minute. It's P86 at page 12. If we could highlight just this area where the graphing is all the way to the bottom. Okay. Thank you.

Q (BY MR. RUHNKE) This test differs slightly from other tests in that the higher the score on the test, the more of a problem there is, correct?

A Yes.

Q It doesn't have much below the mean of 50 because people who have higher levels of executive function, you're not really concerned about how high it happens to be, correct?

A Correct.

Q In this case on the bottom of the page we see E. Does E stand for executive?

A Yes.

Q Okay. And he has a score of 52. Am I right about that?

Am I reading that -- oh, 83.
A The T score is 83.
Q T score is 83.
And that's more than three standard deviations from the norm; is that correct?
A Yes.
Q So he is down in terms of this instrument in executive functioning in the .18 percent that we discussed earlier, correct?
A Yes.
Q And if we can look at --
MR. RUHNKE: And this is the last one I'm going to show, Your Honor.
If we can look at P86 at page 1.
Q (BY MR. RUHNKE) What is P86? What are we looking at here?
A This is the California Verbal Learning Test.
Q And this is an example of a testing instrument that you actually don't score yourself but is machine scored, correct?
A It could be done either way but I use the computer.
Q Okay. So you have a computer program, you put in the raw scores that you got, and it produces this nice, printed report?
A Yes, it does.
Q How about the MMPI-2? I noticed that it was a printed

version of it.

Are the conclusions and the findings in the MMPI-2 also computer generated?

A It depends on what scoring system you select.

Q Which one did you select?

A I don't recall.

Q Okay. Would it help you to look at the --

A It would.

Q Okay. I'll just put on the screen, because it will be easier on the Elmo, the first page of the report that you received of the MMPI. Does that refresh your recollection as to which service you used to score this?

A Yes, it does.

Q And that's the Megargee I think it's pronounced?

A Megargee.

Q Close enough for me.

And the conclusions and hypotheses that are generated in this report come from that service, correct?

A Correct. They're not from me.

Q Okay. So to go back to the California Verbal Learning Test, if we can look at page 2 of Exhibit 86, page 2 of Exhibit 86, that's the scoring portion of it, correct?

A Yes.

Q And is it true that on this test, again, Mr. -- and we can highlight the bottom quarter of the -- yeah, the bottom

quarter of the data, correct.

This test, among other things, tests working memory; am I correct?

A Yes.

Q And working memory is the idea that, you know, we have -- we're told something -- you know, we were in court this morning, Dr. Martell was on the witness stand, you know, 20 minutes later someone could ask me what happened in court. If I've got a good working memory, I say Dr. Martell was in court. He was on the witness stand. We were there until X hours, and that's what took place in court.

But somebody without a good working memory, will they have difficulty doing that?

A I think you're confusing terms just a little bit. That would be short-term memory.

Q Okay. Short-term memory.

A Working memory is can you remember a phone number between when I tell you and when you have to dial it.

Q Okay.

A As opposed to short term which would be the example you gave.

Q All right. So -- but in any event, Mr. -- that's an executive function, though, is it not?

A Well, in part. It -- the frontal lobes are the first area to gather the information and try and organize it. Then

the temporal lobes do most of the encoding and storage.

Q And the encoding is another phrase for putting it into your memory or taking in the information, I guess is the best way to describe it?

A Well, beyond just taking it in but organizing it in a way that -- the frontal lobes help in organizing the information for effective recall.

Q And if the frontal lobe is not functioning properly and is unable to organize the data appropriately, then you have problems with retrieving the data; is that correct?

A Yes.

Q All right. And that's what this instrument measures, correct?

A Yes.

Q And in this case, again, Mr. Nelson is showing two to three standard deviations below working memory; is that correct?

A Yes.

Q Okay. So, again, he's in that .13 percent. 99.8 percent of the world has a better working memory than he does based on this assessment, correct?

A Well, with regard to his long delayed, cued recall. Not that his others are good, but that would be the worst of them.

Q Okay.

MR. RUHNKE: Nothing additional, Your Honor.

MR. VALENTI: I have nothing further, Your Honor.

THE COURT: Thank you, Doctor.

MR. VALENTI: Government has no further witnesses at this time.

MR. RUHNKE: Nor do we.

THE COURT: Okay. I wish I could say this was the end of it.

MR. RUHNKE: So where do we go from here, Your Honor?

THE COURT: I think where we go is each party submitting proposed findings of fact and conclusions of law to the court.

Because of the extensive documentation, I assume you'll want a couple of weeks to do that.

MR. RUHNKE: I think we'd first want to acquire the transcripts, and then -- I was thinking 90 days from getting the transcripts. A lot of materials to organize.

THE COURT: I don't disagree with that.

MR. RUHNKE: Okay.

THE COURT: I don't disagree with that.

MR. RUHNKE: I think the government agrees too.

MR. VALENTI: We're okay with that.

MR. RUHNKE: We will order the transcripts and, you know, that will trigger the 90 days and we'll take it from here.

THE COURT: Well, I would like some page limitations on this. Otherwise, it will take me forever to get through this. So maybe to make you sharpen your pencil a little bit as well, I'm thinking maybe 20 pages. If you want more, you can ask for more, explain why you need it.

MR. RUHNKE: Okay. Yes, Your Honor. If we need to ask for more, which I kind of think we may, we will ask for more.

THE COURT: Okay. Anything else?

MR. RUHNKE: No, sir. Thank you.

THE COURT: Thank you.

* * * * * * * * * * *

REPORTER'S CERTIFICATE

I certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

_______________ _______________________________

Date Registered Merit Reporter