FILED VIA ECF

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| KEITH D. NELSON, | : | |
| Petitioner-Movant, | : | |
| vs. | : | 4:04-cv-08005 (FJG)<br>99-cr-00303-W (FJG) |
| UNITED STATES OF AMERICA, | : | |
| Respondent. | : | |

PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

COMES NOW Keith D. Nelson ("Movant" or "Mr. Nelson"), by his undersigned counsel, and files his proposed findings of facts and conclusions of law.

I - INTRODUCTION AND BACKGROUND.

The Eighth Circuit remanded this case for a hearing on the following six claims of ineffective assistance of trial and appellate counsel:

1. Whether trial counsel were ineffective for failing to conduct an adequate mitigation investigation including a failure to move for a continuance;

2. Whether trial counsel were ineffective for failing to conduct an adequate investigation of Movant's mental health;

3. Whether trial counsel were ineffective because they advised Movant to decline to submit to a mental health examination by government experts;

4. Whether trial counsel were ineffective for failing to object to inflammatory and improper comments in the Government's closing arguments;

5. Whether appellate counsel conducted an adequate review of the trial record and the law; and,

6. Whether appellate counsel were ineffective for failing to raise on appeal the Government's improper closing arguments.

*Nelson v. United States,* No. 07-3071 (8th Cir. 10/27/08), at 3.

The hearing ordered by the Eighth Circuit went forward on April 14-17, 2014.[1] The Court heard testimony from 14 witnesses and received thousands of pages of exhibits. Mr. Nelson's counsel have limited their discussion in this document to those facts and exhibits needed to clarify the issues on which a remand was ordered, but, in seeking a new penalty-phase, rely on the entire record, all exhibits admitted at the hearing, and all prior proceedings. Counsel note, respectfully, that the "duty to search for constitutional error with painstaking care is never more exacting than in a capital case." *Burger v. Kemp*, 483 U.S. 776, 785 (1987).

## II – INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL – THE CAPITAL CASE CONTEXT.

### A. Legal framework: Ineffective assistance of trial counsel in a capital case.

The Sixth Amendment guarantees a defendant effective assistance of counsel at the penalty phase of a capital case. In this regard, the United States Supreme Court, applying the familiar *Strickland* test,[2] has provided extensive guidance on both

---

[1] The April 2014 hearing transcripts will be designated as follows:

T1 – Proceedings of April 14, 2014
T2 – Proceedings of April 15, 2014
T3 – Proceedings of April 16, 3014
T4 – Proceedings of April 17, 2014

References to the original trial proceedings will be to date and transcript page.

[2] *Strickland v. Washington*, 466 U.S. 668, 684 (1984).

the performance and prejudice prongs of *Strickland* as applied in the context of a capital trial.[3] The first in a series of five such decisions was issued one year before Mr. Nelson's trial. In that case, *Williams v. Taylor*, 529 U.S. 362, 396 (2000), the Court vacated the sentence of death after concluding that trial counsel were ineffective because they "did not fulfill their obligation to conduct a thorough investigation of the defendant's background." In the decade since *Williams*, the Court has decided four additional cases in which death verdicts were set aside because trial counsel failed to develop or present evidence in mitigation. *See Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Porter v. McCollum*, 558 U.S. 30 (2009) (per curiam); and, *Sears v. Upton*, 561 U.S. ____, 130 S. Ct. 3259 (2010) (per curiam).[4]

---

[3] The Eighth Circuit has long recognized standards for the performance of counsel in capital cases. *See, e.g.*, *Simmons v. Luebbers*, 299 F.3d 929 (8th Cir. 2002) (Counsel ineffective at penalty-phase of defendant's two capital trials for failure to investigate and present mitigating evidence); *Artwine v. Delo*, 54 F.3d 1357 (8th Cir. 1995) (Counsel ineffective at penalty-phase for failing to investigate and present evidence of mental illness); *Hill v. Lockhart*, 28 F.3d 832 (8th Cir.1994) (Counsel ineffective at penalty-phase for failing to investigate and present evidence of mental illness); *Kenley v. Armontrout*, 937 F.2d 1298 (8th Cir. 1991) (Counsel ineffective at penalty-phase for failing to investigate and present evidence of mental illness).

In a recent case, a panel of the Circuit denied habeas relief, splitting 2-1 on whether, in an AEDPA "double-deference" case arising from the state courts, counsel were ineffective for not conducting neuro-imaging once a neuropsychological examination revealed brain impairments. *Forrest v. Steele*, 764 F.3d 848 (8th Cir. 2014). AEDPA's Double-deference standard does not apply in Mr. Nelson's case. And, as will be shown, it is undisputed that Mr. Nelson's counsel failed entirely to investigate neurological impairments despite having the funding and every intention to do so.

[4] Earlier this year, a unanimous Supreme Court set aside another sentence of death on ineffectiveness grounds. In that case the issue was trial counsel's ignorance

With regard to the norms of capital representation that prevailed at the time Mr. Nelson's case was tried in 2001, it is noteworthy that each of the five cases discussed above was tried well before Mr. Nelson's. Thus, the norms of capital representation discussed in those cases were, at the time of Mr. Nelson's trial in 2001, well-established and recognized as such by the Supreme Court. In each case, as noted, the sentence of death was set aside.

The five cases discussed above share a common element that is also present in Mr. Nelson's case. In each, counsel failed to discover and present evidence of brain damage or other cognitive impairment.[5] *See Williams*, 529 U.S. at 370 ("mental impairments organic in origin"); *Wiggins*, 539 U.S. at 516 ("borderline retardation"), 539 U.S. at 523 ("difficulty coping with demanding situations"); *Rompilla*, 545 U.S. at 382 ("third grade level of cognition after nine years of schooling"); *Porter*, 558 U.S. at 36 (substantial difficulties with reading, writing, and memory, as well as cognitive

---

of the law concerning available funding for expert assistance. *Hinton v. Alabama*, 134 S. Ct. 1081 (2014) (per curiam). The Court also adopted, for the first time in a capital case, the objective measure for determining prevailing professional norms of capital representation initially set out in *Padilla v. Kentucky*, 539 U.S. 356, 366 (2010). *Hinton* was tried in 1995, six years before Mr. Nelson's trial began.

[5] Several circuits have noted that brain damage is particularly powerful mitigation since it diminishes a defendant's moral culpability. *See, e.g., Hooks v. Workman*, 689 F.3d 1148, 1206 (10th Cir. 2012) (vacating sentence of death for failure to investigate organic brain dysfunction, and stating, "Evidence of organic brain damage is something that we and other courts, including the Supreme Court, have found to have a powerful mitigating effect . . . [A]lteration of brain structures, with its attendant effects on behavior, tends to diminish moral culpability . . . ."). *See also*, *Bond v. Beard*, 539 F.3d 256, 290-91 (3rd Cir. 2008) (vacating sentence of death for failure, *inter alia*, to investigate and uncover evidence of brain damage); *Halyiym v. Frazier*, 492 F.3d 680, 716 (6th Cir. 2007) (same).

deficits; state experts could not rule out "a brain abnormality"); and *Sears*, 130 S. Ct. 3259 (performs "at or below the bottom first percentile" in cognitive functioning/reasoning; significant frontal lobe damage suffered as a child, plus drug and alcohol abuse in teens; problems with "planning, sequencing and impulse control"; "grossly impaired"; "pronounced frontal lobe pathology.").

This line of Supreme Court cases also stands for the proposition that doing "some" investigation of mitigating circumstances or presenting "some" evidence in mitigation at trial does not satisfy prevailing performance norms. Thus, uncovering a superficially reasonable mitigation theory, and ceasing the investigation at that point, does not satisfy counsel's obligation to conduct the comprehensive investigation mandated by the Sixth Amendment. This is illustrated by *Sears v. Upton* where the Court observed that even though counsel had presented a mitigation theory in that case that "might be reasonable, in the abstract, [this] does not obviate the need to analyze whether counsel's failure to conduct an adequate mitigation investigation before arriving at this particular theory prejudiced Sears." 130 S. Ct. 3265. The Court also stated, "We have never limited the prejudice inquiry under *Strickland* to cases in which there was only 'little or no mitigation evidence' presented." *Id.* at 3266. In *Rompilla*, by way of another example, the defense conducted extensive interviews of family members, and sought out the assistance of mental-health experts, three of whom testified at trial. *Rompilla v. Beard*, 545 U.S. at 381. These efforts did not, however, excuse or obscure counsels' failure to locate readily available evidence that, the Court concluded, could have led to a different outcome. Accordingly, that counsel at Mr. Nelson's 2001 penalty trial presented some evidence in mitigation or conducted

some investigation does not excuse their failure to investigate other theories of mitigation, including, most glaringly, Mr. Nelson's mental health.

B. Movant's burden of proof on the ineffectiveness of trial counsel.[6]

On the issue of trial counsel's failure to uncover and present available mitigating evidence, Movant's burden is to establish, by a simple preponderance, that there is "a reasonable probability" that the jury "'would have struck a different balance.'" *Porter v. McCollum*, 558 U.S. at 42, quoting *Wiggins v. Smith*, 539 U.S. at 537. In a jurisdiction such as the federal system, where a divided jury spares a defendant's life, *Jones v. United States*, 527 U.S. 373 (1999), the question is whether "there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at *id*.

In this case, as the evidence presented at the hearing has shown, but for counsel's failure to investigate and present a case in mitigation, there is a reasonable probability that at least one member of the jury would have struck a different balance and therefore spared Mr. Nelson's life.

C. Horrific facts versus prejudicial performance.

In deciding to vacate the sentences of death in the cases discussed above, the Supreme Court was keenly aware of the often horrific circumstances of the underlying crimes. Horrific facts notwithstanding, the Court determined in each case not only that counsel's performance had been deficient but that the deficiencies were

---

[6] The burden regarding performance of appellate counsel will be discussed *infra* as appropriate to the argument that appellate counsel were ineffective.

prejudicial to the degree that a new penalty phase was required. Thus, the horrific circumstances of a given capital murder (and capital murders are nearly always horrific)[7] is not a convenient detour allowing a court to short circuit or bypass the analysis required by the *Strickland* line of cases. This point is further illuminated by a review of the facts and circumstances of the criminal conduct underlying the Supreme Court cases discussed above.

In *Williams*, the defendant was sentenced to death for the brutal murder of a defenseless man in order to steal three dollars. *Williams*, 529 U.S. at 368. In dissent, Chief Justice Rehnquist quoted the following summary of the aggravating evidence from the Fourth Circuit's opinion:

> "The murder . . . was just one act in a crime spree that lasted most of Williams' life. Indeed, the jury heard evidence that, in the months following the murder . . ., Williams savagely beat an elderly woman, stole two cars, set fire to a home, stabbed a man during the robbery, set fire to the city jail, and confessed to having strong urges to choke other inmates and to break a fellow prisoner's jaw. 163 F.3d 860, 868 (CA 4 1998)."

529 U.S. at 418 (Rehnquist, C.J., dissenting).

The victim in *Wiggins*, was "a 77-year-old woman [who] was found drowned in the bathtub of her apartment, clothed but missing her underwear, and sprayed with Black Flag Ant and Roach Killer." 539 U.S. at 554 (Scalia, J., dissenting). Kevin

---

[7] In *Kennedy v. Louisiana*, 554 U.S. 407 (2008), the Court described the universe of capital prosecutions as "'limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them the most deserving of execution.'" *Id.* at 420, quoting *Roper v. Simmons*, 543 U.S. 551, 568 (2005) and *Atkins v. Virginia*, 536 U.S. 304, 319 (2002).

Wiggins had stolen the victim's ring, used her credit cards, and lied to the police about where he had obtained this property. *Id.* at 555-556.

In *Rompilla,* the defendant committed capital murder "a mere three months" after his release from prison for a brutal rape and assault in which he had held the victim at knife point, slashed her breast, and raped her for more than an hour. 545 U.S. at 394 (O'Connor, J., majority opinion) and 401 (Kennedy, J., dissenting).

In *Porter*, the defendant had threatened to kill the capital murder victim and her teenage daughter three months before the actual capital offense. *Porter v. Attorney General*, 552 F.3d 1260, 1263 (11th Cir. 2008). After killing the mother in the daughter's presence, he pointed a gun to the daughter's head and said, "boom, boom, you're going to die." *Id.* Although he did not kill the daughter, he was also convicted of a second murder. *Porter v. McCollum*, 558 U.S. at 31-32.

In *Sears*, the defendant kidnapped, raped, and murdered a 59-year-old wife and mother. He punched the victim in the face with brass knuckles, shoved her into her car, handcuffed her, and drove her across state lines from Georgia to Tennessee where he raped her. The victim's interstate ordeal then continued into Kentucky where Sears murdered her as she pleaded for her life. "After throwing her on the ground, he stabbed her in the neck. In his confession he showed no regret or remorse for his heinous crimes." 561 U.S. 945, 130 S. Ct. 3259, 3271 (Scalia, J., dissenting).

As the Fifth Circuit has noted, the horrific nature of a given capital murder does not obviate the constitutional analysis required by the *Strickland* line of cases. For example, in *Walbey v. Quartermain*, 309 Fed. Appx. 795, 804 (5th Cir. 2009), the Court rejected as a "non-starter" the State's argument "that [the defendant] suffered

no prejudice because the brutality of his crime eclipses any mitigating evidence." In an earlier opinion, *Gardner v. Johnson*, 247 F.3d 551 (5th Cir. 2001), the Court dismissed the prosecution's argument that brutality trumps prejudice:

> [T]he State's stereotypical fall-back argument – that the heinous and egregious nature of the crime would have ensured assessment of the death penalty even absent [the error] cannot carry the day here. . . . . [O]ur decades of experience with scores of § 2254 cases from the death row of Texas teach an obvious lesson that is frequently overlooked: Almost without exception, the cases we see in which conviction of a capital crime has produced a death sentence arise from extremely egregious, heinous, and shocking facts. But, if that were all that is required to offset prejudicial legal error and convert it to harmless error, habeas relief based on evidentiary error in the punishment phase would virtually never be available, so testing for it would amount to a hollow judicial act.

*Gardner*, 247 F.3d at 563. Thus, the circumstances of Pamela Butler's tragic death should not divert this Court from a careful scrutiny of the impact of trial counsels' constitutional shortcomings.

The probability of at least one juror striking a different balance if presented with the new mitigation and mental health evidence developed by Mr. Nelson's habeas counsel is particularly high in the federal system. The website of the Federal Death Penalty Resource Counsel Project, an organization funded by the Defender Services Division of the Administrative Office of the United States Courts, reports that, since 1988, utilizing figures current as of October 7, 2014, there have been a total of 495 federal cases authorized for capital punishment, only 79 of which resulted in a sentence of death.[8] The site reports further that "[i]n cases where juries actually

[8] http://www.capdefnet.org/FDPRC/pubmenu.aspx?menu_id=94&id=2094 (last visited October 20, 2014).

reached the point of choosing between life and death, they imposed 153 (66%) life sentences and 79 (34%) death sentences." *Id.* Thus, two-thirds of federal capital cases which reach a penalty phase yield life verdicts.

### III – TRIAL COUNSEL PROVIDED PREJUDICIALLY INEFFECTIVE ASSISTANCE IN THE INVESTIGATION AND PRESENTATION OF A CASE IN MITIGATION.

A. <u>Failure to conduct an adequate investigation of Mr. Nelson's mental-health</u>.

The following facts are not in dispute:

- Prevailing professional norms at the time this case was tried required defense counsel in a capital case to explore mental-health issues.

- Mr. Nelson's particular history raised red flags as to the presence of brain damage and other cognitive impairments.

- Mr. Nelson's counsel in fact recognized the red flags in Mr. Nelson's history, understood the importance of a mental-health investigation focused on brain damage or cognitive impairments, and actually sought and received funding from the Court for expert assistance in order to conduct such an evaluation.

- No neuropsychological or other competent mental-health evaluation ever took place.[9]

- Mr. Nelson suffers from brain damage and cognitive impairments.

This case is on some levels about how an experienced capital-defense attorney – Patrick J. Berrigan – failed to provide effective assistance of counsel to Mr. Nelson. But however it came about, as a result of counsel's failure, Mr. Nelson was sentenced to death. Had Mr. Nelson's jury been presented with the results of a constitutionally

[9] As discussed *infra*, the eleventh hour meeting between Mr. Nelson and Dr. Foster was not seen by Mr. Berrigan or Dr. Foster as anything approaching a comprehensive psychological examination.

effective defense, one that was based on an adequate investigation of his mental health and traumatic childhood experiences, there is a reasonable probability that at least one member of his jury would have struck a different balance. Accordingly, relief must be granted.

The evidence presented at the hearing established that when he accepted an appointment in Mr. Nelson's case in late February 2001, Mr. Berrigan was over-worked and over-committed. Additionally, he labored under what he viewed as an unspoken yet binding agreement with the Court that he would get one, and only one, continuance of the trial date. The record irrefutably shows that before and during the time when he accepted the appointment in this case and was ostensibly preparing for Mr. Nelson's trial, which was then only eight months down the road, Mr. Berrigan:

- Spent the six weeks following his appointment preparing for and trying a capital case in Kansas, during which time his other cases – Nelson included – "languished." (T1.183; 186-187.)

- Faced U.S. Supreme Court deadlines in two or three capital cases where death verdicts had been returned and executions were pending. (T1.183-186.)[10]

- Was involved in another "very active" (T1.187) and demanding federal capital case in Iowa. (T1.186-87.) In that case, his client's ultimate sentence of death was later set aside on a 2255 challenge when it was determined Mr. Berrigan had rendered ineffective assistance in that case in part, as here, because he devoted too little time to trial preparation.[11]

---

[10] At the hearing Mr. Berrigan referenced two Supreme Court deadlines (T1.183-186) while mentioning three such deadlines in his deposition testimony. (US Ex. 112 at 205-206.)

[11] *See Johnson v. United States*, 860 F.Supp.2d 663 (N.D. Iowa 2012).

- Was heavily involved in a complex medical malpractice case that required Mr. Berrigan's attention and trial preparation that included travel "all over the country" until the case settled on the eve of trial in July 2001. (T1.181.)

- On August 8, 2001, just weeks before Mr. Nelson's trial was scheduled to begin, Mr. Berrigan underwent quintuple coronary artery bypass surgery. (T1.183-84; 233.)

- On the same day he underwent the quintuple heart bypass surgery, Mr. Berrigan accepted an appointment in another demanding capital case, this one in Kansas. (T1.187-88; P20.)

Upon entering the case, Mr. Berrigan advised his co-counsel Susan Hunt that he would be solely responsible for the mitigation case. (T1.50.) Mr. Berrigan was "calling all the shots" on mitigation issues. (T1.100.) The reality, however, was that Mr. Berrigan's existing commitments – as reflected in part by the summary of his CJA billing records in the Nelson case (P80) – did not allow for that. Because he was so busy on other matters, Mr. Berrigan had virtually no contact with the mitigation investigator, Tena Francis, or her organization. (T1.272.) Despite having assumed sole responsibility for the mitigation case, he believed that Ms. Hunt – who had never been given any responsibility for that phase of the case and had no capital trial experience – was in primary contact with Ms. Francis. (T1.214.) Ms. Hunt thought the opposite, and assumed, without really knowing, that Mr. Berrigan was not only in contact with the mitigation investigator (T1.63, 101), but was also spending significant time preparing a penalty phase. (T1.54.) Neither assumption was valid.

With the exception of one interview of Mr. Nelson's mother, Nancy Nelson, and one or two other local family members, Mr. Berrigan interviewed no penalty-phase witnesses until shortly before trial. Although he recognized and acknowledged the

need for a neuropsychological assessment of his client (T1.196-97), and had the funding to accomplish that goal, one of Mr. Berrigan's first actions in the case was to cancel an appointment that had been made for such an examination. (T1.197; P11.) At the time he told his co-counsel, Ms. Hunt, "'I'm going to cancel the appointment and don't worry about it, I'll figure out somebody else.'" (T1.59.) As the record demonstrates, Mr. Berrigan never did "figure out somebody else" and, in his own words, "never got back to the issue." (T1.200.) No assessment of Mr. Nelson for brain damage, dysfunction, or other cognitive impairments was ever accomplished. (*E.g.*, T1.196.)

Mr. Berrigan did not equivocate about his failure to follow through on a neuropsychological examination. He knew on his arrival in the case that Dr. Cowan had been appointed to conduct such an examination. (T1.196.) The issue of "potential neurological impairment and neurological deficits" was something Mr. Berrigan believed should be explored. (T1.197.) Although he believed Dr. Cowan was "unequivocally a very qualified neuropsychologist" (T1.199), Mr. Berrigan cancelled the initial appointment because Dr. Cowan would not have been his first choice and Mr. Berrigan saw no reason to continue with him simply because he had already been approved by the court. (T1.199.) Mr. Berrigan's intention was to look for a neuropsychologist with more of a national or regional reputation than Dr. Cowan had. (T1.199.) Describing his failure to follow through on this issue, Mr. Berrigan testified as follows:

> Q: For any reason, tactical or otherwise, did you ever change your mind about the need for a neurological or neuropsychological examination of Mr. Nelson?

A: No, sir.

Q: Can you tell us why it never got done?

A: We dropped the ball. It should have happened. Other things came to the forefront and I never got back to it. There's no good excuse, really no excuse at all.

(T1.200.) When asked if his failure to utilize a neuropsychologist was related to a preference for a neurologist, Mr. Berrigan was, again, clear:

Q: And is there anything about those thoughts about a neurologist that made you decide for tactical reasons or otherwise, that you would not employ a neuropsychological exam?

A: No. Because I didn't. I did not employ a neurologist in lieu of a neuropsychological exam. We didn't employ anyone. The plan was to find someone else, another neuropsychologist, to do the evaluation other than Dr. Cowan, and that did not happen.

(T1.219-20.) Mr. Berrigan's testimony at the hearing was consistent with both his affidavit (P146 at ¶2) and his deposition testimony (US Ex 112 at 30, 32, 49-52, 56-57, 78, 119, 190-93 and 205).

Mr. Berrigan's billing records and an internal file memorandum (P17, P17A, P20) reflect that in the months leading to the Mr. Nelson's trial date he was primarily occupied with other matters. These included the actual trial of another capital case. An inspection of his large and small diaries from this period (P17B, 17C) further make the point. From the time Mr. Berrigan accepted the case in late February 2001, until a few weeks before trial was set to commence, "the overwhelming percentage" of his time was devoted to other cases. (T1.191.) He summarized this state of affairs in his deposition:

> And all I can tell you is, you know, I had three active capital cases in addition to Mr. Nelson's trial and three others that were in cert petitions to the U.S. Supreme Court and I had a regular docket and I was trying civil cases and maybe I shouldn't have taken Mr. Nelson's case because I was too damn busy to do what should have been done.
>
> Looking back, that's kind of how I feel about it now. I shouldn't have agreed to it. And I think Judge Gaitan he wasn't going to give us a continuance after that first one, it's completely unrealistic to be ready to try a case in nine months after you just got on, and it had never happened in my entire career up to this point.
>
> And having committed to it, you know, I felt bound to do it which is sort of a ridiculous reason to go forward just basically out of pride and conceit.

(US112 at pp. 205-206.) At the hearing, Mr. Berrigan adopted his deposition testimony (US Ex 112) and the affidavit (P146) he had previously submitted. (T1.174.) At the hearing, he was again asked whether he should have accepted the Nelson case:

> Looking back, no, no. I have the most – utmost respect for Judge Hays. In fact I think she is a brilliant judge, and I've had nothing but wonderful experiences with her. And the same is true of Judge Gaitan, frankly, who I've known almost – I've known him since the start of my legal career and both as a state court trial judge and appellate judge and a federal judge. And I think looking back in my desire not to disappoint them in some way and the trust that they had put in me in taking Mr. Nelson's case, somehow blinded me to my responsibilities to Mr. Nelson, and there's no real good excuse for that. It's nothing but pride and conceit, and I regret it now that I ever agreed to get involved in the case. . . . . I was very busy.

(T1.244-245.) On cross-examination, the Government returned to the issue:

> Q: I guess what I'm a little bit confused about is [defense counsel] presents all this history about all these other capital cases that you're engaged in and it's almost to the point where you're too overqualified in this area, that you've got yourself spread too thin. Is that what your testimony is?

A: No. I don't – my qualifications and expertise hadn't changed in Mr. Nelson's case. In other words, I'm – this was an aberration in one respect only and that was time. I've never been involved in a case where I was appointed and tried a case essentially in six or seven months. That's never, ever been my experience.

That Angela Johnson case I was on for five years before trial. Typically there's at least a minimum 18 months, 24 months between my appointment and the case coming to trial. This was very, very quick and it turned out to be that I had a lot of other obligations, previous obligations that ended up taking up a lot of my time.

(T1.258.) Thus, Mr. Berrigan's testimony was consistent that his existing obligations combined with the trial's short timeframe rendered it impossible for him to fulfill his obligations to Mr. Nelson.

When this case was tried in 2001 – as the five Supreme Court cases cited previously demonstrate – well-established norms of capital defense required an investigation of a capital defendant's mental health. (*See* Declaration of Russell Stetler, P69A at ¶ 15, ¶¶ 28-31.) Each of the trial attorneys who testified –Susan Hunt, William Shull, Patrick Berrigan and Larry Pace – agreed that this was so at the time of Mr. Nelson's trial. (Hunt, T1.28-29; Shull, T1.151-52; Berrigan, T1.192-93; Pace, T4.626-27.) Mr. Berrigan testified on this issue as follows:

Q: Do you believe that investigation of mental health is virtually mandated by the 8th Amendment in every case?

A: Yes. And certainly the ABA Guidelines make that very clear.

Q: The ABA Guidelines as they existed in 2003 and the previous ABA Guidelines in 1989; is that correct?

A: Yes, sir. I think that's always been the rule as long as the ABA has had guidelines on death penalty representation.

(T1.192-93.) Mr. Berrigan further noted that in any case where the prosecution was actually seeking the death penalty, "it would be the standard of care to have a mental health investigation and eventually evaluation . . . ." (T1.193.) In Mr. Nelson's case in particular, Mr. Berrigan determined, "as is the standard of care and practice, there should be a psychological examination, evaluation, investigation of Mr. Nelson." (T1.195.) Mr. Berrigan was aware, from past capital experience, that brain damage and neurological impairment "can be a significant mitigating circumstance." (T1.215.) He believed, further, that an investigation of Mr. Nelson's potential neurological impairments was needed. (T1.197.) He never changed his mind about the need for such an examination. (T1.200.)

Mr. Berrigan was also familiar with the work of neuropsychologists and had employed such experts in his cases many times. (T1.216.) As a byproduct of that experience, Mr. Berrigan also knew that, in conducting neuropsychological assessments, there is no need "to delve into the facts and circumstances of the crime," and that neuropsychologists are "not employed to speak to the client about the events at the time of the alleged crime." (T1.216.) Instead, utilizing standard testing, the function of a neuropsychologist is "to determine whether or not this client has neurological brain deformities, brain deficits, and to present this information to the attorney that's retained them." (*Id.*) This is, accordingly, not a case where counsel acted out of ignorance of prevailing professional norms or did not know how to go about investigating potential neurocognitive deficits. Instead, this is a case where counsel were aware of their obligations but failed to meet them.

Prior to Mr. Berrigan's entry into the case, Mr. Nelson's counsel had recognized that an investigation of Mr. Nelson's mental health was required. Counsel also recognized that this was not simply a box to be checked off on a larger due-diligence list. Specific information had been gathered about Mr. Nelson's background that suggested a genetic predisposition to mental illness and obvious indicators of potential brain damage or other cognitive impairments. These red flags included:

- The vicious domestic assault on Mr. Nelson's mother, Nancy Nelson, that sent her into premature labor with her twins, Keith and Kenneth Nelson;
- Nancy Nelson's lack of proper prenatal care even while carrying twins;
- Difficulties experienced by Mr. Nelson, a second-born twin, whose brain was deprived of oxygen in the birthing process and who was then hospitalized for the first month of his life;
- A history of traumatic brain injuries throughout his childhood, adolescence, and early adult years;
- The circumstance that two of Mr. Nelson's four brothers were diagnosed schizophrenics, one of whom was serving a life sentence for murder.

In an *ex parte* motion filed in the spring of 2000 (P28 at 17), Attorney William Shull sought $20,000 for the appointment of a psychiatrist, Steven Peterson, M.D. In the motion, Mr. Shull noted:

> The United States Supreme Court has clearly indicated that, since the services of experts, including psychiatrists, may well be critical to effective presentation of a capital litigant's defense, such expenses may properly be paid by the federal courts
>
> . . . .
>
> Many capital cases, including this one, involve extensive issues that deal with a defendant's mental and emotional condition at the time of the offense and subsequent themes that must be presented to the jury during the penalty phase . . . .

(*Id.* at 18, 19; citations omitted.) The motion was granted, but the funds were never utilized and Dr. Peterson never evaluated Mr. Nelson. In a subsequent motion (P28 at 67), also granted by the Court, defense counsel sought and received additional funding for the appointment of neuropsychologist Dennis Cowan, Ph.D. In support of the motion, counsel summarized specific aspects of Movant's history that highlighted the importance of an assessment for the presence of cognitive impairments:

> Investigation to date has revealed that Defendant was born prematurely and spent the first four months of his life hospitalized with breathing difficulties. This fact combined with other factors raise the suspicion that defendant may have organic brain defects which may lead to mitigation evidence in this case.

(*Id.* at 68.) A chronology of the mental health investigation is in evidence as P70.

Internal defense memoranda further confirmed counsels' awareness of the necessity of investigating Mr. Nelson's mental health. When the Federal Public Defender ("FPD") withdrew from the case in August of 2000, investigator Ron Ninemire of that office prepared a detailed close-out memorandum of tasks to be accomplished (P9 at 3), that included the following observation:

> [I]t was interesting that Keith was placed in a hospital for a long period of time at the time of his birth. This needs to be explored more fully. It would appear that all of the boys, with the exception of Steven and Kenny, suffer from a form of mental illness (schizophrenia). It seems prudent that any mitigation investigation must include a psychiatric examination for Keith.

(*Id.* at 6.) In June 2001, Mr. Berrigan asked mitigation investigator Tena Francis to prepare an affidavit (P10 at 4) in support of what she thought was a request for additional funding and a continuance of the trial date. (T3.502.) Ms. Francis, describing in her affidavit work that remained to be completed, stated:

> There is a significant amount of mental illness on both sides of Keith's family. There is reason to suspect Keith might suffer neurological impairment, caused by hereditary factors, prenatal damage, birthing problems, head injuries suffered as a child, and a possible exposure to neuro-toxins. Those issues need further development in order to make an adequate presentation to the jury.

(P10 at 5, 6.) Indeed, Ms. Francis, from her earliest entry into the case suspected that Mr. Nelson had brain damage (T3.476), which is why her notes of one of her initial conversations with Mr. Shull and Ms. Hunt include the following reference, "has neuropsych hired!!" (T3.475; P10 at 11.)

To summarize, each of Mr. Nelson's trial-level attorneys – including Mr. Berrigan (T1.196), the attorney ultimately responsible for the failed mitigation case – testified at the hearing that he or she recognized the importance of investigating Mr. Nelson's neurological functioning. Funds were twice allocated for that purpose. The simple truth is that the investigation never occurred. As a result, evidence of Mr. Nelson's multiple impairments was never presented to or considered by the jury that condemned him to death. This failure on counsels' part requires a new penalty phase.

B. <u>With "convergent validity," all available data supports the undisputed conclusion that Mr. Nelson suffers from brain damage, brain dysfunction and cognitive impairments, primarily located in the frontal lobe</u>.

Mr. Nelson suffers from serious neurocognitive deficits. This circumstance was confirmed by neuroimaging and by every expert who assessed him. Daniel Martell, Ph.D., the government's rebuttal mental-health expert, described this case as one "absolutely" presenting an example of "convergent validity," *i.e.*, where multiple evaluations, sources of data, and assessments consistently reach the same conclusion. (T4.673-74.) All of the experts agreed that Mr. Nelson was cooperative with the testing, that he put forth good effort, that malingering instruments confirmed his

honest efforts, and that the results were valid. The "convergent data" in Mr. Nelson's case consists of:

- The neuropsychological examination conducted by Michael Gelbort, Ph.D. in 2005 (P53);
- The assessment by Natalie Novik Brown, Ph.D. in 2006 in her preliminary investigation of Fetal Alcohol Spectrum Disorder (P48);
- The PET scan and MRI imaging conducted by a private imaging facility near Mr. Nelson's place of confinement in Terre Haute, Indiana in 2010 (P56 PET; P57 MRI);
- The findings of clinical psychologist Xavier Amador, Ph.D. (P60, 61, 62, 63);
- The neuroimaging study by Ruben Gur, Ph.D. (P58, 59, 81);
- The analysis of Mr. Nelson's birth records by neonatologist Carolyn Crawford, M.D. (P45);
- Dr. Martell's own findings (P54).

With regard to Mr. Nelson, Dr. Martell identified "brain damage, brain dysfunction and neurological impairments". (T4.657.) Dr. Martell acknowledged that his findings – and the identical findings of the other experts – would be mitigating as to penalty. (T4.657-58.)

A recurring theme of the government in the original penalty phase was that Mr. Nelson's twin brother, Kenneth, had lived a normal life despite growing up in the same destructive environment as Mr. Nelson. Therefore, it was suggested, Mr. Nelson's problems were simply a matter of choice. *See, e.g.,* TR 11/28/01 at 1124 (during closing argument, the prosecutor argued that "His twin brother, who was raised in the same environment, has turned into a productive member of the United States Army. He's made the right decisions. This defendant decided to live a life of

crime and he's going to have to deal with those consequences.") However, starting with his birth, Mr. Nelson faced significant problems not experienced by his twin brother. (P64.) Without investigating the significance of Mr. Nelson's birth records, Mr. Berrigan actually told the sentencing jury in his opening that, although Mr. Nelson had been hospitalized for a month after his birth, "[Mr. Nelson] recovered just fine." This gratuitous statement, based on no evidence, investigation, or expert assessment, was the very opposite of the truth. (TR 11/19/01 at 38.)

Thus, in addition to their failure to investigate Mr. Nelson's brain damage by utilizing expert assistance that had already been approved by the court, for example Dr. Cowan, counsel failed to consult with appropriate medical professionals, such as a neonatologist, in order to gain an accurate understanding of the circumstances of Mr. Nelson's birth. Had counsel done so, they would have learned that the birth records contained information that had serious negative implications for Mr. Nelson's later development. In her testimony and report, Carolyn Crawford, M.D. summarized the myriad problems documented in Mr. Nelson's birth records. From those records, Dr. Crawford identified evidence of compromised neurological development, something Mr. Nelson's twin brother was not saddled with. (T2.514-526; P45.)

Some of the most sympathetic forms of mitigating evidence are those arising from the defendant's childhood, because they so often involve obstacles and mistreatment beyond the ability of a child to choose or control. Starting with the circumstances of his birth, Mr. Nelson's brain development and functioning was compromised and impaired. With this information, a member of the jury could reasonably have viewed Mr. Nelson in a different light and struck a different

sentencing balance. This evidence has long been singled out by the Supreme Court as inherently mitigating. *See Tennard v. Dretke*, 542 U.S. 274, 287 (2004); *Eddings v. Oklahoma*, 455 U.S. 104 (1982).

The neuropsychological testing and imaging that Mr. Nelson underwent as part of his post-conviction challenge to his sentence of death reveals that he consistently performs significantly below normal levels on standard testing instruments designed to assess neuropsychological functioning. The experts all agreed that the damage is primarily in Mr. Nelson's frontal lobe. Dr. Gur's analysis synthesized data from Mr. Nelson's neuropsychological testing, an MRI and a PET scan. As noted, all three sources of data confirmed the findings of Drs. Gelbort and Martell that Mr. Nelson has brain damage. (T2.551-602; P58, P59.) Mr. Nelson's specific brain damage is especially relevant because the damage is in regions of the brain "that are very important for regulating behavior," including those regions responsible for moral judgment, regulation of emotions, moderation of arousal, and impulse control (P58 at 4; T2.583.) Importantly, Mr. Nelson has abnormalities in his basal ganglia, an area of the brain responsible for regulating sexual impulses. (T2.583.)

This case is thus strikingly like *Sears v. Upton, supra*, where the defendant was convicted and sentenced to death for the brutal and protracted kidnap, rape and murder of a woman seemingly selected for victimization at random. The Supreme Court began its opinion by observing that Sears, like Mr. Nelson, "performs at or below the first percentile in several measures of cognitive functioning and reasoning. The cause of this abnormality appears to be significant frontal lobe brain damage."

*Id.*, 130 S.Ct. at 3261. As with this case, because trial counsel in *Sears* failed to conduct an adequate penalty-phase investigation of this issue, these limitations were "not brought to light at the time he was sentenced to death." *Id.* As discussed earlier, Mr. Sears' underlying crime was also a serious one, with significant parallels to Mr. Nelson's. Notwithstanding the nature of Mr. Sears' crime, the Supreme Court concluded that trial counsel's failure to investigate the issue of their client's neurological impairments amounted to prejudicial ineffective assistance of counsel entitling Mr. Sears to a new penalty phase.

The facts of *Sears* on the issue of brain damage seem indistinguishable from those presented by Mr. Nelson's up to and including their respective performances on specific testing instruments such as the Stroop Word Interference and the Trail-Making B testing instruments. *See Sears*, 130 S.Ct. at 3263; testimony at T2.390; T4.674-675; 676-680.[12] As in *Sears*, had Mr. Nelson's mitigation case been properly investigated and presented to the jury, "[c]ompetent counsel should have been able to turn some of the adverse evidence into a positive – perhaps in support of a cognitive deficiency mitigation theory." 130 S.Ct. at 3264. Such evidence, as further noted in

---

[12] Although Dr. Martell adopted the questioner's assertion at the hearing that the test results on the Color-Word portion of the Stroop was two standard deviations from the norm (T4.676), the actual tests results (P86 at 20) establish that Mr. Nelson T-Score was 22, nearly three standard deviations from the norm. (T4.651-53.) As Dr. Martell noted, a T-Score of 50 is the mean and scores of 40, 30, and 20 respectively represent one, two or three standard deviations from the mean. (*See, e.g.,* T4.677, 679.) *See also* Muriel D. Lezak et al., <u>Neuropsychological Assessment</u> 166-67 (5th ed. 2012). With regard to the Stroop test in particular, *see id.* at 416-18.

*Sears*, "might not have made Sears any more likable to the jury, but it might well have helped the jury understand Sears and his horrendous acts . . . ." *Id.* So too here.

*Porter v. McCollum*, *supra*, is another case in which the Supreme Court found trial counsel had provided ineffective assistance for failing to investigate and prepare a constitutionally adequate penalty case. The circumstances of Mr. Nelson's case present an even stronger basis for relief. As in this case, Porter's counsel conducted no investigation of potential neurological deficits despite numerous red flags suggesting their potential presence. *Porter*, 558 U.S. at 32. *Unlike* this case, however, when the matter proceeded to a post-conviction hearing, the prosecution's experts disputed the findings of Porter's neuropsychologist, challenged certain of the tests that were utilized and concluded only that they "could not . . . rule out brain disorder." *Id.* at 36. In this case, of course, the findings of brain damage were consistent for both defense and prosecution experts. According to the Government's mental health expert, this example of "convergent validity" suggests an especially high degree of reliability.

C. <u>Advising defendant, in 2001, to refuse an evaluation by the Government's experts</u>.

The evidence that Mr. Nelson refused to participate in a mental-health examination at the advice of counsel – principally Mr. Berrigan – is undisputed. Both Mr. Berrigan and Ms. Hunt confirmed that that was the case. (T1.67, 1.70, 1.107-109, Hunt; T1.234-36, 1.265-66, Berrigan.) Each also believed that had Mr. Nelson been advised to cooperate in the investigation, he would have done so. (T1.67, Hunt; T1.236, Berrigan.) In essence this was a decision made by counsel to no discernible

tactical end. Mr. Berrigan rejected any suggestion that he was attempting to create an appellate issue, stating, "No. These cases are to be won in trial, not in appeal. It's way too late in the appellate proceedings." (T1.270.) Ironically, had Mr. Nelson been allowed to undergo a government examination, his pre-existing brain damage would have emerged as it did via Dr. Gelbort's testing in 2005 (P53) and Dr. Martell's later assessment in 2008. (P54.)

Throughout the hearing, the government raised with various counsel the issue that Mr. Berrigan actively litigated the propriety and conditions of a government evaluation of Mr. Nelson and devoted many hours to researching and writing on the issue. (*E.g.*, T1.182; 253-55.) The Government's point seems to be that Mr. Berrigan's lack of attention to the mitigation investigation may be excused because of the time he was spending (wasting, really) on this issue. The reality, however, is that litigation took place in a vacuum since the defense had not investigated Mr. Nelson's mental health and had no mental health case to present or protect. At the 2255 hearing, Mr. Berrigan conceded that at the time Mr. Nelson, on the advice of counsel, refused to cooperate in the Government's mental health examination, the defense "had no neuropsychological exam or mental health evidence to offer . . . ." (T1.268.) Ms. Hunt, in fact, could not understand why Mr. Berrigan was "making such a big deal of it since we hadn't done any evaluations. We'd done nothing." (T1.94.)

The chronology prepared with regard to the issue of the defense mental-health investigation (P79) shows that a Rule 12.2-type notice was filed well *before* the defense had even engaged an expert and that the expert in question – Daniel Foster, Psy.D. – saw Mr. Nelson on consecutive days over a single weekend one month before

trial and never completed his evaluation. (P8 at 4.) As stated in his report, "[W]e were unable to complete an evaluation. Our time was spent primarily in trust-building and history taking." (P8 at 4.) Mr. Berrigan, for his part, did not consider what Dr. Foster did as a complete or comprehensive mental examination of Mr. Nelson. (T1.239.) The only purpose of Dr. Foster's preliminary report – which was faxed to counsel the night before the case went to the jury – was to preserve, for reasons that are unclear or poorly thought out, a "proffer" of what his testimony would have been. (T1.255.) As stated, the faxed report of Dr. Foster was, by its own terms, incomplete and preliminary.

Mr. Berrigan's view that he did not want to have a jury hear the last word as rebuttal from government experts (an experience derived from cases he had tried in the state courts of Missouri (T1.227)) does not justify counsels' failure to investigate the issue. Mr. Berrigan could have as easily advised Mr. Nelson to submit to a Government examination since any defense mental-health evidence could be withdrawn if that evaluation were deemed harmful and the Government's experts would not be permitted to testify since their sole purpose was to rebut any defense case. Mr. Berrigan understood he retained that option. (T1.267.)

If Mr. Berrigan's views on this issue were deemed "reasonable," it would mean that counsel would *never* explore the issue of mental-health-based mitigation. There was no strategic component to this failure at all. Indeed, Mr. Berrigan did not even consider the possibility that the government's selected mental-health experts would uncover significant mental-health mitigation since they were "government guys." (T1.237.)

D. <u>Defense counsel's failure to develop and present a comprehensive mitigation case or request a continuance to do so</u>.

When Mr. Berrigan was scheduled to undergo quintuple bypass surgery in early August 2001, the issue of a continuance came front and center and Mr. Berrigan, Ms. Hunt and Mr. Nelson met to discuss the need for a continuance of the trial date. (T1.66.) Ms. Hunt and Mr. Nelson believed a continuance was needed. (T1.68.) However, at the end of the discussion, Mr. Berrigan simply announced that no continuance would be requested. (T1.67.) Mr. Berrigan noted that, looking back, he can see they were not ready for trial. (T1.231.) Nonetheless, he felt bound by the fact that he had accepted an appointment in the case with the tacit understanding that he would not seek a further continuance, noting, "That was the basis on which I had agreed to get involved in the case." (T1.231.) He also did not believe that the court would continue the case, even if a motion to continue was filed. (T1.232.) Despite the fact that, as a result of his coronary bypass surgery he did little work in the case in August (T1.207), he was loathe to use his personal health issues as a reason to continue the date. (T1.233.)

It is apparent from a review of the record that the defense was not ready to proceed to trial in the fall of 2001. Mr. Berrigan had assumed sole responsibility for the mitigation aspect of the case, but spoke to the mitigation specialist, Tena Francis, only two or three times between entering the case in February 2001 and Mr. Nelson's sentence of death nine months later. (T1.206.) Contrary to what was his usual practice, Mr. Berrigan did not supervise or interact at all with Ms. Francis. (T1.272.) Also atypical of Mr. Berrigan's past experience working with mitigation specialists,

was that he received no assistance from Ms. Francis or her organization at the penalty-phase itself stating, "[u]niformly in my experience, the mitigation investigator has always been there when the penalty phase is ongoing." (T1.205.)

Ms. Francis first became involved in the case in late November 2000 and was not appointed until February 2001. The FPD had assumed sole responsibility for the mitigation aspects of the case until that office withdrew, due to a conflict, in August 2000. That office – and in particular AFPD Larry Pace – was involved in the preparation and trial of another federal capital case throughout the spring of 2000. (T3.619-20.) The individual responsible for the mitigation investigation in the FPD's office was Ron Ninemire, a former federal probation officer working as a fulltime investigator with the FPD. Mr. Ninemire, however, had no formal training as a mitigation specialist and later told Ms. Hunt that he really did not believe in the concept of mitigation. (T1.112.) As Ms. Hunt observed, a mitigation specialist who does not believe in mitigation "isn't going to be much help in a capital case." (*Id.*) His friend and colleague, AFPD Larry Pace, described Mr. Ninemire as a "mitigation investigator," not a mitigation specialist. (T3.615-16.)

Despite the fact that Ms. Francis' usual practice was to see the client "as often as possible" (T3.478), and despite recognizing that the client is the most important single source of information, she visited Mr. Nelson only twice, on consecutive days shortly after Mr. Berrigan's entry into the case. (T3.477.) Neither she nor any member of her staff ever saw Mr. Nelson again. (T3.478.) Although Mr. Nelson, in his first interview with Ms. Francis, broached the fact that he had been sexually abused, that issue was never followed up. (T2.351; 3.477.) Mr. Berrigan assumed Ms. Hunt was in

contact with Ms. Francis; Ms. Hunt assumed the opposite. Mr. Berrigan's billing records (summarized at P-17A) confirm that he was so busy with other matters that he was able to devote little time to the preparation of Mr. Nelson's case.

By the summer of 2001, it was obvious that the mitigation "team" was such in name only. Ms. Francis testified that, other than her one visit to Kansas City, she was too busy on other matters to do anything but play a supervisory and administrative role in the investigation. (T3.482.) Apparently unknown to Mr. Nelson's counsel, after the initial meeting in February 2001 with Mr. Berrigan and Ms. Hunt in Kansas City, it had been Ms. Francis' intention all along to turn the investigation over to her employee Deborah Haddad. (T3.480.) Matters slid further downhill as a result of a dispute between Ms. Hunt and Ms. Haddad which led to Ms. Haddad's refusal to continue working on the case after her visit to Kansas City in March 2001. (T3.481-82.) At that point, no one from Ms. Francis' office was working on the mitigation case and Ms. Francis herself could not step back into the case because of her own commitments in other cases. (T3.482.) For his part, Mr. Berrigan, who had assumed sole responsibility for the mitigation case, seemed oblivious to the fact that no one was working on developing the mitigation case and never pushed Ms. Francis, for example, to engage with the client. (T3.490.)

In May 2001, Ms. Francis provided a first draft of a chronology and social history, neither of which was ever updated or supplemented. (P9 at 34-57.) Mr. Berrigan acknowledged reviewing the documents and then putting them to the side without apparent further action. (T1.213-14.) Virtually no investigation was conducted on the paternal side of Mr. Nelson's family and the jury never learned of

the extensive mental and social pathology that formed Mr. Nelson's genetic makeup. Although at the hearing in this case the Government repeatedly made note of the extensive documentation that had been collected, the reality is that at the penalty phase of Mr. Nelson's trial in the fall of 2001, none of those documents were utilized.

While Ms. Francis' organization billed for a substantial number of hours for work performed in the summer of 2001, an examination of her billing records (P33-36A) shows that little substantive work was being accomplished. There is no evidence of any continuing effort to gather documents, locate additional witnesses, or to update the first draft of the chronology and social history. There was no contact between the defense team and the mitigation investigator or her employees for nearly the entire summer leading up to the trial. (T3.490.) By the end of the summer of 2001, a third person – Lisa Murphy – had come onboard. She had no training in social work and her role was limited to locating potential witnesses and setting up interviews for trial counsel. (T3.492.)

The testimony of Jill Miller, MSSW, and her comprehensive social history and mitigation findings (P38; P38A) illustrate just how incomplete this mitigation investigation was when the case came to trial. And, while it is true, as the Government suggested during the hearing (T2.375), that more time can always produce a broader investigation, that suggestion obscures the fact that the investigation in this case barely scratched the surface and ignored important and obvious areas of investigation, including a complete failure to investigate the paternal (Morse) side of Mr. Nelson's family. As Ms. Miller noted, Mr. Nelson is the product of multiple generations on both sides of a family (Morse and Nelson) where mental

illness, substance abuse, domestic violence, criminality, mistreatment of women and inappropriate and criminal sexual behavior were common. (T2.345.)

At the penalty trial in 2001, trial counsel did present the jury with some testimony about Mr. Nelson's childhood. The focus, however, was more on Nancy Nelson's difficulties than her son's. Without a fully-developed social history and a mental health expert to explain the impact of the type of abuse and neglect suffered by Keith Nelson, counsel ran the unacceptable and unnecessary risk that the jury would dismiss this kind of evidence as amounting to the "abuse excuse," as the prosecutors in fact argued. (*See* discussion of closing arguments *infra*.)

Due to the severity and degree of the trauma suffered by Mr. Nelson throughout his development, an expert (such as Leslie Lebowitz, Ph.D., whose testimony at the hearing was unchallenged) could have explained that Mr. Nelson's experiences represented much more than a garden variety case of child abuse or neglect. (T2.527-551; report, P67.) Instead, what Keith Nelson experienced as a child, especially as a child with compromised neurological functioning, forever shaped and determined his future and the adult he would become.

The nature and quality of the maltreatment Mr. Nelson endured at the hands of adults charged with caring for him, had the subject been properly investigated and presented, should have weighed heavily on life's side of the balance. Indeed, the kind of chronic and severe abuse inflicted on him actually alters the brain's development. (P67 at 14.) Some of the brain-related behaviors that result from a chronically abusive and neglectful home include impulsivity, aggression, the inability to consider alternative behaviors, and criminality. *Id.* at 15. Of his brothers, Mr. Nelson was

particularly susceptible to the harms that emanated from their painful childhood, because of his cognitive impairments and developmental delays. *Id.* at 17, 24. Sexual abuse produces particularly toxic effects, including an increase in the likelihood that the victim will later become the perpetrator of a sexual crime. *Id.* at 16.

The superficial mitigation presentation in this case presents a clear example of the state of affairs described in *Wiggins* where "counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Wiggins v. Smith*, 539 U.S. at 524. There is a reasonable probability that one or more jurors, presented with a full and accurate picture of Mr. Nelson's life and impairments, would have struck a different balance.

## IV - THE GOVERNMENT'S IMPROPER CLOSING ARGUMENTS: INEFFECTIVE ASSISTANCE OF TRIAL AND APPELLATE COUNSEL.

### A. The improper arguments and trial counsel's failure to object.

In this case, the prosecutors – without a word of objection from the trial attorneys or subsequent appellate challenge – unleashed upon the jury an emotional and incendiary closing presentation that incited the jury to act out of emotion, anger, hatred, and vengeance. The improper arguments included, but are not limited to, the following:

*INITIAL CLOSING ARGUMENT*
*FROM TRANSCRIPT OF 11/28/2001*:

- The Government argued that the jury should vote for death because, "If this crime doesn't call for the death penalty, what crime does?" (T1113.)



Case 4:04-cv-08005-FJG Document 267 Filed 10/20/14 Page 33 of 40

- The Government argued that the jury should vote for death because, "We need to protect our children. We need to send a message to guys like the defendant . . . ." (T1113.)

- The Government argued that the death penalty should be imposed because, "The community cries out for justice." (T1114.)

- The Government argued that legally appropriate and relevant mitigating evidence was "all this excuse testimony" and a "guilt trip." (T1123, 1124.)

- The Government argued that the jury should impose a death penalty simply because the Government recommended it "without reservation." (T1128.)

*REBUTTAL ARGUMENT*
*FROM TRANSCRIPT OF 11/28/2001*:

- The Government argued that the case was about the "slaughter" of "our children." (T1155.)

- The Government argued that legally appropriate and relevant mitigating evidence was "an excuse," "the blame game," "the abuse excuse," and an effort by trial counsel to claim the crime was "somebody else's fault." (T1156.)

- The Government argued that the mitigating evidence was not worthy of jury consideration since it didn't "explain why" the crime occurred. (T1158.)

- The Government argued that Movant was "a rotten human being." (T1158.)

- The Government argued that defense counsel's efforts to persuade the jury of mitigating evidence was "a smoke screen" and an attempt to "divert [the jury] from what this case is really about, the slaughter of an innocent." (1158-59.)

- The Government argued that defense counsel's efforts to persuade the jury of mitigating evidence masked counsel's true motive, *i.e.*, "What they want you to do is have him escape justice." (T1159.)

- The Government argued that mercy was weakness. (T1159.)

- The Government argued that Appellant was "evil at his core." (T1161.)

- The Government argued that jurors should rely on the prosecution's experience and expertise, and positioned the case as a referendum on capital punishment by telling the jury, "There is no clearer call for the death penalty than there is in this case," and, later, "If not him, who? If not now, when? If killing and

raping a kid isn't enough, then we don't need a death penalty. We don't need a death penalty." (T1161; 1163.)

- The Government argued that the jury should impose a sentence of death since the jury "represent[ed] the people of the United States in this case . . . ." (T1162.)

- The Government argued that the jurors should close their eyes and re-live the horrors of the victim's last hours, calling upon the jury to "Think about . . . what that little girl was thinking," and to imagine, "What was she thinking?" and to "Imagine what she experienced in that last part of her life," and to "Close your eyes, and . . . envision [the abduction and murder]." (T1161-62.)

- The Government argued that a verdict of death was the only just verdict and that the jurors were "the dispensers of justice," and that the victim's mother "Waits for you to give her some justice. And justice in this case can only be had by imposing a sentence of death," essentially suggesting to the jury that a sentence of death should be imposed because that's what the victim's survivors wished. (T1162.)

- The Government argued that, "[T]he death penalty was enacted for crimes like this." (T1163.)

Trial counsel objected to none of these egregious excesses. For Ms. Hunt's part, she saw this as not her responsibility since Mr. Berrigan had presented the defense summation. She testified, "I mean I could have passed him a note to say object, but it was his job or duty to stand up and object at that point." (T1.79.) Mr. Berrigan agreed that the arguments were improper, but offered no reason, tactical or otherwise, for not objecting. (T1.243.)

The arguments were without a doubt improper. At the time of Mr. Nelson's trial, remarks such as those quoted above had been repeatedly condemned. *See, e.g., Caldwell v. Mississippi*, 472 U.S. 340 n.7 (1985) (death sentence vacated because prosecutor's improper closing argument during penalty phase made it appear to jury that responsibility for the death penalty would be borne by appellate court rather

than by jury itself); *United States v. Johnson*, 968 F.2d 768 (8th Cir. 1992) (Improper to ask jury to send a message) ; *United States v. Lee,* 743 F.2d 1240 (8th Cir. 1984); *United States v. Solivan*, 937 F.2d 1146 (6th Cir. 1991); *United States v. Arrieta-Agressot*, 3 F.3d 525 (1st Cir. 1993) (Improper to enlist jury in "war on drugs"). Moreover, this was a capital case and, as the Eighth Circuit recognized in *Copeland v. Washington*, 232 F.3d 969, 974 n. 2 (8th Cir. 2000), "[i]f there is any distinction between guilt and penalty-phase arguments, it would seem that there should be a more searching review of the penalty phase as the Eighth Amendment is implicated." More recently in *Weaver v. Bowersox*, 438 F.3d 832 (8th Cir. 2006), *cert. granted*, 127 S.Ct. 763 (2006), *cert. dismissed*, 2007 U.S. LEXIS 6082 (U.S. May 21, 2007), the Circuit noted that "send a message" arguments are particularly prejudicial when made in the penalty phase of a capital case because they violate the defendant's Eighth Amendment right to an individualized sentencing determination. It is improper to argue that a death sentence should be imposed because that is what the surviving victims wish. *Payne v. Tennessee*, 501 U.S. 808 (1991).

At a minimum, defense counsel should have objected to the comments as they were being made and sought a mistrial or a strong cautionary instruction that directed the jury to disregard the improper exhortations that return a verdict of death for reasons grounded in emotion, anger, hatred and vengeance. Instead, nothing was said or done and the jury went into the jury room with the prosecutors' words ringing in their ears and emerged with a unanimous death verdict.

B. Ineffective assistance of appellate counsel for failing to raise this issue.

As a matter of Fifth Amendment Due Process, a defendant is entitled to the assistance of counsel on the direct appeal of a criminal conviction. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). That assistance must be effective. *See, e.g., Carter v. Bowersox*, 265 F.3d 705, 715-16 (8th Cir. 2001). A defendant prevails on such a claim where there is "'a reasonable probability that the result of the direct appeal would have been different if the argument had been made.'" *Id.*, quoting *Chambers v. Bowersox*, 157 F.3d 560, 566 (8th Cir. 1993).

The failure of the appellate representation in this case can be explained by a virtually complete lack of communication between Mr. Nelson's appellate counsel. Jennifer Herndon testified that she believed her co-counsel, Susan Hunt, was handling several issues that would have included the improper closing arguments. (T1.116; 134.) Ms. Hunt testified that she believed her role was limited to a change-of-venue argument. (T1.81.) Neither testified that there was any conscious decision to exclude any particular argument.

Appellate counsel, particularly Ms. Herndon, agreed that the government's closing argument was improper in several different respects (T1.118) and that these instances were not isolated but occurred throughout the government's closing argument. (T1.123.) Appellate counsel agreed that examples of this improper argument included "send a message" arguments (T1.119), misleading the jury into believing they did not have responsibility for sentencing the defendant to death (T1.120-22), calling the defendant evil (T1.123-24.) and equating the return of a life sentence with weakness (T1.125). Appellate counsel also agreed that these were

significant and obvious issues that were stronger than some of those actually raised in the brief. (T1.126). Appellate counsel did not make a strategic choice to omit these arguments and agrees that they should have been raised on appeal. *Id.* Had the issue been raised there is a reasonable probability that Mr. Nelson's sentence of death would have been vacated on appeal.

The failure of trial counsel to object in the first instance, and the failure of appellate counsel to raise this issue on appeal, were each instances of ineffective assistance of counsel that prejudiced Mr. Nelson.

## CONCLUSION

For the reasons discussed above, Mr. Nelson did not receive effective assistance of counsel at his capital trial in 2001. He was prejudiced by that failure and there is a reasonable probability that at least one juror would have struck a different balance had the mitigation case been properly investigated and presented. Mr. Nelson's appellate counsel failed to raise meritorious issues that would have led to a different result on appeal. For either or both of these reasons, a new penalty-phase is required.

Respectfully submitted,

Counsel to Movant Keith Nelson

*/s/ David A. Ruhnke*
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
(973)744-1000
(973)746-1490 (fax)
dr@ruhnkeandbarrett.com

*/s/ Paula K. Harms*
Jon M. Sands, Federal Public Defender
Paula K. Harms, Capital Habeas Unit
850 W. Adams Suite 201
Phoenix, AZ 85007
(602)382-2756
paula_harms@fd.org

*/s/ Gary E. Brotherton*
Legal Writes, LLC
503 E. Nifong Blvd. #377
Columbia, MO 65201-3717
(573) 474-0773
(573) 474-0003 (fax)
gebrotherton@legalwrites.com

Filed via ECF: Kansas City, MO
October 20, 2014

## CERTIFICATE OF SERVICE

This will certify that, on today's date, this document was served on the United States by filing via ECF.

/s/ *David A. Ruhnke*
DAVID A. RUHNKE

Dated: October 20, 2014