**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| KEITH D. NELSON, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | No. 04-08005-CV-W-FJG |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

# GOVERNMENT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

The United States of America, by Tammy Dickinson, United States Attorney, and the undersigned Assistant United States Attorneys, all for the Western District of Missouri, files the following proposed findings of fact and conclusions of law relating to movant Keith D. Nelson's motion filed under 28 U.S.C. § 2255.

## I. Summary

The Eighth Circuit remanded this case so that a hearing could be held, and findings of fact and conclusions of law could be made, regarding six specific allegations of ineffective assistance of trial and appellate counsel alleged by Nelson. To be entitled to relief on his claims of ineffective assistance of trial counsel, Nelson must prove that defense counsels' performance was (1) unreasonably deficient, and (2) that he suffered such prejudice from the deficient performance that there is a reasonable probability the result would have been different – he would have received a life sentence rather than death. *See Roundtree v. United States*, 751 F.3d 923, 925 (8th Cir. 2014) (citing *United States v. Taylor*, 258 F.3d 815, 818 (8th Cir. 2001)).

Failure to establish either prong would be fatal to Nelson's claims. *Worthington v. Roper*, 631 F.3d 487, 498 (8th Cir. 2011) (citing *Strickland v. Washington*, 466 U.S. 668, 697 (1984)).

Nelson cannot meet this burden regarding any of the allegations he makes. Contrary to testimony from defense counsel that they simply "dropped the ball," the record reflects that defense counsels' actions were quite thorough and based on trial tactics designed to achieve the best outcome possible for Nelson. Specifically in regard to the mental health of their client, defense counsel made conscience decisions to limit Nelson's exposure to being examined by Government mental health experts based on their reasoned belief and experience that such evidence would be very harmful to the presentation of Nelson's defense. Counsel also chose to not utilize the monies approved for a neuropsychologist and to move forward with the trial as scheduled, believing that ample mitigation evidence had been collected which would provide the jury with the evidence needed to convince them to return a verdict imposing a life, not death, sentence. Furthermore, while the Government's closing arguments may have involved colorful words, those arguments were not inflammatory, but rather painted a vivid picture based on the gruesome crime Nelson committed. Even assuming, arguendo, that there was some improper argument in the trial of this case, Nelson is unable to establish prejudice from those arguments. Instead, the evidence properly before the jury that supported imposition of the death penalty was simply overwhelming.

Defense counsels' testimony about "dropping the ball" is the latest tactic employed to achieve Nelson's goal of avoiding the death penalty. This tactic is easy to argue in hindsight, but is nothing more than after-the-fact, second-guessing and completely ignores the thoughtful decisions previously reached. This type of tactic is insufficient to establish ineffective assistance of counsel in this matter when the record supporting their trial and appellate decisions is so

voluminous and stands in stark contrast to their testimony at the § 2255 hearing. Consequently, the Government asks this Court to discount the self-serving testimony given during the § 2255 hearing and rely on the record and the court's own observations about the representation in this matter. To do this, the court will necessarily need to make credibility findings against counsels' hearing testimony; thereby finding the testimony to be the latest tactic used to defend Nelson and reject Nelson's unfounded criticism of his trial and appellate representation.

When viewed critically, the mental health and mitigation evidence adduced by post-conviction counsel was no more than previous counsel had discovered and presented at trial. Post-conviction evidentiary testimony was more detailed, to be sure, but covered essentially the same material, but with different witnesses. This evidence was gathered over nearly a decade after the original trial and simply provided a degree more of evidence, but nothing particularly new. It is axiomatic to suggest that with more time, more can be done. That has been done here, but in so doing, there is nothing to suggest that the evidence discovered and presented at the original trial was insufficient. To the contrary, based on the evidentiary presentation at the § 2255 hearing, it is clear that the mitigation case for Nelson was well-developed at trial.

## II. Discussion

### A. ***Procedural History***

On October 12, 1999, ten-year-old Pamela Butler was kidnapped by the movant, Keith D. Nelson, in broad daylight from near her Kansas City, Kansas, home while she was roller skating. Two days later, a complaint was filed charging Nelson with kidnapping. On October 15, 1999, Pamela Butler's dead body was recovered from the woods near a church in Grain Valley, Missouri.

One week later, on October 21, 1999, a federal grand jury in the Western District of Missouri returned a two-count indictment charging Nelson with kidnapping resulting in death, in violation of 18 U.S.C. § 1201, and transportation of a minor for sexual relations resulting in death, in violation of 18 U.S.C. § 2241. The Government subsequently filed a "Notice of Intent to Seek the Death Penalty." Nelson pleaded not guilty to both charges.

Nelson was represented at trial by Patrick Berrigan and Susan Hunt, two highly-experienced litigators who specialize in the field of criminal defense.[1] Patrick Berrigan was then and is now, an experienced death penalty litigator. He previously worked for the State Public Defender System and was assigned to the Capital Crimes Section. Though he was in private practice when he represented Nelson in this matter, Berrigan has since returned to the State Public Defender System and is assigned, once again, to the Capital Crimes Section. On appeal, Nelson was represented by Ms. Hunt and Jennifer Brewer, both experienced appellate counsel.

On May 10, 2001, the Government filed a motion for the discovery of mental health evidence to be used in the penalty phase of the capital trial and seeking a court-ordered mental health evaluation. Thus, protracted litigation commenced on the manner, means, and identity of any Government-sponsored mental health evaluation. Nelson, through counsel, fought a delaying action on when, if, and how such a mental health evaluation would be conducted.

[1]When Nelson was first charged, he was represented by Dan Franco, who entered his appearance as retained counsel on October 20, 1999. By all accounts, Mr. Franco provided companionship, but no legal representation. On October 21, 1999, Larry Pace with the Federal Public Defender's Office was appointed as learned counsel. Mr. Pace took over primary case responsibility and used his investigator, Ron Ninemire, to assist him with his investigation. On November 2, 1999, Bill Shull and Susan Hunt were also appointed to represent Nelson under the C.J.A. Mr. Pace developed a conflict in the case and on July 28, 2000, filed a motion to the Court to be removed. Ron Ninemire collected the investigative file materials and provided them to Mr. Shull and Ms. Hunt sometime around September 12, 2000. By November of 2000, Nelson began losing confidence in Mr. Shull, who was eventually removed from the case in February 2001. On February 20, 2001, Patrick Berrigan was appointed to be learned counsel.

(Depo. Exh. 219.)[2] Eventually, after losing the battle regarding whether the Government would be able to conduct its own mental health evaluation, Nelson, upon advice of counsel, refused to meet with the Government's experts. On October 18, 2001, Magistrate Judge Sarah W. Hays held a status conference and discussed with Nelson the consequences of failing to submit to the Government mental health evaluation. Nelson acknowledged his refusal to cooperate and indicated on the record that he understood that the decision was his, and his alone to make, and that he knew the district court may preclude him from adducing mental health evidence if he continued to refuse participation. (Evid. Hrg. Exh. 64.) On October 23, 2001, this Court held a hearing to discuss whether Nelson would be able to use mental health evidence at trial in light of his refusal to cooperate with the Government's mental health evaluation. This Court indicated that exclusion of evidence was likely. (Evid. Hrg. Exh. 66.) On October 26, 2001, this Court excluded mental health evidence. (Evid. Hrg. Exh. 68.)

Trial dates were set and continued several times. On February 16, 2001, Patrick Berrigan filed a motion to continue the trial from the April 2001 docket until the October/November 2001 docket to conduct further investigation on the mitigation phase. (D.E. 193.) The trial date was moved to October 29, 2001. On October 25, 2001, Nelson pleaded guilty to Count One of the indictment, which charged him with kidnapping resulting in death. During his guilty plea, Nelson agreed that at the time he committed this crime he was not suffering from a mental disease or defect that would exclude his criminal responsibility, nor make him incompetent to enter into his guilty plea. (Plea Tr. 21.) Under the terms of the plea agreement, the case would proceed to a penalty trial to begin on November 5, 2001. (*See* Plea Agreement dated October 25, 2001, D.E. 338.)

---

[2] "Depo. Exh." refers to an exhibit used during the deposition of Patrick Berrigan taken on October 19, 2012.

On October 28, 2001, Nelson ingested a non-fatal quantity of pills. He was taken from his place of confinement at CCA to a hospital for treatment and observation. On October 31, 2001, defense counsel filed both a motion for a continuance and a motion for a competency examination.

On November 7, 2001, this Court heard evidence from Assistant Warden Moore, CCA, that Nelson told Assistant Shift Supervisor Allen that he had no intention of killing himself, but "that in a case like his, the name of the game, or the idea is to postpone, postpone, postpone." Assistant Warden Moore testified that Nelson had made a similar statement to Correctional Officer Taylor. (Nov. 7 Hrg. Tr. 12-13.)[3]

This Court hired psychiatrist Dr. William Logan to examine Nelson for purposes of assisting the court in determining whether there existed sufficient doubt about Nelson's competency. Dr. Logan reported that Nelson had both a rational and a factual understanding of the charges and could assist his attorneys in preparation of his defense. He further reported that Nelson suffered from depression, but was not currently suicidal. (Logan Hrg. Tr. 5.)[4] Defense counsel, acquainted with Dr. Logan's qualifications, recommended that (1) Dr. Logan be appointed as a mental health treatment professional for Nelson; (2) that he be allowed to prescribe any medications for him that he adjudged necessary (Logan Hrg. Tr. 11, 15-16); and (3) that the trial proceed on schedule, barring any delays attributable to medication and assuming no further issue of competency. (Logan Hrg. Tr. 16.)

On November 13, 2001, a jury was selected to hear the penalty proceedings of the case, which began on November 19. On November 28, the jury returned a verdict of death against

---

[3]"Hrg. Tr." refers to the hearing held before Judge Gaitan on November 7, 2001.

[4]"Logan Hrg. Tr." refers to the testimony of Dr. William Logan, held November 7, 2001, before Judge Gaitan.

Nelson for the kidnapping and subsequent murder of Pamela Butler. Judgment was imposed by this Court in accordance with the jury's verdict, and on March 12, 2002, Nelson was sentenced to death.

Nelson appealed his conviction and sentence to the Eighth Circuit Court of Appeals in Case No. 02-1757. He raised the following issues on direct appeal:

1. Whether Nelson received a fair trial by an impartial jury when the district court properly denied Nelson's: (a) motion for change of venue; (b) motion for sequestered jury; and (c) motion for additional peremptory strikes;

2. Whether the district court conducted a constitutionally effective voir dire that reasonably assured Nelson's right to a fair and impartial jury;

3. Whether the district court properly denied Nelson's challenges for cause and properly granted the Government's challenges for cause;

4. Whether the district court properly instructed the jury on the correct legal standards that it was to use in deliberating on a just verdict; and

5. Whether the district court properly admitted victim impact evidence.

On October 22, 2003, Nelson's conviction and sentence were affirmed in *United States v. Nelson*, 347 F.3d 701 (8th Cir. 2003).

On November 8, 2004, the United States Supreme Court denied Nelson's petition for a writ of certiorari in Case No. 03-10620. *See Nelson v. United States*, 543 U.S. 978 (2004).

Nelson then filed a motion to vacate his sentence under 28 U.S.C. § 2255. He alleged a multitude of issues and sub-issues (nearly 60 in total) that he claimed warranted an order vacating his sentence. He alleged his rights guaranteed by the Fifth and Sixth Amendments of the United States Constitution and the laws of the United States were violated because the performance of both his trial and appellate counsel fell below an objective standard of reasonableness under prevailing professional norms, and there was a reasonable probability that,

but for counsels' unprofessional errors, the result of the proceedings at trial and on appeal would have been different. This Court denied Nelson's claim without holding a hearing. Nelson filed a certificate of appealability, which the Eighth Circuit granted in part, remanding the case to district court with directions to hold an evidentiary hearing and make findings of fact and conclusions of law on six of the approximately 60 issues regarding trial and appellate counsels' representation. The allegations of trial counsel's constitutional ineffectiveness were (a) failure to conduct adequate mitigation investigation including failure to move for a continuance to complete one; (b) failure to conduct adequate investigation of Nelson's mental health; (c) advising or instructing Nelson to decline to submit to a mental health examination by a government examiner; and (d) failure to make an objection to allegedly inflammatory and improper comments in the Government's closing argument and rebuttal. The allegations of appellate counsels' constitutional ineffectiveness included (a) failure to conduct adequate review of the trial record and the law; and (b) failure to raise on appeal the Government's allegedly improper comments in closing argument. *Nelson v. United States*, 297 Fed.Appx. 563, 565-66, 2008 WL 4697018, *2 (8th Cir. 2008).

## ***B. Death Penalty Trial***

### *1. Aggravation Evidence*

On September 29, 1999, Nelson picked up James Shannon Robinson at a temporary labor service to do construction work. (Trial Tr. 90-91.)[5] During the day they spent working together, Nelson revealed to Mr. Robinson that he wanted to kidnap a female, take her to a remote location where he could torture her, rape her, electrocute her, and then kill and bury her. (Trial Tr. 95.) Nelson bragged that he was going back to the penitentiary anyway, and "wanted to go for

[5] "Trial Tr." refers to the evidence presented during the death penalty phase trial held before the Honorable Fernando J. Gaitan, Jr. on November 19-28, 2001.

something big." (Trial Tr. 96.) Mr. Robinson did not report this to the authorities at the time because he simply did not believe Nelson. (Trial Tr. 99.)

Only ten days before the kidnapping of Pamela Butler on October 2, 1999, in the middle of the night, Nelson, holding a knife to the throat of Michanne Mattson, a medical student, attempted to drag her kicking and struggling from her apartment parking lot to his white Ford pickup. (Trial Tr. 105, 118, 146.) Ms. Mattson testified that she finally dropped limply to the pavement. Despite the fact that Nelson had managed to get handcuffs around one of her wrists, he could drag her no more, and he broke off the attack, warning her over and over, "If you look at me, bitch, I'll kill you." (Trial Tr. 115-16.) Nelson fled in his pickup truck.

Around 4:00 p.m., on Tuesday, October 12, 1999, Nelson told a friend of his that he knew where a 14-year-old girl was and that "right now is the time to get her, take her, kill her, rape her." (Trial Tr. 149.) A little over one hour later in Kansas City, Kansas, ten-year-old Pamela Butler left her home on her roller skates to go one and one-half blocks to the local gas station to buy some cookies and soda. (Trial Tr. 171-75, 188-89.) Her sister, 11-year-old Penny Butler, was playing on the front porch and watched her sister leave. (Trial Tr. 174.)

Meanwhile, a white Ford pickup, with the driver's door left ajar, had parked along Scott Street, the route Pamela had taken many times before. (Trial Tr. 61-63, 175.) She skated the same route home, and as she neared the pickup, Nelson "came up from out the truck and grabbed her and threw her in the truck and slammed the door." (Trial Tr. 176.) Seeing this, Penny Butler began screaming. (Trial Tr. 176, 189.) Hearing her screams, her teenage sister Casey Eaton came out of the house and looked to where Penny was pointing and saw a white pickup pulling away. (Trial Tr. 189.) As the pickup drove past the screaming girls, Nelson gestured to them with his middle finger. (Trial Tr. 177, 192.)

The sounds of the screams and the squealing of tires attracted the attention of Paul Wilt who was sitting in his truck visiting a friend nearby. (Trial Tr. 206.) Mr. Wilt gave chase and, although he eventually lost sight of Nelson's truck, he was able to get its license tag number – 177CE2. (Trial Tr. 210.)

Between 6:30 p.m. and 7:00 p.m. that same evening, Carl and Shirley Condra drove to their church, the Grain Valley, Missouri, Christian Church, on an errand. Parked behind the church was a white Ford pickup, license plate number 177CE2. The truck was unlocked and empty. Suspicious of the truck, they tried to find a police officer. Finding none, they went home. After seeing the 10:00 p.m. news of the abduction and description of the truck used, they immediately called the police. (Trial Tr. 69-70.)

Sometime around 8:00 p.m. or thereafter that same evening, Nelson drove to his mother's house in Kansas City, Missouri. (Trial Tr. 77.) He and his mother drove to the Oasis Bar which was a block and a half away from the victim Pamela Butler's home. (Trial Tr. 77.) While Nancy Nelson drank, her son played a video game. (Trial Tr. 89, 699.) After leaving the bar, they stopped at the gas station where Pamela Butler had bought her cookies and soda. Nelson purchased Pepsi and some cigarettes. (Trial Tr. 700-01.)

Nelson and his mother were at his girlfriend's house when the news was broadcast about Pamela Butler's abduction. Nelson registered no anxiety, no remorse, no grief, or other reaction. They left and returned to Nancy Nelson's residence. (Trial Tr. 77, 699-702.)

At around 11:00 p.m., Patti Griffith, the next-door neighbor to Nancy Nelson, saw Nelson on the passenger side of the white pickup wiping the dashboard and underneath areas while periodically glancing up and down the street. (Trial Tr. 220-22.) Later that same night,

Mrs. Griffith was awakened by a noise. When she looked out of her window, she noticed that the pickup truck was gone and that Nelson was pacing around in his yard. (Trial Tr. 223-24.)

Around 2:00 a.m., in the morning of Wednesday, October 13th, Nelson called for a cab. The dispatcher who took the call remembered him as calm, as "real cool" and "cool as a cucumber," even to the point of telling her a joke. (Trial Tr. 226-27.)

Around 9:00 a.m., on Wednesday morning, the white Ford pickup truck, license number 177CE2, was found abandoned ten blocks from Nelson's residence. (Trial Tr. 79.) The truck, which appeared to have been recently cleaned, had been left unlocked with the keys lying on the floorboard. (Trial Tr. 79-80, 252-53.) The manhunt for Nelson and the search for 10-year-old Pamela Butler continued throughout Wednesday with no success except for a brief sighting of Nelson in the vicinity of his girlfriend's home. (Trial Tr. 233-36.)

On Thursday, October 14th, Laurie Torrez, a civilian employee of the Kansas City, Kansas Police Department, took lunch to her husband at the Santa Fe rail yards and, taking a detour along the dike road (Trial Tr. 237-39), spotted Nelson under the 18th Street Bridge. She called the police. (Trial Tr. 240-41.)

Nelson had injured his leg while attempting to lower himself from the bridge and, being unable to escape, submitted to capture. (Trial Tr. 585-87.) Before a helicopter arrived to extract him from the area, a considerable crowd of watchers had assembled. (Trial Tr. 266-68.) From somewhere in the crowd, a voice yelled out, "What about the girl?" (Trial Tr. 268.) Nelson looked at Officer Keith, the arresting officer, and said, "I know where she's at, but I'm not saying right now." (Trial Tr. 269.) Nelson was airlifted to KU Medical Center for treatment for his injured knee. (Trial Tr. 270.)

Later that same day, a complaint was filed against Nelson for the kidnapping of 10-year-old Pamela Butler. Her body, however, had not yet been found. The information provided by Mr. and Mrs. Condra had prompted law enforcement to intensify searching efforts on the fields, woods, and ponds in the vicinity of the Grain Valley, Missouri, Christian Church.

On Friday, October 15, law enforcement personnel, searching shoulder to shoulder in the woods and fields east of the church, discovered the white sports bra Pamela had last been wearing. Nearby, they found her underpants, and then ten-year-old Pamela Butler's nude body was found buried under a pile of brush. (Trial Tr. 85, 285-93.) A wire ligature was wrapped around her throat. (Trial Tr. 303, 319.)

Results of the autopsy revealed numerous scrapes and abrasions and blunt trauma injury to Pamela Butler's mouth and head. (Trial Tr. 321-27.) Her hymen had been torn near the time of death and there was evidence of redness and irritation in the genital area consistent with a sexual assault having occurred. (Trial Tr. 327-29.) The cause of her death was strangulation. (Trial Tr. 329.)

Pamela Butler's underpants were submitted to the Federal Bureau of Investigation for DNA analysis. (Trial Tr. 87.) Examination revealed the presence of semen in the crotch area of her underpants. (Trial Tr. 345.) When compared to a sample of Nelson's blood, test results conclusively showed that he was the source of the DNA in the semen stain. (Trial Tr. 346.)

On April 5, 2000, the Government filed a notice of intent to seek the death penalty (amended June 9, 2000), alleging both statutory and non-statutory aggravators. Among the non-statutory aggravators alleged was that the offense was particularly cruel and involved serious mental and physical abuse to this child and that Nelson completely lacked remorse for having killed her. These allegations were most evident from the trial testimonies of inmate Frazier, who

described the torture cell Nelson intended to build in order to hold his victims captive before raping and killing them. (Trial Tr. 503-04.) Inmate Bailey testified that he overheard Nelson mimicking the child's "high-pitched screams . . . cries for mommy. Help me. Don't hurt me. Don't kill me." (Trial Tr. 362.) In obvious disgust, Bailey asked Nelson "[h]ow could [he] do that to that little girl?" Nelson simply responded, "You wouldn't believe it." (Trial Tr. 363.)

In addition to the horrific facts of the case, the jury heard evidence about the uniqueness of victim Pamela Butler and the impact of her death on the lives of her family, and that Nelson had, among other things, three prior Missouri state convictions for stealing and a conviction for attempted escape from custody. (Trial Tr. 475-77.) Other evidence presented included information that while in custody on this offense at CCA, Nelson talked about escaping (Trial Tr. 518-19), he unraveled a section of the prison fencing (Trial Tr. 520-21), and he fashioned two workable handcuff keys. (Trial Tr. 424-26.) Nelson threatened to mace his State probation officer (Trial Tr. 486), and while at CCA, in an unprovoked assault, he beat a correctional officer (Trial Tr. 455) and threatened to kill yet another correctional officer. (Trial Tr. 589.)

*2. <u>Mitigation Evidence</u>*

Nelson called numerous mitigation witnesses to testify during the sentencing phase of his trial. The witnesses included his mother, aunts, siblings, former teacher, principal, family, friends, a landlord, prison guards, an employer, a former babysitter and her daughter, and an expert forensic psychologist who specializes in mitigation defense in capital cases. Nelson also introduced a recorded conversation with a girlfriend who is the mother of Nelson's child. These witnesses each testified about the difficult circumstances of Nelson's childhood and his neglectful, alcoholic mother, and abusive, absent father.

The first witness was Nelson's mother, Nancy Nelson, who testified in detail concerning Nelson's violent and abusive father, Kenneth Morse. She told the jury that that Morse frequently beat her and was also abusive to her boys. She described for the jury in disturbing detail how on one occasion Morse tied her up and shocked her with an electrical cord. Morse would also lock her in closets in their home. Ms. Nelson moved her and the children, including Keith, to California and Texas to get away from Morse. She also testified that Keith was diagnosed with dyslexia and was a poor student, he frequently had fights and behavior problems in school, and he had a bed-wetting problem well into his teen years. The jury also heard Ms. Nelson admit that she was an alcoholic and that two of her children were schizophrenic. Ms. Nelson told the jury that because she had to work long hours to support her children she was frequently away from the home, which required the boys to take care of themselves. As a result, the boys often got into trouble at school and in the community. (Trial Tr. 598-694.)

Mary Smith, Nelson's aunt (Nancy Nelson's sister), testified that she and Nancy's stepfather were both abusive alcoholics. She told the jury that Kenneth Morse, Nelson's father, regularly beat Nancy and that he would also lock her up in the home. Ms. Smith helped Nancy and the kids get away from Morse when they moved to California and Texas. Ms. Smith also testified about Nelson's disadvantaged and difficult childhood. (Trial Tr. 712-24.)

Georganna Romero, another aunt (also Nancy Nelson's sister), testified that Morse beat and tortured Nancy and related how on one occasion Morse tried to electrocute Nancy. Ms. Romero described the poor living conditions of Nancy Nelson's home in Texas and further described how the house smelled of urine. (Trial Tr. 725-38.)

Irene Wood testified that she helped Nancy Nelson and her five boys get a home, clothing, and personal items when they moved to Texas. She conveyed the poor conditions of

Nelson's childhood in Texas. Ms. Wood also insisted that Nancy Nelson use the last name of Smith so that Morse could not locate her in Texas. (Trial Tr. 740-49.)

Melvin Lister, a guard at the Community Corrections of America (CCA) federal holding facility in Leavenworth, Kansas, testified that he worked in the segregation area of CCA when Nelson was housed in that facility. Lister told the jury that Nelson was frequently threatened and harassed by other inmates at the facility. (Trial Tr. 749-57.) Lieutenant Bruce Roberts, another CCA employee, also testified that Nelson was frequently verbally harassed by other inmates. During the 25 months that Nelson had been housed at CCA, he had never tried to escape. Roberts did not consider Nelson to be a threat while he was housed at CCA. (Trial Tr. 767-84.)

Kenneth Nelson, Nelson's twin brother, testified he was a satellite communications maintenance operator and installer in the U.S. Army, and described his career in the U.S. Army as a successful career. He graduated from high school with a 3.69 grade point average. Kenneth told the jury about his family's disadvantaged and impoverished childhood, and described an abusive boyfriend of his mother, Nancy Nelson. He and Keith would frequently burglarize and steal from homes when they lived in Texas. Kenneth also told the jury that his mother seriously neglected him and his brothers. He said that his mother was never around and that she was always at the bar working or drinking alcohol. Kenneth straightened his life out when he moved back to Missouri and lived with his aunt and uncle, where he became involved in high school football, worked at a grocery store as a stocker, and subsequently did well in school. (Trial Tr. 798-839.)

David Cunningham, Nelson's employer, testified he owned a basement waterproofing business. Cunningham described Nelson as a pleasant employee and a good worker. He felt that Nelson was reliable and conscientious when working for his business. (Trial Tr. 849-55.)

The defense also played a recorded conversation to the jury between Nelson and his girlfriend, Kerri Dillon. The phone conversation was recorded when Nelson called his mother who then patched Ms. Dillon into a third-party phone call. The conversation was recorded by CCA officials as a part of a routine practice in which all phone conversations of inmates are recorded. In the conversation, among other things, Ms. Dillon and Nelson discussed her recent pregnancy by Nelson. In the conversation, Nelson also appears to express remorse for his involvement in the murder of ten-year-old Pamela Butler. He tells Ms. Dillon of his intent to tell law enforcement authorities of his involvement in the crime. Nelson states in the conversation as follows: "I'm just gonna do the right thing for once in my life." (Trial Tr. 861.)[6]

Steven Nelson, Keith Nelson's youngest brother, testified that he was employed as an engineer and was successful in his career. Following high school, Steven attended DeVry Institute in Kansas City and had a 3.9 grade point average. He described his disadvantaged childhood in Texas and further described how his mother Nancy neglected him and his brothers. Steven also described Keith's bed-wetting problem, told the jury his mother was never home and was either working or drinking, and that he and his brothers had to take care of themselves most of the time. (Trial Tr. 863-87.)

Gene Thompson was the landlord for the Nelson family when they lived in Texas. He testified that the Nelson family lived in Section 8 housing, and described the poor, unkempt conditions of the Nelson home. Thompson told the jury that when the Nelson family left the rental property it was in extremely poor condition. (Trial Tr. 895-903.)

Rhonda Monroe, a former babysitter in Texas, testified she was the babysitter for the Nelson children when Nancy Nelson was at work. Nancy Nelson would bring the children to

---

[6]The recorded conversation was played for the jury's consideration of mitigation evidence.

Ms. Monroe's home and leave them when she went to work. Ms. Monroe testified Keith Nelson had a bed-wetting problem, and that her husband would punish Keith by spanking him with a belt. Her husband was an alcoholic, and was very abusive towards Keith and his brothers and that they were scared of her husband. When her husband was home the Nelson boys would be required to stay in one room in her home. If they left the room her husband would spank the boys with a belt. (Trial Tr. 904-16.)

Jennifer Monroe, Rhonda Monroe's daughter, testified that the Nelson boys were always required to stay in one room when her mother was babysitting them. Her stepfather, Billy Reese, was always spanking the boys with a belt. She said that the Nelson boys were extremely afraid of her stepdad. (Trial Tr. 919-27.)

Ellen Crutsinger, a former teacher of several of the Nelson boys in Texas, testified that Keith was in a special education class and that he struggled while in school. She further described Keith helping a crippled girl in a wheelchair while in elementary school. Keith would push the girl around the school grounds in her wheelchair and that they developed a friendship. Ms. Crutsinger further testified that Nancy Nelson never attended the "meet the teacher" nights at the school. (Trial Tr. 928-36.)

Michael Griffith, a former neighbor of the Nelsons in Texas, testified that Nancy Nelson was never at home and the boys were frequently left alone to fend for themselves. Mr. Griffith did little things to try to help the Nelson family such as doing plumbing repairs at no charge. He testified that the Nelson house was always messy and unclean. He also told the jury that Nelson's brothers would make fun of him because of his bed-wetting problem. (Trial Tr. 940-51.)

Homer Dear, Nelson's former school principal and also a former Texas State Representative, testified that he knew the Nelson family when they were living in Texas and he was their principal at an elementary school. Mr. Dear believed the Nelson boys were physically and mentally abused. He described the Nelson family as a very poor family and further described how he had tried to help them. He described the poor hygiene of the Nelson boys and told the jury how he would require the boys to take showers and would give them clothing at the school. Mr. Dear bought clothes for the boys at a store on at least one occasion. He also visited the Nelson home and described the house as unclean. (Trial Tr. 951-59.)

Finally, Nelson called expert defense witness Dr. Mark Cunningham to testify on his behalf. Dr. Cunningham is a clinical and forensic psychologist who frequently testifies as a mitigation and sentencing expert in capital cases around the United States. He testified concerning the effect of childhood abuse and neglect on Nelson's character and development. In his lengthy testimony, Dr. Cunningham explained to the jury how the squalid conditions and abusive and violent nature of Keith Nelson's childhood affected the formation of Nelson's character. Dr. Cunningham also told the jury that Nelson would be less violent as he aged. (Trial Tr. 964-1025.)

*3.* <u>*Verdict*</u>

On November 28, 2001, the jury received the case, deliberated, and returned a unanimous verdict that death should be imposed, finding unanimously that all aggravating factors submitted had been established, with only one juror finding the existence of but a single mitigating factor. (*See* Special Verdict Form, D.E. 420.)

## *C. § 2255 Evidentiary Hearing*

### *1. Defense Team's Mitigation and Mental Health Investigations*

Susan Hunt and Bill Shull talked about the need for a mitigation investigation to investigate statutory and non-statutory mitigating factors, and noted that records must necessarily be gathered. Ron Ninemire, at the direction of Larry Pace, was leading the mitigation investigation. (Evid. Tr. 26.) After assessing where they were in the preparation of their case, the defense team filed a continuance motion on July 20, 2000, in order to receive additional time to get the mitigation case, including the mental health issues, ready. (Evid. Tr. 31-32.) The trial was continued to April 23, 2001. (*See* Evid. Hrg. Exh. P26; D.E. 119, 121; Evid. Tr. 36.)

Hunt traveled to Texas and California to conduct mitigation investigation. In California, Hunt attempted to obtain records demonstrating that Nancy Nelson had lived in a battered women's shelter back in Sacramento (Visalia), California. When Larry Pace and Ron Ninemire were still on the case, Ninemire was the chief investigator in connection with the mitigation investigation. Ninemire was gathering records, and interviewed several people in White Settlement, Texas. (Evid. Tr. 91.) Ninemire chronicled the team's various investigative efforts and after being removed from the case because of a conflict, created a detailed letter dated September 12, 2000, which documented a to-do list of what had been done and what needed still to be done. (Evid. Tr. 88.) That letter was passed along to Bill Shull and Hunt as Nelson's remaining counsel. (Evid. Tr. 88-89.)

During his testimony, Shull stated that he was familiar with the circumstances of Nelson's birth – him being the second born of twins and possibly being a fetal/alcohol baby, as well as Nelson's sudden personality change in the 9th grade, and extended bed wetting.

(Evid. Tr. 153.) Shull had knowledge that fetal alcohol syndrome could lead to neurological damage or impairments. (Evid. Tr. 154.)

After Ninemire was removed from the case, defense counsel obtained the services of two different investigators, Dan Grothaus and Tim Murphy. (Evid. Tr. 49; Evid. Hrg. Exh. P38 at 79.) Grothaus was a former investigation journalist and documented his progress. (Evid. Hrg. Exh. 10.) By letter dated October 25, 2000, Grothaus kept the defense team informed about his investigation. (Evid. Tr. 89-90.) As the investigation progressed, the defense team secured funding from the court to retain Tena Francis, a seasoned death penalty mitigation investigator. On September 19, 2001, in a sealed motion to this Court, defense counsel and Tena Francis indicated that "extensive mitigation work on the case" had been completed. Correspondingly, in the billing hours of Tena Francis, Patrick Berrigan, and Susan Hunt, it is clear that this statement is true.

As early as the spring of 2000, the defense team was aware that mental health would play a significant role in this case. Larry Pace testified that mental health is always an important consideration in a death penalty case. (Evid. Tr. 608.) In support of a motion to continue the trial, defense counsel informed this Court that two of Nelson's brothers had been diagnosed with schizophrenia and that further mental health evaluations needed to be completed. (Evid. Tr. 33.) In a note from her files regarding a defense team meeting on November 17, 2000, Ms. Francis chronicled the team's discussion of obtaining a neuropsychologist. (Evid. Tr. 40-41.) Consequently, Dr. Dennis Cowan, who was local and highly recommended, was hired. (Evid. Tr. 42.) By December 12, 2000, Dr. Mark Cunningham was hired to review the records that had been collected and to serve as a "teaching witness" on Nelson's traumatic background for the jury. (Evid. Tr. 43-44.)

During the representation, Hunt spent the majority of her time litigating a request to change venue and, based on her scientific background, obtaining an expert to review the Government's forensic evidence (since Nelson was adamant that he did not rape the victim). To advance Nelson's position on this issue, Hunt ultimately sought and obtained a forensic pathologist to examine DNA seminal stains and who reviewed the autopsy reports. (Evid. Tr. 51.) Berrigan, however, began handling the bulk of the mitigation responsibilities, including the mental health issues. Berrigan believed that a neuropsychological examination needed to be done and was aware that Dr. Cowan had been approved by this Court. Dr. Cowan was poised to conduct an examination and evaluation of Nelson. (Evid. Tr. 196.) Berrigan's CJA worksheet (Evid. Hrg. Exh. P17A) indicates that he called Dr. Cowan the day before the evaluation was scheduled to occur and canceled it. (Evid. Tr. 198.) Berrigan testified that he canceled Dr. Cowan's evaluation because he had had prior experience with Dr. Cowan (good and bad) and thought that he could obtain someone with more of a national reputation. (Evid. Tr. 199.) Additionally, Berrigan had just gotten appointed to the case (within two weeks) and did not feel the need to use an expert chosen by another attorney. Berrigan admitted that he wanted to wait and do the mental evaluation later in the case, once he knew more about the case and at a time when he had a better handle on the discoverability of what he uncovered. (Evid. Tr. 199-200.)

Berrigan never commissioned a neuropsychological evaluation and testified that "we dropped the ball. It should have happened. Other things came up to the forefront, and I never got back to it. There's no excuse, really no excuse at all." (Evid. Tr. 200.) The record clearly establishes that after Berrigan was appointed to the case, he filed a number of motions on how, when, and if the Government would be allowed to conduct a mental health evaluation of Nelson. Once this Court ordered the evaluation, Berrigan systematically objected to the manner in which

the evaluation would be conducted and attempted to have the court intervene on what subjects, if any, the Government could question Nelson about. The litigation in this area began in May 2001 and continued until after Nelson pled guilty. Berrigan testified that he had past bad experiences in death penalty cases with mental health evidence and indicated that ". . . the problem with neuropsych testing is certainly if you don't talk about the defendant's history, that's going to be the subject of cross-examination by the government prosecutors. If you had a neurologist, that really isn't part of their job. I mean, somebody who's just doing, for example, objective medical testing, such as brain imaging, doesn't really have occasion to have any discussion with the client about their history or the events of the alleged crime." (Evid. Tr. 219.) Tena Francis testified and her records confirm that Berrigan was skeptical about a neuropsychological examination and wanted more objective testing, or something along the lines of a neurological evaluation. Finally, Berrigan explained that the discoverability of mental health evidence was not well-settled under federal law at the time of Nelson's trial (2001). While on the witness stand, this Court asked Berrigan to explain his concern with the Government's examination of Nelson's mental health. Berrigan explained that in 2000 in state court, the law was that if defense put on mental health evidence, the Government would have the opportunity to examine the defendant. In Berrigan's experience, if the Government put on its psychologist in the penalty phase, it "was devastating testimony" and he lost his case. (Evid. Tr. 227.) Consequently, Berrigan wanted to delay any examination, so as to not give the Government additional, damaging evidence.

2. *Decision to Not Ask For a Trial Continuance*

In the summer of 2001, Berrigan had health issues that necessitated heart bypass surgery which took place on August 8, 2001. Berrigan and Hunt had a meeting at CCA with Nelson

about Berrigan's surgery. Nelson wanted the trial continued so that Berrigan could have time to recover, but Berrigan decided that he was not going to ask for a continuance. (Evid. Tr. 66-67.) Hunt testified about Berrigan's decision to not file a continuance motion with Nelson, stating that Berrigan assured her that he could get everything done, and Hunt and Nelson accepted Berrigan's decision. (Evid. Tr. 110.) Whether she ultimately agreed with the decision to proceed to trial or not, Hunt never informed this Court that she was concerned about Berrigan's health, nor did she express any concerns about whether or not the defense team was ready to go to trial and, correspondingly, never filed for a continuance on her own.

In regards to his surgery, Berrigan said, it "depends on how you look at it." It [the trial] was set for a couple of months after his surgery, and as he "look[s] back on it now, of course, I know I wasn't ready. . . . I wasn't ready, but I guess I didn't particularly assess whether I was ready or not after having bypass surgery." Berrigan testified that he thought "we were going to trial in October, period" – there was "never a promise . . . it will be continued eight months, nine months, a year." (Evid. Tr. 231-32.) Berrigan testified that he just lost a bunch of time, but he is not sure even if he had asked for a continuance he would have used his health as a reason. No continuance was ever filed. (Evid. Tr. 234.) After his surgery, Berrigan testified that he was able to devote a significant amount of time in terms of getting up to speed for Nelson's case. (Evid. Tr. 263.)

Nelson never made the magistrate or district judge aware of his concerns that his case was not going to be ready for trial.

*3.* *<u>Advising Nelson to Decline Examination by Government Expert</u>*

Another issue on remand was the circumstances under which Nelson refused to be evaluated by mental health experts. Berrigan was aware that the Government had sent Dr. Dan

Martell and Dr. Park Dietz to see Nelson at CCA and that Nelson refused to see Dr. Martell (and would have refused to see Dr. Dietz). (Evid. Tr. 234.) Berrigan testified that he was familiar with Dr. Martell (neuropsychologist) and Dr. Dietz (psychologist) and that both doctors had a national reputation. Berrigan's main concern about these two experts was that they would be biased against his client and would therefore be "pro-government." Berrigan believed they would testify in a way that would effectively refute Nelson's defense and he did not want them to be the last witnesses the jury heard from before beginning deliberations. Berrigan indicated that those fears, in part, were the reason why he engaged in a protracted litigation to prevent the Government from being able to conduct its own mental health evaluation. (Evid. Tr. 264.) In the end, Dr. Cunningham was able to provide some expert mental health testimony about Nelson, but did so from a review of the records, rather than an interview with Nelson. Consequently, Nelson was able to prevent the mental health testimony he feared, but was able to introduce some mental health evidence that discussed his horrible childhood environment.

Berrigan admitted that he had an "excellent" relationship with Nelson. Berrigan recommended that Nelson plead guilty to the charge and then proceed to trial on the penalty phase of the case. Berrigan hoped that in so pleading, Nelson would incur some empathy or sympathy from the public by taking responsibility for what he had done and, hopefully, obtain a better result on the sentence. That strategy, ". . . turned out to be a disastrous decision, but this decision regarding not speaking to Dr. Dietz and Dr. Martell was unequivocally my very strong advice to Mr. Nelson based on my experience, . . . and he followed it, as he did almost everything else I asked him to do." (Evid. Tr. 235.) Berrigan further explained that the advice to not submit to an interview ". . . was the strategic decision I made, and I advocated it very

strongly." (Evid. Tr. 265.) Nelson could have gone against that advice, but did not. (Evid. Tr. 265-66.)

*4. No Objection to the Government's Closing Argument*

Berrigan testified that in retrospect, he should have objected to portions of the Government's closing argument, but he did not. He further stated that that his notes reflected that an objection would have been proper, but none was forthcoming. Berrigan was unable to offer an opinion on why an objection was not raised during the trial.

*5. Appellate Counsel Representation*

When the case was set on the appeal schedule, Berrigan moved to withdraw and asked that his former co-worker at the State Public Defender System, Jennifer Brewer, be appointed to handle the appeal. Brewer handled a number of death eligible cases at the state and federal level and was focusing on appellate work. Consequently, she was appointed. Berrigan stated that he has great admiration for Jennifer Brewer and her appellate work. (Evid. Tr. 247.) He did not meet with her to discuss issues regarding the appeal, but he did hand her his trial notes. (Evid. Tr. 248.) Hunt maintained the appointment and continued to represent Nelson on appeal with Brewer.

Brewer had more capital case experience (trial and appellate) than Hunt and was located in St. Louis, while Hunt was in Kansas City. (Evid. Tr. 80.) Brewer was aware that this was Hunt's first capital trial. After being appointed, Brewer and Berrigan met face-to-face, with Berrigan giving Brewer his transcript and parts of the file to use for appeal preparation. (Evid. Tr. 132.) Hunt talked with Brewer via e-mail or phone. (Evid. Tr. 80-81.) Brewer went through and reviewed the trial transcripts, reading them completely to determine what issues she thought should be argued in the appeal. (Evid. Tr. 133.) Brewer testified that these issues were

"sort of, I don't know, complex or technical, capital-specific issues, issues I had drafted before or issues that I had experience with in capital litigation." (Evid. Tr. 138.) Brewer stated that she believed that Hunt was going to draft the "more guilt-phase related issues or issues that didn't require any particular capital experience." (Evid. Tr. 138.) Brewer stated that she was familiar with the ABA guidelines for capital counsel, explaining that every possible issue should be explored that has some merit. (Evid. Tr. 117.) Hunt acknowledged that when page limitations are factored in not all possible issues are raised but your best issues. (Evid. Tr. 86.)

There was a division of labor between Brewer and Hunt on the appellate brief. Hunt was handling the change of venue issue, statement of facts as relating to that issue, and some other issues involving jury selection, while Brewer was handling all appeal issues relating to the penalty phase. They communicated mostly via e-mail, sending drafts back and forth to each other. They applied for, and were granted, several extensions by the Eighth Circuit. (Evid. Tr. 81.) During the deposition taken in anticipation of the § 2255 hearing, Brewer accused Hunt of malfeasance by not handling the other appellate issues that were her responsibility. (Evid. Tr. 83.) Hunt denied the accusations and stated that those responsibilities were in fact Brewer's.

This dispute arose because each attorney believed the other should have raised additional issues on appeal. Hunt believed that Brewer should have prepared the issues because she was the more experienced appellate and capital litigator, while Brewer alleged that the responsibility was Hunt's. Brewer did not keep any documentation or notes with respect to the division of labor with Hunt on the brief. Brewer's account of the responsibilities in this matter is at odds with the fact that she was the editor of the brief. In other words, it was her responsibility to collect the parts each worked on, then put them together in a single coherent document. Consequently, Brewer was the last person to set eyes on the brief. She would have seen it

deficient, if indeed it was, and could have simply asked the court of appeals for an extension of time. Given the nature of the case (it being a capital matter), the request would have no doubt been granted. Brewer hides behind a docket entry that indicates that no further extensions will be allowed. The problem with this position is that on one previous occasion, in this very appeal, Brewer had been told that no further extensions would be allowed, but she nonetheless asked for a continuance and, miraculously, received it. (Evid. Hrg. 136.) Additionally, during her testimony, Brewer acknowledged that she was communicating with the appellate court right up until the time the brief was filed. (Brewer Depo. Tr. 81.)[7] The need to do so was driven by the fact that Nelson's brief was overlong and Brewer needed the court's authority to obtain permission to file a longer than anticipated brief. (Brewer Depo. Tr. 79-81.) Of course, that Court granted her request. Through these contacts Brewer never chose to ask for additional time to file the brief later, to supplement the brief, or to file a Rule 28(j) letter. (Evid. Tr. 139.) Brewer knew it was her duty to advocate for her client and that even if a court told her she could not do something, she was still free to ask. Despite this knowledge, Brewer never asked for a further extension of time to prepare Nelson's brief, so it can be fairly concluded that she was satisfied with the brief she authored, signed, and filed and that she now expresses regret retrospectively, only after being unsuccessful. Like Berrigan's after-the-fact statements about dropping the ball, Brewer's testimony constitutes unbelievable gamesmanship that should be viewed for what it is; her latest tactic to aid her client.

## III. Ineffective Assistance of Counsel Claims

To establish a claim of ineffective assistance of counsel, a defendant must prove that his attorneys' performance was deficient and that the deficient performance prejudiced his defense.

[7]The deposition occurred on October 12, 2012, and Jennifer Herndon was formerly known as Jennifer Brewer.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). Deficient performance is that which falls below the "range of competence demanded of attorneys in criminal cases." *Id*. at 687 (internal quotations and citation omitted). The standard is an objective one, viewed in light of professional norms prevailing when the representation took place. *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) (per curiam); *Strickland*, 466 U.S. at 686. The court must consider "whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688. To establish prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. That showing requires a defendant must establish a "reasonable probability that a competent attorney, aware of the available mitigating evidence would have introduced it at sentencing, and that had the jury been confronted with this mitigating evidence, there is a reasonable probability that it would have returned with a different sentence." *Wong v. Belmontes*, 558 U.S. 15, 20 (2009) (per curiam) (quoting *Wiggins v. Smith*, 539 U.S. 510, 535, 536 (2003)) (internal quotations and alterations omitted).

Thus, to establish prejudice, a defendant must show a reasonable probability that the jury would have rejected a capital sentence after it weighed the entire body of mitigating evidence (including the additional testimony defense counsel could have presented) against the entire body of aggravating evidence (including the testimony from the Government's mental health experts). Nelson cannot meet this burden regarding any of the allegations he raises regarding his defense counsels' effective assistance and decisions on mitigation and mental health issues. The record of defense counsels' actions show that the team discussed, and at that time, made decisions to limit Nelson's exposure to being examined by government mental health experts, to not utilize the monies approved for a neuropsychologist, and to provide the jury with the wealth of evidence

already collected to sway the jury to impose a life sentence rather than the death penalty. Hindsight by defense counsel, or second-guessing those decisions are not sufficient to establish ineffective assistance of counsel, much less prejudice, particularly in light of the strength of the facts of the case surrounding the specific planning and acts Nelson engaged in to kidnap and murder Pamela Butler.

Nelson further cannot show ineffective assistance or prejudice regarding appellate counsels' representation. Even if, arguendo, some of the Government's closing argument could have been deemed objectionable, Nelson cannot show prejudice, as the evidence supporting the jury's decision to impose the death sentence was simply overwhelmingly strong.

### *A. Allegations of Trial Counsel's Constitutional Ineffectiveness*

Claims alleging ineffective assistance of counsel are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). "This standard requires [the applicant] to show that his 'trial counsel's performance was so deficient as to fall below an objective standard of reasonable competence, and that the deficient performance prejudiced his defense.'" *Nave v. Delo*, 62 F.3d 1024, 1035 (8th Cir. 1995) (quoting *Lawrence v. Armontrout*, 961 F.2d 113, 115 (8th Cir. 1992)). This analysis contains two components: a performance prong and a prejudice prong.

> Under the performance prong, the court must apply an objective standard and "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance," *Strickland*, 466 U.S. at 690, while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. *Id*. at 689. Assuming the performance was deficient, the prejudice prong "requires proof 'that there is a reasonable probability that, but for a counsel's unprofessional errors, the result of the proceeding would have been different.'"

*Lawrence*, 961 F.2d at 115 (quoting *Strickland*, 466 U.S. at 694).

Failure to satisfy both prongs is fatal to the claim. *Pryor v. Norris*, 103 F.3d 710, 713 (8th Cir. 1997) (no need to "reach the performance prong if we determine that the defendant suffered no prejudice from the alleged ineffectiveness"); *see also DeRoo v. United States*, 223 F.3d 919, 925 (8th Cir. 2000).

In evaluating counsel's conduct, the court should avoid "the distorting effects of hindsight," *Strickland*, 466 U.S. at 689; and "try to evaluate counsel's conduct by looking at the circumstances as they must have appeared to counsel at the time." *Rodela-Aguilar v. United States*, 596 F.3d 457, 461 (8th Cir. 2010) (quotation omitted). A court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. (quoting *Strickland*, 466 U.S. at 689).

*1. Failure to Conduct Adequate Mitigation Investigation, Including Failure to Move for a Continuance to Complete One*

The record of the actual work done by the defense team in preparation of presenting mitigation evidence to the jury belies Nelson's claim that his defense team failed to conduct an adequate mitigation investigation, and there was no need to ask for a continuance of the trial to conduct additional mitigation work. First of all, there was the extensive mitigation investigation performed by Ron Ninemire, mitigation investigator with the Federal Public Defender's Office, who conveyed the work he had done to defense counsel Susan Hunt in a letter dated September 12, 2000. (Evid. Tr. 88.) In her testimony at the evidentiary hearing, Susan Hunt said that in his letter, Mr. Ninemire's investigation found that Nelson and his brothers were physically and/or sexually abused during their formative years by their mother and men she brought into the home, that Nelson had been hospitalized immediately after his birth, and that some of his brothers suffered from schizophrenia. Furthermore, Mr. Ninemire suggested that further investigation should include a psychiatric examination of Nelson. (Evid. Tr. 113.)

Once Ninemire was removed from the case because of an office-related conflict, the defense team was able to retain the services of two separate investigators, Dan Grothaus and Tim Murphy. Grothaus and Murphy were then able to assist defense counsel in furthering their investigation. As the investigations matured, the defense team applied for and was given authority to hire Tena Francis, a highly experienced and qualified mitigation investigator. Francis was located in Texas, which was an area in this case that a significant amount of investigation needed to be done in because Nelson resided there in his youth. Francis obtained additional records of Nelson's birth, abusive upbringing, lack of educational achievement, and other mitigation issues. She provided the defense team with a binder of this information before trial, and this information was presented to the jury for their consideration of whether a life or death sentence should be imposed. Testimony by Nelson's family and others during the penalty phase included evidence of Nelson's background and possible medical issues that the jury considered in determining whether or not these mitigation circumstances outweighed the aggravating factors submitted by the Government. Nothing in the additional testimony given during the evidentiary hearing added to the mitigating evidence put on during the original penalty phase. Thus, this claim fails, and defense counsel's representation was sufficient to establish that they provided effective assistance to Nelson.

2. *Failure to Conduct Adequate Investigation of Nelson's Mental Health*

As the record reflects, there was a pre-trial discussion between Tena Francis and Berrigan that Berrigan had some hesitation or fear of a neuropsychological test of Nelson because Berrigan did not want Nelson exposed to government experts. (Evid. Tr. 500.) There were "red flags" that mental illness was an issue – multiple people and records suggested mental illness on

both the Nelson and Morse sides of Nelson's family – Tena Francis thought should be explored. (Evid. Tr. 502.) There was ample evidence of mental health issues. (Evid. Tr. 502.)

During the evidentiary hearing, defense expert witness Dr. Carolyn S. Crawford testified that information/studies on areas of brain injury and brain damage was not available in 2001 – she could testify in terms of risk factors, but she could not have offered this same testimony (i.e. the lingering effects of prenatal and neonatal insults) based upon her review of the records back in 2001. (Evid. Tr. 525.) Dr. Reuben Gur, neuropsychologist with a specialty in brain imaging and behavior, testified that in his testing there is no comparative value for the lesion found in Nelson's brain imaging by looking at Exhibit P80 at 11. (Evid. Tr. 600-01.) Consequently, with no baseline comparison value, his imaging looks nice, but really provides no useful information.

Dr. Dan Martell, a forensic neuropsychologist, which studies the brain and behavior, and particularly the effects of brain damage on human behavior, testified as a government witness. (Evid. Tr. 631.) He has published in the field of psychology and neuropsychology between 25-30 times in peer-reviewed journals, and testified hundreds of times in state and federal court in approximately 150 cases, 75 were federal cases. (Evid. Tr. 633.) Government Exhibit 118A is his CV, and Government Exhibit 118 is a copy of his report on Nelson. (Evid. Tr. 634.) He evaluated Nelson on September 9-10, 2010, for 91/2 hours at Terre Haute in a private, quiet room with only a steel table separating him from Nelson. (Evid. Tr. 635-36.) He previously attempted to evaluate Nelson earlier in the fall of 2001 at the Government's request, but Nelson refused to be evaluated. (Evid. Tr. 636.) Despite the level of brain impairment from the testing and examination, Dr. Martell testified that looking at Nelson's behavior in the course of committing the crime, there was no finding of impulsivity. Dr. Martell continued by stating that Nelson tried to carry out his fantasy on another victim, and when that did not work, he selected

another youthful, more easily controlled victim. Nelson laid in wait, hid himself, brought electrical cords to bind the victim, kidnapped her, he took off at a high rate of speed in such a way that people would not be able to see him or identify him. He took the victim to a secluded area, bound her up so she could not get away – these things, Dr. Martell argued, show planning as opposed to impulsive acting out. For those reasons, Dr. Martell did not believe that Nelson's brain damage played a significant role in him committing this crime. (Evid. Tr. 649.)

Contrary to Dr. Amador's report regarding Nelson's sanity as it relates to the McNaughton standards, Dr. Martell's opinion was that Nelson did not meet the standards with regard to knowing the wrongfulness of his behavior. Dr. Martell's opinion was based on the facts that Nelson laid down in the seat prior to the kidnapping, which showed that Nelson had the knowledge that he was planning to do something wrong and he did not want to get caught. (Evid. Tr. 650.) Additionally, Dr. Martell was persuaded by Nelson's efforts to get rid of incriminating evidence, such as wiping down the truck, throwing the victim's clothes into the lake in order to get rid of forensic evidence (trace fiber evidence that could link him to the crime), and scrubbing his fingerprints off. Dr. Martell testified that, "If you didn't know it was wrong, there's no reason to get rid of the truck, to wipe it down for evidence, to try and remove fibers from the crime scene that could identify him." (Evid. Tr. 650.)

Nothing in the evaluations from the other experts employed by Nelson subsequent to Dr. Martell's 2010 examination of Nelson (by Drs. Daniel Foster, Michael Gelbort, Natalia Novick Brown, and Xavier Amador, as well as the social history prepared by Jill Miller, the neonatology report prepared by Dr. Carolyn Crawford, the trauma report by Dr. Leslie Lebowitz, the MRI and PET results, the bio-imaging report of Dr. Reuben Gur, and the dermatological report (but not the one dated May 6, 2011) from Terre Haute done by Dr. Roger Jones) would

have changed Dr. Martell's evaluation or opinions. (Evid. Tr. 651, 656-58.) Dr. Martell knew that Nelson has two first degree relatives (brothers) who are diagnosed schizophrenics. (Evid. Tr. 662.)

So, even if defense counsel had employed these additional mental health experts to testify during the penalty phase, Dr. Martell's testimony would have strongly countered their testimony, and there is a reasonable probability that the jury would have come to the same conclusion – that Nelson's kidnapping and murder of Pamela Butler warranted a death sentence.

*3. Advising or Instructing Nelson to Decline to Submit to a Mental Health Examination by a Government Examiner*

The record shows that at the time of the trial, defense counsel made a conscious and strategic decision to not have Nelson submit to a mental health evaluation by a government expert. Berrigan testified that the reason behind that decision to advise Nelson to not consent to a mental evaluation was because he was concerned that Dr. Martell might testify about his neurological examination of Nelson, and thought that was a "bad idea." (Evid. Tr. 236.) Berrigan testified that he believed at the time that this decision regarding not speaking to Dr. Dietz and Dr. Martell was unequivocally "my very strong advice to Mr. Nelson based on my experience, . . . and he followed it, as he did almost everything else I asked him to do." (Evid. Tr. 235.) Berrigan supported this strategy by challenging the Government's ability to conduct its own mental health evaluation at every turn. Only when he was unsuccessful, did he reach the calculated, strategic decision to recommend to Nelson that he not cooperate with the Government's evaluation. Berrigan admitted that this strategy was a product of his professional experience handling a number of death penalty cases. In those cases, Berrigan explained, if the last thing the jury heard before beginning deliberations was the Government's mental health expert, he lost. Although Berrigan advised Nelson not to cooperate, it was ultimately Nelson's

decision alone whether or not he took the advice. Magistrate Judge Hays explained to Nelson, on the record, that by failing to cooperate with the Government's evaluation, he ran the risk of having his mental health evidence excluded from trial. Only days later, this Court told Nelson the same thing. In the face of these warnings, though, Nelson persisted in his decision to not participate.

In looking at the record in this case, Nelson's failure to participate is not surprising. During the original trial, Nelson petitioned this Court to be allowed to not come to court when hearings and status conferences were held. During the § 2255 hearing in this matter, he similarly asked for leave of the court to absent himself from the proceedings. It is convenient now for post-conviction counsel to allege deficient performance against Berrigan for recommending that Nelson not participate, when lack of participation is exactly what Nelson wants to do. Moreover, in prosecuting this § 2255 motion, current counsel similarly litigated the number of mental health evaluators the Government could use, whether video equipment would be allowed to be used, and what diagnostic tools would be allowed to be used. Fighting to keep Nelson from mental health experts is such an ingrained strategy it has been going on now for over a decade, so, to call Berrigan ineffective for employing a strategy still being used today should not be approved by this Court.

Contrary to his testimony at the evidentiary hearing that he "dropped the ball," Berrigan's decision was a thought-out strategic move to have Nelson exposed to less evidence that could result in the jury finding that the aggravating factors outweighed any mitigating factors, resulting in a hope that Nelson would receive a life sentence. The fact that Berrigan's strategy did not work does not equate with ineffective assistance of counsel. Thus, Nelson has failed to establish

that his defense counsel's representation was outside of the wide range of professionally competent assistance, and this Court should reject Nelson's claim.

4. *Allegations of Defense Counsel's Failure to Make Objections to Allegedly Inflammatory and Improper Comments in the Government's Closing Argument and Rebuttal, and Appellate Counsel's Failure to Conduct Adequate Review of the Trial Record and the Law and Raise On Appeal the Government's Allegedly Improper Comments in Closing Arguments*

A trial court is vested with broad discretion in controlling closing arguments and this Court will reverse a conviction only on a showing of abuse of discretion. *United States v. Coutentos*, 651 F.3d 809, 821 (8th Cir. 2011). "To obtain a reversal based on prosecutorial misconduct to which there was proper objection, a defendant must show that (1) the prosecutor's remarks or conduct were improper, and (2) the remarks or conduct affected the defendant's substantial rights so as to deprive him of a fair trial." *Id*. (quotes and citations omitted). Where there was no contemporaneous objection to statements alleged to be misconduct the appellate court reviews for plain error. *Coutentos*, 651 F.3d at 822. Under plain error review, to obtain relief, a defendant must show (1) that there was error; (2) that the error was plain; and (3) that it affected the defendant's substantial rights. *Id*. The appellate court assesses the prejudicial effect of misconduct by considering: (1) the cumulative effect of the misconduct, (2) the strength of the properly admitted evidence of the defendant's guilt, and (3) the curative actions taken by the trial court. *Id*.

Prosecutorial misconduct claims are generally subject to the standard set forth in *Darden v. Wainwright*, 477 U.S. 168 (1986), and *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974). Under *Darden*, a prosecutor's conduct amounts to constitutional error only if it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 643). The quantum or weight of the evidence is

crucial to determining whether the prosecutor's statements before the jury were so prejudicial as to result in a denial of due process. *Darden*, 477 U.S. at 182; *Donnelly*, 416 U.S. at 644. The Supreme Court instructs that "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context." *United States v. Young*, 470 U.S. 1, 11 (1985). "So long as prosecutors do not stray from the evidence and the reasonable inferences that may be drawn from it, they, no less than defense counsel, are free to use colorful and forceful language in their arguments to the jury." *United States v. Robinson*, 110 F.3d 1320, 1327 (8th Cir. 1997); *United States v. Shoff*, 151 F.3d 889, 893 (8th Cir. 1998) (the prosecutor may use "colorful pejoratives" and argue his interpretation of the evidence). In addition, in closing argument, a prosecutor is entitled to make a fair response and rebuttal when the defense attacks the Government's case. *See United States v. Ziesman*, 409 F.3d 941, 954 (8th Cir. 2005). "Unless calculated to inflame, an appeal to the jury to act as the conscience of the community is not impermissible." *United States v. Sanchez-Garcia*, 685 F.3d 745, 753 (8th Cir. 2012) (quotation omitted) (The concluding statement that the trial had compelled the jury "to see terrible things, disgusting things," was fair comment on the trial evidence.).

Here, having the jury close its eyes to visualize the crime was not for the purpose of diverting it from deciding the case based on the relevant evidence concerning Pamela Butler's kidnaping and murder. Rather, the prosecutor's closing argument was for the purpose of the jury having a complete and clear picture of the heinousness of the crime as told by the evidence as instructed in Special Verdict Form under number 3 in Section III, the "Statutory Aggravating Factors." There was no error, plain or otherwise, in the district court's control of the closing arguments in this hard-fought trial.

In *United States v. Mullings*, 446 F.3d 750 (8th Cir. 2006), the Eighth Circuit concluded that "We bear in mind that fleeting comments that passed without objection during the rough-and-tumble of closing argument in the trial court should not be unduly magnified when the printed transcript is subjected to painstaking review in the reflective quiet of an appellate judge's chambers. *Id*. at 758. Consequently, "[i]f an arguably improper statement made during closing argument is not objected to by defense counsel, we will only reverse under exceptional circumstances." *United States v. Eldridge*, 984 F.2d 943, 947 (8th Cir. 1993) (internal quotation omitted). Even if the prosecutors in Nelson's case made improper inflammatory statements, while some of these remarks may have been phrased colorfully, and a few straddle or cross the line of propriety, the appellate court could have concluded that when the comments are considered cumulatively and in the context of the trial, there is no plain error warranting relief. *See Mullins*, 446 F.3d at 758.

Respectfully submitted,

TAMMY DICKINSON
United States Attorney

By /s/ *Jeffrey Valenti*

JEFFREY VALENTI
DAVID M. KETCHMARK
LAJUANA M. COUNTS
Assistant United States Attorneys

Charles Evans Whittaker Courthouse
400 East 9th Street, 5th Floor
Kansas City, Missouri 64106
Telephone: (816) 426-3122

*Attorneys for Respondent*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was delivered on October 20, 2014, to the CM-ECF system of the United States District Court for the Western District of Missouri for electronic delivery to all counsel of record.

/s/ *Jeffrey Valenti*
Jeffrey Valenti
Assistant United States Attorney